1  MARTIN ANTONIO SABELLI - SBN 164772
Law Offices of MARTIN SABELLI
2  740 Noe Street
San Francisco, CA 94114-2923
3  (415) 298-8435
msabelli@sabellilaw.com
4

5  JOHN T. PHILIPSBORN - SBN 83944
Law Offices of JOHN T. PHILIPSBORN
6  507 Polk Street, Suite 350
San Francisco, CA 94102
7  (415) 771-3801
jphilipsbo@aol.com
8

9  Attorneys for BRIAN WAYNE WENDT

10

IN THE UNITED STATES DISTRICT COURT
11

FOR THE NORTHERN DISTRICT OF CALIFORNIA
12

SAN FRANCISCO DIVISION
13

14  UNITED STATES OF AMERICA,

15           Plaintiff,

16  vs.

17  JONATHAN JOSEPH NELSON, et al.,

18           Defendants.

| | |
|---|---|
| **Case No. CR-17-00533-EMC** | |
| **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO EXCLUDE GOVERNMENT'S PROPOSED ENTERPRISE EXPERTS' OPINION TESTIMONY AND FOR RELATED EVIDENTIARY HEARING** | |
| **Date: April 1, 2020** **Time: 9:30AM** **Dept: The Honorable Edward M. Chen, District Judge** | |

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES ISO BRIAN WENDT
MOTION TO EXCLUDE GOVERNMENT'S PROPOSED ENTERPRISE EXPERT
OPINION TESTIMONY AND FOR RELATED EVIDENTIARY HEARING**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................. iii

I.  INTRODUCTION ....................................................................1

II. DISCUSSION AND AUTHORITIES ...................................................3

  A.  The Government Has Failed to Disclose Bases for the Proffered Opinions
      as Required under F.R.C.P. 16 (a) (1) (G) and by the Court's Orders ..........3

      1.  The Defense Has Made Every Effort to Meet and Confer to Obtain
          Legally Sufficient Disclosures Under Rule 16 and for the Purposes
          of Undertaking the Necessary Analysis of Reliability under F.R.E.
          702. ...................................................................3

      2.  The Defense Has Shown, and Will Further Develop the Record at
          the Hearing, that the Government's Disclosures Are Legally
          Insufficient Under Rule 16 and Do Not Establish Reliability as
          Required by F.R.E. 702. ...............................................5

  B.  The Proffered Opinions Exceed the Scope of Permissible Opinion
      Testimony Under F.R.E. 402, 702, 703, and 704. ........................10

      1.  The Proposed Testimony Does Not Satisfy the Requirement of
          Reliability Under F.R.E. 702 and *Kumho Tire*..............................11

      2.  The Government Has Mischaracterized Wide-Ranging Opinions
          Regarding Enterprise, Purpose, and Motive as Opinions Related
          Narrowly to "Symbols". ..............................................14

      3.  The Opinion-Based "History" of the HAMC Should Be Excluded as
          it Was in the Northern District's "NF" Case. .................................16

      4.  The Government's Proposed Opinions Constitute an "Impermissible
          Shortcut" Effectively Using these Law Enforcement Agents as
          "Surrogate Prosecutors." .............................................17

      5.  The Government's Experts Indicate They Rely on Hearsay of
          Varying Types of Unverified Journalism and Biographies,
          Unattributed Interviews, and General Information about
          Investigations. ......................................................19

      6.  The Proposed Opinions Include Speculation about Mental States and
          Conditions That Constitute Elements of the Crimes Charged Which
          Are Prohibited by Limitations Imposed by F.R.E. 703 and 704(b)
          and by F.R.E. 404(a) and (b) and 403. ................................22

7. Both Deputy Austin and Mr. Scheetz Indicate in Their Expert Disclosures That They Rely on Statements and Opinions of Others for Which They Provide No Corroboration.......................................24

8. The Proposed Experts, Especially Deputy Austin, Raise the "Two Hats" Problem, Creating Potential for Confusion for the Jury Because of His Role as an Investigator and His Role as an Expert. 26

9. Deputy Austin and Mr. Scheetz Overlap Substantially and, If the Court Overrules the Defense Objections, It Should Not Permit Redundancy and Cumulative Evidence............................................27

10. Some of the Opinions Are Simple Statements Which Do Not Require Expertise and Therefore Will Not Assist the Trier-of-Fact as Defined by F.R.E. 702. ....................................................................28

CONCLUSION...............................................................................................31

1

## <u>TABLE OF AUTHORITIES</u>

2

3
<u>Cases</u>

4

*City of Long Beach v. Standard Oil of California*

5
46 F.3d 929 (9th Cir., 1995) .........................................................................12

6

*Claar v. Burlington Northern R.R.*

7
29 F.3d 499 (9th Cir., 1994) ...........................................................................8

8

9
*Cooper v. Brown*

510 F.3d 870 (9th Cir. 2007) ...........................................................................28
10

11
*Crawford v. Washington*

12
541 U.S. 36 (2004)...................................................................................19, 25

13
*General Electric Co. v. Joiner*

14
522 U.S. 136 (1997)........................................................................................12

15

16
*Kumho Tire Co. v. Carmichael*

526 U.S. 137 (1999).........................................................................................11
17

18
*Primiano v. Cook*

19
598 F.3d 558 (9th Cir. 2010) ..........................................................................28

20

*U.S. v. Cazares*

21
788 F.3d 956 (9th Cir., 2015) ........................................................................16

22
*U.S. v. Cerna*

23
Case No. 08-CR-00730-WHA (N.D.Cal, December 17, 2010), Docket 2781...............14

24

25
*U.S. v. Cerna, et al.*

2010 WL 2347406 (N.D.Cal, June 8, 2010)..........................................................passim
26

27
*U.S. v. Cervantes*

28
2016 U.S.Dist. LEXIS 15837 (February 9, 2016) ........................................................16

*U.S. v. Cervantes, et al.*
2016 WL 491599 (N.D.Cal, February 9, 2019) ..........................................................4, 13

*U.S. v. Dukagjini*
326 F.3d 45 (2d Cir., 2002) ...........................................................................................25

*U.S. v. Freeman*
730 F.3d 590 (6th Cir., 2013) ........................................................................................23

*U.S. v. Gomez*
725 F.3d 1121 (9th Cir., 2013) ......................................................................................19

*U.S. v. Hankey*
203 F.3d 1160 (9th Cir., 2000) .................................................................................12, 13

*U.S. v. Hermanek*
289 F.3d 1076 (9th Cir., 2002) .............................................................................7, 12, 13

*U.S. v. Johnson*
587 F.3d 625 (4th Cir., 2009) ...................................................................................19, 25

*U.S. v. Llerenas*
743 F.App'x 86 (9th Cir., 2018) ....................................................................................18

*U.S. v. Mejia*
545 F.3d 179 (2d Cir., 2008) ...................................................................................passim

*U.S. v. Miner*
774 F.3d 336 (6th Cir., 2014) ........................................................................................24

*U.S. v. Noel*
581 F.3d 490 (7th Cir., 2009) ........................................................................................22

*U.S. v. Reyes-Vera*
770 F.3d 1232 (9th Cir., 2014) ......................................................................................19

*U.S. v. Vera*
  770 F.3d 1232 (9th Cir., 2014) ........................................................................12

*U.S. v. Williams*
  2016 U.S.Dist. LEXIS 30318 (N.D.Cal, March 9, 2016)........................................passim


**Rules**

Federal Rule of Criminal Procedure 16 ...............................................................3

Federal Rule of Evidence 403................................................................11, 28

Federal Rule of Evidence 404................................................................23, 30

Federal Rule of Evidence 702................................................................passim

Federal Rule of Evidence 703................................................................16, 23, 25

Federal Rule of Evidence 704................................................................22, 23

1    I.      **<u>INTRODUCTION</u>**

2          The Brian Wendt defense submits this Memorandum to guide the Court during the

3    "enterprise expert" *Daubert* hearing and, specifically, to inform the Court of the legal

4    parameters and purposes of the defense examination of the Government's proposed

5    "enterprise experts."[1] The Wendt defense will, of course, offer post-hearing briefing but

6    offers this Memorandum before the hearing given the scope of the Government's proffer

7    which amounts to using to two law enforcement agents to synthesize and argue its case

8    and, specifically, to establish the charged RICO enterprise (Hells Angels Sonoma

9    County ),[2] a broader, uncharged enterprise (Hells Angels Motor Club), and the purpose,

10   structures, and mental states for these enterprises and their members. In this

11   Memorandum, the Wendt defense raises two sets of related concerns which have been

12   discussed during litigation over the past months and will be the focus of the *Daubert*

13   hearing.

