DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

AJAY KRISHNAMURTHY (CABN 305533)
KEVIN J. BARRY (CABN 229748)
LINA Y. PENG (NYBN 5150032)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7050
    FAX: (415) 436-7234
    Email: ajay.krishnamurthy@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 17-CR-533-EMC |
| Plaintiff, | |
| v. | Supplemental Response in Opposition to Defendants' Motion to Exclude Testimony of Jeremy Scheetz |
| JONATHAN JOSEPH NELSON, et al., | |
| Defendants. | |

# **TABLE OF CONTENTS**

I.   ARGUMENT ................................................................................................................1

A.   Scheetz's testimony is reliable ....................................................................................1

      1.   Hells Angels symbols ......................................................................................7

      2.   Hells Angels Terms ..........................................................................................9

      3.   Hells Angels Territory ....................................................................................11

B.   Scheetz's testimony is relevant ..................................................................................11

C.   The Court should consider the entire record .............................................................14

II.   CONCLUSION ..........................................................................................................15

# TABLE OF AUTHORITIES

## CASES

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, (1993) ................................................. 1, 7

*United States v. Abu-Jihaad*, 553 F. Supp. 2d 121 (D. Conn. 2008) .......................................... 7

*United States v. Alatorre*, 222 F.3d 1098 (9th Cir. 2000) ......................................................... 2

*United States v. Angiulo*, 897 F.2d 1169 (1st Cir. 1990) .......................................................... 6

*United States v. Cerna*, No. CR 08-0730 WHA, 2010 WL 11627594 (N.D. Cal. Dec. 17, 2010) ................................................................................................ 12, 13, 15

*United States v. Flores*, No. CR 12-00119 SI, 2014 WL 12686740 (N.D. Cal. June 16, 2014) ........................................................................................................ 12, 15

*United States v. Griffith*, 118 F.3d 318 (5th Cir. 1997) ............................................................. 3

*United States v. Hankey*, 203 F.3d 1160 (9th Cir. 2000) ............................................... 1, 2, 5, 14

*United States v. Ledbetter*, 929 F.3d 338 (6th Cir. 2019) ........................................................ 13

*United States v. Locascio*, 6 F.3d 924 (2d Cir. 1993) ................................................................ 5

*United States v. Mulder*, 273 F.3d 91 (2d Cir. 2001) ................................................................ 6

*United States v. Odum*, 878 F.3d 508 (6th Cir. 2017) ............................................................. 12

*United States v. Palacios*, 677 F.3d 234 (4th Cir. 2012) ......................................................... 12

*United States v. Paracha*, No. 03 CR. 1197 (SHS), 2006 WL 12768 (S.D.N.Y. Jan. 3, 2006) ......................................................................................................... 7

*United States v. Parkhurst*, 865 F.3d 509 (7th Cir. 2017) ................................................... 1, 14

*United States v. Rios*, 830 F.3d 403 (6th Cir. 2016) ........................................................... 12, 13

*United States v. Smith*, 919 F.3d 825 (4th Cir. 2019) ............................................................ 1, 3

*United States v. Valencia-Lopez*, ___ F.3d ___, (9th Cir. Aug. 19, 2020) ................................. 1

*United States v. Williams*, No. 13-CR-00764-WHO, 2016 WL 899145 (N.D. Cal. Mar. 9, 2016) ................................................................................................ 12, 15

The United States submits this supplemental post-hearing response in opposition to defendants' motion to exclude the expert testimony of Jeremy Scheetz.

I. **Argument**

Federal Rule of Evidence 702 imposes a "gatekeeping role" on the trial judge to ensure that an expert's testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). The proposed testimony of ATF Intelligence Operations Specialist Jeremy Scheetz meets both of these requirements.

    A. <u>Scheetz's testimony is reliable</u>

The Court's inquiry into the reliability of expert testimony under Rule 702 is a "flexible one," *Daubert*, 509 U.S. at 594, and it has "broad latitude to determine what factors in *Daubert*, if any, are relevant to the reliability determination." *United States v. Valencia-Lopez*, ___ F.3d ___, 2020 WL 4814139, at *4 (9th Cir. Aug. 19, 2020). The Ninth Circuit has made clear that in this context— proposed expert testimony about a criminal organization—many of the factors used to evaluate scientific testimony, including "peer review, publication, [and] potential error rate" are "simply are not applicable." *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000).

