**Exhibit 1 (Hearing Transcript)**

Pages 1 - 113

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )
   vs.                              )  No. CR 7-0533 EMC
                                    )
JONATHAN JOSEPH NELSON,             )  San Francisco, California
et al.,                             )  Tuesday
                                    )  August 18, 2020
            Defendants.             )  9:00 a.m.
_____)


**TRANSCRIPT OF HYBRID ZOOM VIDEO CONFERENCE PROCEEDINGS**


**APPEARANCES:**

**For the Plaintiff:**        DAVID L. ANDERSON
                              United States Attorney
                              450 Golden Gate Avenue
                              11th Floor
                              San Francisco, California 94102
                   BY:  **AJAY KRISHNAMURTHY**
                        **KEVIN BARRY**
                        **ASSISTANT UNITED STATES ATTORNEYS**



**For Defendant Jonathan Joseph Nelson:**
                              LAW OFFICE OF JAI M. GOHEL
                              819 Eddy Street
                              San Francisco, California 94610
                   BY:  **JAI M. GOHEL, ESQ.**



          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                 Official Reporter - US District Court
                 Computerized Transcription By Eclipse

**APPEARANCES:   (CONTINUED)**

**For Defendant Raymond Michael Foakes:**
                        GEORGE BOISSEAU LAW OFFICE
                        740 4th Street, Second Floor
                        Santa Rosa, California 95404
                **BY:  GEORGE C. BOISSEAU, ESQ.**


**For Defendant Russell Allen Lyles, Jr.:**
                        LAW OFFICES OF MICHAEL CLOUGH
                        6114 LaSalle Avenue, Suite 833
                        Oakland, California 94611
                **BY:  MICHAEL W. CLOUGH, ESQ.**


**For Defendant Jeremy Daniel Greer:**
                        LAW OFFICE OF RANDY SUE POLLOCK
                        286 Santa Clara Avenue
                        Oakland, California 94610
                **BY:  RANDY SUE POLLOCK, ESQ.**


**For Defendant Brian Wayne Wendt:**
                        LAW OFFICE OF JOHN T. PHILIPSBORN
                        507 Polk Street, Suite 350
                        San Francisco, California 94102
                **BY:  JOHN TIMOTHY PHILIPSBORN, ESQ.**


                        LAW OFFICES OF MARTIN A. SABELLI
                        740 Noe Street
                        San Francisco, California 94114
                **BY:  MARTIN A. SABELLI, ESQ.**


**For Defendant Russell Taylor Ott:**
                        LAW OFFICE OF ROBERT WAGGENER
                        214 Duboce Avenue
                        San Francisco, California 94103
                **BY:  ROBERT F. WAGGENER, ESQ.**


                **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

**APPEARANCES:   (CONTINUED)**

**For Defendant Christopher Ranieri:**
                    LAW OFFICE OF JOHN G. WALSH, P.C.
                    63 Atlantic Avenue
                    Third Floor
                    Boston, Massachusetts 02110
            BY:  **JOHN G. WALSH, ESQ.**


**For Defendant Damien David Cesena:**
                    DURIE TANGRI LLP
                    217 Liedesdorff Street
                    San Francisco, California 94111
            BY:  **GALIA AMRAN, ESQ.**
                 **ENEDA HOXHA, ESQ.**


**For Defendant Brian Burke:**
                    LAW OFFICE OF ERIK BABCOCK
                    707 Washington Street
                    Second Floor
                    Oakland, California 94607
            BY:  **ERIK BABCOCK, ESQ.**


**For Defendant David Salvatore Diaz:**
                    LAW OFFICES OF JAMES S. THOMSON
                    732 Addison Street
                    Suite A
                    Berkeley, California 94710
            BY:  **JAMES THOMSON, ESQ.**


**For Defendant Merl Frederick Hefferman:**
                    LAW OFFICES OF JAMES BUSTAMANTE
                    1000 Brannan Street
                    Suite 488
                    San Francisco, California 94103
            BY:  **JAMES BUSTAMANTE, ESQ.**


                        -   -   -

**P R O C E E D I N G S**

**TUESDAY, AUGUST 18, 2020**                                        **9:01 A.M.**

---oOo---

    (Mr. Krishnamurthy, Mr. Barry and Mr. Philipsborn

     present in the courtroom for these proceedings.

    All other counsel present via Zoom video conference.)

        **THE CLERK:**  Calling Criminal Actions 17-533, United

States of America versus Jonathan Joseph Nelson, Raymond

Michael Foakes, Russell Allen Lyles, Jeremy Daniel Greer, Brian

Wayne Wendt, Russell Taylor Ott, Christopher Ranieri, Damien

David Cesena, Brian Allen Burke, David Salvatore Diaz, and Merl

Frederick Hefferman.

    Counsel, please state your appearances for the record,

beginning with the Government.

        **MR. KRISHNAMURTHY:**  Good morning.  Ajay Krishnamurthy

and Kevin Barry for the United States.

        **THE COURT:**  All right.  Thank you, Mr. Krishnamurthy.

        **MR. PHILIPSBORN:**  Good morning, Your Honor.  John

Philipsborn for Brian Wendt, who I think is expected here

momentarily.

        **THE COURT:**  All right.  And, Mr. Wendt, is he in the

other room or is he in holding?

        **MR. PHILIPSBORN:**  He is in holding.

        **THE COURT:**  All right.  Why don't we go ahead and

bring Mr. Wendt in?

```
 1           (Defendant Brian Wendt present in the courtroom, in

 2       custody.)

 3           MR. PHILIPSBORN:  Your Honor, Mr. Wendt is now

 4  present.

 5           THE COURT:  All right.  Good morning, Mr. Wendt.

 6       Does he have a set of headsets?  You want to put those on?

 7  Tell me if you can hear.  Can you hear okay, Mr. Wendt?

 8       No?  Testing.  Can you hear me?

 9           THE MARSHAL:  Sounds like it's coming through here.

10       (Discussion held off the record.)

11           THE COURT:  Okay.  Mr. Wendt can hear.  He's present.

12       We should also note for the record that I believe

13  Mr. Nelson is here and Mr. Ott is in the other room, in the

14  other courtroom, and they are hooked up by Zoom and can hear

15  and see the proceedings, and that all other defendants are

16  available.  This is being broadcast through Zoom so that all

17  defendants who are not live in the courthouse can participate

18  along with their counsel, and that counsel -- I can see from

19  the Zoom view -- I don't know if we have to go through a roll

20  call.  We have a record of it, but there are many counsel

21  participating through Zoom.

22       We have determined the order of examination of the witness

23  this morning.  Mr. Wendt will have the first opportunity to

24  cross examine the witness through Mr. Philipsborn, who is here

25  live.  Then Mr. Sabelli will participate by Zoom for further
```

1    cross examination.  And at that point Mr. Nelson will come in

2    and commence his examination through Mr. Gohel, and we'll see

3    how far we get today.

4         Just a reminder that the direct testimony of the witness

5    Mr. Scheetz has been given in terms of his declaration, which

6    is in the record, and that is document No. 1084 and associated

7    documents therewith.  And so we are commending with

8    cross-examination in order to make this as efficient as

9    possible.

10        And the Court will note that due to the pandemic and the

11   concerns of public health and safety, we are conducting this

12   proceeding in the manner in which we are, which I previously

13   discussed.  I've made every opportunity to allow defendants to

14   participate live, if they wish, with live cross-examination,

15   but giving the opportunity to also participate remotely.

16   Because of health concerns, we are requiring everybody in the

17   courtroom to don a mask, including the witness, and we are

18   limiting the attendance within the courtroom to ten people.

19        So with that --

20             MR. KRISHNAMURTHY:  Your Honor, if the Court would

21   permit, I think -- and we've previewed this with the defense as

22   well -- we would like to do a brief 30-minute or so direct,

23   just to have Mr. Scheetz introduce himself before the

24   cross-examination starts.

25             THE COURT:  All right.  No objection I assume,

```
 1   Mr. Philipsborn?

 2            MR. PHILIPSBORN:  Your Honor, we have been notified

 3   of that situation.  No objection.

 4       I do want to make a statement on behalf of the other

 5   defendants.  Mr. Boisseau came up and talked to me, expressed a

 6   concern that Mr. Nelson and Mr. Foakes were heavily shackled.

 7   And so we wanted to raise an objection to that and ask if there

 8   is some kind of accommodation that could be reached for them.

 9            THE COURT:  All right.  I discussed the matter with

10   the Marshals, and my understanding is that the shackling is

11   with the legs, and that when they come into the courtroom,

12   there won't be any hand -- are they shackled just by the legs

13   in the other courtroom or hands as well?

14       (Discussion held off the record between the Court and

15        the Marshal.)

16            THE COURT:  All right.  That's because of the limit

17   in the number of Marshals that are available?

18            THE MARSHAL:  Yes, Your Honor.

19            THE COURT:  All right.  The objection will be noted

20   for the record.  It is overruled.  For reasons of public safety

21   and the limitations on the staff available from the Marshal's

22   office, I am allowing the shackling as per the Marshals.

23       I will note that in the courtroom there is only shackles

24   on the legs, and since this is also not a jury trial there is

25   no prejudice stemming therefrom.
```

```
 1        All right.  So we are ready to proceed, and you can call
 2   the witness.
 3             MR. KRISHNAMURTHY:  Yes, Your Honor.  Thank you.
 4             THE COURT:  All right.  Angie, if you could
 5   administer the oath.
 6                       JEREMY SCHEETZ,
 7   called as a witness for the Government, having been duly sworn,
 8   testified as follows:
 9             THE DEFENDANT:  Yes.
10             THE CLERK:  Please state your full name and spell
11   your last name for the record.
12             THE COURT:  We need to unmute his microphone.  It's
13   muted.
14             THE CLERK:  Please state again.
15             THE WITNESS:  Jeremy Colton Scheetz, S-C-H-E-E-T-Z.
16             THE COURT:  Okay.  You may proceed.
17        Let me just make sure the Court Reporter can hear that.
18        (Discussion held off the record between the Court and
19         the Court Reporter.)
20             THE COURT:  Okay.  Thank you.
21                     DIRECT EXAMINATION
22   BY MR. KRISHNAMURTHY
23   Q.   Good morning, Mr. Scheetz.
24   A.   Good morning.
25   Q.   Where do you work?
```

**SCHEETZ - DIRECT  / KRISHNAMURTHY**

1   A.   I work for the Alcohol, Tobacco and Firearms in Washington

2   D.C.

3   Q.   What's your job title with ATF?

4   A.   I am an Intelligence Operations Specialist.

5   Q.   Did you prepare and sign a declaration for this case?

6   A.   Yes.

7   Q.   You should have a binder in front of you.  Could you

8   please turn to Tab 2?

9        (Witness complied.)

10  Q.   What's the document at Tab 2?

11  A.   That's the document we just addressed.

12  Q.   The declaration that you signed?

13  A.   The declaration, yes, sir.

14  Q.   Is it a true and accurate copy of the declaration that you

15  prepared and signed?

16  A.   Yes.

17  Q.   In preparation for this hearing did you review the

18  declaration again?

19  A.   Yes, I did.

20  Q.   Were there any corrections that you wanted to make?

21  A.   Yes.  There's no longer 94 charters in the United States.

22  There is actually 100 charters in the United States.

23  Q.   Thank you.

24       So in your declaration you wrote there were 94 charters.

25  There's actually 100?

**SCHEETZ - DIRECT  / KRISHNAMURTHY**

1  **A.**   Yes.

2  **Q.**   Great.  Other than those corrections, do you adopt your

3  declaration?

4  **A.**   Yes.

5  **Q.**   Thank you.

6       I'd like to go back to your job title as an Intelligence

7  Operations Specialist.  What are your duties as an IOS?

8  **A.**   My duties as an IOS on a daily basis are I assist on ATF

9  investigations, as well as state and local federal

10 investigations across the globe that affect or impacted by

11 Outlaw Motorcycle Gangs or motorcycle clubs.

12      I also do -- I'm actually a liaison for ATF within

13 multiple state and local and federal law enforcement agencies

14 across the globe.

15      I also work and monitor numerous Outlaw motorcycle gang

16 and motorcycle club events across the world.

17      I also participate in debriefings or interviews of OMG and

18 motorcycle club members across the world.

19      And then I also do training on behalf of ATF or gang

20 associations or expert symposiums across the world as well.

21 **Q.**   Did you have any training before starting your job as an

22 IOS?

23 **A.**   Yes.  In 2006 I went to the DEA ten-week intelligence

24 analyst course.

25 **Q.**   What about on-the-job training?

**SCHEETZ - DIRECT / KRISHNAMURTHY**

1   A.   Yes.  When I took the position in 2006, I was assigned

2   with a more experienced homicide detective, who also had been

3   an ATF for roughly about seven years.  He taught me multiple

4   things on how to be an IOS when dealing with Outlaw Motorcycle

5   Gangs.

6   Q.   As an IOS, are you the investigating officer or case

7   agent?

8   A.   No, I'm not.

9   Q.   How are your duties different than a case agent or an

10  investigating officer?

11  A.   First and foremost, I do not have enforcement powers.  My

12  job is to assist the case agent or task force officer or the

13  investigative party who is monitoring or tracking or working in

14  the Outlaw motorcycle gang.

15  Q.   How do you develop intelligence about Outlaw Motorcycle

16  Gangs?

17  A.   Information is derived from multiple investigations

18  through ATF or other state and local and federal investigations

19  across the world.

20      I also look at social media.  I take a lot of the

21  information that's derived from the OMG or motorcycle club

22  events that I work, the pictures that I've snapped, the

23  pictures that I've analyzed.

24      I look at news articles.  I look at stories.  I read a lot

25  of books, and that's how I come to my conclusions.

**SCHEETZ - DIRECT  / KRISHNAMURTHY**

1  Q.  I would like to take a couple of those things in turn.

2  The first thing that you said was intelligence was derived from

3  investigations across the world.  Can you explain what that

4  means?

5  A.  During an OMG investigation or a motorcycle investigation,

6  it could be with ATF or a state and local agency or someone

7  from across the globe, I'm always asked to assist and provide

8  realtime or day-to-day intelligence in particular to that OMG

9  or an adversarial OMG that might affect the investigation or

10  the outcome.

11  Q.  What role do you play in those investigations?

12  Specifically what tasks do you complete?

13  A.  As the intelligence component, I maintain timelines.  I

14  create charts.  I listen to jail calls.  I brief and update the

15  U.S. Attorney or the State's Attorney or District Attorney

16  that's handling the investigation on a day-to-day basis.

17      I provide realtime intelligence to make sure that

18  everybody is up to speed in the investigation.

19  Q.  Do you analyze evidence seized in those cases?

20  A.  Yes.

21  Q.  You also mentioned that you monitor OG events.

22  A.  Uh-huh.

23  Q.  What types events do you attend and monitor?

24  A.  I -- I monitor or work the larger events, such as the

25  Sturgis Bike Rally; or I might work a particular OMG event like

**SCHEETZ - DIRECT / KRISHNAMURTHY**

1   the Hells Angels USA Run, or a Hells Angels South Run, or I

2   might work a Bandidos USA Run.  It all depends on the

3   situation, what the need is asking for.

4   Q.   What does it mean when you work an event?

5   A.   Due to the fact that I'm an intelligence component, I

6   either go out and snap pictures to analyze and look who is new

7   in the club, new colors, new patches in there; or I work in a

8   command post setting, where I'm basically asked to conduct tag

9   checks and identify OMG members that might be at the event.

10  Q.   How many events at which Hells Angels are present have you

11  attended and worked?

12  A.   I've -- roughly about 50 primary -- primarily Hells Angels

13  events I've worked, but I've probably worked about 125 to 130

14  OMG events where Hells Angels are there with other motorcycle

15  clubs and other OMGs.

16  Q.   I want to go back to the investigations for a minute.

17  About how many investigations into the Hells Angels have you

18  assisted with in some capacity?

19  A.   I would say since 2006 I've probably assisted in close a

20  thousand across the world.

21  Q.   Is that just the Hells Angels or all OMGs?

22  A.   That's all OMGs.

23  Q.   What about just Hells Angels?

24  A.   I would say roughly 250 to 300 investigations.

25  Q.   One of the things that you mentioned when you were talking

1    about participating in investigations is debriefing witnesses.

2    Can you explain that in more detail?

3    **A.**    A lot of times if -- even before the investigation starts

4    or begins or during the investigation, I'm asked to come in

5    as -- on behalf of ATF as an expert to assist in debriefing a

6    possible source of information or a suspect or -- I mean, a

7    witness during investigation.

8         There, from there I use that information to assist the

9    case agent or task force officer or U.S. Attorney, District

10   Attorney on the investigation, anything that derives from that

11   interview.

12   **Q.**    Can those sources of information sometimes be current or

13   former members of OMGs?

14   **A.**    Yes.

15   **Q.**    Are you still in contact with any of the current or former

16   members of OMGs that you have debriefed?

17   **A.**    Yes.

18   **Q.**    Do you speak with other law enforcement officers who

19   investigate OMGs?

20   **A.**    Yes, on a daily basis.

21   **Q.**    What do you speak about?

22   **A.**    We talk about ongoing investigations.  We look at new

23   trends and patterns.  We talk about ongoing violent acts that

24   have transpired internally or externally with adversarial OMGs.

25        This is done on a global perspective due to the fact that

1  OMGs are global.  So on a daily basis I might be speaking with

2  somebody from Europe, as well as Australia, as well as somebody

3  in the United States.

4  Q.   Can you give us an example of a trend or pattern that you

5  might discuss?

6  A.   A trend or pattern that we discuss is something that we

7  look at to see if an adversarial OMG moves into a certain area,

8  will there be ramifications from the civilian sector or an OMG

9  or a motorcycle club that's already been embedded in that area

10  for a longer time.

11  Q.   When you speak with law enforcement officers, do they

12  share information about other OMG investigations with you?

13  A.   Yes.

14  Q.   Do you think that every piece of information that gets

15  shared with you is accurate?

16  A.   No.

17  Q.   Do you ever process or try to figure out if a piece of

18  information or a piece of intelligence is valid or accurate?

19  A.   Yes.

20  Q.   Let's take a hypothetical example.  So let's say a police

21  officer in Kentucky reaches out to you and tells you something

22  about an OMG in his or her area.  For example, just as a

23  hypothetical, that she believes that an OMG is recruiting

24  street gang members.

25       As an initial matter, would you have -- what would be your

SCHEETZ - DIRECT / KRISHNAMURTHY

1    initial reaction to that piece of intelligence?

2    A.   My initial reaction is because I have seen that trend and

3    pattern before across the United States, actually across the

4    globe, that would not be my final outcome.   What I would do is

5    I would also search through all my historical data, as well as

6    reaching out to other law enforcement entities across the globe

7    to see if they are seeing that trend and pattern.

8         I also reach out to ATF special agents who have conducted

9    infiltrations or been assigned to work in cases where -- on

10   OMGs where they might have seen this trend and pattern.

11        I also, once again, look at social media.   I look at

12   newspaper articles.   I read books.   I read a lot of reports or

13   officer safety bulletins.   There I compare and contrast and

14   then, depending on the situation or severity, I might write an

15   intelligence briefing or I might pick up the phone and call

16   them and tell them what we're seeing.

17   Q.   I want to talk about one of the things that you just said,

18   which is your initial reaction would be it's something that you

19   have seen before.

20   A.   Yes.

21   Q.   Can you explain how it would be something that you've come

22   across before?

23   A.   When I first worked in -- starting working Outlaw

24   Motorcycle Gangs in 2006, we started working investigations

25   especially in the -- with ATF Los Angeles.   That was something

1    that they saw; not just in the Hells Angels, but other

2    motorcycle gangs, was they were recruiting street gang members

3    to expand their rosters.

4        As the Hells Angels and other OMGs have migrated or

5    expanded across the United States, we saw one of their

6    recruiting mechanisms or recruiting tools is their reaching out

7    to street gang members to bolster their ranks, and that is

8    something that I've written about that has been turned over to

9    the Court, and that would be something that I would tell the

10   law enforcement entity who is putting in the request.

11   Q.   Are there personal observations that you would have made

12   that have any bearing on this assessment?

13   A.   Yes.  It's something that we have noticed, especially

14   working in USA runs, working smaller runs.  We've seen

15   individuals that we knew were previously documented street gang

16   members that are now riding or closely associated with the

17   Hells Angels or other Outlaw Motorcycle Gangs.

18   Q.   Thank you.

19       I would like to briefly go through just a few points in

20   your declaration.

21           MR. KRISHNAMURTHY:  For the record, I'm going to

22   start sharing my screen.

23       (Document displayed)

24   BY MR. KRISHNAMURTHY

25   Q.   So, Mr. Scheetz, throughout your declaration you've cited

1    the Hells Angels World Rules a lot.  What are the World Rules?

2    **A.**   The World Rules are something that all Hells Angels

3    charters across the globe have to abide by.

4    **Q.**   Do the World Rules describe any of the Hells Angels

5    symbols?

6    **A.**   Yes.

7    **Q.**   What's the primary symbol for the Hells Angels?

8    **A.**   The primary symbol is their patch, and that's considered

9    their Death Head.  That's their moniker, and that's what's on

10   the screen directly in the middle.

11   **Q.**   Okay.  I want to take those in pieces.  First of all,

12   what's the Death Head?

13   **A.**   The Death Head is their moniker or their emblem, and that

14   is the symbol for the Hells Angels.  Every Outlaw Motorcycle

15   Gang, even motorcycle clubs for the most part, have an emblem

16   or a picture, something that symbolizes who they are.

17   **Q.**   Can you describe Death Head?

18   **A.**   The Death Head is basically a skull with wings.  It has

19   changed throughout the years.  It's basically symbolmatic for

20   the Hells Angels since their inception.

21   **Q.**   How do Hells Angels members usually display the Death

22   Head, if at all?

23   **A.**   If it's not displayed on their colors, which has to be a

24   member, you'll see it on some type of indicia.  It could be a

25   T-shirt.  It could also be a tattoo.

**SCHEETZ - DIRECT  / KRISHNAMURTHY**

1    You could see it painted on the side of their clubhouse.

2  You can also see it on their gas tank or on their motorcycles.

3  Q.   You just said displayed on their colors.  What are colors?

4  A.   Colors are either a denim or a leather vest that is worn,

5  where the front, for the most part, displays their tags or

6  tabs, what's called their flash, or in the back of the colors,

7  is what we're looking at right now, which is a four-piece set.

8  Q.   Okay.  Do the World Rules specify any requirement for the

9  back of the colors?

10  A.   Yes.

11  Q.   What do they say?

12  A.   You must have the top rocker, if you're a full patch

13  member, that states that you're in the Hells Angels.  The Death

14  Head, which is their moniker, is always in the middle.  Below

15  that is the MC patch.  And then below that is going to be the

16  bottom rocker.  And that specifies the state, country or

17  province that you belong or control.

18  Q.   In the United States what is the bottom rocker?

19  A.   The bottom rockers always symbolizes the state.

20  Q.   So different charters within a single state will all show

21  the same bottom rocker?

22  A.   Yes.

23  Q.   What does it mean for -- for the Hells Angels to control a

24  territory and claim that on the bottom rocker?

25  A.   They are basically -- in the -- in the OMG or motorcycle

1   club community or underworld they are basically the dominant

2   OMG in that area, and everybody else in that area is

3   subservient to some form or fashion.

4        If they wear the California bottom rocker, for instance,

5   every motorcycle club in that state must ask for permission to

6   wear that California bottom rocker or there will be some type

7   of ramification.

8   **Q.**   How do you know that?

9   **A.**   Through reading numerous books, numerous debriefings,

10  numerous ATF and FBI investigations, speaking to OMG experts

11  across the world.  It's symbolmatic, on the type of things that

12  are attributed to the Hells Angels and the bottom rocker.

13  **Q.**   In the hundreds of -- the hundreds of events that you've

14  attended at which you've seen Hells Angels members in the

15  United States, have you ever seen a Hells Angel wearing a vest

16  that looked different or with a back patch that looked

17  different than this?

18  **A.**   Yes, for several of the runs that I've worked across the

19  world, plus going over to Australia.  Due to the fact that some

20  of their -- their -- stuff that's been put on them by the

21  federal government, they are not allowed to wear a certain

22  state -- country bottom rocker, so they might wear a city.

23       We know in Australia at one time their Nomads charter was

24  not wearing Australia.  It said Nomads.  That has since

25  changed.  That's because of what's come down from the courts,

**SCHEETZ - DIRECT  / KRISHNAMURTHY**

1  as well as the police departments.  And that's just something

2  that we noticed when traveling overseas and working these guys.

3  **Q.**   What about the United States?

4  **A.**   United States is always a state bottom rocker.

5  **Q.**   Are people who are not Hells Angels permitted to wear this

6  back patch?

7  **A.**   No.

8  **Q.**   What about anything with the Death Head?

9  **A.**   No.  Only members.

10  **Q.**   Do the World Rules say anything about that?

11  **A.**   Yes.

12  **Q.**   What do the World Rules say about that?

13  **A.**   That members can only don or wear the Death Head or

14  anything that says Hells Angels.

15  **Q.**   In the context of the Hells Angels are you familiar with

16  the term "prospect"?

17  **A.**   Yes.

18  **Q.**   What is a prospect?

19  **A.**   A prospect is someone who is basically the last step

20  before they become a member in the Hells Angels.  It takes

21  exactly 365 days, or one year at minimal, to become a member.

22  It's something that is uniformity across the globe that

23  everybody has to adhere to.

24  **Q.**   Are prospects allowed to wear the back patch of the Hells

25  Angels?

```
 1   A.    No.  They can only wear the state bottom rocker, or the
 2   country bottom rocker, or province and the MC.
 3         (Document displayed)
 4   Q.    Is that what you see in front of you?
 5   A.    Yes.
 6   Q.    Do you believe that these photographs show Hells Angels
 7   prospects?
 8   A.    Yes.
 9   Q.    Why is that?
10   A.    Because it's the two-piece patch that the Hells Angel
11   prospects wear.  It's the state bottom rocker with the state
12   that they below to and the MC patch.
13   Q.    What about people who leave the Hells Angels?  Members who
14   leave, are they permitted to display the Death Head or the word
15   "Hells Angels"?
16   A.    It depends.  If -- there's two ways you can leave the
17   Hells Angels.  You can be either Left or Out.
18         If you -- if you basically Left, that basically meant you
19   left on your own terms, your own recognizance, and you have to
20   at least get your Out date either below or on your Death Head.
21         If you are considered Out, that's basically the equivalent
22   to bad.  Most times they cover up the Death Head completely,
23   and then they put an Out date below it, and it says "Out Bad"
24   and cover it up.
25         And you're not allowed to -- if you're Out Bad, you have
```

1   to turn back all your indicia or anything that states that

2   you're a member of the Hells Angels, Out or Left.

3       (Photographs displayed)

4   **Q.**   Can you describe the photographs in front of you on the

5   screen right now?

6   **A.**   The photograph is of a before and after of a member that

7   was in Nomads Washington.   It clearly shows that he's a member

8   of the Hells Angels because he has a Death Head on the right

9   side his head.

10       He was -- he was at the time kicked out of the club on Out

11   status.   So they covered up his Death Head so nobody could see

12   that he was a former member of the Hells Angels.

13          **MR. PHILIPSBORN:**   Your Honor, just for the record, I

14   think it might help us to get some kind of description of what

15   it is the Court and parties are looking at, because at this

16   point in the hearing any reviewing court wouldn't have a clue.

17       I mean, we're in the process of reviewing a PowerPoint,

18   and -- and I understand the Court is seeing everything in

19   realtime, but we are making a record possibly for a future

20   litigation before another court.

21          **THE COURT:**   All right.   That's a point well taken.

22       Counsel, you should identify the page.   This is taken from

23   an exhibit; correct?

24          **MR. KRISHNAMURTHY:**   It is, Your Honor.

25          **THE COURT:**   Why don't you identify the exhibit and

**SCHEETZ - DIRECT  / KRISHNAMURTHY**

1   the page?

2          MR. KRISHNAMURTHY:  Yes, Your Honor.  So as an

3   initial matter, on the PowerPoint it is slide number 14, I

4   believe.

5          THE COURT:  What exhibit is that?

6          MR. KRISHNAMURTHY:  One second.

7      (Brief pause.)

8          MR. KRISHNAMURTHY:  In the declaration it's a series

9   of photographs under Paragraph 49 in the declaration on

10  Page 13, and that's the document filed as 1084-1 in this case.

11         MR. PHILIPSBORN:  And, Your Honor, again just for my

12  purpose -- purposes, I don't want to torture counsel for the

13  Government.  If we can just identify the slide in the

14  PowerPoint, I think, subject to the Court's ruling, that that

15  might suffice.

16     It's simply that we paused on a particular slide, and we

17  had no way of identifying for the record what it was we were

18  looking at.

19     I'm assuming that counsel for the Government will be

20  moving into evidence the PowerPoint at the end of these

21  proceedings, and if that's the case, then we'll have the

22  sufficient record.  I didn't mean for him to have to --

23         THE COURT:  All right.  Let's find out.  Is the

24  Government intending to move the PowerPoint into evidence?

25         MR. KRISHNAMURTHY:  Your Honor, we just intended it

**SCHEETZ - DIRECT  / KRISHNAMURTHY**

1   as a demonstrative, but if that would make things easier for

2   the sake of the record, we're happy to do that as well.

3           **THE COURT:**  All right.  Well, for the sake of the

4   record, I think we need to make sure the appellate court has

5   it.

6           **MR. KRISHNAMURTHY:**  Yes, Your Honor.

7           **THE COURT:**  So I will -- let's proceed that way.

8           **MR. KRISHNAMURTHY:**  Yes, Your Honor.

9           **THE COURT:**  Okay.

10          **MR. PHILIPSBORN:**  Thank you, Your Honor.

11          **THE COURT:**  Thank you.

12  BY MR. KRISHNAMURTHY

13  **Q.**   Mr. Scheetz, in the context of the Hells Angels, are you

14  familiar with the term "flash" or "tags"?

15  **A.**   Yes.

16  **Q.**   What is flash?

17  **A.**   Flash is basically all the symbols or verbiage that's on

18  the front of their colors that are incorporated or in --

19  verbiage that's on, it's considered a tag or a tab.  And all

20  those tags and tabs are considered flash.

21  **Q.**   What is the purpose of flash?

22  **A.**   Flash basically is a way for them to either pontificate to

23  their adversaries, or show brotherhood toward other charters,

24  or let the public know certain things that they have done in

25  furtherance of the Hells Angels.

**SCHEETZ - DIRECT  / KRISHNAMURTHY**

1   **Q.**   Do the World Rules contain any requirements for flash?

2   **A.**   Yes.

3   **Q.**   What do the World Rules say about flash?

4   **A.**   That the national has the overriding power.

5   **Q.**   What does that mean?

6   **A.**   That means if -- basically if they don't care for it or

7   they disagree with it, they can override and say they can't

8   have it.

9   **Q.**   How is flash usually displayed?

10  **A.**   Flash is usually displayed on the front of their colors or

11  it's on the side of their colors, and that's considered what

12  they call a side rocker.

13  **Q.**   Can it be displayed as a tattoo?

14  **A.**   Yes.

15  **Q.**   In the context of the Hells Angels, are you familiar with

16  the Purple Heart pin?

17  **A.**   Yes.

18  **Q.**   What does the Purple Heart represent?

19  **A.**   It represents that they drew blood in furtherance or on

20  behalf of the Hells Angels.

21  **Q.**   So who drew what -- in the Purple Heart specifically, who

22  drew blood?

23  **A.**   The member did, of the Hells Angels.

24  **Q.**   So the member was --

25  **A.**   Was stabbed or assaulted or shot, for the most part in a

 1  violent confrontation with an adversary or a non-conforming

 2  motorcycle club.

 3  **Q.**   Okay.  Just to clarify, the Purple Heart means that they

 4  themselves were wounded, the member was wounded?

 5  **A.**   Yes, sir.

 6  **Q.**   How do you know that?

 7  **A.**   We have seized information where we've seen exactly what

 8  the definition means.  We've also spoken to former and active

 9  members who have told us what it means.

10       (Document displayed)

11  **Q.**   I'm now showing slide 16 in the PowerPoint.

12       **THE COURT:**  Can you hang for a second?

13       Let me ask, you say you seized info.  I don't know what

14  that means.  Can you explain what you mean by "seized info"?

15  You seized info, or you looked at information obtained in a

16  search warrant, or what?

17       **THE WITNESS:**  Yes, Your Honor.  It was information

18  that was seized from a search warrant in California, and I was

19  able to observe the evidence that was seized during the

20  investigation.

21       **THE COURT:**  And what did that evidence tell you

22  why -- what the Purple Heart means?  Did you just seize the

23  Purple Heart, or was there something, some book or something,

24  or what did you seize?

25       **THE WITNESS:**  For instance, like, this actually photo

1  was seized from a clubhouse, and it was seized in the

2  clubhouse.  This is the first time that we actually saw what

3  the definition means and what it stands for.

4      We had an idea what it meant, but this gave us -- was able

5  to affirm what we always believed, what we were told from other

6  former members.

7  **BY MR. KRISHNAMURTHY**

8  **Q.**   Can you describe what the photograph says?

9  **A.**   The photograph states:

10        "Any member who has earned the Death Head Purple

11      Heart has given his blood in defense and honor of the

12      Hells Angels Motorcycle Club and shall forever be

13      revered by his fellow members, AFFA."

14      That's Angels Forever, Forever Angels.

15          **THE COURT:**  Where was that seized from?

16          **THE WITNESS:**  Riverside County clubhouse.

17          **THE COURT:**  When was that?

18          **THE WITNESS:**  I believe around 2015, '16, Your Honor.

19          **THE COURT:**  And you say you spoke to former and

20  active members on this subject; correct?

21          **THE WITNESS:**  Yes, Your Honor.

22          **THE COURT:**  How many former and active members?

23          **THE WITNESS:**  Three.

24          **THE COURT:**  Okay.  And when was that?

25          **THE WITNESS:**  As late as two weeks ago.

1          **THE COURT:**  And you were told about the meaning of

2   Purple Heart then?

3          **THE WITNESS:**  Yes, Your Honor.

4          **THE COURT:**  Okay.  Thank you.

5   **BY MR. KRISHNAMURTHY**

6   **Q.**   Mr. Scheetz, in the context of the Hells Angels are you

7   familiar with the term the "Filthy Few"?

8   **A.**   Yes.

9   **Q.**   What is the Filthy Few?

10  **A.**   It's a violent act that's been conducted in furtherance of

11  the club or the Hells Angels.

12  **Q.**   And so what does it mean if someone is wearing the Filthy

13  Few as a tattoo or a tag or a pin?

14  **A.**   It means that they have conducted a violent act.  They

15  have been awarded a Filthy Few because they have conducted a

16  violent act in furtherance of the Hells Angels.

17  **Q.**   And how do you believe that?

18  **A.**   That's what I've learned and accumulated since my time of

19  working these guys since 2006, through all the debriefings and

20  interviews that I've worked, as well as all the experts that I

21  have spoken to across the globe on a daily basis.  This is

22  something that we refer to on a daily or weekly basis.

23  **Q.**   Have you spoken with any current or former members of the

24  Hells Angels about the Filthy Few pin specifically?

25  **A.**   Yes.

SCHEETZ - DIRECT  / KRISHNAMURTHY

1    Q.    How many?

2    A.    Three.

3    Q.    Have you seen the Filthy Few displayed on any members in

4    the Hells Angels?

5    A.    Yes.

6    Q.    And have you tried to determine how that member earned his

7    Filthy Few pin?

8    A.    Yes.

9    Q.    Can you describe one of those examples for us?

10   A.    An example would be in 2008 a Hells Angels member Milo

11   Campbell was a member of the Berkshire County, Massachusetts

12   charter.  During the annual Sturgis Bike Rally, he and other

13   members of the Hells Angels were involved in a shooting with a

14   club called the Iron Pigs Motorcycle Club out of Washington.

15         During that incident, he was subsequently arrested, but he

16   was awarded the Filthy Few tag because he defended the patch

17   and actually was involved in the altercation with the Iron

18   Pigs, the shooting.

19   Q.    And had you seen Mr. Campbell before this incident?

20   A.    Yes.  We had seen him numerous -- at numerous East Coast

21   Officers Meetings, as well as USA Runs and South Runs along the

22   East Coast.

23   Q.    And had he been wearing the Filthy Few pin before?

24   A.    No.

25   Q.    And he was wearing the Filthy Few tag afterwards?

1    A.    Roughly two months afterwards, we were monitoring an East

2    Coast Officers Meeting, and he was there wearing a brand new

3    Filthy Few tag.

4    Q.    Are you familiar with the term Dequiallo in the context of

5    the Hells Angels?

6    A.    Yes.

7    Q.    What does that mean?

8    A.    That means that a member or a prospect has assaulted a

9    member of law enforcement on duty or off duty.

10   Q.    Why do you believe that?

11   A.    Similar to the Filthy Few, I've learned that in -- through

12   my years of training, debriefings and speaking to other experts

13   across the globe.  It is something that we discuss.

14        We actually track -- some places actually monitor how many

15   Dequiallos they have across the globe because it's so serious.

16   Q.    Have you personally observed any member of the Hells

17   Angels wearing a Dequiallo tag?

18   A.    Yes.

19   Q.    And have you tried to determine how he earned that tag?

20   A.    Yes.

21   Q.    Can you give us an example of that, please?

22   A.    We know that there was a contingent in 1997 that was

23   involved in the Laconia Bike Rally assault against law

24   enforcement officers.  And that contingent, we have pictures of

25   them before that were not wearing the Dequiallo tag.  Then

1  within some time frame after they got out of jail or we saw

2  them at other runs, they were donning the actual tag.

3      Several of the members we saw beforehand, while they were

4  arrested in their colors, did not have that tag, and then we

5  monitored events and we saw them wearing that tag.

6  **Q.**  Thank you.

7          **MR. KRISHNAMURTHY:**  Just one minute, Your Honor.

8          **THE COURT:**  While you're looking, let me ask you,

9  Mr. Scheetz, when you say you debriefed and talked to experts,

10 when you say "debrief," "debriefing," who was debriefed?

11         **THE WITNESS:**  Our ATF former special agents.  Most of

12 them are retired right now.  They have either conducted

13 infiltrations into an Outlaw Motorcycle Gang or they have

14 conducted long-term investigations on an Outlaw Motorcycle

15 Gang.

16         **THE COURT:**  Did any of those ATF agents learn

17 firsthand about Dequiallo?

18         **THE WITNESS:**  Yes, sir.

19         **THE COURT:**  Through their -- their direct

20 observations?

21         **THE WITNESS:**  Yes, Your Honor.

22         **THE COURT:**  Okay.

23         **MR. KRISHNAMURTHY:**  Your Honor, those are the only

24 questions that I have for Mr. Scheetz on direct.

25         **THE COURT:**  Okay.  Great.  Thank you.  Appreciate it.

1       All right.  Cross-examination.

2           MR. PHILIPSBORN:  Your Honor, just for the record on

3    behalf of the defense, I would ask that the Court entertain at

4    some future point, after the end of the hearing, a motion to

5    strike the testimony based on the ten objections that are in

6    the record and our pleadings.

7       I understand we're obviously going to be going through

8    this hearing, but just to make sure that we've timely made our

9    objections to the direct.

10      I would also indicate that there are a few opinions that

11   are rendered today that, at least as far as I can tell, go a

12   little bit beyond the four corners of our -- of the declaration

13   we've gotten.  So I'm going to ask the Court for a bit of

14   latitude as I go through the cross.

15                   **CROSS-EXAMINATION**

16   **BY MR. PHILIPSBORN**

17   **Q.**  Mr. Scheetz, my name John Philipsborn.  I'm one of

18   Mr. Wendt's lawyers.  Mr. Wendt is present to my right.  I'm

19   going to be asking you really mainly about your declaration and

20   about the exhibits, and not so much the PowerPoint, which I

21   just saw for the first time this morning.

22      And my focus is going to be on the bases for your

23   opinions.  Other counsel will have questions in other areas.

24      Before we get going -- and I ask this respectfully, but

25   just so we make sure it's in the record -- during the course of

1   your career in Government, has there ever been an occasion on

2   which you have been the subject of an adjudication, either in

3   an administrative proceeding or in a court, for having given

4   either false or misleading statements or having made a false or

5   misleading report?

6   **A.**   No, sir.

7   **Q.**   Okay.  Thank you, sir.

8        So is it your understanding that the areas in which you're

9   providing your opinion --

10       (Audio interference.)

11           **THE COURT:**  Hold a second.  We're getting a lot of

12   echo.

13       Mr. Krishnamurthy, could you mute yours?

14       And for some reason, Mr. Philipsborn, occasionally we get

15   a loud echo.  I don't know whether there is a second microphone

16   on.  That sometimes does that.  Maybe you can move your laptop

17   a little further away, in case your laptop microphone is

18   picking you up as a secondary source.  Do you want to try that?

19           **MR. PHILIPSBORN:**  Your Honor, you're dealing with a

20   complete luddite here.  Sorry.

21           **THE COURT:**  Well, we're learning.

22           **MR. PHILIPSBORN:**  Thank you.  I apologize to all

23   concerned.

24           **THE COURT:**  Okay.

25

1  BY MR. PHILIPSBORN

2  Q.   Mr. Scheetz, is it your understanding that the main thrust

3  of your testimony deals with the areas of Hells Angels symbols,

4  terms and territory?

5  A.   Yes, as well as the history.

6  Q.   And counsel for the Government made reference to a 38-page

7  declaration that's been filed in our record.  Let me ask you,

8  sir, who prepared that declaration?

9  A.   I did.

10  Q.   Meaning, you wrote it out?  You typed it?  What did you do

11  by way of preparation?

12  A.   Provided the information for the actual document to be

13  comprised.

14  Q.   You talked to somebody, and that person prepared the

15  declaration?  What is it you're explaining to us about your

16  preparation of the declaration?

17  A.   The declaration is my information.  It's comprised of all

18  -- of information that has been composed with us that we turned

19  in, is that's my declaration.  It's everything that's been

20  compiled by myself.

21  Q.   Okay.  What I'm asking you, sir, is did you physically

22  write this declaration?

23  A.   I wrote it, along with the U.S. Attorney's Office.

24  Q.   Okay.  Meaning, that you provided information to members

25  of the U.S. Attorney's Office and the text is a combination of

**SCHEETZ - CROSS / PHILIPSBORN**

1    what you told them and what they wrote down; correct?

2    **A.**    It's basically mostly all of my information, sir.

3    **Q.**    Okay.  And just so the Court can understand what that

4    means as it reviews your declaration in the future, who typed

5    out the declaration?

6    **A.**    The U.S. Attorney's Office.

7    **Q.**    Okay.  Now, did you review the declaration before you

8    signed it?

9    **A.**    Yes, sir.

10   **Q.**    And in your opinion, are you able to provide a basis for

11   each of the opinions stated in the declaration?

12   **A.**    Yes, sir.

13   **Q.**    And in your opinion, based on your career as an

14   intelligence analyst, is there a way of verifying each of the

15   opinions and opinions on facts and background that you state in

16   your declaration?

17   **A.**    Yes, sir.

18   **Q.**    Incidentally, have you reviewed the indictment in this

19   case?

20   **A.**    No, sir.

21   **Q.**    Do you have any familiarity with the charges in this case

22   at all based on your background?

23   **A.**    Just the basics.  Other than that, no, sir.

24   **Q.**    Okay.  To your knowledge, have you interviewed any of the

25   defendants in this case?

1    A.   No, sir.

2    Q.   To your knowledge, have you interviewed any -- or

3    debriefed any individual who, as far as you knew, was a member

4    or had some association with the Hells Angels of Sonoma County?

5    A.   Yes.  I have talked to members, sir, who have discussed a

6    particular member of the Hells Angels Sonoma County.

7    Q.   Okay.  That's not what I --

8         THE COURT:  Can you hang on?  Can you hang on for a

9    second?

10        I want to make sure everybody has got their mask up.

11   There are some that are below the nose.  We need to make sure

12   they are -- everyone has their nose and mouth covered.  Thank

13   you.

14        Go ahead.

15   BY MR. PHILIPSBORNE

16   Q.   I was unclear, so let me try to clarify.

17        Have you, to your knowledge, talked to a member or

18   associate of the Hells Angels Sonoma County?

19   A.   Can you repeat that again, sir?

20   Q.   Sure.  Have you talked to, debriefed, a member or

21   associate of the Hells Angels Sonoma County?

22   A.   No, sir.

23   Q.   Have you talked to or debriefed a member of the Hells

24   Angels Fresno, California?

25   A.   No, sir.

**SCHEETZ - CROSS / PHILIPSBORN**

1  Q.   Now, you have stated that you -- this morning that you

2  have been involved in 250 to 300 investigations or contacts --

3  and please correct me where I'm wrong -- that were focused on

4  the Hells Angels Motorcycle Club?

5  A.   Correct, sir.

6  Q.   Okay.  Now, again, just so the Court and counsel

7  understand what you're talking about, what does that mean, as

8  far as you're concerned?

9  A.   It means that I have assisted since 2006 with

10  approximately about 250 or so investigations across the world

11  involving the Hells Angels.

12  Q.   Now, would it be fair to say that you're not telling the

13  Court that on 250 to 300 occasions you were actually in the

14  field debriefing members of the Hells Angels or former members

15  of the Hells Angels?

16  A.   That's correct.  That's correct, sir.  I was providing

17  information.

18  Q.   And providing information could be you seated in an office

19  someplace being called by a colleague of yours who is asking

20  for information; correct?

21  A.   Correct, sir.

22  Q.   Or you could be sitting in that same office and having

23  somebody provide you information about the Hells Angels;

24  correct?

25  A.   Correct.

1  Q.   Okay.  Just so we understand, you have talked this morning

2  and have written in your declaration about debriefing

3  individuals about the Hells Angels.  The Court asked you a

4  question about that.

5       What does it mean to debrief somebody?

6  A.   That means that I sit down with them and I ask them a

7  series of questions concerning not only the Hells Angels, but

8  about the motorcycle club or OMG community that they are

9  involved in.

10 Q.   Okay.  It seems as though, for example, with respect to

11 the issue of the Purple Heart certificate that you discussed

12 this morning, you indicated that you had acquired information

13 directly from three individuals; correct?

14 A.   Yes, sir.

15 Q.   One as late as two to three weeks ago?

16 A.   That's correct.

17 Q.   In Riverside County, California?

18 A.   No, sir.

19 Q.   And who are the people you talked to?

20 A.   I talked to Timothy Jordan, who is an ATF source of

21 information.  I talked to -- I forgot his name, David out of

22 Canada.  And I've also had a chance to speak to Nicholas Neff

23 out of San Diego when he spoke at a conference.

24 Q.   Okay.

25 A.   David Atwell is the individual from Canada, sir.

1   Q.   David Atwell is an individual from Canada and --

2   A.   He's a former Hells Angels member, sir.

3   Q.   Okay.  And you talked him in what context?

4   A.   I talked to him on numerous occasions because he was a

5   source of information for the Ontario Provincial Police.  So I

6   got to talk to him while I was up in Canada.

7        I also got to talk to him when he came to the United

8   States and spoke at a conference.  We discussed the Purple

9   Heart at length.

10  Q.   Got it.

11       And it sounds as though Mr. Neff is also somebody who is a

12  former member and now actually at times participates in

13  conferences?

14  A.   No.  At the time, this was many years ago.  He

15  participated in a conference many years ago, and he discussed

16  numerous topics, and I got to ask him a couple questions about

17  the Purple Heart, as well as the Filthy Few.

18  Q.   Got it.

19            THE COURT:  Hang on for a second.  Let me ask, was he

20  a former member?

21            THE WITNESS:  Yes, sir.  Yes, Your Honor.

22            THE COURT:  Okay.

23  BY MR. PHILIPSBORN

24  Q.   And so at least in terms of your direct contact with

25  individuals who provided you information about the Purple

**SCHEETZ - CROSS / PHILIPSBORN**

1    Heart, we're talking about one member of law enforcement and

2    two cooperators or sources; correct?

3    **A.**    Yes.  But I -- yes, sir.  But I've also spoken to numerous

4    OMG experts, individuals in law enforcement that have been

5    deemed experts, either federal, state or by their agency,

6    across the globe about the Purple Heart as well.

7    **Q.**    And let's move for a second to the Filthy Few patch.  It

8    sounds as though there were also, as it happens, three persons

9    you talked to about that; correct?

10   **A.**    Correct, sir.  As well as other OMG experts across the

11   globe.

12   **Q.**    Who are those three people?

13   **A.**    Same individuals, sir.

14   **Q.**    Got it.

15        So they -- and it was on the same occasion, so you learned

16   about the Purple Heart that you also learned about the --

17   talked to them about the Filthy Few patch?

18   **A.**    During the interview, I asked them certain questions about

19   the Filthy Few and the Purple Heart as well, sir.

20   **Q.**    So, again, I think you -- you explained that for one of

21   these individuals, you had a chance to kind of talk to them in

22   passing at a conference, and so you happened to bring up both

23   those topics at the same time?

24   **A.**    Yes.  I asked them several questions, yes, sir.

25   **Q.**    Got it.

**SCHEETZ - CROSS / PHILIPSBORN**

1           And you must have notes of those interviews; correct?

2   **A.**   No, sir.

3   **Q.**   You don't?

4   **A.**   No, sir.

5   **Q.**   And -- I mean, is there some kind of a reporting mechanism

6   you would have used to memorialize these conversations so that

7   they could be shared with your colleagues in law enforcement?

8   **A.**   Well, we were in a room of 400 people at the conference at

9   the time.  The other individual I had spoken to at numerous

10  times in Canada, as well as Australia.  So he wasn't just

11  briefing me.  He was also briefing the room as well.

12  **Q.**   Okay.  So just in terms of our understanding of what was

13  told you and what you took from it, how is it that we would

14  find that out, other than just talking to you?  Is there any

15  place where that information is preserved, to your knowledge?

16  **A.**   Information that I've conducted numerous training

17  sessions, and when I talk about the Filthy Few or the Purple

18  Heart, it's something I discuss.  It's in a PowerPoint slide,

19  but it's not that it's been written down and stored away.

20          I just -- I just know from working these guys and

21  analyzing these individuals, that I'm able to track how they

22  have either earned it or were awarded for the most part.  It's

23  part of my job in intelligence.

24  **Q.**   Got it.

25          But as part of your job in intelligence, you're acquiring

**SCHEETZ - CROSS / PHILIPSBORN**

1   information that's going to be of assistance to colleagues,

2   both in the United States and elsewhere.  Does that sound

3   about, right?

4   **A.**   Yes, sir.

5   **Q.**   Okay.  And so the only way that your colleagues can

6   actually probe your knowledge of, let's say, the issue of the

7   patch, the Filthy Few patch, is to talk to you?  You don't

8   memorialize that anywhere?

9   **A.**   Well, I have -- I have a training slide that I keep and

10  I -- I don't, because I know through slides or pictures that I

11  have, that I have been given from OMG experts across the globe,

12  to include ATF Special Agents.  I have that picture.  I know

13  exactly, for the most -- I know exactly how they earned it or I

14  don't know how they earned it.  There is a lot of them I don't

15  know exactly how they were awarded the tag.

16  **Q.**   Okay.  Dequiallo, you talked about.  You answered

17  questions this morning about observations that you made about

18  people who appeared to have acquired that particular patch.

19      Have you talked to individuals about that particular

20  emblem or patch?

21  **A.**   Yes.

22  **Q.**   Okay.  How many?

23  **A.**   Timothy Jordan and the individual from Canada, as well as

24  other OMG experts across the globe.

25  **Q.**   Okay.  And, again, I won't belabor it, but fair to say

1    there are no notes of your conversations either with Jordan or

2    the guy from Canada?

3    **A.**    No, sir.  Other than the information that's been turned

4    over in the reports to you guys.

5    **Q.**    Okay.  Now, in your declaration you make reference --

6              **THE COURT:**  Can I ask a question?  I'm sorry,

7    Mr. Philipsborn.

8         Let me ask you:  When you talked to -- you say several

9    times you've talked to other experts.  Are there notes?  Did

10   you receive anything in writing from these experts, or is it

11   all just a telephone and they kind of tell you what's going on?

12             **THE WITNESS:**  All right.  So what will happen is say,

13   for instance, in Canada, I go to an expert's meeting every year

14   and we sit in a forum and we discuss, similar to -- we go to

15   Europol every year.  It's in the Hague, Netherlands.  It's

16   basically a forum where OMG experts from across the globe

17   consort and meet and discuss about topics to include some of

18   the tags that we have referenced, your Honor.

19             **THE COURT:**  Will they present by giving you some

20   actual photos and memos or anything, or is it just all oral?

21             **THE WITNESS:**  There are photos sometimes given,

22   depending on the country and the third-party sharing rules.

23             **THE COURT:**  Do they have written reports that they

24   hand out?

25             **THE WITNESS:**  They don't turn over reports.  A lot of

1  times we have the pictures that have snapped and turned over to

2  myself.

3          THE COURT:  And how would they know what the -- they

4  give you a photo, but how would they know what it means?

5          THE WITNESS:  Because they have personally

6  interviewed those individuals in their country, or they were

7  working OMG investigations during what they called the Danish

8  Biker Wars or the Nordic Biker Wars, and they have spoken to

9  people similar to myself or firsthand on their end who have

10  been awarded those particular tags.

11          THE COURT:  So some of these experts that you've

12  consulted have done firsthand interviews?

13          THE WITNESS:  Yes, Your Honor.

14          THE COURT:  Would that include the -- of Hells

15  Angels?

16          THE WITNESS:  Yes, Your Honor.

17          THE COURT:  Okay.  Thank you.

18  BY MR. PHILIPSBORNE

19  Q.   In your declaration, Mr. Scheetz, you make reference to

20  several books; is that a fair statement?

21  A.   Yes, sir.

22  Q.   Okay.  And you explained to the Court earlier today in

23  your direct examination that one of the sources or -- sources

24  of information that you rely on include books; correct?

25  A.   Correct, sir.

1   Q.   Okay.   Now, one of the items that you reference, which was

2   filed in the court record, is Exhibit 2 to your declaration,

3   but that appears to be in a slightly, at least, different place

4   in this morning's binder.

5        But Exhibit 2 to your declaration is what's called the

6   Definitive History.

7        Do you know what document I'm talking about?   "The

8   Definitive History:   Evolution of the Hells Angels Motorcycle

9   Club Insignia and Corporation"?

10  A.   Yes, sir.

11  Q.   Who wrote that?

12  A.   The Hells Angels.

13  Q.   The Hells Angels?

14  A.   Yes.

15  Q.   Okay.   Are you sure about that?

16  A.   The actual report says the Definitive History?

17  Q.   Yeah.

18          THE COURT:   It's Tab 4 of the binder.   I don't know

19  if you have that.

20          THE WITNESS:   My binder seems to be...   It's not in

21  mine.

22          THE COURT:   It's not under Tab 4 of your witness

23  binder there?

24          THE WITNESS:   No, Your Honor.

25          MR. KRISHNAMURTHY:   Your Honor, I see two binders in

1   front of Mr. Scheetz.  One is on the corner.  I want to make

2   sure he's looking at the right binder.

3            THE COURT:  It's the bigger one.  It's the big binder

4   that has your declaration in it.

5            THE WITNESS:  Okay.  Sorry, Your Honor.  That was

6   sitting on the chair when I got here.

7            THE COURT:  So Tab 4 appears to have been Exhibit 2

8   to your declaration, but it appears as Tab 4 in that bigger

9   binder.  At the top it says document 1084-3; do you see that?

10           THE WITNESS:  Yes.

11           THE COURT:  Okay.  So that's the document we're

12  talking about; right?

13           MR. PHILIPSBORNE:  Yes, Your Honor.

14           THE WITNESS:  The 17-page document?

15  BY MR. PHILIPSBORN

16  Q.   Yes.

17  A.   Yes, that was written by the Hells Angels.

18  Q.   And just for drill, if you don't mind, do you want to take

19  a look at Page 17, bottom of the page?

20       Do you see what it says there under "This Definitive

21  History?  It says it was authored by Brooke Oliver, a lawyer?

22  A.   That's my fault.  That's who authored the report.

23  Q.   Okay.  And actually do you know if Brooke Oliver authored

24  that report?

25  A.   No, sir.

**SCHEETZ - CROSS / PHILIPSBORN**

1  Q.   Okay.  You never talked to Brooke Oliver?

2  A.   No, sir.

3  Q.   Do you know where Brooke Oliver is?

4  A.   No.

5  Q.   Would you be shocked to know that she is in San Francisco,

6  California?

7  A.   No.

8  Q.   But you didn't have a clue one way or the other?

9  A.   No.

10  Q.   And actually if -- to come back to the -- just to the

11  authorship and content of this particular document, can you

12  thumb to -- it's Page 12 of the document, if you look at the

13  page number at the bottom.  It's also Expert Page 168.  Do you

14  see that page?

15  A.   12 of 17 yes, sir.  Yes.

16  Q.   Okay.  You see there is a -- there seems to be an emblem

17  Hells Angels, the -- what you described earlier as the Death

18  Head, and at paragraph immediately underneath it that begins

19  with the language "setting up," do you see that?

20  A.   Yes, sir.

21  Q.   Okay.  You want to go one line down from that where

22  whoever wrote this says:

23         "...it was a mistake that we, as directors acting

24         for and on behalf of the Club."

25         Do you know who the "we" is?

SCHEETZ - CROSS / PHILIPSBORN

1  A.   No, sir.

2  Q.   Okay.  Then you want to go all the way down to the last

3  paragraph of that same page that begins "On October 3."  Do you

4  see the language that says:

5              "On October 3, 1981 the Club voted to change the

6        name of Hells Angels, Frisco, Inc. to Hells Angels of

7        the United States, Inc. with me as chairman of its

8        board."

9        Do you see that language?

10  A.   Yes, sir.

11  Q.   Does that -- do you know who the "me" is?

12  A.   I do not know, but it was a member at the time.

13  Q.   Well, are you saying you don't know, or are you saying

14  that you do know?

15  A.   I do not know who the chairman of the Hells Angels

16  Corporation at the time was.

17  Q.   Okay.  So, again, just in terms of our having an

18  understanding of the use you have made and the references that

19  you made to this document in your declaration, let's go back

20  for a moment to the first page of that document -- and, again,

21  it's your Tab 4, but it was Exhibit 2 to your declaration.  You

22  see the first paragraph?

23  A.   Yes, sir.

24  Q.   It references several of the longest serving Hells Angels.

25  And it goes on in the same paragraph to say:

1          "...worked with our lawyer to prepare sworn

2     declarations."

3     Do you see that language?

4   A.   Yes, sir.

5   Q.   Do you have those declarations?

6   A.   No, sir.

7   Q.   Okay.  Just in terms of the process of verifying this,

8   this document -- and I'm referencing Tab 4 or Exhibit 2.  This

9   document, just in terms of intelligence gathering, was a useful

10  document to you; correct?

11  A.   Yes, sir.

12  Q.   But would you agree there are a number of aspects of this

13  document that you don't know about; right?

14  A.   There are some aspects, yes.

15  Q.   Yeah.  Including who actually authored it; right?

16  A.   Correct, sir.

17  Q.   So continuing on with the theme of information that you

18  mention or make reference to in --

19          THE COURT:  Are you moving past this Exhibit 4?

20          MR. PHILIPSBORN:  Yes, Your Honor.

21          THE COURT:  I do have one question.

22          MR. PHILIPSBORN:  Sure, of course.

23          THE COURT:  Where did this document come from?

24          THE WITNESS:  This document came from Germany, Your

25  Honor.

```
 1              THE COURT:  Who did you get it from?

 2              THE WITNESS:  I got it from the German BKA -- that's

 3    their federal government -- through an investigation through a

 4    search warrant.

 5              THE COURT:  And how did they get it?  I mean, they

 6    found it in searching a search of --

 7              THE WITNESS:  I -- I'm sorry.

 8              THE COURT:  What were they searching?

 9              THE WITNESS:  I believe they were searching a Hells

10    Angels clubhouse, sir, Your Honor.

11              THE COURT:  Do you know when that was?

12              THE WITNESS:  I do not remember, sir.

13              THE COURT:  Okay.  Thank you.

14    BY MR. PHILIPSBORN

15    Q.   You also make reference to a book that was written by a

16    person who identifies himself as a former president of a Hells

17    Angels chapter; right?

18    A.   Yes, sir.

19    Q.   Who is that?

20    A.   Was that -- a gentleman in Minneapolis.  I apologize.  A

21    gentleman in Minneapolis, Minnesota.

22    Q.   How about we start with a gentleman from Richmond slash

23    Oakland?

24    A.   Sonny Barger?

25    Q.   Yeah.  Do you rely on his -- on a book from him?
```

1  A.   On some of the information, yes, sir.

2  Q.   Well, actually, your declaration has a number of

3  quotations from that book; correct?

4  A.   Correct.

5  Q.   Okay.  And you were able to sit down with Mr. Barger and

6  review information that you quoted?

7  A.   No, sir.

8  Q.   No?  Can you tell the Court, to your knowledge is Sonny

9  Barger, is he somebody who -- well, was he part of a large

10  trial in this very court in the 1970s?

11  A.   I know he was on trial.  I don't know if it was in this

12  exact court.

13  Q.   Okay.  He's a person who has been the subject of at least

14  two separate murder trials; right?

15  A.   I believe so.  Yes, sir.

16  Q.   Okay.  Then a possession of explosives trial; correct?

17  A.   Correct.

18  Q.   Okay.  And just in terms of what you explained to the

19  Court earlier in response to counsel for the Government, part

20  of what you were explaining is you don't always believe

21  everything you read or hear; correct?

22  A.   Correct, sir.

23  Q.   Okay.  How much of the material in Mr. Barger's book have

24  you verified?

25  A.   Definitely the stuff that I put in the declaration, but I

1  believe not everything that's in there.  I think some of it is

2  an embellishment, a way to sell books.  Not everything is going

3  to be 100 percent factual.

4      So I can't give a percentage on how much.  I've never gone

5  through and looked through everything to verify.  Just the

6  stuff that I've put in the declaration, I've reached out to

7  other people to verify and compare and contrast with

8  information I've derived throughout the years.

9  **Q.**  Again, just so the Court is clearer than I am on what you

10  just said, what do you mean you reached out to other people to

11  verify?  Can you explain that?

12  **A.**  Similar to -- due to my job in intelligence, my job is to

13  reach out to OMG experts from across the world, as well as

14  looking at other things that I might have acquired or read in

15  other books or reports of information that have been submitted

16  by ATF or other state and local law enforcement agencies.  It's

17  my job to make an expert opinion or conclusion on something and

18  not always -- when I do that, there is not always a final

19  answer.  Sometimes we just don't know the answer to that.

20  **Q.**  Incidentally, did you choose the passages from the Barger

21  book that were put in this particular declaration?

22  **A.**  Yes.  I discussed it with the U.S. Attorney's Office.

23  **Q.**  What does that mean?

24  **A.**  It means we went over certain passages that were -- that

25  we felt was pertinent to my report.

1    Q.    So it was you and the -- and an Assistant U.S. Attorney

2    who chose the passages?

3    A.    Yes, sir.

4         (Brief pause.)

5              MR. PHILIPSBORNE:  Your Honor, I apologize.  I'm just

6    looking for one specific and then I'll move on.

7              THE COURT:  Sure.

8         (Brief pause.)

9    BY MR. PHILIPSBORN

10   Q.    Do you have your declaration in front you?

11   A.    Yes, sir.  That's at Tab 2?

12   Q.    Sure.  You want to thumb to Page 14, paragraphs --

13   specifically Paragraph 51?

14   A.    Yes, sir.

15   Q.    That's -- you see there is actually quoted material;

16   right?

17   A.    Yes, sir.  Yes, sir.

18   Q.    Did you show up at the U.S. Attorney's Office and point to

19   that part of the Barger book and say:  This is significant in

20   terms of symbols or territory or terms?

21   A.    No.  It's something we discussed because it's something

22   that we see to this day within the Hells Angels.

23   Q.    When you say it's something that you see to this day, the

24   quoted information has to do with a very specific event that

25   allegedly took place at a house on Golf Links Road; correct?

**SCHEETZ - CROSS / PHILIPSBORN**

1   **A.**    Yes, sir.

2   **Q.**    And what did you do to verify the text of that quoted

3   anecdote?

4   **A.**    I didn't do anything to verify.  I used it as what he put

5   in the book to compare and contrast with other violent events

6   that we have observed across the globe.

7   **Q.**    Got it.

8        And this anecdote is in a portion of your declaration that

9   with deals symbols; right?

10  **A.**    I believe so.

11  **Q.**    And are you -- are you telling the Court that the passage

12  from a book in which somebody is saying, "One at a time we

13  bullwhipped them and beat them with spiked dog collars, broke

14  their fingers with ball peen hammers" has to do with symbols?

15  **A.**    No.  It was to do with my other formal testimony.  It's --

16  it's basically compare and contrast historical violence that

17  they have done in the past in comparison to what they do to

18  current day.

19  **Q.**    Got it.

20        **THE COURT:**  Can I ask you to put your mask over your

21  nose?  Thank you.

22  **BY MR. PHILIPSBORN**

23  **Q.**    That actually isn't a subject which you're being offered

24  as an expert; right?

25  **A.**    I talk about the history of the Hells Angels, and part of

**SCHEETZ - CROSS / PHILIPSBORN**

1    the history is discussing the violent acts that they have been

2    involved in.

3    **Q.**   Got you.

4         So another book that you make reference to is from a

5    person named George Wethern; correct?

6    **A.**   Yes, sir.

7    **Q.**   Okay.  W-E-T-H-E-R-N, for our record.

8         And can you tell the Court how and why it is you happened

9    to choose that particular source for your -- as a basis for

10   some of your opinions?

11   **A.**   Similar to Sonny Barger's book, there were certain --

12   particular items in that book that I can compare and contrast

13   to what's actually going on to this day.

14        There's some historical stuff that he put in that book

15   that we had known through debriefings or speaking with other

16   OMG members that he was able to confirm through his writings.

17   **Q.**   Just so the record reflects it and the Court is aware of

18   it, who, as far as you know, is Wethern?

19   **A.**   He was a former member of the Hells Angels.

20   **Q.**   When?

21   **A.**   I believe he got out for the second time in around the

22   1972, '73 time frame, I believe.

23   **Q.**   And you're explaining to the Court that this is pertinent

24   to a case in which the charges date back to around 2007?

25   **A.**   I was basically showing the history of predictive

**SCHEETZ - CROSS / PHILIPSBORN**

1  analytics on -- on looking at historical violence that

2  transpired in those days, which we're seeing to current day in

3  the United States and across of globe.

4  **Q.**    Predictive analytics.  Okay.  So you must have at least

5  tried to verify the reliability of what Mr. Wethern wrote

6  about.  Did you have a chance talk to Mr. Wethern?

7  **A.**    No, sir.

8  **Q.**    Again, can you tell the Court who chose the language

9  that's in this declaration at --

10 **A.**    We worked together, sir.

11 **Q.**    So it was a collaborative process, you and the lawyers for

12 whom you're testifying now?

13 **A.**    Yes, sir.  The U.S. Attorney's Office.

14 **Q.**    Okay.  You also made reference to a person whose name I

15 believe appears for the first time -- or at least for a time at

16 Page 19, this is in relation to your declaration, in

17 Paragraph 68.  A person who I believe is from Canada, whose

18 name is Yves, that's Y-V-E-S, Lavigne, L-A-V-I-G-N-E; correct?

19 **A.**    Yes, sir.

20 **Q.**    This is a person who wrote a book; is that correct?

21 **A.**    Yes, sir.

22 **Q.**    Who is Yves Lavigne?

23 **A.**    An author.

24 **Q.**    Okay.  Well, that's partially helpful.

25         Can you tell the Court what you know about Yves Lavigne?

1   **A.**   All I know is he's an author of books, and he liked

2   writing books about the Hells Angels and other Outlaw

3   Motorcycle Gangs.

4   **Q.**   Okay.  But here you are testifying as an expert on the

5   Hells Angels?

6   **A.**   Yes, sir.

7   **Q.**   So can you tell the Court -- since you rely on him, can

8   you tell the Court why you decided to focus your attention on

9   Mr. Lavigne and to actually cite his book at Page 19 of your

10  declaration?

11  **A.**   Well, first and foremost, I didn't specifically focus

12  primarily on him.  I focused on the subject they are talking

13  about.

14       And I was able to pick up the phone when I read some of

15  these experts -- excerpts from these books, I'm able to pick up

16  the phone and call experts who have been deemed experts in

17  Canada through the Biker Wars and say:  Is this something that

18  you guys saw in those days?  And that's how I'm able to confirm

19  and contrast some of the information.

20       I'm not able to do that with all the information because I

21  don't have, you know, expansive knowledge of everything.  So

22  what I can reach out to and try to confirm is why I put that in

23  there, because that is something I can reach out to Canada and

24  speak to three or four different experts up there who have been

25  deemed experts, and they confirmed that because of the Biker

1    Wars that were going on up there, these type of things did

2    transpire.

3    **Q.**   Okay.  You're actually making reference in Paragraph 68 of

4    your declaration to Lavigne in relation to an explanation of a

5    patch; correct?

6    **A.**   The tag, yes.

7    **Q.**   Okay.  And you must have actually picked up the phone to

8    contact Mr. Lavigne in Toronto, Canada; right?

9    **A.**   No, sir.

10   **Q.**   No?  Do you have any idea of how he came up with the

11   information that was in his book?

12   **A.**   No, sir.

13   **Q.**   Okay.  Now, there were occasions on your direct

14   examination when you said to the Court that you've spoken to

15   ATF agents who have infiltrated OMGs; right?

16             **THE COURT:**  If you're moving to another subjective, I

17   have a question about this.

18             **MR. PHILIPSBORN:**  Please.  I need all the help I can

19   get.

20             **THE COURT:**  Well, you said that you -- are you

21   testifying today, Mr. Scheetz, that you confirmed the specific

22   information in Paragraph 68 with Canadian experts?

23             **THE WITNESS:**  No.  What I can confirm is that -- not

24   that specific incident, Your Honor, but I know for a fact in

25   speaking to OMG experts in Canada that the Americans did award

1    Filthy Few tags to members in Canada during the Biker Wars.

2         I don't know the exact of what he is referencing there.  I

3    just know that it is deemed credible and it did transpire.  I

4    just don't know exactly what he is referencing.

5              THE COURT:  All right.  Thank you.

6    BY MR. PHILIPSBORN

7    Q.   And incidentally in the language that you actually quote,

8    which stands for itself, but at least according to the

9    information that you are relying on, you -- you have an alleged

10   member of the Bridgeport, Connecticut chapter who is saying

11   that he kept a stack of patches around for the crazy Canadians

12   that had come down to say that they killed X number of people

13   and they would get the patches?  Is that the import of the

14   quote?

15   A.   The import of the quote is to say that we -- that I do

16   know specifically.  I don't know if that's the actual example,

17   but I do know that United States members that were Filthy Few

18   holders did award Canadian members with the Filthy Few for

19   either shooting or assaulting Outlaws, as well as Rock Machine

20   during the Biker Wars.

21   Q.   I'm focused on the beginning of your answer, Mr. Scheetz.

22   Are you saying, just so we clarify, that you don't know about

23   the accuracy of the quoted information that you have at the

24   bottom of Page 19, bottom of -- Paragraph 68?

25   A.   That's correct.

SCHEETZ - CROSS / PHILIPSBORN

1    Q.    Okay.  And did you just come up with that quotation

2    because it sounded good?  I mean, why is it --

3    A.    No.

4    Q.    Okay.  And that's information that you have already

5    explained to us you cannot verify one way or the other;

6    correct?

7    A.    In written documents, no, sir.

8    Q.    Okay.  But you included in a declaration in which you

9    basically are explaining that the information at the end of the

10   declaration, right, in one of the last paragraphs you're

11   explaining to a Court that the information you're setting forth

12   is true and correct to the best of your knowledge; correct?

13   A.    Yes.  I'm using that as an analogy, yes, sir.  Compare and

14   contrast.

15   Q.    You don't have a clue whether the information that's at

16   least in part of Paragraph 68 is correct?

17   A.    No, I don't know, but I do -- I do know as a reference

18   that that did transpire.  I don't know the specifics of that

19   paragraph 100 percent correct, but I do know specifically that

20   did occur.

21         I don't know if this guy had a stack of patches.  I don't

22   know any of that.  But I know -- I was making the reference to

23   we know the patches or tags was awarded by United States

24   members.  I don't know specifically how Lavigne got that

25   information or how it derived.  That's what he put in there.  I

1    was using that as an example that we know it did occur and it

2    did transpire.

3    Q.   Again, just so the Court and counsel have a way of gauging

4    the weight to attach to statements that you make in your

5    declaration, presumably there was some reason that you didn't

6    just cut to the chase and talk about what information you had

7    been provided in Canada and that you chose this reference to

8    the Lavigne book; correct?

9    A.   Well, when I read the book, sir, I take notes, and I

10   compare and contrast on what I know and don't know.  And there

11   are certain things that -- I know during certain Biker Wars

12   that transpired with the Hells Angels and an adversary, I put

13   those to the side and I can pick up the phone and call people.

14        There are certain things in these books, I have no clue if

15   they embellished, pontificated on -- on stuff, I don't know.

16   But there are certain things that I saw that I knew transpired

17   from listening to experts from across the globe.

18        In this specific example I don't know, but I do know the

19   Filthy Few was awarded by American members.  That was the

20   example that I was giving, not the specifics of the fact that

21   he had those stack of patches or tags.

22   Q.   Let me circle back to -- we'll leave Canada behind for a

23   second, and we'll stay with Page 19.  I'll call your attention

24   to Paragraph 66.

25        And the question that I was about to ask you earlier on

SCHEETZ - CROSS / PHILIPSBORN

1  was, you testified in your direct examination that there

2  were -- there have been occasions when you have talked to ATF

3  agents who have infiltrated an Outlaw Motorcycle Gang; correct?

4  A.    Yes, sir.

5  Q.    And have you ever talked to an ATF agent who has

6  infiltrated the Hells Angels?

7  A.    No.   I've had conversations with ATF agents who belonged

8  to either a support club or an associate club of the Hells

9  Angels.

10 Q.    What does that mean?

11 A.    It means that they are not subservient to the Hells

12 Angels, but they basically run parallel with one another, and

13 they didn't really care that they were in the area at the time.

14 Q.    Okay.   What clubs are you referring to?

15 A.    One would be the Warlocks, where we have had two ATF

16 undercovers infiltrate the Warlocks Motorcycle Club on the East

17 Coast.

18     We also had an incident in the early 2000s where ATF

19 Youngstown basically conducted an infiltration on an Aryan

20 Brotherhood sect, where they basically made up their own

21 motorcycle club, and they became very close with both the Hells

22 Angels Lake East and Cleveland charters.

23 Q.    You refer to neither of those ATF efforts in your

24 declaration; correct?

25 A.    Correct, sir.

SCHEETZ - CROSS / PHILIPSBORN

1    Q.    The one you do make reference to is to -- and you'll

2    correct me where I go wrong here, to Special Agent Daniel, is

3    it Ozbolt?

4    A.    Ozbolt.

5    Q.    Ozbolt, okay.

6          And his infiltration was not of the Hells Angels, but it

7    was the Mongols and the Outlaws?

8    A.    As well as the Order of the Blood, which was a club out of

9    Youngstown, Ohio.

10   Q.    Okay.  And when did that infiltration take place?

11   Meaning, what vintage are we talking about?

12   A.    That was early 2000s for the Order of Blood, and then the

13   Outlaws and the Mongols was 2009 to 2011.

14   Q.    Okay.  And do you have -- just in terms of your testimony

15   here in court and, also, your references in the declaration, do

16   you have any other specifics of ATF agents that you're relying

17   on who have infiltrated Outlaw Motorcycle Clubs that shed light

18   on the opinions that you're stating in your declaration?

19   A.    Oh, yes.  There's other ATF undercovers that I've spoken

20   to that I used to garner my opinion, yes, sir.

21   Q.    Okay.  Is there any reason you didn't provide that

22   information in the declaration that you -- that you authored?

23   A.    No, sir.

24   Q.    And getting back to a topic we talked about before, I

25   think you may have answered this, but just in case you didn't

**SCHEETZ - CROSS / PHILIPSBORN**

1    get a chance to answer it completely, when you talked to

2    somebody like the gentleman whose name is referenced in

3    Paragraph 66, you do not memorialize your conversations with

4    him; correct?

5    **A.**    No, sir.

6    **Q.**    Okay.  There are no notes or reports that you generate

7    that can be shared with Government counsel or with the Defense

8    in this case of your contacts with this guy; correct?

9    **A.**    No, sir.

10           **THE COURT:**  Can I ask, if you're about to leave

11   Paragraph 66, Mr. Philipsborn?

12           **MR. PHILIPSBORN:**  Yes, Your Honor.  Thank you.

13           **THE COURT:**  How do you know -- how does former Outlaw

14   member Ozbolt know about the meaning of Filthy Few patch, which

15   is a Hells Angels patch, not an Outlaws patch?

16           **THE WITNESS:**  Yes, because the fact that they were

17   able to join and infiltrate adversarial OMGs, they still

18   understand what most tags, tabs or flash mean even in their

19   adversaries.

20       And it's not just -- when he was a member of the Mongols

21   and a member of the Outlaws, they routinely discussed other

22   tags worn by adversaries, other patches that have been

23   received.

24       He has also spoken to other members of the Outlaws, other

25   members of the Pagans, who, like myself, also know that they

1    discuss other tags, tabs and flash worn by their adversaries.

2            THE COURT:  Okay.  Thank you.

3    BY MR. PHILIPSBORN

4    Q.    Incidentally, following up on the Court's question, but

5    also in terms of bases for your opinions here today, would it

6    be fair to say that the vast majority of the information that

7    you get from human sources is from individuals who are employed

8    by some government agency?

9    A.    I would say most of it, yes, sir.

10   Q.    Okay.  And when you talked earlier on your direct

11   examination, and responded to a question from the Court as

12   well, and when you were responding to me earlier about

13   debriefings of individuals, how many debriefings of people in

14   the Hells Angels have you actually participated in?

15   A.    I would say in reference to the Hells Angels, that would

16   include associates, roughly 100 or so.

17   Q.    Okay.  And these are debriefings.  I'm not including --

18   and I should have been more specific, and I apologize for this.

19        Do you include the presence of a former Hells Angels

20   meeting at a law enforcement training session as a debriefing?

21   A.    I would say no.

22   Q.    Okay.  So what is a debriefing?  Can you explain that?

23   A.    Debriefing is when -- I mean, I have spoken to former

24   members or former prospects of clubs at conferences, but that

25   has been in a separate room or aside.

 1          I don't -- say, if I get a chance to ask a question, I

 2    don't consider that a debriefing.  A debriefing or an interview

 3    would be when I'm asked to come in and sit down face-to-face to

 4    ask questions.

 5    **Q.**    Okay.  And would that -- was the context of a debriefing,

 6    as you use that word, a situation in which an individual has

 7    been detained or arrested?  Are these people in prison?

 8          What context do you -- have you been involved in,

 9    quote/unquote, debriefings in?

10    **A.**    These are witnesses that would like to speak to law

11    enforcement.

12    **Q.**    These are people who are seeking to cooperate with law

13    enforcement?

14    **A.**    Provide information.

15    **Q.**    Again, because some of them have pending cases; correct?

16    **A.**    Several did, yes, sir.

17    **Q.**    Okay.  And have you ever had somebody just come up and

18    knock on your door and say:  I'd like to -- hi.  I'm here.  I'd

19    like to debrief?

20    **A.**    No, sir.

21    **Q.**    Okay.  So there are circumstances in which you're called

22    upon to sit in a debriefing or to assist in a debriefing;

23    correct?

24    **A.**    Yes, sir.

25    **Q.**    And the vast majority of these are situations in which

1    someone is trying to in some way become a source or show some

2    level of cooperation; correct?

3    **A.**    Yes, or provide information.  Yes, sir.

4    **Q.**    Okay.  And these debriefing interviews that you've sat on,

5    sat in on where 100 or so persons that you say had some

6    affiliation with the Hells Angels, in how many of those cases

7    did you take notes of the contact?

8    **A.**    Several.

9    **Q.**    Okay.  Do you have those notes?

10   **A.**    No, sir.

11   **Q.**    Okay.  Where are those notes?

12   **A.**    Hmm, I mean some of those notes I've used to write reports

13   that I have then turned over.  I just don't know, not

14   everything.

15   **Q.**    But you mean -- in other words, after you've debriefed

16   somebody, you, as an intelligence analyst, are telling the

17   Court that you don't retain information that you may have noted

18   down just for intelligence purposes?

19   **A.**    Some of it we've kept, but -- because they are ongoing

20   investigations, but it's not something that if I did, I've come

21   back and I've written a report, an intelligence product, and

22   which we've turned over to the Court or we've written a product

23   on what we learned from the basis of that debriefing.

24   **Q.**    So you make reference to debriefings in your 38-page

25   declaration.  Have you provided the Government with any

SCHEETZ - CROSS / PHILIPSBORN

1    exemplars or copies of written reports or notes of debriefings

2    of Hells Angels?

3    **A.**   No, sir.

4    **Q.**   Have you provided the Government with any notes?  If they

5    are not reports, of any notes of debriefings of individuals who

6    you debriefed who you believed were associated with the Hells

7    Angels?

8    **A.**   No, sir.

9    **Q.**   Is it a fair statement to say that you do not rely for any

10   of your opinions on any specific debriefing that you conducted?

11   **A.**   I use information that's been derived to come to a

12   conclusion through a vast -- different ways.  Just not solely

13   on that debriefing or interview.

14   **Q.**   I understand.  But in terms of a Court and counsel

15   verifying the basis for the information you're providing, are

16   you saying that there are opinions in your 38-page declaration

17   that are based on statements made to you during the course of a

18   debriefing?

19   **A.**   Yes.  I've -- yes, I've discussed.  Yes, sir.

20   **Q.**   Okay.  And are you in a position in which you can identify

21   the individuals whose debriefings you rely upon in your 38-page

22   declaration on whom you -- you say you are basing some of your

23   opinion testimony?

24   **A.**   Some of it.  But like I said, sir, I take that information

25   and I don't just solely -- it's not solely just on that.  I

1    pick up the phone and reach out to other experts in the field

2    to confirm.

3        Just because I got the information or intelligence from a

4    former or active member, I don't solely go off that.  I'll pick

5    up the phone, similar to what I put down in number 66, and I'll

6    say:  Hey, I need an example.  Let's talk.

7        That's how intelligence works.  I'm not going on one

8    source only.  It's going to be numerous people that I reach out

9    to, experts in the field to draw a conclusion.

10   Q.   Mr. Scheetz, I know the Court doesn't want me to argue

11   with you, and I won't.  But just based on the process you just

12   discussed, you also explained to the Court earlier today that

13   you did nothing to verify some of the quoted information from

14   the Barger or Lavigne books.  You agree with that; right?

15   A.   Yes.  I didn't.

16   Q.   So there are certain things that you'll pick up the phone

17   to verify, and there are others that you won't pick up the

18   phone to verify?

19   A.   Well, I don't have anybody I can reach out to, someone

20   that can tell me what transpired in 1969, no, sir.

21   Q.   Okay.  But, again -- hopefully this is the last.  I'll ask

22   the question so that I will not repeat it.

23       In your opinion, based on having reviewed, presumably, the

24   declaration that you wrote, are there opinions that you state

25   that you base on debriefings, the reports of which have not yet

1    been turned over either -- the reports or notes of which have

2    not been turned over to the Government?

3    **A.**   Correct, sir.

4    **Q.**   And are you in a position in which once you review your

5    declaration, you can identify those materials to counsel for

6    the Government?

7    **A.**   I mean, I can confirm in 66.   I know who confirmed that

8    information for me, yes, sir, as an example.

9    **Q.**   Okay.   That's -- that's a useful example, but you're

10   saying there are other places, other than Paragraph 66,

11   where -- and what I'm talking about here, Mr. Scheetz, just so

12   you and I are clear, is not a former or perhaps current Special

13   Agent with the ATF.

14       I'm talking about people that you've identified as

15   debriefers, according to our earlier discussion.   Persons who

16   are being interviewed as part of a debriefing process to gauge

17   their level of cooperation or to gauge them as a source.

18   People who are members or associates of the Hells Angels.

19   **A.**   I don't have the information, sir.   No.

20           **THE COURT:**   You mean, you wouldn't be able to

21   identify the individuals that were the particular sources of

22   some of the information, or what do you mean you wouldn't be

23   able to?

24           **THE WITNESS:**   Well, like I gave an example.   Like, I

25   know for No. 66, that -- and for the most part for the

1  declaration, like I said, I rely on OMG experts who are deemed

2  experts in federal and state court.

3      But for, like, No. 66, when I spoke to Timothy Jordan, who

4  was a member of the Hells Angels -- when I spoke to Timothy

5  Jordan of the Hells Angels during our ATF investigation out of

6  ATF Greenville, he was very familiar with the situation because

7  of Rage Wire.  So that was one of the conversations.

8      I don't know if I -- if I could go back and look at every

9  paragraph to attribute to a debriefing.  It comes from

10  everything I've read and, like I said, all the intelligence

11  that I've gleaned.

12  Q.   It sounds as though you got a fair amount from those

13  conversations with the three individuals you talked about

14  earlier?

15  A.   Yes, as well as -- I mean, I'm very fortunate that -- to

16  listen to OMG experts, who are actually, as they would say,

17  running sources across the globe.  And I go to these

18  symposiums, these expert symposiums.  A lot of information gets

19  confirmed or discussed.

20  Q.   So let me -- with your permission, let me review some

21  exhibits with you.  This will be pretty quick.

22      What I'd like to do, with your permission, with the

23  Court's permission, is to just ask you some questions about a

24  number of the exhibits that you have -- that you have put

25  together.

 1          And I'm going to make reference both to -- because we have

 2   them in the record under one number and they are now in a

 3   binder under another, I'd like to make reference to an item

 4   that you had a slide about, which is the World Rules that is

 5   submitted to the Court as Exhibit 3, but is under your Tab 4, I

 6   believe, or 5.

 7          **THE COURT:**  5.

 8          **MR. PHILIPSBORN:**  5, sorry.

 9          (Document displayed.)

10   **BY MR. PHILIPSBORN**

11   **Q.**   Do you see that, sir?

12   **A.**   Yes, sir.

13   **Q.**   Who authored this document, sir?

14   **A.**   The Hells Angels.

15   **Q.**   Okay.  Can we narrow it down?  Who authored this document?

16   **A.**   I don't know exactly who in the Hells Angels authored it.

17   I know at one time there was a gentleman named Goose out of

18   Cleveland who did it before he was kicked out of the club.  I

19   believe this was -- I think he authored the 2015, '16 version.

20          I don't know who did the -- this 2017 version.  I mean,

21   back in 2012 he did.  I have no clue who in the Hells Angels

22   authored this version.

23   **Q.**   Do you know where this particular document was found, or

24   at least the original of the document?

25   **A.**   Yeah.  This was seized in an airport for members who came

**SCHEETZ - CROSS / PHILIPSBORN**

1  back from Europe.

2  Q.   Now, it sounds as though from -- again, from reading your

3  declaration that there are certain matters on which you rely on

4  this document for some of your opinions; correct?

5  A.   Yes, sir.

6  Q.   Okay.  Can you page over to the -- it says -- this is in

7  the same document.  I think it's the second page in the exhibit

8  though.   It reads Page 3 or Expert-223.

9       (Document displayed)

10  Q.   Do you see that?

11  A.   Yes, sir.

12  Q.   And there is text on this that says:

13          "These rules are to make our Club life easier.

14       If they don't work, the rules are wrong or the people

15       are wrong."

16       Do you see that?

17  A.   Yes, sir.

18  Q.   Who said that?

19  A.   I don't know.  Some member in 1978.

20  Q.   And you said, I think, in your testimony on direct, and

21  you also state in your declaration, that the rules have

22  influence and that as far as you know, the rules are followed?

23  A.   For the most part, yes, sir.

24  Q.   Okay.  For the most part; right?

25  A.   Yes.

1    Q.   And, in fact, what's said on the fly leaf is pretty much

2    that; right?  Basically if you like the rules, you follow the

3    rules you like?

4    A.   I think it's like anything else in life.  There are

5    certain things that they adhere to.  They might not always

6    agree with it, but they adhere to it.

7    Q.   Got it.

8         So then let's page over to the next exhibit, which again

9    for our purposes was Exhibit -- in the record was Exhibit 4,

10   which I believe is your Exhibit 6 now.  Do you see that?

11   A.   Yes, sir.

12   Q.   Now, incidentally, one of the things that your declaration

13   spends time on and, in fact, you excerpt from the -- from

14   Exhibit 2 a number of illustrations of what you say are Hells

15   Angels symbols; correct?

16   A.   Yes, sir.

17   Q.   Hells Angels symbols over the -- over the years; correct?

18   A.   Correct.

19   Q.   And you rely on Exhibit 2 for your opinions on that;

20   correct?  At least that's what you say in your declaration?

21   A.   The new one that we're talking about now, sir?

22   Q.   Yeah.

23   A.   Yes.

24   Q.   Okay.  I want you to take a look at the last page of the

25   exhibit that I called your attention to, which is former

**SCHEETZ - CROSS / PHILIPSBORN**

1   Exhibit 4, current Exhibit 6.

2        (Document displayed)

3   **Q.**   You see that -- at least as I have it, the last page is

4   what seems to be a Death Head; correct?

5   **A.**   Yes, sir.

6   **Q.**   Okay.  And this is not a symbol that's actually included

7   in Exhibit 2 or in your declaration; correct?

8   **A.**   I don't believe so.  No, sir.

9   **Q.**   Okay.  There is something in your declaration, which I

10  imagine other lawyers are going to focus on, that has to do

11  with the -- with the Death Head that shows closed lips or sewn

12  lips; is that right?

13  **A.**   Yes, sir.

14  **Q.**   Okay.  And if you look at the last page of the Modesto

15  exhibit, right, Tab 6 or marked Exhibit 4, an orthodontist

16  would be proud of that mouth.  You can see every -- you can see

17  this Death Head's teeth; correct?

18  **A.**   Yes, sir.

19  **Q.**   Okay.  And where -- where was this item acquired, to your

20  knowledge?

21  **A.**   I'm not sure, sir.

22  **Q.**   Okay.  If you go to the first page of this document, the

23  document that says "HAMC Modesto Charter Rules."

24        (Document displayed.)

25  **Q.**   Do you see that there seems to be some handwriting in a

**SCHEETZ - CROSS / PHILIPSBORN**

1   couple of areas or at least in one area?

2   A.   Yes.

3   Q.   Okay.  How did that get there, do you know?

4   A.   That was -- these were seized during an FBI investigation

5   last year.  I believe that whoever was a member of the charter

6   wrote that on there.

7   Q.   Okay.  Now, the next item I wanted to ask you about is --

8   let me just make sure.  It is, I believe, your Tab 10.  It was

9   former Exhibit 8.  It's an affidavit.  Do you see that?

10       (Document displayed.)

11  A.   Yes, sir.

12  Q.   Now, this affidavit actually relates to an event that you

13  talked about briefly in your direct examination; correct?

14  A.   Yes, sir.

15  Q.   Okay.  Now, just to be clear, this affidavit pertains to

16  events that, at least on the face of the affidavit, explain

17  occurred in 2008 in Sturgis, South Dakota; correct?

18  A.   Yes, sir.

19  Q.   Okay.  As far as we know from reading this document, it

20  has nothing to do with the Hells Angels charter in Sonoma

21  County; correct?

22  A.   Not specifically to Sonoma, no, sir.

23  Q.   And it actually is a matter that arises out of a -- out of

24  events that took place in Sturgis and that, at least as they

25  are described in this affidavit, involved elements, according

1    to the agent, of the Hells Angels and of the Iron Pigs

2    Motorcycle Club; correct?

3    A.    Yes, sir.

4    Q.    Incidentally, and I'll get to this a little bit later, but

5    I notice that you included, especially in your later exhibits,

6    including in Exhibit 17, a lot of press coverage of various

7    events.  I notice you didn't actually cull out any press

8    accounts that are associated with the event in Sturgis that's

9    reflected in this exhibit; right?

10   A.    Correct, sir.

11   Q.    Okay.  You are aware that one of the controversies about

12   this exhibit is that there were allegations that a member of

13   the Iron Pigs, who was a Seattle police officer, discharged his

14   firearm in a bar; right?

15   A.    Yes, sir.

16   Q.    Okay.  I notice that state of affairs is actually not at

17   all covered in this affidavit.  Do you notice that?

18   A.    I notice it, yes, sir.

19   Q.    Okay.  And so just in terms of what the Court and counsel

20   in this case should get out of this particular item, why don't

21   you explain to us what it is this -- what aspect of your

22   opinion is associated with this particular affidavit?

23   A.    Well, multiple things.  Was first and foremost the fact

24   that they did not like law enforcement entities riding in a

25   club with a three piece patch.

1          It also shows the amount of violence that members can do

2     when they are not in their home state, because everybody that

3     was involved with this violent incident was not a resident of

4     South Dakota.  They were either a resident of Berkshire County

5     chapter, Massachusetts; I believe Seattle, Washington charter;

6     and then the San Diego charter of the Hells Angels.

7     **Q.**   Got it.

8          But just in terms of what you are testifying about

9     symbols, terms and territory, take your pick, what does this go

10    to?

11    **A.**   This -- this has to do with territory and respect.

12    **Q.**   Okay.  The territory, the Hells Angels chapter from Sonoma

13    County, California?

14    **A.**   No.

15    **Q.**   Got it.

16          THE COURT:  We probably should take a break for the

17    court reporter soon.  Is there a convenient point?

18          MR. PHILIPSBORN:  This is perfect, your Honor.  Thank

19    you.

20          THE COURT:  All right.  How much longer do you think

21    you'll have on cross, Mr. Philipsborn?

22          You lost your audio there for a second.

23          MR. PHILIPSBORNE:  Your Honor, I do have a ways to

24    go, but these are -- this is material that's not going to be

25    repeated by other counsel.  I have been designated the go over

 1   bases.

 2              THE COURT:  Okay.

 3        All right.  Let's take a ten-minute break.  Thank you.

 4              THE CLERK:  Court is in recess.

 5        (Whereupon there was a recess in the proceedings

 6         from 10:55 a.m. until 11:09 a.m.)

 7              THE COURT:  All right.  Mr. Philipsborn, you may

 8   continue.

 9              MR. PHILIPSBORN:  Thank you, Your Honor.

10   BY MR. PHILIPSBORN

11   Q.   Mr. Scheetz, again, just so you know where I'm going, I'm

12   going to be asking you a few more questions about these

13   exhibits, the stack of exhibits.

14        So the next one I wanted to ask you about briefly is, I

15   believe it's in your binder as Exhibit 14, and it's in the

16   Court's record as Exhibit 12 in support of your declaration.

17        (Document displayed)

18   Q.   I'll simply say at the beginning of the page, it says

19   "Summary of Event."  Maybe you can identify it for us.  What is

20   this item, sir?

21   A.   This is an ATF ROI or Report of Information that was

22   written by the ATF undercovers who conducted the infiltration

23   into the Outlaws and the Mongols.

24   Q.   Got it.

25        This actually at one point makes reference to the agent

SCHEETZ - CROSS / PHILIPSBORN

1   whose name appears in your declaration, Agent Ozbolt; correct?

2   A.   Yes.

3   Q.   Okay.  And is this an example of a -- of the kind of

4   information that you receive and have received from colleagues

5   of yours at the ATF who happened to be special agents who've

6   infiltrated Outlaw Motorcycle Gangs?

7   A.   Yes, or worked as case agents on OMG investigations, yes,

8   sir.

9   Q.   Got it.

10      And, again, to be -- I know that we know this from reading

11  the document, but this is a matter that pertains to an

12  investigation that was being carried out on the East Coast in

13  2009?

14  A.   Correct, sir.

15  Q.   Okay.  This doesn't have anything to do with the Hells

16  Angels chapter in Sonoma County, California?

17  A.   Not the Sonoma charter, no, sir.

18  Q.   Okay.  Incidentally, are any of the agents who are named

19  here in Exhibit 12/14, are they available to testify?

20  A.   I would assume so, yes, sir.

21  Q.   Okay.  The next item I wanted to ask you about is, I want

22  to make sure I get your current partition right.  It should be

23  partition No. 17, and it's your former Exhibit 15.

24      (Document displayed)

25  Q.   And if things are working out correctly, it says at the

1    top of the page "Analysis on how to use Left and Out."

2    A.    Yes, sir.

3    Q.    You see that?

4    A.    Yes, sir.

5    Q.    Can you explain to the Court what that is?

6    A.    That's an internal Hells Angels document that I was able

7    to receive.  I can honestly say I don't remember who gave me

8    that document, but it basically describes the terms in which

9    you can leave the Hells Angels, because there was much

10   confusion across the world.  So they basically outlined it in

11   writing on the two ways that you can physically leave the club,

12   which is Left and Out.

13   Q.    Got it.

14         It looks as though, and I'm -- on the basis of reading the

15   top of the document, it looks as though it might have been

16   produced by a group in Europe or what's called the European

17   Working Group?

18   A.    Yes.  It's a European Working Group.  It's a conglomerate

19   of Hells Angels members throughout Europe who have gotten

20   together, and they work on internal issues and issues that deal

21   strictly with Europe and matters that are internal that they

22   are dealing with.  And within that they have also written some

23   documents, and this is obviously one of the documents they have

24   written.

25   Q.    Okay.  Can you explain to the Court, in terms of the

1    opinions that you've expressed in your 38-page declaration,

2    what the importance of this document is?

3    **A.**   It basically outlines the two ways in which you can leave

4    the club, which is Left and Out.  It's just showing you that

5    it's not so -- you can either leave one way or you leave the

6    other.  That's it.  There are only two ways.  You can't just

7    pack up and go.

8         There is a formal process of doing it and that's why we

9    turned over this information, to show that there was a process

10   to go about.

11   **Q.**   Got it.

12        And in your opinion, does this document state information

13   about the Hells Angels Motorcycle Club that describes the way

14   the motorcycle club generally operates?

15   **A.**   No, because these -- this document, all this does is

16   outline how you can leave the club.

17   **Q.**   Well, it actually, at the end of the first paragraph,

18   refers to what's called "charter autonomy."  Do you see that?

19   **A.**   Yes.

20   **Q.**   Right.  That isn't something I invented.  It's actually on

21   the printed page; right?

22   **A.**   Yes.

23   **Q.**   Okay.  And whoever is writing it explains in that

24   sentence, it is self-explanatory if one reads the sentence

25   before the last sentence, in that last sentence, but the -- the

**SCHEETZ - CROSS / PHILIPSBORN**

 1  concept that's being referenced in that last sentence of the

 2  first full paragraph is the concept of charter autonomy;

 3  correct?

 4  **A.**    correct, sir.

 5  **Q.**   And that's something that you make brief reference to in

 6  your 38-page declaration; correct?

 7  **A.**   Yes, sir.

 8  **Q.**   Okay.  Because there is such a thing -- based on the

 9  information you've acquired and describe in your declaration at

10  least, there is such a phenomenon as charter autonomy; correct?

11  **A.**   Yes, sir.

12  **Q.**   And, well, let's -- while we're talking about that, let me

13  call your attention then to another exhibit.  And if you can

14  give me a moment, I'll give you what I hope is the correct

15  reference.

16       Would you mind just going back to your exhibit, your

17  Tab 15, which is the previous Exhibit 13?

18       (Document displayed)

19  **Q.**   And this is a document that, at least on the printed page,

20  pertains to Fresno County; do you see that?

21  **A.**   Yes, sir.

22  **Q.**   Where was this document acquired?

23  **A.**   I'm not sure, sir, where it was acquired.  I'm not sure if

24  it came from this investigation, but it's not one of my

25  documents.

1    Q.    Okay.  Well, how is it that it happens to be in your

2    exhibits?

3    A.    It's -- I'm not sure, sir.

4    Q.    Let me ask you, not to put you in a difficult spot here,

5    but did somebody give you this document and tell you to include

6    it in your exhibits?

7    A.    I knew the Modesto one was in there, sir.  I did not know

8    the Fresno one was in there.

9    Q.    Okay.

10   A.    It's my fault.

11   Q.    Well, I appreciate you taking one for the team here, but

12   are you saying this is not a document that is -- that you

13   personally had included in your exhibits?

14   A.    I did not, no.  Specifically, no, sir.  The Modesto one,

15   yes.

16   Q.    Okay.  So you don't know, for example, who placed what

17   seems to be handwriting at the -- next to the typewritten

18   phrase "Bylaws"?

19   A.    No, sir.  I'm not sure who put that in there, no.

20   Q.    Incidentally, is it correct, in your experience, that as

21   part of charter autonomy, there are charters that will mandate

22   that individuals ride Harley-Davidson motorcycles to the

23   exclusion of any other motorcycle?

24   A.    Yes, sir.

25   Q.    Okay.  And there are other parts of the world in which

**SCHEETZ - CROSS / PHILIPSBORN**

1    that particular dictate can't be followed; right?

2    **A.**    There are mandated for the most part to ride a

3    Harley-Davidson.  We have seen, and I have seen other -- other

4    members, even in the United States, who do not ride a

5    Harley-Davidson.  They might ride a BMW, for example.

6    **Q.**    Got it.

7          And there are certain parts of Europe where it's actually

8    hard, because of European law, to get your hands on a

9    Harley-Davidson; right?

10   **A.**    Or territory, yes, sir.

11   **Q.**    Okay.  So, again, there are -- in a document -- and I

12   understand that you were not familiar with this document going

13   into this, these questions, but, in your experience, individual

14   charters will have individual bylaws; correct?

15   **A.**    Yes, sir.

16   **Q.**    And those bylaws for one charter may differ in certain

17   respects from bylaws of another charter; correct?

18   **A.**    Yes, but they still don't -- they still don't supersede

19   the World Rules.

20   **Q.**    Okay.  And they don't supersede the World Rules.  Where

21   does that opinion come from?  What is it based on?

22   **A.**    I believe it says in the World Rules that they are -- I

23   believe in there -- I know that from a fact from my debriefings

24   and speaking to people, but I believe it says there in the very

25   front that the World Rules are the -- I don't know what the

1    actual verbiage is, but it says these -- they are the rules.

2         But there is certain rules that each charter has for

3    autonomy, and they have charter bylaws that they adhere to, as

4    well as the World Rules, because of where they are located

5    specifically, strategically across the globe.

6    **Q.**   Got it.

7         I anticipate that other counsel will go into this further,

8    so I'm not going to belabor it.  But, in your experience, would

9    it be fair to say the members of the Hells Angels Motorcycle

10   Clubs or the charters within the United States may have varying

11   regard for rules?

12   **A.**   I mean, are you asking does each charter have their own

13   set of bylaws?

14   **Q.**   Well, some of the people involved may not be strict

15   adherence, adherence to rules or laws; correct?

16   **A.**   They adhere to the World Rules, and then they adhere to

17   the bylaws that are in their charter.

18   **Q.**   Got it.

19        I'm sure somebody else will go into that.  So let's -- let

20   me just for the sake of moving us along, I want to ask you some

21   questions about Exhibit 17 so that we know what to make of

22   that.  That's a -- I'm sorry, Exhibit 17, and I apologize, is

23   your -- in the binder, at least in the binder I was given there

24   is only the face page to Exhibit 17.  I don't know if that's a

25   case for you.

```
 1   A.    No.  There is two more pages, sir, in 17.  That's the Left

 2   and Out form.  The analysis on how to --

 3   Q.    Okay.

 4              MR. KRISHNAMURTHY:  Mr. Philipsborn?

 5              MR. PHILIPSBORN:  Yes.

 6              MR. KRISHNAMURTHY:  There are actually lettered tabs

 7   after 17.

 8              MR. PHILIPSBORN:  Oh, perfect.  Thank you.

 9   BY MR. PHILIPSBORN

10   Q.    I hadn't seen the new and improved model, Mr. Scheetz, and

11   I apologize.

12         (Document displayed)

13   Q.    So it appears that what I'm asking you about, if one looks

14   at your -- at your binder, is the set of documents that are in

15   the lettered tabs that appear essentially to be a series of

16   articles.  Do you see those?

17   A.    Yes.  They are articles, yes, sir.

18   Q.    And just so the record is clear, if you look at the first

19   page, it's from the San Diego County Sheriff's Office, from the

20   look of it, and it's labeled "Expert-1422;" is that fair?

21   A.    Do you have a letter corresponding with that, sir?

22   Q.    Sure.  That is letter A.

23   A.    The letter A, I have Sheriff's Department, yes, San Diego

24   County.

25   Q.    You are familiar with that exhibit; right?
```

**SCHEETZ - CROSS / PHILIPSBORN**

1    A.   Yes, sir.

2    Q.   And just so -- given what happened with the Fresno County

3    item, prior to taking the witness stand today, were you able to

4    go through the exhibits in the binder before you?

5    A.   Yes.  And I mistakenly -- for the one profession, that was

6    an honest mistake.

7    Q.   Okay.  Yeah, not to worry.  But as far as this particular

8    exhibit is concerned, who chose the articles that are -- that

9    were placed into -- to that particular exhibit?

10   A.   For article A I don't have -- I don't have articles, sir,

11   in mind.  I have an actual.

12   Q.   You're absolutely right, and I apologize.

13        What was marked in the Court's record as Exhibit 17 starts

14   with the Sheriff's Department report, and then it's a series of

15   articles that I think are in your binder under Tabs B, C, D,

16   et cetera, up to Y.

17   A.   I actually -- actually B is San Diego County.  C is San

18   Diego County.  My news articles do not start until D.

19   Q.   And I -- you're absolutely right.  I apologize.  You're a

20   better reader than I am.

21        So, again, did you choose those materials?

22   A.   Yes.

23   Q.   None of them have anything to do -- let me withdraw that.

24        These articles and the San Diego Sheriff's Department

25   report do not have any focus on the Hells Angels of Sonoma

1  County; correct?

2  **A.**    It has a focus on the Hells Angels in general, not

3  specific to Sonoma.

4  **Q.**    Okay.  And you reproduced the -- or at least you excerpted

5  a Sheriff's Department report from 1977 --

6  **A.**    Yes, sir.

7  **Q.**    -- correct?

8       And in relation to a case in which the indictment is

9  bracketed roughly in the mid-2000s, 2007 and moving forward?

10  **A.**    I'm not sure about that, sir.

11  **Q.**    Is this -- is this particular document, as far as you

12  know, pertinent to an opinion that you have in regard to this

13  particular case?

14            **MR. KRISHNAMURTHY:**  Your Honor, I object.  I think

15  this is a legal argument for counsel and the Court, not the

16  expert witness.  We're not asking him to establish events in

17  this case.

18            **THE COURT:**  Overruled.  You can answer the question.

19  **A.**    Can you ask it again, sir?  I apologize.

20  **BY MR. PHILIPSBORN**

21  **Q.**    Sure.  Does this document provide part of the basis for

22  your expert opinion in this case?

23  **A.**    Yes, sir.

24  **Q.**    And which of the subject areas in your opinion does it go

25  to?

1    **A.**    It talks about the history of the Hells Angels.

2    **Q.**    The history of the Hells Angels relates to symbols, terms

3    or territory?

4    **A.**    It actually -- it talks about all three.  Because it talks

5    about territory, it talks about the symbols, and it talks about

6    the other one sir, as well.

7    **Q.**    Okay.  Now, the articles that you chose that are -- that

8    were included in what was Court Exhibit 17, those articles

9    generally chronicle or make reference to events that have some

10   element of violence or confrontation?

11   **A.**    Yes, sir.

12   **Q.**    Okay.  And just generally with respect to the basis for

13   your opinions, did you talk to any of the -- where there were

14   named reporters, did you talk to any of the named reporters

15   about their process in putting the articles together?

16   **A.**    No, sir.  I didn't use the reports for -- basically, like

17   I said before, those aren't the only active information, source

18   of information I use is the newspaper articles.  That's just

19   one avenue.

20        The reason we put those in there is because I did not have

21   anything else that I could give out, turn over to include

22   reports or anything, but I was able to confirm those incidents

23   with ATF Special Agents out of Los Angeles Field Division.

24   **Q.**    Meaning, what you're explaining to the Court is that you

25   chose a series of articles that you then discussed with ATF

1   agents in Los Angeles?

2   **A.**   Yeah.   Because I don't have access to everything, sir, on

3   one entity.   So what I'll use is I will use the internet as a

4   tool or a mechanism.   I don't use that as my only source.

5       So if I get something off the internet that says, hey,

6   there was a shooting that just transpired between the Hells

7   Angels and Mongols, that's not my only source of information.

8       So what I do is then I reach out to the law enforcement

9   entity in that town or ATF, and I try to -- to back up that

10  information with police reports.

11      Sometimes I'm not able to get ahold of those police

12  reports, affidavits or anything else.   I know the incident

13  transpired and all I have is a police report to basically note

14  it on the timeline.

15  **Q.**   But in terms of actually constructing the exhibit that

16  consists in part of the -- of the articles, did you essentially

17  sit down at a computer and do a word search to come up with

18  Hells Angels and then pull up articles that were examples of

19  events?

20  **A.**   Ever since I've been on the job since 2006, I used Google

21  search engine.   And I do have Hells Angels in there on a daily

22  basis.

23      But that is not my only mechanism to analyze and track

24  Hells Angels.   I used that as one tool within the puzzle.   And

25  sometimes that's all I have because we don't have people in

1  that area or people in that area that actually work out with

2  motorcycle gangs.

3       So I'll get that information.  I will reach out to my

4  sources or my experts.  And sometimes I can't confirm for the

5  most part for the timeline that I inserted in there between the

6  Hells Angels and Mongols.  The reason I put a newspaper article

7  in there is basically to say there was some type of

8  documentation.  I wasn't the reporter.  I wasn't there.  I just

9  know there was some type of documentation about the incident

10  itself.

11 **Q.**   And in terms of what the Court is supposed to get out of

12  this in terms of the opinions that are sought to be elicited

13  from you, in your estimation do the articles essentially show

14  that there are reported events involving alleged Hells Angels

15  that took place in various parts of the United States?

16 **A.**   Yes.

17 **Q.**   Okay.  And that goes to the subject of what, territory?

18 **A.**   Territory.  And then after territory, we look at stuff

19  like migration leads to violence and when they move into an

20  area.  We look at those type of things.  When the Hells Angels

21  or their adversaries move, we look at those things and then

22  after those, and we see these acts of violence.

23       My job in the analytical world is to start looking at

24  tags, tabs and flash, if we're able to get ahold of reports or

25  videos of people that were involved or members that were

1    actually at the incident.  Then throughout time we try to see

2    if they were charged or convicted or if they wear a certain

3    tag, which we've discussed within the last time I've been here.

4    **Q.**   Got it.  Got it.

5        But in terms of presentation of information about the

6    Hells Angels and where, for example, certain -- let's say,

7    certain charters have influence or are located, there are

8    sources of information, other than just concentrating on

9    articles that chronicle alleged episodes of violence, that you

10   could actually use to explain your opinions; correct?

11   **A.**   Yes, but in those instance I didn't have anything else to

12   go on besides that article.

13   **Q.**   Is it your opinion -- I'm sorry.  In describing the

14   concept of Hells Angels territory, is it your opinion that the

15   best source of information that you have to explain that

16   concept is to go through a series of articles and then one

17   Sheriff's report about events chronicling violence involving an

18   alleged Hells Angels member?

19   **A.**   No.  I don't ever just focus on just one entity.  I always

20   each out to several to confirm.  That just happens to be one

21   incident that took place in a whole litany of -- of incidents

22   that have gone on between Hells Angels and one of their

23   adversaries.

24       I don't -- I don't single source just a newspaper article,

25   and I don't rely just on a reporter for that.

**SCHEETZ - CROSS / PHILIPSBORN**

1          What I do, like I stated, is I used that as -- because I

2     just don't know everything that's going on.  So if I get an

3     email or a search engine pops up and says, hey, a shooting

4     transpired, I immediately pick up if I have a source in that

5     area.  Sometimes I just don't, and I have to use this as my

6     source.

7          I'm not basing my opinion solely on the newspaper article.

8     I'm basing my opinion on a conglomerate, everything that I've

9     compiled together.

10    Q.   I notice that when you do use the secondary sources as a

11    bases for your opinions about territory, you don't, for

12    example, excerpt articles that say -- have something to do with

13    the Hells Angels food give-away; right?

14    A.   No, sir.

15    Q.   Okay.  Now, would you agree that in at least one or more

16    than one training session that you have given, you've expressed

17    the viewpoint that focusing on something like that is,

18    quote/unquote, bullshit?

19    A.   I don't think that's a term I've used, but I would say

20    it's -- it's for jury appeal, is why they do that.

21    Q.   Okay.  Well, and would you agree that excerpting a series

22    of articles about violence has jury appeal depending on what

23    side of the courtroom you're sitting on?

24    A.   No.  Because I have other excerpts from that timeline that

25    we can validate through actual ATF reports of information or

1    FBI reports of information.

2    **Q.**   Got it.

3         But it sounds as though you are aware that there has been

4    press coverage of what you may consider to be fluff, like bike

5    give-aways Fresno County --

6    **A.**   Yes.

7    **Q.**   -- right?

8    **A.**   Correct, sir.

9    **Q.**   And that's something that's associated with the Hells

10   Angels in a particular locale; correct?

11   **A.**   Correct.

12   **Q.**   And it sounds as though you discount that; correct?

13   **A.**   Yes.

14   **Q.**   Okay.  And let me see if that...

15        (Brief pause.)

16   **Q.**   The last question I have for you with respect to the

17   exhibits actually has to do with the last of the exhibits.  And

18   let me make sure that I'm -- so I believe it's your Tab 22, and

19   it's Court Exhibit 20.  It should have in red ink at the top of

20   the page "West Coast Officers Meeting."  Do you see that?

21   **A.**   I'm getting there, sir.

22        (Document displayed.)

23   **A.**   Yes.

24   **Q.**   Okay.  Who authored that document, do you know?

25   **A.**   Whoever was the West Coast secretary at the time of the

**SCHEETZ - CROSS / PHILIPSBORN**

1   Hells Angels.

2   **Q.**   Okay.  But that -- I got you.  Can we drill down in your

3   capacity as an intelligence specialist?  Who authored that

4   document?

5   **A.**   I don't know who at the time was the West Coast secretary

6   for the Hells Angels.

7   **Q.**   Where did this document come from?

8   **A.**   It came from another OMG expert out of California.

9   **Q.**   And who is that?

10   **A.**   It's Jorge Gil Blanco.

11   **Q.**   Got it.

12      So I do have a few questions that are specific now to your

13   declaration.  And I believe that for the rest of my questions

14   I'm just going to be asking but aspects of your declaration.

15      Page 2, Paragraph 5.

16   **A.**   Yes, sir.

17      (Document displayed)

18   **Q.**   You make reference in Paragraph 5 to a number of items

19   that you've been involved in creating or activities that you've

20   undertaken in the course of your investigations; correct?

21   **A.**   What line are you on, sir, in Paragraph 5?

22   **Q.**   Well, if you want to go to Lines 3 and 4:

23         "I have been responsible for create timelines and

24      rosters."

25   **A.**   Yes.  Yes, sir.

**SCHEETZ - CROSS / PHILIPSBORN**

1  Q.   Any timelines and rosters directly relevant to your

2  opinions in this case that you have not included in your

3  exhibits?

4  A.   I have not turned over any rosters or timelines, sir.

5  Q.   Are there any that are directly relevant, in your opinion,

6  to your stated opinions?

7  A.   No, sir.  Not to this investigation, no.

8  Q.   Okay.  It talks about your having interviewed witnesses

9  and confidential informants.  We've covered that in part,

10  though we didn't talk about interviewing witnesses.

11       Is witnesses -- what does "witnesses" mean to you in this

12  context?

13  A.   It would be someone that assisted ATF during the

14  adjudication phase of the investigation.

15  Q.   So let's say you were communicating with a fellow law

16  enforcement officer, including a fellow ATF employee.  That is

17  not encompassed in the word "witnesses"?

18  A.   No, sir.

19  Q.   Okay.  So are there any interviews of witnesses, as you've

20  just defined them, that are reported or noted that pertain to

21  the opinions you're providing to the Court in this case?

22  A.   No, sir.

23  Q.   How about interviews of confidential informants?  Are

24  there any such interviews that pertain to the opinions that you

25  are stating to this Court, other than the three men that you've

**SCHEETZ - CROSS / PHILIPSBORN**

1   already identified?

2   **A.**   No, sir.

3   **Q.**   You talk about conducting overt surveillance.  Is there

4   any specific surveillance that you conducted that you have in

5   mind in the context of your providing evidence in this case,

6   other than your having been present at the World Run Sturgis or

7   other events that you talked about either on direct or that you

8   have specifically noted in your declaration?

9   **A.**   No, sir.  Looking over it, no.

10  **Q.**   Okay.  You talk about analyzing seized documents.  Are

11  there any seized documents that you rely upon, other than the

12  documents that you have either included as exhibits in this

13  case or that you have discussed specifically in the

14  declaration?

15  **A.**   I have not turned them over, no, sir.

16  **Q.**   When you say you have not turned them over, that isn't

17  what I was asking.

18  **A.**   Okay.  I apologize.

19  **Q.**   Are there any such documents that you rely on that are not

20  specified either by being provided as exhibits or being

21  specifically discussed in your declaration?

22  **A.**   No, sir.

23  **Q.**   You talk beginning at Line 6 into Line 7 about being

24  provided with documents seized from OMG members and clubhouses

25  across the world.

**SCHEETZ - CROSS / PHILIPSBORN**

1       Have you provided the documents that you are relying upon

2  in expressing your opinions in your exhibits or have you

3  discussed such documents specifically in your declaration?

4  **A.**   No, sir.

5  **Q.**   In other words, there are some that you are relying on,

6  but that you have not yet provided us?

7  **A.**   Yeah.  There was information I've looked at or analyzed

8  that I have not turned over that was seized evidence, yes.

9  **Q.**   Okay.  Let's drill down on that just so we understand what

10  you're talking about.

11       Can you explain what you mean by that answer?

12  **A.**   Well, information would be like if someone -- if

13  information is seized at the airport or seized during an

14  investigation, I've analyzed or read over those documents.  And

15  that's what I've done since I have been in this position since

16  2006.

17  **Q.**   I understand.  And it's -- it's undoubtedly because I'm

18  not asking the question clearly.

19       Are there any documents that go to symbols, terms and

20  territory that you have in mind as you sit here that you have

21  not included either in your exhibits or have not specifically

22  named in your declaration?

23  **A.**   No, sir.

24  **Q.**   When you -- at Lines 8 and 9 discuss rulebooks, are the

25  rulebooks that you have in mind and that you are making

1    reference to rulebooks that you have included as exhibits and

2    appended to your declaration?

3    **A.**    I don't see rulebooks in 8 and 9, sir.  I apologize.

4    **Q.**    At Lines 8 and 9 of Paragraph 5?

5    **A.**    Oh, Paragraph 5.  I apologize.

6         I turned over those rules.  Those were the ones that were

7    in the back.  Those were rules.

8    **Q.**    And so that's what you were referring when you discuss

9    rulebooks?

10   **A.**    Yes, sir.  That's the rulebook.

11   **Q.**    Okay.  Internal communications are mentioned at 9.  What

12   is it you're telling the Court and counsel?

13   **A.**    That I have observed through our investigation back in

14   2009 that there was internal communiques that went on between

15   the Hells Angels that we were able to view.

16   **Q.**    Okay.  Did any of the -- did any internal communications

17   bear on your opinions about symbols, terms and territory?

18   **A.**    No, because they didn't -- they are not going to put that

19   stuff in writing.

20   **Q.**    Okay.  In terms of histories, are the histories that

21   you're discussing histories that are included in Exhibit 2 that

22   we have previously discussed and in the books that we have

23   previously discussed on your cross-examination?

24   **A.**    On the history -- are you referencing an email, sir?  Are

25   you referencing -- I was a little confused on that, how you

**SCHEETZ - CROSS / PHILIPSBORN**

1    word it.

2    **Q.**    Okay.  You see that you use the word "histories" in your

3    declaration?

4    **A.**    Uh-huh.

5    **Q.**    Okay.  So what I'm asking you is:  What histories do you

6    rely on?

7    **A.**    I rely on -- when I talk about history, I talk about

8    violent transactions that have transpired, as well as when

9    charters were formed.  That's something I monitor on a daily

10   basis because I look at the expansion of the Hells Angels as

11   well their adversaries, and I look at the history of when they

12   were formed, and then we can kind of -- we look at the

13   calculate -- or we like to see -- not like to.  We see how long

14   it takes before a violent action transpires between an

15   unwitting civilian or an adversary.

16        So when I look at the history, I look at the start date

17   the charter was formed, and we know if they move into a certain

18   area, some type violent action is going to be transpire.  Or if

19   an adversary moves into an area, we look at the history of that

20   as well, and as -- the information I have turned over to the

21   Court through my intelligence reports, we document those

22   incidents that transpire.

23   **Q.**    Okay.  With respect to your use of the word "histories" in

24   the context of the opinions that you're giving in this case,

25   are there any documents, in addition to those that are included

**SCHEETZ - CROSS / PHILIPSBORN**

1  in your exhibits or that you reference in the text of your

2  declaration, that you are relying on as, quote/unquote,

3  histories on which you are basing opinions?

4  **A.**   No, sir.

5  **Q.**   Now, later in this same paragraph you make reference to

6  your daily communications with law enforcement officers.  And

7  beginning at Line 12 into Line 13 you explain that "they share

8  information about their investigations with me."  Do you see

9  that phrase?

10 **A.**   Yes, sir.

11 **Q.**   Okay.  You've discussed generally how you go about your

12 intelligence-gathering process.

13       What I'm asking you now is specific to opinions that

14 you're rendering in this case.  Is there any information or

15 record of information that has been provided to you from other

16 law enforcement officers that you are relying on to state your

17 opinions that you have not provided either in the exhibits or

18 in a specific statement or quotation in your declaration?

19 **A.**   I believe there's probably certain particular emails that

20 I'm privy to that I have not turned over.

21 **Q.**   Can you explain a little bit more about what you're

22 telling us in that regard?  Emails --

23 **A.**   If I get an email from somebody overseas or Canada and

24 it's in regard to an ongoing investigation, I might say:  Hey,

25 this is some of the intelligence I can provide, some

1   intelligence I can't provide.  Am I aware of the situation, or

2   I might be providing to an actual or ongoing investigation that

3   comes through the emails.

4   **Q.**   Okay.  And in your opinion, there is information of that

5   type that goes to either symbols, terms or territory that you

6   have in mind when you are providing your opinions that are not

7   reflected in either your exhibits or in the text of your

8   declaration?

9   **A.**   Yes.  There is because we know about ongoing situations or

10  ongoing investigations.  It has to reference symbols, and

11  that's something I'm going to look at future down the road.  So

12  it does reflect.

13  **Q.**   Okay.  Can you provide us a general example so that we

14  have a better understanding of what you have in mind that might

15  not appear in written form, even in your declaration or in the

16  exhibits?  Can you give us an example?

17  **A.**   I mean, are you asking for an example of how somebody

18  reaches out to me and says:  Hey, we've just had a shooting or

19  stabbing between the Hells Angels and the Mongols.

20      I mean, we've had three of those in the last six weeks.

21  So there's -- they are ongoing investigations.  So I might

22  provide information to those people, either ATF or external,

23  and those are all communiques that we have done electronically

24  through my ATF email.

25  **Q.**   Okay.  And what -- what aspect of your expert testimony in

1    this case, in your opinion, does that example go to?  In other

2    words, how would you use that information?  Does it go to

3    symbols, terms or territory?

4    **A.**   All three.  It definitely has to deal with territory

5    because that's why the violent acts transpired.  And then

6    something that we're going to look at in all three instances,

7    we're going to look for the tags, tabs and flash; any type of

8    territory act that would transpire immediately afterwards.

9    **Q.**   Got it.

10       At Page 2, Paragraph 6 you make reference -- and I know we

11   have talked about this a bit, but just so we understand the

12   basis for your opinion.  You begin Paragraph 6 with the

13   following language:

14           "Although each individual Hells Angels charter

15       has a degree of autonomy, there are many similarities

16       among Hells Angels charters within the United States

17       and across the world."

18       Do you see that sentence, sir?

19   **A.**   Yes, sir.

20   **Q.**   Okay.  And what is the basis for your opinion about

21   charter autonomy besides what we read over earlier today?

22   **A.**   Well, we noted there's certain aspects of the Hells Angels

23   rules that they will adhere to and everyone has to adhere to.

24   But when they talk about charter autonomy, certain charters

25   have different requirements for their members.  It can be

1    something as mundane as, like you saw from Modesto, was that,

2    basically the fighting.  There's other things in Modesto that

3    you see that you might not see in Fresno or you might see in

4    Greenville, South Carolina.

5         So what the reference is, there are certain things within

6    the World Rules.  For instance, the way your back patch is

7    going to be, the font, the way it's going to sit, the way it's

8    going to lay.  The way you're going to be disseminating In and

9    Out forms of new members, of ex-members, new prospects.

10        But the charter autonomy goes in the fact that everybody

11   has to have a rule of adhering to 365 days of prospecting, but

12   there might be certain charters in the United States that

13   actually make their guys do 18 months.  And that's a charter

14   rule.  That's not specific.  At least if they do the 365 days,

15   they have done that part adhering to the World Rules, but the

16   charter itself specifically might say, no, they have to do it

17   an extra six months.

18   **Q.**   Got it.

19        Just in terms of your -- how your expertise applies in the

20   context of this case, do you have any opinion of whether there

21   is a central decision-making apparatus for what you consider to

22   be the Hells Angels Motorcycle Club?

23   **A.**   No, there is not.  There's not one president of the Hells

24   Angels, no, sir.

25   **Q.**   Okay.  And just in terms of decision-making, let's say, on

1  what you've chronicled and what we discussed is incorporated

2  into the series of articles about acts of violence, are those

3  matters that are -- in your opinion and in your understanding

4  are subject to discussion between a person, let's say, in

5  Fresno, California and some higher decision-maker elsewhere in

6  the United States?

7  **A.**   We do know that the discussions have been -- that there is

8  internal discussions and external discussions between charters.

9  Even if it doesn't primarily affect, say, for instance, Fresno.

10 If a shooting transpires in Denver or anywhere else, like we've

11 had over the last six weeks, Denver is still going to talk -- I

12 mean, Fresno or Sonoma or somewhere else could still talk about

13 it.  They are going to know that their, quote/unquote, brothers

14 or a prospect or an associate of the club was either shot at or

15 assaulted or stabbed or killed by an adversary, primarily the

16 Mongols.

17 **Q.**   Okay.  And as I understand what you're talking about,

18 there is some -- you have knowledge, given the position you

19 occupy, of a certain amount of information sharing between

20 people who are in individual chapters of the Hells Angels

21 Motorcycle Club; correct?

22 **A.**   Yes.

23 **Q.**   Okay.

24 **A.**   Or experts -- we know from certain acts of violence that

25 people have been involved with incidents where they don't have

**SCHEETZ - CROSS / PHILIPSBORN**

1   that adversary even where their charter is; that incident

2   actually transpired in another area.  But because of what goes

3   on in the communiques between the individuals and members and

4   prospects, they know exactly what's going on with their

5   adversaries.

6   **Q.**   Okay.  In your opinion, based on the information you've

7   provided to the Court, is there an executive branch of the

8   Hells Angels Motorcycle Club, let's say, the way there is an

9   executive branch of the Government of the United States?  Is

10  there someone or one or two persons who, in your understanding,

11  make decisions for other individuals throughout what you've

12  discussed as a Hells Angels Motorcycle Club?

13  **A.**   No.  First and foremost, it's one man, one vote, and that

14  pertains to the members.

15       In the United States, the United States is actually split

16  into two separate entities.  There is the West Coast and the

17  East Coast.  The West coast is from Denver to Hawaii.  And then

18  there is the East Coast, which is Omaha, Nebraska to the

19  Atlantic Ocean.  Each one of those sections, the East Coast and

20  the West Coast, has a hierarchy that makes decisions.  On the

21  East Coast they call it a chairman, and on the West Coast they

22  have a president.  But there is not one sole person in the

23  United States that oversees.

24       And in Canada, it's a similar setup that way.  Europe is

25  set up that way.  There is not one person, like most OMGs,

SCHEETZ - CROSS / PHILIPSBORN

1   where there is one top down single area person who oversees or

2   makes decisions for the club.

3   **Q.**   We're reaching our time limit here.  I want to ask you a

4   question about your declaration at what, at least for me, is

5   Page 4 and Paragraph No. 13.

6   **A.**   Yes, sir.

7   **Q.**   You make reference to investigations, and then you list

8   four captioned cases that seem to be matters that ended up in a

9   court; correct?

10  **A.**   Yes, sir.  Those three cases, yes.

11  **Q.**   Okay.  And can you explain to the Court what, in your

12  estimation, is the significance in terms of your opinions of

13  the -- of the reference to those cases?

14  **A.**   The significance is the amount of violence attributed to

15  these adversarial OMGs with the Hells Angels.

16  **Q.**   Okay.  These are relatively old cases.  I mean, two of

17  them were filed -- or three of them were filed in 2010.  One

18  was filed in 2012; right?

19  **A.**   Yes.  The other ones I didn't put down because they still

20  haven't been fully adjudicated yet.

21  **Q.**   Got it.

22      But from the sound of it and the way you're helping us out

23  by explaining the basis for your opinions, the reason this is

24  significant is that it's another way of your communicating that

25  Outlaw Motorcycle Gangs are involved in acts of violence?

SCHEETZ - CROSS / PHILIPSBORN

1  **A.**    Yes.

2  **Q.**    Okay.  And, again, can you explain to us in terms of

3  symbols, terms and territory where does that fit?

4  **A.**    It fits in all three, because it shows us the Hells Angels

5  expanding across the United States, as well as their

6  adversaries expanding their territory.  Each one of these

7  investigations, there was a large amount of violence attributed

8  to the Hells Angels, as well as the Mongols, Outlaws and the

9  Pagans.

10        **MR. PHILIPSBORNE:**  Your Honor, I do have some

11  additional questions.  I see what time we're at.  It would

12  probably shorten what I have -- it's up to the Court -- if I

13  were able to talk to other counsel, who I think are expecting

14  me to cover a few other things, but I don't want to overstay my

15  welcome.

16        So I don't know if the Court thinks this is an appropriate

17  time to break, and I can either pass the baton for our next

18  session, or with the Court's indulgence just ask some questions

19  about two or three more pages of the declaration.  That was the

20  ends of my mandate.

21        **THE COURT:**  So you're asking whether you can complete

22  those two or three more questions, or are you asking for a

23  break now?

24        **MR. PHILIPSBORN:**  What I'm asking is if the Court

25  would consider adjourning, I can confer with other counsel to

1  see if I should just have other counsel on the next session

2  pick up or --

3          THE COURT:  All right.  So there's a chance that you

4  just might -- this might be your completion if you have a

5  chance to confer with counsel as opposed to launching into

6  another --

7          MR. PHILIPSBORN:  Exactly.  And what I would launch

8  into wouldn't be long, but it's not five to ten minutes.  It's

9  a little bit more.

10         THE COURT:  All right.  Well, it is -- we've only got

11  a couple minutes left, so why don't we adjourn and see if you

12  can work that out with counsel.

13         Let me just get a preview.  I mean, this has been very

14  extensive, and there is a lot of material here that doesn't go

15  directly to the *Daubert* question in my view.  I have allowed it

16  to go on.

17         Are you anticipating that if you talk with other counsel,

18  that others are going to be shorter or more focused, or what's

19  your expectation?

20         MR. PHILIPSBORN:  Your Honor, I do anticipate that

21  other counsel will be more focused.

22         Part of what we weren't sure of, because of the nature of

23  the declaration, was where we might go with some of the general

24  statements that were made in Mr. Scheetz's declaration or how

25  he was relying on certain sources of information.

SCHEETZ - CROSS / PHILIPSBORN

1    During the break, I actually talked briefly to three of

2 the other counsel involved in the case, and I think they now

3 have a better idea of what we're dealing with.

4    But other counsel are going to be more focused on

5 specifics, and especially on the issue of methodology.  So, how

6 is it that you in the end have arrived at specific opinions.

7         THE COURT:  Okay.  All right.  Well, I do want to

8 keep our focus on the *Daubert* questions and that is the bases.

9 Both the factual bases and methodology are the two critical

10 issues.

11         MR. PHILIPSBORN:  Understood.

12         THE COURT:  And so why don't we adjourn?  We are

13 going to pick up again next week.  I think at the same time;

14 right?  Next Tuesday at 9:00 o'clock.

15         MR. PHILIPSBORN:  I believe so, your Honor.

16         THE CLERK:  Yes, Your Honor.

17         THE COURT:  All right.  And you will either ask your

18 follow-up questions or not.  At that point Mr. Sabelli will be

19 conducting via remote?

20         MR. PHILIPSBORN:  Yes, Your Honor.

21         THE COURT:  Okay.  All right.  Thank you.

22    Thank you, everyone.  We'll see you a week from today.

23 Thank you.

24         THE CLERK:  Court is adjourned.

25         (Proceedings adjourned.)

## I N D E X

Tuesday, August 18, 2020 - Volume 1

| GOVERNMENT WITNESSES | PAGE | VOL. |
|---|---|---|
| **SCHEETZ, JEREMY** | | |
| (SWORN) | 8 | 1 |
| Direct Examination by Mr. Krishnamurthy | 8 | 1 |
| Cross-Examination by Mr. Philipsborn | 33 | 1 |

—   —   —

<u>**CERTIFICATE OF REPORTER**</u>


I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.



_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Tuesday, August 18, 2020

Volume 2

Pages 114 - 244

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

UNITED STATES OF AMERICA,        )
                                 )
          Plaintiff,             )
                                 )
  VS.                            )        NO. CR 17-0533 EMC
                                 )
JONATHAN JOSEPH NELSON, et       )
al.,                             )
                                 )
          Defendants.            )
_____ )


                        San Francisco, California
                        Tuesday, August 25, 2020

  __TRANSCRIPT OF HYBRID IN-PERSON/VIDEO CONFERENCE PROCEEDINGS__

__APPEARANCES:__

__For the Plaintiff:__      DAVID L. ANDERSON
                            United States Attorney
                            450 Golden Gate Avenue - 11th Floor
                            San Francisco, California 94102
                    BY:  __AJAY KRISHNAMURTHY__
                         __KEVIN BARRY__
                         __ASSISTANT UNITED STATES ATTORNEYS__

__For Defendant Jonathan Joseph Nelson:__
                            LAW OFFICE OF JAI M. GOHEL
                            819 Eddy Street
                            San Francisco, California 94610
                    BY:  __JAI M. GOHEL, ESQ.__
                         __RICHARD NOVAK, ESQ.__

          __(APPEARANCES CONTINUED ON FOLLOWING PAGE)__

Reported By:  Ruth Levine Ekhaus, RDR, FCRR
              CSR No. 12219, Official Reporter

**APPEARANCES:   (CONTINUED)**

**For Defendant Raymond Michael Foakes:**
> GEORGE BOISSEAU LAW OFFICE
> 740 4th Street
> Second Floor
> Santa Rosa, California 95404
> BY:  **GEORGE C. BOISSEAU, ESQ.**


**For Defendant Russell Allen Lyles, Jr.:**
> LAW OFFICES OF MICHAEL CLOUGH
> 6114 LaSalle Avenue
> Suite 833
> Oakland, California 94611
> BY:  **MICHAEL W. CLOUGH, ESQ.**


**For Defendant Jeremy Daniel Greer:**
> LAW OFFICE OF RANDY SUE POLLOCK
> 286 Santa Clara Avenue
> Oakland, California 94610
> BY:  **RANDY SUE POLLOCK, ESQ.**

**For Defendant Brian Wayne Wendt:**
> LAW OFFICE OF JOHN T. PHILIPSBORN
> 507 Polk Street
> Suite 350
> San Francisco, California 94102
> BY:  **JOHN T. PHILIPSBORN, ESQ.**


> LAW OFFICES OF MARTIN A. SABELLI
> 740 Noe Street
> San Francisco, California 94114
> BY:  **MARTIN A. SABELLI, ESQ.**


**For Defendant Russell Taylor Ott:**
> LAW OFFICE OF ROBERT WAGGENER
> 214 Duboce Avenue
> San Francisco, California 94103
> BY:  **ROBERT F. WAGGENER, ESQ.**
> **MARCIA MORRISEY, ESQ.**


**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

**APPEARANCES:   (CONTINUED)**

For Defendant Christopher Ranieri:
                        LAW OFFICE OF JOHN G. WALSH, P.C.
                        63 Atlantic Avenue
                        Third Floor
                        Boston, Massachusetts 02110
                   BY:  **JOHN G. WALSH, ESQ.**


For Defendant Damien David Cesena:
                        DURIE TANGRI LLP
                        217 Liedesdorff Street
                        San Francisco, California 94111
                   BY:  **GALIA AMRAM, ESQ.**
                        **ENEDA HOXHA, ESQ.**


For Defendant Brian Burke:
                        LAW OFFICE OF ERIK BABCOCK
                        707 Washington Street
                        Second Floor
                        Oakland, California 94607
                   BY:  **ERIK BABCOCK, ESQ.**


For Defendant David Salvatore Diaz:
                        LAW OFFICES OF JAMES S. THOMSON
                        732 Addison Street
                        Suite A
                        Berkeley, California 94710
                   BY:  **JAMES THOMSON, ESQ.**


For Defendant Merl Frederick Hefferman:
                        LAW OFFICES OF JAMES BUSTAMANTE
                        1000 Brannan Street
                        Suite 488
                        San Francisco, California 94103
                   BY:  **JAMES BUSTAMANTE, ESQ.**

**I N D E X**

Tuesday, August 25, 2020 - Volume 2

<u>GOVERNMENT'S WITNESSES</u>                                    <u>PAGE</u>   <u>VOL.</u>

<u>SCHEETZ, JEREMY</u>
(PREVIOUSLY SWORN)                                        124     0
Cross-Examination by Mr. Philipsborn (continued)          124     0
Cross-Examination by Mr. Sabelli                          151     0
Cross-Examination by Mr. Gohel                            212     0

PROCEEDINGS

1    **Tuesday - August 25, 2020**                              **9:13 a.m.**

2                         P R O C E E D I N G S

3                            ---o0o---

4          **THE COURT:**  Angie, if you could call the case.

5          **THE CLERK:**  Court is now in session.  The Honorable

6    Edward M. Chen is presiding.

7          Calling Criminal Action 17-533, United States of America

8    versus Jonathan Nelson, Raymond Foakes, Russell Lyles, Jeremy

9    Greer, Brian Wendt, Russell Ott, Christopher Ranieri, Damien

10   Cesena, Brian Burke, David Diaz, and Merl Hefferman.

11         Counsel, please state your appearances for the record,

12   beginning with the Government.

13         **MR. KRISHNAMURTHY:**  Good morning.  Ajay Krishnamurthy

14   and Kevin Barry for the United States.

15         **THE COURT:**  All right.  Thank you.

16         All right.  And for defense, if each counsel could state

17   their appearance and state the presence or not of their client.

18         **MR. BOISSEAU:**  Good morning, Your Honor.  George

19   Boisseau on behalf of Raymond Foakes, who's present in the

20   courtroom.

21         **THE COURT:**  All right.  Thank you.

22         **MR. GOHEL:**  Good morning, Your Honor.  Jai Gohel --

23         **THE COURT:**  Mr. Gohel, I don't know if you have a

24   second device, but I'm getting a whole lot of feedback there.

25   You should turn off your phone or whatever it is.

PROCEEDINGS

```
1              MR. GOHEL:  Is this better?

2              THE COURT:  Yeah.  No.  I'm still hearing an echo.

3         Do you have your phone tied into Zoom?

4              MR. GOHEL:  I don't.

5              THE COURT:  Maybe somebody else in the room.  Is there

6    somebody else in the room with you that's got their phone

7    going?

8              MR. GOHEL:  Possibly.

9              THE COURT:  Well, okay.

10             MR. GOHEL:  Appearing for Jon Nelson, who's present in

11   custody.

12             THE COURT:  All right.  Thank you.

13             MS. POLLOCK:  Good morning, Your Honor.  Randy Sue

14   Pollock on behalf of Jeremy Greer.  Mr. Greer is on a phone

15   line, Your Honor.

16             THE COURT:  All right.  Thank you.

17             MR. WALSH:  Good morning, Your Honor.  John Walsh on

18   behalf of Christopher Ranieri, whose presence is waived.

19             THE COURT:  All right.  Thank you, Mr. Walsh.

20             MR. THOMSON:  James Thomson on behalf of David Diaz,

21   who is present with me in the other room, Your Honor.

22             THE COURT:  All right.  Thank you.

23             MR. WAGGENER:  Good morning, Your Honor.  Robert

24   Waggener and Marcia Morrisey for Russell Ott.  Mr. Ott is

25   virtually appearing, virtually present.
```

PROCEEDINGS

1         **THE COURT:** He is appearing via Zoom?

2         **MR. WAGGENER:** He's on Zoom, yes.

3         **THE COURT:** Thank you.

4         **MR. WAGGENER:** Yes.

5         **MR. CLOUGH:** Your Honor, Michael Clough on behalf of

6 Mr. Lyles, who I am pretty sure is online but, if not, will be

7 on soon.

8         **THE COURT:** All right.  Thank you.

9         **MR. BUSTAMANTE:** Good morning, Your Honor.

10     Go ahead, Galia.

11         **MS. AMRAM:** Oh.  Galia Amram and Eneda Hoxha who are

12 appearing for Damien Cesena, who should be appearing virtually.

13         **MR. BUSTAMANTE:** Good morning, Your Honor.  James

14 Bustamante on behalf of Merl Hefferman, who is present with me

15 at my office.

16         **THE COURT:** All right.  Thank you, Mr. Bustamante.

17         **MR. BABCOCK:** Good morning, Your Honor.  Erik Babcock

18 for Brian Burke, who is present via Zoom on another line.

19         **MR. SABELLI:** Good morning, Your Honor.  Martin

20 Sabelli for Brian Wendt.

21     John Philipsborn was on a moment ago.  I believe he is in

22 the courtroom.  I don't see him on the Zoom screen anymore.

23 And I believe that our client, Brian Wendt, is with

24 Mr. Philipsborn in custody, but in the courthouse.

25         **THE COURT:** Yes.

PROCEEDINGS

1          **MR. SABELLI:**  I don't see Mr. Philipsborn.

2          **THE COURT:**  Well, Mr. Philipsborn is here.  I don't

3     know why you're not seeing him, unless your camera is not

4     working.

5          **MR. SABELLI:**  No.  I see everybody else --

6          **THE COURT:**  I don't know whether Mr. Philipsborn's

7     camera is not on or something.  But he's here, and he's

8     listening.

9        So do you want to say something, Mr. Philipsborn, make

10    sure we can hear you?

11       Oops.  Not working.

12       Angie, let's see.

13         **THE CLERK:**  I just promoted him again.

14         **THE COURT:**  I see Mr. Philipsborn in the attendees.

15    Here.  I'll promote him to panelist, see if that does anything.

16       For some reason, it's not transferring into the panelist.

17       How about if we allowed him to talk, at least?

18         **THE CLERK:**  We can do that.

19         **THE COURT:**  Okay.  Do you want to talk,

20    Mr. Philipsborn?  Oh.  Do you want to try to sign in again?

21       (Reporter interruption for clarification of the record.)

22                  (Discussion off the record.)

23         **THE COURT:**  While we're waiting, I believe --

24    Ms. Morrisey, did you already make your appearance for Mr. Ott?

25    You're muted.

PROCEEDINGS

 1          **MS. MORRISEY:**  Yes, Your Honor.  Mr. Waggener made the

 2     appearance for both of us.

 3          **THE COURT:**  Okay.  That's right.  Okay.  Thank you.

 4       So I think that completes everyone.

 5       And I will state for the record that we are holding a live

 6     hearing, but with limits as to who can be in the courtroom

 7     pursuant to the earlier order.  And once Mr. Philipsborn gets

 8     hooked up, we're going to resume cross-examination by

 9     Mr. Philipsborn of the witness, and Mr. Wendt is present, and

10     Mr. Sabelli is also present by Zoom.  And my understanding is

11     Mr. Sabelli will then take the next turn.

12          **MR. SABELLI:**  Good morning, Your Honor.  I believe

13     that Mr. Philipsborn has a few more questions and then I'll

14     take over.

15          **THE COURT:**  Okay.  And do you have a time estimate for

16     me, how long you'll be on cross?

17          **MR. SABELLI:**  Your Honor, I would guess about --

18     probably towards the end of the day.  I hope to finish by the

19     end of the day.  But I'm not quite sure, depending on what time

20     I get started.  Probably about two hours.

21          **THE COURT:**  Okay.

22          **MR. KRISHNAMURTHY:**  Your Honor, while we're waiting

23     for Mr. Philipsborn to get set up, should I bring the witness

24     in and have him --

25          **THE COURT:**  Yeah, might as well.  Let's take care of

**PROCEEDINGS**

1    that.

2                    (Pause in proceedings.)

3         **THE COURT:**  Are you showing a weak -- are you showing

4    a weak Internet connection?  All right.

5         Angie, can you ask IT to --

6         **THE CLERK:**  I have them.  Buz is helping.

7         **THE COURT:**  I wonder if you just restart your laptop,

8    Mr. Philipsborn, and just restart it and start from scratch and

9    see if that does anything.

10        **THE CLERK:**  Mr. Philipsborn, this is your own laptop?

11        (Reporter interruption for clarification of the record.)

12                    (Discussion off the record.)

13        **THE COURT:**  All right.  Let's hope this stays this

14    way.

15        Do you want to go ahead and make your appearance?

16        **MR. PHILIPSBORN:**  Good morning, Your Honor.  John

17    Philipsborn for Mr. Wendt, who is present in court.

18        **THE COURT:**  Great.

19        All right.  All the appearances have been made, and we

20    should resume now that we have lost 25 minutes here and try and

21    make up for lost time.

22        So we are in the midst of Mr. Wendt's cross-examination of

23    Mr. Scheetz.

24        And good morning, Mr. Scheetz.  Welcome back.

25        And why don't you go ahead and pick up where you left off.

SCHEETZ - CROSS / PHILIPSBORN

1          **MR. PHILIPSBORN:**  Thank you, Your Honor.

2                     **JEREMY SCHEETZ**,

3   called as a witness for the Government, having been previously

4   duly sworn, testified further as follows:

5                  **CROSS-EXAMINATION** (Resumed)

6   BY MR. PHILIPSBORN:

7   Q.  Mr. Scheetz, good morning, sir.

8       In the interim since you were last here, did you have the

9   opportunity to look for any notes you may have made that

10  pertain to your interactions with debriefers or with other

11  agents, notes that may have a bearing on your testimony before

12  the Court?

13          **THE COURT:**  I can't hear the witness.

14      Can you say something, Mr. Scheetz?

15      Is he un-muted, Angie?

16          **THE CLERK:**  Okay.

17          **THE COURT:**  He is muted.

18      Okay.  There.  Speak.

19          **THE WITNESS:**  Yes.

20          **THE COURT:**  Okay.  Good.  Thank you.

21          **THE WITNESS:**  Okay, Your Honor.

22  BY MR. PHILIPSBORN:

23  Q.  Were you able to locate any such notes, sir?

24  A.  Yes.

25  Q.  And have you made those notes available to the office of

**SCHEETZ - CROSS / PHILIPSBORN**

1   the United States Attorney?

2   **A.**   Not yet, sir, no.

3   **Q.**   Okay.  Will you be able to do that at some point in the

4   near future?

5   **A.**   Yes.

6   **Q.**   In your declaration, sir, you also mention at page 4 of

7   the declaration in paragraph 14 that one of the things -- one

8   of the activities you do as an intelligence analyst is that you

9   listen to jail calls and wire intercepts; right?

10  **A.**   Yes, sir.

11  **Q.**   Are any such matters, either jail calls or wire

12  intercepts, pertinent, in your opinion, to the opinions you are

13  rendering in this case?

14  **A.**   Yes.

15  **Q.**   Okay.  And first, let's start with, are there any jail

16  calls or wire intercepts that, to your knowledge, involve any

17  of the defendants in this case?

18  **A.**   No, sir.

19  **Q.**   Okay.  Can you explain to the Court how jail calls and

20  wire intercepts pertain to the opinions you've rendered in this

21  case?

22  **A.**   For the jail calls, it's actually direct -- it's listening

23  to two members of the Hells Angels discussing ongoing

24  situations that they are involved in or going to be involved

25  in.  And I have looked through all my historical information to

1  correlate that information with stuff that I have learned since

2  2006 to render my opinion.

3  Q.   Okay.  And where are these members of the Hells Angels

4  located?

5  A.   They're on the East Coast, sir.

6  Q.   Okay.  And are you talking about an ongoing investigation,

7  or are you talking about an historical investigation?

8  A.   Historical, sir.

9  Q.   Okay.  And how far back in history are we going?

10  A.   Three years.

11  Q.   Okay.  And how are those -- or which of the subjects that

12  you've testified about, either including history, but the

13  subjects of symbols, terms, and territory, which of those

14  subjects do these jail calls pertain to?

15  A.   All of them, sir.

16  Q.   Did you make notes of those calls?

17  A.   No.  I have the calls themselves.

18  Q.   And what subject is it that they pertain to, sir?

19  A.   Subject, you mean, of territory, tags, tabs, and symbols?

20  Is that what you're referencing, sir?

21  Q.   Yes.

22  A.   Yes, all of them.

23  Q.   Okay.  And so I gather from what you're explaining, the

24  only way of our finding out what it is you're getting from

25  those calls is for us to listen to the calls because you made

1   no notes of them.  Right?

2   A.   Correct.

3   Q.   Okay.  Let me move to another subject just quickly.

4        You also may recall that you and I discussed on the last

5   occasion of your appearance -- and for the Court and counsel,

6   the reference is in the transcript of August 18 beginning at

7   page 103 -- certain e-mails.  And at lines 19 and 20 of

8   page 103, you say (reading):

9             "I believe there's probably certain particular

10        e-mails that I'm privy to that I've not turned over."

11        Does that sound familiar to you, sir?

12  A.   Yes, sir.

13  Q.   Okay.  Have you looked for those e-mails?

14  A.   Yes, sir.

15  Q.   And -- I'm sorry, and I apologize to you, sir.  I didn't

16  catch the answer.

17  A.   Yes, I've looked for them.

18  Q.   Okay.  Did you locate them?

19  A.   No, sir.

20  Q.   Meaning you're still looking, or you feel they're no

21  longer in existence?

22  A.   Both.  We had a computer crash back in 2011 with my

23  co-worker, so I'm unable to located some of those -- or those

24  e-mails, sir.

25  Q.   Okay.  And, again, if you could remind us, in terms of the

**SCHEETZ - CROSS / PHILIPSBORN**

1   opinions that you've rendered before this Court and also in

2   your declaration, how is it that the e-mails would have -- or

3   provide some basis for your testimony?

4   **A.**   It was during an ongoing investigation with Hells Angels,

5   Greenville, South Carolina.  And some of those e-mails outline

6   some of the events, some of the violence that transpired and

7   other symbols and locations that I reference in my expert

8   testimony, sir.

9   **Q.**   Okay.  At the last calling of the case, we had a brief

10  conversation about an exhibit which -- do you have the exhibit

11  book in front of you, sir?

12  **A.**   Yes, sir.

13  **Q.**   The exhibit was in the court record as Document 1084-14.

14  It's labeled in the court record -- meaning in the docket -- as

15  Exhibit 13.  It's in your binder as Tab 15.  That's the Fresno

16  County bylaws and rules.

17  **A.**   Yes, sir.

18  **Q.**   Okay.  That was the document that you explained at your

19  last appearance in this case that you're not sure where it was

20  acquired.  (Reading):

21          "I'm not sure if it came from this investigation, but

22      it's not one of my documents."

23      And I'm citing page 84 of the transcript, lines 23 and 25.

24      Do you remember that testimony?

25  **A.**   Yes, sir.

**SCHEETZ - CROSS / PHILIPSBORN**

1  Q.    Okay.  And you stand by that testimony; right?

2  A.    Yes, sir.

3  Q.    Okay.  Now, I gather there would have been no reason that

4  you would have been referencing that Fresno document in your

5  declaration; correct?

6  A.    Not specifically the Fresno, but I do reference the

7  charter autonomy, and I talk about the charter rules.  That's

8  why the Modesto rules are in there.

9        And I use that when I correlate and analyze, looking at

10  the World Rules, and compare and contrast historical

11  information.

12  Q.    Okay.  But I -- what I'm referring to is, in a declaration

13  that you signed that was lodged with this Court on June 29,

14  2020, you had not seen the Fresno document that's at Tab 15;

15  correct?

16  A.    Not that I can remember, no, sir.

17  Q.    Okay.  Do you have your declaration in front of you?

18        I believe it's at Tab 2.

19  A.    Yes, sir.

20  Q.    Do you want to page over to page 26, paragraph 100.  And

21  let me know when you're there.

22  A.    Yes, sir.

23  Q.    So you start that paragraph saying (reading):

24              "I viewed charter rules that require members to

25        attend church.  For example, the Fresno County bylaws

1          require members to attend weekly meetings, with a missed

2          meeting punished with a fine of $25."

3     A.   Yes, sir.

4     Q.   So as of the time you had prepared this declaration, you

5     had not even seen that document, had you?

6     A.   Not that I can remember, no, sir.  I've been -- it was an

7     honest mistake, or I just don't remember.  Just been looking at

8     so many documents.

9     Q.   Right.  But the point is, this declaration is attributed

10    to you.  And you were very clear when you were here testifying

11    under oath on August 18 that you'd never seen that document

12    before I pointed it out to you; right?

13    A.   That's correct, sir.

14    Q.   Okay.  So there would have been no reason for you to refer

15    to that document in your declaration as of June 29 of 2020;

16    right?

17    A.   Or that, or if I -- it's just an honest mistake.  I just

18    don't remember looking at all the documents.

19    Q.   Okay.  I mean, are you falling on your sword again, sir?

20    A.   No, not at all.  I've looked at so many documents and I

21    have so many ongoing investigations, things that I'm going -- I

22    could have over- -- just an oversight or just something I just

23    forgot that I put in there.  It's an honest mistake which I

24    honorly [sic] stand up to.

25    Q.   Okay.  Is it also equally conceivable, as far as you're

1    concerned, that you're not the person who actually provided

2    that text, that part of your declaration?

3    **A.**    No, sir.  It's just an honest mistake by me.  It's just

4    there's so much going on.  Either I put it in there and can't

5    remember.  It's just -- I just can't answer this right now.

6    **Q.**    Or somebody else put it in there?

7    **A.**    No, sir.

8    **Q.**    Okay.  Well, you, as an intelligence analyst employed by

9    the United States Government, do you have any explanation for

10   how it is a document that you had not seen until August of 2020

11   gets referenced in your declaration?

12   **A.**    It's an honest mistake.  Like I said, I might have seen it

13   before.  I just can't remember.  There's so much -- so many

14   documents and so much paperwork that I haven't analyzed and

15   gone through that it could have been something that it slipped

16   my mind or slipped through.

17   **Q.**    Okay.  And you're representing to the Court, as you sit

18   here --

19           **MR. KRISHNAMURTHY:**  Objection; asked and answered.

20           **THE COURT:**  I'll allow a little more.  But let me

21   remind the parties, credibility determinations of fact -- this

22   is not trial.  I'm here to determine whether -- the methodology

23   and reliability.  So I'm going to allow it, but we've got to

24   move on.

25           **MR. PHILIPSBORN:**  Agreed.  Thank you, Your Honor.

SCHEETZ - CROSS / PHILIPSBORN

1    Q.   Just in terms of the document that's been placed before

2    the Court that the parties are relying on to make their

3    arguments to the Court, which is your declaration, when, to

4    your knowledge, did you review this declaration in relation to

5    June 29 of 2020, when it ended up being signed?

6    A.   I have looked at this numerous times.  Like I have said,

7    it's something that slipped past me.  And it's my honest

8    mistake.  I could have seen it before.  I'm not going to sit

9    here and lie and say I did, because I just don't know.  Like I

10   said, I've looked at so many documents, that going through so

11   many reviews and looking -- it's stuff that we've gone through.

12   And myself -- not just this but other investigations.  It's

13   just something that slipped my mind.

14   Q.   Where were you at the end of June of 2020?  Were you

15   actually physically here in San Francisco going over the

16   document?

17   A.   No.

18   Q.   Okay.  So this document, it's according to a file stamp on

19   it, it is lodged with the Court or filed with the Court on

20   June 29 of 2020, which is the date that you -- your electronic

21   signature appears on it.

22   A.   Correct.

23   Q.   Okay.  Were you ever asked to sign a copy of this?

24   A.   Yeah, electronically.  We went over it and we did it

25   telephonically, and we had a conference call and we went

**SCHEETZ - CROSS / PHILIPSBORN**

1  through everything numerous times.  Once we agreed with all the

2  substance in there, I electronically signed it, yes.

3  Q.  So, I will move on.

4       On the issue of Hells Angels' symbols, would it be fair to

5  say that of the areas of opinion that you've provided to the

6  Court, the one area that you have personally made a number of

7  observations about has to do with Hells Angels' symbols?

8  Right?

9  A.  Yes.

10  Q.  You have explained that you have been at Hells Angels'

11  events and that you've taken -- as you've put it in your -- in

12  your declaration, that you've snapped pictures -- and I'm

13  referencing page 13, lines 6 and 7 -- you've snapped pictures

14  to analyze and look at who is in the club, new colors, new

15  patches; correct?

16  A.  Correct, sir.

17  Q.  Okay.  So you have personal knowledge based on your

18  personal observations of the appearance of Hells Angels'

19  emblems, symbols; correct?

20  A.  Yes, sir.

21  Q.  Okay.  Your interpretation of Hells Angels' symbols -- and

22  I'm going to use as an example the "Filthy Few" patch -- is

23  dependent on information that you've acquired in your capacity

24  as an intelligence analyst; correct?

25  A.  As intelligence analyst and operations specialist, yes,

SCHEETZ - CROSS / PHILIPSBORN

1    sir.

2    Q.   Okay.  And that's dependent in part on your review of the

3    books that you mention in your declaration; correct?

4    A.   One of them, yes.

5    Q.   Three live human sources that you described for us last

6    time; correct?

7    A.   Yes.  And I have been able to talk to some others since

8    then, sir, yes.

9    Q.   Some other what?

10   A.   Some former members.

11   Q.   What -- which other former members have you talked to --

12   you mean since August 18 of 2020?

13   A.   Yes, sir.

14   Q.   Okay.  Who have you talked to?

15   A.   Talked to Jacob Sams.

16   Q.   How do you spell the last name?

17   A.   Sams, S-a-m-s.

18   Q.   Where did you talk to Jacob Sams?

19   A.   Over the phone.

20   Q.   Who is Jacob Sams?

21   A.   Jacob Sams is a former member of Hells Angels Minneapolis

22   charter.

23   Q.   Is he a cooperating witness or a source?

24   A.   Yes.

25   Q.   And who is his relationship with?  ATF?

**SCHEETZ - CROSS / PHILIPSBORN**

1   A.   Yes, sir.

2   Q.   And you talked to him by phone?

3   A.   Yes, sir.

4   Q.   You undoubtedly must have made notes; right?

5   A.   Yes, sir.

6   Q.   Okay.  Do you have those notes?

7   A.   Not with me, but I'll turn those over.  Yes.

8   Q.   Okay.  And who else did you talk to?

9   A.   Joshua O'Brien.

10  Q.   How do you spell the last name?

11  A.   O, apostrophe, B-r-i-e-n.

12  Q.   Who is O'Brien, Mr. O'Brien?

13  A.   He is a former Hells Angels Denver member.

14  Q.   Is he a cooperating witness or a source?

15  A.   Yes, sir.

16  Q.   For what agency?

17  A.   ATF Denver.

18  Q.   Is he currently working off a case?

19  A.   I don't know the circumstances, sir.

20  Q.   Okay.  How is it you were put in touch with him?

21  A.   I know the case agents out in both field divisions, ATF

22  St. Paul and ATF Denver.

23  Q.   Okay.  And did you make notes of that call?

24  A.   That's correct, sir.  Yes.

25  Q.   Okay.  And you're going to turn those over?

SCHEETZ - CROSS / PHILIPSBORN

1    A.    Yes, sir.

2    Q.    Anybody else you talked to since last week?

3    A.    Timothy Jordan.

4    Q.    Okay.  You had already mentioned Mr. Jordan --

5    A.    Yes, sir.

6    Q.    -- correct?

7    A.    Yes, sir.

8    Q.    Did you make notes of your conversation?

9    A.    Yes, sir.

10   Q.    You're going to turn those over to the office of the

11   United States Attorney?

12   A.    Yes, sir.

13   Q.    Okay.  And all those conversations had to do with the

14   "Filthy Few" patch?

15   A.    We did discuss the Filthy Few, yes, sir.

16   Q.    Okay.  And how is it that you came to talk to these

17   people?  Was it -- were you asked to do that?

18   A.    I have -- I was asked in the past and asked again if I

19   wanted to speak to them.  And any time I have an opportunity to

20   speak to a former member or an ongoing member or something to

21   do with an outlaw motorcycle gang, or motorcycle club, I'm

22   going to take advantage of that on behest of ATF.

23         (Reporter interruption for clarification of the record.)

24            THE WITNESS:  Sorry about that, ma'am.  I apologize.

25         Yes.  I am going to take that opportunity to speak with

1    them because that's part of my job within ATF.

2            THE COURT:  So just that I'm clear, Mr. Scheetz, you

3    have spoken to these three individuals in the last week; is

4    that right?

5            THE WITNESS:  Yes.  Yes, Your Honor.

6            THE COURT:  But you had not spoken to them recently

7    prior to your declaration in this case?

8            THE WITNESS:  Your Honor, informally, I had spoken to

9    them when they -- when I was -- more of a telephone, simple

10   questions.  It was basically a one-two question.  This was more

11   of a pick-up-the-phone, we spoke about certain things, because

12   I just had not had time to go back and speak to those

13   individuals.

14           THE COURT:  So you spoke to them briefly before the

15   declaration but more in depth after the declaration?

16           THE WITNESS:  Yes, Your Honor.

17           THE COURT:  Remind me.  Are they identified in the

18   declaration?

19           THE WITNESS:  No, sir.  No, Your Honor.

20   BY MR. PHILIPSBORN:

21   Q.   Mr. Scheetz, you indicated that these are people who were

22   made available to you.

23       Again, who is it that asked you to speak to them in the

24   past week?

25   A.   It's their handlers or the case agents who are handling

SCHEETZ - CROSS / PHILIPSBORN

1    the investigation, sir.

2    **Q.**   You mean they just called you up out of the blue?  It's a

3    coincidence that it happened while you are a witness in this

4    case?

5    **A.**   No.  We had talked about speaking before, and I just never

6    got around to it because I'm so occupied with so many things

7    going on with -- with ATF.

8    **Q.**   Sure.

9            **MR. PHILIPSBORN:**  So I'm going to impose, if possible,

10   on the clerk of the Court to help me, Your Honor, since I have

11   distinguished myself with my laptop operation thus far.

12   Hopefully, this will work.  I'd like to share screen a

13   document.

14           **THE COURT:**  Okay.  Angie, can you do that?

15           **THE CLERK:**  Yes.  Yes, Your Honor.

16           **THE COURT:**  Okay.

17           **MR. PHILIPSBORN:**  Can I upload from my workstation?

18           **THE CLERK:**  Which document would you like to share?

19           **MR. PHILIPSBORN:**  This document.  Can you --

20           **THE COURT:**  Who is doing the screen sharing?  Is that

21   coming from our clerk or your machine?

22           **THE CLERK:**  Mr. Philipsborn is sharing it.

23           **THE COURT:**  Oh.  Well, then you have control,

24   Mr. Philipsborn.

25           **MR. PHILIPSBORN:**  Well, that's in question.  But thank

**SCHEETZ - CROSS / PHILIPSBORN**

1   you.

2   **Q.**   Mr. Scheetz, you make mention in your declaration of a

3   book -- that there is no reason you'd be able to see from the

4   witness stand.  I certainly couldn't, but I'm going to wave it

5   around -- the Sonny Barger book.

6   **A.**   Yes, sir.

7   **Q.**   Do you recognize this book, sir?

8   **A.**   Yes, sir.

9   **Q.**   Okay.  If you look at the screen in front of you, do

10  you -- do you recognize this to be from the Sonny Barger book?

11  **A.**   Yes, sir.

12  **Q.**   Okay.  This is -- I'm displaying page 39.

13       I notice that you do cite the Barger book for some -- for

14  some matters but you don't cite Barger on the Filthy Few.  He

15  actually discusses the "Filthy Few" patch; right?

16  **A.**   Yes, sir.

17  **Q.**   And, in fact, he discusses it in a passage that I'm

18  displaying in front of you, where he says (reading):

19          "The Filthy Few patch signifies 'the first to the

20       party and the last to leave' after somebody once said

21       'Man, by the time the last of you leave, you're fucking

22       filthy.'" -- excuse me -- "So we came up with the name the

23       Filthy Few."

24       Do you see that?

25  **A.**   Yes, sir.

**SCHEETZ - CROSS / PHILIPSBORN**

1  Q.   And then he goes on to talk about, later in the same

2  paragraphs -- paragraph, was -- he talks about the Filthy Few

3  being an Oakland exclusive.

4       Do you see that?

5  A.   Yes, sir.

6  Q.   Okay.  Now, you were aware of that language when you --

7            MR. KRISHNAMURTHY:   Objection; irrelevant.

8            THE COURT:   Overruled.

9  BY MR. PHILIPSBORN:

10  Q.   You were aware of that language when you were preparing

11  your declaration; right?

12  A.   Yes, sir.

13  Q.   Okay.  He also acknowledges something that you make

14  reference to, to some degree.  He says (reading):

15            "Then the cops claimed that if you were a

16       Hells Angels and you wore the 'Filthy Few' patch, you were

17       the killer elite hit men, that you actually killed

18       somebody for the club."

19       Do you see that?

20  A.   Yes, sir.

21  Q.   Okay.  And then he goes on to, later on, on the same page,

22  talk about another patch that you make reference to in your

23  discussion in the declaration; correct?

24  A.   Yes, sir.

25  Q.   You spell it slightly differently in your declaration, the

1  Dequiallo, D-e-q-u-a-i-l-l-o, [sic] which he spells

2  D-e-q-e-l-o; right?

3  A.   Yes, sir.

4  Q.   Okay.  And he, again, indicates (reading):

5       "That some guys wear Dequelo, which means roughly 'no

6       quarter' or 'no mercy,' in Spanish.  If you study the

7       police books, they still claim the Wrecking Crew and

8       Dequelo are the guys who beat up cops.  More law

9       enforcement crap."

10      Right?

11 A.   That's what he puts in there, yes, sir.

12 Q.   Okay.  So just in terms of making reference to source

13 materials and information that you placed before the Court in

14 your declaration, just using what I read out as an example,

15 right, there are clearly discussions in books that you quote

16 about some of the symbols, including the "Filthy Few" patch and

17 "Dequiallo" patch; right?

18 A.   Yes, sir.

19 Q.   That you choose not to put into your declaration; correct?

20 A.   That's not correct.  No, sir.

21 Q.   Okay.  So there is a reason then that you didn't quote

22 this language; is that correct?

23 A.   Yes.  Because that's -- that was back in the beginning of

24 the Hells Angels in the early '60s and early '70s.  That was

25 what it stood for.  But as they migrated across the world and

1    were basically inflicting violence or involved with violence,

2    the definition of the Filthy Few changed.

3          And so at the time when he wrote this, you know, we --

4    under the assumption of speaking to other experts and

5    everything else, this is what it did mean at that time.

6          And when I've spoken to former members, they will come out

7    and tell you the original meaning was this, but it has since

8    morphed into something totally different that is actually

9    involved with violence.

10   **Q.**   Got it.  So first of all, none of your inquiry into this

11   subject that you just put before the Court is in your

12   declaration; correct?

13   **A.**   I can't -- I -- I mean, we reference stuff.  And I don't

14   know if I put that exact in there, no, sir.

15   **Q.**   Okay.  So the notion of the meaning of the symbols

16   "Filthy Few" and "Dequiallo" changing over time, that isn't in

17   your declaration; right?

18   **A.**   I don't believe so, no.

19   **Q.**   Right.  The language from Barger isn't in the

20   declaration --

21   **A.**   That particular -- no, sir.

22   **Q.**   Okay.  And now, once again, you're making reference to

23   having talked to sources about the meaning of the "Filthy Few"

24   and "Dequiallo" patch; correct?

25   **A.**   Yes.  And not just sources, but I have the opportunity to

**SCHEETZ - CROSS / PHILIPSBORN**

1    talk to everybody who is an expert or deemed an expert across

2    the world.  So it's not just the sources that I have referenced

3    previously or today or books.  It's other experts who have been

4    deemed experts who come to the same conclusion about the

5    Filthy Few.

6    **Q.**   Okay.  "Experts" meaning people who are law enforcement

7    officers in some capacity; correct?

8    **A.**   Yes.  They've been deemed expert in their federal or state

9    court in their country.

10   **Q.**   Okay.  So what I'm going to narrow myself to are the

11   sources that you discussed last time.

12       Last time you were here, you explained to the Court and

13   counsel that there were actually three persons that you had

14   talked to about the "Filthy Few" patch, meaning three former

15   members of the Hells Angels; correct?

16   **A.**   Yes, sir.

17   **Q.**   Okay.  Do you stand by that testimony, or has that

18   changed?

19   **A.**   No.  I stand by that.

20   **Q.**   Okay.  And, again, just so we understand what you're

21   explaining, in terms of the source named Neff --

22   **A.**   Yes.

23   **Q.**   -- when was he in the Hells Angels, to your knowledge?

24   **A.**   I believe he was in -- this is a ballpark.  He was only in

25   for several years.  And I believe it was, like, 2009 to 2012,

1   I believe, something of that nature.

2   **Q.**   How about Jordan?  When was he in the --

3   **A.**   I believe he was 2000 to 2009, or 2008.

4   **Q.**   And how about the Canadian, David Atwell?

5   **A.**   I don't know his exact year, sir.

6   **Q.**   Okay.

7   **A.**   I know it was in the 2000s, in that time frame.

8   **Q.**   So if you look at the -- if you look at the language that

9   is in the Barger book, you'll notice that in a paragraph that

10  begins "Because of our German charters," he makes reference to

11  a vote that was taken in 1997; correct?

12  **A.**   Correct, sir.

13  **Q.**   Okay.  So what he is saying is that the appearance of the

14  "Filthy Few" patch changed in 1997; correct?

15  **A.**   No.  The appearance of one of their tags.  There's many --

16  there's many examples of the Filthy Few.  That's just one that

17  forbid them from wearing the SS lightning bolts because in

18  Germany, it's illegal to wear the SS lightning bolts.

19      In certain charters in the United States -- one being

20  San Diego, which they call "Dago" -- was adamant about putting

21  the SS lightning bolts.

22      And the SS lightning bolts, which we know through our

23  debriefings and interviews in speaking to experts across the

24  world, meant that you did it more than one time in furtherance

25  of the club.

1        But because of the ongoing issue in Germany, they took a

2   world vote, and the vote was because the SS lightning bolts are

3   forbidden to be worn or displayed in Germany.

4   **Q.**   Got it.  What I'm referencing is the information that you

5   claim to refer to that comes from your three sources, all of

6   whom you say were people -- except for Atwell -- whose

7   connection with the Hells Angels you can't date exactly.

8        But the other two are people whose experience with the

9   Hells Angels, as far as you know, dates back to the mid-2000s

10  or before; correct?

11  **A.**   Correct.

12  **Q.**   Right about the time, clearly, that Barger is covering in

13  his book; correct?

14  **A.**   No.  The other thing is they changed the Filthy Few.  The

15  Filthy Few was changed during the Tony Tait trial.  I believe

16  that was in the mid-80s.  And the Filthy Few colors changed

17  from red and white to black and white.

18  **Q.**   Okay.

19  **A.**   And there has been many changes to the Filthy Few that

20  have gone on and continue to this day.

21  **Q.**   Got it.  So let me move on, so I can conclude.

22       Hells Angels terms.  The terms that you proposed to

23  provide information about, as I understand your testimony and

24  your declaration is, you propose to provide information about

25  "charters;" correct?

**SCHEETZ - CROSS / PHILIPSBORN**

1   **A.**   Correct.

2   **Q.**   About "church"; correct?

3   **A.**   Correct.

4   **Q.**   About "charter rules"; correct?

5   **A.**   Correct.  Correct.

6   **Q.**   About "Nomads"; correct?

7   **A.**   Correct.

8   **Q.**   About "full patch members"; correct?

9   **A.**   Correct.

10   **Q.**   "Hangarounds"; correct?

11   **A.**   Correct.

12   **Q.**   "Prospects"; correct?

13   **A.**   Correct.

14   **Q.**   Can you think of any other term that you're proposing to

15   provide a definition based on your expertise about?

16   **A.**   This is definitions referring to their status within the

17   club?  Or associates or friendly with the club?

18   **Q.**   Should we add, then, the term -- you would propose to

19   describe the term "associates"?

20   **A.**   I don't know.  That's what I'm -- I don't know.  What I

21   described is in the declaration, sir.

22   **Q.**   Okay.  So I correctly read your declaration, including the

23   terminology you put in bold to explain to the Court what terms

24   you're proposing to define based on your background and

25   experience; correct?

1   A.   That's correct, sir.

2   Q.   Okay.  Now, in terms of explaining the terminology that we

3   just discussed, if you look at your page -- your declaration at

4   page 31, paragraph 116, that references -- you're giving an

5   example of what "out" means --

6   A.   Yes.

7   Q.   -- in the phrase "left and out"; correct?

8   A.   Yes, sir.

9   Q.   Okay.  You can explain the concept of "left and out"

10  without having to get into some --

11          MR. KRISHNAMURTHY:  Objection; relevance.

12          THE COURT:  I haven't heard the question yet.

13      Finish the question, please.

14  BY MR. PHILIPSBORN:

15  Q.   You can get into a description of what "left and out"

16  means without going through an anecdote about somebody from the

17  Honolulu, Hawaii, chapter getting beaten up by somebody from

18  the San Diego chapter; right?

19  A.   Yeah.  I put it in there as an example, yes.

20  Q.   Well, you put it in there as an example.  But the point is

21  you can discuss "left and out" without actually going through

22  that particular example; correct?

23  A.   I could, but there is a reason to put that in there.  It

24  exemplifies the amount of violence that exemplifies the

25  Hells Angels and what they are involved in.  And this was just

**SCHEETZ - CROSS / PHILIPSBORN**

1  one example internally of what they do to people as being out

2  of the club.

3  Q.   Got it.  So that brings us to the last area I wanted to

4  ask you about, and that is the bases for your opinions about

5  territory.

6       You describe some of the bases for your opinions about

7  territory on the next page following the -- the paragraph I

8  referenced, meaning you discuss the notion of charters and the

9  number of charters that exist; correct?

10 A.   Correct.

11 Q.   You explain that they exist not only in the United States,

12 but elsewhere; correct?

13 A.   Yes, sir.

14 Q.   On the first day of your testimony, you explained it's no

15 longer 99 charters, it's 100; right?

16 A.   Yes, sir.

17 Q.   You explain just in terms of territory and the

18 pervasiveness of the club, that there are a thousand members

19 and prospects, roughly?

20 A.   Approximately, yes.

21 Q.   In the United States; correct?

22 A.   Yes, sir.

23 Q.   Okay.  And you are capable of explaining roughly where the

24 charters are, where they are spread around the United States;

25 correct?

SCHEETZ - CROSS / PHILIPSBORN

1   A.    Yes, sir.

2   Q.    Okay.  So just in terms of explaining Hells Angels'

3   territory, the -- the explanation that you're talking about

4   depends in part on where some of the permanent installations,

5   like charter clubhouses, are; correct?

6   A.    Correct.

7   Q.    Or charter houses are; correct?

8   A.    Yes.  Correct.

9   Q.    And you would agree that there are instances that you make

10  mention of in your declaration and in your -- in the exhibits

11  that you've appended to your declaration, instances of examples

12  of violent conduct, as discussed in a newspaper article, that

13  take place in geographical locations in which the Hells Angels

14  have no specific charter or charter house; correct?

15  A.    Correct.

16  Q.    And the very definition of a motorcycle club is that

17  people ride on motorcycles which, by definition, can move from

18  A to B, right, at any given time; correct?

19  A.    Yes.

20          MR. KRISHNAMURTHY:  Relevance.

21          THE COURT:  I'm not sure what the relevance is here;

22  so I'm going to sustain the objection.

23  BY MR. PHILIPSBORN:

24  Q.    How many of the articles that you included in your initial

25  Exhibit 17, which is here placed before the Court in your

1    binder in Tab 19, followed by Sub-tabs A through Y -- A through

2    Y, just for our record, covers the -- it begins with, the first

3    four tabs, I think, are the 1977 San Diego Sheriff's report,

4    and then you have a series of articles.

5         Are we in sync here, Mr. Scheetz?

6    A.    Yes, sir.

7    Q.    Okay.  How many of the incidents that are covered in those

8    specific exhibits pertain to a location in which there is no

9    Hells Angels' charter or no charter house?

10   A.    Well, there are several.  And Sturgis is a great example.

11   Q.    Okay.  In other words -- okay.  And let's use that great

12   example.

13        Sturgis is a place in South Dakota in which at certain

14   times you can find a lot of bikers from a lot of clubs;

15   correct?

16   A.    Correct.

17   Q.    And at other times, particularly when it's, like, minus-45

18   in the middle of winter, you probably don't find a whole lot of

19   bikers from a whole lot of clubs; correct?

20   A.    No, sir.  No, sir.

21   Q.    Okay.  So in terms of a claim of territory, the -- that is

22   biker territory at certain times of year; correct?

23   A.    That's correct.  During the Sturgis Bike Rally, the

24   Hells Angels claim Sturgis as their rally.

25        MR. PHILIPSBORN:  Thank you, Your Honor.  I have no

SCHEETZ - CROSS / SABELLI

1   further questions and would pass the witness to my colleague,

2   Mr. Sabelli.

3              THE COURT:  All right.  Mr. Sabelli?

4              MR. SABELLI:  Good morning, Your Honor.  Thank you.

5              THE COURT:  Good morning.

6                        **CROSS-EXAMINATION**

7   BY MR. SABELLI:

8   Q.   Good morning, Mr. Scheetz.  My name is Martin Sabelli and,

9   together with Mr. Philipsborn, I represent Brian Wendt.  Good

10  morning, sir.

11  A.   Hello, sir.  How are you doing?

12  Q.   Good.  Thank you.

13       Let's start with a very specific issue about methodology,

14  a very specific part of your declaration.  And then I'm going

15  to try to pan out wider and talk about the methodology used to

16  be certain that your opinions are reliable.

17       So the first thing I want to do is share a screen and look

18  at paragraph 88 of your declaration.

19       Do you see it there, sir?

20  A.   Yes, sir.

21  Q.   Okay.  You recognize that declaration?

22  A.   Yes, sir.

23  Q.   Okay.  And what you're explaining -- this declaration is

24  in the context of your discussion of World Rules and of the

25  relationship between what you call the Hells Angels

**SCHEETZ - CROSS / SABELLI**

1   organization and specific charters; right?  That's the context

2   for this paragraph?

3   **A.**   Correct, sir.

4   **Q.**   And what you're explaining to us in this paragraph is that

5   this particular episode that you describe is an example of a

6   larger phenomenon?

7   **A.**   I wouldn't say "phenomenon."  It's just an example of

8   putting -- of some of the notations that they put in there

9   referring to what they do to other charters or outlining some

10  of what they do in their minutes, an example of what they put

11  in there, depending on how certain charters react and don't

12  react to certain issues.

13  **Q.**   Well, you're explaining to us here a series of things that

14  happened; right?

15  **A.**   Correct, sir.

16  **Q.**   And you're explaining what your conclusion is based upon

17  that series of things that happened?

18  **A.**   Yes, and speaking with other experts who have testified to

19  this, yes, sir.

20  **Q.**   Okay.  Well, let's stick with this example that you use in

21  paragraph 88.  Okay?

22       All right.  What you're explaining to us is that the

23  Sonoma charter, supported by the Frisco charter, submitted a

24  motion to expel most of the Shasta County members; right?

25  **A.**   Correct, sir.

SCHEETZ - CROSS / SABELLI

1   Q.   And then you explain to us that, according to the

2   July 2007 West Coast officers meeting minutes, the Shasta

3   County charter was subsequently frozen?

4   A.   Yes, sir.

5   Q.   And from this, you arrived at a conclusion?

6   A.   Yes, sir.

7   Q.   Okay.  And the conclusion was that this episode -- your

8   word -- shows that the West Coast controlled the existence of

9   the Shasta County charter?

10  A.   Yes, because Shasta falls under the West Coast charters.

11  Q.   Okay.  Okay.  Now, to help us understand this a little

12  bit, I'd like to look at the actual World Meeting minutes that

13  you have referenced here.

14       So I'm going to try to share the screen again.  I'm going

15  to try to do the old switcheroo here, see if I know how to do

16  that.  This is first time I'm doing this.  I tried it this

17  morning and it worked.  Oh, there we go.

18       Give me a second here.

19       All right.  I'm sorry, Your Honor.  For some reason, it's

20  not giving me the screen-share option.  I'm just going to --

21            THE COURT:  You might want to close your screen share

22  and reopen it with --

23            MR. SABELLI:  There we go.  All right.  There we are.

24  Okay.  All right.

25  Q.   So I'm starting on page 4 of the exhibit.  Do you see that

SCHEETZ - CROSS / SABELLI

 1    in front of you, sir?

 2              THE COURT:  What exhibit number is this?

 3              MR. SABELLI:  Oh, Your Honor, thank you.  This is

 4    Exhibit 20, and I believe it would be Exhibit 21 in the binder.

 5    I believe it's Exhibit 20 to 1084.

 6              THE COURT:  Maybe it's 22 in the binder.  Let's see.

 7              MR. KRISHNAMURTHY:  That's correct.  It's 22.

 8              THE COURT:  It's 22 in the binder.

 9              MR. SABELLI:  Thank you, Your Honor.

10         And this is Exhibit 20 to 1084.

11    BY MR. SABELLI:

12    Q.   Okay.  Mr. Scheetz, I'm on page 4 there.  Do you see that?

13    A.   I'm getting there, sir.

14    Q.   Thank you.  It's up on the screen in front of you, if you

15    need to look.

16    A.   Yes, sir.  Okay.

17    Q.   Okay.  So what you see on page 4 is that there was a

18    motion from June that was being described; right?

19    A.   Yes.

20    Q.   And that motion was from June 16th?

21    A.   Yes.

22    Q.   That's the motion you referenced in paragraph 88?

23    A.   Yes.

24    Q.   And it's a motion by Sonoma to bring the membership of

25    Shasta County up for their patches?

SCHEETZ - CROSS / SABELLI

```
 1   A.   Correct, sir.

 2   Q.   There was a vote on that?

 3   A.   Yes.

 4   Q.   And the vote failed?

 5   A.   At that time, yes.

 6   Q.   Okay.  There is nothing in your declaration about that

 7   vote or that vote failing; correct?

 8   A.   No.  I did not put that in there.

 9   Q.   Okay.  What you explained to the Court in your shorthand

10   was that Sonoma wanted to have these folks expelled; right?

11   A.   That's correct, sir.  Yes.

12   Q.   Nothing about a vote?  Nothing about the vote failing?

13   A.   No, sir.

14   Q.   Okay.  You didn't walk us through that process?

15   A.   No, sir.

16   Q.   Okay.  Now, please look at page 2 of the same exhibit.

17   A.   Yes.

18   Q.   Okay.  Do you see the Shasta County entry?

19   A.   Yes.

20   Q.   Okay.  And by the way, these are the minutes, if you saw

21   going to the top of the page for a moment, these are from

22   July 14th; right?

23   A.   Yes, sir.

24   Q.   Okay.  And what is recorded here in Exhibit 20 is that one

25   member of Shasta County split.  His name is Phil Strada;
```

SCHEETZ - CROSS / SABELLI

1  correct?

2  A.   Yes.

3  Q.   And that (reading):

4       "Shasta:  Due to our low numbers, we are asking to be

5  frozen."

6  That's what written in the exhibit; right?

7  A.   Yes.

8  Q.   And that then it says (reading):

9       "Decided today Shasta was frozen."

10 A.   Yes.

11 Q.   Three remaining members will be going to the Nomads?

12 A.   Yes.

13 Q.   Their Hells Angels' patches weren't taken away?

14 A.   No.  Those three transferred.

15 Q.   They went to the Nomads?

16 A.   Yes.

17 Q.   And that's because Shasta County had less than six

18 members?

19 A.   Correct.

20 Q.   And they asked to be frozen?

21 A.   I would say that's the nice way they put it, yes.

22 Q.   Okay.  Whatever you're insinuating there, none of that

23 process of thinking about this, evaluating this, reconciling

24 page 4 with page 2, none of that is in your declaration; right?

25 A.   No, sir.

1   Q.   Now, I want to sort of pan out and focus on --

2        THE COURT:   Before you do that, Mr. Sabelli -- so

3   where in these minutes does this support your conclusion about

4   the petition and West Coast sort of shutting down the Shasta

5   charter?  Is there anything else?

6        THE WITNESS:   The information that I have them being

7   shut down is, like I spoke last time, I got that from Jorge Gil

8   Blanco, who is an expert, on speaking to him on numerous

9   occasions.  We knew about the incident on why they were being

10  shut down because they did not retaliate for a member being

11  shot.

12       And that's -- that was the final conclusion, was they

13  ended up freezing the chapter because several of the members

14  left and several of the members transferred.

15       THE COURT:   Is that consistent with these minutes?

16       THE WITNESS:   No, that's not what's actually in the

17  minutes, sir, Your Honor.

18       THE COURT:   So how do you explain that?

19       THE WITNESS:   The information came from Jorge Gil

20  Blanco, when I spoke to him about it.

21       THE COURT:   So what he told you is not consistent with

22  what's in the minutes?

23       THE WITNESS:   No.  It was a conclusion afterwards that

24  they had come to.  Even though they voted on not to freeze

25  them, certain members were asked to leave before they were

1    kicked out because they never retaliated versus the Mongols.

2    And they are not going to put that in their minutes, Your

3    Honor.

4            **THE COURT:**  So it doesn't surprise you they didn't put

5    the real reason in the minutes?

6            **THE WITNESS:**  Oh, no.  They wouldn't because at this

7    time they knew a bunch of their minutes were being -- were

8    found during search warrants and stuff of that nature.  So they

9    limited the information they put out.

10           **THE COURT:**  Okay.  Thank you.

11           **MR. SABELLI:**  Thank you.  Just to follow up on that,

12   Your Honor.

13   Q.   What you've just explained to Judge Chen, that analysis,

14   that process, that methodology -- if that's what you call it --

15   none of that is in the declaration?

16   **A.**   No.  I did not put my methodology in the declaration.

17   Q.   Bottom line, what your methodology is with respect to

18   paragraph 88 in these notes is to take the word of Jorge Gil

19   Blanco as the truth?

20   **A.**   Not just his, but I speak to other experts.  And we know

21   the fact that one of the members received a Purple Heart.  We

22   know that from talking to other experts at the time who

23   actually had an ongoing RICO investigation with the Mongols --

24   which was very successful -- out of ATF Los Angeles, there was

25   never any type of retaliatory act that was taken by the

1    Hells Angels at that time, after the shooting involving the

2    Mongols.

3    Q.   So it's --

4    A.   So it's not just --

5    Q.   Go ahead.

6    A.   So it wasn't just from what Jorge said.  There was other

7    experts at the time that we spoke to who were either undercover

8    in the Mongols at the time, as full patch members, ATF agents,

9    or ATF agents or FBI agents or state and local law enforcement

10   experts within California and the West Coast who were also

11   working ongoing investigations at the time.

12        And this is something that I put everything together and

13   we came to this conclusion speaking to Jorge Gil Blanco who has

14   testified to this situation.

15        We have noticed that there was never a retaliatory act

16   taken towards the Mongols.  Mr. Thompson received his Purple

17   Heart for being shot by the Mongols and wounded and drawing

18   blood.  And that's the conclusion I came to after going through

19   all the analysis and all the paperwork and all the information.

20   Q.   Phil Strada wasn't taken out as bad; right?  He quit?

21   A.   I believe so.  I don't know what his status is, no, sir.

22   Q.   And Billy, Red, and Bobby T., they weren't kicked out of

23   the club; right?

24   A.   No.  They were -- they transferred to the Nomads.

25   Q.   They didn't retaliate against the Nomads; right?

SCHEETZ - CROSS / SABELLI

1    **A.**    You mean the Mongols?

2    **Q.**    The Mongols.  I'm sorry.

3    **A.**    Not that we know, no, sir.

4    **Q.**    Okay.  Now, let's look, please, at a little bit --

5              **THE COURT:**  Before -- let me -- I'm sorry to

6    interrupt.

7         Are you saying -- I understand you've talked to others to

8    confirm that there was lack of retaliation.  What is the source

9    of your information that that resulted in members of the Shasta

10   charter being kicked out or having to leave?  That's just on

11   Gil Blanco's testimony?

12             **THE WITNESS:**  Gil Blanco's testimony and then speaking

13   to ATF agents at the time.

14        We had four ATF undercovers who had infiltrated the

15   Mongols out of ATF Los Angeles.  They were all patches of --

16   eventually became patches of the Mongols.  And within the

17   Mongols, there was no type of retaliatory act on the behalf of

18   the Hells Angels towards the Mongols for that actual incident.

19             **THE COURT:**  Yeah, I understand you've got evidence

20   that there was no retaliation.  What is the evidence that that

21   led to people having to leave, members having to leave the

22   Shasta --

23             **THE WITNESS:**  I apologize, Your Honor.  That came

24   directly from Jorge Gil Blanco.

25             **THE COURT:**  Anybody else?

```
1            THE WITNESS:  No, sir.

2            THE COURT:  And why do you think his testimony is

3   reliable?

4            THE WITNESS:  Because he was deemed an expert in court

5   and he had spoken to many either Hells Angels members or former

6   members who gave him that information at the time, sir.

7            THE COURT:  So he had spoken directly with

8   Hells Angels members?

9            THE WITNESS:  Yes, Your Honor.

10           THE COURT:  All right.  Thank you.

11           THE WITNESS:  And we also know that Mr. Thompson

12  received a Purple Heart for being wounded for that incident as

13  well.

14  BY MR. SABELLI:

15  Q.   Mr. Sheetz, what member -- what members did Mr. Gil Blanco

16  speak to, to support paragraph 88?

17  A.   I don't know who exactly they are, sir.

18  Q.   Did you ask him?

19  A.   I did.  I just can't remember.

20  Q.   Do you have those written down anywhere, those names?

21  A.   I don't believe so, no, sir.

22  Q.   Have you recorded anywhere what you did to confirm their

23  reliability or their credibility?

24  A.   No, sir.

25  Q.   Okay.  Now, I want you to look, please, at Exhibit -- at
```

SCHEETZ - CROSS / SABELLI

1   your declaration, 1084, at paragraphs 15 through 17, please.

2              THE COURT:  That's Exhibit 2 in the exhibit book.

3              MR. SABELLI:  Thank you, Your Honor.

4              THE COURT:  What paragraphs?

5              MR. SABELLI:  Let's start with 15.  I'm going to look

6   at 15 through 17 together, but let's look at 15 first.

7   Q.   In 15, you describe on some level, on a very broad level,

8   your methodology; is that correct?

9   A.   Correct, sir.

10  Q.   Same with 16 and same with 17; right?

11  A.   Yes, sir.

12  Q.   Okay.  Now, do you consider paragraph 15 to lay out a

13  methodology?

14  A.   Somewhat, yes, sir.

15  Q.   Well, isn't it true that what paragraph 15 relates to is

16  what you do to check the reliability of information or data

17  that you receive?

18  A.   Yes.

19  Q.   It does not explain what you do after confirming -- let's

20  assume you confirm the reliability of data.

21       It does not explain -- paragraph 15 does not explain what

22  you do after confirming the reliability of information to

23  process that information and come up with --

24  A.   No, I do --

25  Q.   I'm sorry.

SCHEETZ - CROSS / SABELLI

1    A.    I apologize.

2    Q.    About the reliability of the information?

3    A.    No.  I don't talk about that process, no, sir.

4    Q.    Okay.  Let's look at 16.

5    A.    Yes, sir.

6    Q.    Okay.  I'm just going to move that up there.

7          You're explaining to us here that you believe that other

8    professionals develop their knowledge about the Hells Angels in

9    the same way that you do; right?

10   A.    Yes, sir.

11   Q.    And then you discuss that.  You discuss what they do.

12   They review evidence from Hells Angels' investigations and

13   prosecutions; they read Hells Angels' documents; they read

14   books authored by and about Hells Angels; they speak with other

15   investigating officers; and they observe events happening in

16   realtime.

17         That's what you attribute to other professionals; right?

18   A.    It's my conversations with them, yes.

19   Q.    Okay.  Now, do you consider paragraph 16 to be a

20   methodology?

21   A.    Yes.  That's one of them, yes.

22   Q.    Okay.  Wouldn't you agree that 16 is a lot like 17 in that

23   what it does is talk about the sources that you use?

24   A.    I mean, there is -- yes, multiple sources.  Yes.

25   Q.    Right.  Right.  But what we're doing here in 16 is talking

SCHEETZ - CROSS / SABELLI

1   about the sources that a professional in your field would

2   review:  Evidence from investigations, evidence from

3   prosecutions, all of that.  That's what discussed here is

4   sources of information?

5   A.   Correct, sir.

6   Q.   Okay.  This paragraph doesn't tell Judge Chen anything

7   about the reasoning process that you use after you put together

8   whatever information you consider to be reliable and credible;

9   right?

10  A.   No.  I don't go into reasoning.

11  Q.   And let's look at paragraph 17, please.

12       In 17, what you're explaining to us is that, in your view,

13  investigating one of these clubs is a useful way to develop

14  information about their adversaries; right?

15  A.   Yes.

16  Q.   And you give us three reasons for it.

17       The first one you say is that sometimes violent acts by an

18  OMG appear to be in retaliation for a specific incident or

19  territorial encroachment by an adversary; right?

20  A.   Correct.

21  Q.   Okay.  Now, would you agree with me that methodologically

22  speaking, scientifically speaking, the word "sometimes" is a

23  very weak correlation?

24  A.   No, because it's -- you know, until we have confirmation,

25  I mean, I can't put in there with 100 percent validity.  I

1    can't do that.  I have to go through the whole process of

2    analyzing all my information.

3    Q.   "Sometimes" could be 3 out of 100, or it could be 3 out of

4    5; right?

5    A.   Yes.  It all depends on the situation.

6    Q.   Okay.  All right.  And what you explained to us is that

7    you used the word "sometimes" here without any definition;

8    right?

9    A.   Correct.

10   Q.   Or how you get from that characterization of "sometimes"

11   to a broader conclusion, you don't explain that either; right?

12   A.   No, sir.

13   Q.   Okay.  All right.  Now, the second reason you give us is

14   that law enforcement officers, special agents, and intelligence

15   components find it useful to compare and contrast the practices

16   of OMGs.  And then you list some of those things that can be

17   compared; right?

18   A.   Correct.

19   Q.   Okay.  Now, that tells us why you would want to do a

20   comparison, but it doesn't tell us how you do the comparison or

21   why that comparison is valid; right?

22   A.   Correct.  When I write intelligence reports, I don't put

23   down why we did it.  We come to a conclusion, positive or

24   negative.  I'm not putting down the methodology in there.  I'm

25   putting down the things that we utilize.

SCHEETZ - CROSS / SABELLI

1   Q.   My question is:  What you're saying here is that analysts

2   find it useful to do something.  You don't explain how to do it

3   or why doing it is valid; right?

4   A.   I did not put that in there, no, sir.

5   Q.   Okay.  Okay.  All right.

6        So we need some standards for validity; right?  I mean we

7   can't be assuming that the Hells Angels in 1977 were the same

8   as they are in 2020, right, or 2014?

9             MR. KRISHNAMURTHY:  Objection; relevance.

10            THE COURT:  Overruled.

11       You can answer the question.

12            THE WITNESS:  Could you repeat that again, sir?

13  BY MR. SABELLI:

14  Q.   Sure.  We need some standards for reliability; right?

15  A.   Yeah.  It's -- yeah.  We do a lot of compare and contrast.

16  We do historical.  We do predictive analytics.  There's many

17  things we do.  I did not put that in there.  But we utilize a

18  bunch of tools and terms to come to a conclusion.

19       Not every time that I send out a report or look at

20  something do I have a final conclusion.  That's just part

21  of the intelligence cycle.  That's part of what goes on in

22  intelligence.  I'm not always going to be able to formulate a

23  final opinion in -- which we might save for down the road.

24       But when I do, what -- on all my reports and everything, I

25  always send those out.  And there is times when I get

**SCHEETZ - CROSS / SABELLI**

1  information that comes back that validates, or I get additional

2  information, or sometimes I get information that says:  Hey,

3  you might want to look into this sort of thing.  So --

4  **Q.**   You've just explained to us what some of the techniques

5  are.  My question was -- and I will repeat it.

6       We need standards, don't we?  Standards, I'm talking about

7  to evaluate techniques.  Would you agree that we need standards

8  to evaluate the techniques that people like you use?

9  **A.**   Well, we do.  We have -- we do have standards on what we

10 do.  I just didn't put it in there on how we come to a

11 conclusion.

12 **Q.**   Is there a single standard listed in your declaration?

13 **A.**   No, sir.

14 **Q.**   Okay.  All right.  And then the third reason you give:

15 Members of the OMGs may know about practices of their

16 adversaries.

17      That is kind of like the first one; right?  That's sort of

18 like "may."  We don't know.  Is that 1 out of 100?  Is that 20

19 out of 100?  That's just a possibility; right?

20 **A.**   I don't know the percentages, sir.  I didn't put

21 percentages or that in there.  I don't know.  It all depends on

22 what I'm analyzing at the time.  Everything is different.

23 **Q.**   Right.  They might know about the practices of their

24 adversaries; right?

25 **A.**   They might, yes.

SCHEETZ - CROSS / SABELLI

1   **Q.**   They might not?

2   **A.**   That's correct.

3   **Q.**   They might be wrong?

4   **A.**   Correct.

5   **Q.**   You haven't explained to us how you figure that out?

6   **A.**   Well, I do.  I do a compare and contrast.  I look at

7   predictive analytics.  I speak to other experts, other

8   intelligence experts.  I go to a lot of expert seminars.  I go

9   to -- I assist and analyze a bunch of ongoing investigations,

10   historically and ongoing.  And that's how I formulate my

11   conclusion.

12   **Q.**   Let's look at 15 to 17 all together.  What you're

13   suggesting is that there is a common approach in your field;

14   right?

15   **A.**   For the most part, yes.

16   **Q.**   Okay.  Now, you don't lay out for us the standards in your

17   field or the specific methodologies you use.  But 15 and 17,

18   fair to say that they leave us with an impression that there is

19   a common way that people like you do your work.  Right?

20   **A.**   Correct.  Yeah, we're not going to put in there what we do

21   day-to-day.  That's not what I am allowed to put in there.

22   **Q.**   Are you familiar, by the way, with the concept of group

23   think?  Group think, g-r-o-u-p.

24   **A.**   I believe so, yes, sir.

25   **Q.**   I'm talking not generally, but specifically --

SCHEETZ - CROSS / SABELLI

1   specifically in terms of operations research.  Do you know what

2   that means?

3   **A.**   No, sir.

4   **Q.**   Do you know what the conservatism bias is?

5   **A.**   No, sir.

6           **MR. KRISHNAMURTHY:**  Objection; relevance.

7           **THE COURT:**  Overruled.

8   **BY MR. SABELLI:**

9   **Q.**   Do you know what the anchoring effect is?

10  **A.**   No, sir.

11  **Q.**   Do you know what confirmation bias is?

12  **A.**   No, sir.

13  **Q.**   By the way, you guys go to conferences together; right?  A

14  lot of these analysts, you guys spend time together at

15  conferences?

16  **A.**   I spend more time with the enforcement side, not the

17  intelligence.  There's more -- I do go to some conferences

18  where it's just for analytical approach.  But most of the

19  conferences or seminars I go to are about -- I'm probably -- a

20  handful of a small contingent of intelligence components at

21  these conference or seminars or symposiums.

22  **Q.**   Got it.  And when you're there, one of things you want to

23  do is have access to speak to people; right?

24  **A.**   Correct.

25  **Q.**   And so you ask people for permission to talk to people, to

**SCHEETZ - CROSS / SABELLI**

1  talk to them, you ask for introductions, that sort of thing;

2  right?

3  A.   Correct.

4  Q.   Fair to say that in the OMG world, there is a community of

5  intelligence analysts?

6  A.   Not particularly, no, sir.

7  Q.   Okay.  All right.  Now, in terms of how you deal with some

8  of the inputs here -- let's focus for a second on hearsay.

9  Okay?  Now, you cited an author named Yves Lavigne.  Do you

10  recall?

11  A.   Yes, sir.

12  Q.   And by the way, do you know when his book was published?

13  A.   No, sir.

14  Q.   Would it surprise you to learn it was published in 1987?

15  A.   No, sir.

16  Q.   Okay.  Now, do you know what Mr. Lavigne said about

17  hearsay in the outlaw motorcycle gang -- to use your phrase --

18  world?

19  A.   No, sir.

20  Q.   Now, you've cited a book for us that he wrote; right?

21  A.   Correct.

22  Q.   And have you actually read that book?

23  A.   Yes, sir.

24  Q.   Cover-to-cover?

25  A.   Yes, sir.

1  **Q.**   Give me a moment, please.

2       Okay.  All right.

3       Give me a second here.  Lavigne.

4       Would you agree with the following statement, sir?

5  (Reading):

6            "It is crucial to protect expert testimony by first

7       laying a foundation establishing that the basis of expert

8       testimony encompasses far more than just testimonial

9       hearsay statements."

10            **MR. KRISHNAMURTHY:**  Objection; relevance.

11            **THE COURT:**  Overruled.

12            **THE WITNESS:**  To be honest, I don't even understand

13  what the question is.

14  **BY MR. SABELLI**

15  **Q.**   How about this?  (Reading):

16            "An expert should be able to articulate the variety

17       of non-testimonial hearsay evidence on which he or she has

18       based his opinion, including non-testimonial statements

19       that do not implicate *Crawford*."

20  **A.**   I'm not familiar with *Crawford*.

21  **Q.**   Okay.  Do you know what a non-testimonial statement is?

22  **A.**   I don't know the legal term.  If you can explain it to me.

23  **Q.**   Now, in paragraphs 15 through 17 or anywhere in your

24  declaration, have you explained to us the distinction between a

25  statement which is testimonial or a statement which is

**SCHEETZ - CROSS / SABELLI**

1  non-testimonial?

2  **A.**   No, sir.

3  **Q.**   Okay.  Have you explained to us anywhere where -- have you

4  made the distinction in your declaration or in your direct

5  testimony between statements which have the possibility of

6  being in-court testimony versus statements which are not going

7  to be in-court statements?

8  **A.**   No, sir.

9  **Q.**   Okay.  Have you laid out in 1084 or your direct testimony

10  the variety of non-testimonial evidence that you've used to

11  support testimonial hearsay evidence that you rely on?

12  **A.**   No, sir.

13  **Q.**   Okay.  So now, let's go to Lavigne, please.

14      Now, Lavigne wrote principally about the East Coast and

15  Canada; right?

16  **A.**   I believe so, yes, sir.

17  **Q.**   Okay.  And, again, his book was published in 1987?

18  **A.**   As you say, yes.

19  **Q.**   And it was -- and you cited Lavigne's book repeatedly

20  through your declaration?

21  **A.**   Yes.

22  **Q.**   Okay.  So I want to look at page -- I'm sorry --

23  paragraph 68.

24      All right.  We're on paragraph 68 in your declaration,

25  sir.

**SCHEETZ - CROSS / SABELLI**

1    A.    Okay.

2    Q.    Okay.  Now, this relates to the "Filthy Few" tag; right?

3    A.    Correct.

4    Q.    Okay.  And what you're explaining to us here is something

5    that you talked about last week, which was Canadian folks,

6    Canadians Angels coming down and asking for patches based upon

7    violence that they claimed they committed.

8    A.    Correct.  I talked about that last week, yes.

9    Q.    Okay.  I'm going to go a little bit further down on the

10   page so we can see.

11        I have included on the screen right now the totality of

12   your reference to Mr. Lavigne's book quotation on the subject;

13   right?

14   A.    Yes.  It's in 68, yes.

15   Q.    What we're looking at is from page 334 -- 333 and 334 of

16   Mr. Lavigne's book; right?

17   A.    I believe so, yes, sir.

18   Q.    Now, the quotation is longer than that; right?

19   A.    I believe so.

20   Q.    Who cut it down?

21   A.    I'm not sure, sir.

22   Q.    Did you cut it down?

23   A.    I believe so, yes.  When we went over the -- this

24   document, we reviewed it numerous times.

25   Q.    Who's "we"?

SCHEETZ - CROSS / SABELLI

1   **A.**   Myself and the U.S. Attorneys.

2   **Q.**   Who cut it down?

3   **A.**   I can't remember, sir.

4   **Q.**   Okay.  So I'm going to turn -- I'm going to share 334.

5        I'm giving you all -- everybody nausea here, I'm sure, by

6   moving the page.  I apologize.

7            **THE COURT:**  And we're going to need to take a break

8   soon for the court reporter.

9            **MR. SABELLI:**  Sure.  Whenever the Court wants me to,

10  I can --

11           **THE COURT:**  How long will you have for this segment?

12           **MR. SABELLI:**  Probably about five or six minutes.  But

13  I can take a break whenever the Court --

14           **THE COURT:**  Why don't we take a break now.  I think

15  the court reporter needs a break.

16           **MR. SABELLI:**  Okay.

17           **THE COURT:**  So let's take a ten-minute break and come

18  back.

19           **MR. SABELLI:**  Thank you, Your Honor.

20           **THE COURT:**  Okay?  Thank you.

21           **THE CLERK:**  Court is in recess.

22                   (Recess taken at 10:34 a.m.)

23                 (Proceedings resumed at 10:49 a.m.)

24           **THE COURT:**  Mr. Sabelli, you may resume.

25           **MR. SABELLI:**  Can you hear?

1           **THE COURT:**  There you are.

2           **MR. SABELLI:**  Good or bad as the case may be.

3   **Q.**   Mr. Scheetz, let's look at the screen, please.  What I

4   have up there is the publication page of Mr. Lavigne's book

5   1987.  That's correct; right?

6   **A.**   Correct.

7   **Q.**   Okay.  All right.  So I'm going to go to page 19 now for a

8   second, going back to this point about testimonial hearsay

9   versus non-testimonial hearsay, page 14, rather.

10          Again, this is a book you've cited; right?

11  **A.**   Yes, sir.

12  **Q.**   Okay.  And what Mr. Lavigne is explaining in his

13  introduction, his prologue, is that there are myths that plague

14  the Hells Angels; right?

15  **A.**   Correct.

16  **Q.**   Inaccuracies?

17  **A.**   Correct.

18  **Q.**   And those inaccuracies are sometimes due to the media?

19  **A.**   Correct.

20  **Q.**   And sometimes due to lazy law enforcement officers who

21  accept hearsay as fact?

22  **A.**   I don't know that to be true.

23  **Q.**   Well, I'm just asking you whether or not this is something

24  that is part of Mr. Lavigne's view of the Hells Angels

25  intelligence world.

SCHEETZ - CROSS / SABELLI

1   A.   I wouldn't say -- I mean, it's his opinion, if he is

2   saying there are lazy law enforcement officers.

3   Q.   Okay.  And in your view, there aren't any lazy law

4   enforcement officers.

5   A.   I'm not saying that, but the people I work with aren't.

6   Q.   Okay.  And that some of these lazy officers who accept

7   hearsay, they fill gaps in their knowledge with erroneous

8   assumptions; right?

9   A.   I don't know that, sir.

10  Q.   In his view, public literature and police intelligence

11  reports are rife with useless crap about the club; right?

12  A.   That's his opinion.

13  Q.   Okay.  All right.  And you rely on his opinions; right?

14  A.   I rely on excerpts from the book to show correlation or

15  compare and contrast to -- to formulate my conclusions.  That

16  does not mean I believe everything in his book to be a hundred

17  percent correct.

18       There's stuff written in his book that we compare and

19  contrast.  And when I speak with my community and counterparts

20  or other people across the globe and we speak about the

21  Filthy Few, we do compare and contrast about things that he has

22  quoted or other books have quoted or other agents or people we

23  have worked with quote.

24  Q.   Got it.

25       Let's look at the quotation that we were talking about

**SCHEETZ - CROSS / SABELLI**

1    before.  That's at pages 334 and 335 of the book; right?

2    **A.**    Yes, sir.

3    **Q.**    Okay.  So this is the part that you quoted -- right --

4    right here that I have just yellowed?

5    **A.**    Where -- just so I know where in the -- what page was that

6    on again, in mine?

7              **THE COURT:**  It's on the screen, Mr. Scheetz.  You

8    should have it on the screen.  There is a display.  Do you

9    see --

10             **THE WITNESS:**  Yes.  I see it.  Sorry, I apologize

11   Your Honor.

12        Yes.

13   **BY MR. SABELLI:**

14   **Q.**    That's the part you quoted; right?

15   **A.**    Correct.

16   **Q.**    And this, by the way, is coming from a -- of some -- via

17   somebody who is a charter -- a member of the charter of

18   Bridgeport; right?

19   **A.**    Correct, sir.

20   **Q.**    Sometime in the 1980s?

21   **A.**    Yes, sir.

22   **Q.**    Okay.  What you didn't quote was what came afterward;

23   right?

24   **A.**    Correct.

25   **Q.**    He said (reading):

**SCHEETZ - CROSS / SABELLI**

1           "I didn't ever ask questions.  If they said they got

2       the Filthy Few, I gave the patch to them.  Canadians came

3       down for a party and said in broken English" --

4       And now I'm going to read it the way he wrote it.  It's

5   going to be hard, but I'm going to try.  (Reading):

6           "Canadians came down from party and said in broken

7       English 'I don't understand.  Up there we do Outlaws.  We

8       take care of business.  We don't hear about you people in

9       the States doing that.'"

10      Right?

11  **A.**  Correct.

12  **Q.**  So in the full quotation, if you evaluate the full

13  quotation, you would communicate to Judge Chen that whoever

14  gave out the patches back in the 1980s wasn't asking any

15  questions about what violence was committed?

16  **A.**  They knew exactly what violence was committed.

17  **Q.**  I see.

18      And that's in the quotation that you're -- that you're

19  pointing us to?

20  **A.**  No, it's from my analysis since working these individuals.

21  In 2006 they had two Canadian biker wars between the

22  Hells Angels and the Outlaws.  And many members in Canada

23  earned a Filthy Few, but because they did not have Filthy Few

24  members up there, those were actually handed to them by members

25  in the United States because to receive a Filthy Few you need

1    to have another Filthy Few member give it to you.

2    Q.    I see.  And so you've described what you believe happened.

3    Is any of that your declaration?

4    A.    No, sir.

5    Q.    The sources for that information?

6    A.    No, sir.

7    Q.    The way you processed those sources?

8    A.    No, sir.

9    Q.    The way you compared it to whoever it is that said this,

10   whatever his quotation is?

11   A.    No, sir.

12   Q.    Okay.  And whoever it is, this unnamed Canadian whose

13   voice I have ruined forever, this person, they are suggesting

14   that the Americans don't take care of business; right?

15   A.    No.  He's not saying that at all.  It's basically

16   referencing what happens when the Outlaws and the Hells Angels

17   went to war over drug territory during the biker wars, that the

18   Hells Angels American charters handed out the "Filthy Few" tags

19   because they, like I said, to give a tag to somebody who's a

20   brand new Filthy Few member, it has to come from somebody who

21   has already dons the patch or the tag.

22   Q.    Does the person who's quoted hear actually exist?

23   A.    I'm not sure, sir.

24   Q.    And whoever it is, whether this person exists or not,

25   says:  We take care of business.  We don't hear you people in

**SCHEETZ - CROSS / SABELLI**

1    the States doing that.

2        Right?

3    **A.**   That's what he quoted, yes.

4    **Q.**   So whether this person is fictional or real, they have a

5    view of what the American Hells Angels do and don't do?

6    **A.**   That's his opinion.  That's in the book, yes.

7    **Q.**   Now, by the way, George Christie in this book is mentioned

8    how many times?  You've read it cover-to-cover, you said;

9    right?

10   **A.**   Correct, sir.

11   **Q.**   Fair to say he is mentioned once in the book?

12   **A.**   Okay.  Once.

13   **Q.**   Just -- so this is a book really about Canada and the

14   East Coast; right?

15   **A.**   It's -- no, sir.

16   **Q.**   In the 1980s?

17   **A.**   I have also read other books.  I just didn't quote those

18   in this particular document.

19   **Q.**   Got it.

20       Okay.  So, let's look earlier in the book, shall we?

21       Now, by the way, before we do that, I just want to ask you

22   this:  Scale of 1 to 10, do you believe that Mr. Lavigne is

23   biased against the Hells Angels?  1 being lowest, 10 being

24   highest, where would you put him?

25   **A.**   I can't give you that opinion, I don't know Mr. Lavigne.

1    Q.    But you read the book?

2    A.    Yes.  But it doesn't mean I know his ideology or thinking

3 or how he actually believes.

4    Q.    He doesn't lay that out in his book for you?

5    A.    Not that I can remember, no, sir.

6    Q.    Let's look at the introduction.  It's up on the screen.

7    A.    Yes.

8    Q.    By the way, would you characterize his book as being

9 written with a journalistic style?

10    A.    I would just say it's a book written by an author.  I

11 don't know if there is any type of style that he wrote it in.

12    Q.    Got it.  Got it.

13        Look at page 13.  It's up on the screen in front of you,

14 sir.

15        Now, I have highlighted a couple of pieces but I ask you

16 just go ahead and look at that half-page in front of you, the

17 beginning of the book, the first part of the book?

18    A.    Correct.

19    Q.    Now, he said, speaking of Hells Angels (reading):

20          "They are the gang out of which all outlaw motorcycle

21       gangs grow, the primal ooze out of which the last links

22       crawl, white trash on wheels."

23       Right?

24    A.    That's what he wrote.

25    Q.    Fair to say he has a fairly strong view, negative view

1  about the Hells Angels?

2  **A.**    I mean, that's his opinion.  He is allowed to have that

3  opinion.

4  **Q.**    I'm asking you, as an intelligence expert, whether or not

5  you understand that he has that opinion.

6  **A.**    I can't draw that from just that one sentence, sir.  No.

7  That could have been something that he is speaking to somebody.

8  He doesn't basically say that's his person -- he is not putting

9  that per my blah-blah-blah-blah.  That's just maybe something

10  he is going to outline later in the book.  Could be something

11  he is going to discuss in, maybe, the next page.  I don't know.

12  It's something I would have to read into.

13       But just because he put that in there doesn't mean that's

14  his personal opinion.

15  **Q.**    That process you just described for us, you haven't done

16  that yet?

17  **A.**    I mean, you have to read on in the book.  You have to -- I

18  mean, I don't know Mr. Lavigne that way.  I don't know what his

19  methodology was for writing the book or anything of that

20  nature.

21       So just because he put that in there, I'm not saying that

22  that's his formal opinion.  Maybe it's someone else and he is

23  trying to gain that opinion as he writes the whole book.  Maybe

24  it's something he is trying to garner.  I'm not sure.

25  **Q.**    How about the last sentence on the page?  Is that -- is

**SCHEETZ - CROSS / SABELLI**

1  that what you would call an agenda?

2  **A.**   That's his -- that could be his agenda for writing this

3  book.  I don't know what his agenda was.  I wasn't there when

4  he wrote the book.  He didn't tell me specifically why he wrote

5  the book.  That's his personal opinion.  This is why he's

6  writing the book.

7  **Q.**   You've spoken to him?

8  **A.**   Nope.

9  **Q.**   Never?

10  **A.**   Nope.

11  **Q.**   So you've never asked him what his agenda is?

12  **A.**   Nope.

13  **Q.**   Have you discussed his agenda with other people in your

14  field?

15  **A.**   Nope.

16  **Q.**   Now, you also brought up in -- last week you brought up

17  somebody from Minnesota.  Do you recall that?

18  **A.**   Yes.  Can you refresh my memory, sir?

19  **Q.**   Well, today you brought up somebody named Jacob Sams;

20  right?

21  **A.**   Yes.  That wasn't last week.  That was today, sir.

22  **Q.**   I understand.  But today you brought up Jacob Sams; right?

23  **A.**   That's right, sir.  Yes.

24  **Q.**   And he is not anywhere in the declaration; right?

25  **A.**   No, sir.

**SCHEETZ - CROSS / SABELLI**

1  Q.   Now, last week you brought up somebody else.  You brought

2  up somebody who was a president of the Minneapolis charter;

3  right?

4  A.   Correct.

5  Q.   And that person's name was Pat Matters [sic]?

6  A.   Correct.

7  Q.   You brought him up?

8  A.   Yes.

9  Q.   He is not in your declaration?

10  A.   No, sir.

11  Q.   Now, he was actually a president of a Hells Angels

12  charter?

13  A.   Yes, sir.

14  Q.   And you know what a 5K is in federal court?

15  A.   No, sir.

16  Q.   Do you know what a motion for substantial assistance is?

17  A.   No, sir.

18  Q.   Do you know anything about what happens to a federal

19  cooperator if they cooperate successfully?

20  A.   I don't know.  No, sir.

21  Q.   Do you know what happens after a cooperator has cooperated

22  successfully and is going to be sentenced?

23  A.   No, sir.

24  Q.   Do you know about the process that that person is put

25  through, I mean, to determine whether or not they have

1  substantially assisted the Government and been truthful?

2  A.   No, sir.

3  Q.   Do you know whether or not Pat Matters received 5K

4  substantial assistance reductions in sentence?

5  A.   I do not know.  No, sir.

6  Q.   Do you know whether or not he received one or two?

7  A.   I am not even sure, sir.  No.

8  Q.   Do you know who has to vet somebody like Mr. Matters if

9  they testified in court for the Government to assure the Court

10 that that person was reliable and truthful?

11 A.   No, sir.

12        MR. KRISHNAMURTHY:  Objection; relevance.

13        THE COURT:  Overruled.

14 BY MR. SABELLI:

15 Q.   Now, Pat Matters wrote a book; right?

16 A.   Correct, sir.

17 Q.   He didn't write it alone?

18 A.   Nope.

19 Q.   He wrote it with an agent?

20 A.   A police officer.

21 Q.   Yeah.  A guy named Chris Omodt; right?

22 A.   Yes, sir.

23 Q.   And Chris Omodt now runs an outlaw motorcycle gang --

24 using your terminology, not mine -- intelligence analyst

25 network; right?

SCHEETZ - CROSS / SABELLI

```
 1   A.   No, sir.

 2   Q.   It's called the Heartland Law Enforcement Training

 3   Institute?

 4   A.   I don't believe he does that anymore, sir.

 5   Q.   Okay.  He did at one point?

 6   A.   I believe so.  I'm not really sure.

 7   Q.   Okay.  And by the way, his name is O-m-o-d-t; right?

 8   A.   I believe so, yes, sir.

 9   Q.   And the way that Mr. Omodt and Mr. Matters wrote this book

10   is they wrote -- each of them wrote some chapters and the other

11   wrote other chapters?

12   A.   I believe so, yes.

13   Q.   Do you recall that?

14   A.   I believe there's -- each paragraph -- each chapter is

15   written by one; then the other.  And they basically feed -- I

16   won't say "feed."  They basically go back and forth with one

17   another on their stories and how they correlate.

18   Q.   Do you know when Mr. Matters was president of the charter?

19   A.   Not exactly, no, sir.

20   Q.   Fair to say 1990s and early 2000s?

21   A.   Yes.

22   Q.   Okay.  So he is more modern than Lavigne; right?

23   A.   Yes, sir.

24   Q.   And he was actually on the inside?

25   A.   Yes.
```

SCHEETZ - CROSS / SABELLI

1  **Q.**    And he was a president?

2  **A.**    Yes.

3  **Q.**    And you don't know whether or not this is true, but he may

4  or may not have received substantial assistance 5K sentence

5  reductions in federal court?

6  **A.**    I have no clue, sir.

7  **Q.**    That's not anything you factored in to whether or not you

8  would take his opinion over that of anything named in Lavigne;

9  right?

10  **A.**    No.  I mean, similar to that book, there is references

11  within that book that I know to be true because that was an ATF

12  investigation at the time, and I was -- have been able to look

13  at the reports of information through the ongoing

14  investigation, as well as officer safety bulletins, and spoke

15  to numerous -- I won't say "numerous" -- several case agents at

16  that time who were able to verify some of the experts in

17  Matter's book.

18  **Q.**    Okay.  Now, do you recall what Pat Matters says about the

19  "Filthy Few" patch?

20  **A.**    Yes.

21  **Q.**    Okay.

22  **A.**    No.  I don't know the exact words.  I apologize.  No, I

23  don't know exact words.

24  **Q.**    Would you say he agrees with you or disagrees with you?

25  **A.**    I would say, on one hand, he disagrees; but then he hands

**SCHEETZ - CROSS / SABELLI**

1    out Filthy Few tags to members who committed a shooting against

2    the Outlaws.  So the two members that received it did it in

3    furtherance of the club, and they shot an Outlaw off his bike

4    during the Chicago biker wars.

5    **Q.**   I'm going to go to page 75 of the book, put it on the

6    screen.

7          Okay.  Here we are.

8          Okay.  So I'm at page 75.  Can you see that on the screen,

9    sir?

10   **A.**   Yes, sir.

11   **Q.**   Okay.  Now, I'm going to highlight a section here.

12         Do you see that?

13   **A.**   Yes, sir.

14   **Q.**   So do you see -- Rooster is another Hells Angels; right?

15   **A.**   Correct, sir.

16   **Q.**   So he wanted to -- what Mr. Matters is explaining here is

17   that he has a motive to convey the club's toughness; right?

18   **A.**   Correct.

19   **Q.**   Conveying the club's toughness is a way to intimidate

20   other people?

21   **A.**   Okay.

22   **Q.**   Isn't that right?

23   **A.**   Can you repeat that again, sir?

24   **Q.**   Sure.  Can you hear me all right, Mr. Scheetz?

25   **A.**   Yes.  I'm just having trouble reading the screen.

SCHEETZ - CROSS / SABELLI

1    Q.    Okay.  Got it.  Got it.

2         Intimidating other people, whether they are civilians or

3    other club members, that's a way to -- to protect the club;

4    right?

5    A.    Correct.

6    Q.    Now, that's a motive that you didn't describe at all in

7    your declaration; right?

8    A.    No, sir.

9    Q.    Now, what he explains here is that Rooster, the other

10   Angel and he, Mr. Matters, put in for "Filthy Few" patches;

11   right?

12   A.    Correct.

13   Q.    For those who have taken -- and he says (reading):

14        "The Hells Angels award 'Filthy Few' patches to those

15        who have taken care of the club's business."

16        Right?

17   A.    Correct.

18   Q.    There are no written rules about what that means?

19   A.    Correct.

20   Q.    (Reading):

21        "But those on the outside have come to believe that

22        if you're wearing that patch you have killed for the

23        club."

24   A.    That's what some believe, yes.

25   Q.    Okay.  (Reading):

1    "There was a lot of shit people on the outside didn't

2  understand about the Hells Angels and don't understand to

3  this day."

4  Right?

5 **A.** Correct.

6 **Q.** (Reading):

7    "I found it amusing that cops would rely on books

8  like Lavigne's to get their information."

9 **A.** Okay.

10 **Q.** Right?

11  But he wasn't going to do anything to counter the

12 perception that people had about the "Filthy Few" patch; right?

13  So what he was explaining there is that this myth of the

14 patch has a value unrelated to the reason you got the patch;

15 right?

16 **A.** I mean, that's not really what he is saying.  He's

17 basically outlining -- he outlines in the book, you know,

18 people have perceptions of the Filthy Few, and he outlines in

19 the book why he gave two members of Chicago, or the Nomads

20 Illinois charter, later on in the book for shooting an Outlaws

21 members.

22  He is basically going off Lavigne saying he doesn't

23 really -- I'm guessing people have a perception and they don't

24 know how it's run internally.

25 **Q.** I asked you a question about what Mr. Matters wrote in

SCHEETZ - CROSS / SABELLI

1    that paragraph, and you responded by giving me a specific

2    anecdote; right?

3    A.    I gave you what I thought was correct, sir.

4    Q.    Okay.  Putting aside one specific anecdote and focusing on

5    what Mr. Matters is trying to communicate to us here, what he

6    is trying to communicate to us is that there is a value in this

7    myth that the patch means something, even though it doesn't

8    necessarily mean that.  That's what he's communicating.

9    A.    He's saying that, yes, communicating.  And he's also

10   referring to one specific thing:  You killed for the club.

11         That's not what it means.

12   Q.    Let's go to page 194.

13         By the way, do you see this phrase "downward departure"

14   here?

15   A.    Yes, sir.

16   Q.    When you saw that, did you figure out what it was?  Did

17   you look it up, talk to the prosecutor, try to figure it out?

18   A.    No.

19   Q.    Actually, I'm going to 84.  I'm sorry.  I'm going to go to

20   page 84.

21         Okay.  There we go.

22         All right.  Now, this is Mr. Omodt's writing; correct?

23   Are you able to tell?

24   A.    Not really sure, sir.  It could be.

25   Q.    Okay.  If you look up here where I have got the cursor --

SCHEETZ - CROSS / SABELLI

1   A.    Yes.   Okay.   I -- yes.

2   Q.    Okay.   So this is actually written by a law enforcement

3   officer who later created a training institute for experts like

4   you?

5   A.    I have never been to his training.

6   Q.    Okay.   So let's look down here at the bottom of 84.

7   Apologies for getting it wrong there.   Top of page 85.

8   A.    Correct.

9   Q.    He is echoing what Mr. Matter said, that intimidation is

10  important?

11  A.    Yes.

12  Q.    And the example he gives is a "Filthy Few" patch.

13  A.    Correct.   But he also says the exact same thing Matter

14  says, and it says "kill for the club."   And that's not what it

15  means.

16  Q.    Got it.   But what he's explaining is that there is a value

17  in outward intimidation; right?

18          MR. KRISHNAMURTHY:   Objection; relevance.

19          THE COURT:   Overruled.

20          THE WITNESS:   Are you talking about the intimidation

21  of the patch itself, the "Filthy Few" patch or --

22  BY MR. SABELLI:

23  Q.    I'm talking about the intimidating effect on civilians,

24  other club members, or members of other clubs of having a

25  "Filthy Few" patch.

SCHEETZ - CROSS / SABELLI

1   **A.**   Yes, other clubs know what it means.

2   **Q.**   Okay.

3   **A.**   But he is referring to --

4   **Q.**   That's not my question.  My question is:  What Mr. Omodt

5   is conveying here is that the myth about the patch, in this

6   case, the myth as he defines it, is killing for the club.

7   **A.**   That's the exact same --

8   **Q.**   Hold on just a second.  I'm sorry.

9   **A.**   I apologize.  Let you finish.

10  **Q.**   No, no.  My bad.

11        He's explaining that this myth -- in this case he defines

12  the myth more narrowly than you do.  He's explaining that this

13  myth has a value because it intimidates others.

14  **A.**   That's correct.  But he also reiterates the exact same

15  thing that Pat Matter says, that the terminology is "kill for

16  the club."  And that's not what it means.  And that's why

17  there's this misunderstanding, this misnomer about what the

18  actual definition is.

19        **THE COURT:**  Actually, the quote is a little broader

20  than that.  It says "or beaten somebody severely."  It says

21  "killed or beaten severely."

22        **THE WITNESS:**  Okay.  I apologize, Your Honor.  I

23  didn't see that.  I apologize.

24        **THE COURT:**  Okay.

25  \\\

SCHEETZ - CROSS / SABELLI

1  BY MR. SABELLI:

2  Q.   Okay.  I'm going to page 227.  This is Mr. Omodt, again.

3       Do you see what I have written there -- what I have

4  highlighted there?

5  A.   Correct, sir.  Yes, I see it.

6  Q.   (Reading):

7            "We have been trained to think the 'Filthy Few';

8       patches meant killing for the club and our training had

9       also included the widespread belief that a .22 with a

10      silencer, the exact kind of gun Richard Rohda told us Pat

11      used, was the gun of choice for the Hells Angels.  It was

12      poor training and I would like to humbly submit that I

13      have helped improve upon what law enforcement knows today

14      about how the Hells Angels operate."

15      Okay.  You're not relying on Mr. Matters or Mr. Omodt in

16  your declaration; right?

17 A.   No, sir, but I -- I apologize.

18 Q.   Would you characterize these folks, this book, as being

19 journalistic and documented?

20 A.   I mean, it's a firsthand knowledge from Pat Matter as a

21 member.  And I agree with exactly what he said about the

22 "Filthy Few" patch meaning they're killing for the club.

23 That's what he is saying.  There is other ways to earn or be

24 awarded that patch or that tag.

25 Q.   Let's go back to Lavigne for a second.  And I'm going to

SCHEETZ - CROSS / SABELLI

```
 1    go, right here is page 334, is the quotation we read from.

 2         On the page before, is 333, we have the explanation of

 3    what's going on with this Canadian and these Canadians; right?

 4    A.   Correct.

 5    Q.   And what he is explaining is what Mr. Philipsborn

 6    discussed with you today which is the "Filthy Few" patch being

 7    born of major partying; right?

 8    A.   Correct.

 9    Q.   And I have asked my mother not to join this Zoom, so I'm

10    going to feel okay about reading what I'm going to read now.

11         And I want to ask you if what I'm going to read now from

12    Mr. Lavigne is journalistic, precise, documented, reliable.

13    All right?  And I'm going to highlight it here and with

14    apologies to everybody who is going to hear it.

15         Here's what Mr. Lavigne wrote (reading):

16             "The original Filthy Few collect dirt like the inside

17         of a foreskin.  They're the boys with furs on their teeth

18         and chunks of shit caked to their hair around their

19         assholes.  These putrid few prepare campsites for runs

20         before the pack hits the road.  They chop wood and hot

21         water.  They dig trenches and set up tents.  They can make

22         a whore gag at 50 feet."

23         That's Mr. Lavigne's approach; right?

24    A.   Yes.

25    Q.   He is about selling books, isn't he?
```

SCHEETZ - CROSS / SABELLI

1   A.   I believe so.  And I don't know his ideology of writing

2   the book.

3   Q.   Okay.  Now, I want to take a step back and change the

4   subject and ask you about the opinions that you're here to

5   give.

6        You're here to give us opinions on three issues:  Symbols,

7   terms, and territory; right?

8   A.   I believe so, yes, sir.

9   Q.   And you've laid at that out for us in paragraph 18 of your

10  declaration?

11  A.   Yes, sir.

12  Q.   Okay.  Your history -- your section about territory is

13  really and it -- that's at pages 31 through 38 of your

14  declaration, let's go to that.

15       Territory.  What you do in the territory section is lay

16  out history; right?

17  A.   History to current day, yes.

18  Q.   Pages 31 to 38 of your declaration are nothing more than a

19  list, there is no opinion in there, right, it's just a list of

20  what you consider to be historical events?

21  A.   They are factual events that transpired, yes, sir.

22  Q.   So when you say you're here to offer an opinion about

23  territory, which is documented on pages 31 through 38, really

24  it's a list of what you consider to be historical events?

25  A.   No, it's not just a list.  It's ongoing violence that's

1    transpired when the Hells Angels have moved.  And some of the

2    reports that I have disseminated to the Court talks about

3    Hells Angels violence.  We call it "migration leads to

4    violence."  Wherever the Hells Angels move or set up a new

5    charter, they are involved, either as the aggressor or someone

6    comes after them, for moving into a previously established or

7    previously pre-noted territory that someone else, basically a

8    preceived [sic] notion that they control the territory.

9         So these are just examples of violent acts that

10   transpired, I believe was between the Mongols and the Vagos, if

11   I remember correctly.

12   **Q.**   Got it.  That's not my question.  But let me ask you this

13   first:  The word "migration" doesn't appear in your

14   declaration?

15   **A.**   No, sir.

16   **Q.**   Okay.  Let me ask you my question again.  Looking at the

17   territory section, pages 31 through 38, is there an opinion in

18   there somewhere?

19   **A.**   I don't believe so, no.  These are just listing of

20   violents acts that have transpired between them and an

21   adversarial OMG.

22   **Q.**   Okay.  And you also lay out a similar kind of historical

23   report without an opinion at paragraph 52; correct?

24        I'm going to move it up for you so you can see it.

25   **A.**   Yes, that's correct.

SCHEETZ - CROSS / SABELLI

1    Q.    Okay.  Now, let's go back to the -- give me a second here.

2         By the way, with respect to Exhibit 17, that's -- I think

3    it's described at paragraph 120.  Let's go up to that.

4              THE COURT:  17 of the declaration or 17 in the book?

5              MR. SABELLI:  Of the declaration, Your Honor.  I'm

6    sorry.  I don't have the exhibit binder from the Court.  I only

7    have the --

8              THE COURT:  You're referring to the articles?  What is

9    it?

10             MR. SABELLI:  Correct.  Paragraph 120.  It's up on the

11   screen.  And what it says -- it's Exhibit 17 to Exhibit 1084.

12             THE COURT:  And that's -- I think that's 19 in the

13   binder, which is all the articles and the reports.

14             MR. SABELLI:  Yes, Your Honor.

15             THE COURT:  Exhibit 19 in the book.

16             MR. SABELLI:  Thank you, Your Honor.

17   Q.   You describe it as a set of investigative reports,

18   charging documents, newspaper articles describing violent

19   incidents between Hells Angeles and Mongols.  Right?  That's

20   your description?

21   A.   Yes, sir.

22   Q.   In fact, it consists almost exclusively of newspaper

23   reports, right, with two investigative reports from 1977?

24   A.   For this basis, yes.  I only -- we only put the newspaper

25   reports in there.  So there is some reference to the actual

SCHEETZ - CROSS / SABELLI

1    incident.

2    Q.    Paragraph 120 is inaccurate; right?  There is, for

3    example, no charging document there?

4    A.    In the -- no.  We put the indictment in the beginning.  In

5    the very beginning of the San Diego reports.  That's the one we

6    put in there.

7    Q.    Got it.  Let's see.

8         So apart from -- I don't have it let's see.  Let's look at

9    it right now.  Apart from that -- the 1977 report and charging

10   document, the rest is all newspaper articles?

11   A.    That we put in there, yes.

12   Q.    Who's "we"?

13   A.    Myself and the U.S. attorneys.

14   Q.    What you're explaining to us is you could have put other

15   things in there?

16   A.    I could have, yes.  I could have put the actual police

17   report in there.

18   Q.    You didn't do that?

19   A.    No, sir.

20   Q.    Did anybody stop you from doing that?

21   A.    No, sir.

22   Q.    Do you understand that there would be a value to defense

23   counsel, to the Court, even to the prosecutors to understand

24   the more specific and reliable information that you rely on?

25   A.    I guess.  I mean, newspaper articles is one of the many

1    things that I rely on.  And like I stated last time, I use that

2    as an example to find a story if I don't know about it.  I used

3    the Google search engine.

4         There's many violent altercations that take place across

5    the globe that my first contact of knowing about the incident

6    is the newspaper article or a Google search.

7         And then I reach out to the investigative party who's

8    working it and I do my best to validate that information.

9         If it's not been validated, there is things in this

10   time -- that I did not list in that timeline that have been --

11   people have said a violent incident transpired and I did not

12   put it down.

13        I did not have a newspaper article.  I did not have an

14   actual police report, did not have an officer safety bulletin.

15   I didn't have anything to confirm that these are actual

16   incidents that I can confirm with either a newspaper article

17   that's been confirmed by ATF, working their infiltration into

18   the Mongols, or police reports, or some type of indictment

19   paperwork.

20   Q.   Part of what you've just explained to us is that where you

21   don't have a law enforcement source you turn to the media; is

22   that right?

23   A.   I wouldn't -- no, I wouldn't say that.  Media is just one

24   of my -- many things that I utilize.  It's one of the tools in

25   the shed that I use.  I don't -- I don't primarily use it.

SCHEETZ - CROSS / SABELLI

1    Like I just said, if I don't have supporting documentation,

2    then I'm not going to put it in there.

3            THE COURT:  All right.  Let me ask:  Are you saying

4    that each of the news articles that are contained in this

5    exhibit -- which is D through Y or whatever it is -- you

6    independently talked to somebody to verify that that incident

7    as reported happened?

8            THE WITNESS:  Your Honor, yes.

9            THE COURT:  For every one of those?

10           THE WITNESS:  Yes, ATF Los Angeles and others, sir.

11           THE COURT:  Thank you.

12   BY MR. SABELLI:

13   Q.   Where is that information for the Court or for defense

14   counsel?

15   A.   I didn't put it into my -- I didn't turn it over where

16   it's not listed.

17   Q.   Where is your analysis of the reliability of the

18   information that you didn't turn over?

19   A.   I -- I didn't put it in.  I came frame from OMG experts or

20   motorcycle club law enforcement experts within ATF Los Angeles

21   who've been working the Mongols since the mid-1980s.

22   Q.   Have you ever seen an expert report where there is an

23   opinion and then there's the basis of opinion underneath?

24   A.   Yes.

25   Q.   What?

**SCHEETZ - CROSS / SABELLI**

1    A.    Yes, sir.

2    Q.    You could have done something like that; right?

3    A.    I could, sure.  This is my first time since what I put in.

4    Q.    Got it.  And by the way, one of the sources you refer to

5    in the Court's 19, which is 17 to 1084, is a couple of pages

6    from a website called The Aging Rebel.

7    A.    Yes, sir.  Where are you -- are you looking at?

8    Q.    It's in Exhibit 17 or 19, whatever you want to call it.

9    A.    Okay, yes.

10   Q.    Do you know what The Aging Rebel is?

11   A.    Yes.

12   Q.    It's not a newspaper; right?

13   A.    Nope.

14   Q.    It's not a recognized media outlet?

15   A.    No.  It's a website.

16   Q.    Do you know who writes it?

17   A.    I don't know his name.  I know he recently deceased.

18   Q.    Have you told us anything about him?

19   A.    No, sir.

20   Q.    By the way, you mentioned violence a couple of minutes

21   ago.

22         Do you know how many times in your declaration you've used

23   the term "violent" or "violence"?

24   A.    No, sir.

25   Q.    Okay.  Well, let's -- let's discuss in terms of

**SCHEETZ - CROSS / SABELLI**

1    methodology -- let me back up a second here.  Okay.  I'm going

2    to skip over that in the interest of time.

3         All right.  Let's look at paragraph 52.  I'm not going to

4    spend a lot of time with it because I think there may be

5    another lawyer or lawyers who will.  But I'm going to look at

6    52 for a second here.  I'm going to your declaration,

7    paragraph 52.

8         Now, 52 and 53 relate to Laughlin; right?

9    **A.**   Yes, sir.

10   **Q.**   And let's look at -- let's look 53.

11        The riot at Laughlin between the Mongols and the Angels is

12   famous within the OMG community; right?

13   **A.**   Correct.

14   **Q.**   Okay.  That's your view.

15        Now, I want to turn to this part of it.  According to you,

16   Laughlin demonstrated that Hells Angels are willing to take

17   action; right?

18   **A.**   Correct.

19   **Q.**   Now, Laughlin is 2002?

20   **A.**   Correct.

21   **Q.**   According to you, the Hells Angels already have a long

22   history?

23   **A.**   Correct.

24   **Q.**   Okay.  And presumably by 2002, they wouldn't need to

25   demonstrate anything, according to you; right?

**SCHEETZ - CROSS / SABELLI**

1    A.    Well, that demonstrated because they were outnumbered by

2    the Mongols.  And their willingness to go toe-to-toe when they

3    were violently outnumbered showed -- it demonstrated how -- the

4    totality which they'll go to, to go against the Mongols.

5    Q.    I see.  Is that in your declaration?

6    A.    No, sir.

7    Q.    And now you're focusing -- and I'm not going to go into

8    this, but just to point it out to the Court -- you're actually

9    focusing on an event, Laughlin, and a person, Mr. Foakes, who

10   is part of this case; right?

11   A.    Correct, sir.

12   Q.    You don't mention the word "Sonoma" here, do you?

13   A.    No, sir, I don't believe so.

14   Q.    So your opinion is that -- that what is demonstrated about

15   the Hells Angels -- about Laughlin relates to the Hells Angels

16   generally; right?

17   A.    Correct.

18   Q.    Not to Sonoma specifically?

19   A.    No, sir.  It's Hells Angels in general.

20   Q.    Now, by the way, on the issue of Sonoma -- I'm sorry --

21   Laughlin, there is no special Hells Angels patch commemorating

22   Laughlin; right?

23   A.    I don't believe so, no, sir.

24   Q.    But the Mongols have one; right?

25   A.    Yes.

**SCHEETZ - CROSS / SABELLI**

1   Q.   Okay.   Switch gears a little bit here.   Let's talk about

2   your methodology about the Death Head, to get to your

3   interpretation of the Death Head.   Okay?

4   A.   Yes.

5   Q.   I'm desperately trying not to knock over my glass of water

6   here.

7        Okay.   Let's go to page -- paragraph 38.

8        Now, paragraph 38 is contained within your discussion of

9   the Death Head; right?

10  A.   Yes.

11  Q.   So you're discussing a symbol, the Death Head, and then

12  you put in paragraph 38; right?

13  A.   Yes.

14  Q.   38 doesn't mention "Death Head;" right?

15  A.   No, sir.

16  Q.   38 refers to a 2014 conviction about a 2011 event; right?

17  A.   Yes.

18  Q.   When was the Fuki Death Head created?

19  A.   Was that -- '86, I believe.

20  Q.   Well, whether it's '86 or '83, whatever; it was in the

21  '80s.   Right?

22  A.   Correct.

23  Q.   So this paragraph about a 2011 event and a 2014 conviction

24  doesn't explain how the Death Head was created; right?

25  A.   No.   We're not talking about -- no, not --

1  Q.   Let's look at paragraph 40.  Paragraph 40, here is what

2  you tell us (reading):

3            "Within the OMG and motorcycle club underworld, the

4        Death Head represents violence and a mantra of living by a

5        different set of rules and behaviors.  The trademark named

6        Hells Angels and Death Head logo demand respect from other

7        OMGs, motorcycle clubs, and others.  Anyone or anything

8        that opposes or disrespects a member or the colors is

9        subject to the wrath of the HAMC, including being subject

10       to violence.  Once a member receives his colors, he is

11       accepted as a brother at any HAMC charter across the

12       globe.  By placing the Death Head on his back, a member

13       represents approximately 5,000 members across the world

14       who share a common set of goals or traits."

15       Right?

16  A.   Correct.

17  Q.   Do we see a little bit of a drop of Yves Lavigne in the

18  writing there?  Is it a bit dramatic?

19  A.   No.

20  Q.   You're talking about a mindset for 5,000 people which, in

21  your view, is shared in common?

22  A.   That's my interpretation.  That's my opinion after all of

23  my work.

24  Q.   You're telling us about the state of mind of 5,000 people?

25  A.   My opinion, yes.

1  Q.   Okay.  Sources.  Let's talk about sources for one second.
2         MR. SABELLI:  And this will be very quick, Your Honor.
3  I know it parallels something that Mr. Philipsborn talked
4  about, but I'll be very quick on this.
5  Q.   You mentioned last week Jordan Atwell and Neff; right?
6  A.   Yes.
7  Q.   Their names aren't in the declarations?
8  A.   No, sir.
9  Q.   You've given us no information about them; right?
10  A.   No, sir.
11  Q.   When you say "no, sir," you mean I'm correct; right?
12  A.   I haven't given you specific information.
13  Q.   Okay.
14       And, for example, you didn't give us any information about
15  whether or not these people had motives to lie?
16  A.   No, sir.  I don't know their motives.
17  Q.   You don't know their motives.  Okay.
18       You don't know whether or not they were paid, whether or
19  not they had axes to grind, whether or not they were cocaine
20  addicts at the time they were giving this information?  You
21  haven't given us any of that because you don't know it?
22  A.   I don't know.  I just know that they were members.
23  Q.   Are you telling us that Mr. Neff was a member?
24  A.   Yes.
25  Q.   And, by the way, Mr. Atwell is Canadian; right?

**SCHEETZ - CROSS / SABELLI**

1    **A.**   Correct.

2    **Q.**   Was he facing life sentences?

3    **A.**   I don't know, sir.

4    **Q.**   Now, Jordan, you say he's an ATF guy; right?

5    **A.**   He was, yes.

6    **Q.**   It would have been pretty easy to get some reports, a

7    curriculum, testimony, something so we would have -- Judge Chen

8    would have a way to evaluate the reliability of the methodology

9    you used to include his information; right?

10   **A.**   There's, yes, reports available, yes.

11   **Q.**   Now, did you decide not to include any of that or were you

12   told not to include any of that?

13   **A.**   I just didn't turn it over.

14   **Q.**   Next subject, data.  Do you have a database?

15   **A.**   We did, yes.

16   **Q.**   Do you have a database?

17   **A.**   Yes.

18   **Q.**   Did you say "we do" or "we did"?

19   **A.**   We do.  I apologize on that.

20   **Q.**   Did you share that database with us?

21   **A.**   No, sir.

22   **Q.**   Did you create it?

23   **A.**   I did not specifically, no.

24   **Q.**   Is it referenced in your declaration?

25   **A.**   No, sir.

**SCHEETZ - CROSS / SABELLI**

1    Q.   Have you given it to the prosecutors?

2    A.   No, sir.

3    Q.   When you put together this declaration, did you use the

4    database?

5    A.   No, sir.

6    Q.   So you did this declaration pretty much from memory?

7    A.   No.  From other reports that I've written, other people

8    I've talked to, stuff of that nature, I didn't use the database

9    for.

10   Q.   Very briefly, with respect to the Fresno rules,

11   Mr. Philipsborn showed you one example in your declaration

12   where you referred to the Fresno rules.

13   A.   Correct.

14   Q.   You used it more than once in your declaration; right?

15   A.   I'm not sure, sir.  I might have.

16   Q.   Paragraphs 82, 100, 109, 112, and 115.

17   A.   Okay.

18   Q.   And what you're explaining to us today is that even though

19   you mentioned it five times in your declaration you had no

20   memory of it?

21   A.   I had no memory of being in there.  I just -- I didn't

22   have it.  I mean, I remember -- let me -- just one second.

23       I just -- like I said before, I don't remember how it got

24   in there or where I -- excuse me -- or where I acquired it

25   from.

SCHEETZ - CROSS / SABELLI

1   Q.   So that we're not torturing each other and I'm going

2   through every paragraph, what you're saying is that with

3   respect to the paragraphs where Fresno rules are mentioned, you

4   forgot all of those times when you testified last week?

5   A.   No -- I don't forget, no.

6   Q.   You forgot using that exhibit and including references to

7   Fresno five times in your declaration, that's what I'm asking.

8   A.   I forgot that I put the exhibit in there, or the exhibit

9   was in there.

10      MR. SABELLI:  Your Honor, I think that's all I have

11  for now.  Thank you.

12      THE COURT:  All right.  Thank you.

13  So who do we have next up on the list?  Is it Mr. Gohel?

14  All right.  So we do need to exchange places.  And we do

15  need to take a bit of a break so that the day porter can

16  disinfect.  So why don't we take maybe a ten-minute break and

17  arrange to have Mr. Gohel and Mr. Nelson come into the

18  courtroom and exchange places with Mr. Philipsborn and

19  Mr. Wendt.

20  We will need a new -- Angie, we will need a new headset.

21  Do we have a new headset?

22      THE CLERK:  Yes, Your Honor.

23      THE COURT:  All right.  So why don't we go ahead and

24  take the ten-minute break and make the switch.

25      THE CLERK:  Court is in recess.

SCHEETZ - CROSS / SABELLI

```
 1                    (Recess taken at 11:33 a.m.)

 2                 (Proceedings resumed at 11:46 a.m.)

 3           THE COURT:  Shall we test out the equipment,

 4  Mr. Gohel?  Can you hear me?

 5      We can't hear you.  Let's -- we need to un-share

 6  Mr. Sabelli's screen.

 7      Mr. Sabelli, can you remove the share?  Thank you.

 8           THE CLERK:  I got it.

 9           THE COURT:  Oh, you got it.  Okay.

10           MR. SABELLI:  Thank you.

11           THE COURT:  All right.  And, Mr. Gohel, can you speak?

12      Okay.  We're not hearing you.

13      I don't see Mr. Gohel here.

14           THE CLERK:  Let me see.  Oh.  Okay.  I'll need to

15  promote him again.

16           THE COURT:  Mr. Nelson, can you hear me?  Okay.

17  Great.

18      Mr. Gohel, can you speak?

19           MR. GOHEL:  How is this?

20           THE COURT:  Now you're in the well so we can hear you.

21           MR. GOHEL:  Is there an echo, Your Honor?  I can't

22  tell.

23           THE COURT:  Not too bad.

24      All right.  You may conduct your cross.

25           MR. GOHEL:  Thank you.
```

1    <u>**CROSS-EXAMINATION**</u>

2    **BY MR. GOHEL:**

3    **Q.**    Mr. Scheetz, good afternoon.   I am --

4    **A.**    Good afternoon, sir.

5    **Q.**    My name is Jai Gohel.   Myself along with attorney Richard

6    Novak represent Jonathan Nelson.   You see him seated here, in

7    custody, to my right.

8         What I wanted to do, sir, is sort of hit two areas.   I

9    doubt I'll get to them both today.   But the first area that

10   I -- just as a roadmap, I wanted to sort of expand upon or

11   drill down on some of the -- you know, you used the term

12   "compare and contrast" quite a bit in your process, your

13   methodology, in particular when you confirm the reliability of

14   some of the sources.   So I want to stick to sort of the sources

15   or the inputs of information that you use to ultimately

16   formulate your opinions, and I want to get a little more

17   details about that.   So that's the area I'm going to address

18   first.

19        First of all, I know that your CV says that you've had

20   training as an intelligence analyst and -- from the ATF;

21   correct?

22   **A.**    As well as DEA, yes, sir.

23   **Q.**    Okay.   Does that training -- and my understanding is that

24   there is both sort of school or class studies from those

25   agencies, and there is also some field training that you've

**SCHEETZ - CROSS / GOHEL**

1  done; correct?

2  **A.**   Yes, sir.

3  **Q.**   Okay.  And at some point, I think around 2006, you started

4  to focus on OMGs; is that correct?

5  **A.**   No.  In 2006 I actually switched job fields within the

6  ATF.  I went from a critical information specialist to an

7  intelligence research specialist.  Totally different field.

8  **Q.**   Okay.  But, I guess what I'm asking is:  The term "OMGs"

9  which -- means "outlaw motorcycle gangs" in law enforcement

10 parlance; correct?

11 **A.**   Yes, sir.

12 **Q.**   Okay.  And without agreeing with that particular

13 characterization, when did you first start -- receive any

14 training or education related to OMGs?

15 **A.**   January 2006.

16 **Q.**   Okay.  So during that time that you -- from the time that

17 you started, let's say the beginning of 2006 until the current

18 date, did you learn any standards, particular standards that

19 you were to apply when analyzing data as it related to OMGs in

20 formulating your opinions?

21 **A.**   Not on OMGs themselves, but on a particular topic there

22 was, and that correlated into OMGs or motorcycle clubs.

23 **Q.**   All right.  So let me put it in application.  So in other

24 words, you applied it, these standards that you learned more

25 generally in your training, to the OMG cases that you were

**SCHEETZ - CROSS / GOHEL**

1  working; correct?

2  **A.**   Correct, sir.  That's how the training is.  It's not one

3  specific topic.  It's what you learn and then you apply it to

4  that field, whatever you're investigating or analyzing.

5  **Q.**   Okay.  So I want to kind of back up.

6       Your testimony last week, you testified in response to one

7  of my colleague's questions that the majority of your

8  intelligence that you get, in other words, the information that

9  you process as it relates to OMGs comes from human sources --

10  for the most part, comes from human sources that are employed

11  by some government agency; correct?

12  **A.**   I wouldn't say they are all employed, no, sir.  I would

13  say that they're employed.  They are also friendly.  They are

14  also waiting.  But they are not always employed.

15  **Q.**   Well, I mean, I don't want to quibble, but you did testify

16  last week that -- let me see if I can quote it.  Just tell me

17  if this is accurate.

18       You were asked:  Would it be fair to say that a vast

19  majority of the information that you get from human sources is

20  from individuals who are employed by some government agency?

21       And your answer was:  I would say most of it, yes, sir.

22  **A.**   Okay.  Then yes, sir.

23  **Q.**   Okay.  So I want to stick on this human source input or

24  information that you obtained that are employed by government

25  agencies.  And that can include things or people like police

SCHEETZ - CROSS / GOHEL

1  officers?

2  A.   Correct.

3  Q.   Members of law enforcement?

4       Including both state and federal?

5  A.   Yes.

6  Q.   Okay.  And also perhaps there are some intelligence

7  agencies that you may obtain -- or people that are employed by

8  intelligence agencies that are not necessarily law enforcement,

9  someone like yourself.  So I'm focusing on those areas.

10      The way I understand what your testimony is, as -- the

11 process in which you begin to vet the information that you

12 receive and sticking to what I call essentially law enforcement

13 or what you call "deemed experts," a lot of times this is

14 initiated by you may become aware of an incident; correct?

15 A.   Correct.

16 Q.   Maybe it involves the Hells Angels and another motorcycle

17 club, at least according to newspaper reports; correct?

18 A.   I don't just focus on the Hells Angels, no, sir.

19 Q.   Okay.  So let's just use -- let's use the example of the

20 Hells Angels.

21      You find out through a Google search that a particular

22 incident of violence that's reported as violence may involve

23 the Hells Angels and it may involve some other motorcycle

24 group.

25      That has happened on numerous occasions; correct?

SCHEETZ - CROSS / GOHEL

```
 1   A.    Yes, sir.
 2   Q.    And I'm not focusing on any particular incident.   I'm
 3   talking about the procedures and the process that you use.
 4         So a lot of times if that is the only information you
 5   have, you will call -- I'm going to call it either a police
 6   officer or an expert -- and I should probably clarify that.
 7         When you say "deemed experts," are these individuals that
 8   are typically employed by law enforcement?   Not always but
 9   typically?
10   A.    Yes, sir.
11   Q.    Okay.   So I'm going to use those terms interchangeably,
12   police officers, deemed experts, someone employed by a
13   government agency in a law enforcement or intelligence
14   capacity.
15         THE COURT:   I think we should clarify what is meant by
16   "deemed experts."   Not every police officer is a deemed -- you
17   mean deemed because they were found in a court of law to be a
18   qualified expert.   Is that what you mean when you say "deemed"?
19         THE WITNESS:   Yes, sir.   Some of the people I speak
20   out to are deemed experts in a federal, state, or court.   Or
21   when I speak to people in Canada, Europe, Australia they are
22   deemed experts by their federal law enforcement agency.
23         But not every person that I speak to in the field is
24   deemed an expert.   They can be just an intelligence asset.
25   They could be part of a gang unit or it could be someone who
```

1   was a first responder to the scene.

2   BY MR. GOHEL:

3   Q.   Okay.  I'm going to follow up a little bit on the judge's

4   questions on deemed experts in a minute.

5        But generally, you reach out to this government agency

6   source, police officer, expert, someone like that, and you

7   reach out to them, is it usually by phone?

8   A.   Yes.

9   Q.   Okay.  And do you have a -- well, sometimes it's also by

10  e-mail; correct?

11  A.   Yes, sir.

12  Q.   Okay.  And do you have a, like, a Rolodex or some sort of

13  database, either personal or agency, that you know who to

14  contact in a given area?

15       And let's use the example, if you're in Washington, D.C.

16  and you hear about an incident in, let's say, the -- you know,

17  the North Bay of the Bay Area, somewhere around Sonoma County.

18  How do you locate the person that you contact if you have read

19  a report, a newspaper report?

20  A.   If I do not have a point of contact for that area, the

21  first person that I reach out to is our field intelligence

22  group within ATF because I always -- I don't -- there are

23  certain areas of the United States that I don't have someone to

24  speak with.  So what's applicable is reaching out to my agency

25  first and a lot of times they have somebody who's either a task

SCHEETZ - CROSS / GOHEL

1  force officer or someone they work alongside in that city.

2  Q.   So if you don't know someone through your work in ATF that

3  you have kept their contact information, you'll reach out to

4  your agency and find someone who can locate a person in the

5  area that the incident occurred; correct?

6  A.   Correct, sir.

7  Q.   And do you know, in your agency, where is that information

8  kept?  Like, for example, who would you reach out to first if

9  it was today?  Is there a particular person?

10 A.   I would reach out to ATF San Francisco.

11 Q.   Okay.  All right.  So it's not centralized in

12 Washington, D.C.  It's whatever the area where there may be a

13 field office near the incident?

14 A.   Correct, sir.

15 Q.   And what if the situation involves, for example, Canada or

16 a foreign country that you're interested in an incident

17 involving what you call OMGs?  How would you reach out to them

18 if there's not an ATF office there?

19 A.   Well, there's going to be no ATF office, excluding one

20 representative in Canada, one representative in Mexico, and one

21 representative in Europe at The Hague.

22      So what I do is I reach out to contacts that I have met

23 since working -- this is 2006.  And if I don't know somebody

24 similar to the example I just used, then I'll reach out to my

25 attaches in Canada, Mexico or my attache at The Hague in the

1    Europol.

2    **Q.**   And then, if you reach out to these individuals,

3    ultimately getting to someone in the area where the incident

4    occurs, do you -- how do you determine that this person has

5    the -- you know, has knowledge about this incident, for

6    example?  How do you know that?

7    **A.**   If they're able to get me a contact, if there's a police

8    report, a police summary, if there was a 9-1-1 call that was

9    made.  Sometimes there is no report and there's nothing -- and

10   that's the way the intelligence wheel works sometimes.  There's

11   areas, events that I know transpired or I have been told, as

12   I've seen in an article, and I just have nothing to validate

13   it.  And that happens, not all the time, but it does happen,

14   where I can't validate it because I don't have that point of

15   contact or any way to acquire a police report or speak to

16   someone who was on the scene.

17   **Q.**   Okay.  If you get a police report or some kind of

18   documentary, electronic evidence about an incident, do you get

19   a copy of that sent to you or -- where is that kept?

20   **A.**   That's stored on my ATF computer.

21   **Q.**   Okay.  And for the incidents, for example, that you've

22   referred to in the -- at the end of your declaration involving

23   the Mongols and the Vagos, have you stored documents or other

24   reports, charging documents, things like that, on your ATF

25   computer that relate to those incidents?

1   A.   Yes, sir.

2   Q.   And have you produced those to the Government?

3   A.   No, sir.

4   Q.   Okay.  And can you produce those to the Government?

5   A.   Yes, sir.

6   Q.   Okay.  Now, I want to broaden this out, moving away from

7   particular incidents.  But, for example, you, I think, from a

8   question from the prosecutor at the beginning earlier, was it

9   last week, he asked you about a hypothetical situation

10  involving street gang members potentially being recruited by

11  OMGs, as you guys call them.

12       And you said that you would reach out to people, you know,

13  depending on where it was, and see if you were seeing those

14  type of trends and confirm it with, I think you said, experts

15  or people that would -- in law enforcement that would have

16  knowledge about those type of patterns and trends; do you

17  remember that?

18  A.   Yes, sir.

19  Q.   Okay.  So let's use that example.  So not a specific

20  incident, but you want to reach out to certain trends or things

21  that you are interested in as an analyst in doing your job.

22       How would you figure out who is the person in an area?

23       So let's say, for example, it involved the Sonoma County

24  Hells Angels, how would you find the person who not just maybe

25  is a reporting police officer or someone who investigated the

1    particular incident, but someone who has expertise in that

2    area?

3    A.    I would -- I would reach out to -- if I don't have anybody

4    in Sonoma, that area, I would reach out to somebody maybe in

5    Bakersfield, Fresno, maybe Stockton, to see if they know

6    anybody in the law enforcement community who is familiar with

7    this new trend and pattern.

8    Q.    Okay.  And I'll get back to that in a second, but is it

9    also fair to say, according to your declaration, I believe,

10   that you find people with expertise in certain areas of the

11   country, certain geographies of the United States and outside

12   of the United States at some of these conferences and

13   presentations that you give?

14   A.    That's correct, sir.  Yes.

15   Q.    And one of those -- one of the groups that sponsored these

16   conferences and presentations that you referred to in your

17   declaration is -- I think it's called the International Outlaw

18   Motorcycle Gang Investigators; is that correct?

19   A.    Association, yes, sir.

20   Q.    And you're a member of that; are you not?

21   A.    Yes, sir.

22   Q.    I think the acronym is IOMGIA.  Correct?

23   A.    Yes, sir.

24   Q.    Are you an officer in that particular organization?

25   A.    I'm not an officer, but I'm a training coordinator.

**SCHEETZ - CROSS / GOHEL**

1    Q.    Okay.  And these -- and that is -- is it fair to say that

2    that is a pretty good clearinghouse, in your experience since

3    2006, for you to find people and locate people who maybe have

4    some level of expertise in OMGs?  Is that a good place to find

5    them?

6    A.    Expertise -- sorry.  Either expertise or knowledge, yes.

7    Q.    Okay.  And you share information at these conferences;

8    correct?

9    A.    Often, yes, sir.

10    Q.    Okay.  And these conferences, they are not open to the

11    public, are they?

12         In other words, I, as a criminal defense lawyer or just a

13    member of the public, if I'm interested in this, I can't just

14    walk in and go to these conferences; correct?

15    A.    No, sir.

16    Q.    In fact, you have to be either a member of law enforcement

17    or you have to be cleared, essentially, by the IOMGIA to attend

18    the meetings; correct?

19    A.    Yes.  But we -- for this year's conference, we do have an

20    attorneys' portion.

21    Q.    And that attorneys' portion is separate from where the

22    police officers and gang experts are --

23    A.    They are actually -- it's a one-day symposium within the

24    conference.  But those same attorneys can attend the four days

25    of training as well.

SCHEETZ - CROSS / GOHEL

1   Q.   Okay.  And are these defense attorneys or prosecutors?

2   A.   I don't believe so.  I'm not sure, sir.

3   Q.   They're prosecutors; right?

4   A.   I believe so.  Yes, sir.

5   Q.   So you were asked a question earlier if you understood

6   what the term "group think" was.  And I think your response, to

7   be fair, was you didn't know what that meant; correct?

8   A.   Correct.

9   Q.   But it is fair to say that at these -- I'm using the

10  example of the IOMGIA.  These meetings, you're basically with a

11  bunch of other -- I'll try and be -- a little colloquial term,

12  but a lot of gang cops and agents who may have been qualified

13  as experts in their area to give opinions about what you folks

14  call outlaw motorcycle gangs?

15  A.   Yes, sir.

16  Q.   I mean, for example, when someone -- when the term "OMG"

17  or "outlaw motorcycle gang" is used that's the term everyone

18  uses at those conferences; correct?

19  A.   No, not everybody, sir?

20  Q.   Well, they don't say "the Hells Angels Motorcycle Club" or

21  "the Outlaws Motorcycle Club" or "this group of motorcycle

22  enthusiasts;" correct?

23  A.   The Canadians do, yes.  They say "motorcycle club."

24  Q.   Okay.  But it's fair to say that you're kind of -- at

25  these conferences, you're -- you are sharing information with

SCHEETZ - CROSS / GOHEL

1  people who are like-minded in terms of their mind-set with

2  respect, for example, to the Hells Angels; correct?

3  A.   No, sir, because we have a lot of people that are brand

4  new.  And we bring a lot of different opinions to the table and

5  there is talk about what they are seeing in the area, and if

6  they are deemed a gang in their state or in their country, so

7  not everybody has the same exact opinion.

8  Q.   Okay.  But it's fair to say, I mean, if you were to take a

9  poll it's probably fair to say that maybe less than 10 percent

10  of the gang investigators and what you call "deemed experts"

11  that are at those conferences that only law enforcement are

12  invited to, probably less than 10 percent would agree with the

13  Hells Angels that they are a motorcycle club and not a

14  motorcycle -- outlaw motorcycle gang; correct?

15  A.   I cannot say that, sir.  Because I can give you an example

16  that I think at least 15 percent of our last conference those

17  people come from Canada alone.  So they are -- I can't give

18  that number.  I don't know the percentage.

19  Q.   Okay.

20  A.   I never talked to anybody, never asked anybody

21  specifically what you just asked.

22  Q.   Okay.  But it's fair to say that this well of information,

23  these -- of human sources, these other "deemed experts" as you

24  call them or gang investigators, outlaw motorcycle gang

25  investigators, they are -- they tend to work in law enforcement

1    and work on prosecution of cases; correct?

2    A.    Not everybody, no, sir.

3    Q.    Are there any reports or information -- for example, I

4    know that there are PowerPoints that are often displayed as

5    part of presentations that are given; correct?

6    A.    Correct.

7    Q.    And those PowerPoints, are they given out, for example,

8    just -- because it sounds like oftentimes the way you, you

9    know -- you convert your notes into, for example, PowerPoints;

10   correct?

11   A.    I do sometimes, yes, sir.

12   Q.    And that's often what other gang investigators do,

13   especially those that testify in court; correct?

14   A.    I do not know, sir, how they do it.

15   Q.    Okay.  But, are copies made available, either on disks or

16   thumb drives or DropBox or some other way, are they shared

17   between people who attend, for example, the IOMGIA meetings?

18   A.    No, sir.

19   Q.    Okay.  And are there any overall reports or a curriculum

20   of materials that are given at these conferences to people who

21   attend?

22   A.    The curriculum with each class is given to each attendee,

23   but the actual PowerPoint is only -- it's not handed out to

24   everybody.  That's at the discretion of the presenter, and if

25   he wants to give that out separately, that's up to him.

SCHEETZ - CROSS / GOHEL

1   Q.    Okay.  And you said that there are sometimes contrary

2   opinions that are -- people have differing opinions about

3   certain aspects of OMGs at these conferences; correct?

4   A.    That's correct, sir.

5   Q.    I think my colleague was asking about this Chris Omodt who

6   was the agent working on Mr. Matter's case in Minnesota.  If he

7   had the opinion that a lot of law enforcement has the meaning

8   of Filthy Few wrong, have you -- have you heard those kind of

9   dialogues going on at these conference?

10  A.    Yes.  We have talked about that.  As I reiterated before,

11  it was the perception of that they kill for the club, is what

12  he said.  But we do talk about that because certain countries,

13  it's on charter autonomy and certain charters don't even wear

14  it, and certain ways that you can earn it as well, and we do

15  discuss that.

16  Q.    Okay.  Are there ever any persons at these conferences

17  that are, for example, social scientists or psychologists,

18  sociologists who may describe -- maybe not from a law

19  enforcement perspective, but maybe from the perspective of:

20  Hey, there's a reason that these groups, such as the

21  Hells Angels, these men get together that may not be criminal,

22  that may be related to their social status, their family

23  status, that may be related to other things.

24        Are there any people at these conferences that give those

25  kinds of opinions that --

SCHEETZ - CROSS / GOHEL

1    A.    I apologize.

2    Q.    -- that emphasize, for example -- that, for example,

3    emphasize the legal aspect, the motorcycling aspect, or the

4    brotherhood aspect of the Hells Angels at these conferences?

5          Is that opinion voiced at these conferences that you

6    attend to find the data and the materials upon which, in part,

7    you base your opinions?

8    A.    As the occupations you just noted, no.

9    Q.    Okay.  So going to -- let's say you have now gone to a

10   conference and you found that there is a really good expert, at

11   least you believe may be a good expert, and you want to find

12   out information, for example, about the Sonoma County

13   Hells Angels.

14         And how would you vet, how would you determine that this

15   individual has the proper training, experience to be a source

16   of information for you?

17         What is the process that you go about to determine whether

18   this particular -- and I'll use the example of, let's say, a

19   gang police officer with, you know, let's use 20 years of

20   experience, many years investigating OMGs -- again, your

21   term -- and who has been qualified by at least one court, local

22   court, state court, as an expert.

23         How would you go about checking his credentials -- his or

24   her credentials?  What kind of materials would you obtain?

25   A.    I wouldn't obtain any materials.  During our

SCHEETZ - CROSS / GOHEL

1  conversations, we might discuss -- because there's people that

2  I've met before that have testified in not just Hells Angels

3  but other motorcycle clubs in OMG cases.  And usually, if

4  somebody says they testified in court and they're deemed an

5  expert, I validate what they have to say -- I mean, I evaluate

6  what they have to say.

7      But I don't first -- my first question to them is:  Are

8  you an expert in court?  [sic]

9      There's many people that I talk to that are just in gang

10  units, who really don't know much about outlaw motorcycle gangs

11  or motorcycle clubs, but they can provide information on who is

12  a charter member, on who wears certain tags, tabs, or flash, or

13  certain prospects, certain new people, or certain new trends

14  and patterns.  They just don't know the totality of working

15  OMGs or motorcycle clubs.

16  Q.  So let's use the example of someone who you say has been

17  deemed an expert.  I mean, do you check and see:  Well, was it

18  state court or federal court?

19      Do you have a way that you check that?

20  A.  No, sir.

21  Q.  When you collect this information, let's say you have a

22  roster of, you know, in last 14 or so years that you have been

23  going to these conferences or just through your inquiries that

24  you make related to incidents, do you have a list -- an ongoing

25  list of what I'm going to call law enforcement OMG experts

1    and/or investigators that you go to in different areas, like a

2    database or Rolodex of these individuals?

3    **A.**    No, sir.  I just know from working these guys for so long

4    and from the totally of all these motorcycle clubs, if I get a

5    phone call asking for a certain club or somebody calls me from,

6    say, NCIS or FBI and says, do you know somebody who can

7    testify, and yadda-yadda-yadda.  I might know somebody who has

8    testified and been deemed an expert or I pick up the phone and

9    call certain people who might know.

10        I have no Rolodex or keep track of anybody that is an

11   expert on a particular gang, other than the people I talk to on

12   a daily basis who I know their qualifications.

13   **Q.**    If you're seeking, you know, reaching out, for example,

14   about this idea that there are street gangs that are being

15   recruited by certain OMGs -- this is a hypothetical that

16   the Government the prosecutor gave you -- how do you determine

17   that, you know, let's say you find someone that you think might

18   be good, how do you determine that this person has, you know,

19   what information that they are relying upon to advise you, what

20   do you do to confirm that they actually know what they are

21   talking about?

22   **A.**    For the most part, if it's dealing with street gangs, a

23   lot of times they are able to provide tattoos of an individual

24   who was previously in a street gang, which deems his or

25   verifies his membership within that street gang.  And then we

1    make that applicable to the fact that he is now wearing some

2    type of indicia that he is a member of an OMG or motorcycle

3    club.

4         I know some states classify or document some of their

5    street gang members and they might have some documentation.

6    They might have handed me information through a debriefing.

7         Or if somebody self-admitted.  They said, "Oh, I know that

8    individual before," and they self-admit it to being a member of

9    a street gang and now we see them wearing some type of indicia

10   that puts them in an outlaw motorcycle gang or motorcycle club.

11   Q.   Okay.  So -- and that information is shared and you store

12   that information in somewhere; correct?

13   A.   Yes, sir.

14   Q.   Okay.  And that will be on your computer or you'll have

15   access to that information, something that you can turn over to

16   the Government; correct?

17   A.   A lot of it is source information or it's information that

18   we're utilizing for investigations right now.  But I did turn

19   over my -- I did turn over a report that I documented or

20   authored, I believe that was 2016, that outlines a growing

21   trend and pattern.

22   Q.   Okay.  Let's --

23        THE COURT:  Let me ask a question, Mr. Gohel.

24        Let me explore that further with you.  I think Mr. Gohel's

25   question is:  Somebody gives you information about street gang,

1    members being recruited.  You get this information from one of

2    these experts that you talk to.  Do you then ask for documents

3    to verify, do you then talk to other experts to verify, or do

4    you just believe the person?

5         I think the question is:  How do you know what that person

6    is telling you is reliable?

7         Do you then say:  Let me see some of the police reports?

8         Or what do you do?

9         THE WITNESS:  Yes, Your Honor.  I -- particularly with

10   street gangs, I look for some type of tattoo.  If there is a

11   tattoo deeming them a member or a former member of a street

12   gang, if there is some documentation where they said, "Hey, I

13   have spoken to this individual several times" -- by a street

14   gang member, yadda, yadda, then I utilize that information.  If

15   it's information that he can't validate or turn over, then I'm

16   not putting that in my report.

17        THE COURT:  So if that expert tells you "I have spoken

18   to members and that's how I got this information, former

19   members," or "I have seen it with my own eyes," is that

20   generally good enough for you to rely on that person?

21        THE WITNESS:  Yes, but I would -- yes, Your Honor.  I

22   would still like a picture of the individual to compare and

23   contrast.

24        THE COURT:  Okay.  Thank you.

25   \\\

1  BY MR. GOHEL:

2  Q.   So let's use an example of where it's not the -- let's not

3  use the street gang example, or let's not use an example where

4  something is visible, like a tattoo, or something you can

5  personally observe or someone else can personally observe.

6      A lot of the information in your declaration, for example,

7  some of the meanings that you attach to certain symbols, for

8  example, Filthy Few, the "Dequiallo" patch, these are things

9  that are not visible; is that fair to say?  The patch may be,

10 but the meaning is not visible.

11 A.   No.  The meaning, no, sir.

12 Q.   And it's fair to say that information like that -- it is

13 your opinion or at least it is your -- in your declaration

14 opinion that the criminal activity that the Hells Angels that

15 you claim that they may be involved in is not typically

16 discussed in the open, just out to the public; correct?

17 A.   No.  It's not discussed, sir.

18 Q.   Okay.  And so it's fair to say that information related to

19 meanings of certain symbols that you've given in this case, and

20 alleged criminal activity, that information would need to come

21 from someone on the inside of the Hells Angels; in other words,

22 a member, a prospect, or some sort of associate.  Correct?

23 A.   Yes.  Or somebody who's done an infiltration into an

24 adversarial OMG on behalf of ATF.

25 Q.   Okay.  Well, that brings up a good point because it is

**SCHEETZ - CROSS / GOHEL**

1  true, and I believe that was your testimony last week, that

2  there has never been an actual law enforcement officer who has

3  infiltrated the Hells Angels Motorcycle Club; correct?

4  **A.**   I don't believe so.  I'm not sure, sir.

5  **Q.**   Okay.  Well, you certainly can't think of any right now;

6  correct?

7  **A.**   Not that I'm aware of, no, sir.

8  **Q.**   Okay.  So it's fair to say that a lot of this inside

9  information -- I'm referring to things that are not visible:

10  Meanings of symbols, desires to, for example, expand territory,

11  using violence, some of the opinions that you've given in

12  this -- in your declaration, these are things that necessarily

13  some of these deemed experts and/or gang officers would need to

14  be relying upon what I'm going to call "informants," because

15  they are individuals who are giving information; correct?

16  **A.**   Correct.

17  **Q.**   Correct?  So when I use the term "informant," I'm not

18  using a legal term.  I'm using a term that means individuals

19  who are on the inside in some fashion of a motorcycle club --

20  an OMG, as you call it -- who are providing information to law

21  enforcement.

22      So do we understand that term "informant"?

23  **A.**   Yes.  It doesn't have to be on the inside.  It could be

24  someone who's very close friends with the club.

25  **Q.**   Okay.  Well, all right.  We'll get to that.

1      So when you -- let's say you've found an expert, someone

2   who has been deemed expert, and they give you information about

3   a meaning, for example, the Filthy Few.

4      And they say:  Oh, that means, whatever the opinion is,

5   that it means they have committed a murder or an act of

6   violence and -- for the Hells Angels and were awarded this

7   patch, and the opinions that you give in your declaration.

8      Because that information would necessarily come from an

9   informant, do you ask these officers:  Who did you talk to?

10  Who was the person that gave you that information?  How do you

11  know that?

12     Do you ask them that?

13  **A.**   Yes.

14  **Q.**   Okay.  And do you ask them if they personally interviewed

15  informants to obtain that information?

16  **A.**   Sometimes, yes.

17  **Q.**   Okay.  And do you keep track of which informants that

18  particular gang -- or gang experts who you rely on their

19  information, do you keep track of who they have interviewed?

20  **A.**   No, sir.

21  **Q.**   Okay.  So you're an intelligence -- I'm sorry if I -- it's

22  a complicated term.

23  **A.**   It's okay.

24  **Q.**   Can we just call you an intelligence analyst?

25  **A.**   Yes.  Yes.

SCHEETZ - CROSS / GOHEL

1   Q.   You're an intelligence analyst.  You write lots of

2   reports; correct?

3   A.   Correct.

4   Q.   You write reports, for example, about ex-military members

5   or government contractors who become members of what you call

6   outlaw motorcycle gangs; correct?

7   A.   Yes.

8   Q.   And these will be -- can be 40, 50, 60 pages long;

9   correct?

10  A.   Yes.

11  Q.   They give great details about times and dates; correct?

12  A.   Correct.

13  Q.   And they give photographs of individuals' faces and some

14  of the motorcycle gear that they wear, correct, including

15  patches?

16  A.   Correct.

17  Q.   And you are an analyst who is trying to obtain information

18  from all over the world -- mainly the United States, but all

19  over the world about what you consider to be essentially a

20  secret organization; correct?

21  A.   It's not mainly United States, sir.  I work just as much

22  United States as I do across the globe.

23  Q.   Okay.  So even more to my point, you have a vast amount of

24  data that you need to keep track of that you need to be able to

25  access relatively quickly; correct?

**SCHEETZ - CROSS / GOHEL**

1  **A.**    At times.

2  **Q.**    Okay.  And so if an officer in the -- a gang expert in

3  Northern California tells you that there is information about

4  the meaning of a particular symbol that he derived from -- that

5  could only be derived from someone on the inside, an informant,

6  do you document that in any way so that you can go and verify

7  who that person is that he relied upon?

8  **A.**    Rarely.  No, sir.

9  **Q.**    Okay.  Do you ask this particular gang officer or expert

10  on OMGs:  Well, how do you know that that information that you

11  got is accurate?  Like, what are you basing your opinion on?

12      Do you ask them that?

13  **A.**    No, sir.  I don't ask them.

14  **Q.**    So you basically -- is it fair to say -- and I don't want

15  to put words in your mouth.

16      Is it fair to say that if they have been deemed an expert

17  you will give them, essentially -- you will give them the

18  status of an expert in your eyes, that their -- information

19  they're giving you is reliable?

20  **A.**    No, because I don't just come out and ask certain gang

21  cops or certain gang experts -- I don't always just -- first

22  thing I don't do, I don't pick up the phone and say:  Hey, can

23  you tell me about the Filthy Few?

24      It's usually a relationship that I have either come in

25  contact with when I took the job in 2006 or someone that I've

1  worked with for a while.  And they've -- it's not just somebody

2  who we didn't know.  It's someone who's maybe worked in

3  investigation.  We've seen through their work in investigations

4  that they've learned what some of these tags, tabs, and flash

5  mean.

6      It's not somebody -- if somebody -- I don't just pick up

7  the phone and call somebody and say:  Hey, why is that guy

8  wearing a Filthy Few?  Why is that guy doing that?

9      I don't ever do that.  I also never ask who their sources

10 are.  That's none of my business.  That's not my role in intel.

11 My role is to verify and after a while, you know, start talking

12 to some people and figure out if they're valid or not.

13     And I'm not going to lie.  I've talked to people and I've

14 said:  Hey, the information from your source of information is

15 not what I've seen.

16     But I keep that in the back of my head or whatever.  Just

17 say:  Hey, look.  That's not been put out there.  But that's

18 not what I'm seeing.  I'm not saying it's deemed right, wrong,

19 or indifferent.

20     But there's certain people -- I don't call everybody an

21 expert.  There's many people -- and like I said, I deem them an

22 expert because they've been deemed an expert by the state and

23 federal court.  And from there, I know their information is

24 valid and it's been validated.

25     If they're working an ATF or an FBI or a state or local

1  investigation and they ask me for assistance to provide

2  intelligence, oftentimes they will say to me:  Hey, this is my

3  source of information, my CI, or whatever has been noted by the

4  Court.

5  **Q.**   So let me jump to that.  This idea they have been deemed

6  experts, you said that -- you mean that some court of some

7  jurisdiction has deemed them an expert; correct?

8  **A.**   In the United States, yes, sir.

9  **Q.**   And then do you inquire exactly -- for example, if it's a

10  Hells Angels -- information you need on the Hells Angels, do

11  you find out if this individual has been deemed an expert on

12  gangs generally, outlaw motorcycle gangs as you call them, or

13  the Hells Angels?  Do you make a determination; is there a

14  distinction that you make between those three?

15  **A.**   I don't make it, but I know many of the investigations

16  that they've testified in, if it be a Bandidos, Hells Angels,

17  Vagos, and I know if they have been deemed experts.

18  **Q.**   Okay.  So you know the cases that they have been

19  testifying in.  That's a good point.

20      You obtain transcripts, their sworn testimony at, for

21  example, preliminary hearings in state court or grand jury

22  proceedings or trials; correct?

23  **A.**   No, I don't get their transcripts.

24  **Q.**   Okay.  Because it's in the transcripts that would be

25  probably the best source of information to find out whether, in

1    fact, the Court had deemed them an expert; right?

2    **A.**    I take their word for it.   I know they are not lying to

3    me.

4    **Q.**    Okay.   So when they say "I'm an expert.   I'm a deemed

5    expert," or whatever the term they use, you take their word

6    that they have been -- they have been -- a court in some

7    jurisdiction has declared that they are experts on the Hells

8    Angels Motorcycle Club?

9    **A.**    No.   It's not simple.   I know who -- I know what cases are

10   going on at the time and I know who is going to testify.   And

11   usually it comes out through a phone call someone say, "Hey, I

12   was deemed an expert.   If you need anything else or something

13   comes up down the road," you know.   And I would say yadda,

14   yadda.   "But if you need something down the road, you need an

15   expert for state court, I have been deemed an expert in state

16   court."

17       I'm sure there is other experts that are out there that I

18   just don't know who's testified, but through the group and

19   channels that I speak with or the conglomerate of people that I

20   speak with, I know who has been deemed an expert, at least in

21   the United States, on certain OMGs.

22   **Q.**    And so because it sounds like a vast amount of information

23   that you have to process just in the ability of gang officers

24   and/or experts related to OMGs, you must keep track of this

25   somewhere; don't you?

1   **A.**    Yeah, in my head.

2   **Q.**    Okay.  So all of these experts, what cases they worked on;

3   what jurisdictions they worked in; what motorcycle club that

4   they have expertise in; whether or not they have been deemed

5   experts in state or federal court or a foreign court, you keep

6   all that information in your head; is that correct?

7   **A.**    The united States ones, yes, sir.

8   **Q.**    Okay.

9             **THE COURT:**  How many -- may I ask how many such

10  experts do you have in your head?  Are there 5 of them, 10 of

11  them?

12            **THE WITNESS:**  Right now in the United States, since

13  attrition, a lot of people are retiring, there is probably 10

14  to 15 experts in the United States that can testify.  And

15  that's on a vast majority -- some are just on one particular

16  OMG for the most part.

17            **THE COURT:**  There are 10 to 15 experts on OMGs?

18            **THE WITNESS:**  On particular OMGs, yes, Your Honor.

19            **THE COURT:**  How about on the Hells Angels?

20            **THE WITNESS:**  I would probably say, that are actually

21  working right now, I would say three to four.

22            **THE COURT:**  And we're getting some feedback.  Do you

23  have any idea what it is?  Why don't you mute Mr. Gohel's, and

24  see if that does it.  There's some kind of distortion here.

25        Let me ask, did you say -- was the gist of your testimony

SCHEETZ - CROSS / GOHEL

1    that you -- that experts sort of develop a track record in your

2    head that you just don't go to them for one thing, that when

3    you go to them you have developed some confidence in what they

4    have told you before and there are some people that you sort of

5    don't give much weight to because they haven't been reliable;

6    is that what you're saying?

7              THE WITNESS:  Yes.  Yes, Your Honor.  There are some

8    people that I have spoken to that I didn't know that were

9    actually working outlaw motorcycle gangs or motorcycle clubs

10   who have a vast knowledge of these clubs or groups.  And then

11   there is some people I talk to who not all their information I

12   take because I have learned through other channels that their

13   information might not be valid.

14             THE COURT:  Okay.

15        All right.  It's about 12:30.  I don't know if you have a

16   couple more minutes but -- we're actually past, but I wanted to

17   give the full three hours today.  So why don't you -- I'll give

18   you another five minutes.

19             MR. GOHEL:  Yeah, it is me somehow.  I'm trying to

20   stay still.

21   Q.   These three or four experts that are working now, who are

22   these individuals?

23   A.   On is John Ciccone.  He is with ATF Los Angeles.

24   Q.   He was involved in the Laughlin case; correct?

25   A.   I believe so, yes, sir.

SCHEETZ - CROSS / GOHEL

1   **Q.**   He was involved in Black Biscuit; correct?

2   **A.**   Black Meringue.

3   **Q.**   Okay.  ATF out of Los Angeles and who else?

4   **A.**   There is Douglas Pearson, he is an ATF task force officer

5   out of ATF Denver.

6   **Q.**   Okay.  Who else?

7   **A.**   There is Robert Belcher.  He is Seattle police department.

8   **Q.**   And who else?

9   **A.**   Cal Raley.  He is out of South Carolina, law enforcement

10  division.  I think it's called SLED.

11  **Q.**   Okay.  Is that all you can think of right now?

12  **A.**   There is several retired or former ATF agents that were

13  deemed experts who still testify right now, but they are no

14  longer on the job.

15          **THE COURT:**  Your mic -- now your mic is not working.

16          **MR. GOHEL:**  Can you hear me?

17          **THE COURT:**  Yeah.

18          **THE WITNESS:**  One is Darren Koslowski.  He is out of

19  ATF Los Angeles as well.

20  **BY MR. GOHEL:**

21  **Q.**   Okay.  Who else?

22  **A.**   Jeff Grabman, who is currently an ATF special agent.  I

23  forgot about him.  He is an expert in court.

24  **Q.**   Okay.

25  **A.**   Daniel Ozbolt.

1   Q.   And that's an individual that infiltrated one of the

2   motorcycle clubs, not the Hells Angels?

3   A.   No, he did the Outlaws.  None of those guys have

4   infiltrated the Hells Angels.  They have only Mongols,

5   Warlocks, Outlaws, Vagos.

6   Q.   And you didn't mention, but have in previous testimony,

7   Jorge Gil Blanco?

8   A.   Yes, but he is retired.  He doesn't testify anymore.

9   Q.   Okay.  So speaking of Mr. Gil Blanco -- actually, withdraw

10  that.

11       In general terms --

12                      (Audio interruption.)

13       THE COURT:  You're totally distorting.

14       MR. GOHEL:  I'm not really sure, Your Honor.  Maybe

15  this might be a good time to stop.

16       THE COURT:  Yeah.  Why don't we do that.

17  It's 12:30.  So we have another session.

18  Is it Friday, Angie?

19       THE CLERK:  Yes, Your Honor.  Friday at 1:00 p.m.

20       THE COURT:  How much longer do you think you're going

21  to have, Mr. Gohel?

22       MR. GOHEL:  Honor, I wouldn't say I have more than

23  60 minutes.

24       THE COURT:  I would really like to conclude by Friday.

25  I don't know how much more ground the other three or other four

**SCHEETZ - CROSS / GOHEL**

1  attorneys are going to have.

2      Do you have any idea?

3          **MR. GOHEL:**  Your Honor, I don't want to speak for

4  them, but I do believe everyone's is shorter, significantly

5  shorter, but I don't --

6          **THE COURT:**  I'm going to remind the parties, again, we

7  are looking at *Daubert* and issues of reliability foremost.  So

8  I would like to get to the heart of these matters and keep this

9  focused.

10      So we'll be back -- is it 1:00, Angie?

11          **THE CLERK:**  Your Honor, it is.

12          **THE COURT:**  All right.  We should gather beforehand

13  and make sure our equipment is working properly.  We should

14  probably get here at least 45 minutes before and test

15  everything out.

16      And you might want to try a new microphone and headset or

17  something.  There is something distorting that.

18      All right.  So we'll adjourn for the day and reconvene on

19  Friday.  Thank you.

20          **THE CLERK:**  Court is adjourned.

21          (Proceedings adjourned at 12:31 p.m.)

22                  ---o0o---

23

24

25

1

2                     <u>**CERTIFICATE OF REPORTER**</u>

3              I certify that the foregoing is a correct transcript

4     from the record of proceedings in the above-entitled matter.

5

6     DATE:    Wednesday, August 26, 2020

7

8

9

10    _____

11           Ruth Levine Ekhaus, RDR, FCRR, CSR No. 12219
                  Official Reporter, U.S. District Court
12

13

14

15

16

17

18

19

20

21

22

23

24

25

Volume 3

Pages 245 - 409

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

UNITED STATES OF AMERICA,       )
                                )
          Plaintiff,            )
                                )
  VS.                           )        NO. CR 17-00533 EMC
                                )
JONATHAN JOSEPH NELSON,         )
et al.,                         )
                                )
          Defendants.           )
_____)


                        San Francisco, California
                        Friday, August 28, 2020

  **TRANSCRIPT OF HYBRID IN-PERSON/VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES:**

For the Plaintiff:      DAVID L. ANDERSON
                        United States Attorney
                        450 Golden Gate Avenue, 11th Floor
                        San Francisco, California 94102
                BY:  **AJAY K. KRISHNAMURTHY**
                     **KEVIN J. BARRY**
                     **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant Jonathan Joseph Nelson:
                        LAW OFFICE OF JAI M. GOHEL
                        819 Eddy Street
                        San Francisco, California 94109
                BY:  **JAI M. GOHEL, ATTORNEY AT LAW**


        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


Reported Remotely By:  Ana M. Dub, RMR, RDR, CRR, CCRR, CRG
                       CSR No. 7445, Official U.S. Reporter

1   **APPEARANCES:**   (CONTINUED)

2   For Defendant Raymond Michael Foakes:
                        GEORGE BOISSEAU LAW OFFICE
3                       740 4th Street, Second Floor
                        Santa Rosa, California 95404
4              BY:  **GEORGE C. BOISSEAU, ATTORNEY AT LAW**

5   For Defendant Russell Allen Lyles, Jr.:
                        LAW OFFICES OF MICHAEL CLOUGH
6                       6114 La Salle Avenue, Suite 833
                        Oakland, California 94611-2802
7              BY:  **MICHAEL W. CLOUGH, ATTORNEY AT LAW**

8   For Defendant Jeremy Daniel Greer:
                        LAW OFFICE OF RANDY SUE POLLOCK
9                       286 Santa Clara Avenue
                        Oakland, California 94610-2624
10             BY:  **RANDY SUE POLLOCK, ATTORNEY AT LAW**

11  For Defendant Brian Wayne Wendt:
                        LAW OFFICES OF JOHN T. PHILIPSBORN
12                      507 Polk Street, Suite 350
                        San Francisco, California 94102-3339
13             BY:  **JOHN T. PHILIPSBORN, ATTORNEY AT LAW**

14                      LAW OFFICES OF MARTIN A. SABELLI
                        740 Noe Street
15                      San Francisco, California 94114-2923
               BY:  **MARTIN A. SABELLI, ATTORNEY AT LAW**

16

17  For Defendant Russell Taylor Ott:
                        LAW OFFICE OF ROBERT WAGGENER
18                      214 Duboce Avenue
                        San Francisco, California 94103-1008
19             BY:  **ROBERT F. WAGGENER, ATTORNEY AT LAW**

20                      LAW OFFICE OF MARCIA MORRISSEY
                        11400 W. Olympic Boulevard, Suite 1500
21                      Los Angeles, California 90064-1543
               BY:  **MARCIA A. MORRISSEY, ATTORNEY AT LAW**

22

23          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

24

25

```
 1   APPEARANCES:   (CONTINUED)

 2   For Defendant Christopher Ranieri:
                         LAW OFFICE OF JOHN G. WALSH, P.C.
 3                       63 Atlantic Avenue, Third Floor
                         Boston, Massachusetts 02110
 4                  BY:  JOHN G. WALSH, ATTORNEY AT LAW

 5   For Defendant Damien David Cesena:
                         DURIE TANGRI LLP
 6                       217 Liedesdorff Street
                         San Francisco, California 94111
 7                  BY:  GALIA Z. AMRAM, ATTORNEY AT LAW
                         ENEDA HOXHA, ATTORNEY AT LAW
 8

 9   For Defendant Brian Burke:
                         LAW OFFICE OF ERIK BABCOCK
10                       717 Washington Street, Second Floor
                         Oakland, California 94607
11                  BY:  ERIK G. BABCOCK, ATTORNEY AT LAW

12
     For Defendant David Salvatore Diaz:
13                       LAW OFFICES OF JAMES S. THOMSON
                         732 Addison Street, Suite A
14                       Berkeley, California 94710-1908
                    BY:  JAMES S. THOMSON, ATTORNEY AT LAW
15

16   For Defendant Merl Frederick Hefferman:
                         LAW OFFICES OF JAMES BUSTAMANTE
17                       1000 Brannan Street, Suite 488
                         San Francisco, California 94103
18                  BY:  JAMES A. BUSTAMANTE, ATTORNEY AT LAW

19

20

21

22

23

24

25
```

<pre>
 1                        I N D E X

 2

 3   Friday, August 28, 2020 - Volume 3

 4

     GOVERNMENT'S WITNESSES                         PAGE   VOL.
 5

 6   SCHEETZ, JEREMY (RECALLED)
     (PREVIOUSLY SWORN)                              253    3
 7   Cross-Examination resumed by Mr. Gohel          253    3
     Cross-Examination by Ms. Hoxha                  287    3
 8   Cross-Examination by Ms. Morrissey              294    3
     Cross-Examination by Mr. Walsh                  310    3
 9   Redirect Examination by Mr. Krishnamurthy       319    3
     Redirect Examination by Mr. Barry               341    3
10   Recross-Examination by Mr. Philipsborn          360    3
     Recross-Examination by Mr. Sabelli              376    3
11   Recross-Examination by Ms. Amram                386    3
     Recross-Examination by Ms. Morrissey            392    3
12

13                      E X H I B I T S

14

     GOVERNMENT'S EXHIBITS                 IDEN   EVID   VOL.
15

16      1                                         406    3

17      2                                         406    3

18      3                                         406    3

19      4                                         406    3

20      5                                         406    3

21      6                                         406    3

22      7                                         406    3

23      8                                         406    3

24      9                                         406    3

25     10                                         406    3
</pre>

**I N D E X**

**E X H I B I T S**

| GOVERNMENT'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 11 | | 406 | 3 |
| 12 | | 406 | 3 |
| 13 | | 406 | 3 |
| 14 | | 406 | 3 |
| 15 | | 406 | 3 |
| 16 | | 406 | 3 |
| 17 | | 406 | 3 |
| 18 | | 406 | 3 |
| 19 | | 406 | 3 |
| 20 | | 406 | 3 |
| 21 | | 406 | 3 |

**E X H I B I T S**

| DEFENDANTS' EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 22 | | 290 | 3 |
| 23 | | 291 | 3 |

```
 1   Friday - August 28, 2020                    1:00 p.m.

 2                    P R O C E E D I N G S

 3                       ---o0o---

 4        THE CLERK:  Court is now in session.  The

 5   Honorable Edward M. Chen is presiding.

 6        Calling Criminal Action 17-533, United States of America

 7   versus Jonathan Nelson, Raymond Foakes, Russell Lyles, Jeremy

 8   Greer, Brian Wendt, Russell Ott, Christopher Ranieri, Damien

 9   Cesena, Brian Burke, David Diaz, and Merl Hefferman.

10        Counsel, please state your appearances for the record,

11   beginning with the Government.

12        MR. KRISHNAMURTHY:  Good afternoon.

13   Ajay Krishnamurthy and Kevin Barry for the United States.

14        THE COURT:  All right.  Thank you, Mr. Krishnamurthy.

15        MR. GOHEL:  Good morning, Your Honor.  Jai Gohel

16   appearing with Jonathan Nelson, who's present, in custody, in

17   the courtroom.

18        THE COURT:  All right.  Good afternoon.

19        Good afternoon.

20        MR. BOISSEAU:  Good afternoon, Your Honor.  George

21   Boisseau on behalf of Raymond Foakes, who is in the courtroom.

22        THE COURT:  All right.  Thank you, Mr. Boisseau.

23        MS. AMRAM:  Good afternoon, Your Honor.  Galia Amram

24   and Eneda Hoxha on behalf of Damien Cesena, who is present via

25   Zoom.
```

PROCEEDINGS

```
1              THE COURT:  All right.  Thank you.  Good afternoon.

2              MR. WAGGENER:  Good afternoon, Your Honor.  Robert

3  Waggener and Marcia Morrissey appearing for defendant Russell

4  Ott, who is on the Zoom call.

5              THE COURT:  All right.  Thank you.

6              MR. CLOUGH:  Good afternoon, Your Honor.  Michael

7  Clough appearing for Mr. Lyles, who I believe is on the Zoom

8  video but, if not, will be on off and on.

9              THE COURT:  Thank you.

10             MR. WALSH:  Good afternoon, Your Honor.  John Walsh on

11 behalf of Christopher Ranieri, whose presence is waived.

12             THE COURT:  All right.  Thank you, Mr. Walsh.

13             MR. THOMSON:  James Thomson on behalf of David Diaz,

14 who is present via Zoom.

15             THE COURT:  All right.  Thank you.

16             MR. BUSTAMANTE:  Good afternoon, Your Honor.  James

17 Bustamante appearing on behalf of Merl Hefferman, who is

18 present on video with counsel.

19             THE COURT:  All right.  Thank you.

20             MR. SABELLI:  Good afternoon, Your Honor.  Martin

21 Sabelli and Johns Philipsborn for Brian Wendt, who I believe is

22 present in the court.

23             THE COURT:  All right.  Thank you.

24             THE CLERK:  Counsel for Mr. Greer?

25             THE COURT:  Is Ms. Pollock on?
```

PROCEEDINGS

1           **MS. POLLOCK:**  Yes.  I'm sorry.  Randy Sue Pollock

2    appearing on behalf of Jeremy Greer, who is on the phone call,

3    Your Honor.

4           **THE COURT:**  All right.

5           **THE CLERK:**  Counsel for Brian Burke?

6           **MR. SABELLI:**  Angie, this is Martin.  Mr. Babcock is

7    in a sentencing hearing before Judge Illston.  He asked that we

8    appear for him.  So I apologize that I didn't raise that

9    earlier.

10        There he is.  I see Mr. Babcock is on now.

11          **THE COURT:**  Oh.  All right, Mr. Babcock.  Do you want

12   to enter your appearance?

13          **MR. BABCOCK:**  Thank you, Your Honor.  Just in the nick

14   of time.  Erik Babcock for Brian Burke, who is present remotely

15   via Zoom.

16          **THE COURT:**  Okay.  So I think that covers everyone;

17   right, Angie?

18          **THE CLERK:**  It does, Your Honor.

19          **THE COURT:**  All right.  So all counsel are present,

20   and all defendants are attendant, either live and in person,

21   either in this courtroom or in the next-door courtroom where

22   the monitors are set up, or by videoconferencing through Zoom.

23        And so we will pick up where we left off, which is, we

24   were in the midst of cross-examination by Mr. Gohel of the

25   witness, Mr. Scheetz.

1      And good afternoon, Mr. Scheetz.

2           **THE WITNESS:**  Hello, Your Honor.

3           **THE COURT:**  And so we can resume.

4           **MR. GOHEL:**  Thank you, Your Honor.

5                          **JEREMY SCHEETZ**,

6  called as a witness for the Government, having been previously

7  duly sworn, testified further as follows:

8                  **CROSS-EXAMINATION   (resumed)**

9  BY MR. GOHEL:

10 **Q.**  Sir, going back, just finishing up with the source of

11 information that you used being gang experts and/or gang

12 investigators.

13      Did you ever come to learn of any lawsuits that had been

14 filed by members of the Hells Angels against any of the gang

15 investigators or experts that you said you use as some of the

16 sources of your information?

17 **A.**  Yes, sir.

18 **Q.**  Okay.  And that would be Jorge Gil-Blanco?

19 **A.**  Yes, sir.

20 **Q.**  Okay.  And with respect to that -- okay.  With respect to

21 that lawsuit, were you made aware of that by Mr. Gil-Blanco?

22 **A.**  Yes, sir.

23 **Q.**  Okay.  And with respect to, again, any of the gang experts

24 that you rely upon as information to base your opinions, did

25 you ever become aware of any either court opinions or court

SCHEETZ - CROSS / GOHEL

1    decisions which were critical in any way of any of the gang

2    experts that you rely upon?

3    **A.**    I mean, against them or information that they've

4    submitted?

5    **Q.**    Against -- not against them personally, but against their

6    opinions or the basis for their opinions or anything critical

7    from a court.  Did you review anything like that?

8    **A.**    No, sir.

9    **Q.**    Have you considered any -- in terms of any of the gang

10   experts that you rely upon, any jury verdicts in which one of

11   these experts had testified and there were acquittals on

12   charges that related to the opinions given by the gang experts?

13   **A.**    No, sir.

14   **Q.**    I want to go to informants now.  What you had testified,

15   I think it was on Tuesday of last week when my colleague was

16   asking questions, you had stated that -- and this was on the

17   subject of informants.  And we talked about last time what my

18   definition for today of "informants" is.

19        You had said that you had debriefed -- and I think the

20   quote was (reading):

21             ". . . in reference to the Hells Angels, that

22        would include associates, roughly 100 or so."

23        Do you remember that testimony?

24   **A.**    Yes, sir.

25   **Q.**    Okay.  So these 100 debriefings -- first of all, the term

SCHEETZ - CROSS / GOHEL

1  "associates," what does that mean to you when you gave that

2  response?

3  A.   That could be friends of the club, male or female.  That

4  could be individuals that were former prospects or former

5  hangarounds or associates of the club, of that nature.

6  Q.   Okay.  Well, you said "former associates of the club."

7  What does that mean?  Somebody who -- like their dentist?

8  Their -- you know, their neighbors?  Someone who's friendly

9  with them?

10  A.   Someone who's friendly with them.  Someone who's gone to

11  events.  Someone who's attended parties.  Someone who knows

12  them personally.

13  Q.   Okay.  Well, it's true, sir, isn't it, that a lot of their

14  events are open to the public?

15  A.   Yes, sir.

16  Q.   So someone who goes to an event as a member of the public

17  may potentially be an associate, in your definition?

18  A.   If they're wearing some type of support gear or some type

19  of indicia or they openly admit that they're an associate or

20  supporter of the club, yes.

21  Q.   Okay.  So of those, roughly, I think what you said, "in

22  reference to the Hells Angels," how many of those

23  individuals -- and I know you've given a list of, I think, five

24  total people that you gave my colleague at the last session.

25  Actually, you'd given three and then you added two more -- how

**SCHEETZ - CROSS / GOHEL**

1   many were actual members or former members of the Hells Angels

2   Motorcycle Club, as you understand that to mean in your

3   declaration?

4   **A.**   I would possibly say probably 10, 15.

5   **Q.**   10 to 15.

6   **A.**   Yes.

7   **Q.**   And how many of these people were either current or

8   former -- well, let me withdraw that.

9        Of the members, how many were still current members when

10  you debriefed them?

11  **A.**   Of the five that we discussed, sir?

12  **Q.**   Of the 10 to 15 out of the hundred.

13  **A.**   None of them, sir.

14  **Q.**   Okay.  And how many of those, out of the hundred, were

15  either current or former prospects?

16  **A.**   I'd say approximately 10 to 15, sir.

17  **Q.**   And in your declaration, you defined the term, as you

18  understand it, "hangarounds."  How many of these hundred were

19  hangarounds, either current or former?

20  **A.**   Oh, not many.  I'd say approximately five or so, sir.

21  **Q.**   Okay.  And of the -- I should back up.

22       Of the prospects, at the time that you debriefed them, as

23  you defined it, how many of those were currently prospects of

24  the Hells Angels?

25  **A.**   Oh, God.  Approximately 50 percent.

SCHEETZ - CROSS / GOHEL

1    Q.    Okay.  And of the five or so hangarounds, how many were

2    currently in the status, as you define it, of hangarounds?

3    A.    From what I know, none of them were, even though they said

4    they were.  I didn't have them documented as hangarounds.

5    Q.    So just if I do some quick math, it looks like at most

6    possibly 35 out of the hundred somehow formally had some

7    status, that you debriefed at some point, with the

8    Hells Angels, either as members, prospects, or hangarounds, and

9    that's at the maximum; correct?

10   A.    Yes, sir.

11   Q.    And the rest, 65 or more, were associates, as you define

12   it -- that could mean a variety of things -- that had some sort

13   of indication to you that they supported the club; correct?

14   A.    Yes, sir.

15   Q.    And it's true, is it not, that non-members -- and that

16   includes prospects, hangarounds, and other associates -- would

17   not be privy to all the information or club-related matters and

18   activities and discussions?  That's correct?  And that's in

19   your declaration; correct?

20   A.    Yes, sir.

21   Q.    In other words, for example, even prospects, though

22   they're just one level below a member, they are not allowed to

23   attend -- actually attend the church meetings; correct?

24   A.    Just be outside.  Yes, sir.

25   Q.    And in your declaration, you state that it's at church

SCHEETZ - CROSS / GOHEL

1   that there are discussions amongst members, according to you,

2   of criminal activities; correct?

3   **A.**   Yes, sir.

4   **Q.**   And at those church meetings, just to confirm, prospects

5   would not be inside the meetings; correct?

6   **A.**   From what I know, no, sir.  They're not allowed.

7   **Q.**   Okay.  Have you reviewed any reports -- other than the

8   hundred or so individuals that you did some form of debriefing

9   as informants, did you ever review any reports of any of the

10  historical Hells Angels; in other words, Hells Angels that had

11  debriefed, you know, going back to the '70s and '80s?

12  **A.**   Yes, sir.

13  **Q.**   Okay.  And you reviewed those reports?

14  **A.**   Or interviews, yes.

15  **Q.**   Okay.

16  **A.**   Recorded interviews, yes, sir.

17  **Q.**   And you're in possession of those reports or interviews?

18  **A.**   Some, I am; but some are from overseas or third-party

19  rules.  I don't know.  I'd have to talk to my chief counsel's

20  office about dissemination and sharing.  I'm not really sure

21  what the process is for that, sir.

22  **Q.**   Okay.  So there are -- there are some memorialization,

23  either electronic or on paper, in some format, of informants

24  that you did not personally debrief that you have reviewed, and

25  that is part of the basis of your opinions; correct?

**SCHEETZ - CROSS / GOHEL**

1    **A.**    Correct, sir.

2    **Q.**    Are any of those in your possession?

3    **A.**    No, sir.

4    **Q.**    You would know where to find them, though; correct?

5    **A.**    Correct, sir.

6    **Q.**    Okay.  Sir, you mentioned an individual named -- well,

7    let's start with Jacob Sams and another individual named Joshua

8    O'Bryan.  Do you remember that testimony?

9    **A.**    Yes, sir.

10   **Q.**    Okay.  And those are two individuals that you had

11   contacted or been con- -- you had contacted or they contacted

12   you and discussed between the first and second session of these

13   proceedings; correct?

14   **A.**    Yes, sir.

15   **Q.**    And you had also spoken to Mr. Jordan?  Did you speak to

16   Mr. Jordan as well during that --

17   **A.**    Yes, sir.

18   **Q.**    -- period of time?

19        Okay.  And what you had said in response to my colleague's

20   questioning at the last session was those three individuals

21   were facing some sort of charges and they were cooperating with

22   the Government; correct?

23   **A.**    I don't know if I said they were -- I know they're

24   cooperating.  I don't know if they're facing charges.  I don't

25   know what the severity of it is.  I know that two of the three

1    were cooperating.  Mr. Jordan had already cooperated.

2    **Q.**    Okay.  So that goes to my point.

3        And I'll put in, in addition to that, Mr. Atwell and

4    Mr. Neff.  With respect to those five individuals that you have

5    spoken to, did you ever review any information with respect to

6    what their motivations may have been, just the source

7    information of what their motivation may have been to

8    cooperate?

9    **A.**    No, sir.

10   **Q.**    Okay.  Did you know -- and it sounds like you don't know

11   for sure whether even Mr. Sams or Mr. O'Bryan was actually

12   facing charges or working off a case.  Is that your testimony

13   today?

14   **A.**    I'm not sure, sir.

15   **Q.**    Okay.  And how about Mr. Neff, Mr. Atwell, and Mr. Jordan?

16   Any of those.  Do you know whether they were working off a case

17   or receiving any consideration or anything in return for their

18   cooperation?

19   **A.**    I think Mr. Jordan was the only one.  I'm not sure about

20   Mr. Neff and Mr. Atwell.

21   **Q.**    Okay.  What information do you know about what Mr. Jordan

22   was facing?

23   **A.**    I think at the time, back in late 2007-'08, that time

24   frame, I think he was facing a drug charge or something of that

25   nature, sir.

SCHEETZ - CROSS / GOHEL

1    Q.   Okay.  And do you, as source information, look at what --

2    for example, have some -- of what charges any of these

3    individuals that either you personally debriefed or that --

4    well, that you personally debriefed that were associated with

5    the Hells Angels, what charges they may or may not have been

6    facing?

7    A.   No, I did not check, sir.

8    Q.   Okay.  And what about -- it is true that Mr. Neff, for

9    example, had been kicked out of the San Diego Hells Angels;

10   correct?

11   A.   I believe so, yes, sir.

12   Q.   Okay.  You believe so.  Didn't you talk to him about why

13   he was at a big ATF conference, testifying about, supposedly,

14   the inner workings of the Hells Angels?  Did you ask him,

15   "Well, did you get kicked out?"

16   A.   First and foremost, it was not an ATF conference.  It was

17   IOMGIA.  And he came on behalf of -- I'm not sure who it was

18   that he was speaking with at the time, and he answered a litany

19   of questions.

20        And several of us had a chance to ask him two to three

21   other sidebar-type questions.  I did not ask or I don't believe

22   it was ever discussed on why he was talking, of that nature.  I

23   know, personally, I did not ask it.  I don't know if he gave

24   that to the audience.

25        But it was at the annual IOMGIA conference.  It wasn't

SCHEETZ - CROSS / GOHEL

1  anything to do with ATF.  And it was in front of 2- to 300
2  participants at the conference, sir.
3  **Q.**   Okay.  But in one of your exhibits -- I think it's
4  Exhibit 13 to your declaration and Exhibit 15 in the binder --
5  this is the Fresno -- Fresno rules.  Do you remember that
6  document?
7  **A.**   Yes, sir.
8  **Q.**   And in that document -- and I know that these are rules of
9  that particular charter but -- there is a reference that
10  members will be kicked out for lying; correct?
11  **A.**   Correct.
12  **Q.**   I mean, that's -- the punishment, essentially, for lying
13  is being kicked out by the charter; correct?
14  **A.**   Depending on the charter, sir.
15  **Q.**   Well, let's talk about Fresno, the declaration that's
16  in -- attached to -- well, the exhibit that's attached to your
17  sworn declaration.  Fresno says that if you lie, you get kicked
18  out; correct?
19  **A.**   That's correct.  Neff was San Diego, though, and I don't
20  know what San Diego's rules are.
21  **Q.**   I'm getting there.
22  **A.**   Okay.
23  **Q.**   There's also stealing.  You see that?  If you steal, you
24  get kicked out of the Fresno Hells Angels, at least according
25  to Exhibit 13/15; correct?

SCHEETZ - CROSS / GOHEL

1    **A.**   Correct, sir.

2    **Q.**   And I think you just -- you answered a question I was

3    going to ask you.  Do you know what the rules are, with respect

4    to someone getting kicked out, for the San Diego Hells Angels

5    at the time that Mr. Neff left?

6    **A.**   No, sir.

7    **Q.**   So you don't know whether he was accused of lying or

8    stealing?

9    **A.**   No, sir.

10   **Q.**   And when you took his information, you did not have any

11   information -- when you used his information that he gave you

12   and you testified about here, you didn't know whether or not he

13   was a liar or a thief; correct?

14   **A.**   No, sir.

15            **THE COURT:**  I have a question, if you don't mind.

16            **MR. GOHEL:**  Please, Your Honor.

17            **THE COURT:**  When you spoke with these informants, do

18   you know that when they were speaking to you, whether they were

19   doing so as part of a cooperation agreement?  Was it part of a

20   deal?  Do you know?

21            **THE WITNESS:**  Your Honor, it was not part of the

22   agreement to speak with me.  I just happened to know they were

23   signed up and working alongside or with ATF, and I had the

24   opportunity to speak with them.

25            **THE COURT:**  So as far as you know, they weren't

SCHEETZ - CROSS / GOHEL

1  speaking to you because that was part of their promise in the

2  cooperation agreement?

3          **THE WITNESS:**  No, Your Honor.

4          **THE COURT:**  Thank you.

5  **BY MR. GOHEL:**

6  **Q.**  With any -- well, I'll withdraw that.

7      Have you reviewed, as source information which formed the

8  basis of any of your opinions, any criminal histories of any of

9  the informants that you've either personally debriefed or have

10  read reports about that have been debriefed by law enforcement?

11  **A.**  Yes.  Some of them, I've looked at their criminal

12  histories.  Yes, that's correct, sir.

13  **Q.**  Okay.  "Some."  What does that mean?  Let's say out of the

14  hundred, how many criminal histories did you look at?

15  **A.**  Okay.  I take that back.

16      I do -- I do do a criminal history check on them -- I just

17  can't remember the severity of what they were found guilty of

18  or arrested for -- as part of my process, if I'm able to get

19  the information.  That's if I'm able to get the information to

20  validate and can get a date of birth or a Social Security

21  number, I do do a criminal history check.

22  **Q.**  With respect to -- I'm going to go to the issue of some of

23  the books that you reviewed.

24      In your declaration, you refer to George Wethern.  Do you

25  remember that?

**SCHEETZ - CROSS / GOHEL**

1   A.   Yes, sir.

2   Q.   Mr. Wethern, I think, was a member back in the '60s and

3   left in the very, very early '70s.  Correct?

4   A.   I believe he left and then came back and then finally left

5   in the mid to early '70s, yes, sir.

6   Q.   Well, he had cooperated in exchange for immunity in 1972.

7   So it would have been before that; correct?

8   A.   Yes.

9   Q.   And this is an individual who, after he cooperated with

10   law enforcement in exchange for immunity and subsequently some

11   time later wrote a book, had tried to gouge his eyes out and

12   strangle his wife while he was in protective custody in

13   November of 1972; correct?

14   A.   I believe so, yes.

15   Q.   And this is a person that you put in your declaration as a

16   source of some of your opinions; correct?

17   A.   Yes, sir.

18   Q.   I want to go to one of the articles that you referred to

19   in Exhibit 17.

20       That's the original Exhibit 17; so I believe it would be

21   Exhibit 19 of the binder, Your Honor.

22       And it's paragraph, I believe -- in your declaration, it's

23   referred to in paragraph 120 --

24           THE COURT:   19 are all the --

25           MR. GOHEL:   Yes.

1          THE COURT:  -- reports and stuff?

2          MR. GOHEL:  That's correct, Your Honor.  I'm going to

3    get to that, I think.

4          THE COURT:  Okay.

5          MR. GOHEL:  So it's paragraph 120(ee).  That's on

6    page 35.

7          THE COURT:  I am now lost.

8          MR. GOHEL:  Sorry, Your Honor.

9       Okay.  Let me start with the declaration.

10         THE COURT:  Okay.

11         MR. GOHEL:  In Mr. Scheetz's declaration, page 35, if

12   you see the little (ee) --

13         THE COURT:  That's Exhibit 2 in the binder.

14         MR. GOHEL:  Sorry.  Exhibit 2 in the binder, correct.

15         THE COURT:  And what paragraph number?

16         MR. GOHEL:  It's (ee).

17         THE COURT:  (Ee)?

18         MR. GOHEL:  (Ee), as in Eric.

19         THE COURT:  Oh, I see.

20         MR. GOHEL:  February 7th, 2015, there's a reference to

21   Patrick Eberhardt.

22         THE COURT:  That's on page 35.

23         MR. GOHEL:  Yes.  And then it refers to -- or there is

24   a corresponding incident report -- or, excuse me -- newspaper

25   article from the *Phoenix Times*, I believe.  And that is,

SCHEETZ - CROSS / GOHEL

1  I believe, Exhibit 19 -- I'm trying to find where -- now, I

2  don't know which...

3       Hold on one sec.

4       Oh, I'm sorry.  "O," as in orange juice.

5            THE COURT:  19-O.

6            MR. GOHEL:  Yeah.  So there's a Tab O.

7            THE COURT:  The *Valley News* article?

8            MR. GOHEL:  Is it Phoenix?  *Phoenix News*.  Let me just

9  double check.

10           THE COURT:  Yeah, *PhoenixMag* -- *Magazine.com*.

11  BY MR. GOHEL:

12  Q.   And it's an article about the shooting of Patrick

13  Eberhardt.

14       Were you able to locate that through that mess,

15  Mr. Scheetz?

16  A.   Yes.  I'm looking at it now, sir.

17  Q.   Okay.  And in your declaration, you put this incident in

18  the column of -- or the category of Mongols incidents, what you

19  call -- you know, incidents -- Hells Angels -- or an example of

20  how the Hells Angels' claim to territory has led to violence.

21  And this is what you consider to be a Mongol incident; correct?

22  A.   Correct, sir.

23  Q.   Okay.  Now, in 19-O, there is a reference that there's

24  some suspicions that it was the Mongols that may have done this

25  act against Mr. Eberhardt; correct?

**SCHEETZ - CROSS / GOHEL**

1   **A.**   That's what we suspect, yes.

2   **Q.**   Okay.  And there's also a reference to an individual named

3   Mr. Davis who says that there is -- there is -- at least he had

4   suspicions that it may have involved a different motorcycle

5   club, the Iron Order; correct?

6   **A.**   That's what it says, yes, sir.

7   **Q.**   Okay.  And do you have any reports that you have reviewed

8   or are in possession of related to the Eberhardt investigation?

9   **A.**   I don't have any reports, but I did talk to one of the

10  detectives.

11  **Q.**   Okay.  And this detective, did he say he had any reports

12  or he had any proof that the Mongols did it?

13  **A.**   I think it's still an ongoing investigation; so I'm not

14  sure, sir.  I just know at the time that they were suspects; so

15  I put that in the timeline.

16  **Q.**   And just -- that is an incident where basically two

17  individuals were shot on the side of a highway and there were

18  no witnesses; correct?

19  **A.**   There was Hells Angels witnesses, but that's it.

20  **Q.**   Okay.  And so there were witnesses.

21      And in that incident, the Hells Angels did not say that

22  the Mongols did it; correct?

23  **A.**   No, they did not state that, sir.

24  **Q.**   Okay.  But you put it in the Mongols section; correct?

25  **A.**   Correct, sir.

**SCHEETZ - CROSS / GOHEL**

1  **Q.**   And you haven't reviewed any reports other than talking to

2  a particular individual, investigating officer about it;

3  correct?

4  **A.**   Correct.

5  **Q.**   Okay.  Sir -- and I'm trying to move -- just hit the

6  highlights and get my portion done.  So, sorry about skipping

7  around.

8  **A.**   That's okay.

9  **Q.**   I want to talk about some of your personal observations

10  that you've made.  You've described going to certain motorcycle

11  events that may or may not have involved members of the

12  Hells Angels or what you call "associates"; correct?

13  **A.**   Correct.

14  **Q.**   Okay.  And you document those and you identify patches and

15  pins; correct?

16  **A.**   Correct, sir.

17  **Q.**   And at times, you may report to incidents where there's a

18  fight or an arrest or some other law enforcement interaction

19  during those events; correct?

20  **A.**   Yes.  Such as a shooting or a stabbing, yes, sir.

21  **Q.**   Okay.  And do you attend any of the events that are

22  designated by the Hells Angels Motorcycle Club as -- my

23  colleague asked you a little bit about this -- things like toy

24  runs or charity events or events that are open to the public

25  that are related to some charitable activity?

SCHEETZ - CROSS / GOHEL

1  A.    Yes.   I've been to several in Maryland, yes, sir.

2  Q.    Okay.   And in response to my colleague's questioning,

3  I think, on the first day that we were in session here, you

4  testified -- and I'm paraphrasing but -- these good deed events

5  were done for juries.

6      Do you remember that testimony?

7  A.    Yes, sir.

8  Q.    Okay.   So my question is very specific.   What is the

9  specific document or source, specifically, information that you

10 relied upon to form that opinion?

11 A.    Speaking to other OMG or motorcycle club experts across

12 the globe.

13 Q.    So it's gang officers that told you that these good

14 deeds -- toy runs, charity events, buying bikes for kids at

15 Christmastime -- that that's done for juries?

16 A.    Or intelligence officers, yes, sir.

17 Q.    Okay.   So there's no document that you can point to or

18 specific source information for that other than, as you often

19 do, your reliance upon gang officers; correct?

20 A.    Gang or intelligence officers or special agents, yes, sir.

21 Q.    Okay.   You give the opinion that the territorial expansion

22 of the Hells Angels is -- one big thrust of your testimony is

23 that it gives -- it can cause violence with other motorcycle

24 clubs; correct?

25 A.    Correct, sir.

1    **Q.**    And that's pretty replete in your declaration.

2         Have you reviewed the world website, the Hells Angel World

3    website?

4    **A.**    No, sir.

5    **Q.**    So just to be clear, you are here for the Government as an

6    expert on the Hells Angels Motorcycle Club related to symbols,

7    territories, and terms; correct?

8    **A.**    Correct, sir.

9    **Q.**    And there is a website called Hells Angels World that is

10   the central website for the entire Hells Angel organization

11   throughout the world; correct?

12   **A.**    Yes.  I don't rely on that, sir.  Yes.

13   **Q.**    You don't go on that?

14   **A.**    If -- rarely, if I ever do.  Rarely.

15   **Q.**    Okay.  So you don't consider that.  It has the history of

16   the club.  It has the history of some of its symbols, where the

17   Death Head symbol that you say is a violent symbol that

18   symbolizes violent [sic].  It has the military history of where

19   it came from.  It has every single new charter or prospect

20   charter.  It has supporters and business throughout the world

21   where you can buy Hells Angel support gear.  And you've not

22   reviewed that; correct?

23   **A.**    I can -- I can tell you with a hundred percent -- I don't

24   want to say "a hundred percent."

25        I can tell you, they're not going to put down the number

**SCHEETZ - CROSS / GOHEL**

1    of violent acts that they've been involved in every time that

2    they expand across the globe.

3          In the reports that I have submitted to the Court, I have

4    named them, and their expansion leads to violence.  Excluding

5    one area in the United States, since I've been working these

6    guys, where the Hells Angels has either expanded or someone has

7    expanded into their area, there has been some type of violent

8    altercation taken place.

9    **Q.**    So getting back to my question, though, you have not

10   reviewed that website and what information it contains about

11   the symbols, the territories, and the terms that the

12   Hells Angels use; correct?

13   **A.**    No, because there's no reason to review that site.  It's

14   not going to give you all the facts.  It's going to give you

15   what you want to see.  But that's not the truth, sir, what's on

16   the website, other than where their charters are, yes, and some

17   of the stuff they did.  They're going to put pictures on there,

18   and they're going to tell you about where the new charters are;

19   but they're not going to put down the number of violent acts

20   that they've been involved in or all the shootings and

21   stabbings that have transpired over the last, say, six weeks in

22   the United States.  That's not on there either.

23   **Q.**    So you said that twice, but the answer is "no"?

24          (Stenographer interrupts for clarification of the record.)

25          **THE COURT:**  She didn't catch everything you said.

1           **THE WITNESS:**  I'm sorry.

2        They're not -- they are not going to document or list the

3    number of shootings or stabbings that they have been involved

4    in over the last six weeks to eight weeks, sir.

5    **BY MR. GOHEL:**

6    **Q.**   Okay.  So, but the answer, again -- I understand your

7    speech; but your answer, again, is no, you have not --

8    **A.**   No.

9    **Q.**   -- reviewed it?

10       Now, with respect to clubhouses, how many -- which

11   clubhouses have you ever actually gone into?

12   **A.**   I've been into Nomads Maryland.  I have been into Nomads

13   Australia.  I have been into Vallejo.

14       And I'm drawing a blank where.  I've been in a couple

15   others, sir.

16   **Q.**   Okay.  So you've not been to Boston/Salem; correct?

17   **A.**   No, sir.

18   **Q.**   You've not been to Fresno; correct?

19   **A.**   No, sir.

20   **Q.**   You've not been to Sonoma; correct?

21   **A.**   No, sir.

22   **Q.**   You've never driven by the Sonoma clubhouse; correct?

23   **A.**   No, sir.

24   **Q.**   And just quickly, on the patches that you've given some

25   testimony about, how many Filthy Few patches are currently --

SCHEETZ - CROSS / GOHEL

1   you're an expert on symbols, signs, and territories.   How many

2   Hells Angels currently have some form of a Filthy Few patch on

3   them?

4   **A.**   Within the United States, if I had to do a ballpark, I

5   would say 50 to 75.

6   **Q.**   Okay.   And what source information do you have for that?

7   **A.**   The source information is either interviews I've conducted

8   or compare-and-contrast photos of all the events that I've

9   worked, to place them at an event through a police report and

10  analyzing pictures snapped by myself or one of my colleagues.

11  **Q.**   You reviewed a corresponding assault or murder

12  investigative -- law enforcement investigative report related

13  to each and every one of these patches, Filthy Few patches;

14  correct?

15  **A.**   I've tried to.   I don't -- there's some that I just don't

16  know.   It's a huge intelligence gap, that I don't know why they

17  received the Filthy Few.

18  **Q.**   Well, you testified, moving now to the Dequiallo patch,

19  that -- actually, let me withdraw that just quickly.

20      We were talking about -- other lawyers have talked about

21  Pat Matters [sic], the president of Minnesota, who wrote a

22  book; and some quotes were taken, passages were taken from that

23  book.

24      Do you recall that at the last session?

25  **A.**   Yes, sir.

1  Q.    Okay.  And you're aware that Mr. Matters [sic] testified

2  for the Government, United States Government, in at least two

3  criminal -- felony criminal trials in United States district

4  courts; correct?

5            MR. KRISHNAMURTHY:  Objection; relevance.

6            THE COURT:  Overruled.

7            THE WITNESS:  I believe he testified.  I don't know if

8  it was federal or state, sir.

9  BY MR. GOHEL:

10  Q.    Do you know -- just in terms of source material for your

11  opinions, do you know what his testimony was with respect to

12  the meaning of the Filthy Few patch, as to whether or not it

13  was given out -- whether or not it was given out for a

14  Hells Angel committing a murder or an assault on behalf of the

15  club?  Do you know what his testimony was?

16  A.    No, sir.

17  Q.    Going to the Dequiallo patch, your testimony was that law

18  enforcement keeps, I think, quote, close tabs on Hells Angel

19  members with Dequiallo patches because it's so serious;

20  correct?

21  A.    Correct, sir.

22  Q.    It's a major law enforcement concern of officer safety;

23  correct?

24  A.    Correct, sir.

25  Q.    And they keep close tabs on it; correct?

SCHEETZ - CROSS / GOHEL

1  **A.**    Yes, law enforcement does.  I do, yes, sir.

2  **Q.**    How many Hells Angel members in the United States

3  currently have a Dequiallo patch?

4         **MR. KRISHNAMURTHY:**  Objection; relevance.

5         **THE COURT:**  Overruled.

6         **THE WITNESS:**  I'd have to give a ballpark because I

7  haven't counted.  I would say approximately 25 to 30.

8  **BY MR. GOHEL:**

9  **Q.**    So because your testimony is that a Dequiallo patch is

10  given for the purpose of -- because you've assaulted a law

11  enforcement officer, certainly there are police reports and

12  investigative reports for each and every act of violence

13  against a police officer in the United States that would match

14  each and every Dequiallo patch; correct?

15  **A.**    Similar to the Filthy Few, I don't know exactly why they

16  earned it; but I know, through some of the criminal

17  histories -- I don't have a police report; but I know through

18  looking at some of the criminal histories, they have been

19  charged with assaulting a police officer.

20  **Q.**    Okay.  So answering my question, have you matched each and

21  every Dequiallo patch with an actual police report or

22  prosecution related to an assault on a law enforcement officer

23  in this country?

24  **A.**    Not every one, no, sir.

25  **Q.**    You have given testimony, and in your declaration, I think

**SCHEETZ - CROSS / GOHEL**

1    in paragraph 35, you say that (reading):

2          "The stitched mouth of the Death Head" --

3    Which, I guess, was the -- paragraph 35, Your Honor.  Let

4    me just find the...

5    You said (reading):

6          "I believe that the stitched-shut mouth means

7    'We don't discuss club business'...."

8    Correct?

9    **A.**  Correct, sir.

10   **Q.**  Who is that quoting?

11   **A.**  Jorge Gil-Blanco, Lenny Eisner, Ray Wolf, Bruce from

12   Australia.  There's several OMG experts who are documented in

13   court, not just from their agency, who testify across the

14   globe, who are non-U.S. citizens, who've also said the same

15   thing.

16   **Q.**  We're back to -- this doesn't come out of the words -- the

17   source material for that opinion in quotes there, that it means

18   "We don't discuss club business," the source material is

19   information that you obtained from gang experts or gang

20   officers -- I think you named four or five of them -- including

21   Jorge Gil-Blanco; correct?

22   **A.**  Correct, sir.

23   **Q.**  Okay.  It didn't come from a document?

24   **A.**  No, sir.

25   **Q.**  Okay.  And one of your exhibits, you have a picture, you

**SCHEETZ - CROSS / GOHEL**

1   may recall that there's Death Heads surrounding the

2   Purple Heart pin.  You know, there's Death Heads that are

3   drawn.  And you have it in your declaration.  We don't need to

4   look at it.  But you recall that; correct?

5   **A.**   Yes, sir.

6   **Q.**   And there's four Death Heads, and they have their mouths

7   open; correct?

8   **A.**   I believe so.

9   **Q.**   And you've seen many Hells Angels who wear the Death Head

10  with its mouth open, including the minutes that my colleague

11  showed you -- excuse me -- the rules for the Modesto charter;

12  correct?

13  **A.**   Correct, sir.

14  **Q.**   You also -- Exhibit 7 and Exhibit 9, so in the binder, to

15  your declaration, is the -- what do you call it? -- the

16  BHC Newsletter; correct?

17  **A.**   Correct, sir.

18  **Q.**   Okay.  And that's -- that has -- you used the acronym to

19  mean what?

20  **A.**   The Big House Crew.

21  **Q.**   Okay.  Big House Crew.  And there's also Brothers Held

22  Captive.  You've heard that; correct?

23  **A.**   I've never heard that, sir.

24  **Q.**   Okay.  And in that, with respect to that particular

25  exhibit, your opinion that you give is that Hells Angels --

1   when you look at that, that has the names and addresses of

2   various people who are, throughout the world and, I think back

3   in 2011 at the time that it was printed, were possibly

4   incarcerated.  You gave the explanation for that particular

5   document to be that Hells Angels take care of the incarcerated

6   so they won't cooperate with law enforcement; correct?

7   A.   That's correct, sir.

8   Q.   All right.  And the source information for that opinion,

9   that particular opinion -- a person, a document, a witness --

10  what is that?

11  A.   It's similar.  The experts that I've spoken to -- and

12  that's just, obviously, once again, across the globe -- it's

13  the same conclusion that we come to, that they take care of the

14  ones that go to jail because they don't want them to talk.

15       And I've even spoken to -- like I said in my opening, I

16  spoke to Dave Lowry years ago, who was a source for ATF as a

17  member of the Outlaws, and he even spoke about that, how they

18  take care of their own when they go to jail.

19  Q.   So if I were to distill your answer down, you'd agree with

20  me that what you're saying is that it's other gang experts and

21  gang or intelligence officers that is the source information

22  for that opinion; correct?

23  A.   Correct, sir.

24  Q.   And you also have the opinion that Hells Angels use their

25  colors to intimidate other OMGs and the public.  That's in

**SCHEETZ - CROSS / GOHEL**

1   paragraph 63 of your declaration.  Correct?

2   **A.**   Correct, sir.

3   **Q.**   And you use the example "Power Runs," one in 2019, that

4   was a ride by a Mongol member's tattoo parlor.  Do you recall

5   that in your declaration?

6   **A.**   Yes, sir.  I was there.

7   **Q.**   It's fair to say that the Hells Angels Death Head is a

8   pretty famous symbol, both in the United States and around the

9   world; correct?

10  **A.**   Correct, sir.

11  **Q.**   It's probably the best known and sort of top of the heap

12  in terms of the original, quote, outlaw motorcycle clubs;

13  correct?

14  **A.**   Yes, sir.

15  **Q.**   And it has value.  It's trademarked; correct?

16  **A.**   Yes, sir.

17  **Q.**   They protect their trademark and are pretty litigious with

18  respect to protecting their trademark, including lawsuits with

19  major entities like Disney; correct?

20  **A.**   Yes, sir.

21  **Q.**   And so I'm asking you, what is the specific source

22  information -- I'm talking about the document or person that

23  told you -- that the Power Run in 2019 that went by a Mongol

24  member's tattoo parlor was to use their colors to intimidate

25  that Mongol?

SCHEETZ - CROSS / GOHEL

1   **A.**   Because I was there, sir.  I witnessed it.

2   **Q.**   Okay.  And so you -- no.  Withdraw that.

3        Do you rely upon -- I think you do say in some of your

4   reports and your declaration -- the acronym is W-S-I-N -- WSIN,

5   which is the Western States Intelligence Network, as source

6   materials for your opinions in this case?

7   **A.**   I did when Jorge Gil-Blanco was employed by them, yes,

8   sir.

9   **Q.**   Okay.  So those opinions, you still hold; correct?

10  **A.**   Yes.

11  **Q.**   And Jorge Gil-Blanco was employed by WSIN; correct?

12  **A.**   He was, yes.

13  **Q.**   And information that he shared with you, he told you he

14  had at WSIN; correct?

15  **A.**   I believe so, sir, yes.

16  **Q.**   And you have access to those materials; correct?

17          **MR. KRISHNAMURTHY:**  Objection; vague.

18  **BY MR. GOHEL:**

19  **Q.**   Can you provide those source materials from WSIN to

20  the Government?

21  **A.**   I don't know if I still have them, sir, from WSIN.

22  **Q.**   Where would they be?

23  **A.**   I'm not sure.  I mean -- and this is not excuse -- we did

24  have a computer crash, like I say, in 2011, and we did lose a

25  lot of things there.

**SCHEETZ - CROSS / GOHEL**

1    But I think Jorge stopped working for them.  And I don't

2  think he produced much information for WSIN after that because

3  I think there was an analyst that was hired on right after

4  that.

5    A lot of stuff was verbal or we received at IOMGIA

6  conference or through training.

7  **Q.**   All right.  I want to just finish up here just quickly

8  talking about the Sonoma County Hells Angels that my client is

9  a member of.

10    It is true that you have not conducted, yourself, any

11  interviews of any current or former members of the Hells Angels

12  Sonoma County; correct?

13  **A.**   No, sir.

14  **Q.**   Have you been made aware of any interviews -- I'm not

15  asking for the substance, but have you been made aware of any

16  interviews given by any current or former members of the Sonoma

17  County Hells Angels?

18  **A.**   I'm not aware of any, sir.

19  **Q.**   You've never -- I think you testified you've never been to

20  the clubhouse.  Correct?

21  **A.**   No, sir.

22  **Q.**   You have the opinion that charters have some degree of

23  autonomy; correct?

24  **A.**   Yes, sir.

25  **Q.**   In paragraph 53 of the declaration, it seems -- of your

1    declaration, which is Exhibit 2, it appears that you focus

2    on -- in that paragraph, you focus on the raising of the

3    natural -- excuse me -- national stature of the Sonoma County

4    Hells Angels as a result of the Laughlin incident in 2002;

5    correct?  That's the general thrust of --

6    **A.**    I believe -- I believe I said Ray Foakes, not Sonoma, sir.

7    **Q.**    Okay.  And Ray Foakes, at the time and currently, is a

8    Sonoma County Hells Angel member; correct?

9    **A.**    I believe so, sir.  I'm not sure.  I just -- that's why I

10   put "Ray Foakes."  I wasn't sure what charter he belonged to at

11   the time.

12   **Q.**    Okay.  But you quote -- as part of your opinion, you quote

13   that he became a famous Hells Angel who started the riot.

14        (Reading):

15            "Other Hells Angels admire him as someone who is

16            a 'real Hells Angel.'"

17        Who is it that you talked to that gave you what's between

18   those two quotes?

19   **A.**    Timothy Jordan.  And I believe I heard -- well, I know for

20   a fact when Atwell spoke in Canada, he spoke about Foakes.  And

21   I know other people who I've spoken to who I deem as OMG

22   experts or been deemed OMG experts, the people they've spoken

23   with.

24        And obviously, my role in intel is to take everyone's

25   opinion, expert, and formulate a conclusion.  They all came to

1    the conclusion that it was -- he was very well respected for

2    what he did for a multitude of reasons.

3    **Q.**    Okay.  Did they tell you who they'd spoken to to provide

4    you that information, those gang experts?

5    **A.**    No, sir.

6    **Q.**    And in the violent incidents, or incidents that you

7    describe related to violence that results from the Hells Angels

8    claim of territory in paragraph 17 -- just hold on one sec.

9    I'm sorry -- paragraph 120 of your declaration -- that's

10   Exhibit 2 of the binder -- you list, I think it's about 62

11   incidents between the Mongols -- you know, more on the Mongols

12   and Vagos.

13        You don't have to count it, but does that sound like a

14   fair approximation?

15   **A.**    There's been more since I submitted this, but, yes, sir.

16   **Q.**    Okay.  Well, but the answer is that in your declaration,

17   there's around 60 or so of those; correct?

18   **A.**    Yes.  I haven't counted.  Yes.

19   **Q.**    And there's only one with respect to the Mongols that

20   involved a Hells Angel -- a Sonoma County Hells Angel --

21   correct? -- and that was the Laughlin incident?

22   **A.**    I believe so, sir, yes.

23   **Q.**    And there's only one that relates to the Vagos that

24   involves a Sonoma County member which is the Lake County casino

25   fight; correct?

1  **A.**    Yes, sir.

2  **Q.**    Okay.  So two out of 62; correct?

3  **A.**    Yes, sir.

4            **MR. GOHEL:**  And -- just one second, Your Honor.

5                       (Pause in proceedings.)

6            **MR. GOHEL:**  That's all the questions I have.

7            **THE COURT:**  All right.  Thank you.

8       All right.  We should take a break.  And next counsel up

9  is whom?  Mr. Boisseau?  Or who's --

10           **THE CLERK:**  Mr. Boisseau.

11           **MR. GOHEL:**  I believe it's Ms. O'Byrne.  I don't want

12 to --

13           **THE COURT:**  Who is it?

14           **MR. GOHEL:**  I'm not sure.  I think it's --

15           **THE COURT:**  Do you have our order, Angie?

16      (Discussion off the record between the clerk and

17 the Court.)

18           **MR. BOISSEAU:**  Your Honor, that was the original

19 schedule.  We have changed that among counsel.

20           **THE COURT:**  What's the proposal then?  Who's next?

21           **MS. AMRAM:**  I believe it's us, Your Honor.  And we're

22 in the attorney lounge.  We'll come down.

23           **THE COURT:**  All right.  Where are you now?

24           **MS. AMRAM:**  The attorney lounge.

25           **THE COURT:**  Okay.  And is Mr. Cesena going to attend

PROCEEDINGS

1    live?

2              **MS. AMRAM:**  Yes, if there's room.

3              **THE COURT:**  Yeah.  We're going to do a switcheroo, but

4    we do have to take a break and do some cleaning because counsel

5    and client will do a switch.  So we'll take a --

6         Do we have a day porter, Angie, ready?

7              **THE CLERK:**  We do, Your Honor.

8              **THE COURT:**  So we need what?  About 15 minutes to

9    clean up and do the switch?

10             **DAY PORTER:**  Yes.

11             **THE COURT:**  Okay.  So we'll take a 15-minute break,

12   and then we'll resume with Mr. Cesena and his counsel doing the

13   next cross, and that will be live.

14             **MS. AMRAM:**  Thank you, Your Honor.

15             **THE COURT:**  All right.  Thank you.

16             **THE CLERK:**  Court is in recess.

17                      (Recess taken at 1:47 p.m.)

18                 (Proceedings resumed at 2:02 p.m.)

19             **THE COURT:**  Be seated, everyone.

20             **THE CLERK:**  Please be seated.

21             **THE COURT:**  Okay.  Counsel -- oops.  We're getting an

22   echo.  So somebody has to turn off their -- mute their sound.

23             **THE CLERK:**  All right.

24             **THE COURT:**  Okay?

25        All right.  Counsel, you want to make your appearances for

SCHEETZ - CROSS / HOXHA

```
 1   the record here in the courtroom?
 2           MR. KRISHNAMURTHY:  Good afternoon again.  Ajay
 3   Krishnamurthy and Kevin Barry for the United States.
 4           THE COURT:  All right.  Thank you.
 5           MS. HOXHA:  And this is Eneda Hoxha and Galia Amram
 6   for Mr. Cesena, who is present.
 7           THE COURT:  You'll have to speak into the mic.  Make
 8   sure you're speaking loud enough.
 9           MS. HOXHA:  Okay.
10       (Stenographer interrupts for clarification of the record.)
11           MS. HOXHA:  Okay.  This is Eneda Hoxha and Galia Amram
12   for Damien Cesena, who is present in the courtroom.
13           THE COURT:  And Mr. Cesena is present and attending.
14       Good afternoon.
15           DEFENDANT CESENA:  Good afternoon, Your Honor.
16           THE COURT:  All right.  You may begin your
17   cross-examination.
18           MS. HOXHA:  Thank you, Your Honor.
19                       CROSS-EXAMINATION
20   BY MS. HOXHA:
21   Q.   Hello, Mr. Scheetz.
22   A.   Hello, ma'am.
23       (Stenographer interrupts for clarification of the record.)
24           THE COURT:  If you can make sure you speak into the --
25           MS. HOXHA:  Okay.
```

1          THE COURT:  -- microphone, we're having a little

2   trouble hearing you.

3          MS. HOXHA:  Is this better?

4          THE COURT:  Yes.

5          MS. HOXHA:  Okay.

6          THE COURT:  And speak slowly so we can get everything.

7   Okay?

8          MS. HOXHA:  Got it.  Okay.

9   Q.   Hello, Mr. Scheetz.  I have just a few questions for you

10  today.

11         The first one is with regard to a word you used throughout

12  your report, "OMG," which I understand to mean "outlaw

13  motorcycle gang."  Is that correct?

14  A.   Yes, ma'am.

15  Q.   And "outlaw," that first word there, means to operate

16  outside the law; is that correct?

17  A.   Correct.

18  Q.   So, Mr. Scheetz, are you aware of any instances where a

19  court of law in this state has determined that the Hells Angels

20  Motorcycle Club is a criminal organization?

21         MR. KRISHNAMURTHY:  Objection; relevance.

22         THE COURT:  Overruled.

23         THE WITNESS:  I believe in certain states there's been

24  several cases where they've been found guilty of the gang

25  enhancement, I believe.

BY MS. HOXHA:

Q.   Mr. Scheetz, I am asking you first, are you aware of any instances where a court of law in the state of California has determined that the Hells Angels Motorcycle Club is a criminal organization?

A.   No, ma'am.

Q.   And are you aware of any court of law in another U.S. state determining that the Hells Angels Motorcycle Club is a criminal organization?

A.   Organization?  No.  Just a gang.  No, ma'am.

Q.   Okay.  Next I want to turn to paragraph 40 on page 10 of your report and, specifically, that second sentence in that paragraph.  Are you there?

A.   (Nods head.)

Q.   Okay.  You say (reading):

        "The trademarked name Hells Angels and Death
    Head logo...."

    So "trademark," do you mean trademark under the trademark law with the U.S. Patent and Trademark Office?

A.   Yes, ma'am.

Q.   Okay.  And do you know who is the owner of that trademark, Mr. Scheetz?

A.    The Hells Angels.

Q.   Okay.  So next I'd like to share my screen and show a document.

SCHEETZ - CROSS / HOXHA

1        Do you see this document, Mr. Scheetz?

2   **A.**   Yes, ma'am.

3   **Q.**   Okay.  There is a seal of the U.S. Patent and Trademark

4   Office right here.  Do you see that?

5   **A.**   Yes.

6   **Q.**   And there is a signature from the director of the

7   United States Patent and Trademark Office.  Do you see that?

8   **A.**   Yes, ma'am.

9          **MS. HOXHA:**  Your Honor, we would like to move to admit

10  this into evidence as a self-certifying document under Rule 902

11  of the Rules of Evidence.

12         **THE COURT:**  Any objection?

13         **MR. KRISHNAMURTHY:**  No.

14         **THE COURT:**  All right.  It is admitted as Exhibit --

15  what number are we on?

16      It should be Exhibit 20 because there are 19 exhibits of

17  the Government.

18         **MR. KRISHNAMURTHY:**  Yes, Your Honor, I believe that's

19  correct.

20         **THE COURT:**  All right.  We'll call it Number 20.

21  Thank you.

22      (Defendants' Exhibit 22 received in evidence.)

23  **BY MS. HOXHA:**

24  **Q.**   And do you recognize the mark on this page, Mr. Scheetz?

25  **A.**   Yes.

**SCHEETZ - CROSS / HOXHA**

1   **Q.**   Is that the Death Head logo that you're referring to in

2   your report?

3   **A.**   Yes.

4   **Q.**   And is the phrase above that, "Hells Angels," the phrase

5   that you're referring to in your report?

6   **A.**   Yes.

7   **Q.**   And you see that there is a registration number associated

8   with it, 5779764?

9   **A.**   Yes.

10   **Q.**   And do you see who is the owner of this, Mr. Scheetz?

11   **A.**   Yes.  The Hells Angels Corporation.

12   **Q.**   Correct.  The Hells Angels Motorcycle Corporation.

13         I would like to show you another document.

14         Do you see this document, Mr. Scheetz?

15   **A.**   Yes, ma'am.

16         **MS. HOXHA:**  And this is a document from the Secretary

17   of State of the State of California.  It has a certification

18   number.  It has the seal of the Secretary of State of the State

19   of California and the signature.

20         And, Your Honor, we'd like to move to admit this into

21   evidence under Rule 902 of the rules of evidence.

22         **THE COURT:**  Any objection?

23         **MR. KRISHNAMURTHY:**  No, Your Honor.

24         **THE COURT:**  All right.  Admitted as Exhibit 21.

25         (Defendants' Exhibit 23 received in evidence.)

**SCHEETZ - CROSS / HOXHA**

1    BY MS. HOXHA:

2    **Q.**   Do you see what the entity name is on this document,

3    Mr. Scheetz?

4    **A.**   Yes, ma'am.

5    **Q.**   What is it?

6    **A.**   Hells Angels Motorcycle Corporation.

7    **Q.**   Okay.  And under "Status" there, do you see that it says

8    "Active and in good standing"?

9    **A.**   Yes.

10   **Q.**   Okay.  And do you see that this is recent, as of

11   August 23rd, 2020?

12   **A.**   Yes.

13   **Q.**   And it says that as of August 2020, the entity, the

14   Hells Angels Motorcycle Corporation, is authorized to exercise

15   all its powers, rights, and privileges in California.

16   **A.**   Yes.

17   **Q.**   And is a corporation duly incorporated and operating under

18   the laws of the State of California.

19        Do you see that?

20   **A.**   Yes.

21   **Q.**   Okay.  And those rights include the rights to have

22   guidelines on how to exercise their trademark rights.  Would

23   you agree?

24        **MR. KRISHNAMURTHY:**  Objection; foundation.

25        **THE COURT:**  Yeah.  There's nothing on the face of

SCHEETZ - CROSS / HOXHA

1   this; so you need to lay a foundation.

2   **BY MS. HOXHA:**

3   Q.   Do you agree that the Hells Angels Motorcycle Corporation,

4   certified, incorporated, and in good standing under the state

5   laws of California, is the same corporation that owns the

6   Hells Angel trademark that we just saw previously?

7   A.   I believe so, yes, ma'am.

8   Q.   Do you believe that one right the corporation has is to

9   protect their trademark?

10  A.   Yes.

11  Q.   And do you agree that as of August 23, 2020, that right

12  includes the right to protect the trademark?

13  A.   Yes.

14  Q.   Okay.  Mr. Scheetz, is it true that for some Hells Angels

15  events, the Hells Angel Motorcycle Club assigns someone to be

16  in contact with law enforcement?

17  A.   Yes.

18  Q.   Okay.  Can you please tell me a little bit more about

19  that.

20  A.   Depending on the scale of the event that I've worked.  For

21  instance, Hells Angels U.S.A. Run, which is their major run in

22  the United States, they assign one or two persons that are --

23  that have direct contact with law enforcement from the

24  inception of the run, for up to about six months, until the run

25  starts.  And then, during the run itself, that law enforcement

1    entity speaks to that law enforcement contact sometimes

2    multiple times a day or on a daily basis.

3         **MS. HOXHA:**  Okay.

4       Your Honor, could I have a second to --

5         **THE COURT:**  Yes.

6         **MS. HOXHA:**  -- ask a question of my co-counsel?

7                        (Pause in proceedings.)

8         **MS. HOXHA:**  No further questions, Your Honor.

9         **THE COURT:**  All right.  Thank you.

10      All right.  Then we will proceed to the next examiner.

11      Mr. Boisseau, are you intending to conduct cross?

12        **MR. BOISSEAU:**  No, Your Honor.  I have no questions.

13        **THE COURT:**  All right.  Thank you.

14        **MS. MORRISSEY:**  Your Honor, I believe the next

15   examiner would be me on behalf of Mr. Ott.  This is Marcia

16   Morrissey speaking.

17        **THE COURT:**  That's correct.  And you're doing it by

18   remote, and Mr. Ott, obviously, is by remote as well; correct?

19        **MS. MORRISSEY:**  Yes, Your Honor.

20        **THE COURT:**  Okay.  All right.  You may conduct your

21   cross.

22        **MS. MORRISSEY:**  Thank you.

23                     <u>**CROSS-EXAMINATION**</u>

24   BY MS. MORRISSEY:

25   **Q.**   Mr. Scheetz, I am Marcia Morrissey.  And Bob Waggener and

**SCHEETZ - CROSS / MORRISSEY**

1   I represent Russell Ott.  Good afternoon.

2   **A.**   Hello, ma'am.

3   **Q.**   I'm going to try and move through this quickly so that we

4   can all get done today.

5         Sir, you mentioned during your testimony today and on

6   other days David Atwell, who is from the Toronto chapter of the

7   Hells Angels; correct?

8   **A.**   Yes, ma'am.

9   **Q.**   He's one of the people you called during your examination

10  to verify or check the testimony that you had given on a

11  previous occasion; correct?

12  **A.**   No, I did not talk to David Atwell.

13  **Q.**   You didn't talk to him at all?

14  **A.**   Before this or during, no.

15  **Q.**   Okay.  Did you mention him as a source during your

16  testimony?

17  **A.**   Yes, ma'am.

18  **Q.**   Okay.  He left the club in 2007; correct?

19  **A.**   I'm not sure the exact date.

20  **Q.**   Well, he left the club just about a year after you started

21  working for ATF and concentrating on motorcycle clubs; correct?

22  **A.**   He never worked for ATF.  He worked for the Ontario

23  Provincial Police.

24  **Q.**   No.  My question was:  Did he stop -- did he leave the

25  club shortly -- about a year after you started working

SCHEETZ - CROSS / MORRISSEY

1   motorcycle clubs for ATF?

2   **A.**   I apologize.  Yes, ma'am.  I believe that's the date, yes.

3   **Q.**   And are you aware, sir, that David Atwell was paid more

4   than a half a million dollars by the Ontario Provincial Police

5   for his testimony in the -- in various proceedings in Canada?

6   **A.**   No, ma'am.

7   **Q.**   Do you think that somebody who receives a half a million

8   dollars as payment for testimony might have a motive to curry

9   favor with those who are giving him the money?

10  **A.**   No, ma'am.

11  **Q.**   And you don't think that's something you ought to consider

12  in relying on Mr. Atwell; correct?

13  **A.**   No, ma'am.

14  **Q.**   Okay.  Do you know that Atwell, while he was earning his

15  half a million dollars, engaged in drug sales that were

16  initiated by law enforcement with members of the Toronto

17  chapter?

18  **A.**   Are you saying that he worked on -- he worked on behalf

19  of --

20  **Q.**   No.

21  **A.**   -- of buying narcotics --

22  **Q.**   I'm asking whether you are aware that --

23          (Simultaneous speaking; stenographer interrupts.)

24          **THE WITNESS:**  -- of the Ontario Provincial Police,

25  buying narcotics, as evidence?

1    BY MS. MORRISSEY:

2    Q.   I am asking you if you -- okay.  You can answer that.  The

3    answer is yes; correct?

4    A.   I'm not sure what he purchased, ma'am.  I just know he was

5    working on behalf of them.

6    Q.   Do you know there was a finding by the Supreme Court of

7    British Columbia, during a forfeiture proceeding, that

8    Mr. Atwell engaged in drug sales initiated at the direction of

9    the Ontario Provincial Police?

10   A.   I do not know that ruling, no, ma'am.

11   Q.   Okay.  Do you know that Mr. Atwell wrote a book called

12   *The Hard Way Out* with a co-author?

13   A.   Yes, I know he wrote a book.

14   Q.   Okay.  And do you know that in subsequent proceedings, he

15   claimed that words attributed to him in the book were not his?

16   A.   I do not know that, ma'am.

17   Q.   And do you know that the Supreme Court of British Columbia

18   considered that in deeming Mr. Atwell not credible in

19   forfeiture proceedings?

20   A.   No, ma'am, I do not know that.

21   Q.   Okay.  You mentioned -- I think we've covered Mr. Neff.

22        What about Joshua O'Bryan?  He was part of the Denver

23   chapter of the Hells Angels; correct?

24   A.   Correct.

25   Q.   This has to do with charter autonomy, sir.

1      Are you aware that Mr. O'Bryan told police officers that

2  if you want hugs and love, you go to the Rocky Mountain

3  chapter, but if you want drugs, you go to the Denver chapter?

4  **A.**   I do not know that, ma'am.

5  **Q.**   Okay.  Is that, in your expert opinion, an example of

6  chapter autonomy?

7          **MR. KRISHNAMURTHY:**  Objection; relevance.

8          **THE COURT:**  Overruled.

9          **THE WITNESS:**  I mean, certain charters do certain

10  things.  I wouldn't say it's charter autonomy.  I mean,

11  there's -- charter autonomy would be more of rules of wearing

12  tabs and patches, attending events, stuff of that nature.  I'm

13  not sure that would be charter autonomy or not.

14  **BY MS. MORRISSEY:**

15  **Q.**   Well, charters are different; correct?

16  **A.**   All charters are different, yes, ma'am.

17  **Q.**   Yeah.  Rocky Mountain, you get hugs and love.  Denver, you

18  get drugs.  Right?

19  **A.**   If that's what he's saying.

20  **Q.**   Okay.  Do you know that at the time O'Bryan first became

21  involved in cooperating with the police in that case in Denver,

22  he was in jail and contacted authorities, saying, "I have

23  information for you"?  Did you know that?

24  **A.**   No, ma'am.  I don't know the circumstances of him

25  contacting law enforcement.

**SCHEETZ - CROSS / MORRISSEY**

1    **Q.**    Okay.  And at the time he contacted law enforcement, he

2    had warrants out for his arrest in multiple counties.  Did you

3    know that, sir?

4    **A.**    No, ma'am.

5    **Q.**    Do you think that those things might affect his

6    credibility for the worse?

7    **A.**    For me speaking to him on behalf of the Hells Angels, I

8    trust what he had to say.  I'm not sure about the validity of

9    other things that he was involved in.  I don't not -- I don't

10   know that.

11   **Q.**    You take -- is what you're telling us, sir, you take as

12   true and valid everything he has to say about the Hells Angels

13   but, as to other things, you don't have such an opinion?

14   **A.**    I don't know any of the other circumstances involving the

15   individual.  What I talked to him about is Hells Angels, and

16   then I compare and contrast that with other things that I've

17   seen or written to formalize a conclusion.

18   **Q.**    Right.  And the things that you've seen or written come

19   mainly from law enforcement; is that correct?

20   **A.**    Yes.  Or intelligence agencies, yes, ma'am.

21   **Q.**    Right.  Intelligence agencies that are part of law

22   enforcement; correct?

23   **A.**    No.  There's three-letter agencies that are not part of

24   law enforcement, that are outside the Department of Justice.

25   **Q.**    And those agencies would be what?

1    **A.**    There's CIA.  There's NSA.  There's all types of other

2    agencies, ma'am, that aren't law enforcement, like, under DOJ

3    like FBI, DEA, and ATF.

4    **Q.**    You're telling us that NSA is not a law enforcement

5    agency?

6               **MR. KRISHNAMURTHY:**  Objection; relevance.

7               **THE COURT:**  Overruled.

8               **THE WITNESS:**  I don't -- I don't look -- I look at law

9    enforcement agencies I work for as under the Department of

10   Justice, ma'am.  I don't know the formality of considering them

11   a law enforcement agency.

12   **BY MS. MORRISSEY:**

13   **Q.**    All right.  Thank you.

14        And the same would be true for the CIA; correct?

15   **A.**    Correct, ma'am.

16   **Q.**    All right.  You mentioned in your C.V. that you spoke at

17   NCGIA in Pinehurst, North Carolina, in September of 2015.

18   **A.**    Yes, ma'am.

19   **Q.**    And you also, I believe, mentioned *The Aging Rebel*, which

20   is a website that you used as a source of information.

21   Correct?

22   **A.**    For one article, yes, ma'am.

23   **Q.**    Well, you use it -- you included it in your exhibit.

24   Let's see.  It's Exhibit 17, now 19, Tab B; correct?  That's

25   from *The Aging Rebel*?

**SCHEETZ - CROSS / MORRISSEY**

1    **A.**    Correct.

2    **Q.**    And you -- are you aware that there was a posting on

3    *The Aging Redel -- Rebel* -- excuse me -- about statements you

4    made in Pinehurst, North Carolina, in September 2015?

5    **A.**    Yes, ma'am.

6    **Q.**    And you've read that?

7    **A.**    Yes.

8    **Q.**    Okay.  Let me ask you something.  Did you say (reading):

9              "We know who these guys are.  We stand right in

10        front of them.  We take their photos.  I write the

11        OMG Military report.  I get fuck-yous all the time.

12        I put my phone number right in there.  They call.

13        They just don't like us.  That's good.  That means

14        we're doing our jobs.  We're putting them in jail.

15        And, that's what our job is to do."

16        Did you say that?

17    **A.**    Yes, ma'am.

18    **Q.**    And is that how you feel?

19    **A.**    Sometimes, yes, it is.  We do get --

20    **Q.**    Well, sometimes?

21        (Simultaneous speaking; stenographer interrupts.)

22            **THE WITNESS:**  Sometimes we feel that way because we

23    are told derogatory things or flicked off or told things that

24    aren't appropriate.  Yes, ma'am, that does occur on -- time to

25    time.

SCHEETZ - CROSS / MORRISSEY

1  BY MS. MORRISSEY:

2  Q.   Well, that's because you're at motorcycle events snapping

3  pictures of them; right?

4          MR. KRISHNAMURTHY:  No evidence.

5          THE COURT:  Sustained.

6          THE WITNESS:  Yes, ma'am.

7          THE COURT:  Wait.  No, I sustained.  You don't have to

8  answer the question.

9          THE WITNESS:  I'm sorry.

10 BY MS. MORRISSEY:

11 Q.   And you also, in that meeting, spoke with derogatory terms

12 about a food drive that takes place every year in Virginia

13 Beach; correct?

14         MR. KRISHNAMURTHY:  Objection.

15         THE COURT:  Overruled.

16         THE WITNESS:  Yes, ma'am.

17 BY MS. MORRISSEY:

18 Q.   Okay.  And you basically said that you didn't like the

19 multiracial aspect of the food drive?

20 A.   I did not say that, ma'am.  No, ma'am.  I would not --

21 Q.   Okay.

22 A.   -- say that.

23 Q.   Did you say (reading):

24         "All biker clubs to include the African-American

25     biker clubs, the multiracial, the expanded

**SCHEETZ - CROSS / MORRISSEY**

1    associational, it doesn't matter.  They show up"?

2    **A.**    Yes, they do show up.  Yes, ma'am.

3    **Q.**    Okay.  And in your mind, this is just fluff and nonsense;

4    correct?

5    **A.**    Correct.

6    **Q.**    And have you ever found out or asked how many hours are

7    spent on food drives, toy drives, bike drives by the

8    Hells Angels?

9    **A.**    No, ma'am.

10   **Q.**    You don't think it's important to know that before

11   dismissing this as propaganda?

12   **A.**    No, ma'am.

13   **Q.**    Would it be fair to say, sir, that you have a significant

14   bias against motorcycle clubs?

15   **A.**    Absolutely not, no.

16   **Q.**    Absolutely not?

17   **A.**    No bias.

18   **Q.**    Thank you.

19       You mentioned predictive analytics during your testimony.

20   Do you recall?

21   **A.**    Yes, ma'am.

22   **Q.**    Okay.  Now, predictive analytics is a process of refining

23   data to extract knowledge from patterns.  Would that be a fair

24   statement?

25   **A.**    Yes.

1  Q.   Okay.  And it uses mathematics and statistical methods to

2  extract information from data and use it to predict trends and

3  behavior patterns; correct?

4  A.   That's one way.  That's not how I -- I don't use

5  statistical data like that, no, ma'am.

6  Q.   That's the point.  When you say you use predictive

7  analytics, you're not using statistical techniques; correct?

8  A.   We use stats, but I don't look at just the statistics.  We

9  look at predictive analytics to show that if something

10  transpired in some other area, that the likelihood of that

11  transpiring in another area is going to occur.  And we use

12  proof as well as factual information derived from

13  investigations or intelligence to prove that.

14  Q.   Sir, do you have -- do you use mathematical algorithms to

15  mine data in your predictive analytic process?

16  A.   I wouldn't say of that nature.  We compare and contrast

17  percentages to see if there's going to be an increase or a

18  decrease every year from the number of violent acts involving

19  an outlaw motorcycle gang or motorcycle club.  That's what

20  we -- that's how I do it.

21  Q.   Okay.  Sir, you're not using predictive analytics in the

22  term that it is known as a science; correct?

23  A.   I'm using it in the -- I'm using it in the format of how I

24  utilize it with ATF --

25  Q.   Okay.

1  **A.**   -- the way we were taught.

2      And I put it to the one subject of outlaw motorcycle gangs

3  or motorcycle clubs.  It would be no different from someone

4  else in my position using predictive analytics doing firearms

5  trafficking or arson investigations.  I just happen to do it

6  for outlaw motorcycle gangs and motorcycle clubs.

7  **Q.**   Okay.  Sir, this is not a sophisticated process you're

8  talking about; correct?

9  **A.**   No, not at all.

10 **Q.**   Okay.  You didn't use a database in expressing any of the

11 opinions that you have told us about in this courtroom;

12 correct?

13 **A.**   No, ma'am.

14 **Q.**   You just look at things and you make predictions; correct?

15 **A.**   No.  I look at historical data that I have in the reports

16 that I've submitted to the Court, and I can prove with almost

17 certainty that something is going to transpire.  And in those

18 reports I've submitted, I put in there that something is going

19 to transpire.

20      And when something does transpire, I usually -- or I

21 always do -- I do a follow-up intelligence report or

22 intelligence note.

23 **Q.**   You're telling us that you can predict things with almost

24 certainty; correct?

25 **A.**   When the Hells Angels move into an area --

**SCHEETZ - CROSS / MORRISSEY**

1  Q.   No.  Yes or no, sir?

2  A.   In comparison to outlaw motorcycle gangs and the

3  Hells Angels, yes, ma'am.

4  Q.   Mr. Scheetz --

5  A.   That's my job --

6  Q.   -- can you ask -- are you telling us you can make

7  predictions based on your method that doesn't involve

8  mathematics, statistics, or algorithms with almost complete

9  certainty?

10     Yes or no?

11 A.   Yes, ma'am, involving the Hells Angels migrating into an

12 area, which we use that for, yes.  That's my job with ATF.

13     MS. MORRISSEY:  Thank you, Your Honor.  I have no

14 further questions.

15     THE COURT:  All right.  Let me follow up on those

16 questions.

17     Can you give an example?  When you say "predictive

18 analytics," basically, you take historic data; and then, if you

19 have information that the Hells Angels are going to move into a

20 particular area, you use that data then to predict whether

21 there's going to be violence?

22     THE WITNESS:  Yes, sir.  Your Honor, if there's an

23 adversary in an area where they're going to move to or migrate

24 to, we utilize historical information, where those violent acts

25 have transpired because someone has moved into the area or they

1   have moved into the area, to show that it is going to

2   transpire.

3          THE COURT:  So you look at past violence involving

4   other groups with --

5          THE WITNESS:  With the Hells Angels, yes, sir.

6          THE COURT:  With the Hells Angels.

7          THE WITNESS:  And we also don't just do it with the

8   Hells Angels.  We do it with the other traditional dominant

9   OMGs.  When they move into an adversary's territory, some type

10  of violent incident or altercation is going to transpire.

11         THE COURT:  So in addition to just looking at it, do

12  you have some kind of formula, or what do you -- is there a

13  math formula or computer program, or you just kind of eyeball

14  it and say, "There's been 20 incidents in the past.  It looks

15  like there's a good chance it's going to happen again"?

16         THE WITNESS:  Yes, Your Honor.  Through -- we have a

17  listing of the violent acts in those areas; and we show -- and

18  we have them documented, that when they move into a certain

19  area, excluding one right now in the United States, a violent

20  act is going to transpire.  And that's through the reports that

21  I've submitted to the Court, you can see those in there.

22         THE COURT:  All right.  But there's no -- is there a

23  mathematical formula that you use, or you just look at it and

24  you can kind of predict?

25         THE WITNESS:  There's no math formula, sir, because

1    there's variables or the Hells Angels are the components of the

2    traditional dominant OMGs.  We're not saying that there's 95

3    violent acts.  We're saying if something is -- if they are in

4    one area and they migrate to another area or somebody migrates

5    into the area, we can look at historical violence to prove that

6    violent act happened.  And then we can show the time frame of

7    when one of the two entities moved into that area.

8         **THE COURT:**  All right.  But there's no formula.  You

9    don't use any kind of computation.

10        **THE WITNESS:**  No, there is no formula, sir.

11        **THE COURT:**  And do you check -- once you've done the

12   prediction, do you then go back to it a year later, two years

13   later, and say, "Yep, we were right" or "No, we were wrong"?

14        **THE WITNESS:**  Yes.  Yes, we do that all the time.  And

15   when we send out reports, some people say -- we've even got

16   responses back from people saying, "Hey, that didn't transpire.

17   This did occur" or "You missed something."

18        But when I submit my annual report every year, which we've

19   submitted to the Court, I put that in there as one of the

20   trends and patterns that myself observes on a daily basis.

21        **THE COURT:**  And are there times when your prediction

22   didn't come true?

23        **THE WITNESS:**  I'll give an example.  We knew the

24   Hells Angels were moving into -- were expanding in Kentucky;

25   and myself and other people said that nothing was going to

 1   transpire because where they were moving to was no adversarial

 2   OMGs.  They were just expanding the moniker.

 3        However, since that was two years ago, we are starting to

 4   see an uptick, which we did -- which we did not see until

 5   another adversary moved into that state, sir.

 6             THE COURT:  Okay.  So you hadn't predicted that, but

 7   it happened?

 8             THE WITNESS:  We did not predict that, because where

 9   they moved to or expanded that charter, there was no adversary

10   in the area.  So we didn't put out that something was going to

11   occur.  Or myself.  Sorry.

12             THE COURT:  So the main thing you look to is whether

13   there's an adversary already in the area?  That's the main

14   factor in your prediction?

15             THE WITNESS:  Yes, Your Honor.

16             THE COURT:  Okay.  All right.  Thank you.

17        Anything further, Ms. Morrissey?

18             MS. MORRISSEY:  No, Your Honor.  Thank you.

19             THE COURT:  Thank you.

20        All right.  Then we have Mr. Walsh.  Were you going to --

21   do you have some questions?

22             MR. WALSH:  Yes, I do, Your Honor.  Thank you.

23        Your Honor, I'm having a tough time hearing you at times;

24   so --

25             THE COURT:  Okay.  I'm not -- I'm distanced from the

1    microphone.  I'll try to keep close.  Go ahead.

2           MR. WALSH:  So just throw something at my screen.

3                         CROSS-EXAMINATION

4    BY MR. WALSH:

5    Q.   Mr. Scheetz, my name is John Walsh.  I represent

6    Christopher Ranieri.  Good afternoon.

7    A.   Hello, sir.

8    Q.   I'm going to try to move at flank speed with you,

9    Mr. Scheetz.  If you don't understand any question I put to

10   you, would you please tell us?  Otherwise, I'll operate on the

11   assumption that you have understood my question and answered

12   accordingly.  Fair enough?

13   A.   Yes, sir.

14   Q.   Thank you.

15        Now, in terms of the bases of each of your opinions, have

16   you spoken with, debriefed, or interviewed anyone who is or was

17   a member or someone who has had a relationship with the

18   Hells Angels chapter in Salem, Massachusetts?

19   A.   The only one would have been Timothy Jordan, but his

20   relationship was only the fact that they had attended events

21   together and were members of the same -- were both members of

22   the Hells Angels.  Other than that, no, sir.

23   Q.   And Mr. Jordan is an informant, is that correct, or was an

24   informant?

25   A.   He was, yes, sir, for ATF.

**SCHEETZ - CROSS / WALSH**

1   **Q.**   And he's out of Denver or was out of Denver?

2   **A.**   No, sir.  He was out of Greenville, South Carolina.

3   **Q.**   Oh, South Carolina.  And what event was that that he

4   attended?

5   **A.**   He attended South Run, which is an annual event every year

6   on the East Coast.  He also attended several U.S.A. Runs where

7   members of Salem were present.

8   **Q.**   Okay.  And what did he tell you about members of Salem?

9   **A.**   Nothing, other than -- nothing, because it was never

10  something that we asked.

11  **Q.**   Pardon?

12  **A.**   It was not something that we asked.  We observed him.  We

13  were working those runs where he was there.

14  **Q.**   Okay.  So he gave you no information about any member of

15  Salem; correct?

16  **A.**   No, sir.

17  **Q.**   Okay.  Correct, you agree with me?

18  **A.**   Yes, he didn't give us any information, other than being

19  at the same events with him.

20  **Q.**   Okay.  Thank you very much.

21       And when I use the term "relationship with Salem," I use

22  that broadly.  Anyone who has a relationship with Salem.  Is

23  that your understanding, and was your answer based on that

24  understanding?

25  **A.**   It was just a relationship that they were all members

1    together and they attended the same events.  It was not --

2    **Q.**    Okay.

3    **A.**    -- something that he --

4    **Q.**    But when I used the phrase -- and I'll use it again --

5    "anyone who has a relationship with," I include both a member,

6    a hangaround, a prospect, what you have described as an

7    associate, a friend, or anyone.  Okay?  Anyone.  Do you

8    understand?

9    **A.**    Yes, sir.

10   **Q.**    Okay.  Thank you.

11        Now, again, in terms of the bases of each of your

12   opinions, have you spoken with, interviewed, debriefed anyone

13   who is or was a member or someone who has had or does have a

14   relationship with a Hells Angels chapter in Boston?

15   **A.**    The only person I've spoken to is a -- is a New Hampshire

16   state police off- -- trooper, and that's it.  Other than

17   that --

18        (Stenographer interrupts for clarification of the record.)

19        **THE WITNESS:**  The only person I've spoken with is a

20   New Hampshire state trooper who had an investigation that

21   recently was adjudicated.  Other than that, of all the people

22   I've spoken to, no, sir.

23   **BY MR. WALSH:**

24   **Q.**    Okay.  And what's the name of that trooper?

25   **A.**    Shane Larkin.

**SCHEETZ - CROSS / WALSH**

1  Q.   Okay.  And what investigation are you talking about?

2  A.   He did a narcotics investigation, I believe in 2018; and

3  that was on the Manchester, New Hampshire, charter.

4  Q.   Okay.  And how did that -- what did Trooper Larkin say to

5  you about a Hells Angels chapter in Boston?

6  A.   The only thing that -- actually, in Salem -- was the fact

7  that they were very close with the New Hampshire charter

8  because they're right there on the border.

9  Q.   Okay.  That's the Manchester, New Hampshire, charter?

10 A.   Yes, sir.

11 Q.   Okay.  In fact, you'd agree with me that there is no

12 Hells Angels chapter in Boston; correct?

13 A.   That's correct, sir.

14 Q.   Okay.  There's only a Hells Angels chapter in Salem;

15 correct?

16 A.   Correct, sir.

17 Q.   Mass?

18      Okay.  Now, again, in terms of the bases of all of your

19 opinions, have you spoken with, talked to, interviewed,

20 debriefed anyone who is or was a member or someone who has had,

21 had, or does have a relationship with any New Hampshire chapter

22 of the Hells Angels in New Hampshire, other than what you've

23 just described with respect to Trooper Larkin?

24 A.   No, sir.

25 Q.   Okay.  Now, in your declaration, you describe what a Nomad

1   chapter is; correct?

2   **A.**   Yes.  Nomad charter, yes, sir.

3   **Q.**   Okay.  And could you briefly describe it for us now,

4   please.

5   **A.**   A Nomad charter basically does not reside in the area

6   that's close to the charter itself oftentimes, or it can.

7   Somebody can live outside state lines and still belong to that

8   charter.  Oftentimes, they don't -- they don't have regular

9   church meetings.  There's members of Nomads charters that have

10  attended other church meetings at other charters if they're in

11  that area.

12  **Q.**   And are you referring to a Nomad having an affiliation

13  with the Hells Angels?

14  **A.**   Yes, sir.

15  **Q.**   Okay.  And, again, in terms of the bases for all of your

16  opinions, have you spoken with, interviewed, debriefed anyone

17  who has or -- who is -- excuse me -- or was a member or someone

18  who has had or does have a relationship with a Nomad chapter in

19  New Hampshire or Massachusetts?

20  **A.**   No, sir.

21  **Q.**   Okay.  Is there a Nomad chapter of the Hells Angels in

22  New Hampshire?

23  **A.**   Yes, sir.

24  **Q.**   Where is it located?

25  **A.**   I believe that's located in Laconia, New Hampshire, sir.

1   **Q.**   Okay.  Is there only one Nomad chapter in New Hampshire?

2   **A.**   Yes.  There can only be one Nomad in each -- one Nomad

3   charter in each state.  So that's correct, sir, yes.

4   **Q.**   Okay.  And is there a Nomad chapter of the Hells Angels in

5   Massachusetts?

6   **A.**   No, sir.

7   **Q.**   Okay.  How many members are there of the Nomad chapter in

8   Laconia?

9        **MR. KRISHNAMURTHY:**  Objection; relevance.

10       **THE COURT:**  Sustained.

11  **BY MR. WALSH:**

12  **Q.**   Well, are you familiar about the term "ghost club"?

13  **A.**   No, sir.

14  **Q.**   Okay.  Now, you mentioned Laconia a few moments ago.  And

15  in your declaration, you describe having attended a number of

16  motorcycle groups events; correct?

17  **A.**   Yes, sir.

18  **Q.**   Okay.  And are you familiar with a motorcycle gathering in

19  Laconia, New Hampshire?

20  **A.**   Yes, sir.

21  **Q.**   And would you agree with me that that's a -- that was a

22  fairly famous event; correct?

23  **A.**   It's an annual bike event.  I don't think it's a famous

24  event.

25  **Q.**   Okay.  Have you ever attended it?

**SCHEETZ - CROSS / WALSH**

1  A.   I've attended the World Run when it was -- the World Run

2  when it was held at Laconia, yes, sir.

3  Q.   When was that?

4  A.   That was in 2011.  I believe 2011.

5  Q.   Is that the only one you've attended at Laconia?

6  A.   I attended a -- yes, sir.

7  Q.   Okay.  I'm sorry.  Why don't you complete your thought,

8  please.

9  A.   I'm trying to think.  I -- it was either, like, 2008, 2009

10  that I worked, like, half a day at Laconia Bike.  Usually, that

11  event is usually not covered, or it's not an annual event that

12  I cover every year.

13  Q.   Okay.  You leave that to the East Coast --

14  A.   Say again.

15  Q.   -- ATF?

16       You leave that to the East Coast ATF and law enforcement?

17  A.   I didn't hear your question, sir.

18  Q.   You leave coverage of Laconia to the East Coast branch of

19  the ATF?

20  A.   No, sir.  New Hampshire State Police as well as other

21  New Hampshire municipalities cover that event, sir.

22  Q.   Okay.  Now, in terms of the bases for each of your

23  opinions, do you rely upon any interviews or debriefs or

24  discussions with law enforcement authorities or your resources,

25  as you've described them, your investigative and analytical

1  resources, as you've described them, or any documents

2  pertaining to the motorcycle event at Laconia?

3  **A.**   No, sir.

4  **Q.**   Okay.  Thank you.

5      With respect to your opinions -- I just need to clarify

6  something in my mind, sir.  In roughly the first 18

7  paragraphs -- well, the first 17 paragraphs of your

8  declaration, which is Exhibit 2 to Document 1084 in the Court's

9  docket as well as Tab 4, as I understand it, in your binder --

10  in any event, the first 17 passages -- paragraphs describe your

11  background; correct?

12  **A.**   My what, sir?  Your last question?

13  **Q.**   Your background.

14  **A.**   Yes, sir.

15  **Q.**   Okay.  And paragraph 18 -- do you have that document in

16  front of you?

17  **A.**   One second, sir.

18      Yes, sir.

19  **Q.**   Okay.  In paragraph 18, you state (reading):

20          "The subject of my dec-" -- "declaration" --

21      excuse me -- "is Hells Angels symbols, terms, and

22      territory."

23      Correct?

24  **A.**   Yes.

25  **Q.**   So your opinions don't go into the Hells Angels history,

1   does it?  And I'm just trying to get on the same page, sir.

2   **A.**   It does.  The history is wrapped up into understanding the

3   symbols, terms, and territory.  To understand those terms, you

4   must know the history.  And we go into --

5   **Q.**   Okay.

6   **A.**   I go into the history next.

7        And to understand those terms, you must know the history.

8   **Q.**   Okay.  I appreciate that.  But your opinions go to the

9   terms, symbols, and territory; correct?

10  **A.**   Yes.

11       **MR. WALSH:**  All right.  That's all I have.  Thank you,

12  Mr. Scheetz.

13       Thank you, Your Honor.

14       **THE COURT:**  All right.  Thank you, Mr. Walsh.

15       And, again, just to make sure, Mr. Boisseau, you are not

16  asking any questions on cross; is that correct?

17       **MR. BOISSEAU:**  That is true, Your Honor.

18       **THE COURT:**  All right.  We've concluded the

19  cross-examination.  No other -- there are no other, as I

20  understand it, no other counsel that has sort of signed up to

21  ask questions; correct?

22                    (No response.)

23       **THE COURT:**  All right.  Hearing none and consistent

24  with prior filings, I conclude that the cross-examination phase

25  of this *Daubert* hearing has been concluded.

 1    So now is the chance for the Government conduct its

 2    redirect.

 3          **MR. KRISHNAMURTHY:**  Yes, Your Honor, thank you.

 4                    **REDIRECT EXAMINATION**

 5    **BY MR. KRISHNAMURTHY:**

 6    **Q.**   Mr. Scheetz, you've talked a lot during the

 7    cross-examination --

 8          **THE COURT:**  Can you get the mic closer to you?  You're

 9    a little bit soft there.

10    **BY MR. KRISHNAMURTHY:**

11    **Q.**   Mr. Scheetz, you've talked a lot during the examination

12    about compare and contrast.  Can you explain what that means?

13    **A.**   Compare and contrast means I take a piece of intelligence

14    or information that derives from an ATF report, another DOJ

15    entity report, maybe something that I've received on the high

16    side from another federal or state, local agency, could be

17    United States or across the world, and I compare and contrast

18    with information that I've either seen or I have historically

19    stored with ATF.  And then that's how I compare and contrast

20    and come to a conclusion.

21          Sometimes when I compare and contrast, I don't come to a

22    conclusion because I just don't have enough evidentiary

23    information.  But I always compare and contrast.  Even if

24    I think I know the answer, I always look to make sure, due to

25    the fact that I'm the representative on outlaw motorcycle gangs

1    and motorcycle clubs for ATF for the outside as well as

2    internal.  So I want to make sure I have the information

3    correct.

4    Q.   Thank you.

5         I'd like to ask you how that applies to a couple of

6    specific things that you discussed during the

7    cross-examination.

8         The first is, last week we talked about Shasta and Sonoma

9    County.  Do you remember that?

10   A.   Yes.

11   Q.   And if I remember correctly, you explained that you spoke

12   with Mr. Gil-Blanco about that situation and why Shasta was

13   frozen.

14   A.   Correct, sir.

15   Q.   What specifically did Mr. Gil-Blanco tell you?

16   A.   I was told because the Shasta charter did not retaliate

17   for Mr. Thomson being shot, that they step to the charter and

18   the charter was made frozen because they fell below the six

19   person minimal to sustain a charter.

20   Q.   First of all, who's Mr. Thomson?

21   A.   He was a member at the time of the Hells Angels

22   Shasta County charter.

23   Q.   And who was he shot by?

24   A.   Members of the Mongols.

25   Q.   What information, if any, did you use to compare with

1  Mr. Gil-Blanco to tell you to come to your conclusion?

2  A.   Most we compared was the fact that this was just another

3  violent act that I compared with other violent acts that have

4  transpired, not just in the United States but across the globe,

5  involving the Hells Angels and the Mongols.

6      I also look to show that the fact that they went below

7  their six person minimal to have a charter, that doesn't always

8  mean that they're going to freeze that charter.  So I compare

9  and contrast that with things that are still transpiring to

10  this day where charters go below that minimal and they don't

11  get frozen.  And I can use that as information to stand for

12  charter autonomy or state autonomy, that they don't always

13  freeze the charter.  This just happens to be one instance where

14  that did transpire.

15  Q.   Did you do any research into the underlying incident where

16  Mr. Thomson got shot?

17  A.   I tried.  I wasn't able to get much information, other

18  than the fact that I spoke to Mr. Gil-Blanco.  And I've also

19  spoken to ATF Los Angeles, which is John Ciccone, and the four

20  ATF undercovers who conducted the infiltration into the

21  Mongols, I think it was 2007 to 2010.  And they were fully

22  aware of the situation that transpired betweens the Mongols and

23  the Hells Angels, and they gave me a little bit of information,

24  which coincided, confirmed what Jorge had said.

25  Q.   Did they explain to you how they were fully aware of the

1   situation?

2   **A.**   Other than -- only the fact that they explained to me that

3   the Mongols did shoot a member of the Hells Angels, but they

4   didn't go into detail about the charter being frozen and of

5   that nature.

6   **Q.**   One other -- one other piece --

7        **THE COURT:**  Before you leave that subject, what was

8   the basis of Mr. Gil-Blanco's statement to you that the

9   freezing was due to the lack of retaliation?  How did he know

10  that?

11       **THE WITNESS:**  I believe he had done some debriefing,

12  sir, on some former members or through some sources; and he had

13  come to the conclusion and was told that because they did not

14  retaliate, that a vote was going to be held.  And they

15  eventually -- one of the members ended up leaving.  And then,

16  them being below the six minimal to hold a charter, three ended

17  up transferring to the Nomads charter, and then they froze that

18  charter.  That's what Mr. Gil-Blanco told me, sir.

19       **THE COURT:**  And did he describe who these former

20  members were or what their credibility was?

21       **THE WITNESS:**  He did.  I can't remember at the time

22  now, sir.

23       **THE COURT:**  He did describe to you who these people

24  were?

25       **THE WITNESS:**  Yes, sir.  I just don't remember at the

1   time.  It was, like, 2008, 2009.  They were full-patch members,

2   sir.

3           THE COURT:  Full-patch members of Shasta or some

4   other --

5           THE WITNESS:  Of other charters.

6           THE COURT:  Of other charters.  But they knew what was

7   happening at Shasta?

8           THE WITNESS:  Yes, sir.

9           THE COURT:  And how would they know that if they were

10  members of other --

11          THE WITNESS:  I guess between internal discussions.

12  He didn't go into exactly how they knew, but he told me exactly

13  what transpired.

14          THE COURT:  Okay.  Thank you.

15  BY MR. KRISHNAMURTHY:

16  Q.  Mr. Scheetz, do you believe that Hells Angels from

17  different charters use common symbols?

18  A.  Yes.

19  Q.  Why is that?

20  A.  Because it's in their World Rules.

21  Q.  Have you been to events where members of Hells Angels from

22  different charters had congregated?

23  A.  Yes.

24      Oh.  Hells Angels events alone, I've been to a little over

25  50, and I've been to about 125 events where the Hells Angels

1  have been there.

2         (Stenographer interrupts for clarification of the record.)

3         **MR. KRISHNAMURTHY:**  Oh, I'm sorry.  I think my last

4  question was how many events -- how many events did Mr. Scheetz

5  attend at which Hells Angels members had been present.

6         **THE WITNESS:**  In reference to just Hells Angels events

7  where they're the sole entity at the event, it's approximately

8  about 50, and that's across the globe, and about 125 where

9  they've been there with other either outlaw motorcycle gangs or

10 motorcycle clubs.

11 **BY MR. KRISHNAMURTHY:**

12 **Q.**  Have you seen photographs of Hells Angels members from

13 different charters?

14 **A.**  Yes.

15 **Q.**  In your experience, have you ever seen, within the

16 United States, a back patch look different than the one

17 mandated by the Hells Angels rules?

18 **A.**  Other than the state bottom rocker, no.

19         **THE COURT:**  Other than the what?

20         **THE WITNESS:**  The state bottom rocker, which outlines

21 the state, sir.

22 **BY MR. KRISHNAMURTHY:**

23 **Q.**  Have you seen the Filthy Few tab or tag on members of

24 different charters?

25 **A.**  Yes.

1   **Q.**   Approximately how many?

2   **A.**   Oh, I couldn't count.  I've been to several events across

3   the world.  So it's probably 50 to a hundred across the world.

4   **Q.**   Have you seen -- have you seen members of different

5   Hells Angels charters wearing the Dequiallo tag?

6   **A.**   Yes, sir.

7   **Q.**   About how many?

8   **A.**   I'd say probably 35.  There's not as many Dequiallo tags

9   outside the United States that are being worn or being

10  displayed.

11  **Q.**   For both the Filthy Few tag and the Dequiallo tag, you

12  talked earlier on direct about how you have tried to match up

13  the person wearing the tag to what they might have done to earn

14  it.

15  **A.**   Yes.

16  **Q.**   Do you remember that?

17  **A.**   Yes.

18  **Q.**   Have you been able to match that up for different

19  charters?

20  **A.**   Yes.

21  **Q.**   Can you give us an example of a Dequiallo tag -- how you

22  determined what it could mean for a person from different

23  charters?

24  **A.**   Yes.  During the, I believe it was 1997 Laconia Bike Week,

25  I'm not sure how many but a number -- a large contingent of

1   Hells Angels from across the United States ended up getting

2   into an altercation with a police-officer-based ideology club.

3   And then they assaulted, I believe, three to four local police

4   officers.

5        I've looked at the colors of the individuals before they

6   attended the event, the ones that were arrested, and then after

7   the event.  And we saw them, once they got out of prison -- I

8   wasn't employed with ATF at the time, but I've been privy to

9   pictures that were given to me that shows them immediately

10  wearing the Dequiallo tag on their colors.

11       So we looked at before the event transpired.  They were

12  subsequently arrested.  Some were convicted for that assault on

13  the law enforcement officers.  And then we visually saw them,

14  through the pictures I've seen historically.  And to this day.

15  I've still seen some of those members wearing Dequiallo tag.

16  Q.   Can you explain what charter autonomy means?

17  A.   Charter autonomy basically states that you do adhere to

18  the World Rules, but there are certain rules within your

19  charter that you're going to do differently than other

20  charters.

21  Q.   Do you believe that the Hells Angels knowledge you have,

22  you've accumulated from attending national events and observing

23  investigations nationally can be applied to understand the

24  actions of specific charters?

25  A.   Yes.

**SCHEETZ - REDIRECT / KRISHNAMURTHY**

1   Q.   Why is that?

2   A.   Because through investigations, we've seen some charters

3   have been involved with some type of violent acts more than

4   others.

5        We know that -- or I know from analyzing thousands of ATF

6   reports, DOJ reports, local police reports, there are certain

7   charters that are more violent than others.  There are certain

8   charters that have a propensity to maybe traffic in narcotics

9   or firearms more than others.  And that's a trend and

10  pattern -- another trend and pattern that I observe and keep

11  track of.

12  Q.   I guess my question is, you've just -- you've testified

13  there are some aspects of charters that are different.

14  A.   Yes.

15  Q.   Do you still believe that there are similarities?

16  A.   Yes.

17  Q.   Why is that?

18  A.   Because similarities is -- is -- is the back patch is

19  always going to be the same, excluding the state bottom rocker,

20  across the globe.  But the top rocker, the moniker Death Head,

21  or the MC is always going to be the same.

22       The amount of time that they have to prospect, at a

23  minimal, is always going to be the same.

24       The way they document members either coming or going, to

25  include hangarounds, prospects, they usually have to send some

1  type of communiqué out to the world, and that's uniformity

2  across the globe.

3      There's ways they do things.  There are certain fonts on

4  their colors that everyone has to adhere to.  They all wear the

5  same Death Head on the back of their colors.  And that's part

6  of the World Rules that they adhere to, even though there's

7  different charter autonomy rules that apply to certain charters

8  or every charter across the globe.

9  **Q.**   Thank you.

10     On cross-examination, you used the phrase "intelligence

11  cycle."  Do you remember that?

12 **A.**   Yes.

13 **Q.**   What does that mean?

14 **A.**   It's basically a methodology that myself -- because I'm in

15  an intelligence component -- that I look to analyze information

16  on a daily basis.

17 **Q.**   Can you explain what that process is.

18 **A.**   There's processes that we look at -- that I look at a

19  little bit differently than, say, if you're entering firearms

20  trafficking.

21     For mine, for looking at outlaw motorcycle gangs or

22  motorcycle clubs, the first thing that I do in the intelligence

23  cycle is I want to see who is giving me that information.  Is

24  it a law enforcement entity?  Is it a civilian?  And then I

25  kind of look at the validity of that.  Is that something I have

1   seen before?

2       I do some -- a lot of analysis, a lot of compare and

3   contrast, which we talked about.

4       I also speak to other deemed experts or people who work in

5   the field to compare and contrast what they might have that's

6   differently.

7       I'm also fortunate enough that I can reach out across the

8   globe, because they're a global organization, motorcycle gang,

9   to see if they're seeing something totally different.

10      And at the very end, I'm able to either formulate a

11  conclusion, some validity; and there's oftentimes when I can't

12  formulate a conclusion.  An intelligence cycle allows me that.

13      Per my chain of command, I don't have to come to some type

14  of conclusion because if we don't have a conclusion, even

15  though it's in the intelligence cycle, we just don't know; and

16  we leave that as an intelligence gap, which we have on a daily

17  basis as well.

18  **Q.**  Thank you.

19      I'd like to talk about the 2019 Power Run.

20          **THE COURT:**  Before you get to that, number one, can

21  you pull your mask up?

22          **THE WITNESS:**  Oh, sorry.

23          **THE COURT:**  Number two, I do have a question.

24          **THE WITNESS:**  Yes, sir.

25          **THE COURT:**  You say that some chapters are known to be

1    more violent; some chapters are known for more drugs.

2        If you take the Sonoma County chapter in particular, based

3    on the variations that you're seeing from chapter to chapter

4    and the emphasis there, what can you attribute to that

5    particular chapter if you haven't talked to anybody in that

6    chapter?

7            THE WITNESS:  From the people that I've spoken to or

8    the analytical reports that I've studied, Sonoma charter is --

9    I would say in the intelligence world is considered a violent

10   charter.  I just don't have the documented proof through arrest

11   reports or anything of that nature, sir.

12       But there's other charters that myself, as I deem through

13   looking at other arrest reports, debriefings, where we know

14   that they happen to be a little more violent than others.

15           THE COURT:  So what's -- if you can list the bases of

16   your sources on that particular statement about Sonoma, what

17   would those sources be?

18           THE WITNESS:  It would be arrest reports, people

19   that I've spoke- -- is that what you're talking? -- people that

20   I've spoken to, ATF special agents who are assigned in

21   California who might know -- who do know Sonoma.

22       There's other charters that, from my working and

23   analyzing, that are much more violent than Sonoma.  I just

24   don't have a lot of information on particulars on certainty on

25   the Sonoma charter.

SCHEETZ - REDIRECT / KRISHNAMURTHY

1          THE COURT:  So the information is arrest reports of

2     members of the Sonoma chapter?

3          THE WITNESS:  Members or people that I've spoken to

4     who say they're familiar with them, but they're just -- it's

5     just not too much detail.  I don't know a whole lot of

6     specifics about Sonoma chapter, other than the fact that they

7     fall under the umbrella as being a unified member or charter of

8     the Hells Angels.

9          THE COURT:  Are any of these arrest reports of Sonoma

10    chapter members or associates?

11         THE WITNESS:  Yes, some reports.  Yes, sir.  Arrest

12    reports, yes.

13         THE COURT:  And are they in relatively recent times,

14    last five years?

15         THE WITNESS:  Other than this investigation, no, sir.

16         THE COURT:  And what about, you say you talked to some

17    special agents about -- ATF special agents about Sonoma.

18         THE WITNESS:  Yes.

19         THE COURT:  How many agents did you talk to about

20    Sonoma?

21         THE WITNESS:  I would say at -- I would say two from

22    ATF Los Angeles.

23         THE COURT:  And what's the basis of their knowledge

24    about Sonoma, in particular?

25         THE WITNESS:  Just working outlaw motorcycle gangs for

1    30 years with ATF in California.

2         THE COURT:  So their information would be -- what

3    would be the source of their information about Sonoma?

4         THE WITNESS:  When they were members of the Mongols or

5    ATF investigations they have conducted.

6         THE COURT:  So these would be other OMGs talking about

7    the Sonoma chapter's reputation?

8         THE WITNESS:  That's correct, sir.

9         THE COURT:  Okay.  But not directly in debriefing any

10   Sonoma chapter member?

11        THE WITNESS:  No, Your Honor.

12        THE COURT:  Thank you.

13   BY MR. KRISHNAMURTHY:

14   Q.   Mr. Scheetz, have you seen members of the Sonoma charter

15   at Hells Angels events?

16   A.   Yes.

17   Q.   How were you able to identify them as members of the

18   Sonoma charter?

19   A.   Either I've known them through seeing pictures of them,

20   through their faces, or they're wearing the Sonoma charter tag

21   on their colors.

22   Q.   What is the Sonoma charter tag on their colors?

23   A.   It just signifies that they're a member of that charter.

24   Q.   Are there any other tags that you've associated with the

25   Sonoma charter?

1   **A.**   Yes.  The Young Guns.

2         **THE COURT:**  The what?

3         **THE WITNESS:**  It's called The Young Guns, sir.

4         **THE COURT:**  Young Guns?

5         **THE WITNESS:**  Yes.  It's a tag that they wear or a

6   side rocker.

7   **BY MR. KRISHNAMURTHY:**

8   **Q.**   How do you know about that?

9   **A.**   I've talked to certain people during debriefings who've

10  mentioned The Young Guns tag or side rocker.

11  **Q.**   Have you been able to personally observe it?

12  **A.**   Yes.

13  **Q.**   I'd like to go to the 2019 Power Run that you said that

14  you witnessed.  Could you describe what happened?

15  **A.**   I would say a contingent of about 40 to 50 Hells Angels --

16  where, at this time, there was probably about 125 attending

17  what they called the South Run.  The South Run is an annual

18  event held by the Hells Angels on the East Coast and the

19  West Coast -- this happened to be the East Coast -- which is

20  mandatory for all, they call, Dixie charters.  And Dixie

21  charters are Virginia, North Carolina, South Carolina, and

22  Tennessee.  Actually, Kentucky.  I apologize.

23       And at this run, there's a brand-new Mongols charter that

24  had been started -- or chapter had been started in Virginia

25  Beach.  The chapter president of the Mongols is a former

1    Hells Angels support club member who was kicked out bad because

2    he opened up and moved back to Virginia Beach, starting a

3    Mongols charter -- chapter, their main adversary besides the

4    Pagans and the Outlaws.

5          For some reason, they decided to do a Power Run on that

6    Saturday.  I would say a good 40 to 45, possibly 50 bikes from

7    all up and down the East Coast rode past his tattoo shop that

8    he owns.  And there was probably -- he was not there at the

9    time, but I think two -- there was definitely two employees out

10   front, giving each other finger gestures at the time.

11         It was a power move to let them know that the Hells Angels

12   were in town.  And it's something that we've seen.  And we

13   didn't think it was actually going to occur.  We didn't know

14   where they were going at first, until they took a left to go

15   right in front of the tattoo parlor.

16   **Q.**   Why do you believe that that was meant to intimidate

17   anyone?

18   **A.**   It was basically just what the Hells Angels or any other

19   motorcycle club or motorcycle gang would call a show of force.

20   It's pontification.  It's peacocking on those guys.  What they

21   do, they do it in numbers.  That's their strength.  Their

22   strength is in numbers.  And if they have an opportunity to do

23   that, they will take any advantage of the situation.

24         When you have 125 guys in town and there's only five

25   members of an adversarial OMG in that town as well, then you're

1  going to run past their clubhouse because you know nothing's

2  going to occur.  I won't say -- I take that back.  They're

3  hoping that if something does occur, that the adversary will be

4  outnumbered.  It's called a show of force.  That's all it is.

5  It's pontification on their end.

6  **Q.**   Is your interpretation of that event in any way informed

7  by the Hells Angels' history?

8  **A.**   Yes.

9  **Q.**   Can you explain how that is.

10 **A.**   Especially in reference to the Mongols themselves, due to

11 the fact that the war has broken out between them.  It started

12 probably in the mid-1970s, but it was officially kicked off

13 Labor Day 1977 when two Mongols were blown off their bikes or

14 shot off their bikes outside San Diego.

15      That war has transpired since then.  It's been well

16 documented, not just by ATF and not just by law enforcement,

17 but it's been well documented by members of both OMGs.  And

18 we've seen videos and debriefings where members have talked

19 about the actual incidents and talked about why they are at war

20 with each other.  And it's over that state bottom rocker.

21      Once they went to the California bottom rocker, the

22 Hells Angels were offended.  They basically told them to take

23 it off, and they didn't.  And that has subsequently migrated

24 with the Hells Angels and the Mongols.  In every state that

25 they have been to, we can put a violent act or incident that

1    has transpired between those two OMGs.

2        To this day, it's still something that goes on.  We've

3    had -- in the last, I believe, seven weeks, we've had three

4    Hells Angels murdered or killed or death -- or death at the

5    hands of the Mongols.  Two of those have been ruled

6    self-defense on the fact that the Mongols stabbed a member of

7    the Hells Angels.

8        And it's something that we look at.  And we can use,

9    obviously, what we were talking about before, predictive

10   analytics.  And once the Mongols had moved into Ohio and moved

11   into Indiana, we knew something was going to transpire, and

12   something did transpire recently.

13            THE COURT:  Let me -- if I may ask, are you aware of

14   any conflict between -- maybe I already missed this -- the

15   Hells Angels Sonoma County and the Mongols, any events, other

16   than Mr. Foakes' involvement in Laughlin, alleged involvement?

17            THE WITNESS:  No, Your Honor.

18            THE COURT:  Is it possible, in your view, to have a

19   Hells Angels chapter not engage in violence, to do only, call

20   it, lawful or legitimate motorcycle activities?

21            THE WITNESS:  No, sir.  No, Your Honor.

22            THE COURT:  So you don't think it's possible?

23            THE WITNESS:  No, because it's -- the fact that -- I'm

24   not saying that they're all conducting something criminal; but

25   if they see an adversarial OMG, it is attack on sight.  And if

1    they don't take action towards that adversary, then oftentimes

2    those members are beaten out of the club.

3            THE COURT:  So that's universal.  If you see an

4    adversary, on sight, you have to attack.

5            THE WITNESS:  If you do.

6        Some- -- if they're with their families, that's usually a

7    hands-off situation.

8        But with the growing violence with not just the

9    Hells Angels and Mongols, but with the Hells Angels and another

10   club on the East Coast, a club called the Pagans, we've seen

11   violent acts transpire where members have been with their wives

12   or their kids, on both sides, and they've been attacked by an

13   adversary.

14           THE COURT:  And you're saying that is essentially a

15   rule?

16           THE WITNESS:  It's an unwritten rule within the

17   OMG/motorcycle club community that you don't go after someone's

18   family when they're there.

19           THE COURT:  Okay.  But otherwise, you do go after

20   them if they're --

21           THE WITNESS:  Yes.  You go after them, yes, sir.

22           THE COURT:  And that is based on all the things you've

23   talked about, debriefings and talking to experts and this sort

24   of thing?

25           THE WITNESS:  Yes.  And police reports and violent

1    acts that we've actually witnessed transpire.

2              **THE COURT:**  But it's not in the World Order Rules or

3    it's not in a written rule that we've seen?

4              **THE WITNESS:**  No, Your Honor.

5              **THE COURT:**  Thank you.

6    **BY MR. KRISHNAMURTHY:**

7    **Q.**   Following up on that point, are you aware of violent acts

8    between the Hells Angels and other adversarial OMGs where you

9    can't figure out any other reason for that violent act besides

10   the historical adversarial relationship?

11   **A.**   Yes.  There's been incidents where the Hells Angels have

12   been involved with violent acts with motorcycle clubs that have

13   nothing to do with the history, like between the Hells Angels

14   and Outlaws, Hells Angels and Pagans, Hells Angels and Mongols.

15   There has been violent acts that transpire with other

16   motorcycle clubs or OMGs that don't have a history, and that

17   history kicks off when they migrate into that new state or new

18   area.

19   **Q.**   Can you turn to Exhibit 3, please, which is Tab 5 in your

20   binder, and this is the Hells Angels World Rules for 2017.

21        You testified earlier that you didn't know who wrote this

22   version of the World Rules.  Is that accurate?

23   **A.**   Correct.

24   **Q.**   Do you believe this to be a genuine Hells Angels rulebook?

25   **A.**   I don't know that, because I know -- I know who wrote the

1    2011 version.  I just don't know the proper protocol for

2    writ- -- I don't know what the proper protocol is for writing

3    the rules.  I just know that during the world meetings, which

4    they have two of every year in Europe, this is discussed.

5         And usually, it's a conglomerate of people now that write

6    the rules together.  And obviously, from large part, what we

7    found out is somebody else put their pen to paper, but it's at

8    the hands or behest of the Hells Angels that it's written.

9    **Q.**   Have you seen other versions -- other years' versions of

10   the Hells Angels World Rules?

11   **A.**   Yes.

12   **Q.**   Are those prior versions consistent with this 2017

13   version.

14   **A.**   There are some similarities and there's some additions

15   from the ones I've seen in the mid-1980s.  They've omitted or

16   taken out some versions to make it look more friendly, as they

17   would say.  They've taken out things, and they've also added

18   some things.  That's why they update it all the time, or every

19   five years.

20   **Q.**   And have you seen these rules being implemented?  Have you

21   personally observed these rules being implemented?

22   **A.**   Yes.

23   **Q.**   Can you give us an example of that?

24   **A.**   We know that there has to be -- from analyzing the

25   Hells Angels, we know that looking at -- one great example is

1   that they have to prospect for 365 days.  That's something that

2   we -- if we see a new member, we try our best to put a date on

3   it.  It might be eight months, nine months.  But I personally

4   have never seen a Hells Angels member who didn't prospect for

5   365 days.

6        I have seen some differences of the back patch, which they

7   don't talk about, in the colors themselves, other than the fact

8   that they have a four-piece patch.  And that has to go with the

9   country or the state that might have some litigation or

10  something going on, like what's going on in Germany or

11  Australia, something of that nature.

12            MR. KRISHNAMURTHY:  Thank you.

13        One moment, Your Honor.

14            THE COURT:  While you're looking at that, I don't

15  think he answered the question as to whether you believe this

16  is a genuine version of the World Rules, Exhibit 5.

17            THE WITNESS:  I apol- -- yes, this is.  I apologize.

18  I didn't hear that.

19            THE COURT:  Did you say "yes"?

20            THE WITNESS:  Yes, sir.  Yes, Your Honor.

21            MR. BARRY:  This is Kevin Barry.

22        Your Honor, just normally, I would speak with

23  Mr. Krishnamurthy and have him do some questioning; but with

24  the masks and the hot mics, I just --

25            THE COURT:  That's fine.  Go ahead.

1      **MR. BARRY:**  Thank you.

2                       **REDIRECT EXAMINATION**

3    BY MR. BARRY:

4    **Q.**   To follow up on Judge Chen's question, Mr. Scheetz, is it

5    surprising to you that Hells Angels from different chapters or

6    different charters would know about significant events in the

7    Shasta charter?

8    **A.**   No.  It's -- it's well -- it's not well documented.  But

9    when you do it, on the intelligence field, you know that they

10   talk amongst once -- one another.

11          And when I say you compare and contrast -- how do you know

12   that?  Because we know -- and that's just not me talking to

13   Jorge Gil-Blanco or talking to John Ciccone or Darrin Kozlowski

14   from ATF.  These individuals in these clubs, they talk on a

15   daily basis.  And it's not just the West Coast guys that talk.

16   It's, the West Coast also speaks to the East Coast or the

17   East Coast speaks to the West Coast.

18          Or you might see out-of-country Hells Angels who know

19   exactly what's going on in another country.  And they know that

20   because we've seen violent acts transpire with an adversarial

21   OMG where that individual doesn't even have that OMG in their

22   state or their province where they reside.  So we know they

23   talk, because if they didn't know that they were an adversary,

24   they wouldn't have gone after them and conducted a drive-by

25   shooting or stabbing or something of that nature.

**SCHEETZ - REDIRECT / BARRY**

1  **Q.**   So is -- charter autonomy, is that a rule where you keep

2  your business completely to yourself?  Is that an absolute?

3  **A.**   No.  They try to, but people talk, and you know there's

4  certain persons from other charters that they can reach out to.

5        And even debriefing or talking to people, there's a reason

6  we know that to be true that they talk because they wear side

7  rockers of other charters.

8        So, say, if somebody -- just give an example.  Somebody in

9  Sonoma who's very friendly with somebody in Fresno or, say, in

10  Salem or Nomads charter, he's going to wear a side rocker and

11  it's going to show his allegiance to somebody.  Yes, it names

12  that charter itself, but it shows his allegiance.  For the most

13  part, for maybe one member or two members within that charter

14  he's very friendly with.

15  **Q.**   Now, let me ask you just about your process.

16        **THE COURT:**  Before you do that, Mr. Barry, let me ask.

17        You say you know that people from one chapter talk to

18  another because they're aware of the other's adversaries, even

19  though it's not public.  Is that what you're saying?

20        **THE WITNESS:**  Correct, sir.

21        **THE COURT:**  They kind of have inside information?

22        **THE WITNESS:**  Correct.

23        **THE COURT:**  What's an example how you heard that?

24        **THE WITNESS:**  2006, there was a shooting at Sturgis

25  where one member of Canada and one member -- well, I think he

1  was a prospect at the time -- of San Diego conducted a shooting

2  on a contingent.  There was five Outlaws that were shot in

3  Custer Park.  The two Hells Angels that conducted the shooting

4  do not have Outlaws either in their state or in their province

5  where they live.  And the only way they would know that they're

6  adversaries is talking.

7      And through tracking all the violence between the

8  Hells Angels and the Outlaws.  One month before that --

9  sorry -- three months before that, a prominent Hells Angel was

10  killed on I-95 outside Bridgeport, and he was shot and killed

11  by a member of the Outlaws.

12      I've seen communiqués, in talking to people that they

13  know, "Hey, a member was shot" or "A member was injured," not

14  just by e-mail, but in communication with each other.

15      So the fact that these two members during the 2006

16  Sturgis Bike Rally shot five Outlaws and don't have Outlaws

17  where they reside or their province, they know through talking

18  to other people that they're their primary adversary on the

19  East Coast next to the Pagans.

20          **THE COURT:**  You say there are communiqués.  Do you

21  have some correspondence or e-mails or something between

22  members of different chapters?

23          **THE WITNESS:**  Well, I've seen e-mails.  When Timothy

24  Jordan was a member, when he was secretary, he talked about:

25  Something happened last night.  This occurred.  Yada-yada.

1    Something of that nature transpired with an adversary or a

2    smaller motorcycle club, or a member's been arrested.

3         So they communicate, not just on the e-mails, but they use

4    apps as well.  It's -- communication is primary in these.  They

5    know exactly what's going on.

6         **THE COURT:**  So you're saying you've seen

7    communications between chapters?

8         **THE WITNESS:**  Between charters, yes, sir.

9         **THE COURT:**  Between charters.

10        **THE WITNESS:**  Yes.

11        **THE COURT:**  How do you know that, in the Sturgis

12   incident, the Outlaw person was shot, but it was widely known

13   because some of the incidents reported in the press?  Wouldn't

14   that be an explanation?

15        **THE WITNESS:**  That's one thing.  But we also --

16   immediately after that, ATF, I believe, three years ago --

17   three years later after that, ATF conducted an infiltration

18   into the Mongols and the Outlaws.  And during that, that was

19   part of the -- some of the discussions that our three ATF

20   undercovers had at the time.

21        **THE COURT:**  What did that infiltration reveal?

22        **THE WITNESS:**  Infiltration revealed, through our ATF

23   undercovers, that their intel was better than ours.  They knew

24   exactly who their primary players were, who the members were of

25   the adversaries, who their support clubs, other incidents that

SCHEETZ - REDIRECT / BARRY

1    have transpired.

2         Our members -- we had a member of the Outlaws.  His name

3    was Jeff Grabman.  He's still on the job.  He was the chapter

4    president of the -- basically the Richmond, Virginia, Outlaws

5    charter.  And he was very fortunate that he got to go to the

6    Outlaws' regional meeting.  And during that meeting, they

7    discussed adversarial acts of violence or people that had been

8    arrested involving adversaries while he was the chapter

9    president for about 12 months.

10        **THE COURT:**  All right.  So this revealed information

11   flowing within the Outlaws?

12        **THE WITNESS:**  Yes.

13        **THE COURT:**  But are you assuming that the Hells Angels

14   has the same kind of flow of information?

15        **THE WITNESS:**  It does, yeah.  In talking to other

16   people, they know -- I've seen the communiqués where they talk

17   about, in talking to ATF and other people, that they talk on a

18   daily basis.  They know exactly what's going on.  There's been

19   communiqués similar to the Outlaws, that information -- or an

20   incident has occurred:  Be prepared.  Don't wear your colors.

21   Hey, this is going on.

22        **THE COURT:**  And the source of that information?  You

23   didn't have an infiltration.  You haven't talked to --

24        **THE WITNESS:**  No.  That was through Timothy Jordan

25   when he was the -- working for ATF.  I believe it was 2007-2009

**SCHEETZ - REDIRECT / BARRY**

1    time frame.

2         THE COURT:  And you say you've actually seen some kind

3    of communication, whether it's by e-mail or otherwise, between

4    chapters of the Hells Angels?

5         THE WITNESS:  Yes.  They'll talk about:  Hey, a

6    member's been arrested.  Don't send anything.  Law enforcement

7    has seized his phone.  Somebody was killed last night.

8    Somebody was shot last night.  This person's been arrested

9    because of blah-blah-blah.

10        And they know exactly what happened.  They talk all the

11   time, sir.

12        THE COURT:  And do you keep a record of those

13   communications that you've seen?

14        THE WITNESS:  I do not, no, sir.

15        THE COURT:  Where would you -- how would you come

16   across something like that?

17        THE WITNESS:  At the time, Timothy Jordan was the

18   secretary of the Hells Angels.  His charter.

19        THE COURT:  All right.  So he's a primary source?

20        THE WITNESS:  He was at the time, yes, sir.

21        THE COURT:  And then he had -- he showed you or

22   showed --

23        THE WITNESS:  Yes.

24        THE COURT:   -- other law enforcement some of these

25   communications?

1           **THE WITNESS:**  Yes, Your Honor.

2           **THE COURT:**  Thank you.

3           **MR. BARRY:**  This is Kevin Barry again.

4    **Q.**   Mr. Scheetz, I'd like to ask you some questions about your

5    process of evaluating, say, new information.

6           I want to take a hypothetical example of, you know,

7    tomorrow, a different expert tells you, for the first time,

8    that the Death's Head, the mouth being sewed shut on the

9    official Death's Head means that you don't conduct [sic] club

10   business, and this is the first time you're hearing that.

11          What is your process for evaluating whether that piece of

12   information is accurate?  Do you look at Hells Angel Rules?

13   **A.**   Yes.  Hells Angels Rules would probably be one of the

14   first things I look at to see something that is documented.  I

15   also go through reports that I have written to see if I have

16   documented that.  I painstakingly go through ATF investigations

17   that have involved the Hells Angels to see if that's been

18   documented through -- either from a CI or one of our

19   undercovers who's done infiltration.

20          I also reach out to -- I deem them and we deem them, in my

21   community, not just OMG experts, but I'm fortunate enough that

22   I can reach out to the Europol contingent.  I can reach out to

23   the Australian contingent.  I can reach out to the Canadian

24   contingent.  And I basically, in an e-mail, say:  Hey, is this

25   something that you have seen?

**SCHEETZ - REDIRECT / BARRY**

1          (Stenographer interrupts for clarification of the record.)

2          **THE WITNESS:**  An Australian contingent, a Canadian

3    contingent, the Europol contingent, which consists of all the

4    host countries that attend an annual meeting.

5          And I'll ask them:  Hey, is this something that you have

6    witnessed?  Is this a new trend and pattern?  Is this something

7    I just haven't seen? -- because there's a lot of things we

8    haven't seen -- to formulate my opinion.

9          Once I get information back, if I get information back, I

10   analyze the information I have with what I previously had.

11         But then there's times where I've sent out communications

12   and I've gotten:  Sorry.  Never seen that.  New to me.

13         And I'll literally just put that -- I'll store it for a

14   rainy day in case somebody asks me:  Hey, can you tell me about

15   the Death Head being sewn shut, yada?

16         And I'll say:  Hey, this time last year or six months ago

17   or two years ago, I asked the same question because we had

18   heard the same thing.

19         The process is, we always -- myself, I always go -- I

20   wouldn't say I always go through the same process, because

21   sometimes I know the answer and I've already written about it

22   and I usually just pull that report or the communiqué or

23   something I've sent.  Say:  Hey, here's my report.  Or:  Hey,

24   speak to this individual.  He might have more.  Or I just -- I

25   don't know the answer.

SCHEETZ - REDIRECT / BARRY

1    But there's a method to the madness, and there's always an

2    answer.  Either I don't know it or I say:  Hey, this is what --

3    the conclusion I've come to or the conclusion someone else has

4    come to on findings that we have been able to assist them with.

5    **BY MR. BARRY:**

6    **Q.**   And then speaking about your conclusion that the mouth

7    stitched shut means you don't discuss club business, is that

8    consistent with what you've seen in the Hells Angel rules?

9    **A.**   Yes, because it basically says no snitches.  They don't

10   allow cops in the club.  They don't even allow you to take a

11   police test.  If you've taken a police test, they will kick you

12   out.

13       We've had situations where someone has been 82nd Airborne

14   Military Police, and they found out when he was a prospect and

15   they kicked him out because he was a sworn law enforcement

16   entity within the U.S. Army.

17       They take it seriously.  And one of the first things is,

18   if you've ever taken a police test or been a sworn law

19   enforcement officer, they're going to kick you out.  They

20   don't -- it's a very closed, tight-knit community.

21   **Q.**   And do you -- would you also consider the police history

22   or their failure -- law enforcement's failure to infiltrate the

23   Hells Angels, is that something you consider when evaluating

24   whether that piece of intelligence about the mouth stitched

25   shut is accurate?

1  **A.**   Yes.  It's very difficult.  I mean, just alone, 365 days

2  to get someone to prospect before they even become a member.

3  You have to think in circumstances:  Would law enforcement

4  allow that?  And that doesn't even include the time that they

5  have to hang around.  Some charters, because of charter

6  autonomy, will make you be a hangaround for, at minimal,

7  six months and then be a prospect for a minimal for two years.

8  If that wasn't the case, why would they make you prospect?  Why

9  would they make you hang around?

10      There's certain charters that I've read books where they

11  openly talk about having polygraphs conducted on individuals or

12  some type of police entity has done a background check on you.

13      So they're really -- it's a tight-knit community.  If they

14  didn't want to be a tight-knit community, they -- I'm not

15  saying they wouldn't allow cops or police officers or someone

16  who's taken a test in, but they wouldn't make you prospect for

17  365 days minimal.  They wouldn't do background investigations

18  on you.  They wouldn't even put something down there about

19  snitches.  I mean, if they're just a motorcycle club, what do

20  you have to snitch about if nothing illegal is being done?

21  **Q.**   And do you consider -- in evaluating whether that new

22  piece of intelligence is accurate, do you consider statements

23  made by Hells Angels about that subject?

24  **A.**   Yes.  Yeah, I look at the statements, and I analyze their

25  statements.  There's -- I know we talked about that before,

1    about Chris Omodt saying that he came in with a perception,

2    when he started working the Hells Angels in the '90s, that you

3    had to shoot and kill somebody to wear a Filthy Few.  That

4    misnomer has always gone around.  And it's through analyzing

5    reports and stuff of that nature that we've come to the same

6    conclusion, that you don't have to.  It's a violent act in

7    furtherance of the club.

8        So it's through talking to people and talking to other

9    experts and reading so much to formulate that conclusion.

10   **Q.**   And speaking of reading, would you -- with a piece of new

11   intelligence like the -- again, hypothetically -- the mouth

12   being stitched shut means don't discuss club business, would

13   you compare that with what you know from Hells Angels written

14   materials?

15   **A.**   I mean, the books that I've read?

16   **Q.**   Well, yeah, books would be one thing.

17   **A.**   Yeah, because, I mean, they -- yes, books would be one

18   thing; other reports I have written -- not written -- that I've

19   read from other agencies; other three-letter agencies that I'm

20   privy to; other world organization law enforcements that I'm

21   privy to.

22       And that's the conclusion that we come to, is there's a

23   tight -- that that stitched shut is because it's a tight-knit

24   community.  There's no snitches.  And that would be

25   something -- to finish up on, we send out -- if that came in

SCHEETZ - REDIRECT / BARRY

1  and I had some type of conclusion that I could come to, I would

2  send out an intelligence report similar to what I have

3  submitted to the Court.

4  Q.   And in addition to, sort of, books that Hells Angels have

5  written, have you reviewed internal Hells Angels'

6  communications, like materials that have been seized during

7  search warrants?

8  A.   Yes.

9  Q.   And are those materials things that you rely on in

10  assessing that piece of intelligence?

11  A.   Yes, that's one of the things that I use.  I use them to

12  compare and contrast because it's written from them.  So if I'm

13  looking at the Hells Angels rules or if I'm looking at

14  something where someone's been arrested or there's been a

15  violent act that transpires, I go through everything.  I see if

16  guns have been seized in a clubhouse.  I go to see if guns have

17  been seized at a member's house during a search warrant.  I

18  analyze everything to totality to formulate my conclusion.

19  Q.   So in your opinion -- is your opinion that the mouth being

20  stitched shut means "Don't discuss club business"?  Is that

21  your opinion?

22  A.   Yes.

23  Q.   Now, is that the only basis for your opinion is that

24  another expert told you that?  Is that the only basis for that

25  opinion?

SCHEETZ - REDIRECT / BARRY

1   **A.**   No.   I've read that in books.   I've read that in other

2   communiqués.   I've discussed with, you know, other ATF agents.

3   I've spoken to members of the Outlaws.

4       I spoke to one of our ATF agents who conducted an

5   infiltration into the Pagans, and he really didn't know much

6   about the Hells Angels until he did a Pagans infiltration in

7   New York.   And he learned really quickly about the Hells Angels

8   through the Pagans, who basically told him all he needed to

9   know about the Pagans [sic].   He would pick up the phone and

10  call myself and Mike Will, at the time, who was my mentor.

11      (Stenographer interrupts for clarification of the record.)

12      **THE WITNESS:**   I'm sorry.   About the Hells Angels.

13      Because he wasn't really -- when he did the outlaw

14  motorcycle gang infiltration, he wasn't really what we call

15  someone who's done those.   He's done other undercover deals for

16  ATF.   But he had the opportunity to do it.

17      He learned very quickly as a Pagans hangaround, as a

18  Pagans prospect and as a member of the Pagans all about the

19  Hells Angels from the Pagans.

20      And that's no different from any other ATF undercover or

21  FBI undercover or state and local undercover who's either

22  conducted an infiltration or run a parallel investigation with

23  the Hells Angels or another adversarial OMG; that you learn

24  very quickly about the other person.

25      So it's -- and I take all that information, what they give

1  me as well as what I'm looking at, the evidentiary, to

2  formalize my conclusion.

3  **BY MR. BARRY:**

4  **Q.**   And, sorry.  Did you say earlier that with respect to the

5  Los Angeles infiltrations of the Mongols, that the Mongols --

6  you said they had -- they seemed to have better intelligence

7  than you on the Hells Angels?

8  **A.**   Yes.  It's -- it's amazing the network that not just the

9  Mongols have, that all these outlaw motorcycle gangs and

10  motorcycle clubs have.  And it goes for the contacts that they

11  have within law enforcement, which we've seen.  It's very well

12  documented across the globe; law enforcement entities that are

13  in gang units or intel units who've provided information to

14  outlaw motorcycle gangs.

15      Or the amount of information.  They might have somebody

16  working at the DMV or -- a great example is 2010, I submitted

17  my OMG military report at the annual conference in Baltimore,

18  which was called the McLaughlin Conference.  Six weeks after

19  that conference where I had handed out that report to all 600

20  participants, there was a Hells Angels in Newark who was pulled

21  over on a traffic stop, and on the front seat of his car was my

22  report.

23      We've done numerous -- not just ATF, but other state and

24  local have done search warrants on clubhouses, people's

25  residences, and not just my report, where other officer safety

1    bulletins have been observed.

2        It's something that's -- it's -- it's a terrible thing

3    because it's law enforcement sensitive.  So people in law

4    enforcement [sic] shouldn't have that.  But I have seen

5    pictures.

6        And somebody I rely on a lot is a guy named Mike Honig

7    with the New York State Police, who was working a Hells Angels

8    event; and a report that he had written was actually being

9    viewed by two Hells Angels 20 feet in front of him.  They had a

10   contact within -- somebody within the fusion center.

11       So it's very disheartening, but it's something that we

12   deal with on a daily basis.

13       And a great example is -- myself is a great example.  I

14   was asked about *The Aging Rebel*.  I was literally at a

15   conference, conducting a presentation on trends and patterns;

16   and someone in the audience, who we don't know to this day,

17   took my presentation verbatim and gave it to *The Aging Rebel*.

18       And that's something that we're aware of because I believe

19   my information is valid, that I spoke that day.  It didn't

20   bother me because it's something that happens all the time.

21   It's something we're very cognizant of.  And we know that their

22   information is better than ours, and we've been told that on

23   numerous occasions to this day.

24   **Q.**   And then, just wrapping up, you used a term earlier that

25   was very interesting.  You said something about "peacocking."

**SCHEETZ - REDIRECT / BARRY**

1   **A.**   Yes.

2   **Q.**   What do you mean?

3   **A.**   Peacocking is just -- it's like pontification.  It's

4   something that not just the Hells Angels do, but they all do.

5   And it happens to go with the terminology.

6        They use a terminology called "flash."  Why is it called

7   "flash"?  It's something that they put on the front of their

8   colors to basically pontificate to other OMGs or MCs who know

9   exactly what that meaning is.

10        They know -- the Mongols and the Outlaws and the Pagans

11   know what "Filthy Few" means.  And vice versa, the Hells Angels

12   know exactly what "Respect Few Fear None" means within the

13   Mongols.  It's the equivalent to assaulting someone in

14   furtherance of the Mongols.  They know what it means in the

15   Outlaws that somebody wears SS lightning bolts on the Outlaws.

16   It doesn't mean a white supremacy ideology.  It means they've

17   conducted a violent act in furtherance of the Outlaws.

18        And I know that because I've talked to guys who've done

19   these infiltrations and I've talked to guys that are in outlaw

20   motorcycle gangs, and they know exactly what those other

21   patches mean.

22        It's a bravado that they do.  They wear it because they're

23   letting the adversary know, hey, I've done something pretty

24   evil or pretty violent in furtherance of the Hells Angels.  And

25   it's not just the Filthy Few.  It could be other tags that they

**SCHEETZ - REDIRECT / BARRY**

1  wear that have some semblance of violence.

2  **Q.**   And your basis for concluding that rival OMGs know what

3  the Hells Angels flash means is from those investigations and

4  those reports you were just talking about?

5  **A.**   Yes.

6     And I have been very fortunate to -- to not just go to

7  IOMGIA.  We talked about IOMGIA.  But I'm very fortunate that

8  every year I get to go to Canada and I get to go to Europol,

9  which is in The Hague.  And it's what they deem an experts

10 meeting.  And all the representatives from their country.  And

11 I represent the United States.  And it talks about the amount

12 of violence that goes on and the ideology that these guys

13 adhere to.  And they do these large runs, and they wear these

14 certain tags or tabs or flash to basically show off their

15 colors.

16    And they talk about all the time that -- they might have a

17 member in a club they've just debriefed, and they'll say:  Hey,

18 we just noticed that member of the Hells Angels is wearing a

19 certain tag or something of that nature.

20    Those things I bring back and I ask my ATF agents, if I

21 don't have the opportunity to speak to someone, and say:  Hey,

22 when you work those investigations or when you're working the

23 investigation, see if you hear something like that.

24    And like I just said, Kenny Croke was a great example when

25 he did the Pagans; Jeff Grabman, when he did the Warlocks and

1  the Outlaws; our ATF undercovers who did the Mongols, they

2  learn about all those patches.  And you can watch people and

3  their mannerisms when they go to events and when they do the

4  Power Runs like we discussed in 2019.

5  **Q.**  Let me ask you about that international meeting of

6  experts.  The people that you were with from other countries,

7  were they nominated or sent there from their countries?

8  **A.**  Yes.

9  **Q.**  So is it your -- was it your view that that country deemed

10  this person an expert?

11  **A.**  Yes.

12  **Q.**  Because they're at that conference?

13  **A.**  Yes.  I'm the only one there who's an intelligence asset.

14  Everyone else is sworn.  So I represent the United States at

15  that Europol meeting.

16      And then, obviously, at the annual Canadian conference of

17  experts too, I'm the only one who -- there's other Americans

18  that show up, but they goes as attendees.  I go as a speaker or

19  someone representing the United States.

20  **Q.**  But if you hear a piece of intelligence for the first time

21  at, say, the international conference, do you just take it as

22  gospel because an expert told you it?

23  **A.**  No.  We have sidebar conversations.  There's -- like

24  anywhere else, we -- there's countries there that aren't as

25  familiar or up to speed on OMGs; some of the southeastern

SCHEETZ - REDIRECT / BARRY

1   European countries.  Their individual might be deemed an

2   expert, but when he comes there, he has more questions than he

3   has information.

4        So somebody who might be from Germany who's been working

5   for 25 years, Spain, Netherlands or Holland, where they've been

6   working these guys 20, 25 years, they basically can bring them

7   up to speed on stuff that they're seeing.  And it's not just

8   the gospel because there's people who come there who don't

9   know.  They might be deemed experts from that country.  They

10  know a little bit of information.  They're deemed their expert.

11  But they come there to provide information or to learn.

12  **Q.**  And then, if you pick up a new piece of intelligence at

13  one of these meetings, do you go through that

14  compare-and-contrast process that you talked about before with

15  that new piece of information?

16  **A.**  Yes.

17       **MR. BARRY:**  Thank you for this procedure, Your Honor.

18  The Government doesn't have anymore questions.

19       **THE COURT:**  All right.  Thank you.

20       Let's go to recross, presumably in the same order.

21       Mr. Philipsborn?

22       **MR. PHILIPSBORN:**  Thank you, Your Honor.  Can

23  the Court hear me?

24       **THE COURT:**  Yes.

25  \\\

1                    <u>RECROSS-EXAMINATION</u>

2    BY MR. PHILIPSBORN:

3    **Q.**   Mr. Scheetz, can you hear me?

4    **A.**   Yes, sir.

5    **Q.**   Great.  Good afternoon, sir.  I just have a few questions.

6    And like Mr. Barry, I'm just going to be asking you about

7    process, focusing to some degree on the testimony you've given

8    this afternoon, but just so we understand the process and

9    especially your concept of verifiability.

10        The declaration, the 38-page declaration that you signed

11   on June 29, 2020, you've already told us a bit about it.  But

12   it was put together with information that you provided.  And

13   you and colleagues at the office of the United States Attorney,

14   Northern District of California, combined to put that

15   declaration together.  Is that correct, sir?

16   **A.**   Like I said, yes, sir.

17   **Q.**   Okay.  And would it be fair to say that when that

18   declaration was provided, you understood it was going to be

19   filed in the court?  True?

20        **MR. BARRY:**  Well, this is beyond the scope of

21   redirect.

22        **THE COURT:**  Well, I'll allow one more question, see if

23   it is within the scope.  If it's preliminary to something, I

24   will; but if it's going off on another tangent, it is beyond

25   the scope.

SCHEETZ - RECROSS / PHILIPSBORN

1    So I'll let you ask a question.

2  BY MR. PHILIPSBORN:

3  Q.   Is that true, sir?  You understood it was going to be

4  filed in court?

5  A.   Yes.  Filed in court?  Yes.  I'm new to this.  So, yes.

6  Q.   Okay.  And you understood that the Court and counsel would

7  be depending on the accuracy of the information in the

8  declaration; correct?

9        MR. BARRY:   Same objection, Your Honor.

10       THE COURT:   All right.  Sustained.

11   Let's get to the heart of it because right now, this is

12  collateral to the scope of the redirect.

13       MR. PHILIPSBORN:   Okay.

14  Q.   So one of the things that you've repeated, both in your

15  answer to the Court's questions and questions from

16  the Government, is that you've talked to guys or you've talked

17  to ATF agents or that you've talked to sources, including

18  cooperators.

19   Would you agree you've used those sentences and phrases in

20  your testimony?

21  A.   Yes.

22  Q.   Okay.  And in terms of verifiability, would you agree that

23  the majority of the conversations you've had with ATF agents,

24  law enforcement officers who are sworn officers, as well as

25  sources, have not been documented?  You have no notes of them;

**SCHEETZ - RECROSS / PHILIPSBORN**

1  correct?

2  **A.**   Some of the individuals, I do have notes; but a lot of

3  them are during these experts meetings where we -- where,

4  because of third-party rules and being overseas and where the

5  information derives, I basically -- other than edification

6  purposes, we don't -- I'm not taking notes.

7      I might have constructed a picture in a PowerPoint that

8  reminds me, and I have no problem ever turning that over to

9  anybody because it's just a picture that I can put on a

10  PowerPoint slide.  But a lot of the stuff, it's basically for

11  edification purposes; and I don't take notes, no, sir.

12  **Q.**   So if you come into this court and you testify in answer

13  to questions about the Filthy Few patch and the relative

14  frequency of your sightings of the Filthy Few patch, how do we

15  verify the number of occasions on which you have sighted the

16  Filthy Few patch?

17  **A.**   It's not something I doc- -- when I go work events, I

18  don't document the fact that I saw a Filthy Few tag.  That's

19  not something I do.

20      If I take a picture of it and I'm able to confirm or

21  contrast how I think that they were awarded that because of

22  pictures I have previously observed or snapped myself, then

23  I'll put that in a PowerPoint picture.  And I can say I have

24  observed this individual through a picture either I've snapped

25  or someone else has snapped.

1      But I don't go to an event and say:  Hey, by the way, I

2  just -- in the report especially I've submitted to this Court,

3  I don't specifically -- that's not one thing I specifically

4  look for is the Filthy Few.  That's one of many entities that I

5  observe and analyze while I'm there.

6  **Q.**   So when you're asked questions about your opinion of the

7  meaning of the Filthy Few patch and, among other things, you

8  discuss your observations, tell us, first of all, can you link

9  your observation of a Filthy Few patch on 75 to 100 people to

10  particular names?

11  **A.**   I have pictures of in- -- are you asking can I -- because

12  I was a little confused on your question.  So I'm asking, am I

13  putting a violent act on that person of 75 to 100 people who

14  are wearing a Filthy Few tag?

15  **Q.**   You're almost there.

16      Do you document your sighting of an individual so that you

17  can, in fact, correlate your sighting to an alleged violent

18  act?

19  **A.**   I try to.  If I can get a police report and if I can get a

20  picture of before and after, then I do document it in a

21  PowerPoint slide.

22  **Q.**   Okay.  In a PowerPoint slide, sir?  A PowerPoint slide

23  that you're going to go discuss with an audience at a training

24  seminar?

25  **A.**   Correct.

1  **Q.**   Okay.  But you're not going to a training seminar,

2  essentially, to document the identity of 50 to 100 Filthy Few

3  patch wearers and the incidents that led them to get a

4  Filthy Few patch.

5      What I'm asking you is:  How do we verify your testimony

6  to the effect that it's your opinion that there are 50 to 100

7  Filthy Few patch members and that there's a specific

8  significance that you feel can reliably be attached to the

9  Filthy Few patch based on your work and your documentation?

10  **A.**   My documentation, as I said, there is 50 to 75.  I just

11  cannot put a violent act to that Filthy Few tag.

12      And if you're asking can I turn over pictures that have

13  been snapped of members wearing a Filthy Few tag either I

14  snapped or someone else has snapped, I have no problem turning

15  that over to show that there -- there could be more.  That's

16  just all I can, top of my head.  It's approximate.

17      I said I cannot put a violent act on every Filthy Few tag.

18  That is an intelligence gap that I just don't know.

19      There is some -- or there's a contingent of members or

20  people that I know from -- that have been documented as

21  prospects who conducted a violent act and that are wearing a

22  Filthy Few tag.

23      Now, does that mean that I went and spoke to Jeff Grabman,

24  who did the Outlaws infiltration, and he told me about it and

25  do I have documentation of my conversation with him?  No,

**SCHEETZ - RECROSS / PHILIPSBORN**

1    there's no documentation.

2         There's reports of information that have been written

3    through their investigation, would be a great example.  But my

4    direct interview -- or it wasn't even an interview.  It was

5    just a conversation I might have had with Mr. Grabman about:

6    Hey, how do you think about this?

7         That's not something I've documented other than taking a

8    picture of -- before-and-after pictures of an individual we

9    spoke about of a Filthy Few.

10   **Q.**   Got it.  So when you were talking earlier this afternoon

11   about matching up observations with documentation, that's a

12   process that you've just explained may have happened in

13   specific instances and hasn't happened in other instances;

14   correct?

15   **A.**   Yeah, because sometimes I cannot match up a violent act

16   with an individual.  I don't have -- I'm not privy to a police

17   report.  I'm not privy to speaking to somebody in that area

18   who's familiar with why a certain member got a Filthy Few.

19   That's a huge intelligence gap that I just don't -- and I have

20   no problem saying it -- I just don't know.  And I said that in

21   the beginning.  I can put Filthy Few tags on individuals.  I

22   just can't always put a definition on how they earned it.

23   **Q.**   And the Dequiallo patch that is discussed in specific

24   detail in your 38-page declaration is essentially -- were I to

25   ask you the same questions about your process in regard to that

**SCHEETZ - RECROSS / PHILIPSBORN**

1  patch, would your answer be substantially the same, which is:

2  I've taken photographs of some guys.  I've made observations of

3  some guys who didn't have the patch but then later displayed

4  it.  Here is my understanding of how they got the patch, but I

5  have no reports that correlate my documentation meticulously on

6  a name-by-name and incident-by-incident number?

7  **A.**   No, because that's not -- I'll give you a great example.

8  And furthermore, the Dequiallo, I can actually probably put

9  more instances of how I know they got it.

10     And one instance is 2011 at the Sturgis Bike Rally.  I

11  know that Mark Duclos from Anchorage, or I believe it's the

12  Fairbanks chapter -- I'm sorry -- that during the 2011

13  Sturgis Bike Rally, there was a stabbing and a melee between

14  the Hells Angels and the Mongols.  During that melee, he was --

15  tried to stab -- and it's on video -- tried to stab a member of

16  the Mongols.  Subsequently, he was arrested by law enforcement.

17  He was tased twice by law enforcement for whatever reason.  He

18  was found guilty and served time in jail.

19     An incident would be a great example of not just the

20  Dequiallo but the Filthy Few is, he was wearing a Filthy Few --

21  because we have pictures of him at Sturgis that year wearing a

22  Filthy Few -- but not a Dequiallo.  When we saw him when he got

23  out of jail, roughly two and a half years later, we saw a

24  brand-new set of colors with a Dequiallo and a Filthy Few, 666

25  on him.

**SCHEETZ - RECROSS / PHILIPSBORN**

1          So due to the fact that I have only documented him at that

2     Sturgis without the Dequiallo and then, afterwards, when he got

3     out of jail and off his association, we saw him at an event, he

4     was wearing that, that's part of my compare and contrast.  And

5     that's just one example of Dequiallo to show that's how he

6     earned it, because we visually saw him there that day without a

7     Dequiallo.  He couldn't have done anything else because he was

8     in jail or on non-association.  It's documented that he was

9     arrested that day, he was tased by police that day, and then he

10    started wearing the tag.  That's just one example.

11    **Q.**   That is a wonderful example.  How many Dequiallo tabs do

12    you think -- or tags do you think exist within the framework of

13    the Hells Angels?

14    **A.**   Oh, God.  Not many.  It's -- it's -- you rarely see them

15    overseas.  Like I say, I've probably seen 25 to 30 in the

16    United States.

17         We know there was a litany of them given out immediately

18    after the, I believe it was 1997 Laconia Bike Week, which I

19    discussed before, when they got in that incident, I think it

20    was with Wild Pigs, or whatever group it was, and then the

21    three or four Laconia or local police officers during Laconia

22    Bike Week.  That's given out.  And there's actually -- I've

23    been told there's certain members that have it and don't wear

24    it.

25         And that's the same for the Filthy Few.  There's

```
 1   Filthy Few members who have the tag, and their charter doesn't
 2   allow them to wear that.  And I just learned that the other
 3   day.
 4   Q.   So I gather that part of the answer, if we cut to the
 5   chase, is:  I'd have to guess at the number; correct?
 6   A.   I -- I can -- if you're asking me can I give examples of
 7   members wearing a Filthy Few -- I mean -- sorry -- Dequiallo
 8   tag, I can give you pictures.  I don't -- it's not something I
 9   count, not something I keep track of.
10        MR. PHILIPSBORN:  Okay.  Well, actually, that -- and
11   that sounds as though it's a good summary of your process; so
12   I'll move on.
13        And, Your Honor, I appreciate your indulgence.
14        Thank you, Mr. Scheetz.
15        I'll pass the witness.
16        THE WITNESS:  You're welcome.
17        THE COURT:  Let me -- I've got a follow-up question.
18        THE WITNESS:  Yes, sir.
19        THE COURT:  So it sounds like you, based your
20   conclusion, in part, on observations kind of before and after.
21   You see before the Laconia incident or before the Sturgis
22   incident, and then you see somebody emerging with the patch;
23   right?
24        THE WITNESS:  That's correct, sir.
25        THE COURT:  How many times has that happened?  I mean,
```

**SCHEETZ - RECROSS / PHILIPSBORN**

1    you've named a couple.  Has it happened more than once or twice

2    where you've sort of seen this cause and effect, what looks

3    like a cause and effect?

4         **THE WITNESS:**  For Dequiallo and Filthy Few, it's a

5    little harder.  But they wear a thing called the Purple Heart

6    pin.  And for all the members that I have observed -- that

7    doesn't mean I've seen every member -- wearing the Purple Heart

8    pin, we can put an adversarial act on the guys that I've seen

9    wearing the pin 100 percent of the time.

10        **THE COURT:**  Okay.  But let me go back to the

11   Filthy Few and the Dequiallo.  So it's hard to document this

12   cause and effect.  You happen to have photos before and after

13   in a couple of instances.

14        **THE WITNESS:**  With the Filthy Few, yes, Your Honor.

15        **THE COURT:**  Yeah.  So what else -- remind me again

16   what else feeds your -- or provide the basis for your opinion.

17   You've got one or two, kind of, actual observations.

18        **THE WITNESS:**  The actual police report.  There was an

19   incident that actually transpired with another motorcycle club,

20   a civilian or an adversarial OMG.  And this would be for the

21   Filthy Few.  I look at the police reports if I know they've

22   been arrested, and then we try to look at the pictures before

23   and after, do a compare and contrast.

24        In reference to the Dequiallo --

25        **THE COURT:**  So on the Filthy Few, you've seen some

 1   other examples of no patch, then police report, then patch?

 2          **THE WITNESS:**  Yes.  Yes, Your Honor.

 3          **THE COURT:**  Not just the Sturgis incident?

 4          **THE WITNESS:**  We've seen other Sturgis incidents.

 5   We've seen other incidents where they've been involved with an

 6   incident with an adversary and then we saw them wearing it

 7   afterwards.

 8          **MR. PHILIPSBORN:**  Objection; non-responsive.

 9       I'd ask -- the pronoun used is "we."  I think the Court is

10   asking this witness to be responsive to what he did and what he

11   can respond.

12          **THE WITNESS:**  Okay.  I apologize.

13       Yes, myself.  Yes, I have examples that I look at of

14   individuals; my one example of Sturgis.

15       We have another incident in 2017 where an individual was

16   involved -- I believe it was '17 or '18 -- he was involved in a

17   melee in Ottawa, Illinois.  He was a Nomad member of the

18   Illinois chapter.  He was involved in a melee with the Outlaws.

19   Immediately after that incident, we saw him with a brand-new

20   set of colors and he was wearing a Dequiallo tag and a

21   Filthy Few.

22       He was arrested that day for assault on a member of

23   the Outlaws, and he was also arrested that day for, I believe,

24   an assault on law enforcement, a female law enforcement

25   officer.  When he finally was seen, he posted on Instagram a

**SCHEETZ - RECROSS / PHILIPSBORN**

1    picture of him with a brand-new set of colors with his

2    Filthy Few and his Dequiallo.  So when I look at his pictures

3    before him wearing those colors, before that incident, and then

4    afterwards, I compare and contrast that's how he earned it and

5    was awarded those tags.

6         THE COURT:  All right.  And about how many -- if you

7    can just name a number.  How many incidents can you say that

8    you've sort of seen this correlation, before-and-after photo,

9    police incident report or some kind of police report?

10        THE WITNESS:  With the Filthy Few, it's probably about

11   15 to 20.

12        THE COURT:  So you've seen that happen about 15, 20

13   times?

14        THE WITNESS:  Yes, sir.

15        THE COURT:  You've actually seen the photos and stuff?

16        THE WITNESS:  Photos, yeah, and then seen arrest

17   reports, yes, sir.

18      (Stenographer interrupts for clarification of the record.)

19        THE WITNESS:  Yes, either the photos or the arrest

20   report that corresponds with the incident.

21        THE COURT:  And with the Dequiallo, same kind of

22   question.  How many times have you seen that kind of

23   correlation?

24        THE WITNESS:  Filthy Few would be less.  It's more of

25   a police report or an incident where they've been involved with

SCHEETZ - RECROSS / PHILIPSBORN

1  an arrest with law enforcement.

2          THE COURT:  You mean Dequiallo would be less?

3          THE WITNESS:  Yes, sir.

4          THE COURT:  Would it be two, three times?

5          THE WITNESS:  Oh, I would say five to ten, sir.

6          THE COURT:  Okay.  And these are ones that you've

7  actually seen the police reports yourself and you've seen

8  photos yourself?

9          THE WITNESS:  Yes, or their -- yes, or their NCIC

10 criminal history.  Yes, sir.

11         THE COURT:  All right.  Thank you.

12         MR. PHILIPSBORN:  Would you permit one follow-up to

13 your question?

14         THE COURT:  Yep.

15         MR. PHILIPSBORN:  Thank you, Your Honor.

16 BY MR. PHILIPSBORN:

17 Q.   Mr. Scheetz, when you respond to the Court as you did, do

18 you have documentation of, let's say, the 10 to 15 times you

19 engaged in the verification process that you just discussed

20 with the Court, or is this all in your head?

21 A.   No.  I have pictures of compare and contrast, and I put

22 those in a PowerPoint slide.  I showed them --

23 Q.   That's not --

24      (Stenographer interrupts for clarification of the record.)

25         THE WITNESS:  I place it into a PowerPoint slide.  And

1   that's how we do it.   And I show before and I show after.   And

2   then usually, on that slide I can talk about an incident that

3   transpired with an adversary or an unwitting civilian or a

4   motorcycle club.

5   **BY MR. PHILIPSBORN:**

6   **Q.**   And again --

7                              (Overlapping speakers.)

8   **A.**   Hiding.   I have the police report.   I have his criminal

9   history.   I have a before and an after photo.   That's how we do

10   it.   That's the process in which I verify.

11       Now, there's other times I have been privy and told how

12   somebody received one, but that's just how I've been privy on

13   how they've received it.

14   **Q.**   Just so we're being clear in our record, again, the

15   PowerPoint you reference is a PowerPoint you use in training

16   sessions; correct?

17   **A.**   Yes.   And that's -- yes.

18   **Q.**   Okay.   So what I'm asking you, sir, is:   If the Court were

19   to ask you to produce 10 to 15 reports evidencing a

20   documentation process of the type you just discussed with

21   the Court, do such reports exist?

22   **A.**   The PowerPoint slides, yes, they do exist.

23   **Q.**   The PowerPoint slide, but no reports; correct?

24   **A.**   There's often times I can't get a copy of the report.

25   There's some police departments who don't share those reports.

PROCEEDINGS

1    I just can't get copies.  I know what examples.  I have them

2    documented.  That's mine, in the intelligence world, I've

3    documented them.  That's how I do it.

4         **MR. PHILIPSBORN:**  Thank you, Your Honor.

5         Thank you, sir.

6         **THE COURT:**  All right.

7         And just one clarification.  If you're asked to produce

8    the photos that you're using on the PowerPoint slide for, like,

9    the 15, 10, or whatever, do you have those photos that are just

10   one set?

11        **THE WITNESS:**  No.  Yes, Your Honor.  Yeah, I can

12   produce those photos.

13        **THE COURT:**  Okay.  All right.  Thank you.

14        All right.  Let's go ahead and take a break.  I don't know

15   if we're going to get through today or not at this point.  But

16   the reporter needs a break.

17        Do you need five? ten?  How long do you need?

18        **THE STENOGRAPHER:**  Five minutes.

19        **THE COURT:**  Five minutes.  And let's see at that point

20   how many more questions we have, if we can wrap up today or

21   not.  Thank you.

22        **THE CLERK:**  Court is in recess.

23                    (Recess taken at 3:53 p.m.)

24               (Proceedings resumed at 3:59 p.m.)

25        **THE COURT:**  All right.  We've concluded, I think, with

**PROCEEDINGS**

 1   Mr. Philipsborn's recross.

 2       And I take it, Mr. Sabelli, do you have anything?

 3       **MR. SABELLI:**  I do, Your Honor.  Before we start,

 4   first of all, I'm sorry.  I lost my suit coat.  I'm in

 5   San Diego, and I'm without a suit coat.  Last time that

 6   happened, I was in Barry, Portland; so it was many years ago.

 7       I have a question for the Court before I start.  Both

 8   Ms. Morrissey and I would like to do some recross.  I don't

 9   anticipate that we will be able to do it in less than half an

10   hour.  So in terms of scheduling, if the Court -- if we're at

11   the end of the week and the Court -- we're scheduled to resume,

12   I think, on September 1st.  If the Court prefers, we can kick

13   it till then, or I can start now.  Whatever the Court prefers.

14       **THE COURT:**  I'd like to conclude today.  And I'm able

15   to extend this time till 5 o'clock.  So I'd like to conclude by

16   5:00.

17       **MR. SABELLI:**  Understood, Your Honor.  Thank you.

18       **MR. BARRY:**  Your Honor, this is Kevin Barry.  I'm not

19   sure how there's going to be two half-hour chunks of recross

20   when the redirect was --

21       **THE COURT:**  Is it each a half hour?

22       **MR. SABELLI:**  No, Your Honor.  I think that both of us

23   can be done in half an hour.

24       **THE COURT:**  Yeah.  All right.  Let's get started and

25   see how we are.

1          **MR. SABELLI:**  Okay.  Thank you, Your Honor.

2                    <u>**RECROSS-EXAMINATION**</u>

3     **BY MR. SABELLI:**

4     **Q.**   Good afternoon, Mr. Scheetz.

5     **A.**   Hello, sir.

6     **Q.**   Let's start with this concept of peacocking.  Okay?

7     Peacocking is not in your declaration; right?

8     **A.**   No, sir.

9     **Q.**   It's not a technical term?

10    **A.**   No, sir.

11    **Q.**   You've used it for the first time here on direct and

12    cross-examination during this hearing?

13    **A.**   Yes.

14    **Q.**   And peacocking is a form, as you've described it, of

15    intimidating another club?

16    **A.**   No.  It's basically -- basically flashing their colors and

17    walking around with a bravado.  I didn't say anything about

18    intimidating their club.  It's something they do during a

19    Power Run or when they're walking down the sheet or something

20    that we've observed -- sorry -- I've observed at the events

21    that I've worked.

22    **Q.**   And one of the purposes of peacocking is to intimidate a

23    rival club, according to you?

24    **A.**   Yes.

25    **Q.**   So, for example, the other day when I asked you about the

SCHEETZ - RECROSS / SABELLI

1    Filthy Few patches and the purpose of intimidation -- do you

2    recall that conversation?

3    **A.**    No, but I'm -- no, but...

4    **Q.**    One of the purposes of a Filthy Few patch is to peacock;

5    right?

6    **A.**    Yes.

7    **Q.**    Now, let's pick up on that point and switch to a larger

8    point, which is this notion of comparing and contrasting.

9    Right?

10   **A.**    Yes.

11   **Q.**    Fair to say that there are different ways to compare and

12   contrast?

13   **A.**    I'm sure there is, yes.

14   **Q.**    You haven't described for us how you compare and contrast;

15   correct?

16   **A.**    No.

17   **Q.**    For example, with respect to peacocking and the patch,

18   you've explained your conclusion that the Filthy Few patch

19   somehow signifies an act of violence; right?

20   **A.**    In furtherance of the club, yes.

21   **Q.**    You haven't described for us how your comparison and

22   contrasting process takes in different kinds of information to

23   rule out the intimidation function and, instead, determine that

24   the patch signifies that the member committed an act of

25   violence.  You haven't explained that to us, have you?

**SCHEETZ - RECROSS / SABELLI**

1  **A.**   When I compare and contrast a piece of information, one of

2  the processes isn't going -- looking to see if they're

3  peacocking.   Peacocking is what I'm using to show when they're

4  either walking down the street or riding their bike or putting

5  something on social media.   Peacocking is something that I

6  observe.   It's not one of the mechanisms I use to compare and

7  contrast and say:  Was he peacocking?   That's not what I'm

8  talking about.

9        I look -- and I have explained, I look through all the

10  information that I gather, if I have it or don't have it, and

11  reaching out to experts.   I don't say to myself:  Was he

12  peacocking?  Was there a bravado?  I don't -- that's not the

13  relevance to the compare and contrast.   Compare and contrast is

14  an observation that I've observed working these OMG or

15  motorcycle club events.

16  **Q.**   Again, you haven't explained for us how your process of

17  comparing and contrasting leads you from the information you

18  have to the conclusion that the Filthy Few patch signifies an

19  act of violence rather than solely an intent to intimidate.

20  You haven't explained that to us, have you?

21        **THE COURT:**   Still, I'm not sure what I understand the

22  question is, frankly.

23  **BY MR. SABELLI:**

24  **Q.**   Let me approach it a different way.   If the Court doesn't

25  understand the question, it's of no value.

1    So you've explained to us that you have some examples,

2    whatever the number is, of instances where you believe you can

3    document a Filthy Few patch being awarded as a result of

4    violence; right?

5    **A.**   Correct.

6    **Q.**   You've explained to us that there are other instances,

7    without giving us a number -- you haven't given us a number

8    about these other instances in which you haven't been able to

9    document the act of violence which you believe resulted in the

10   patch being awarded; right?

11   **A.**   That's correct.

12   **Q.**   You haven't explained to us, have you, how that -- how

13   you've come to the conclusion that these instances where you

14   can, quote/unquote, document the violence mean that the patch

15   equates violence when there are instances when the patch --

16   when you haven't been able to confirm the underlying violence;

17   right?

18   **A.**   The pea- -- if you're referring to the peacocking, that's

19   an observation that -- that myself has observed.  And it

20   doesn't come from working one event.  It's not something that I

21   put down in my annual OMG Military or whatever --

22        **THE COURT:**  Hold on one second.  Hold on.  I don't

23   think he's asking about peacocking.

24   I didn't understand you to be -- I understood the question

25   to be off that subject.  Correct, Mr. Sabelli?

1      **MR. SABELLI:**  Yes.

2      **THE WITNESS:**  I apologize.

3      **THE COURT:**  The question, as I understand it, is --

4  sometimes you can't document the correlation between violence

5  and the Filthy Few patch.  I think the question, as I

6  understand it, is:  How do you know, nonetheless, even though

7  you can't document it, that it does signify some act of

8  violence if you can't corroborate that with something concrete?

9      **THE WITNESS:**  Because all my training and experience

10  tells me that the Filthy Few means that they conducted violent

11  acts in furtherance of the club.

12      I have openly admitted that I do not know and I didn't

13  give a percentage of those violent acts that were committed.  I

14  just know that individual is wearing a Filthy Few tag.  And

15  I've admitted that I don't know what they did, and I just don't

16  have information or any way to confirm what they did.

17      I just know through all my debriefings or interviews or

18  speaking with what are deemed experts in my world and deemed

19  experts in court, that that's what the Filthy Few means.  I

20  just can't put the violent act on a known percentage of them.

21      **THE COURT:**  And that means that in every case, that's

22  a universal -- you don't get a Filthy Few patch unless you've

23  committed an act of violence?

24      **THE WITNESS:**  In furtherance of the club, yes,

25  Your Honor.

1          THE COURT:  So even in an individual case where you

2    haven't been able to document it with a police report, you're

3    convinced that, nonetheless, that's how it happened?

4          THE WITNESS:  Yes, Your Honor.

5          THE COURT:  And that's based on your debriefing,

6    things you've talked about, speaking with experts, speaking

7    with people who have infiltrated other groups, et cetera,

8    et cetera?

9          THE WITNESS:  Yes, Your Honor.

10          THE COURT:  Okay.

11   BY MR. SABELLI:

12   Q.   I want to pick up on the last phrase you used in response

13   to the last question I asked you.  You said, "I just can't

14   document those instances."  Do you recall that?

15   A.   Yeah, because I just don't know what transpired.

16   Q.   So is that an example of the confirmation bias?

17   A.   No.  That's an intelligence gap that I just don't know,

18   which is large in the intelligence world.  I just don't know.

19   And it's not a bias when I have been told exactly what it

20   means, which I've been telling the Court what I've been told or

21   learned through all my experience, training, and everything

22   else.  I just can't put it on there.  So it's an intelligence

23   gap that I have no problem admitting because in the

24   intelligence world, we have intelligence gaps, and that's what

25   that is.

**SCHEETZ - RECROSS / SABELLI**

1  **Q.**  And you consider it a gap because it's contrary to your

2  belief?

3  **A.**  It's what I -- it's what I've learned, yes.

4  **Q.**  So you have a belief.  Sometimes when you look at it, that

5  belief is confirmed, and other times you have a gap?

6  **A.**  No.  I know from my -- if I hear you correctly, the gap is

7  I don't know the incident involved with him being awarded the

8  Filthy Few.  That's the intelligence gap.

9      My intelligence gap is not what I've been told or trained

10  or learned through my years of experience since 2006.  I stand

11  behind that it has been awarded for a violent act in

12  furtherance of the club.  My intelligence gap is I cannot tell

13  you with certainty -- because I just don't know -- how some of

14  them received it or were awarded that.

15  **Q.**  Despite this gap, you are thoroughly convinced it must be

16  for the reason that you already believe?

17  **A.**  Yes.  That's my training and experience.

18  **Q.**  Okay.  Now, let's talk about comparing and contrasting

19  generally.

20      Have you walked us through, in your declaration, what you

21  do when you have contrary pieces of information?

22          **MR. BARRY:**  Objection, Your Honor.  It's beyond the

23  scope.

24          **MR. SABELLI:**  Your Honor, may I respond?

25          **THE COURT:**  You can respond.

1        **MR. SABELLI:**  Yeah.  Mr. Barry went into the

2    compare-and-contrast process, and that's what I'm doing now.

3        **THE COURT:**  Okay.  I'll allow it to some extent.

4      Go ahead.

5        **THE WITNESS:**  I'm sorry.  Can you repeat that

6    question, sir?

7    **BY MR. SABELLI:**

8    **Q.**   Sure.  Focusing on comparing and contrasting, you haven't

9    explained to us how you reconcile or process conflicting pieces

10   of information, have you?

11       **MR. BARRY:**  Your Honor, argument.  Objection.

12       **THE COURT:**  Overruled.  It's cross.

13       **THE WITNESS:**  No, I haven't -- I -- no, sir.

14   **BY MR. SABELLI:**

15   **Q.**   Did anybody ask you not to do that?

16   **A.**   No.

17   **Q.**   Okay.  All right.  Now, looking at just in terms, now,

18   switching gears to the bases for your opinions as they're

19   reflected in 1084 and as they're reflected in the hearings that

20   we've had over the last couple of weeks, would you agree with

21   me that you have given information during the hearing that is

22   not in your declaration?

23       **MR. BARRY:**  Objection, Your Honor.  Relevance and

24   beyond the scope.

25       **THE COURT:**  Sustained.

1   BY MR. SABELLI:

2   **Q.**   Okay.  Let's focus on Exhibit 20.  Okay?  That's the --

3   it's 22 in your binder.  It's the minutes regarding Shasta

4   County.

5            **THE COURT:**  Oh, I misspoke, by the way.  I notice

6   there is 20.  We had designated the two exhibits that were the

7   trademarks stuff, we'll call that 23 and 24 instead of 21 and

8   22.  We'll have to redesignate that because I now see that

9   there already was a 21 and 22.  Okay?

10        All right.  So now we're on the real 22.

11            **MR. SABELLI:**  Thank you, Your Honor.

12  **Q.**   Mr. Scheetz, are you all set to go?

13  **A.**   I don't have 22, but I know what you're referring to.

14  **Q.**   Yeah.  My questions are going to be general.

15        During the hearing, you explained to us all sorts of

16  things about Gil-Blanco and about the Mongols and that sort of

17  thing, right, that relate to Exhibit 20 to 1084?  Right?

18  **A.**   Yes.

19  **Q.**   That's not in your declaration; right?

20            **MR. BARRY:**  Objection, Your Honor.  Relevance.

21            **THE COURT:**  Sustained.

22            **MR. SABELLI:**  Your Honor, may I respond to that?

23            **THE COURT:**  Briefly.

24            **MR. SABELLI:**  Yes.  The Court made a ruling that

25  whatever was not in the declaration was not going to be

1  permitted.  And so I need to establish that for the purposes of

2  our post-hearing briefing.

3           THE COURT:  Well, it's established by the record.  You

4  can argue in post-hearing briefing.  You don't have to take

5  time to cross-examine the witness on what he testified to and

6  what he didn't.  It's in the record.  So let's move on.

7  BY MR. SABELLI:

8  Q.   Mr. Scheetz, with respect to the PowerPoint that you

9  referred to, have you provided that to the Government?

10 A.   No, sir.

11 Q.   Did anybody tell you not to provide it?

12 A.   No.

13 Q.   If we had had that PowerPoint, we could have known more

14 about your opinion and the bases?

15          THE COURT:  Sustained.  Move on.

16     Let me remind you, this is a *Daubert* hearing; this is not

17 trial.

18          MR. SABELLI:  Got it.  Well, that's -- that's --

19 that's all I have, Your Honor.  Thank you.

20          THE COURT:  Great.  Thank you.

21     Ms. Morrissey?

22          MS. AMRAM:  And, Your Honor -- sorry.  This is Galia

23 Amram.

24     I will have a very brief recross that'll take about five

25 minutes.  I'm sorry.

 1          **THE COURT:**  All right.  Go ahead.

 2          **MS. AMRAM:**  Okay.

 3                  <u>**RECROSS-EXAMINATION**</u>

 4  BY MS. AMRAM:

 5  **Q.**   Mr. Scheetz, I'm going to talk to you briefly about what

 6  you said about the Shasta chapter and the Sonoma County

 7  chapter.

 8          I believe you said that you were told by Jorge Gil-Blanco

 9  that the Shasta chapter was frozen because they did not

10  retaliate after Thomson was shot.  Is that correct?

11  **A.**   That was one -- that was one of the leading reasons.  The

12  main reason -- and it's in there -- is one of the members

13  left -- three of the members left and one quit, which put them

14  below the six.  But the reason, the overall circumstance that

15  started it is they did not retaliate against the Mongols.

16  **Q.**   And that was not in the minutes on why the Shasta chapter

17  was frozen; right?

18  **A.**   No, ma'am.

19  **Q.**   And was your only source of that information Jorge

20  Gil-Blanco?

21  **A.**   Yes, ma'am.

22  **Q.**   And you also mentioned that -- on redirect that I believe

23  it's your understanding that if a Hells Angels member sees a

24  rival OMG member, that they have to attack.  Is that correct?

25  **A.**   Yes, ma'am.

1  Q.   And the only exception for that is if they are with their

2  family?

3  A.   It was, but that's changed now.

4  Q.   What are the other exceptions?

5  A.   Depending on the circumstance.   It might be -- not be

6  the -- might not be the right time and place.

7       You are expected to do some type of retaliatory act or

8  some type of violent act.   It's documented, basically, in Sonny

9  Barger's book.   He talks about it.   You basically might get

10 beat down, but you're going to defend the patch.   It's

11 something they discuss.   It's well known.

12      And rules have changed where I work -- not say "work."

13 Stuff we've seen on the East Coast between the Hells Angels and

14 the Pagans where both sides are going after each other when

15 they're around their families.   It used to never be like that.

16 And I was privy to that type of information through people I've

17 talked to, especially special agents who've done infiltrations

18 into OMGs.   When violent acts transpire, you don't involve the

19 family because it's not the family you're going after; it's the

20 actual individual.

21 Q.   So I just want to make sure I understand.   They always

22 attack if they -- a Hells Angels member will always attack if

23 they see a rival OMG; and even now, they might attack even if

24 they're with their family?

25 A.   They're supposed to.   They don't always do that.   And it's

SCHEETZ - RECROSS / AMRAM

```
 1  not just the Hells Angels.  It's support clubs as well.
 2  Q.   Okay.  But they are always supposed to attack if they see
 3  a rival OMG?
 4  A.   Yes.
 5  Q.   And it's your testimony that there's no exceptions to
 6  that?
 7  A.   I mean, the exceptions are the family.
 8       And charter autonomy sometimes says that you don't.  A
 9  charter president might put out:  You're not going to attack.
10  You're not going to bring media attention or any type of
11  scrutiny from law enforcement on us at the time.
12       And that's not just the Hells Angels.  That's a lot of
13  OMGS, that when they do the tit-for-tat-type violence, they
14  might say:  Hands off.  We don't want to do anything right now.
15  There's too much media attention or law enforcement scrutiny on
16  us.
17  Q.   And what is the policy of the Hells Angels Sonoma County
18  charter on attacking rival OMGs?
19  A.   I don't know the policy.  I've just -- I just know from
20  the one case that I've observed at the casino.  That's all I
21  know.
22  Q.   And would the judge -- when the judge was asking you
23  about -- or, actually, it might have been Mr. Philipsborn --
24  about the Dequiallo tags, you said that some members have it
25  and they don't always wear it.  Do you recall that?
```

SCHEETZ - RECROSS / AMRAM

1   A.   Yes, ma'am.

2   Q.   And that also applies to the Filthy Few tags?

3   A.   Yes, ma'am.

4   Q.   And you said that you just learned that the other day.  Do

5   you recall that?

6   A.   Yes, about the Filthy Few.  Yes, that some have it; that

7   they don't wear it because their charter doesn't allow them to

8   wear the Filthy Few tag.

9   Q.   And from whom did you learn that?

10  A.   Joshua O'Bryan, Denver.

11  Q.   I'm sorry.  Who is Josh O'Bryan?

12  A.   He was the individual I spoke to, I discussed in the last

13  hearing.

14  Q.   Can you tell me about him again.

15  A.   He was the former member of Hells Angels Denver.

16  Q.   And when did you speak to him?

17  A.   Last week.

18  Q.   And why did you speak to him?

19  A.   Because I had -- I was given the opportunity by ATF to

20  speak to him, and I spoke to him.  And certain things I asked

21  him were -- one of the questions I did ask him was about the

22  Filthy Few.

23  Q.   And why did you ask him about the Filthy Few?

24  A.   Because a lot of times when I conduct a debriefing, one of

25  the questions I do ask is about the violence because that's why

1    ATF is working these individuals and these groups or these

2    gangs.  It's because of the violence.

3         And then with the violence, the amount of violence, I go

4    into the tags, taps -- tabs, flash, and patches.  And I usually

5    try to ask, if I can:  Are they awarded the same way?  Do

6    members wear them?  How are they worn?  Is there tattoos?

7         And I was privy to a conversation where he told me that

8    the Denver charter does not wear the Filthy Few tag.  That's

9    part of their charter rules.

10   Q.   When you said you were given an opportunity to speak to

11   him, who suggested that you speak to him?

12        MR. BARRY:  Objection; relevance.

13        THE COURT:  Overruled.

14        THE WITNESS:  I mean, it was -- it was the fact that I

15   had an opportunity.  I've been so busy.  I've been back to back

16   from bike events to working cases.  This was the first ample

17   opportunity I had to speak with him.

18   BY MS. AMRAM:

19   Q.   How did you learn you had the opportunity to speak to him?

20   A.   Through TFO Doug Pearson.

21   Q.   So he just reached out last week?

22   A.   No.  I talk to Doug Pearson probably three to four times a

23   week, and we also worked the annual Sturgis Bike Rally this

24   year.

25   Q.   And so Doug Pearson suggested you speak to him?

SCHEETZ - RECROSS / AMRAM

1   **A.**   Yeah.  He said:  Hey, when you're available, you should

2   speak to him.

3       Because any time I have an opportunity to speak to a

4   former member, that is my job within ATF.  My job is to do

5   those type things and garner and gain intelligence from these

6   type of people so we can learn.

7   **Q.**   Did Doug Pearson know you were testifying in this hearing?

8   **A.**   Yes.

9   **Q.**   Did the prosecutors ask you to speak to Josh O'Bryan?

10  **A.**   No.

11  **Q.**   Did the prosecutors know you spoke to Josh O'Bryan?

12  **A.**   Not until -- no, not until I came in.

13  **Q.**   And did Doug Pearson suggest you speak to Josh O'Bryan as

14  part of your testimony in this hearing?

15  **A.**   No.

16          **MS. AMRAM:**  No further questions, Your Honor.

17          **THE COURT:**  Okay.  All right.  So then who's next?

18  Ms. Morrissey?  No.  Who's that leave?  Who's up?

19          **MS. MORRISSEY:**  I'm willing to go ahead if there are

20  no volunteers, Your Honor.

21          **THE COURT:**  Mr. Gohel, actually, I think was in next

22  order.

23          **MS. MORRISSEY:**  You're right.

24          **THE COURT:**  Is Mr. Gohel on the line?

25                          (No response.)

1    **THE COURT:**  Okay.  Well, why don't we proceed with

2    Ms. Morrissey, since you're ready.

3    **MS. MORRISSEY:**  Okay.  Thank you, Your Honor.

4    <u>**RECROSS-EXAMINATION**</u>

5    BY MS. MORRISSEY:

6    **Q.**  Mr. Scheetz, you testified on redirect examination that,

7    in your opinion, it is not possible for a clubhouse to do only

8    lawful activities because of the universal rule that a club

9    must attack a rival if -- on sight.

10       Would that be a fair statement of what you said?

11   **A.**  No.  I don't think I said about the clubhouse.  I said

12   it's --

13   **Q.**  Charter.  I'm sorry.  A charter.

14   **A.**  A charter.  That is -- it's one of those unwritten rules

15   that because of the ongoing violence and war with, at minimal,

16   three dominant OMGs in the United States and across the globe,

17   it is a sight unseen that they will go against one another.

18   And it's not just the Hells Angels.  It's also the Pagans as

19   well.  It's also the Mongols, also the Outlaws.

20   **Q.**  Thank you, sir.

21       So this rule is unwritten; correct?

22   **A.**  Yes.

23   **Q.**  Okay.  And is it correct, sir, that you have to be wearing

24   colors in order for this rule, this universal rule to be in

25   effect?

**SCHEETZ - RECROSS / MORRISSEY**

1  A.   No, because there's been violent incidents where someone's

2  just wearing some type of indicia stating that they're a member

3  of an OMG.

4  Q.   My question is:  Is there a rule that you have to be

5  wearing colors, meaning a cut, a vest, whatever you want to

6  call it?  Yes or no?

7  A.   When they conduct the violent act?

8  Q.   Yeah.  When they retaliate.

9  A.   No, there's no rule.  You don't have to wear your colors.

10 Q.   All right.  So it could be at a PTA?  If a Hells Angels

11 meets a Mongol at a PTA meeting, the rule is he must attack;

12 correct?

13 A.   He should.  I've never seen one at a PTA.  I've seen them

14 in the airport and they weren't wearing colors.

15 Q.   He should attack; is that correct?

16 A.   Yeah.  He's -- and like I stated before, it's not just the

17 Hells Angels.  It's their --

18 Q.   I --

19 A.   -- adversaries as well.

20 Q.   I understand that, Mr. Scheetz.

21      All right.  So this can occur anywhere; correct?

22 A.   Yes.

23 Q.   Okay.  Have you ever heard of a thing called the

24 Confederation of Clubs?

25 A.   Yes.

**SCHEETZ - RECROSS / MORRISSEY**

1  **Q.**  And is that a confederation of motorcycle clubs?  It has

2  one in Northern California, has one in Southern California.

3  They're all over the country; correct?

4  **A.**  Yes, ma'am.

5  **Q.**  And the Confederation of Clubs is a place where clubs meet

6  and try and work out issues.  Would that be correct as well?

7  **A.**  That's one of the things they discuss, yes, ma'am.

8  **Q.**  All right.  And if I was able to, after your testimony, in

9  about five minutes get an article from the *Orange County Weekly*

10  about a Confederation of Motorcycle Clubs meeting that involved

11  Mongols, Hells Angels, and Vagos, would that change your

12  opinion about the, you know, attack-on-sight rule?

13  **A.**  No, because there was a stabbing right before Laughlin

14  that transpired at a COC meeting, between the Mongols and the

15  Hells Angels.

16  **Q.**  Mr. Scheetz, I am not asking about Laughlin.

17       You're telling me that if there is a published account of

18  Hells Angels, Mongols, and Vagos meeting at a Confederation of

19  Clubs and there's no problem, that does not change your

20  opinion; is that correct?

21  **A.**  No, because I think what you might be referring to,

22  there's a national meeting of clubs that transpires.  I believe

23  that occurs every quarter.

24  **Q.**  No.

25  **A.**  And it involves all documented OMGs in the United States.

1    And that is a hands-off thing that occurs there.

2        What you're referring to, I think, is the state coalition

3    of clubs, which is run by the dominant OMG in that area.

4        The National Coalition of Clubs is a meeting I believe

5    they hold either twice a year or four times a year where all

6    OMGs basically go and they talk about issues pertaining to law

7    enforcement.

8    Q.   Mr. Scheetz, would you listen to my question?

9    A.   Yes.

10   Q.   This was a Confederation of Clubs meeting for

11   Southern California that occurred at a Veterans of Foreign Wars

12   building in which Hells Angels, Vagos, and Mongols sat down and

13   talked.

14   A.   Yes.  What was the date on that, ma'am?

15   Q.   This was in 2015.

16   A.   I'm not aware -- I'm not aware of that.

17       I do know that there has been meetings between the

18   Hells Angels --

19   Q.   You're not aware of it is fine as an answer.  Thank you.

20           THE COURT:  I have a follow-up question.

21       Can you explain that?  I mean, if you say it's a universal

22   rule, why wasn't there -- if this meeting took place, as

23   apparently reported, why wasn't there a melee?

24           THE WITNESS:  Because there's times when, between the

25   Hells Angels and Mongols, where both sides have actually met

**SCHEETZ - RECROSS / MORRISSEY**

1   and said that:  We need to squash the amount of violence that's

2   going on because of the media attention that's going on.

3        There's been meetings that have taken place between

4   high-level members of the Hells Angels and not just the

5   Mongols.  We just saw one two weeks ago in Sturgis where the

6   Hells Angels and the Sons of Silence met at the NCOM meeting.

7        There's times when these clubs do meet to basically say:

8   Hey, look, we need to stop this because of the amount of law

9   enforcement scrutiny or media attention.

10       It's been well documented through ATF Los Angeles that the

11  Mongols have had meetings with the Hells Angels in

12  Southern California.

13       We know of several instances, which is also documented, by

14  the Mongols as well, where the Mongols have met with the

15  Hells Angels and said:  Hey, look, we need to stop.

16       And that usually lasts about probably sometimes six months

17  to a year -- and I'm just giving a ballpark figure -- and then

18  some type of violent act transpires.

19            **THE COURT:**  You're saying it's like a temporary truce?

20            **THE WITNESS:**  Yes, sir.

21            **THE COURT:**  What about this national meeting every

22  quarter where all clubs are involved?

23            **THE WITNESS:**  I think it's called the National

24  Coalition of Motorcyclists.  I think the last one was either

25  held in Mississippi or -- I know there was one that was held in

SCHEETZ - RECROSS / MORRISSEY

```
 1   Atlantic City.
 2         And usually, a representative from all documented OMGs --
 3   it can be Hells Angels, Mongols.  Even the African-American
 4   multiracial clubs, they'll show up as well.  And it's a
 5   hands-off approach.  It's not for the individual charter -- I
 6   mean, the individual OMG or club.  It's basically them citing
 7   the amount of traffic stops that might have been conducted.
 8   There might be defense attorneys that might testify -- not
 9   "testify" -- might give a presentation on investigation,
10   something of that nature, that transpires at these conferences.
11         I know the Hells Angels have -- I know John Beal is their
12   representative to this.  And I think the Vagos have one, the
13   Mongols have one.  And it's basically a hands-off approach,
14   basically, to get stuff done.
15              THE COURT:  No violence occurs at these --
16              THE WITNESS:  No.  We did.  We had -- the one in
17   Atlantic City, the Wheels of Soul and the Pagans got into an
18   altercation.  I believe that was six months ago or a year ago,
19   sir.  It's supposed to be, but sometimes it happens.
20              THE COURT:  So you're saying there are some times when
21   they do meet without attacking each other?
22              THE WITNESS:  Yes.
23              THE COURT:  And that's because it's sort of sanctioned
24   from above or it's --
25              THE WITNESS:  It's everybody coming together with a
```

1  handshake agreement saying:  Hey, look, we need -- it's not --

2  at this time, you put your differences aside when you walk in

3  this door.  It's us versus law enforcement, for whatever reason

4  that they garner.  But sometimes these clubs don't listen.

5          **THE COURT:**  All right.  Thank you.

6      Go ahead, Ms. Morrissey.

7          **MS. MORRISSEY:**  Thank you, Your Honor.

8  **Q.**  You testified on redirect about the no police officers, no

9  one who's ever applied to be a police officer requirement for

10 the Hells Angels.  Do you recall that?

11 **A.**  Yes, ma'am.

12 **Q.**  Okay.  And that is -- that is a requirement for most of

13 the major motorcycle clubs, that you can't have a police

14 officer background; correct?

15 **A.**  No.  The Pagans allow it.  The Wheels of Soul allow it.

16 **Q.**  Okay.  Well, do the Mongols allow it?

17 **A.**  No.

18 **Q.**  Do the Vagos allow it?

19 **A.**  I believe the Mongols -- I mean, the Vagos have had former

20 police officers in their club.

21 **Q.**  Can you give us a name?

22 **A.**  I can't, but I think one -- I think the guy was a former

23 air marshal.

24 **Q.**  Well, do you think you could provide that information so

25 that we can evaluate it?

1          **MR. BARRY:**  Objection; relevance as to the Vagos.

2          **THE COURT:**  Sustained.

3   **BY MS. MORRISSEY:**

4   **Q.**   Okay.  So you have already talked to us about how your job

5   is, in your view, to put people in jail; correct?

6          **MR. BARRY:**  Objection; beyond the scope.

7          **THE COURT:**  Sustained.

8   **BY MS. MORRISSEY:**

9   **Q.**   Okay.  The Death Head.  You have testified that the

10  present Death Head has what appears to be a mouth that's sewn

11  together.  Do you recall that?

12  **A.**   Yes, ma'am.

13  **Q.**   And that that is a change from other Death Heads; correct?

14  **A.**   Yes.  Worn on the back of their colors, yes.

15  **Q.**   Yeah.  And it's a relatively recent change?

16  **A.**   1980s.  Yes.

17  **Q.**   And you told us that that means that you don't snitch;

18  right?

19  **A.**   Yes.  In their words, yes, ma'am.

20  **Q.**   You keep your mouth shut?

21  **A.**   That's correct.

22  **Q.**   Now, prior Death Heads which did not have the lips sewn

23  shut, was it okay to talk to police then?

24  **A.**    No.  From my training, what I was told was the reason that

25  they switched to the Death Head for the mouth shut/sewn was

1    because of the Tony Tait trial that the FBI had, because he was

2    a confidential informant for the FBI.  And that was basically

3    saying no snitches.  When they changed it, I believe it was

4    1986, they put that in.  They changed their World Rules --

5    **Q.**  Mr. --

6                          (Overlapping speakers.)

7    **A.**    -- I think.

8         My training through speaking to Jorge Gil-Blanco, Lenny

9    Eisner, other OMG experts across the globe is that's when they

10   changed it because of the Tony Tait investigation.

11   **Q.**  Mr. Scheetz, what I asked you was:  Prior to the

12   lips-sewn-together Death Head, was it okay to talk to police?

13   Yes or no?

14   **A.**  I don't have -- I don't know because it wasn't documented.

15   But -- yeah.

16           **MS. MORRISSEY:**  Thank you.

17       I have nothing further.

18           **THE COURT:**  All right.  Thank you, Ms. Morrissey.

19       Is Mr. Gohel back online?

20           **MR. GOHEL:**  Yes, Your Honor.  Can you hear me?

21           **THE COURT:**  Okay.  Yeah.  You've got an echo; so make

22   sure you've got all your devices turned off other than the one

23   you're listening to.

24       Okay.  You can proceed.

25           **MR. GOHEL:**  Well, what I -- I just have a few

**PROCEEDINGS**

1   questions.  Is it okay with the echo?

2         **THE COURT:**  We're hearing an echo.  You must have a

3   speaker on or something.  Do you have two devices?  Do you have

4   a cell phone and a laptop on?

5         **MR. GOHEL:**  I do, but it's just -- does that help?

6      You know what?  Let's -- why don't I -- in the interest of

7   time, I don't have any more questions.

8      Jesus.

9         **THE COURT:**  Turn off the speaker or something.  There

10  you go.  All right.

11     All right.  So that leaves Mr. Walsh, I think.

12     Do you have any questions, Mr. Walsh?

13        **MR. WALSH:**  No.  Thank you, Your Honor.

14        **THE COURT:**  All right.  Does that cover -- have I

15  missed anybody?

16                        (No response.)

17        **THE COURT:**  All right.  Anything further on redirect?

18        **MR. KRISHNAMURTHY:**  No, Your Honor.

19        **THE COURT:**  All right.  In that case, that will

20  conclude the evidentiary portion of this hearing.  So let's

21  talk about where we go from here.

22     I'm hesitant to invite 60 more pages of briefing.  I don't

23  think I need 60 more pages of briefing, but it might be helpful

24  to briefly sum up what each party thinks where we come out

25  under *Daubert* standards.

**PROCEEDINGS**

 1       And maybe what would be useful is if we looked at each of

 2   the proffered opinions, if you can break it down that way and

 3   just tell me what you think was shown by way of sufficient

 4   bases and reliability under *Daubert* or not for each of those.

 5       And it may be that different -- a lot of it's going to

 6   overlap.  I mean, I can see that it's going to be kind of

 7   repeated in terms of what the reliance was, et cetera.  But

 8   there may be some differences in methodology, may be some

 9   differences in bases.

10       But that's one way we can break it down in a way that

11   would be coherent and helpful, I think, to the Court, based on

12   the evidence that we've heard.

13       But I don't need a rebriefing of the whole wall and

14   everything.  I think I just want to get your views on what the

15   evidence has shown.

16       **MR. BARRY:**  Your Honor, this is Kevin Barry.

17       Before we had the evidentiary hearing, the Court had

18   seemed to indicate that even on the face of the declaration,

19   there was a robust enough presentation of bases.

20       So would it be more -- even to help the Court, if

21   the Court says, you know, I want to focus on these four

22   opinions, or whatever, that I've got questions about this --

23   because this is really for the Court.  And so if the Court is

24   completely satisfied that there is a basis, then there need not

25   be any briefing at all.

 1          If, on the other hand, the Court has questions about

 2    certain opinions, then if the Court would let the parties know

 3    that, then we could focus our attention on things that

 4    the Court does have actual questions.

 5          And, again, if the Court is satisfied, then if the Court

 6    wants to issue an order on the briefing that's already there,

 7    then that would be fine.

 8          **THE COURT:**  Well, I'm looking at the affidavit, and

 9    there are -- I mean, it's divided in certain categories.  On

10    the other hand, there are sort of substatements within each

11    opinion.  And I think, frankly, it would be useful to hear a

12    brief summary.  I don't -- again, I don't need to hear the same

13    arguments all over again.  And I already have the declaration,

14    and that's part of the record.  It's direct testimony.

15          But with respect to further inquiry into the bases of some

16    of these things and questions of methodology, whether certain

17    inferences were reasonable inferences, whether reliance on

18    certain sources were the kind of thing that an expert can

19    reasonably rely upon, et cetera, et cetera, it would be helpful

20    if we looked at -- if we did it by opinion.

21          **MR. BARRY:**  Your Honor, a related question is -- the

22    complaint that arose or tried to arise was that there are

23    things that -- opinions that were offered that were not in the

24    declaration.  But as the Court can see, those opinions, those

25    new things came up on cross-examination.

1    So would the Court entertain admission of those opinions?

2  Again, the Government wasn't sandbagging with this material

3  but --

4        **THE COURT:**  Yeah.  What I want to do is, if you

5  feel that supports -- if something came up, like identification

6  of two new informants or two new sources, you can list that as

7  part of the evidence.  There will be an objection, I'm sure,

8  from the other side, and I'll evaluate at that point.  I may or

9  may not have to look at that.

10   I did say that I wanted all bases set forth, but there's a

11 question of level of specificity that is reasonable or not or

12 if something intervening came up or not and whether there's

13 prejudice or not.  I'm going to look at those factors with

14 respect to any objection as to admissibility.

15   Again, this is *Daubert*.  It's not trial.  So, but my main

16 goal was not to have any sandbagging and have a substantial

17 basis not revealed knowingly, and then having it sort of sprung

18 after the declaration.  And I don't think that happened here in

19 the main, but I'll hear the objection, as I'm sure there will

20 be.

21   But I'd like to get a summary to see where the parties are

22 at with respect to each opinion that has been tendered.

23       **MR. PHILIPSBORN:**  Your Honor, this is Philipsborn.

24   Are you -- I think just for the record, this may be clear,

25 but I take it the Government has moved into evidence what's in

PROCEEDINGS

1    the record as 1084-1, which is the declaration or whatever it

2    is, Exhibit 2 in the binder, as well as all subsequent exhibits

3    and that the Court is admitting them.

4         THE COURT:  I assume that is the case.

5       Counsel?

6         MR. KRISHNAMURTHY:  Yes, Your Honor.  Actually,

7    I think you started out the hearing by saying that those were

8    in evidence, and you went from there.

9         THE COURT:  Yeah, I believe I did.  And if I didn't,

10   unless I see a basis for exclusion, I'm going to admit all of

11   those.  I guess if someone has got an objection to anything in

12   particular, I'll hear it right now.

13        MR. PHILIPSBORN:  Your Honor, as I indicated verbally

14   when we reiterated our, I think it's -- whatever it is, nine to

15   ten written objections, I assume that the Court had those in

16   mind.  I would submit the matter.

17      I had assumed the Court was going to admit all of the

18   exhibits, but we have made objections that will probably be

19   reiterated at least insofar as the Government may propose the

20   use of some of these exhibits at trial.

21      So we will brief those issues as well, if that's okay, and

22   save the Court the wear and tear right now.

23        THE COURT:  Yeah, that's fine.  What you just said is

24   accurate.  My admission for purposes of a *Daubert* hearing is

25   entirely different than admission at trial.  I'm not prejudging

 1    that at all.  So I don't want to spend a lot of time as if

 2    we're debating over the admissibility for trial of these

 3    exhibits.

 4              **MR. PHILIPSBORN:**  Understood.

 5              **THE COURT:**  All right.

 6         (Government Exhibits 1 through 21 received in evidence.)

 7              **THE COURT:**  All right.  So maybe the best thing to do

 8    is to have a sequential -- rather than trying to do it

 9    simultaneously, the Government says here are the -- again,

10    maybe just -- I'm not even sure it has to be in a big narrative

11    form.  I just need to see a list of the issues and the

12    evidence, testimony you believe and whatever exhibits supports,

13    provides a basis, both in terms of factual basis as well as the

14    process, the methodology, whatever you think is relevant, and

15    just have those.

16         And then, defense, frankly, I'd like a consolidated

17    brief -- I don't want to have to look at ten different

18    briefs -- just to respond to each of the proffered opinions and

19    a proffered reason and basis and with a response to those.

20         And that way, they'll -- I want something that lines up.

21    I don't want to have to hunt around.  But it's something that

22    the Government has its proffered opinions and it's already,

23    I guess, sort of contained; but it'd be nice if you could

24    just -- almost in a bullet-point fashion so it's really clear,

25    and then I can rule on those.

**PROCEEDINGS**

```
 1        So I don't know how much time you need, Mr. Barry,
 2   Mr. Krishnamurthy.
 3        MR. KRISHNAMURTHY:  Does the Court intend to address
 4   this at the next status hearing on the 23rd?
 5        THE COURT:  That might be a good opportunity.  We can
 6   try to take care of as many things as we can.
 7        MR. KRISHNAMURTHY:  Okay.  Would it work, then, if we
 8   submitted our brief in a week and the defense had a week after
 9   that?  Then I think the Court would still have a couple weeks
10   to consider both --
11        THE COURT:  Yeah, I would like a couple of weeks.  So
12   if we can do it one week from today and, defense, one week
13   thereafter; and then I will have a chance to look at that.  And
14   we'll kill several birds with one stone on the 23rd.
15        MR. KRISHNAMURTHY:  Thank you.
16        THE COURT:  All right.
17        MR. PHILIPSBORN:  Your Honor, if you're going to do it
18   that way -- again, this is Philipsborn -- I can tell you that
19   there have been some discussions initiated wisely by
20   Ms. Morrissey to defer briefing on one of the matters that you
21   had teed up, which was the Laughlin matter.
22        We were due to tender a brief early next week, and I think
23   that -- I don't want to speak for Mr. Barry so I'll defer to
24   him.  But it looked as though there were some productive
25   discussions towards delaying that brief.
```

**PROCEEDINGS**

1       But I would respectfully put it that I don't think we can

2   do both of those things at once.  And my sense is that

3   the Court's priority may be to focus on the *Daubert* issues.

4       So is it okay if the Government and defense work out the

5   Laughlin issue briefing, propose it to you, with the idea that

6   we'll focus on *Daubert* over the next two weeks?

7       **MR. BARRY:**  This is Kevin Barry, Your Honor.

8       We've communicated with Ms. Morrissey, and we agree with

9   her plan to defer that and then figure out a schedule once

10  we're done with *Daubert*.

11      **THE COURT:**  All right.

12      **MR. PHILIPSBORN:**  Thank you.

13      **MR. BARRY:**  Assuming the Court agrees, obviously.

14      **THE COURT:**  That's fine.  Now that we've got a trial

15  date that's in the fall of next year, we've got a little bit of

16  breathing room, but I do want to keep moving things along.  So

17  that's fine.

18      Why don't you stipulate to a further date, maybe a month

19  later or something, whatever works with you all, on the

20  Laughlin situation.

21      All right.  So we'll devote the 23rd to the, hopefully,

22  conclusion of this *Daubert* phase as well as other issues that

23  have been brought up.  But we'll defer the Laughlin to a

24  further briefing and hearing schedule that you can all

25  stipulate to and submit for my review and approval.  All right?

PROCEEDINGS

1   Great.  All right.

2        Thank you, everyone.

3        And thank you, Mr. Scheetz, for your patience.

4             **MS. MORRISSEY:**  Thank you, Your Honor.

5             **THE COURT:**  Thanks, everyone.

6             **MR. WALSH:**  Thank you, Your Honor.

7             **MR. BOISSEAU:**  Thank you, Your Honor.

8                  (Proceedings adjourned at 4:44 p.m.)

9                       ---o0o---

10

11                  **CERTIFICATE OF REPORTER**

12        I certify that the foregoing is a correct transcript

13   from the record of proceedings in the above-entitled matter.

14

15   DATE:  Wednesday, September 2, 2020

16

17

18   _____

19   Ana M. Dub, CSR No. 7445, RDR, CRR, CCRR, CRG, CCG
              Official Reporter, U.S. District Court

20

21

22

23

24

25