MICHAEL CLOUGH State Bar No. 235410
Law Offices of Michael Clough
6114 LaSalle Ave #833
Oakland, CA 94611
Telephone: (650) 274-7764
Facsimile: (888) 285-4128
cloughlawoffices@gmail.com
Counsel for Defendant Russell A. Lyles, Jr.

**U.S. DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>          Plaintiff,<br><br>vs.<br><br>RUSSELL LYLES JR.,<br>          Defendant. | Case No.: 3:17-cr-00533-3 EMC (LB)<br><br>NOTICE OF FALSE TESTIMONY BY ATF INTELLIGENCE OPERATIONS SPECIALIST SCHEETZ, JOINDER IN THE JOINT OBJECTIONS , AND RESERVATION OF RIGHTS |

**Introduction**

In the *Daubert* hearing, ATF intelligence operations specialist Jeremy Scheetz repeatedly testified the Shasta charter of the Hells Angels was frozen in July 2007 because Shasta members failed to retaliate against the Mongols for the shooting of Robert Thompson ("Bobby T."). Mr. Lyles files this Notice, in part, to inform the Court that specialist Scheetz's testimony regarding this matter -- including answers given to direct questions from the Court -- was demonstrably false and, indeed, impossible, but also to reserve his rights to request a further *Daubert* hearing and to file a motion in limine to exclude testimony by Scheetz based on *Crawford v. Washington*, 541 U.S. 36, 68 (2004) before his trial in the event that Scheetz is permitted to testify at the initial trial.

. . .

As clearly documented in the West Coast Officers' meetings minutes, which were attached as an exhibit to Scheetz's declaration, the Shasta charter was frozen in mid-July

1

2007[1]. As documented in further detail below based on readily available newspaper articles, Bobby T. was shot by a member of the Mongols in Eureka, California on November 8, 2008[2]. Because Bobby T. was shot more than 15 months **after** the Shasta charter requested to be frozen, Scheetz's testimony in the *Daubert* hearing is indisputably false. Obviously, the Shasta charter could not have been frozen in July 2007 because of its members' failure to retaliate against a shooting that occurred in November 2008. As discussed below, the inaccuracies in Scheetz's testimony regarding this issue are not limited to providing a false explanation for the freezing of the Shasta charter.

Scheetz's false testimony strongly suggests he is not an unbiased expert who consistently applies a reliable procedure to ensure the validity of the information he relies on and to form reasoned opinions. It also illustrates the significance of Scheetz's practice of <u>not</u> taking notes, memorializing, or otherwise documenting information he receives from other purported OMG experts such as Jorge Gil Blanco, who Scheetz told this Court was the source for his allegation that the Shasta charter was frozen because its members failed to retaliate for the shooting of Bobby T.[3].

Issues of methodology and the inadmissibility of testimony based on testimonial hearsay aside, Scheetz's false testimony calls into question the reliability of any testimony he might offer at trials in this case based on undocumented observations and interviews, and

---

[1] See Attachment A: West Coast Officers Meetings Notes, July 14, 2007, p.2 (Exhibit 20 - ECF Document 1084-21); *Daubert* Hearing Transcript (Tr.) at 155-156.

[2] See Attachment B: Articles appearing in the *Eureka Times-Standard* on November 9 and 14, 2008, December 16, 17 and 18, 2008, and January 21, 2009 downloaded from Lexis-Nexis on September 13, 2020.

[3] See "Joint Post-Hearing Objections to Opinions of Government Law Enforcement 'Enterprise Expert' Jeremy Scheetz," p. 11, 15. In his testimony, specialist Scheetz acknowledged that his general practice is to <u>not</u> take notes or otherwise memorialize interviews and statements. See Tr. at 42, 44, 65, 68-69, 225, 361-362. When he was questioned about details regarding Gil Blanco's sources for his assertion that the Shasta charter was frozen because its members failed to retaliate for the shooting of Bobby T., Scheetz pleaded memory lapse -- see Tr. at 161, 322-323.

undisclosed law enforcement reports, statements by informants and other witnesses, and information he claims to have received from other purported "OMG experts" such as Gil Blanco.

