DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

AJAY KRISHNAMURTHY (CABN 305533)
KEVIN J. BARRY (CABN 229748)
LINA Y. PENG (NYBN 5150032)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7050
    FAX: (415) 436-7234
    Ajay.krishnamurthy@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| UNITED STATES OF AMERICA, | ) | CASE NO. 17-CR-533-EMC |
|---|---|---|
| Plaintiff, | ) | Response in Opposition to Defendant Russell Lyles's "Notice of False Testimony" |
| v. | ) | |
| JONATHAN JOSEPH NELSON, et al., | ) | |
| Defendants. | ) | |

During the three-day *Daubert* hearing, ATF Intelligence Operations Specialist Jeremy Scheetz made a mistake recalling a fact. Scheetz was mistaken in testifying that the Hells Angels Shasta charter was frozen in 2007 because its members "never retaliated against the Mongols" after a member of the Shasta charter was shot by the Mongols. ECF No. 1184-1 at 160–61. Instead, the Shasta charter was frozen after its members failed to make the Vagos "back down" after "several violent confrontations" with the Vagos. Krishnamurthy Declaration, Exhibit 1 at EXPERT-00000269–270 (Expert report of Jorge Gil-Blanco).

But Scheetz's mistake does not provide any basis for excluding his testimony. For one, the nature of his mistake falls squarely within what the Ninth Circuit has held to be proper for impeachment

1

1 at trial, not wholesale exclusion under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). This is so because "weakness" in the "factual underpinnings of the expert's opinion goes to weight and credibility, rather than admissibility." *Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1352 n.5 (9th Cir. 1987), opinion modified on reh'g, 866 F.2d 318 (9th Cir. 1989) (quotation omitted). And even if the Court were to disregard Scheetz's testimony on the Shasta charter altogether, Scheetz's opinions would still be well supported.

Lyles' passing suggestion that the Court should exclude Scheetz' testimony under *Napue v. Illinois*, 360 U.S. 264 (1959) should also be rejected. As Lyles acknowledges, *Napue* is applicable only at trial. Further, the Ninth Circuit has made clear that an "honestly mistaken witness recollection" is not false testimony. *United States v. Renzi*, 769 F.3d 731, 752 (9th Cir. 2014). In this case, Scheetz conflated two sets of violent incidents that both took place a decade ago. And importantly, an accurate recollection of the facts would have supported Scheetz's opinion too. The circumstances of Scheetz' mistake demonstrate that it was not intentional.

I.   Background

A.   Scheetz's testimony

Scheetz's testimony about the Shasta charter arose in the context of his discussion of "charter autonomy." In his declaration, Scheetz stated that even though "there are differences in how charters operate," there "are also significant similarities between charters" and that "charters believe themselves bound together as part of a single organization with the same values and culture." ECF No. 1084-1, ¶¶ 84–85. In support, Scheetz listed a number of examples, including that there exist World Rules that are generally followed, that different charters communicate regularly about both outgoing members and incoming prospects, that different charters share common enemies such as the Mongols and Vagos, and that individual charters are bound by decisions made by the Hells Angels organization as a whole. ECF No. 1084-1, ¶¶ 85–89. As one example of this last point, Scheetz wrote in his declaration that "the Sonoma County charter submitted a motion (seconded by the Frisco Charter), to expel most of the Shasta County charter members from the club" and that the "Shasta County charter was subsequently 'frozen.'" ECF No. 1084-1, ¶¶ 88.

During cross-examination, Scheetz was asked about this incident. He testified that he had spoken

to another law enforcement officer, Jorge Gil-Blanco, who told him that the Shasta charter was "shut down because they did not retaliate for a member being shot." ECF No. 1184-1 at 159. Specifically, "certain members were asked to leave before they were kicked out because they never retaliated versus the Mongols." ECF No. 1184-1 at 160. Scheetz also stated that he knew that one of the Shasta charter members named "Mr. Thom[p]son" "received a purple heart" and that he had spoken with ATF undercover officers who had infiltrated the Mongols; these officers told him that the Shasta charter had never retaliated for the shooting of Thompson. ECF No. 1184-1 at 161–62.

On redirect, Scheetz testified again that he was told by Gil-Blanco that the Shasta charter was ultimately frozen because it "did not retaliate for Mr. Thom[p]son being shot." ECF No. 1184-1 at 320. He elaborated that Thompson was a "member at the time of the Hells Angels Shasta County charter" who was shot by "members of the Mongols." ECF No. 1184-1 at 320. Scheetz further explained that he had reached out to ATF law enforcement officers who had been undercover with the Mongols: these officers confirmed to him that the Mongols had shot a member of the Hells Angels and the Hells Angels did not retaliate, but they "didn't go into detail about the charter being frozen." ECF No. 1184-1 at 324–325.