14         First, the Wendt defense has objected to the Government's disclosures as

15   insufficient under Rule 16(a)(1)(G) given the nature of the proffered opinion testimony

16   (broad opinions exceeding parameters allowed in other cases in this District) and the

17   nature of expertise claimed (opinions by employees of law enforcement agencies

18   ostensibly based on law enforcement experience). These issues have been litigated over

19   several months and, during this litigation, the Wendt defense has argued that the

20   Government has not sufficiently set forth a methodology, reasoning, or information

21   _____

22         [1] The two are Deputy Brandon Austin of the Ada County Sheriff's Office in Boise, Idaho,
23   (formerly with the Sonoma County Sheriff's Office in Santa Rosa, California), and Jeremy
      Scheetz, an Intelligence Operations Specialist with the ATF.
24
25         [2] The charged enterprise is HASC. See page 11, Superseding Indictment, beginning at
      ¶11, defining the racketeering enterprise. The "HASC" is identified in the Introduction to the
26   Superseding Indictment as the "Hells Angels Sonoma County Chapter." Superseding Indictment,
      ¶ 1. The racketeering conspiracy charged in Count 1 focuses on the HASC as does Count
27   2, the conspiracy to commit murder in aid of racketeering said to be related to the HASC,
      as well as Count 3, murder in aid of racketeering and subsequent counts.
28

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**MOTION TO EXCLUDE GOVERNMENT'S PROPOSED ENTERPRISE EXPERTS'**
**OPINION TESTIMONY AND FOR RELATED EVIDENTIARY HEARING**

amounting to "bases" for opinions stated. During recent hearings, the Court has articulated its views of the legal and practical issues related to disclosure under Rule 16(a)(1)(G) and the nexus of that rule with the Court's gate-keeping duties under F.R.E. 702.

Second, in this Memorandum the Wendt defense sets forth the boundaries of permissible experience-based law enforcement expert opinion testimony which requires exclusion of most of the Government's proposed opinions on numerous bases including the following which often overlap and are therefore treated jointly below:

1. Lack of assistance to the jury under F.R.E. 702(a); insufficient data under 702(b); opinions not the product of reliable principles and methods under F.R.E. 702(c); lack of reliable application of the methods under F.R.E. 702(d);

2. Lack of relevance within the meaning of F.R.E. 401 and 402;

3. Reliance on testimonial hearsay from unknown sources "passed through" the expert in violation of *Crawford v. Washington,* 541 U.S. 36 (2004);

4. Probative value substantially outweighed by unfair prejudice; confusion of issues, and undue delay caused by cumulative evidence under F.R.E. 403;

5. Improper character evidence under F.R.E. 404(a) and (b);

6. Failure to satisfy the requirements of F.R.E. 702 (a) and 703 including assisting the trier-of-fact; and

7. Usurping the province of the jury by reaching ultimate facts in violation of F.R.E. 704(b).

These legal parameters are discussed below in anticipation of the issues which are likely to arise during the hearing.

///

///

///

///

## II.     DISCUSSION AND AUTHORITIES

### A.     The Government Has Failed to Disclose Bases for the Proffered Opinions as Required under F.R.C.P. 16 (a) (1) (G) and by the Court's Orders

#### 1.     The Defense Has Made Every Effort to Meet and Confer to Obtain Legally Sufficient Disclosures Under Rule 16 and for the Purposes of Undertaking the Necessary Analysis of Reliability Under F.R.E. 702.

As discussed both with this Court and with Magistrate Judge Beeler, the Government's disclosures have not been adequate under F.R.C.P. 16(a)(1)(G). The docket in this case makes it clear that the defense has repeatedly sought adequate expert disclosures, and towards the end of 2019, both this Court and Magistrate Judge Beeler have acknowledged that part of any motion seeking the exclusion of some or all of the Government's "enterprise" or "gang" experts in this case will no doubt reference F.R.C.P. 16(a)(1)(G). Though hardly news to this Court, it is clear that the defense has sought "…the witness's opinions, the bases and reasons for those opinions…" together with the qualifications that the proposed witnesses have to provide the opinions. (Quotation from F.R.C.P. 16(a)(1)(G).)

While F.R.C.P. 16.1 was not on the books when this case was initiated n 2017, it is clear that there have both been discovery conferences between the parties within the meaning of F.R.C.P. 16.1(a). The defense has made requests for Court action within the meaning of F.R.C.P. 16.1(b) and while the Court and Magistrate Judge Beeler have encouraged progress related to expert disclosures, the Court has been informed that the problems persist.

Concerns about obtaining timely expert disclosures are reflected in a wide variety of entries in this Court's records and can be found, among other places, in Judge Beeler's "Discovery Order" of June 13, 2019 (Doc 703), beginning at page 3, where the Court directed "…the parties to confer about their anticipated expert testimony and rebuttal

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO EXCLUDE GOVERNMENT'S PROPOSED ENTERPRISE EXPERTS' OPINION TESTIMONY AND FOR RELATED EVIDENTIARY HEARING**

3

1  expert testimony over the next two months (in the context of the production of the

2  reports) and see if they can work out earlier insight into the scope of expert testimony…."

3  (Judge Beeler's just-cited Order, June 13, 2019, Doc 703, at pp.3-4.)

4      On August 14, 2019, Judge Beeler issued another Discovery Order, this one also at

5  least making reference to experts, reflecting another Court-ordered meet and confer.

6  (Doc 769, at p.3.)

7      The Court's records indicate that when the parties were before this Court on

8  September 17, 2019, representations were made about producing expert disclosures as to

9  the "enterprise and CAST" issues by October 4, 2019.  (Doc 803, minutes of the

10  appearance on 9/17/2019.) The initial disclosures on that front were insufficient.

11      On October 18, 2019, the Court's further intervention into the subject of expert

12  disclosures and concerns about "…a comprehensive and complete written response to the

13  defense's requests" by the Government– a chance to supplement its October 2019

14  disclosures were reflected in Judge Beeler's October 18, 2019 "Discovery Order," Doc

15  841, at pages 2-3.

16      On December 20, 2019, Judge Beeler again issued a "Discovery Order" after

17  further written arguments were submitted by the parties and further oral argument was

18  presented. In her December 20, 2019 "Discovery Order" (Doc 904), Judge Beeler

19  addressed a defense complaint concerning the sufficiency of the "enterprise experts'"

20  disclosures. In that December 20, 2019 Order, Judge Beeler set up a discussion that was

21  continued before this Court subsequently. Judge Beeler explained that "The undersigned

22  asked the Government at the hearing if it wanted to further supplement its disclosures,

23  and the Government responded that it did not want to further supplement its disclosures.

24  It may be that the Government's disclosures do not provide a sufficient basis for

25  establishing that their experts' proposed opinions are reliable." (Doc 904, December 20,

26  2019, at p.2.) Judge Beeler cited Judge Gonzalez Rogers' ruling in *U.S. v. Cervantes, et*

27  *al.*, CR-12-792-YGR, 2016 WL 491599 (N.D.Cal, February 9, 2019) as the basis for the

28  observations. Judge Beeler then noted that as of December 20, 2019, she was of the

1    opinion that "…opining on the sufficiency of the disclosures veers too closely to the trial

2    judge's ultimate decision about whether the Government experts' opinions are reliable or

3    whether the disclosure sufficiently established the opinions' reliability."  (Doc 904, at

4    p.2.)

5          During discussions held with this Court *after* December 20, 2019, this Court

6    essentially echoed Judge Beeler's observations acknowledging that, at this point,

7    challenges to the admissibility of enterprise experts' opinions would be heard by the

8    Court with the experts present. The Court correctly anticipated, and the Wendt defense

9    telegraphed, that part of the inquiry would be focused on whether the experts indeed have

10   sufficient "bases" within the meaning of relevant law, for their testimony to be admitted –

11   a matter that (as noted below) is related to but not completely overlapping with the

12   analysis of the admissibility of an expert's opinion within the meaning of F.R.E. 702 and

13   related law.

14         The Wendt defense reiterated its concerns in its filing of March 6, 2020, and again

15   during the status conference held in this Court on March 9, 2020.

16              **2.    The Defense Has Shown, and Will Further Develop the Record
                        at the Hearing, that the Government's Disclosures Are Legally
17                      Insufficient Under Rule 16 and Do Not Establish Reliability as
                        Required by F.R.E. 702.**
18

19

20         Notwithstanding the history set forth here, the Government proposes to go into the

21   upcoming *Daubert* hearing having essentially ignored several 'enterprise' and/or gang

22   expert litigations that have taken place in this District to date, including most recently the

23   litigation marked by Judge Orrick's Order in *U.S. v. Williams*, Case No. 13-CR-00764-

24   WHO, 2016 U.S.Dist. LEXIS 30318 (N.D.Cal, March 9, 2016)(ECF Doc 927). In this

25   connection, this Court told the Government that it agreed with Judge Alsup's ruling, cited

26   by both parties from *U.S. v. Cerna, et al.*, 2010 WL 2347406 (N.D.Cal, June 8, 2010),

27   directing the Government to disclose supplements and "the specific basis" for each of Mr.