Instead, reliability "depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *Id.*; *United States v. Parkhurst*, 865 F.3d 509, 516 (7th Cir. 2017) ("We have repeatedly allowed such expert testimony without requiring 'scientific methodologies' or 'peer review.'"). Moreover, courts have observed that experts who testify on the basis of their experience cannot "always point to a specific experience that informed each expert opinion." *United States v. Smith*, 919 F.3d 825, 836 (4th Cir. 2019). This is "unsurprising"; the basis for these experts' testimony "does not derive from any singular piece of information" but rather the expert's ability to "analyze and synthesize an array of information learned over years." *Id.*

The Court's focus in a case like this one should therefore be on the "extent" of the proposed expert's "knowledge and experience." *Hankey*, 203 F.3d at 1169. In *Hankey*, for instance, the Ninth Circuit affirmed the admission of gang expert testimony where the "the witness had devoted years working with gangs" and "knew their 'colors,' signs, and activities." *Id.* The same is true here. Like the expert in *Hankey*, Scheetz knows the Hells Angels' symbols, terms, and territory because of the years he

has devoted to monitoring and investigating them. In particular, Scheetz:

- Has been involved (in some capacity) in about 250 investigations into the Hells Angels. Evidentiary Hearing Transcript (Tr.) 38.
- Has debriefed about 100 people associated with the Hells Angels, including about 10 – 15 former members of the Hells Angels, 10 – 15 prospects, and 5 hangarounds. Tr. 66, 255–256.
- Worked about 50 events sponsored by the Hells Angels, and about 125 – 130 events where Hells Angels were present, including the annual Hells Angels run, the Sturgis Bike Rally, and Myrtle Beach Bike Week. Tr. 13; ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 7. At events, Scheetz conducted "overt surveillance by observing, identifying, and photographing" Hells Angels and other OMG members. *Id.* ¶ 9. Scheetz also staffed the events' command centers. *Id.* ¶ 10.
- Has "spoken to hundreds of Hells Angels members, prospects, hangarounds, and associates." ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 14.
- Has analyzed evidence seized from Hells Angels investigations all over the world. This evidence includes photographs, meeting minutes, rulebooks, and rosters. ECF No. 1084-1, ¶ 5 (Evidentiary Hearing Exhibit 2).
- Speaks with other law enforcement officers who investigate Outlaw Motorcycle Gangs (OMGs) on a "daily basis." ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 5. These law enforcement officers, in turn, have "personally interview[ed]" witnesses and "run[] sources" across the globe, including current and former Hells Angels members. Tr. 45, 72.
- Has viewed "thousands" of photographs of Hells Angels members. ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 45 (Evidentiary Hearing Exhibit 2).
- Has listened to "jail calls and wire intercepts, reviewed post-arrest statements, . . . and reviewed documents seized from members of OMGs." ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 14.

This extensive experience compares favorably to other law enforcement experts whose testimony courts have found reliable. *Hankey*, 203 F.3d at 1169; *United States v. Alatorre*, 222 F.3d 1098, 1104 (9th Cir. 2000) (expert had "1) twenty-one years of experience with the Compton police department; 2)

experience with thousands of gang members in the past decade; 3) formal training in gang structure and organization; and 4) extensive personal knowledge of the two gangs at issue"); *Smith*, 919 F.3d at 835 (law enforcement expert was "a twelve-year veteran of the FBI with substantial experience in drug and gang investigations (conducting controlled buys, interviewing drug dealers and gang members, using gang members as confidential sources, listening to thousands of recorded conversations, and so forth)"); *United States v. Griffith*, 118 F.3d 318, 323 (5th Cir. 1997) (expert's experience "at the time of trial included eight-and-one-half years as a DEA agent, during which she participated in 50 investigations, working at times in an undercover capacity").

It also provides a reliable foundation for the testimony Scheetz proposes to offer. Scheetz knows what the Hells Angels symbols are because he's personally observed them, and knows what they mean because he's talked to former Hells Angels members about them. ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 45 (has viewed "thousands" of Hells Angels cuts), ¶ 66 (personally observed the Filthy Few flash), ¶ 70 (personally observed Dequiallo flash), ¶ 73 (personally observed Purple Heart); Tr. 28 (spoken with former members about the Purple Heart), 29 (Filthy Few), 43 (Dequiallo). Likewise, Scheetz is familiar with Hells Angels terms and territory because he has researched the organization's history, and has seen or heard those terms used in internal Hells Angels documents, countless conversations with other law enforcement officers (who themselves have interviewed current and former Hells Angels members), debriefings with Hells Angels members and associates, and jail calls between Hells Angels members. *See*, *e.g.*, ECF No. 1084-4 at EXPERT-0000232 (Hells Angels World Rules describing "left" and "out") (Evidentiary Hearing Exhibit 5); ECF No. 1084-5 (Modesto charter bylaws describing "church") (Evidentiary Hearing Exhibit 6); Tr. 102 (Scheetz familiar with the "start date" for Hells Angels' charters), 201 (Scheetz has personally verified violent incidents that accompanied expansion).