. . .

Mr. Lyles understands that the Covid-19 crisis has had, and is likely to continue indefinitely to have, an unprecedented impact on the ability of this and other courts to manage complex, multi-defendant trials. He respectfully suggests, however, that unless and until extraordinary measures to conduct hearings and trials safely are no longer necessary, it may be impossible to conduct a rolling trial of eleven defendants on 11 substantive counts involving at least three separate clusters of charges and defendants and an overarching RICO charge, which combines the 11 substantive counts with a mish mash of 22 disconnected alleged acts based on a Hells Angels-cum-Hells Angels Sonoma County-cum-"Young Guns"-cum-Enterprise-in-Fact theory, without violating the defendants' individual rights to due process and a fair trial.

The risk that the defendants' individual rights to due process and a fair trial will be compromised in this case are compounded by the government's unequivocally expressed intent to use the grouping and sequencing of the defendants' trials to tilt the scales of justice in favor of the government. Indeed, AUSA Barry has been remarkably frank in stating on the record that he expects the outcome of the initial trial to have a domino effect that will coerce defendants not in the initial group to plead and thus obviate the need for later trials. To achieve that result, counsel for Mr. Lyles reasonably expects the government to use Count One as a vehicle to introduce evidence in the initial trial concerning charges and acts primarily alleged as to Mr. Lyles, Mr. Foakes, Mr. Greer and Mr. Cesena to obtain guilty verdicts in that trial and simultaneously stack the deck against Mr. Lyles and the other defendants who will be tried in the second and third trials.

If the government is allowed to proceed in this manner, it will unduly burden and prejudice the defendants in the initial trial group by forcing their counsel to prepare defenses to a large number of allegations that do not substantially involve their clients. For example,

except for Counts 2 and 3 and the so-called "Laughlin riot," defendant Wendt is not personally implicated in any other count or act noticed by the government; and, despite being a member of the Sonoma charter significantly longer than any other defendant, defendant Ott is not personally implicated in any charges or noticed acts except Counts 2 and 3. At the same time, if the government is allowed to, in effect, try defendants Lyles, Foakes, Greer and Cesena in abstentia, there is a substantial risk that evidentiary and other rulings in the initial trial may substantially limit and prejudice their ability to present effective and complete defenses in trials two and three.

Mr. Lyles understands it is common practice in complex, multiple defendant cases in this district to set schedules for the filing of pretrial motions that include defendants not in the initial trial group. He further recognizes the Court's interest in expediting and efficiently managing a case such as this one. However, in light of the severe limits on in-court proceedings imposed by the Covid-19 crisis and the ways in which the government has charged this case, Mr. Lyles respectfully submits that the procedures followed in prior RICO cases cannot be presumed to be appropriate in this case.

For the above reasons, Mr. Lyles objects generally to any order requiring him to file a pretrial motion or join a pretrial motion filed by other defendants in advance of the initial trial of defendants Nelson, Ott and Wendt, or risk waiving his right to file such a motion after the initial trial; and he asserts his right to a de novo hearing and independent determination of any issue affecting his substantial rights and interests <u>except</u> in those instances where he explicitly joins a pretrial motion filed by other defendants, or files his own motion. Mr. Lyles does so, because his counsel reasonably expects the legal and evidentiary posture of the government's case to change substantially over the next year, especially if it the government is allowed to continue to shield a significant amount of its most crucial evidence from disclosure until shortly before trial under the guise of protecting witnesses; and that it will change even more as a result of developments in the initial trial of defendants Nelson, Ott and Wendt. Consistent with that position, in addition to alerting the Court to the false testimony by specialist Scheetz, Mr. Lyles has filed this notice to make of a

record of his joinder as to the Joint Post-Hearing Objections filed by co-counsel for defendant Wendt and his reservations with regard to the narrower *Crawford* motion filed by counsel for defendant Cesena.