B. *Gil- Blanco's Report*

Scheetz was mistaken in his recollection regarding the Thompson shooting being a specific reason for Shasta's dissolution.

According to the expert report of Gil Blanco—produced to the defense on January 31, 2020—Gil Blanco believed that the Shasta charter was frozen not due to gang rivalry between the Hells Angels and the Mongols, but rather "due to the gang rivalry between the Hells Angels and Vagos." Krishnamurthy Declaration, Exhibit 1 at EXPERT-00000267. Specifically, the Sonoma charter had been "upset with Shasta" because they did not "handle the situation" with the Vagos "properly": "there were several violent confrontations between the Vagos and Shasta Charter" and "Sonoma felt that Shasta was unable to properly make the Vagos back down." Krishnamurthy Declaration, Exhibit 1 at EXPERT-00000269–270. Thus, the mistake made by Scheetz is that he incorrectly recalled the Thompson shooting as being a basis for the dissolution of the Shasta charter, rather than other disputes between the Hells Angels and Vagos.

But as Lyles himself concedes, it is still true that Robert Thompson, a former member of the Shasta charter, was shot by the Mongols. ECF No. 1205-2. It is also true that Scheetz spoke with both Gil-Blanco and ATF undercover officers about this shooting, and based on these conversations, Scheetz believes that the Hells Angels never retaliated for the Thompson shooting.

### II. Scheetz's mistake of fact does not warrant exclusion

Scheetz's mistake of fact does not warrant the exclusion of his testimony. While this error provides the defense with impeachment material at trial, it does not undermine the overall reliability of Scheetz's expertise given the totality of his testimony and opinions.

The Ninth Circuit has made clear that cross-examination—not exclusion—is the remedy for these types of issues. The gatekeeping function is meant to "screen the jury from unreliable nonsense opinions, but not to exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis/Budget Group*, 738 F.3d 960, 969 (9th Cir. 2013). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

Accordingly, "weakness" in the "factual underpinnings of the expert's opinion goes to weight and credibility, rather than admissibility." *Bergen*, 816 F.2d at 1352 n.5 (quotation omitted). This is so because "[t]he trier of fact is then capable of judging the credibility of the witness as it would that of anyone else giving expert testimony." *United States v. Sims*, 514 F.2d 147, 149 (9th Cir. 1975). *See also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) ("weaknesses in the factual basis of an expert witness' opinion bear on the weight of the evidence rather than on its admissibility" (quotation omitted and alteration adopted)); *Hartley v. Dillard's, Inc.*, 310 F. 3d 1054, 1061 (8th Cir. 2002) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility[.]"); *Romero v. S. Schwab Co., Inc.*, No. 15-CV-815-GPC-MDD, 2017 WL 5885543, at *14 (S.D. Cal. Nov. 29, 2017) ("Moreover, any alleged contradictory statements Dr. Brones made during the litigation may affect credibility determinations that go to the weight, not admissibility, of the evidence and can be challenged at trial.").

Under this standard, "[t]he jury is entitled to hear" Scheetz's "testimony and decide whether to accept or reject it after considering whether predicate facts on which the expert relied were accurate."

*Nomo Agroindustrial Sa De Cv v. Enza Zaden N. Am., Inc.*, No. CV 05-351-TUC-FRZ, 2009 WL 211085, at *5 (D. Ariz. Jan. 29, 2009). This is especially true because Scheetz's error does not cast doubt on his conclusion. Specifically, as described above, Scheetz believes that there are "significant similarities between charters" and that "charters believe themselves bound together as part of a single organization with the same values and culture." ECF No. 1084-1, ¶¶ 84–85. The Shasta charter incident is but one reason that Scheetz believes this is true: even without relying on it, Scheetz's conclusion is still supported by charters' adherence to a single set of rules; charters' use of a single set of symbols; internal communications between charters about important events; internal communications between charters about prospective and outgoing members; and charters' belief that they share common rivals. ECF No. 1084-1, ¶¶ 85–89. And even beyond these additional factors, even Lyles appears to accept that an accurate recounting of the Shasta incident still supports Scheetz's conclusion: regardless of which violent incident led to Shasta's dissolution, it appears that the Shasta charter was frozen by the Hells Angels' West Coast officers after the charter failed to respond appropriately to violence by rivals.