28   Scheetz's and Mr. Austin's opinions.  (Doc 938, at p.2.) The Government has elected not

1    to do so.

2         As to Mr. Scheetz, the Government's disclosures now consist of a March 13, 2020

3    letter, 20 pages long, that contains a total of 54 footnotes apparently aimed at providing

4    notice of 'bases' for Mr. Scheetz's upcoming testimony. In addition, the Government had

5    provided a four-page "Supplemental Expert Disclosure" concerning Mr. Scheetz two

6    days before the parties appeared in front of this Court to address the adequacy of the

7    Government's expert disclosures. In that February 5 supplement, the Government

8    provided citations to some cases that Mr. Scheetz is said to have been involved in and

9    also referenced in a short spreadsheet its expert disclosures, as well as listing the title of

10   documents that were disclosed. The defense notes that prior to the February 5

11   supplement, the Government had provided a CV pertinent to Mr. Scheetz and has

12   provided a slightly augmented version of that CV with its February 21, 2020 disclosure.

13        With respect to expert Austin, the Government provided a 7-page March 13, 2020

14   disclosure, in addition to its February 21, 2020 disclosure which had followed the

15   February 7, 2020 court appearance), which has 14 footnotes that purport to explain the

16   basis for Mr. Austin's opinions. The Government also provided the defense, as of

17   February 21, 2020, a 10-page CV for Mr. Austin.

18        The Government's March 13 and February 21, 2020 disclosures should likely be

19   looked at in light of the litigation that preceded them and that preceded Judge Beeler's

20   December 20, 2019 above-referenced Discovery Order, including the pleadings that

21   preceded Judge Beeler's December 20, 2019 Discovery Order and that preceded, as well,

22   this Court's subsequent February 7, 2020 Order. In the various motions filed mainly by

23   the Wendt defense, including the "Motion for Disclosure of Experience, Bases, and

24   Methodology for Each Opinion of the Government's Law Enforcement/Enterprise

25   Experts…" (Doc 879), the defense provided the Court the disclosures pertinent to Mr.

26   Scheetz and Deputy Austin such as they existed as of November 26, 2019. The

27   disclosures included a November 4, 2019 11-page letter from the Government to the

28   defense concerning Mr. Scheetz (Doc 879-3), which clearly served as most of the 'bones'

1  of the Government's above-referenced and latest March 13, 2020 Scheetz-related
2  supplemental disclosure.

3  Without belaboring the matter, the same is true with respect to disclosures
4  pertinent to Mr. Austin, as evidenced by the fact that the Government had disclosed, as of
5  October 25, 2019 (Doc 879-2), 4-page disclosure pertinent to Mr. Austin's opinions that
6  essentially is much of what was disclosed again on February 21, 2020, with footnotes
7  added—with the latest version having been provided on March 13, 2020.

8  Notwithstanding the Court's clear directive to the Government that it should be
9  attentive to Judge Alsup's June 8, 2010 ruling in *Cerna* – a ruling which has in a number
10  of ways guided rulings by other District Judges in this District and that was relied on by
11  *this* Court as well – the Government has shunned Judge Alsup's calls for "particularity"
12  and has made reference to generalities in providing the 'bases' for its enterprise experts'
13  opinions: newspaper articles; books consulted by the experts; 'investigations' said to
14  have been conducted, without actually responding (with very limited exceptions) to the
15  Court's February 7, 2020 ruling.

16  A number of the grounds for the objections stated in this pleading were stated in
17  varying ways by the Wendt defense in its various arguments, most notably in its "Reply
18  to Government Response to Motion for Disclosure of Bases for Each Expert Opinion
19  (Docs 879, 881, 887) re Enterprise Experts." (Doc 892, filed December 9, 2019.)

20  This Court correctly anticipated that if the disclosures by the Government
21  continued to be inadequate and conclusory, the defense would need to use the presence of
22  both Mr. Scheetz and Deputy Austin at the *Daubert* hearing, in part to address the
23  sufficiency of the disclosed bases (and indeed whether there are bases) for a number of
24  the stated opinions that have been disclosed without recognizable 'bases.' The defense,
25  more than once, has pointed the Court to the Ninth Circuit's ruling in *U.S. v. Hermanek*,
26  289 F.3d 1076 (9th Cir., 2002), a case far more 'confined' in the Government's ambitions
27  for the scope of opinions than the ambitions evident for Mr. Scheetz and Mr. Austin in
28  this case. In *Hermanek*, the Ninth Circuit focused in part on the way the District Court

had assessed whether to admit the testimony of a law enforcement officer concerning his interpretation of words, including vocabulary used by suspects that he had never encountered before.  Part of what the Court pointed out was that:  "As a prerequisite to making the Rule 702 determination that an expert's methods are reliable, the court must assure that the methods are adequately explained."  *Id.*, at 1093, *relying in part on Daubert v. Merrell Dow Pharmaceuticals*, 43 F.3d 1311, 1319 (9th Cir., 1995).  The *Hermanek* court also made reference to its ruling in *Claar v. Burlington Northern R.R.*, 29 F.3d 499, 502 (9th Cir., 1994):  "The district court repeatedly ordered the experts to explain the reasoning and methods underlying their conclusions…," but because the disclosures were "…devoid of any such explanation," the Ninth Circuit noted that the District Court could not make findings required by F.R.E. 702.

At this point, contentions about the inadequacy of the Government's disclosures are not worth belaboring since the Court has already scheduled *Daubert* hearings to address the issues in the case.  But some examples of the disclosure problems are being given to explain why the defense will be inquiring further into the bases for given opinions in the written disclosures of  March 13, 2020:

In explaining, for example, how Deputy Austin knows about the "common symbols" said to be employed by the Hells Angels, the defense is informed by footnote 1 at page 2 of the Government's March 13, 2020, disclosure that Deputy Austin can provide such testimony because of his personal observations of "HASC members at their clubhouse"; his "drives to " of the Sonoma County clubhouse between 2014 and 2016; his occasional interactions with HASC members; his review of books and press accounts concerning the Hells Angels. [3]

Another opinion sought to be explained in this way are opinions from Deputy Austin concerning the "pride" that members take of being pioneers in the club (paragraph

---

[3]  Deputy Austin related March 13, 2020, disclosure at p. 2, fn 1; p. 6, fns 12 and 13; p. 7, fn 14.

1   5), the *non-expert and ostensibly universal* notion that members who use imagery of
2   hammers "could claim that it is simply a tool used for motorcycle maintenance, but it is
3   really used as a weapon."[4]

4       Notwithstanding the Court's reference to the above-cited 2010 *Cerna* Order or the
5   months-long discussions of the sufficiency of expert disclosures, the Government has not
6   in fact linked these or a number of other Austin opinions to a reliable methodology or
7   explicable reasoning and method. Ditto for previously complained-of insufficiently based
8   opinions about "violence" related to disrespect to HASC symbols. The 'reasoning and
9   methodology' offered for the opinion that "violence to address disrespect or perceived
10   disrespect to HASC…or their symbols is celebrated by members" is that he has
11   conducted prior investigations (unnamed, unexplained, and unreferenced); personal
12   observations of members at "their clubhouse" (no clubhouse identified or description of
13   the observations and the connection with the inference sought to be drawn), and has
14   reviewed books written by others, with no specific references.

15       Similarly problematic unexplained inferences or arguments (rather than opinions)
16   are throughout the Austin disclosure.

17       When the Government seeks to provide some description of the bases for Mr.
18   Scheetz's proposed testimony about the history of the Hells Angels, at page 2, footnotes 1
19   and 2 of the March 13, 2020 disclosure, the Government makes reference to Mr.
20   Scheetz's experience in investigating Outlaw Motorcycle Gangs, including HAMC;
21   review of literature produced by and about HAMC.  On the issue of history, Mr. Scheetz
22   relies largely on information that he has read rather than information that he has acquired
23   as a result of personal observation or corroborated discussions—his description of
24   HAMC history bleeds over into descriptions of 'Symbols) [disclosure of 3/13/20, p. 3]

25

26   _____

27       [4] This opinion, contained at page 3, paragraph 6, of the above described 3/13/20 Austin
28   disclosure is footnoted as based on "personal observation" of members wearing pins displaying
    ball peen hammers.

and purports to cover a variety of matters that originated 'as far back as World War I'.
He offers no explanation of what reasoning or corroboration he will offer.

What is clear from cases analyzing experience-based expertise is that an opinion
without a sufficient basis must be excluded.