The process Scheetz uses to analyze the broad range of sources at his disposal also demonstrates the reliability of his testimony. In both his declaration and during cross-examination, Scheetz repeatedly explained that he evaluates new information against what he knows "from other investigations" into the Hells Angels, what he has "observ[ed] at Hells Angels events," and what he knows "from [his] conversations with witnesses and confidential informants." ECF No. 1084-1 (Evidentiary Hearing

Exhibit 2), ¶ 15. The "first thing" Scheetz does when he learns new intelligence is examine "who is giving [him] that information": "is it a law enforcement entity" or a "civilian." Tr. 328. Then he "look[s] at the validity" of the intelligence by "compar[ing] and contrast[ing]" it with information that he's "either seen" or can research. Tr. 16, 328. To research, Scheetz may "search through all [his] historical data"; "reach out to ATF special agents who have conducted infiltrations"; "reach[] out to other law enforcement entities"—many of whom have "personally interviewed" current and former Hells Angels; and "look at social media," "books," "newspaper articles," police "reports[,] and officer safety bulletins." Tr. 16, 45.

Given the nature of what Scheetz investigates—the operation of an organization that seeks to conceal criminal conduct—Scheetz is sometimes unable to "formulate a conclusion" about whether what he's learned is accurate. Tr. 329. But through this process and over time, Scheetz is able to evaluate both the accuracy of the information that he takes in, as well as the validity of the conclusions that he draws. Sometimes, he speaks to sources (including other law enforcement officers) whose "information might not be valid." Tr. 241. When Scheetz learns "through other channels" that information is inaccurate, he gives less weight to a particular source. Tr. 241. Likewise, because Scheetz constantly provides information to other investigating officers, he learns from others when he "missed something." Tr. 308.

And while Scheetz uses information provided to him by former Hells Angels members and other trusted law enforcement officers, even this material goes through the same analytical process. For instance, former Hells Angels members have told Scheetz that the Filthy Few flash means that the wearer committed a violent act in furtherance of the Hells Angels, and the Dequiallo flash means that the wearer assaulted a member of law enforcement. Tr. 29, 31, 43. While information directly from the Hells Angels is perhaps the best evidence of what these symbols mean, Scheetz also bases his conclusion that the Filthy Few and Dequiallo flashes do in fact carry those meanings based on his conversations with other law enforcement officers, books that he's read, and personal observations. ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶¶ 66–68, 70–72. In particular, Scheetz has personally observed Hells Angels members wearing both flashes, and believes he is able to pinpoint the reason why "15 to 20" Hells Angels members wear their Filthy Few flash and "five to ten" members wear their Dequiallo flash. Tr. 371–72.

One such example is that of Mark Duclos, who "tried to stab a member of the Mongols" at the 2011 Sturgis Bike Rally and was subsequently "tased twice" in the process of getting arrested. Tr. 366. Prior to that incident, Duclos wore only the Filthy Few flash; when Scheetz saw Duclos shortly after he was released from prison, Duclos had a "brand new set of colors with a Dequiallo and Filthy Few, 666"[1] flash. Tr. 366. Scheetz concluded that Duclos was awarded both flashes for the 2011 incident because Duclos "couldn't have done anything else" to earn these symbols "because he was in jail or on non-association." Tr. 367. Both the timing and circumstances of Duclos's new colors corroborate the information provided by the former Hells Angels.

Likewise, based on information provided by another law enforcement officer named Jorge Gil-Blanco, Scheetz believes that the Death Head's sewn-shut mouth represents the Hells Angels' dedication to secrecy. ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 33; Tr. 277. But Scheetz has also evaluated this information against everything else he knows about the Hells Angels: the interpretation is consistent with the Hells Angels World Rules, which expressly prohibit "snitches," Tr. 349; with certain charter bylaws, some of which prohibit using electronic devices at church, ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 36; and with statements made by founding members of the Hells Angels, *id*. ¶ 37. Scheetz explained that this interpretation is also consistent with the Hells Angels' recruitment practices: if the Hells Angels were not dedicated to secrecy, charters would not prohibit former law enforcement officers joining, would not "make [new members] prospect for 365 days minimal," and would not "do background investigations" on new members. Tr. 350.