### Notice of Joinder as to the Joint Post-Hearing Objections to Expert Opinion Testimony by Intelligence Operations Specialist Scheetz

Because Mr. Lyles is not in the initial trial group and given the logistical and time constraints on the ability of the Court to afford all counsel a full opportunity to effectively cross-examine intelligence operations specialist Jeremy Scheetz concerning the bases and reliability of the opinions the government intends to offer at the initial trial, counsel for Mr. Lyles did not participate in the questioning of specialist Scheetz. Mr. Lyles, nevertheless, did not object to the hearing; and he and his counsel were present for all sessions via ZOOM. Mr. Lyles understands that the Court has indicated it will presume joinder in the case of pretrial motions. But, for the reasons stated above, Mr. Lyles hereby expressly joins the "Joint Post-Hearing Objections to Opinions of Government Law Enforcement 'Enterprise Expert' Jeremy Scheetz" submitted by co-counsel for defendant Wendt. In the event that specialist Scheetz is permitted to testify at the initial trial, however, Mr. Lyles reserves his right to request a supplemental *Daubert* hearing if, after the first trial, he reasonably believes there are grounds to exclude expert opinion testimony by Scheetz on grounds that were not fully developed in the initial *Daubert* hearing.

### Reservation of Rights as to Defendant Cesena's Motion to Exclude *Certain* Opinions and Testimony

Mr. Lyles shares co-defendant Cesena's concerns about the possible introduction of inadmissible testimonial hearsay through testimony by specialist Scheetz. However, except to the extent they are subsumed by the "Joint Post-Hearing Objections" submitted by co-counsel for defendant Wendt, Mr. Lyles does not join defendant Cesena's "Motion To Exclude Certain Opinions and Testimony." Instead, in the event that specialist Scheetz is permitted to testify at the initial trial and is offered as a witness at the second trial, Mr. Lyles

1 reserves his right to object to specific testimony by Scheetz in limine or at trial based on
2 *Crawford v. Washington*, 541 U.S. 36, 68 (2004).

With regard to the "statements regarding the violence of the Sonoma charter" spontaneously offered by Scheetz without notice in response to questions at the *Daubert* hearing, Mr. Lyles does not join defendant Cesena's motion additionally because he does not consider those statements, which were unsourced and case-specific, to be admissible at his trial for any permissible purpose irrespective of the fact they are based on third-party hearsay -- and, given Scheetz's admission he "doesn't know a whole lot of specifics about the Sonoma chapter," Mr. Lyles submits, they clearly do not satisfy the *Daubert* requirements for admission of expert opinions.

Mr. Lyles agrees with defendant Cesena's argument that Scheetz's testimony concerning the freezing of the Shasta charter was improperly based on third party hearsay -- i.e. statements by Jorge Gil Blanco, a now retired OMG "expert" <u>and</u> statements by ATF investigators and "undercovers." Tr. at 160, 321. However, as noted above and detailed below, the grounds for excluding Scheetz's testimony on this issue are far more substantial and serious than a violation of *Crawford*. Instead, Mr. Lyles submits that any testimony regarding the freezing of the Sonoma chapter by analyst Scheetz must be excluded because, as detailed below, his testimony concerning that matter was demonstrably false.

## Notice of False Testimony By Intelligence Operations Specialist Jeremy Scheetz

**A.   Scheetz's Testimony Concerning the Freezing of the Shasta charter And Jorge Gil Blanco**

In his declaration/testimony, Scheetz averred:

88.    I believe that charters are bound by decisions made at the higher levels of the HAMC organization because I have reviewed minutes of World Meetings, East Coast Officers Meetings and West Coast Officers Meetings. For example, during the June 18, 2007 West Coast Officers' Meeting, the Sonoma County charter submitted a motion (seconded by the Frisco charter), to expel most of the Shasta County charter members from the club. The July 2007 West Coast Officers' Meeting minutes note that the Shasta County charter was subsequently "frozen." Exhibit 20. Therefore, I believe that this

6

episode shows that the West Coast controlled the existence of the Shasta charter.