      Lyles contends that that even if Scheetz's testimony was not knowingly false, it still warrants exclusion because it reveals "cognitive biases, information processing limitations, and memory problems." ECF No. 1205 at 12. This argument is foreclosed by the Ninth Circuit. In *United States v. Abonce-Barrera*, 257 F.3d 959 (9th Cir. 2001), for instance, the Ninth Circuit rejected an argument that an expert should have been excluded because of his bias, explaining that "[g]enerally, evidence of bias goes toward the credibility of a witness, not his competency to testify, and credibility is an issue for the jury." *Id.* at 965. *See also IGT v. All. Gaming Corp.*, No. 2:04-CV-1676, 2008 WL 7084608, at *2 (D. Nev. Oct. 21, 2008) ("The case law is clear that bias is not a bar to admission of expert testimony, and in this case, the bias is not so prejudicial as to outweigh the probative value of his testimony under Federal Rule of Evidence 403.").

      The same is true of Lyles's contention that Scheetz's testimony should be excluded because of his "practice of not taking notes, memorializing, or otherwise documenting information." ECF No. 1205 at 2 (emphasis omitted). The Ninth Circuit has made clear that "adherence to protocol" is "an issue for the jury" rather than one of admissibility. *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1047 (9th Cir. 2014). In short, because "[d]isputes as to the strength of an expert's credentials, faults in his use

of a particular methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony," *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998) (quotation omitted and alterations adopted), Scheetz's testimony should be admitted.

In passing, Lyles suggests that Scheetz's testimony could give rise to a claim under *Napue v. Illinois*, 360 U.S. 264, 265 (1959). ECF No. 1205 at 14. As Lyles acknowledges, however, *Napue* applies only at trial. In any event, this argument fails as well. For one, as explained above, a witness's "recollection merely being mistaken, inaccurate or rebuttable" does not render it false within the meaning of *Napue*. *Henry v. Ryan*, 720 F.3d 1073, 1084 (9th Cir. 2013). *Napue* instead requires a knowing false statement at trial. *Id.* As a result, "honestly mistaken witness recollections generally do not satisfy the falsehood requirement." *Renzi*, 769 F.3d at 752.

In *Henry*, for example, the Ninth Circuit rejected a *Napue* claim after the petitioner "provided evidence rebutting [a witness's] version of the facts" because the petitioner had "provided no evidence that [the witness] knew his testimony was inaccurate at the time he presented it, rather than [the witness's] recollection merely being mistaken, inaccurate or rebuttable"; the petitioner's "conclusory assertion" was insufficient. *Id.* at 1084. The same is true here, and this alone is enough to defeat Lyles's argument.

The circumstances here demonstrate that Scheetz's mistake was unintentional. As described above, during a multi-day cross examination and redirect, Scheetz mixed up two sets of violent incidents involving the Hells Angels, both of which took place over a decade ago. And if Scheetz had accurately recalled why the Shasta charter was frozen, this would not have undermined his conclusion: the dissolution of the Shasta charter still provides a basis to opine that individual charters are bound by decisions made by the Hells Angels organization as a whole. ECF No. 1084-1, ¶¶ 85–89.

Lyles also cannot show that "the prosecution knew or should have known that [Scheetz's] testimony was" inaccurate. *Id.* On this point, it is significant that Gil-Blanco's expert report—to which Lyles now points to as evidence of Scheetz's error—was produced to the defense in January 2020. The Shasta discussion occupies about two pages of a 65-page report, and Gil-Blanco's report itself was just a small part of the over 1,500 pages of law enforcement reports, newspaper articles, photographs, and other documents that the United States produced related to Scheetz's testimony. If the prosecution

"should have known" about Scheetz's factual error, so too should have the defense. But none of the defense counsel raised this issue during the hearing.

Finally, Scheetz's error was not material. For the reasons explained above, even without reliance on the Shasta example, Scheetz's conclusion that "charters believe themselves bound together as part of a single organization with the same values and culture," ECF No. 1084-1, ¶¶ 84–85, is still well-supported by the record.

### III.  Conclusion

For the foregoing reasons, the United States opposes Lyles' "Notice of False Testimony." To the extent that the Notice seeks any relief with respect to Scheetz' proposed testimony, the Court should deny that request.

DATED:  September 22, 2020                                  Respectfully submitted,

                                                            DAVID L. ANDERSON
                                                            United States Attorney


                                                             /s Ajay Krishnamurthy
                                                            AJAY KRISHNAMURTHY
                                                            KEVIN J. BARRY
                                                            LINA Y. PENG
                                                            Assistant United States Attorneys