**B.      The Proffered Opinions Exceed the Scope of Permissible Opinion
         Testimony Under F.R.E. 402, 702, 703, and 704.**

The Government has offered a wide array of great number of "expert" opinions
that purport to describe approximately 75 years of the Government's version of the
history of the HAMC – an uncharged enterprise. These opinions include acts and
opinions which:

1.      Are not relevant to the charged enterprise (HASC) (for example, "The
        Purple Heart is awarded to any member who has given his blood in the
        defense and honor of the HAMC. It also means a conflict resulting in injury
        by a weapon. The Purple Heart pin is another avenue for a member to
        display his propensity to be involved in a violent conflict in furtherance of
        the HAMC, even if he is stabbed, shot or brutally assaulted.");[5]

2.      Are marginally relevant to the charged enterprise (for example, "By placing
        the Death Head on his back, a member represents approximately 5,000
        members from across the world who share a common set of goals and
        traits.");[6]

3.      Do not require expert testimony (for example, the above-referenced notion
        that a ballpeen hammer can be used as a weapon);

4.      Cross the line into the realm of ultimate issues (for example, a common
        thread which assumes the existence of an enterprise and its purposes
        including the opinion that "Anyone or anything that opposes or disrespects

---

[5] Scheetz March 13, 2020 Disclosure at paragraph 17.
[6] Scheetz March 13, 2020 Disclosure at paragraph 12.

a member or the colors is subject to the wrath of the HAMC, including being subject to violence.") [7]

For these reasons, and other specific reasons, the proposed opinion testimony does not satisfy the requirements of F.R.E. 702 and should be excluded under *Kumho Tire Co. v. Carmichael*, under F.R.E. 704, and under F.R.E. 403. The legal parameters are discussed below.

## 1. The Proposed Testimony Does Not Satisfy the Requirement of Reliability Under F.R.E. 702 and *Kumho Tire*.

The Court is well aware of the contours of F.R.E. 702. These contours apply to all forms of expert testimony. They provide that a qualified expert may testify in the form of an opinion if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. (F.R.E. 702.)

In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) [hereafter '*Kumho*'], the United States Supreme Court determined that the general principles applicable to expert matters described in 702 apply to all forms of expertise. *Kumho*, 526 U.S. at 149-50, *relying on Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). The issue in *Kumho* was in part that the tire expert involved was depending mainly on experience to explain what caused a tire to fail under particular circumstances. The *Kumho* court determined that while the criteria applicable to scientific or scholarly endeavors as outlined in *Daubert* may not apply completely to experience-based testimony where an expert's opinions rest on experience that would be 'foreign' to the experience of jurors, the trial judge must nonetheless determine whether the testimony is "…reliable and relevant." *Id.*, at 149-50. The Court noted that while some *Daubert* questions may not

---

[7] Scheetz March 13, 2020 Disclosure at paragraph 12.

apply to experience-based testimony "…some of *Daubert*'s questions can help to evaluate the reliability of even experience-based testimony." *Id.*, at 151-52.

In the Advisory Comments to the 2000 Amendments to Rule 702, there are citations to the Ninth Circuit's ruling in the above-cited *Daubert v. Merrell Dow Pharmaceuticals*, 43 F.3d 1311 (9th Cir., 1994)(*Daubert II*). As the Advisory Comments state: "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, and why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." The same commentary then quotes from *Daubert II*: "We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under *Daubert*, that's not enough." 43 F.3d, at 1319.

Clearly, under Rule 702, the District Court must "…assure that [the proffered] expert's methods…are both reliable and adequately explained." *U.S. v. Vera*, 770 F.3d 1232, 1241 (9th Cir., 2014). Here under *Daubert, supra*, 509 U.S., at 592, fn.10, the Government has the burden of showing that the proffered expert testimony is admissible, by a preponderance of the evidence. As the proponent of the Austin and Scheetz evidence, the Government "…bears the burden of laying the proper foundation for [its] admission." *City of Long Beach v. Standard Oil of California*, 46 F.3d 929, 937 (9th Cir., 1995).

The subject of the admissibility of enterprise-related police experts has been reviewed by the Ninth Circuit and has been the subject of a number of rulings in this District. Many of these rulings have made reference to the Ninth Circuit's analysis and ruling in *U.S. v. Hermanek, supra*, 289 F.3d 1076, and another ruling in *U.S. v. Hankey*, 203 F.3d 1160 (9th Cir., 2000) *cert. denied* 530 U.S. 1268 (2000). *Hermanek, supra*, found error in the District Court's failure to have inquired into the reliability, reasoning, and methods employed by a police expert to explain his understanding of drug trafficking vocabulary – in a case in which the officer in question had relied on a specified informant whose lack of reliability in addressing drug commerce shorthand was made known to the

court allowing the Circuit Court to conclude that "…there is too great an analytical gap between [the officer's] information and the particular matter at issue." *Id.*, at 1094, *relying in part on General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997).

*Hankey, supra*, involved an opinion, first vetted by the trial court outside the presence of the jury, that specified witnesses were gang members. 203 F.3d, at 166. In *Hankey*, the Circuit upheld the opinion in part because the Agent in question explained both the nature of his personal knowledge and the connection between that knowledge and his opinions that the witnesses were gang members. *Id.*, at 1168-70; *Hermanek, supra*, 289 F.3d, at 1093-94.

The *Hermanek* court pointed out that the problem with the testifying officer's proposed opinions in that particular case was that he never was called upon to explain the link between his "…knowledge and the particular matter he interpreted." *Id.*, at 1094-95.

In one of the most recent detailed analysis of proposed law enforcement officers' opinion testimony in an enterprise case *in this District*, Judge Orrick described the problem with a proposed opinion about a gang sign made through a specific hand gesture that the Government contended – as did its expert – that it symbolized one of the target street gangs in the Western Addition of San Francisco. According to Judge Orrick's ruling, at the *Daubert* hearing, the Officer in question had "…testified that he reached this opinion by speaking with Western Addition gang members and citizens as well as with other police officers, and by seeing the hand signal in videos and photographs. [Footnote omitted.]" *U.S. v. Williams*, Case No. 13-CR-00764-WHO (N.D.Cal, March 9, 2016), Doc 927, p.10.

Judge Orrick explained that the opinion was unaccompanied by a description of the extent of the observation; the number of gang members, citizens, or police officers who had been spoken with by the expert about the alleged gang sign, the details of the videos observed, and the way the expert sought to assure that the information was corroborated. "This testimony does not provide a reliable basis for [the opinion about the gang sign]." *Id.*, at p.10.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO EXCLUDE GOVERNMENT'S PROPOSED ENTERPRISE EXPERTS'
OPINION TESTIMONY AND FOR RELATED EVIDENTIARY HEARING

13

1    Judge Orrick further wrote in the *Williams* ruling of March 9, 2016, Case No. 13-

2   CR-00764-WHO, Document 927, at page 10, that he had reviewed Judge Gonzalez

3   Rogers' Order from *U.S. v. Cervantes*, Case No. 12-CR-00792-YGR (N.D.Cal,

4   February 9, 2016), Docket 928, and another one of Judge Alsup's Orders from *U.S. v.*

5   *Cerna*, Case No. 08-CR-00730-WHA (N.D.Cal, December 17, 2010), Docket 2781.  In

6   each of these Orders, a Judge of this Court ruled that a 'gang expert' could testify only on

7   specific matters that his expertise related to and that other 'synthesizing' opinions or

8   opinions unrelated to the proffered expertise could not be admitted.

9    Here, the Austin and Scheetz opinions, as outlined in writing, are not linked to a

10   reasoning process or an inquiry leading to a conclusion that the opinions are reliable.

11    The March 13, 2020 disclosure covering Deputy Austin is said to cover symbols,

12   terms, and territory specific to the Hells Angels Sonoma County.  In reality, it explains

13   that Deputy Austin will provide expert evidence concerning the Hells Angels generally,

14   as well as the charged enterprise, the Hells Angels Sonoma County; the intentions behind

15   certain symbols; the propensity for violence within HASC and the Hells Angels; habits

16   and customs associated with the Hells Angels.  Deputy Austin is described has having

17   investigated HASC.

18    The March 13, 2020 disclosure covering Specialist Scheetz explains that he

19   focuses on the Hells Angels (not the charged enterprise).  He will cover their history

20   (dating back to the 1940s and before); Hells Angels Terms; Hells Angels territory,

21   including overseas clubs and 70-plus incidents of violence.

22    With limited exceptions, the disclosures for both experts explain that theirs is

23   second- and third-hand information, some gleaned from case investigations and

24   testimony hearsay, some from uncorroborated news reports, newspapers, and books

25   written containing anecdotal information, without any indication or mention of

26   verification and corroboration.