The defense has previously criticized Scheetz for relying on hearsay, information from confidential informants, and information from other law enforcement officers. ECF No. 985 at 20. But this is precisely the type of material "on which experts in the particular field would reasonably rely." *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2012 WL 2571332, at *6 (N.D. Cal. June 30, 2012). "Certainly the officer relied on 'street intelligence' for his opinions about gang membership and tenets." *Hankey*, 203 F.3d at 1169. *See also United States v. Locascio*, 6 F.3d 924, 938 (2d Cir. 1993) ("[T]here is little question that law enforcement agents routinely and reasonably rely upon such

---

[1] The addition of the "666" to the Filthy Few flash signifies an additional violent act.

hearsay in the course of their duties."). Given the secretive nature of criminal organizations, there's no other way to develop intelligence.

And as Scheetz explained, based on his daily conversations with other law enforcement officers, he has concluded that other professionals develop their knowledge about the Hells Angels the same way that he does: they review evidence, read documents, speak with other law enforcement officers, and draw inferences based on personal observations. ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 16. *See United States v. Mulder*, 273 F.3d 91, 102 (2d Cir. 2001) (expert testimony properly relied "on the statements of detectives he supervised, victim contractors, and informants" because "[e]ach of these sources normally would be relied on by expert police officers"); *United States v. Angiulo*, 897 F.2d 1169, 1188 (1st Cir. 1990) ("Phrased another way, the experts acknowledged that information gleaned from informants over the course of their FBI careers was part of the vast mix of material that contributed to their background expertise on La Cosa Nostra.").

Nor does Scheetz's reliance on statements made by confidential informants require any additional disclosures about the informants themselves. The First Circuit rejected a similar challenge in *United States v. Angiulo*. There, FBI agents gave general expert testimony on the structure and operations of La Cosa Nostra as well as their opinion, based on wiretap recordings, of each defendant's role in an alleged racketeering enterprise. *Id.* at 1187. Although the agent's testimony was based in part on statements made by confidential informants, the district court refused to order the informants' identity pursuant to Federal Rule of Evidence 705. *Id*. The First Circuit affirmed this decision: even though experts had spoken with confidential informants, this was simply part of the "vast mix of material that contributed to their background expertise on La Cosa Nostra." *Id.* As explained above, the same is true here.[2]

In addition to the sources on which Scheetz relied, his process for analyzing evidence is also used by others in his field. ECF 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 16. This process has been

---

[2] Perhaps more importantly, the defense had nine hours to cross-examine Scheetz, and he demonstrated himself willing to discuss both the names of several confidential informants with whom he spoke as well as to answer questions about what he knew of their background. *See, e.g..*, Tr. 134, 143–144. If the defense wanted additional information about Scheetz's interactions with these informants, they could have asked him. They did not, and cannot now complain about their lack of opportunity to probe the basis for Scheetz's testimony.

Scheetz Post-Hearing *Daubert* Brief
17-CR-533-EMC
6

found reliable by multiple courts. In *United States v. Paracha*, No. 03 CR. 1197 (SHS), 2006 WL 12768, at *20 (S.D.N.Y. Jan. 3, 2006), aff'd, 313 F. App'x 347 (2d Cir. 2008), the district court admitted testimony of a terrorism expert whose methodology consisted of "gathering multiple sources of information, including original and secondary sources, cross-checking and juxtaposing new information against existing information and evaluating new information to determine whether his conclusions remain consonant with the most reliable sources." *Paracha*, 2006 WL 12768, at *20. That is precisely what Scheetz described doing here. ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶¶ 15–17; Tr. 16, 45, 241. *See also United States v. Abu-Jihaad*, 553 F. Supp. 2d 121, 125-126 (D. Conn. 2008) (the expert "gathers information from multiple sources and cross-checks factual information from other sources. He also works collaboratively with his peers and relies upon original information provided directly by the terrorist organizations themselves.").

      In the context of this type of expert testimony, the Court's function under *Daubert* is, in effect, to ensure that the witness has had the type of experience that provides a sound basis for the opinions that the expert provides. If the United States presented a patrol officer who did little more than enforce traffic stops on a few members of a motorcycle gang and observe a handful of their rallies, the Court would rightfully exercise its gatekeeping role. The United States' proposed expert in this case is as far removed from that level of experience as possible.