Scheetz Dec. at 23.

On cross-examination, Scheetz admitted his summary of the West Coast Officers meeting actions was incomplete and misleading. Combined Daubert Hearing Transcript ("Tr.") at 151-156. The Court asked, "so where in these minutes does this support your conclusion about the petition and West Coast shutting down the Shasta charter? Is there anything else?" Tr. at 157. In response, Scheetz offered an opinion he did not include in his declaration/testimony:

> The information that I have them being shut down … I got that from Jorge Gil Blanco, who is an expert, on speaking to him on numerous occasions. *We knew about the incident on why they were being shut down because they did not retaliate for a member being shot.*
>
> *And that's -- that was the final conclusion, was they ended up freezing the chapter because several of the members left and several of the members transferred.*

Tr. at 157 (emphasis added.).

After acknowledging this explanation was not in the July 2007 minutes, Scheetz repeated, "the information came from Jorge Gil Blanco, when I spoke to him about it," and explained further:

> It was a conclusion afterwards that they had come to. *Even though they voted on not to freeze them, certain members were asked to leave before they were kicked out because they never retaliated versus the Mongols.* And they were not going to put that in their minutes.

Tr. at 157-158.

The Court asked, "So it doesn't surprise you they didn't put the real reason in the minutes?" Scheetz answered:

> Oh, no. They wouldn't because at this time they knew a bunch of their minutes were being -- were found during search warrants and stuff of that nature. So they limited the information they put out.

Tr. at 158.

7

Attorney Sabelli, co-counsel for defendant Wendt, followed up by suggesting Scheetz's methodology "in these notes is to take the word of Jorge Gil Blanco." Scheetz responded:

> Not just his, but I speak to other experts. And we know the fact that one of the members received a Purple Heart. *We know that from talking to other experts at the time who actually had an ongoing RICO investigation with the Mongols -- which was very successful -- out of ATF Los Angeles, there was never any type of retaliatory act that was taken by the Hells Angels at that time, after the shooting involving the Mongols.*
>
> …
>
> So it wasn't just from what Jorge said. There were other experts at the time that we spoke to who were either undercover in the Mongols at the time, as full patch members, ATF agents, or ATF agents or FBI agents or state and local law enforcement experts within California and the West Coast who were also working ongoing investigations at the time.
>
> *And this is something that I put everything together and we came to this conclusion speaking to Jorge Gil Blanco who has testified to this situation.*
>
> *We have noticed that there never was a retaliatory act taken towards the Mongols.* Mr. Thompson received his Purple Heart for being shot by the Mongols and wounded and drawing blood. And that's the conclusion I came to after going through all the analysis and all the paperwork and all the information.

Tr. at 158-159.

In response to further questioning, Scheetz indicated "Billy, Red, and Bobby T.," the three members referred to in the West Coast Officers meeting minutes who requested that the Shasta charter be "frozen," were transferred to the Nomads and confirmed that they did not retaliate against the Mongols. Tr. at 159-160.

The Court interrupted:

> Are you saying -- *I understand you've talked to others to confirm that there was lack of retaliation. What is the source of your information that that resulted in members of the Shasta charter being kicked out or having to leave? That's just on Gil Blanco's testimony?*

Tr. at 160.

Scheetz affirmed,

> It was Gil Blanco's testimony and then speaking to ATF agents at the time.
>
> We had four ATF undercovers who had infiltrated the Mongols out of ATF Los Angeles. They were all patches of -- eventually became patches of the

8

> Mongols. *And within the Mongols, there was no type of retaliatory act on behalf of the Hells Angels towards the Mongols for that actual incident.*

Tr. at 160.

The Court emphasized it was asking what the evidence was that the failure to retaliate led to members having to leave the Shasta charter. Scheetz answered, "that came directly from Gil Blanco" and no one else. Tr. at 160-161. And the Court asked why Scheetz thought Gil Blanco's testimony[4] is reliable. Scheetz answered: "Because he was deemed an expert in court and he spoke to *many either Hells Angels members or former members who gave have him that information at the time*, sir." Scheetz also affirmed that Gil Blanco had spoken directly to Hells Angels members. Tr. at 161.