27       **2.    The Government Has Mischaracterized Wide-Ranging Opinions**
            **Regarding Enterprise, Purpose, and Motive as Opinions Related**
28          **Narrowly to "Symbols".**

1

2          Deputy Austin and Mr. Scheetz intertwine opinions about HASC and HAMC. The

3  disclosures in the name of Deputy Austin are said to be focused on HASC. However, the

4  literature said to be relied on by Mr. Austin, including a biography by Oakland HAMC

5  founding member and Hells Angels Motorcycle Club president, Sonny Barger, who is

6  widely known to have moved to Arizona in the late 1990s, and a book by former ATF

7  Agent Jay Dobyns, who investigated the Hells Angels in Arizona (see March 13, 2020

8  Austin disclosure, page 2, fn.1), is not focused on HASC. In addition, the various

9  rulebooks and ancillary sources that Mr. Austin is alleged to have reviewed, according to

10  footnote 1, do not correspond with the HASC – the charged enterprise – but correspond

11  with other entities. The Government assumes – *without explaining* – that time and

12  geography are completely irrelevant to the "analysis" of its experts.

13          In the disclosure of opinions related to "symbols" specified in the March 13, 2020,

14  2020 expert disclosure, Austin references "specific territory claimed by the Hells Angels"

15  in paragraph 1. In paragraph 2, referencing a symbol said to be used by the Hells Angels

16  Sonoma County, the disclosure is clear that the use of the so-called "Death's Head"

17  symbol is pertinent to the Hells Angels, said to be active in a wide variety of parts of the

18  United States and elsewhere, mainly in the western world, including in Europe.

19          In paragraph 5 of his disclosure, Mr. Austin purports to describe the symbolic

20  implications of "1%" "and images of ball peen hammers." March 13, 2020 disclosure, at

21  pp. 2-3, ¶ 5 & 6) This disclosure describes a specific symbol or set of symbols, then goes

22  on to explain that Hells Angels members "…consider themselves to be pioneers in the

23  outlaw motorcycle club. They are proud of the status and seek to maintain their

24  prominence within it. [Footnote omitted.]" (Austin March 13, 2020 disclosure, at p.2-3,

25  fn.5.) At page 3, paragraph 6, Mr. Austin purports to describe 'ball peen hammer

26  imagery,' explaining that "individuals found in possession of such hammers could claim

27  that it is simply a tool used for motorcycle maintenance, but it is really used as a weapon.

28  [Footnote omitted.]" (March 13, 2020 Austin disclosure, at p.3, fn.6.)  There is no

1  specific tie-in to the charged enterprise.

2      At page 4, in paragraphs 10 and 11, again Deputy Austin goes well beyond the

3  description of Sonoma County chapter "symbols." For example, one of his opinions is

4  qualified (page 4, paragraph 10) by the statement that "Violence to address disrespect or

5  perceived disrespect to HASC, the Hells Angels, or their symbols, is celebrated by

6  members."

7      These examples point to attempts to use Deputy Austin not specifically to address

8  the symbols or territory of the charged enterprise, but rather as a surrogate for the

9  prosecutor in attempting to synthesize general information about the Hells Angels and

10  their allegedly violent conduct generally by interspersing HASC-related opinions and

11  more general opinions related to the Hells Angels, their conduct, and intention in general.

12  Deputy Austin is being produced as an expert who, in the words of the Second Circuit in

13  *U.S. v. Mejia*, 545 F.3d 179 (2d Cir., 2008), becomes "…a chronicler of the recent past

14  whose pronouncements on elements of the charged offense serve as shortcuts to proving

15  guilt." *Id.*, at 190; *accord, U.S. v. Cazares*, 788 F.3d 956, 977-78 (9th Cir., 2015).

### 3.    The Opinion-Based "History" of the HAMC Should Be Excluded as it Was in the Northern District's "NF" Case.

18      The opinions just described are of the type that Judge Gonzalez Rogers

19  specifically excised in *U.S. v. Cervantes*, 2016 U.S.Dist. LEXIS 15837 (February 9,

20  2016), a ruling rendered in a prison gang case which proceeded through trial in this

21  District in 2016.  There, the Government claimed to be pursuing two or three defendants

22  (out of a total of four) who purportedly were among the leadership of a prison gang said

23  to be active both in prisons and on the streets.  The Government sought to introduce

24  evidence from a BOP gang intelligence officer, as well as from other law enforcement

25  officers familiar with the specific gang. Nonetheless, Judge Gonzalez Rogers explained:

26  "The specificity with which each expert seeks to opine combined with a failure to explain

27  his reasoning or analysis, or to distinguish among the sources on which he relied lead the

28  Court to find that the opinions as set out in this category are not admissible expert

1  opinions that would assist the fact finder in compliance with Rules 702, 703, and

2  *Crawford*." *Id.*, at 28-29.

3        In the Superseding Indictment in this case, beginning at paragraphs 5 and 6 (pages

4  3-4) (see Document 374, filed September 11, 2018), there are allegations about HASC

5  members being "…expected to use any means necessary, including acts of intimidation

6  and violence, to obtain respect from those who show its members disrespect."  (From

7  Doc 374, p.3, ECF page 23.)  According to the statement of 'means and methods of the

8  enterprise,' members of the Hells Angels Sonoma County are expected to be involved in

9  the commission, attempted commission, and threat to commit violence.  (Superseding

10  Indictment, at p.26 of the ECF, Doc 374, ¶ 13.) Having law enforcement officers appear

11  as ostensible experts but really as commentators to provide synthesized anecdotal

12  information that parallels, and indeed essentially repeats, allegations in the Superseding

13  Indictment, a number of which do not even specifically relate to the charged enterprise

14  runs contrary to ruling made in the Ninth Circuit and consistently made by Judges in <u>this</u>

15  Court.

16        **4.    The Government's Proposed Opinions Constitute an**
         **"Impermissible Shortcut" Effectively Using these Law**
17       **Enforcement Agents as "Surrogate Prosecutors."**

18

19        Part of the reason that the Ninth Circuit – and other courts – have allowed law

20  enforcement officers to testify about matters such as drug-related jargon, gang code, gang

21  colors, enterprise territory, and the like was because under circumstances the information

22  relied on, reasoning engaged in, inferences drawn, and data gathering experience relied

23  upon are all clarified – and as a group, these pieces of information are components of the

24  Government's case, not a synthesis of it. The Sixth Circuit's conclusions, set forth above,

25  explain that where the Government's agents essentially tie the case together by

26  purporting to explain what the accused's state of mind or mental condition must have

27  been, then the agent is not providing specific expertise but essentially argument and

28  synthesis to help make the Government's case.

1  There is essentially no way there can be a "…preliminary assessment of whether

2  the reasoning or methodology underlying the testimony is…valid and of whether that

3  reasoning or methodology properly can be applied to the facts at issue." *Daubert, supra*,

4  509 U.S., at 592-93.

5  The proposed testimony fits Judge Alsup's description of an "impermissible

6  shortcut" to achieving a conviction.  The reference here is to Judge Alsup's above-cited

7  June 8, 2010 ruling in *U.S. v. Cerna, et al.*, Case No. CR-08-0730-WHA (June 8, 2010).

8  As have other judges in this District since, in *Cerna*, Judge Alsup looked to the analysis

9  of the Second Circuit in *U.S. v. Mejia, supra*, 545 F.3d 179, in which a law enforcement

10 officer was called to try to explain that a number of activities that he and his colleagues

11 investigated, including homicides, were clearly related to enterprise activities – there the

12 enterprise was the MS-13 gang on Long Island.  As the Second Circuit pointed out, while

13 ostensibly called to explain 'structure, leadership, practices" and other specific aspects of

14 MS-13, the Agent then mixed information from his investigation of the defendants into

15 his explanations of MS-13 structures and organization so that he presented testimony

16 both as a fact and expert witness.  The Circuit Court noted that in doing this, he was

17 invading the province of the jury; serving as the Government's narrator and

18 commentator; mixing his role as an investigator and expert witness; incorporating into his

19 opinions swaths of hearsay, including testimonial hearsay, all in such a way as to go

20 beyond the role of an expert witness.  *Id.*, at 196-98.  The Second Circuit was particularly

21 concerned that rather than helping the jury understand particular evidence, the

22 Government used the law enforcement officer to synthesize and summarize evidence to

23 demonstrate the connection between the enterprise and particular criminal activities,

24 including murders:  "The Government cannot take a shortcut around its obligation to

25 prove murder beyond a reasonable doubt just by having an expert pronounce that

26 unspecified deaths of eighteen to twenty-three persons have been homicides committed

27 by members of [the enterprise]." *Id.*, at 196-97.

28 In *U.S. v. Llerenas*, 743 F.App'x 86 (9th Cir., 2018) –an unpublished case – the

1    Ninth Circuit reviewed expert testimony by law enforcement officers and used a turn of

2    phrase that is particularly useful in evaluating the Austin and Scheetz evidence here:

3    "Expert testimony is not merely a vessel for the Government to get expert endorsement of

4    its closing argument."  *Id.*, at 89-90, relying on *Mejia* and its injunction against

5    permitting law enforcement experts to become "chronicler[s] of the recent past whose

6    pronouncements on elements of the charged offense serve as shortcuts to prove guilt…."