      The specific information on which Scheetz based his opinions is summarized below.

      1.   Hells Angels symbols

- Death Head: The basis for Scheetz's testimony about the appearance of the Death Head is his review of the Hells Angels rules (which prominently display and describe the Death Head, *see* ECF No. 1084-4 at EXPERT-00000244 (Evidentiary Hearing Exhibit 5); personal observations of the symbol through attending hundreds of events at which Hells Angels were present and viewing "thousands" of photographs of Hells Angels cuts, ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 45; and review of internal Hells Angels documents that display the Death Head, *see* ECF No. 1084-5 at 2 (Evidentiary Hearing Exhibit 7).

- Scheetz's testimony about the importance of the Death Head to the Hells Angels is based on his observations of Hells Angels displaying the Death Head, ECF No. 1084-1 (Evidentiary Hearing Exhibit

2), ¶ 45; the Hells Angels' statements that any item displaying the Death Head is the "sole and legal" property of the Hells Angels, ECF No. 1084-6 (Evidentiary Hearing Exhibit 7); the Hells Angels' rules, which state that only members are permitted to display the Death Head, ECF No. 1084-4 at EXPERT-00000227 (Evidentiary Hearing Exhibit 5); the Hells Angels' practice of requiring former members to cover up tattoos displaying the Death Head, ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶¶ 47–48, 49; and memoirs written by former members of the Hells Angels that emphasize the importance of the Death Head, ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶¶ 42–43.

- Scheetz's testimony about the use of the Hells Angels colors to intimidate others is based on his personal observations, including his observations of the 2019 power run at the HAMC South Run. ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 63; Tr. 333–335.

- Death Head's Sewn-Shut Mouth: The basis for Scheetz's testimony regarding the meaning of the Death Head's sewn-shut mouth is his conversations with other law enforcement officers, and the Hells Angels rules and practices, as described above. ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 33; Tr. 277, 350.

- Four-piece back-patch: the basis for Scheetz's testimony about the appearance of the four-piece back-patch is his personal observations of "hundreds of events at which members of the Hells Angels have been present" and his review of "thousands of photographs of Hells Angels members wearing their colors," ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 57; and his review of the Hells Angels World Rules, which set forth requirements for the back patch, ECF No. 1084-4 (Evidentiary Hearing Exhibit 5) at EXPERT-00000244.

- Scheetz's testimony about the meaning of the back patch—and specifically that the bottom rocker represents a claim to territory—is based on statements made by former members of the Hells Angels and other OMGs, ECF. No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 61 ("the patch we wore to show our preeminence in the state"); ¶ 89-90; his knowledge of decades of violence between the Hells Angels and other organizations that have tried to claim the same territory, *id.* ¶¶ 58-60; his own observations of Hells Angels charter expansion, ¶ 91; and information from undercover ATF agents embedded with rival OMGs, ¶ 92.

- Filthy Few: Scheetz's testimony about the Filthy Few is based on his personal observations, ECF

No. 1084-1, ¶ 66; his conversations with former Hells Angels members, Tr. 29; his conversations with other law enforcement officers, ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 66; his review of books about the Hells Angels, ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 68; and his knowledge about the backgrounds of "15 – 20" Hells Angels members who wear the flash, Tr. 371–72.

- Dequiallo: Scheetz's testimony about the Dequiallo is based on his personal observations, ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 71; his conversations with former Hells Angels, Tr. 43; conversations with other law enforcement officers. ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 71; and his knowledge about the backgrounds of "five to ten" Hells Angels members who wear the flash, Tr. 371–72.

- Purple Heart: Scheetz's testimony about the Purple Heart is based on his personal observations, ECF No. 1084-1, ¶74; a Hells Angels document that explains why the flash is awarded, ECF No. 1084-10 ("Any member who has earned the Deathhead Purple Heart has given his blood, in the Defense and Honor of the Hells Angels Motorcycle Club"); conversations with former Hells Angels members, Tr. 39; and knowledge about the backgrounds of "100 percent" of the Hells Angels members Scheetz has seen wearing the flash, Tr. 369.