Attorney Sabelli followed up by asking what members Gil Blanco spoke to. Scheetz said he "didn't know exactly [who] they are," but explicitly affirmed he "did" ask Gil Blanco who the members were, but "just can't remember." Tr. at 161.

On redirect, AUSA Krishnamurthy began by asking Scheetz to explain his "compare and contrast" method. Tr. at 319. Scheetz explained he takes a piece of intelligence or information he receives from a report or agency, and "compare[s] and contrast[s] [it] with information" he had "either seen or … historically stored with ATF," "to come to a conclusion" -- or "[doesn't] come to a conclusion because [he] just [doesn't] have enough evidentiary information." He emphasized:

> I always compare and contrast. Even if I think I know the answer, I always look to make sure, due to the fact that I'm the representative on outlaw motorcycle gangs and motorcycle clubs for ATF for the outside as well as internal. So I want to make sure I have the information correct.

Tr. 319-320.

---

[4] Scheetz's reference to Gil Blanco's "testimony" is curious because, in response to a question by counsel for defendant Nelson, Scheetz testified that he did not obtain the transcripts of testimony by OMG experts. Tr. 238-239. This is significant with regard to the Shasta charter issue because, counsel for Mr. Lyles can proffer that, if Scheetz had reviewed Gil Blanco's testimony in that trial, he would have known that Gil Blanco had previously offered a different opinion as to why the Shasta charter was frozen.

9

AUSA Krishnamurthy then returned to the Shasta charter issue. He asked Scheetz to confirm why Gil Blanco said the Shasta charter was frozen. Scheetz testified:

> *I was told because the Shasta charter did not retaliate for Mr. Thompson being shot,* that they step [sic] to the charter and the charter was made frozen because they fell below the six person minimal to sustain a charter.

Tr. at 320. And Scheetz specifically confirmed Thompson was a member of the Shasta County charter "at the time he was shot," and he was shot by the Mongols. Tr. at 320.

AUSA Krishnamurthy asked Scheetz if he did any research into the underlying incident in which Mr. Thompson got shot. Scheetz answered,

> I tried. I wasn't able to get much information, other than the fact that I spoke to Mr. Gil-Blanco. And I've also spoken to ATF Los Angeles, which is John Ciccone, and the four ATF undercovers who conducted the infiltration into the Mongols, I think it was 2007 to 2010. And they were fully aware of the situation that transpired between the Mongols and the Hells Angels, and they gave me a little bit of information, which coincided, confirmed what Jorge had said.

Tr. at 322. He said that his ATF contacts explained that "the Mongols did shoot a member of the Hells Angels, but they didn't go into detail about the charter being frozen and of that nature." Tr. at 321-322.

AUSA Krishnamurthy then asked Scheetz how Gil Blanco knew "that the freezing was due to the lack of retaliation." Scheetz testified:

> I believe he had done some debriefing, sir, on some former members or through some sources; and *he had come to the conclusion and was told that because they did not retaliate, that a vote was going to be held.* And they eventually -- one of the members ended up leaving. <u>And then</u>, them being below the six minimal to hold a charter, three ended up transferring to the Nomads charter, and then they froze that charter. *That's what Mr. Gil-Blanco told me*, sir.

Tr. at 322.

When AUSA Krishnamurthy asked if Gil Blanco described "who these former members were or what their credibility was," Scheetz answered, "He did." But, once again said, he could not " remember at the time now." The Court interjected, "He did describe to you who these people were?" And Scheetz testified: "Yes, sir. I just don't remember at the time. It was, like, 2008, 2009. *They were full-patch members*, sir." Tr. at 322-323.

10

In response to a question from the Court, Scheetz indicated that the "full patch members" Gil Blanco spoke with about this were "from other charters. But they knew what was happening at Shasta?" Tr. at 323. Scheetz added that Gil Blanco "didn't go into exactly how they knew, but he told me exactly what transpired." Tr. at 323.