7    *Ibid.*

        **5.**    **The Government's Experts Indicate They Rely on Hearsay of**
8                **Varying Types of Unverified Journalism and Biographies,**
9                **Unattributed Interviews, and General Information about**
10               **Investigations.**

11

12        Another problem raised by the Austin and Scheetz related disclosures is that both

13   officers purport to rely on a generally described mash of investigations, interviews, and

14   consideration of literature, including unverified biographical material and journalism.

15   They are being served up as a conduit for testimonial statements of witnesses who do not

16   appear at trial, who have not been cross-examined, and whose information is being

17   funneled to the jury in violation of *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004),

18   insofar as the investigations, interviews, biographies, and journalism involve

19   consideration of testimonial hearsay.  See also the discussion in *U.S. v. Gomez*, 725 F.3d

20   1121, 1129-30 (9th Cir., 2013), reviewing the Fourth Circuit's criticism of the use of an

21   expert as "…little more than a conduit or transmitter for testimonial hearsay…."  *U.S. v.*

22   *Johnson*, 587 F.3d 625, 635 (4th Cir., 2009).

23        The Ninth Circuit acknowledges, as have other Circuit Courts in rulings like

24   *Johnson, supra*, and *Mejia, supra*, how Agents can be identified as experts on matters

25   like drug-related jargon and gang territory while also being used to funnel interpretations

26   and summaries of the evidence and thereby communicate testimonial statements of

27   cooperators and witnesses from investigations in violation of the Federal Rules and of the

28   Confrontation Clause.  *U.S. v. Reyes-Vera*, 770 F.3d 1232, 1238-39 (9th Cir., 2014).

In *Reyes-Vera*, for example, the Ninth Circuit upheld a ruling that admitted an officer's expert testimony because it was specific to matters that unfolded in a specific case and in which the officer was able to listen to calls and explain the meaning of what was being said in such a way as to also identify one of the individuals on the call as in charge of narcotics distribution in a highly specific area.  The Court then noted that this opinion evidence "…was not merely repackaged testimonial hearsay…" and was of the type that could be tested on cross-examination and demonstrated an application of training and experience and independent judgment, and not just synthesizing of information heard, read, or digested elsewhere.  *Id.*, at 1239-40.

Deputy Austin is said to have both investigation experience and a history of some observations of the Sonoma Chapter of the Hells Angels.  But the disclosures of his opinions do not shed light on how his experiences allow him to then opine about what enterprise members intend to do, are expected to do, and have been rewarded for doing – which is much of what his discussion of symbols and terminology is all about.  Mr. Scheetz does not have specific experience with Sonoma, it appears, but he is disclosed as a general distiller, synthesizer, and commentator of Hells Angels history dating back long before his birth, as well as an expert who will describe Hells Angels' 'territory' by offering anecdotal information about more than 70 'inter-group' incidents, many of which allegedly involved violence, mostly relying on hearsay, including reports contained in newspapers.

The Government's proposal here is precisely related to categories of synthesized and regurgitated hearsay, second-hand information, and vicariously prepared argument that would benefit the Government's case without truly being expertise such that this Court should exclude all of it.

Not only does the Government and its expert disclosures not provide a specific basis for opinions that Deputy Austin and Mr. Scheetz are offering about what individuals associated with the Hells Angels (and not always the Hells Angels, Sonoma County) may intend, know, or otherwise legally entertain a mental state about, but also,

1 the Government's disclosures fail to differentiate between a proposed expert as a conduit

2 for argument and unadorned conclusions as compared with an explainer of events or

3 observations.  F.R.E. § 704(b) does not permit the Government's experts to purport to

4 inform jurors in a conclusory way about specific mental condition related elements that

5 the Government will be required to prove through evidence and testimony, fact witnesses,

6 rather than through surrogates. (This objection is argued below in detail.)

7    Far more than in any other racketeering conspiracy charged in this District in

8 recent memory, in this case, the Government is intent on having two law enforcement

9 officers, one of whom has highly limited experience with the charged entity (Hells

10 Angels of Sonoma County), and the other of whom has some episodic information about

11 the chapter, purport to wrap the case together.

12    This is not what the law permits, and indeed is not the direction that this District

13 Court has gone in when considering the proposed testimony of law enforcement officers

14 in conjunction with the Government's case-in-chief.  Judge Alsup observed as follows in

15 the above-cited June 8, 2010 ruling from *U.S. v. Cerna*, CR-08-0730, when he wrote,

16 with italics in the original: "*The gang's existence, organization, and history should,*

17 *therefore, be proven through undercover officers, cooperating witnesses, admissions by*

18 *defendants, co-conspirator statements, physical evidence, documents, videos and*

19 *photographs, wire taps and recordings.*" *Id.*, at page 6. While citing the Second Circuit's

20 ruling in *U.S. v. Mejia, supra*, 545 F.3d 179, Judge Alsup quoted the Second Circuit's

21 opinion as follows:  "[i]t is a little too convenient that the Government has found an

22 individual who is expert on precisely those facts that the Government must prove to

23 secure a guilty verdict – even more so when that expert happens to be one of the

24 Government's own investigators."  *Id.*, at 195.

25    This concern of Judge Alsup's could hardly have come as a surprise to the

26 Government, since it prosecuted the *Cerna* case, and since District Judges have similarly

27 limited the Government's evidence.

28    Judge Orrick picked up on the same theme citing the above-referenced *Cerna*

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**MOTION TO EXCLUDE GOVERNMENT'S PROPOSED ENTERPRISE EXPERTS'**
**OPINION TESTIMONY AND FOR RELATED EVIDENTIARY HEARING**

1    decision when he explained that a jury "…does not need expert testimony to understand

2    the structure of Western Addition gangs or the acts of violence and types of crimes they

3    typically commit." *U.S. v. Williams*, Case No. CR-13-00764-WHO (N.D.Cal, March 9,

4    2016), Doc 927.

5              **6.      The Proposed Opinions Include Speculation about Mental States**
                        **and Conditions That Constitute Elements of the Crimes**
6                       **Charged Which Are Prohibited by Limitations Imposed by**
                        **F.R.E. 703 and 704(b) and by F.R.E. 404(a) and (b) and 403.**
7

8

9              Under the rubric of 'symbols' as quoted above, Mr. Austin purports to provide

10   jurors information about the intent, mental state, and condition "…that constitutes an

11   element of the crime charged…" within the meaning of F.R.E. 704(b).

12             The pitch made is precisely to exclude opinions that would "…merely tell the jury

13   what result to reach." *U.S. v. Noel*, 581 F.3d 490, 497 (7th Cir., 2009).

14             In the Deputy Austin disclosure of March 13, 2020, the disclosure of opinions that

15   are improper under F.R.E. 704(b) range from page 2, paragraph 5, "…HASC members do

16   not obey laws and cultural norms…" (in relation to certain symbols); page 3 , paragraph

17   6, hammer imagery could be used for metal work or could convey items "…really used as

18   a weapon." Page 4, paragraph 10 is more clearly problematic where the opinion is that:

19   "any actual or perceived disrespect to the cut or the HASC symbols on it is expected to

20   be met with violence." At page 6, paragraph 18 a problematic opinion includes: "Failure

21   to acknowledge the Hells Angels' claim over territory would result in war with the Hells

22   Angels. [Footnote omitted.]"

23             Similarly, the March 13, 2020 disclosure related to Mr. Scheetz at page 4,

24   paragraph 12, anyone who opposes "or disrespects a member or the colors is subject to

25   the wrath of the HAMC, including being subject to violence." At page 5, paragraph 15,

26   Mr. Scheetz explains that a given tag "means a member or prospect has committed an act

27   of violence in furtherance of the gang." Later in the same paragraph, same page, Mr.

28   Scheetz opines: "If you are a member of the Filthy Few, you can be called upon to

1    commit additional violent acts, which is depicted with '666' in the middle."  Another tag

2    described at page 6, paragraph 16, "means a member assaulted a law enforcement entity,

3    on or off duty…."  Page 6, paragraph 17, a Purple Heart pin "…is another avenue for a

4    member to display his propensity to be involved in a violent conflict in furtherance of the

5    HAMC, even if he is stabbed, shot or brutally assaulted. [Footnote omitted.]"

6           Page 6, paragraph 18, refers to yet another tag which is said to characterize some

7    persons in general, and Mr. Foakes in particular, noting that it is worn by individuals who

8    have been involved in violence.

9           At page 12, Mr. Scheetz purportedly is describing "HAMC territory," but the

10   disclosure, in fact, relates to a number of violent incidents addressed in a conclusory way

11   at paragraph 20 of page 12, where it is said that "[t]he basis for Specialist Scheetz's

12   testimony as to the violence between HAMC and rival motorcycle gangs…is his

13   familiarity with a number of violent incidents between the gangs…."  Incorporated by

14   reference in this disclosure that appears at page 12, paragraph 20, are then several other

15   paragraphs that list specific incidents said to be known by Mr. Scheetz that involve

16   alleged violence by some component of the Hells Angels Motorcycle Club.