### 2. Hells Angels Terms

- Charters: Scheetz's testimony about Hells Angels charters is based on his review of the Hells Angels World Rules, which describes requirements for charters, *see* ECF No. 1084-4 at EXPERT-0000234 (Evidentiary Hearing Exhibit 5); review of charter bylaws, ECF No. 1084-5 (Evidentiary Hearing Exhibit 6); research into the formation and operation of Hells Angels charters, Tr. 102; ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶¶ 91–92; knowledge about the establishment of new Hells Angels charters in states dominated by adversarial OMGs, ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 91; memoirs written by the Hells Angels, ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 90; and knowledge about differences between and commonalities among charters, ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶¶ 84–89.

- Clubhouses: Scheetz's testimony about Hells Angels clubhouses is based on his personal observations of several Hells Angels clubhouses, where he has viewed "security arrangements," ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 96, and his review of photographs of clubhouses searched

by law enforcement, *id.*

- Church: Scheetz's testimony about church is based on his review of charter rules requiring members to attend church, ECF No. 1084-5 (Evidentiary Hearing Exhibit 6); conversations with other law enforcement officers, who are aware of when specific charters hold church, ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 101; and review of "church minutes," ECF No. 1084-2 (Evidentiary Hearing Exhibit 3).

- Nomads: Scheetz's testimony about Nomads charters is based on his knowledge about the establishment of Nomads charters, ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 92; Tr. 20, 23, 190, 273; 314–15; use of the phrase in internal Hells Angels documents such as the BHC List, ECF No. 1084-8 at HA-00045112 (Evidentiary Hearing Exhibit 9), and West Coast Officers' Meeting minutes, ECF No. 1084-21 at 2 (Evidentiary Hearing Exhibit 22); and descriptions of Nomads charters in press accounts, ECF No. 1084-19 at 9 (Evidentiary Hearing Exhibit 20).

- Full-patch members, hangarounds, and prospects: Scheetz's testimony about the meaning of these terms, and the relationship between hangarounds, prospects, and full-patch members is based on his interviews of about 10 – 15 former members of the Hells Angels, 10 – 15 Hells Angels prospects, and 5 Hells Angels hangarounds, Tr. 66, 255–256; his review of the Hells Angels World Rules, which establish requirements for prospects, including a minimum prospecting period and the directive that prospects are not permitted to wear Hells Angels insignia, ECF No. 1084-4 at EXPERT-00000236 (Evidentiary Hearing Exhibit 5); his personal observations of visual identifiers worn by Hells Angels members, hangarounds, and prospects, including that prospects "wear vests that contain only the state bottom rocker and the word 'MC'" but not "any items of clothing that use 'Hells Angels' or the Death Head logo," ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 110; and his personal observations of the interactions between hangarounds, prospects, and full-patch members, including that prospects and hangarounds provide security, run errands, and guard motorcycles for full-patch members, ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 110.

- Tattoos: Scheetz's testimony about the significance of Hells Angels tattoos is based on his personal observations of Hells Angels, ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 111.

- Left/Out: Scheetz's testimony about the meaning of "Left" and "Out" is based on his review of

the Hells Angels rules, which state that a "Left" person "must write LEFT and date his most visible tattoo" but an "Out" person must have his tattoos "covered or removed" and can only be contacted with his former charter's permission, ECF No. 1084-4 at EXPERT—0000232–233 (Evidentiary Hearing Exhibit 5); internal Hells Angels documents explaining the terms, ECF No. 1084-16 (Evidentiary Hearing Exhibit 17); knowledge of violent assaults that happened when former members were thrown "Out" of the Hells Angels, ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 116; and review of photographs of "Out" members tattoos, ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 49.

        3.   *Hells Angels Territory*

- Scheetz's testimony about the Hells Angels' territory is based on his awareness of the Hells Angels' expansion, where Hells Angels' charters are located, and when Hells Angels charters were opened, ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 117; his knowledge that the state bottom rocker represents a claim to territory, ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶¶ 60–61; and his knowledge of conflicts that have arisen over territory, ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶¶ 91–92, 120–122; Tr. 201.

- Scheetz testified that he tracks "ongoing violence" between the Hells Angels and other adversarial OMGs that is based on the Hells Angels' expansion and migration. Tr. 197. He's concluded that expansion leads to violence because of the timing of violence incidents compared to the timing of the Hells Angels' expansion. Tr. 308

- In addition, Scheetz's knowledge about the Hells Angels' disputes over territory is also based on his conversations with law enforcement officers who infiltrated rival OMGs that were involved in those disputes. This includes Dan Ozbolt, who was undercover with the Outlaws Motorcycle Club when the Outlaws carried out an assault Hells Angels affiliates over a territorial dispute. ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 66, 91–92; ECF No. 1084-13 (Evidentiary Hearing Exhibit 14).