On re-cross, counsel for defendant Cesena asked Scheetz to repeat his earlier testimony he was "told by Jorge Gil-Blanco that the Shasta chapter was frozen because they did not retaliate after Thompson was shot." Scheetz hedged slightly:

> That was one -- that was one of the leading reasons. The main reason -- and it's in there -- is one of the members left -- three of the members left and one quit, which put them below the six. *But the reason, the overall circumstance that* **started** *it is they did not retaliate against the Mongols.*

Tr. at 386. And he confirmed his "only source of that information" was Jorge Gil Blanco. Tr. 386.

**B.     Scheetz's Testimony Concerning the Freezing of the Sonoma County Hells Angels charter Was False.**

Scheetz's testimony concerning the freezing of the Shasta charter and, most crucially, by implication, that the Sonoma charter members moved to bring the Shasta members up for their patches at the June 16, 2007 meeting of the West Coast Officers for failing to retaliate for a shooting, see Attachment A, p.4, was clearly and demonstrably false.

As noted above, in the *Daubert* hearing, Scheetz repeatedly testified that the Shasta charter was frozen because Shasta members failed to retaliate against the Mongols for the shooting of Bobby T. (Thompson). That was demonstrably false -- and, indeed, impossible. As clearly documented in the West Coast Officers' meetings minutes attached as an exhibit to Scheetz's declaration, the Shasta charter was frozen in **July 2007**. See Attachment A, p. 2. As documented above, Bobby T. was shot by a member of the Mongols in **November 2008.** See infra. at p. 1-2 and Attachment B, p. 1. Thus, the timing of the shooting of Bobby T. contradicts Scheetz's repeated testimony concerning the reasons for the freezing of the Shasta charter, and, most crucially, Scheetz's implied allegation that members of the Sonoma charter moved in **June 2007** to "bring the members from Shasta County up for their patches" **because of** their failure to retaliate against the Mongols for shooting of Bobby T..

11

The fact that the freezing of the Shasta charter occurred substantially before the shooting of Bobby T. also places Scheetz's testimony that, according to ATF investigators and "undercovers," there was no retaliation by any member of the Hells Angels for the shooting of Bobby T. in a very different light, especially as it relates to the Sonoma charter. Indeed, the previously undisclosed ATF information that a member of the Hells Angels was shot by the Mongols and there was no retaliation against the Mongols tends to disconfirm Scheetz's assertions about the automaticity of retaliatory violence between the Hells Angels and the Mongols and is, therefore, potentially exculpatory.

Given that it is indisputable Scheetz falsely testified regarding the reasons Sonoma charter members moved to bring up members of the Shasta charter for their patches in June 2007 in ways that falsely supported his opinion regarding "charter autonomy" and falsely suggested the Sonoma charter sought to punish another Hells Angels charter for failing to retaliate against the shooting of a Hells Angels member by a member of the Mongols, the only possibilities are that Scheetz's false testimony was a knowing lie, or it was the result of Scheetz's cognitive biases, information processing limitations, and memory problems.

If Scheetz knowingly lied about the reasons for the freezing of the Shasta charter after Attorney Sabelli forced to him acknowledge the flaws in the factual basis of the inference he drew regarding charter autonomy based on paragraph 88, it provides a substantial reason to doubt the reliability of any testimony he might offer at trial based on undocumented observations and undisclosed law enforcement reports, statements by informants and other witnesses, and knowledge Scheetz claims to have obtained from other purported "OMG experts" such as Jorge Gil Blanco and "law enforcement officers involved in OMG investigations." But, even if Scheetz merely misremembered and conflated what he was purportedly told by Gil Blanco about the freezing of the Shasta charter and by ATF investigators and "undercovers" about the lack of retaliation for the shooting of Bobby T., it strongly supports excluding expert opinion testimony by him as requested in the "Joint Post-Hearing Objections" submitted by co-counsel for defendant Wendt.