17          The conclusory opinions about violence, expectation of future violence, and

18   rewards for violence amount to inadmissible character and propensity evidence in

19   violation of F.R.E. 404(a) and (b) and when augmented by opinions about what certain

20   terms and symbols 'mean' in terms of persons' intent, including the intent to assault or

21   otherwise do violence to others, the evidence runs afoul of F.R.E. 703 and 704(b) – it is

22   not evidence that can be said to fit into the category of admissible expert evidence.

23          Indeed, the sorts of opinions objected to here are exactly the type prohibited by

24   courts that have applied F.R.E. 704(b) to exclude proposed testimony from a Government

25   agent that essentially is purportedly reviewing information pertinent to a case and then

26   offering a conclusion that in effect "…spoon-fed his interpretations of [evidence] and the

27   Government's theory of the case to the jury…."  *U.S. v. Freeman*, 730 F.3d 590, 597-98

28   (6th Cir., 2013) [dealing with interpretations of phone calls and noting that the law

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO EXCLUDE GOVERNMENT'S PROPOSED ENTERPRISE EXPERTS'
OPINION TESTIMONY AND FOR RELATED EVIDENTIARY HEARING**

23

1   enforcement officers were essentially called to provide jurors with conclusions they could

2   have reached on their own]  The Sixth Circuit reached a similar conclusion in a

3   subsequent case in which an Agent was called to interpret letters written by a taxpayer,

4   and the court there noted that it was the "…jury, not the witness [who] must draw the

5   inference…."  *U.S. v. Miner*, 774 F.3d 336, 349-50 (6th Cir., 2014).

6          Both Mr. Scheetz and Deputy Austin purport to be able to characterize the acts

7   and intents of Hells Angels and/or alleged members of HASC.  In his March 13, 2020

8   disclosure, Mr. Scheetz includes under the rubric of 'territory' more than 70 summaries

9   of alleged violent confrontations between Outlaw Motorcycle Gangs.  His personal

10  knowledge of any of these is not specified, nor is the basis for using them to describe the

11  enterprise's territory.

12         But more problematic is that what he is purporting to describe is a general, seven-

13  decade history of violent conduct under the guise of addressing "territory."

14         The complained of opinions are inadmissible.

15             **7.      Both Deputy Austin and Mr. Scheetz Indicate in Their Expert**

16                 **Disclosures That They Rely on Statements and Opinions of**

17                 **Others for Which They Provide No Corroboration.**

18         The objection just stated is that both Deputy Austin and Mr. Scheetz are

19  announced as depending on information from others, including: readings of rulebooks; of

20  books written by one older member of the Hells Angels (Sonny Barger); a book written

21  by an undercover officer (Jay Dobyns) (March 13, 2020 Austin disclosure); as well as

22  reviews of literature and books about HAMC  discussed in the Scheetz disclosure of

23  March 13, 2020 in many of the footnotes in his disclosure including numbers 1-6.  Mr.

24  Scheetz, throughout his expert disclosure, makes reference to having reviewed an expert

25  report prepared by Jorge Gil-Blanco, an individual employed by law enforcement who

26  has testified on a number of occasions about California outlaw motorcycle gangs. (See

27  3/13/20 disclosure paras. 10-12 as examples)  A review of the footnotes in the Scheetz

28  disclosure reveals that much of his proposed testimony in this case involves observations

of various kinds made mainly outside of California and a review of literature, copiously referred to, which is disclosed in the 54 footnotes attending Mr. Scheetz's 20-page disclosure.  Many of the Scheetz-related 'bases' for opinions consist of his review, or at least a citation, to 'literature' including news reports in newspapers, on news channels, and other unattributed or undescribed sources of information.

The Ninth Circuit has explained that where an expert is being asked to apply an independent judgment based on the application of training and experience to source material, then such matters, so long as they are subject to cross-examination, will often not violate the Confrontation Clause. But where a witness essentially provides repetition or synthesis of testimonial statements of cooperating witnesses, for example, or purports to synthesize second-hand information, then the independent analysis and judgment is lacking. The synthesizer or repeater of hearsay, particularly testimonial hearsay, frames a Confrontation Clause problem under *Crawford v. Washington, supra*, 541 U.S. 36, 53-54; *accord U.S. v. Johnson, supra*, 587 F.3d 625, 635-36, explaining that: "Allowing a witness simply to parrot 'out of court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of expert opinion' would provide an end run around *Crawford*."  *Ibid.*  The Ninth Circuit has endorsed this same view by relying on *Johnson*, *supra*.  *U.S. v. Gomez*, *supra*, 725 F.3d 1121, 1131-32.  See also *U.S. v. Dukagjini*, 326 F.3d 45 (2d Cir., 2002).

In *Dukagjini*, the court noted that during the course of a law enforcement officer's testimony, purportedly to cover drug jargon, he repeatedly made reference to his review of his knowledge of the investigation, speaking with individuals who were cooperating. The Second Circuit found that especially where the Government expert is relying on out-of-court source information which is both accusatory and offered for the truth, and where the Government made no showing of trustworthiness, allowing the law enforcement officer to so testify is an error, both because such testimony is outside the bounds of F.R.E. 702 and 703, but also because it violates the Confrontation Clause and allows the introduction of what amounts to being hearsay.

1    Clearly the disclosures, and particularly the Scheetz-related disclosure, raises that

2    problem here.

3    ///

4    ///

5        **8.    The Proposed Experts, Especially Deputy Austin, Raise the**
            **"Two Hats" Problem, Creating Potential for Confusion for the**
6            **Jury Because of His Role as an Investigator and His Role as an**
            **Expert.**
7

8

9        In the disclosure specifically related to Deputy Austin (March 13, 2020), it is

10   noted that he claims to have been observing "… many events at which members of the

11   HASC were present…." (p. 1) He also for a period of two years, which would be

12   comprehended within the time frame charged in the Superseding Indictment (2014 and

13   2016), drove to the Sonoma County clubhouse on a weekly basis; interacted with Sonoma

14   County members; investigated the Sonoma County chapter and its members.  (March 13,

15   2020 Austin-related disclosure at fn. 1, 6,8,9.)

16       Several courts in this District have expressed concern where the Government

17   seeks to introduce the testimony of an individual who is a law enforcement officer

18   testifying as an expert, and also providing evidence as an actual investigator of the facts.

19   As has been pointed out repeatedly, there is a distinction between a fact witness and an

20   expert who provides opinion testimony.

21       In his December 17, 2010 Order in *U.S. v. Cerna*, 2010 U.S.Dist. LEXIS 146687

22   (N.D.Cal, December 17, 2010), Judge Alsup made that point, relying in part on the

23   Second Circuit's ruling in *U.S. v. Mejia, supra*, 545 F.3d, at 191.  *Cerna*, at pp.17-19 of

24   the cited ruling.  Judge Alsup cited the language from *Mejia* stating:  "[i]t is a little too

25   convenient that the Government has found an individual who is an expert on precisely

26   those facts that the Government must prove to secure a guilty verdict – even more so

27   when that expert happens to be one of the Government's own investigators…."  *Id.*, at

28   191.

1    The Judges who have reviewed the use of law enforcement expert opinion in this

2    District – after having heard the proposed testimony – have expressed concerns that any

3    expertise admitted should be appropriately limited.  As previously noted, one of the most

4    recent and fulsome rulings on this issue comes from Judge Orrick in *U.S. v. Williams*,

5    2016 U.S.Dist. LEXIS 30318 (N.D.Cal, March 9, 2016), a ruling found at Doc 927 of the

6    docket in *Williams*.  As Judge Orrick put it:  "The Government needs to prove the

7    existence of a criminal enterprise and the violent crimes committed on its behalf on the

8    basis of evidence from lay witnesses, not through the opinions of a police officer who has

9    spent most of his career, among other things, investigating people in the group against

10   whom this case is brought."  *Id.*, at 17-18.

> **9.    Deputy Austin and Mr. Scheetz Overlap Substantially and, If the Court Overrules the Defense Objections, It Should Not Permit Redundancy and Cumulative Evidence.**

14   As pointed out above, the stated distinction (drawn from the Government's expert

15   disclosures dated March 13, 2020) between its law enforcement employee experts is that

16   Deputy Austin will focus his expertise on the Hells Angels of Sonoma County and their

17   symbols, terms, and territory.  HASC is the charged enterprise.  The Hells Angels,

18   generally, or internationally, are not framed in Count 1 as the enterprise which was being

19   conspired with.  While the Hells Angels are mentioned in the Superseding Indictment, the

20   racketeering enterprise is specifically defined at page 5, paragraph 11, as "HASC" –

21   Hells Angels Sonoma County.  Similarly, the purpose of the enterprise and 'means and

22   methods of the enterprise' are phrased exclusively in terms of the HASC.  The

23   conspirators are said to have been "…employed by and associated with HASC…."