        B.   <u>Scheetz's testimony is relevant</u>

In addition to reliability, the Court is required to determine whether Scheetz's testimony will be relevant. Because of the racketeering charges, the United States will required to prove the existence of an association-in-fact, and these areas—symbols, terms, and territory—fall squarely within proving that association. Indeed, these topics are the "the traditional areas in which a gang expert can testify." *United*

*States v. Rios*, 830 F.3d 403, 415 (6th Cir. 2016); *United States v. Palacios*, 677 F.3d 234, 249 (4th Cir. 2012) (proof of association-in-fact involved evidence of "common symbols, gestures, colors, and parlance"); *United States v. Odum*, 878 F.3d 508, 516–17 (6th Cir. 2017) ("The required relationships were shown by testimony regarding PMC's by-laws, its hierarchical chain of command, and the importance of PMC symbols, primarily members' rags.").

These are also the same subjects that courts in this district have found will be helpful to a jury. *United States v. Cerna*, No. CR 08-0730 WHA, 2010 WL 11627594, at *6 (N.D. Cal. Dec. 17, 2010) ("On the other hand, Sergeant Molina's interpretation of code words, colors, tattoos, gang-territory mapping, and symbols generally will assist the jury in understanding fact evidence otherwise presented at trial and will be allowed."); *United States v. Williams*, No. 13-CR-00764-WHO, 2016 WL 899145, at *5 (N.D. Cal. Mar. 9, 2016) ("Sgt. Jackson's opinions regarding CDP and other Western Addition gangs cover six basic topics: (1) common slang; (2) gang territory; (3) gang symbols; (4) gang alliances and rivalries; (5) general characteristics of gangs, including common values and behaviors; and (6) use of rap music. Sgt. Jackson's knowledge and experience qualify him to give expert testimony that will be helpful to jurors on the first three topics, but for a variety of reasons he is precluded from giving opinions on the latter three."); *United States v. Flores*, No. CR 12-00119 SI, 2014 WL 12686740, at *1 (N.D. Cal. June 16, 2014) ("For example, a lay juror would probably not know much, if anything, about the colors and symbols related to the various gangs in the Bay Area. Similarly, a juror would probably not understand the significance of specific gang tattoos or gang graffiti. Additionally, a juror might not know the meaning of certain terms such as to 'put in work' for or be 'jumped in' to a gang, or what a 'kite' is.").

The defense has suggested that Scheetz's testimony is irrelevant because of the concept of "charter autonomy," and the possibility that the Sonoma County charter of the Hells Angels functions differently than the national organization. Scheetz testified to the opposite; he explained that all Hells Angels charters in the United States share common symbols because of the conventions mandated by the World Rules. ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 85; Tr. 324 (Filthy Few flash worn by multiple charters), 325 (Dequiallo flash worn by multiple charters).[3] Scheetz also testified that various

---

[3] In fact, the World Rules state that "[a]ll flashes old and new" must be "cleared on country

Scheetz Post-Hearing *Daubert* Brief          12
17-CR-533-EMC

Hells Angels charters act as though they are part of a single organization, as alleged in the Superseding Indictment in this case. For instance, "[i]ndividual charters send 'prospect' and 'out' information to the entire organization," ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 88; meeting minutes show structure and hierarchy on a regional and national level, *id.*; historical rivalries carry over across charters, *id.* ¶ 89; and there exist internal communications between charters about significant events, including those internal to a charter, even though charter autonomy would suggest that each charter is supposed to keep its business to itself. Tr. 341.

In any event, the indictment here alleges that the Sonoma charter is part of a transnational organization. Even if the Court were to find that Scheetz himself cannot link Sonoma to the national enterprise, the United States proffers that it will elicit testimony from fact witnesses who will explain that the Sonoma charter of the Hells Angels does in fact use the same symbols, terms, and concept of territory to which Scheetz will testify. In analyzing a similar issue, the Sixth Circuit approved this process, explaining that the United States may elicit "expert testimony on a national gang and separately draw[] a link to the local set." *United States v. Ledbetter*, 929 F.3d 338, 349 (6th Cir. 2019). *See also United States v. Rios*, 830 F.3d 403, 415 (6th Cir. 2016) ("Rather, he opined about the nationwide Latin Kings, and the government sought to make the link to the Holland Latin Kings through other testimony.").