Scheetz's repeated claim his opinion was based on statements made to him by Jorge Gil Blanco also involves substantially more than evidence of a *Crawford* issue. Based on discovery concerning the Lake County incident that has been disclosed to the defense by the government[5], Bates HA:45406-45411: "Jorge Gil Blanco opinion letter," and a statement of opinion by Gil Blanco, Bates EXPERT:267-270: excerpt from "Statement of Opinion by Gil Blanco," it seems highly unlikely Gil Blanco told Scheetz that Sonoma County members proposed the freezing of the Shasta charter in July 2007 due to the failure of Shasta members to retaliate against the Mongols for shooting Bobby T.. Aside from the fact that was impossible, neither of the two statements regarding Gil Blanco's speculation as to why Sonoma charter members moved "to bring up the members in Shasta Co for their patches" in June 2007 mentions either a shooting of a Hells Angels member or the Mongols. Thus, it appears Scheetz not only testified falsely about the reasons Sonoma charter members moved to bring up Shasta charter members for their patches, he also testified falsely when, in response to a direct question from this Court, he said the "source" of his information that the "lack of retaliation" for the shooting of Bobby T. "resulted in members of the Shasta charter being kicked out or having to leave" was Gil Blanco. See Tr. at 160.

It is also significant that on redirect examination, AUSA Krishnamurthy elicited testimony from Scheetz about the way in which he reached his conclusions about the freezing of the Shasta charter in an obvious effort to validate and vouch for the so-called "compare and contrast" process Scheetz purports to use to confirm the reliability of relevant information about the Hells Angels and reach conclusions (opinions). Tr. at 319-322. Based on the facts regarding the Shasta issue, the government's use of this example proves the opposite of what AUSA Krishnamurthy apparently believed it proved. In response to a

---

[5] Out of an abundance of caution regarding their status, counsel for Lyles has not attached these statements by Gil Blanco, but reasonably believes that the government will not dispute that they contradict Scheetz's testimony. Because the evidence is so clear regarding the falsity of Scheetz's testimony, Mr. Lyles does not believe an evidentiary hearing on this matter is necessary, but would, of course, not oppose one if the Court decides it would be helpful.

question from AUSA Krishnamurthy as to whether Scheetz did any research into the underlying incident in which Mr. Thompson got shot, Scheetz answered that he "tried," but "wasn't able to get much information, other than the fact that I spoke to Mr. Gil-Blanco." Tr. at 322. Since the shooting incident, arrest, plea and sentencing of the Mongols members were reported in detail in local newspapers in Eureka at the time (and are still readily accessible in widely used online databases), see Attachment B, and Gil Blanco had previously offered opinions that contradict Scheetz's explanation of the freezing of the Shasta charter, the only inference that this Court can reasonably draw is that Scheetz' "compare and contrast" method is very unreliable. That offers further strong support for the request in the defendant's "Joint Post-Hearing Objections" to exclude testimony by Scheetz.

Finally, based on the government's knowledge of Gil Blanco's actual opinion concerning the freezing of the Shasta charter in July 2007, as confirmed by the discovery referenced above, if Scheetz's false testimony had been offered at trial, the government's failure to correct that testimony would constitute a clear violation of *Napue v. Illinois*, 360 U.S. 264, 265 (1959) (due process is violated when the prosecution fails to correct false testimony); see also *Giles v. Maryland*, 386 U.S. 66, 87 (1967)(a prosecutor has a duty to refrain from soliciting false evidence and correct false evidence he does not intentionally elicit). At this stage in the proceedings, Mr. Lyles submits the appropriate sanction for specialist Scheetz's demonstrably false testimony and the government's inexplicable failure to correct that testimony, is for the Court to grant the defendants' joint request to exclude Scheetz from testifying as an expert at trial.

DATED: September 16, 2020

                                              /s/ Michael Clough
                                              MICHAEL CLOUGH
                                              Attorney for Defendant
                                              RUSSELL LYLES Jr.