24   (Pages 7-8 of the Superseding Indictment, ¶ 20.)

25   Of the two proposed experts, as noted, only one purports to have specific expertise

26   focused on HASC -- Deputy Austin.  He is said to have had "…experience investigating

27   and personally observing HASC members at their clubhouse…."  (Austin disclosure of

28   March 13, 2020, at p.5, fn.11)

1   Deputy Austin purports to have expertise in identifying and describing HASC

2   symbols.  Intelligence Specialist Scheetz focuses on the HAMC and other outlaw

3   motorcycle clubs, and his description of the symbols that he purports to cover address the

4   Hells Angels Motorcycle Club generally. Several of his opinions about the rockers and

5   the Death Head are covered by Deputy Austin.

6   Similarly, Mr. Scheetz explains terminology that is also explained by Mr. Austin,

7   including vocabulary like 'hang around' and 'prospect' and the like.

8   Clearly, the Government is attempting to interpose into this case two important

9   synthesizers and surrogates to help the Government make sure that the jurors get

10   synthesized, 'processed' information from more than one law enforcement officer.

11   This repetitious, duplicative, and argumentative approach should not be tolerated

12   by the Court.  It provides a danger of unfair prejudice, confusing the issues, misleading

13   the jury, undue delay, wasting time, and needlessly presenting cumulative evidence – all

14   covered under Rule 403.

15   The Court should prohibit the redundancy.

16   **10.  Some of the Opinions Are Simple Statements Which Do Not**
      **Require Expertise and Therefore Will Not Assist the Trier-of-**
17   **Fact as Defined by F.R.E. 702.**

18

19   Judge Orrick has succinctly explained the analysis of whether expert opinion

20   evidence will be deemed relevant and thus potentially admissible:

21   Expert testimony is admissible under Rule 702 if it is
     both relevant and reliable. See *Daubert v. Merrell Dow*
22   *Pharm., Inc.*, 509 U.S. 579, 589 (1993). "[R]elevance means
     that the evidence will assist the trier of fact to understand or
23   determine a fact in issue." *Cooper v. Brown*, 510 F.3d 870,
24   942 (9th Cir. 2007); see also *Primiano v. Cook*, 598 F.3d 558,
     564 (9th Cir. 2010).
25

26   With respect to when expert testimony will assist the
27   trier of fact, the advisory committee notes for Rule 702 "refer
28

to the traditional common law rule that expert testimony is called for when the 'untrained layman' would be unable intelligently to determine 'the particular issue' in the absence of guidance from an expert." *United States v. Mejia*, 545 F.3d 179, 189 (2d Cir. 2008); see also Fed. R. Evid. 702 Advisory Committee Notes ("There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.") (internal quotation marks omitted).

*United States v. Williams, supra*, Case No. 13-CR-0764 -WHO, March 9, 2016 Order, Doc. 927, at pp. 6-7.

The first requirement for the admission of proposed expert opinion evidence which is set forth in F.R.E. 702 (a) is that: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue...."  And some of the opinions that the Government proposes to elicit through Deputy Austin and Mr. Scheetz are not of the type to help jurors–indeed, in some specifics, they state evident points that will largely be made (if the Government has pertinent lay witnesses) through lay witnesses.

One basic example of proposed testimony that could easily come from a lay witness and which jurors would understand is the above-cited proposed opinion from Deputy Austin that a ball peen hammer can be used as a tool and could be used as a weapon – an opinion that makes its way both into the March 13, 2020 Austin disclosure in paragraph 6, and again in footnote 3.

Mr. Scheetz proposes a series of opinions under the rubric "Hells Angels terms,' describing the level of what he contends is organization within Hells Angels Motorcycle

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO EXCLUDE GOVERNMENT'S PROPOSED ENTERPRISE EXPERTS'
OPINION TESTIMONY AND FOR RELATED EVIDENTIARY HEARING

29

Club.[8]  Beginning at page 7 of the March 13, 2020 Scheetz disclosure, in paragraph 20 and the paragraphs that follow, Mr. Scheetz states a series of opinions about the requirements associated with the Hells Angels Motorcycle Club; the forms of communication that are provided for; the existence of charters, rules, etc.  All of these matters are discussed in documents that have been seized by the Government and that can easily be reviewed by and displayed to a jury if the Court admits them over objection.

In addition, the alleged strictures and structures of the organizational units of HAMC are best testified to by percipient witnesses. What Mr. Scheetz purports to do is what any person who is able to read documents, journalism, and biographical material can do.  He does not propose a firsthand account of information pertinent to the charged enterprise, and his 'distillation' of documents falls specifically into a category of matters that can be made known to the 'untrained layman' through a review of evidence and firsthand witnesses. Re-chewing the information and giving it the gravitas that may be associated with an 'intelligence specialist' who works for a Government agency makes the synthesis no more 'relevant' under the authorities relied upon by Judge Orrick than the kind of expert evidence that Judge Orrick and Judge Gonzalez Rogers, in addition to Judge Alsup, have excluded in cases presented in their courts.

Similarly, if the Court considers the proposed 'territory' related opinions said to be within the province of Mr. Scheetz's expertise, the Court will note, first, that the stated bases for Mr. Scheetz's familiarity with much of the material clearly comes from his review of press articles and books Scheetz disclosure of March 13, 2020, footnotes 18 to 53 referencing documents and publications.

_____

[8] As pointed out elsewhere in the Wendt defense's papers, including above, it is important to underscore that the racketeering enterprise that is focused upon and 'charged' in the current Indictment is HASC, which according to Mr. Scheetz's discussion would be one charter, or a highly localized alleged enterprise.  This raises the question of the relevance of many of the opinions stated by both Mr. Austin and Mr. Scheetz concerning the HAMC.  The question of that relevance is intended to be one of the subjects focused upon by the defense during the upcoming *Daubert* hearings.

First, the type of evidence included in Mr. Scheetz's proposed discussion of 'territory' related opinions is being objected to on many different grounds as explained above, including but not limited to:  its lack of relevance to the charged enterprise; its inadmissibility as bad character evidence under F.R.E. 404(b); the substantial danger that it raises of both prejudice and of misleading the jury, especially insofar as the proposed evidence is not related to issues that concern this case or any particular defendant charged in it.  But beyond that, assuming the Court were convinced by the Government that there are prior incidents of violence that could and should be admitted in this case, these should be presented through the testimony of firsthand percipient witnesses, most likely lay persons, and jurors would readily be able to comprehend the actuarial information so provided.

There is no expertise involved in an individual's reading of particular events and then reciting the synthesized version of the readings to jurors who presumably would hear the factual information (provided it were deemed factual) and would draw inferences and make decisions about the implications of the information presented without the need for a government expert to tie the package together.

Thus, as reflected in heading 10 above, there are numerous grounds on which the proposed expert evidence is subject to exclusion.

## CONCLUSION

For all of the reasons stated here, this Court should exclude the evidence complained of and should either completely exclude or impose strict limitations on the breadth of any opinion evidence to be offered by either Deputy Austin or Mr. Scheetz.  As argued immediately above, the Court should prohibit the Government from calling both experts to repeat one another's opinions or to buttress them inappropriately and in a cumulative and repetitious way.

Dated: March 17, 2020

Respectfully Submitted,
MARTIN ANTONIO SABELLI
JOHN T. PHILIPSBORN


 _/s/ John T. Philipsborn_
JOHN T. PHILIPSBORN
Attorneys for Brian Wayne Wendt

1

## **PROOF OF SERVICE**

2

I, Melissa Stern, declare:

3

4       That I am over the age of 18, employed in the County of San Francisco,
California, and not a party to the within action; my business address is Suite 350, 507
5  Polk Street, San Francisco, California 94102.

6

On March 17, 2020, I served the within document entitled:

7

8       **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
        **MOTION TO EXCLUDE GOVERNMENT'S PROPOSED ENTERPRISE**
9       **EXPERTS' OPINION TESTIMONY AND FOR RELATED EVIDENTIARY**
        **HEARING**
10

11

12  ( )     By placing a true copy thereof enclosed in a sealed envelope with postage thereon
                fully prepaid, in the United States Mail at San Francisco, CA, addressed as
13              set forth below;

14
    (X)     By electronically transmitting a true copy thereof through the Court's ECF system;
15

16  ( )     By having a messenger personally deliver a true copy thereof to the person and/or
                office of the person at the address set forth below.
17

18
        AUSA Kevin Barry
19      AUSA Ajay Krishnamurthy

20
        All defense counsel through ECF
21

22      Executed this March 17, 2020, at San Francisco, California.

23                              Signed:     */s/ Melissa Stern*
24                                          Melissa Stern

25

26

27

28