The defense may also argue that Scheetz's proposed testimony is prejudicial because of its references to violence. It's true that in *United States v. Cerna*, Judge Alsup precluded a gang expert from referring to violence. 2010 WL 11627594, at *10. But there are two important distinctions between *Cerna* and this case. The first is that in *Cerna*, there was no "actual proof of any violence within the four corners of the proffer." *Id.* at *3. That is not the case here. Scheetz has provided the court with a number of documented violent incidents between the Hells Angels and other adversarial motorcycle gangs, and he confirmed that he personally verified that those incidents took place. Tr. 201.

And perhaps more importantly, Scheetz's references to violence are not gratuitous but instead provide the basis for his testimony. The Hells Angels' history of violence explains how Scheetz knows

---

level." ECF No. 1084-4 at EXPERT-00000230 (Evidentiary Hearing Exhibit 5).

that the bottom rocker represents a claim to territory (because another gang's claim to the same territory has led to 40 years of violence); it explains how Scheetz knows how the Hells Angels implement "left" and "out" (because of the violence associated with the "out" status); it explains how Scheetz knows of the significance of Hells Angels symbols such as the Filthy Few, Dequiallo, and Purple Heart (because each one can be traced to violent acts); and it explains how Scheetz knows the meaning of the stitched-shut mouth (in part because of the threat of violence against cooperators).

In short, Scheetz's testimony is relevant.

### C. The Court should consider the entire record

The defense has argued that Scheetz did not explain his "methodology" in his declaration and that therefore, the Court should not consider Scheetz's testimony on the issue at the hearing. There are several problems with this position. First, as explained above, the defense's legal premise is incorrect. The Court's evaluation of reliability should focus on the extent of Scheetz's experience rather than "the methodology" he employs. *Hankey*, 203 F.3d at 1169; *Parkhurst*, 865 F.3d at 516 ("[w]e have repeatedly allowed such expert testimony without requiring 'scientific methodologies' or 'peer review.'"). Second, the defense's factual premise is incorrect. In his declaration, Scheetz explained that he evaluates new information against what he knows "from other investigations" into the Hells Angels, what he has "observ[ed] at Hells Angels events," and what he knows "from [his] conversations with witnesses and confidential informants." ECF No. 1084-1, ¶ 15 (Evidentiary Hearing Exhibit 2). That's the same process he described repeatedly at the hearing. Tr. 328.

In any event, the defense is stuck with the record that they created. If they believed that Scheetz's declaration did not adequately set forth the basis for his opinions, they should have not have elicited additional information on cross-examination. There's no rule that requires the Court to disregard a witness's cross-examination testimony just because defense counsel do not like the answers the witness provided.

Finally, the Court indicated that it would assess whether the defense was prejudiced. Tr. 404. They are not. Under normal circumstances, the defense would have only a "written summary" of the anticipated expert testimony prior to the date of the hearing, Fed. R. Crim. P. 16(a)(1)(G), rather than the

fulsome declaration and exhibits that it was provided with here.[4] Because it is not possible for a party to anticipate and preemptively address every topic of cross-examination, it is the United States that will be prejudiced if the Court does not consider Scheetz's responses to defense counsel's cross-examination. Such a ruling would leave the defense free to contest a proposed expert on whatever grounds they wished, but leave the United States constrained in its ability to provide the Court with accurate factual information.

## II. Conclusion

For the foregoing reasons, the Court should deny defendants' motion to exclude the proposed expert testimony of Jeremy Scheetz.

DATED:  September 4, 2020

Respectfully submitted,

DAVID L. ANDERSON
United States Attorney

_/s/_____
KEVIN J. BARRY
AJAY KRISHNAMURTHY
LINA Y. PENG
Assistant United States Attorneys

---

[4] *Compare Ablett*, 09-CR-0749 RS, Dkt. 134-1 at 2-3 (one-page expert notice regarding the Mongols OMG); *Flores*, 12-CR-0119 SI, Dkt. 982-1 at 1-2 (one-page gang expert notice); *Williams*, 13-CR-0764, Dkt. 858 (five-page gang expert notice); *Cerna*, 08-CR-0730 WHA, Dkt. 1884-1 (seven-, four-, and six page gang expert notices); and *United States v. Cervantes*, 12-CR-0792 YGR, Dkt. 666-1 at 3-6 (N.D. Cal.) (two- and one-page gang expert notices).