Pages 1 - 59

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

Before The Honorable Edward M. Chen, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | NO. CR 17-00533 EMC |
| | ) | |
| JONATHAN JOSEPH NELSON, a/k/a | ) | |
| "Jon Jon," et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Wednesday, September 23, 2020

**TRANSCRIPT OF REMOTE ZOOM VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES VIA ZOOM:**

For the Plaintiff:          DAVID L. ANDERSON
                            United States Attorney
                            450 Golden Gate Avenue, 11th Floor
                            San Francisco, California 94102
                    BY:  **AJAY K. KRISHNAMURTHY**
                         **KEVIN J. BARRY**
                         **LINA Y. PENG**
                         **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant Jonathan Joseph Nelson, a/k/a "Jon Jon":
                            LAW OFFICE OF JAI M. GOHEL
                            819 Eddy Street
                            San Francisco, California 94109
                    BY:  **JAI M. GOHEL, ATTORNEY AT LAW**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


Reported Remotely By:  Ana M. Dub, RMR, RDR, CRR, CCRR, CRG
                       CSR No. 7445, Official U.S. Reporter

```
 1    APPEARANCES:   (CONTINUED)

 2    For Defendant Jonathan Joseph Nelson, a/k/a "Jon Jon":

 3                              LAW OFFICES OF RICHARD G. NOVAK
                               65 North Raymond Avenue, Suite 320
 4                             Pasadena, California 91103

 5    For Defendant Raymond Michael Foakes:
                               GEORGE BOISSEAU LAW OFFICE
 6                             740 4th Street, Second Floor
                               Santa Rosa, California 95404
 7                        BY:  GEORGE C. BOISSEAU, ATTORNEY AT LAW

 8    For Defendant Russell Allen Lyles, Jr.:
                               LAW OFFICES OF MICHAEL CLOUGH
 9                             6114 La Salle Avenue, Suite 833
                               Oakland, California 94611-2802
10                        BY:  MICHAEL W. CLOUGH, ATTORNEY AT LAW

11    For Defendant Jeremy Daniel Greer:
                               LAW OFFICE OF RANDY SUE POLLOCK
12                             286 Santa Clara Avenue
                               Oakland, California 94610-2624
13                        BY:  RANDY SUE POLLOCK, ATTORNEY AT LAW

14    For Defendant Brian Wayne Wendt:
                               LAW OFFICES OF JOHN T. PHILIPSBORN
15                             507 Polk Street, Suite 350
                               San Francisco, California 94102-3339
16                        BY:  JOHN T. PHILIPSBORN, ATTORNEY AT LAW

17                             LAW OFFICES OF MARTIN A. SABELLI
                               740 Noe Street
18                             San Francisco, California 94114-2923
                          BY:  MARTIN A. SABELLI, ATTORNEY AT LAW
19

20    For Defendant Russell Taylor Ott:
                               LAW OFFICE OF ROBERT WAGGENER
21                             214 Duboce Avenue
                               San Francisco, California 94103-1008
22                        BY:  ROBERT F. WAGGENER, ATTORNEY AT LAW

23

24            (APPEARANCES CONTINUED ON FOLLOWING PAGE)

25
```

**APPEARANCES**:  (CONTINUED)

For Defendant Russell Taylor Ott:
                        LAW OFFICE OF MARCIA MORRISSEY
                        11400 W. Olympic Boulevard, Suite 1500
                        Los Angeles, California 90064-1543
                  BY:   **MARCIA A. MORRISSEY, ATTORNEY AT LAW**

For Defendant Christopher Ranieri:
                        LAW OFFICE OF JOHN G. WALSH, P.C.
                        63 Atlantic Avenue, Third Floor
                        Boston, Massachusetts 02110
                  BY:   **JOHN G. WALSH, ATTORNEY AT LAW**

For Defendant Damien David Cesena:
                        DURIE TANGRI LLP
                        217 Liedesdorff Street
                        San Francisco, California 94111
                  BY:   **GALIA Z. AMRAM, ATTORNEY AT LAW**

For Defendant Brian Burke:
                        LAW OFFICE OF ERIK BABCOCK
                        717 Washington Street, Second Floor
                        Oakland, California 94607
                  BY:   **ERIK G. BABCOCK, ATTORNEY AT LAW**

For Defendant David Salvatore Diaz:
                        LAW OFFICES OF JAMES S. THOMSON
                        732 Addison Street, Suite A
                        Berkeley, California 94710-1908
                  BY:   **JAMES S. THOMSON, ATTORNEY AT LAW**

For Defendant Merl Frederick Hefferman:
                        LAW OFFICES OF JAMES BUSTAMANTE
                        1000 Brannan Street, Suite 488
                        San Francisco, California 94103
                  BY:   **JAMES A. BUSTAMANTE, ATTORNEY AT LAW**

| | |
|---|---|
| 1 | **Wednesday - September 23, 2020**                               **1:30 p.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---o0o--- |
| 4 | **THE CLERK:**  Court is now in session.  The Honorable |
| 5 | Edward M. Chen is presiding. |
| 6 | Calling Criminal Action 17-533, United States of America |
| 7 | versus Jonathan Nelson, Raymond Foakes, Russell Lyles, Jeremy |
| 8 | Greer, Brian Wendt, Russell Ott, Christopher Ranieri, Damien |
| 9 | Cesena, Brian Burke, David Diaz, and Merl Hefferman. |
| 10 | Counsel, please state your appearances for the record, |
| 11 | beginning with the Government. |
| 12 | **MR. BARRY:**  Good afternoon, Your Honor.  Kevin Barry |
| 13 | for the United States along with Ajay Krishnamurthy and |
| 14 | Lina Peng. |
| 15 | **THE COURT:**  All right.  Good afternoon, everyone. |
| 16 | **MR. GOHEL:**  Jai Gohel and Richard Novak for Jonathan |
| 17 | Nelson, and his appearance is waived because of the pandemic, |
| 18 | and we are appearing by Zoom. |
| 19 | **THE COURT:**  All right.  Thank you, Mr. Gohel. |
| 20 | **MR. BOISSEAU:**  Good afternoon, Your Honor. |
| 21 | **MR. WALSH:**  Good afternoon, Your Honor.  John Walsh on |
| 22 | behalf of Christopher Ranieri, whose presence is also waived. |
| 23 | **THE COURT:**  All right.  Good afternoon, Mr. Walsh. |
| 24 | **MR. BOISSEAU:**  And George Boisseau on behalf of |
| 25 | Mr. Foakes, whose appearance is waived. |

1          **THE COURT:**  All right.  Thank you, Mr. Boisseau.

2          **MR. CLOUGH:**  Michael Clough, Your Honor, on behalf of

3    Mr. Lyles, who is, I think, listening on Zoom.

4          **THE COURT:**  All right.  Thank you, Mr. Clough.

5          **MR. WAGGENER:**  Good afternoon, Your Honor.  Robert

6    Waggener and Marcia Morrissey appearing for Russell Ott, and

7    Mr. Ott has confirmed that he is participating by means of the

8    Zoom call.

9          **THE COURT:**  All right.  Thank you, Mr. Waggener.

10         **MR. BABCOCK:**  Erik Babcock for Brian Burke, who's also

11   participating by Zoom.

12         **THE COURT:**  All right.  Good afternoon.

13         **MS. AMRAM:**  And Galia Amram for Damien Cesena, who is

14   participating by Zoom.

15         **THE COURT:**  All right.  Thank you, Ms. Amram.

16         **MS. POLLOCK:**  Good afternoon, Your Honor.  Randy Sue

17   Pollock appearing on behalf of Jeremy Greer.

18      Mr. Greer just advised me that he was having trouble with

19   one of the phone calls; so -- phone lines; so I'll try to give

20   him another one.

21         **THE COURT:**  All right.  Can we proceed?

22         **MS. POLLOCK:**  Yes, Your Honor.  Yes.

23         **THE COURT:**  All right.  Thank you, Ms. Pollock.

24         **MR. BUSTAMANTE:**  Good afternoon, Your Honor.  James

25   Bustamante appearing on behalf of Merl Hefferman, who's

```
 1   appearing via Zoom.

 2          THE COURT:  All right.  Thank you, Mr. Bustamante.

 3          MR. THOMSON:  James Thomson appearing on behalf of

 4   David Diaz, who is participating through Zoom, Your Honor.

 5          THE COURT:  All right.  Thank you, Mr. Thomson.

 6          MR. SABELLI:  Good afternoon, Your Honor.  Martin

 7   Sabelli for Brian Wendt.  He is in custody.  We have waived his

 8   appearance under these circumstances, though we're hopeful we

 9   can start involving him in the hearings.

10      Mr. Philipsborn is trying to join.  So hopefully, his hand

11   will be raised soon and he'll be able to get in.

12          THE COURT:  Okay.  So he's not in the waiting room?

13   He's still trying to get access?

14          MR. SABELLI:  He's trying to get in.  So he may have

15   gotten in in the last minute or so.  I don't know.  I can't see

16   who's there.  But I know he's trying to get on.

17          THE CLERK:  He is not in yet, Your Honor.

18          THE COURT:  Okay.  Do you want to -- are you willing

19   to proceed pending his joining, or do you want to wait?

20          MR. SABELLI:  We can proceed if the Court wants.  I

21   have no doubt that he'll be on any moment.

22          THE COURT:  Okay.

23      All right.  Has everybody made their appearance at this

24   point?

25                       (No response.)
```

1          **THE COURT:** All right.  So there are three things on

2      the agenda.  One is to hear any final comments on the *Daubert*

3      hearing with respect to Mr. Scheetz; two is the appeal from the

4      magistrate order from Judge Beeler regarding disclosure of

5      documents; and three is the sealed matter brought up by

6      the Government's motion under seal with respect to the

7      matter -- the order to show cause that pertains to Counsel

8      Boisseau.

9          And I did get a filing from Mr. Sabelli and

10     Mr. Philipsborn stating their view that there is an

11     interrelatedness in terms of timing, et cetera, et cetera, with

12     respect to the last matter.

13         My view is that the matter that's been brought up by the

14     motion for order to show cause does not preclude this Court

15     from moving forward on the Scheetz *Daubert* matter.  I've gotten

16     extensive briefing.  You've had three days of hearing.  I do

17     have some questions, but I don't see any reason to hold that

18     up.  I'm going to move forward with that.

19         With respect to the appeal from Magistrate Judge Beeler,

20     there is an issue there; there is an interrelationship; and so

21     I'm going to defer that pending what we do with the order to

22     show cause motion.

23         And so what I'd like to do is address myself, really, to

24     the Government and Mr. Boisseau about timing on an order to

25     show cause.

1          My view is that it appears that we're going to have to

2   have an order to show cause hearing, and if there are contested

3   facts, I may have to have an evidentiary hearing.  And so I

4   want to talk about that.  That hearing would be under seal, and

5   we can talk about who gets to attend or not.  But I want to

6   schedule that because that may have an impact on many other

7   things in this case.

8          So let me just first hear from the Government.  What's

9   your view about how we proceed?

10         And then I'd like to hear if Mr. Boisseau has any

11  comments.

12         **MR. BARRY:**  Thank you, Your Honor.  This is Kevin

13  Barry.

14         We spoke with Mr. Boisseau about the possibility of an

15  evidentiary hearing.  And in the Government's view, I think

16  that we could have an evidentiary hearing in 30 days.  Of

17  course, we'd like it to go faster, but we appreciate that

18  Mr. Boisseau needs time to prepare.

19         The wrinkle with respect to the evidentiary hearing is, we

20  think the Court would need to hear from Witness 1 -- you know,

21  all of the witnesses listed in that as well as the former

22  employee -- one former employee is Witness 1 -- and the other

23  former employee who's named in the motion for the OSC.

24         Now, that does implicate the potential for attorney-client

25  and work product issues.  But what we'd like to do is lay out

1    some ideas, at least, for the Court in terms of how to proceed.

2        And I think the most important one is, you know, if these

3    are two people who have worked in a law office, the

4    understanding should be that they know what attorney-client

5    privilege is; they know what work product privilege is; and,

6    you know, they should be admonished that the answers -- the

7    questions are not seeking any of that information and that

8    their answers should stay far away from any of that.

9        And then, in terms of the other structure about who gets

10   involved and how it would proceed, we can lay out some

11   suggestions for the Court in a filing in a couple of days.  But

12   in terms of timing, we think that -- 30 days is what

13   Mr. Boisseau indicated he needs.  We agree with his need to

14   proceed in that way.

15       And also, the sort of mechanics of it as well, Your Honor.

16   So this is sort of the Court's order to show cause; so these

17   are witnesses for the Court.  But if Your Honor indicates which

18   witnesses the Court would like to hear from and issue

19   subpoenas, we can make sure those witnesses are served and go

20   through the procedural aspect of getting them into court and

21   telling them where and when to show up and things like that.

22           **THE COURT:**  Okay.

23       All right.  Mr. Boisseau?

24           **MR. BOISSEAU:**  Your Honor, I think the issues are

25   broader than mentioned by the Government.  And I would like to

1    discuss those matters with this Court at this hearing outside

2    the presence of all defense counsel because it involves eyes

3    only information.  So I'm prepared to at least discuss those

4    issues in greater detail with the Court today at the completion

5    of this hearing.

6        I do believe that the allegations made in this case impact

7    my ability to go forward, at least at the *Daubert* hearing, and

8    to the extent that affects, you know, my representations of

9    Mr. Foakes.  But I think we can go forward with the *Daubert*

10   hearing because the primary movers are before the Court, and we

11   can discuss the impact at the end of the hearing, outside the

12   presence of other counsel.

13            **THE COURT:**  All right.

14            **MR. BARRY:**  Your Honor, this is Kevin Barry again.

15            **THE COURT:**  Yes.

16            **MR. BARRY:**  On the *Daubert* issue, Mr. Krishnamurthy is

17   going to be handling that.  But while I have the Court's

18   attention, I just want to make the record that with respect to

19   Mr. Boisseau, even if he is or believes himself to be frozen

20   out because of the OSC issue, Mr. Boisseau didn't -- he had the

21   opportunity to ask questions; he had the opportunity to submit

22   briefing.  He didn't.  I think he's relying on the hard work

23   that the rest of the counsel did, which is perfectly

24   understandable.

25        So I think even if he is right in that -- or Mr. Sabelli

1   is right that Mr. Boisseau can't participate in the *Daubert*

2   hearing, we think the Court is absolutely right in that the

3   issue has been -- it has been joined and it's ripe for

4   the Court's decision, even without any participation from

5   Mr. Boisseau.

6          **THE COURT:**  All right.  Well, let's do this:  I think

7   we should schedule an in camera, sealed hearing with just

8   Mr. Boisseau, the Court, and the Government.

9      I take it you have no objection to that, Mr. Barry, after

10  this hearing.

11         **MR. BARRY:**  None whatsoever, Your Honor.

12         **THE COURT:**  And, Mr. Boisseau, with respect to your

13  client's availability, you would like to have this hearing even

14  if he's not a participant?

15         **MR. BOISSEAU:**  Well, until the Court makes certain

16  findings or at least preliminary findings regarding disclosure,

17  what disclosures can be made -- my client will be brought into

18  this, but I would like to have this hearing today so we can

19  discuss these preliminary hearings.  I think they're

20  time-sensitive.  And there's -- I have concerns that I'd like

21  to bring to the Court's attention regarding the process and the

22  continuing concerns that I have regarding this case.

23      So I don't want to delay the first part of the in camera

24  hearing to a later date.  I'm urging the Court to -- at the end

25  of this hearing, we can have an ex parte -- or, rather, a

```
 1   sealed hearing and we can --
 2           THE COURT:  Right.
 3           MR. BOISSEAU:  -- start that process.
 4           THE COURT:  Right.  I just wanted to make sure that
 5   the fact that your client would not be participating in that
 6   ex parte hearing would not prevent us -- you do not want that
 7   to prevent this from going forward today.  Right?
 8           MR. BOISSEAU:  Yes, that's true.
 9           THE COURT:  All right.  Then, Angie, I'm going to ask,
10   we need to set this up not as a webinar but as a regular Zoom
11   meeting with strict attendance limits, since it's sealed.
12           THE CLERK:  Yes, Your Honor.  I will set it up
13   immediately after our public hearing.
14           THE COURT:  All right.
15           THE CLERK:  And those counsel will get e-mails.
16           THE COURT:  All right.  So, Mr. Boisseau and
17   government counsel, you'll get an e-mail with a link, and we'll
18   have a subsequent, kind of a breakout hearing.  Okay?
19           MR. BOISSEAU:  Thank you, Your Honor.
20           THE COURT:  Under seal.
21           MR. SABELLI:  Your Honor, may I say something on this
22   point?
23           THE COURT:  Yeah.
24           MR. SABELLI:  We really don't -- we have no idea what
25   the parameters are of the disclosures or their contacts or if
```

anything ever happened; but I would ask the Court either to

include counsel -- and I'm not really making this request now

because I don't know what the parameters are -- but to be

vigilant that information from other defendants or other

counsel is not implicated in some way.  Whether that's

fabricated or not, I have no idea.

But if there has been any kind of intrusion into the

defense camp in any way, obviously, our concern is that we are

in touch with Mr. Boisseau and his team; we've shared

information; we've conducted litigation jointly; we've had

strategy sessions.  So there is some concern for the rest of us

as well.

**THE COURT:**  And so you are asking that the Court be

vigilant to see if there's any information that either

implicates anybody else or that is joint defense information

that's been disclosed in some way?

**MR. SABELLI:**  Yes, Your Honor.  It's a bit awkward.

We can't put Mr. Boisseau in that position and be direct.  It's

our role to govern that, to try to monitor that.

But I understand the need to have a hearing with

Mr. Boisseau, the Court, and the Government today.  But we may

be making inquiry to make sure that there is adequate concern

about the possibility of an intrusion into other defense teams

or a jointly conducted or joint interest defense.

**THE COURT:**  All right.  But that intrusion -- what

 1   this hearing concerns is certain disclosures made by certain

 2   people.  The substance of what was stated, that's a different

 3   matter.  The issue is what's been disclosed and how it's been

 4   disclosed.

 5          MR. SABELLI:  Yes, Your Honor.  In my experience in

 6   these kinds of situations, there are all sorts of protocols

 7   that involve taint teams and separation of government counsel.

 8   I don't know whether or not that happened.  Certainly, there's

 9   some information on the face of the motion for the OSC that

10   suggests that the prosecutors in this case are privy to certain

11   things.  I don't know how far that goes.  I don't know if

12   the Government has other information that they did not include

13   in the motion for OSC that would be relevant or of concern to

14   the rest of us and possibly taint the prosecution.  We're in

15   the dark, Your Honor, on that.

16      And so I hesitate to slow down the train in some way, but

17   I want to point out that, you know, we have reason to be

18   concerned about intrusion into our own situation.

19          THE COURT:  All right.  Mr. Barry, do you have any

20   comments in that regard?

21          MR. BARRY:  Your Honor, I just -- it takes -- it's

22   kind of astounding how Mr. Sabelli is able to spin a defense

23   mistake, a defense disclosure, a defense breach of the

24   protective order and then turn it into something that

25   the Government has done wrong.  I mean, it's just astounding

1  how he does that, and it just needs to stop.

2      I appreciate his --

3          **THE COURT:**  My question is more specific.  Do you see

4  anything, from where you sit, regardless of whose fault it is,

5  that would end up with the Government having sort of

6  information that it otherwise would not have obtained,

7  substantively, into the defense side?

8          **MR. BARRY:**  I do not believe that Mr. Boisseau is

9  going to be discussing joint defense protected information or

10 any client confidences during an ex parte -- during the limited

11 ex parte under seal hearing, Your Honor.  I don't see any

12 concerns there.

13     I appreciate what the defense's concern should be is

14 whether these employees talked about joint defense material

15 with third parties and strangers, not the Government and not

16 things that the Government did.  It's:  What is the nature of

17 the breach?  I appreciate that concern.  But that is not an

18 intrusion into the defense camp.  That is the defense camp

19 breaching its own walls and spilling information out to the

20 public.

21          **MR. CLOUGH:**  Your Honor --

22          **THE COURT:**  Well --

23          **MR. SABELLI:**  Mr. Barry misunderstood me, in part.

24 I'm not concerned about Mr. Boisseau.  I'm concerned about what

25 may or may not have happened during the course of this

1    investigation.

2        Whether it's real or not, I have no idea what this person

3    or persons told the Government, no idea whatsoever.  That may

4    or may not involve information that involves the Wendt defense

5    team or the joint interests.  I have no idea.  And I have a

6    duty to try to monitor that for my client's sake, as upsetting

7    as it might be to some counsel.

8        **THE COURT:**  All right.  And what is your suggestion

9    procedurally to address that?

10       **MR. SABELLI:**  Your Honor, I cannot speak on behalf of

11   all the defense counsel in this respect.  But it's an inquiry

12   that's going to need to be made, and I would suggest that

13   rather than interrupting the hearing now and having a side

14   conference, that the members of the defense team apart from

15   Mr. Boisseau -- because we want to protect his own situation --

16   make a suggestion to the Court over the next day or two about

17   how to protect potential that there was some sort of intrusion,

18   whether real or not, into the defense camps of other folks

19   besides Mr. Foakes.

20       **THE COURT:**  All right.  Then there's nothing to be

21   done in that regard.  That does not preclude, I think, our

22   going forward procedurally with respect to the post meeting

23   that I'm going to have, post sealed meeting with Mr. Boisseau

24   and the Government.

25       **MR. SABELLI:**  Yes, Your Honor, I agree with that.

1          **THE COURT:**  All right.

2        All right.  So let's proceed on the one matter that

3    I believe that we can proceed on.  And frankly, I don't --

4    I mean, I could rule without taking arguments, and that's why I

5    don't think that what's happened has any effect.

6        In addition, as Mr. Barry has pointed out, Mr. Foakes has

7    had an opportunity to cross-examine.  That opportunity is now

8    gone; it's over.  So that's moot.

9        With respect to briefing, all the briefing is in.  I'm not

10   allowing any further briefing.  So the idea that Mr. Boisseau

11   cannot submit further briefs, that's moot.

12       And with respect to arguments, the argument's been carried

13   by other counsel, and I don't see an issue.  And I don't even

14   have to have argument, frankly.  So this is icing on the cake,

15   and therefore, I'm going forward.  There's no prejudice.

16       So that being said, let me zero in on what I think the

17   issues are with respect to the *Daubert* hearing.

18       It seems to me that whether or not Mr. Scheetz, for any

19   particular opinion, engaged in using multiple sources and some,

20   what he called, comparing and contrast -- others might say

21   verification, unverification, corroboration, non-corroboration,

22   contradiction, synthesis, whatever you want to call it -- to

23   the extent that there are multiple sources of information that

24   were considered by the witness and that the sources, even if

25   some are more questionable than others or some are subject to

1   some questioning as to validity, if they are of reasonable

2   reliability such that an expert in the field such as him can

3   rely on it, that opinion, based on that, comes in.

4        So the more the information base is based on multiple

5   sources, the less of a problem.  It's no longer just a straight

6   conduit under the conduit theory under the Sixth Amendment, and

7   it shows that there was some exercise of judgment.

8        It also shows a methodology.  I understand it's not

9   science and you can't put a formula on it.  And I read all the

10  briefing, and frankly, I'm not convinced that an expressive

11  preformula that shows how much weight is given to X, et cetera,

12  et cetera, but I do believe that that is one of the key things

13  I'm looking to.

14       On the other hand, to the extent that a particular opinion

15  is based on a single source that is not reliable, that raises

16  questions in my mind.

17       And so that's the first question.  The key question is:

18  What are the bases for each of the opinions stated herein?

19       And the Government has set forth sort of three categories

20  of opinions in its brief:  symbols, terms, and territory.

21  And so I want to hear -- and it set forth what it believes to

22  be the various sources for each of these sort of subopinions

23  within each category.  And I think there are a few that are

24  fairly critical.  That's what I'd like to get comments on.

25       So one of them -- and this overlaps into sort of two areas

1    with respect to symbols -- is Mr. Scheetz's testimony about the

2    back patch and that it represents a claim to territory and

3    then, later on, claim to territory is what leads to violence.

4         The Government, at page 8 of the brief, refers to his

5    declaration, sort of like his knowledge.  But I'd like to hear

6    comments about whether or not there are sufficient sources

7    there such that this was something that truly involved an

8    exercise of independent judgment, some synthesis, and a basis,

9    articulated basis that is the kind of thing that those in the

10   field might reasonably rely upon.

11        So I'd like the Government to be specific now and tell

12   me -- not just cite the declaration.  But what is the basis for

13   saying that the meaning of the back patch, the bottom rocker

14   represents a claim to territory?  Take that issue first.

15             **MR. KRISHNAMURTHY:**  Yes, Your Honor.

16        The declaration lays out a couple of different sources for

17   that.  The first is two insiders, one from the Hells Angels and

18   one from the Mongols.  The Hells Angels insider is

19   George Christie.  The Mongols insider is Doc Ruben.  I believe

20   that was his name.

21        Both of them described the fact that the back patch and

22   the bottom rocker does mean a claim to territory; and the fact

23   that the Mongols adopted the same bottom rocker, the state of

24   California, has led to decades of violence.  That's sort of the

25   core of what Mr. Scheetz knows.

From that, he can confirm that that is actually, in fact, true because he knows that there have been decades of violence that have ensued.  He provided the Court with a number of reports that started -- for the violent incidents that started this war over territory from San Diego in the 1970s.  He also documented incidents that span across California to pretty much the present day.

And so that's what we're sort of relying on for the basis of Mr. Scheetz's testimony that the bottom rocker represents a claim to territory.

THE COURT:  How do we know that this claim to territory is the genesis of various acts of violence as opposed to just other reasons for violence, just rivalry as opposed to claimed territory?

MR. KRISHNAMURTHY:  Your Honor, both of the insiders cited in the declaration said as much.  One of them said it in an article that he wrote.  The other one said it in a videotaped interview that we cited the YouTube link for.

THE COURT:  So this is in paragraph 61?  Is that the key?

MR. KRISHNAMURTHY:  Yes, Your Honor.

THE COURT:  And similarly, in his declaration that has the lengthy list under "HAMC Territory," starting with paragraph 117 but going into, really, 120, that has all the subparts with all these conflicts that occurred between the

1    Mongols and the HAMC and the Vagos, how do we know that those

2    incidents are tied to a territorial dispute as opposed to just

3    some other kind of rivalry or triggered by some other incident?

4        **MR. KRISHNAMURTHY:**  I think there's a couple of

5    reasons for that, Your Honor.  The first is, both of the

6    insiders explained, like, this is why the rivalry exists and

7    still continues to this day.  That was in both the article as

8    well as the interview.

9        The other part of that is what Mr. Scheetz testified to

10   during the hearing, which is he's able to sort of -- like, he

11   tracks the expansion of Hells Angels charters and he sees that

12   when the Hells Angels move into a territory that is

13   traditionally dominated by an adversarial OMG, there's violence

14   that ensues.

15       I think it's also important that this is not just about

16   California, although this sort of arose in the context of the

17   California bottom rocker.  Mr. Scheetz is aware that the

18   Hells Angel also wear bottom rockers that have other states and

19   that that bottom rocker also claims those other states as

20   territories, and violence then ensues following their --

21       **THE COURT:**  What paragraphs --

22       **MR. KRISHNAMURTHY:**  -- expansion into those

23   territories as well.

24       **THE COURT:**  What paragraphs -- what exhibits and

25   paragraph would you point me to in that regard?

1           **MR. KRISHNAMURTHY:**  Your Honor, I don't have the

2    hearing citation in front of me.  I can provide it to the Court

3    afterwards.

4           But this is sort of in the context of his testimony about

5    what he tracks about the Hells Angels' expansion.

6           **THE COURT:**  In other words, he correlates -- he finds

7    a correlation between his finding of expansion followed by a

8    period of violence?

9           **MR. KRISHNAMURTHY:**  Correct.

10          And the Court might recall that he actually brought up an

11    example of where he was incorrect about this, which is, he said

12    that when the Hells Angels expanded into Kentucky, he did not

13    expect there to be any violence because there were no

14    adversarial OMGs in the area at the time; but later, there was

15    another OMG that moved in and there was violent incidents

16    following that.

17          **THE COURT:**  All right.  So what we've been talking

18    about for the last minute is in the form of his testimony at

19    the hearing and not specifically in his declaration with

20    respect to outside of California?

21          **MR. KRISHNAMURTHY:**  Correct, Your Honor.

22          **THE COURT:**  Okay.  All right.  What's the response?

23    So the bases for this claim to territory as signified by the

24    bottom rocker the Government contends is in paragraph 61 and

25    his reliance on two insiders, as well as his observations --

1   I guess you might call them empirical-type observations of

2   expansion followed by some ensuing violence.  Why isn't that

3   enough for *Daubert* purposes?

4           **MR. SABELLI:**  Well, Your Honor, I'll start, and I'm

5   sure other counsel want to join in.

6           But, first of all, both the Cesena brief and the Wendt

7   brief raise the issue of *Crawford*, of a Sixth Amendment issue.

8   And simply serving as a pass-through for two opinions is not

9   what expert testimony is about.

10          So what Mr. Krishnamurthy has described is a process of

11  simply -- and I'm not using this word in a derogatory sense

12  but -- parroting two other folks.  And this is exactly the kind

13  of thing that Judge Alsup signaled could be gotten from

14  insiders; and, in fact, we anticipate the Government will be

15  asking these types of questions of insiders who testify for

16  the Government.

17          **THE COURT:**  Where would you draw the line between the

18  pass-through conduit world into the synthesis, independent

19  judgment?  Does it take three sources? four sources?  At what

20  point?

21          **MR. SABELLI:**  That is the question.  And the question

22  is where the expert exercises some sort of independent

23  judgment -- and I'll use Mr. Scheetz's phrase -- to compare and

24  contrast sources.

25          There is no evidence with respect to this opinion or

others that he's done any comparing and contrasting.  This is

simply a straight pass-through of two of many sources.  And as

the Court can tell from several moments in the hearing,

sometimes his passing through was simply dead wrong.  Whether

it's false or mistaken, that's another issue, and we may come

to that today with respect to the whole Shasta deal, but he is

simply passing through what two people have said.

He didn't tell us, for example:  I surveyed 100 different

sources, and these two sources are representative of what I've

learned.  That is not what -- that would be possibly an

indication of independent judgment.  He didn't do that.

He's picking two sources out, and as we've seen in other

examples -- for example, ignoring the Pat Matters [sic] and

Chris Omodt book -- we cannot have confidence in the

reliability of the sources he picks.

He doesn't tell us how many sources, how he selected them.

He doesn't show us how he compares and contrasts them.  He is

simply doing an anti-*Crawford* pass-through of two people and,

by the way, referring to a time period that is far beyond what

we're doing here in this case.

THE COURT:  What about Mr. Krishnamurthy's point about

that he also considered his own observations about tracking

expansion of the HAMC in other areas and then seeing violence

sort of ensue thereafter and making some kind of -- you may

contest this but -- making an inference of a causal effect

1    there?

2         **MR. SABELLI:**  I don't see that laid out anywhere.  I

3    certainly don't see that in the declaration.  When the Court

4    asked Mr. Krishnamurthy, he referred to the testimony, not to

5    the declaration.  It's not in the declaration.  We don't have

6    specific examples of it.

7         We know we can't rely on Mr. Scheetz's memory for all

8    sorts of reasons.  We've pointed out not only faults with his

9    memory, but faults with his collection of information in the

10   form of notes and reports, which, by the way, we have not been

11   provided with after the hearing.

12        And so to sort of come in for a landing on this thing,

13   there are no opinions, expressly no opinions about territory in

14   the declaration.

15        I asked Mr. Scheetz directly about it, with respect to

16   paragraphs 117 through 122, the last eight or nine pages of the

17   declaration about territory:  Are you offering any opinions?

18   The answer was "no."

19        The Government then went back on redirect and now has

20   reconstructed a territorial opinion, but it's not in the

21   declaration.  And I asked that question during my portion

22   before the redirect, and Mr. Scheetz's answer was a very

23   candid:  No, I don't have any opinions in the declaration about

24   territory.

25        And finally, what these really are, are opinions about

propensity for violence.  And if what we're talking about here is Mr. Scheetz coming in and showing a series of photographs with a bottom rocker and saying "This is what the Hells Angels use," that's one thing; but to say this evinces or reflects or establishes a propensity for violence is quite another and it's exactly what the case law forbids.

And just the final point is, on direct questioning -- and I think this was on August 25th, I think I asked this question -- he was willing to say that this was a mind-set he attributed to every single Hells Angel across the planet, over 5,000 people.  So this is way beyond what the case law permits, and it's not in the declaration.

**THE COURT:**  Let me ask you about propensity for violence.  I understand the point about attributing it to the mental state of 5,000 individuals being potentially problematic; but why can't he opine that, for instance, as he seems to have done, that the Hells Angels -- if you remove, for instance, the territory aspect -- that's kind of a motivational element there -- but if you just say that the Hells Angels, as a group, have been involved in numerous violent confrontations over the years and then catalog all those, that would not be inaccurate.  Right?

I mean, maybe that's on the border of propensity, but isn't that a point that he could properly opine on?

**MR. SABELLI:**  No, Your Honor, I don't think so for a

1    number of reasons.

2        First of all, if it's presented the way the Court has just

3    articulated, whether there is care or not, you've got at least

4    two problems.

5        One is that the implication is that you have established a

6    propensity for violence.  This sort of catalog of really not

7    properly verified violent acts in paragraphs -- in the last

8    eight pages of the declaration, if Mr. Scheetz were allowed to

9    testify and simply testify to a history -- a hearsay history of

10   violence in this way, that would be a way to suggest that there

11   is a violent mind-set that applies to all Hells Angels, all

12   Hells Angels charters, and across time from the '80s all the

13   way to now.  And that is simply -- methodologically, it's

14   unreliable, and it also crosses the line into mental state and

15   testimony about the element of mental state with respect to

16   each of the accused here.

17       Also, what's included there is unverified.  As we pointed

18   out in the hearing, most of what Mr. Scheetz has attached were

19   unverified media accounts that were sloppy, at best.  And

20   having gone through those -- and I'm sure the Court has as

21   well -- these are reports of violence.  They're not violence

22   tied to territory or territorial expansion.  They're reports of

23   violence.  And some of them even show the Hells Angels as

24   defending themselves from attacks by others.

25       And so you'd have to have some kind of reliable

1  methodology to either include something like that, with a

2  Hells Angel who's attacked in a bar; come around and say:  Aah,

3  but really, that's an indication of Hells Angels violence

4  associated with territorial expansion even though that Angel

5  was defending himself.

6      So we don't have any of that independent judgment.  We

7  don't have any of the verification.  And there is no opinion

8  about territory in the declaration.  It's simply a long list.

9      What you end up with is an expert essentially arguing a

10 prosecution case.  And if there are violent episodes, they can

11 be established in other ways -- that's up to the Government,

12 not up to us -- including through cooperators or informants.

13           **THE COURT:**  All right.  Let me ask Mr. Krishnamurthy.

14      If you look at paragraph 120, it's such an assortment of

15 things.  There's a general supposition.  It says (reading):

16           "As described above, the Hells Angels' claim to

17      territory has led to violence.  I have attached as

18      Exhibit 17 a set of investigative reports . . . ."

19      Blah-blah-blah-blah-blah.

20           "As explained above, this violence arose from a

21      dispute over territory."

22      And then it goes on to list a number of things, including,

23 for instance, fights at a bar, including HAMC members being

24 lured into a Nevada bar, being assaulted.

25      How do we know from any of these that this was about

territory?

**MR. KRISHNAMURTHY:**  Yes, Your Honor.  That's the conclusion that Mr. Scheetz has drawn.  That's the inference that he's drawn from the insiders' explanation of what this ongoing feud is about, and that's his inference from the explanation for how far ranging it is.

I just want to make one point, which is about sort of the independent exercise of judgment.  It's not just that Mr. Scheetz is taking the accounts of Hells Angels and Mongols and transmitting it to the jury.  He's also independently verifying that it makes sense to him based on his training and experience.  And there's a couple of reasons that it makes sense to him.

The first is through all the Hells Angels events that he's attended and other motorcycle gang events that he's attended, he can see for himself that these clubs use the bottom rocker as states.  So he can see that that part makes sense.

He can also see that, sort of, these are the facts that go into the reason for his conclusion.  Essentially, they help him reach the conclusion that what those insiders said is, in fact, accurate just because --

**THE COURT:**  Well, but I guess my question, even if you assume that that may be a motivation, how can you take this catalog of stuff, like what happened on May 14th, 2014, in Oahu, where David Coombes, formerly of the Vagos, was stabbed

 1   at Kealoha Beach Park, I mean, how do we know that that's tied

 2   to territory?

 3          **MR. KRISHNAMURTHY:**  Your Honor, I think that

 4   actually -- like, that goes to -- the fact that it is so

 5   wide-ranging actually helps show that it is, in fact, tied to

 6   territory, because there's no other reason for this violence to

 7   keep happening across all these states and across these

 8   40 years unless it's tied to this historical rivalry that the

 9   Hells Angels --

10          **THE COURT:**  How do we know that?  How do we know what

11   happened on Oahu in 2014 wasn't a personal spat or something

12   else happened, words exchanged or something else?

13          **MR. KRISHNAMURTHY:**  Your Honor, it's because the

14   Hells Angels and Mongols have told us themselves that this

15   ongoing violence is about territory, an historical feud that

16   started over territory.

17          **THE COURT:**  Well, you say "Hells Angels themselves,"

18   you're talking about Christie and Cavazos?

19          **MR. KRISHNAMURTHY:**  Cavazos, yes.

20          **MR. GOHEL:**  Your Honor, this is Jai Gohel.

21       If I could just add that whether, in answer to the Court's

22   question, these acts of violence are to demonstrate a

23   conclusion that this is expansion of territory or, in the

24   context of the Court's question as to whether this is a catalog

25   of violence that attributes violence to the organization and,

therefore, might suggest some mental state for the defendants

in this case, I think the elephant in the room is that each and

every one of these cataloged incidents, I think it would be our

obligation to, for example, undermine with each specific

incident -- for example, the Oahu incident -- with evidence,

with witnesses, potentially each one a little mini-trial that

that is not why that occurred; that maybe the Vagos fellow in

Oahu had a personal beef, shared a girlfriend.  I mean, I don't

mean to be -- you know, but there could be all kinds of other

reasons that undermine either the Government's theory or the

fact that this was violence that's attributed to an

organization as opposed to, for example, many of these

incidents are self-defensive in nature.

So we're really allowing the Government to catalog all of

these incidents through, I think -- I think it's a 40-year

period, is going to create, I mean, an incredible amount of

rebuttal evidence that I think we would be at least, in part --

of course, the Court is the ultimate decider but -- would have

to be -- our obligation would be to present the

counternarrative to undermine the purported purpose for those

incidents.  So I think it's a really slippery slope to catalog

these in this way.

THE COURT:  Well, essentially, you're arguing this

raises a 403 problem.  If you allow the expert to make an

opinion and, to support his or her or their opinion, they cite

1  50, 40 incidents, claiming that they are all part of this

2  pattern, they're part of this territorial fight, that part of

3  your rebuttal or cross of that would be to contest and raise

4  issues as to any one or all of those 40 incidents, which then

5  turns into a mini-trial sidebar to -- so I understand your

6  point.

7      It's a 403 issue --

8          **MR. GOHEL:**  That is --

9          **THE COURT:**  -- in addition.

10         **MR. GOHEL:**  -- my point, Your Honor.

11         **THE COURT:**  Right.

12         **MR. GOHEL:**  You said it much more succinctly.

13         **MR. SABELLI:**  And, Your Honor, in addition to the 403

14  point, there is the point that this really doesn't assist the

15  trier of fact.  As Mr. Krishnamurthy just said, quote/unquote,

16  no other explanation is possible.  So that's not what expert

17  testimony is about.

18         **MR. BARRY:**  Your Honor, this is Kevin Barry.

19      Rather than having mini-trials on all these events to find

20  out whether they're connected, the way, in the context of

21  experts, this is addressed is the defense can have their own

22  expert.

23      At the *Daubert* stage, the question isn't whether his

24  conclusion, whether his opinion is right or wrong.  The

25  question is whether or not he followed -- the Court can rely on

1    the methodology.

2        If the defense wants to call an expert to say that the

3    Hells Angels are the most peaceful organization on the face of

4    the earth and here's why I can say that, they're welcome to do

5    that.  But the question is whether our --

6            **THE COURT:**  Well, that's one way.

7        Another way is to say:  Well, let's go through,

8    Mr. Scheetz, each one of your examples here which you say

9    supports a claim of territorial warfare.  Let's take the

10   example of Oahu and blah-blah-blah-blah-blah.  And then you can

11   bring up -- you cross.

12       Whether you can bring in extrinsic evidence at that point,

13   I don't know.  It raises a question.  But it does suggest --

14   that's not to say you can never do it.  But when somebody

15   relies on 50 incidents to support one proposition, it's fair

16   game to be cross-examined on that.  And I'm not saying you

17   always have room.  I'm just saying it raises potential 403

18   issues.

19       I think the bigger question is, I don't see a methodology

20   here, why he chose these.  It's like, did he just go through

21   Google and find every incident of violence?  How did he know?

22   Reading a newspaper article?  Did he question the participants

23   on the Oahu shooting?  What does he know other than a newspaper

24   article?  Why does he think -- other than what two former

25   members told him -- that suggests that every incident of

1    violence is attributable to a territorial beef, not a personal

2    beef, or just a straight rivalry between -- not territory, just

3    rivalry?

4         How do we know that?  How does he know that?  I don't see

5    anything in his declaration that says how he was so discerning

6    to pick out these.  Did he exclude some and include others?

7    What was his criteria for this particular proposition?  That's

8    the one I'm having a problem with.

9         It seems to me, to say that this is attributable to a

10   fight over territory based on two former insiders, I'm not

11   sure.  I'm not sure.

12        **MR. KRISHNAMURTHY:**  Your Honor, I think Mr. Scheetz

13   testified at the hearing that he tries to track every violent

14   incident in the United States involving the Hells Angels and

15   rival motorcycle gangs.

16        As to the Court's point about whether or not this is just

17   a rivalry or a rivalry over territory, I'm not sure that makes

18   a difference at this point.  I think Mr. Scheetz would agree

19   that this is just a rivalry; but his point is that this started

20   over territory and it's still the driving force for the rivalry

21   today.

22        **THE COURT:**  Well, his declaration phrases it in terms

23   of a rivalry, if you read it, over territory.  If you read

24   paragraph 120, he says that three times, at the beginning and

25   at the end.

1          And that's the kind of stuff we hear about Sureños and

2    Norteños and stuff like that, block by block in the Mission.

3    Is it the same way here?  I don't know.  Certainly, these

4    examples don't say much, other than there's been a lot of

5    violence, assuming that these are reliable reports.

6          What's the Government's view about his comment about,

7    well, on the stand, this shows a mental set of all 5,000

8    members?

9          **MR. KRISHNAMURTHY:**  We wouldn't intend to elicit that

10   at trial.

11         **THE COURT:**  Because that would seem to me to be

12   problematic.

13         **MR. KRISHNAMURTHY:**  Yes, Your Honor.  We didn't elicit

14   it during the hearing.

15         **THE COURT:**  All right.  Well, let me ask this:  What

16   about the Shasta -- let me hear about the Shasta situation,

17   since there's been a lot of subsequent sur-briefing and

18   sur-replies about that.  That certainly suggests that there's

19   no basis -- at least I see no basis, now that we have this

20   timeline, for the notion that the reason why the Shasta County

21   was frozen out was because of their failure to retaliate.

22         Does the Government have anything more to say about that?

23         **MR. KRISHNAMURTHY:**  Yes, Your Honor.  I can address it

24   briefly.

25         I think, first of all, it's important to note that the

1   Shasta example is not sort of an independent opinion that

2   Mr. Scheetz purported to offer.  He offered it as an example,

3   along with several other examples, of why he believes that

4   despite the concept of charter autonomy, there's still

5   sufficient similarities between charters that he can offer

6   opinions on symbols, terms, and territory across charters.

7        With respect to the Shasta example, he just got it wrong,

8   and that's -- it's a significant error, but I don't think it's

9   an error that either rises to the level of false testimony, as

10  suggested by Mr. Clough, or warrants the preclusion of his

11  testimony altogether.

12       The issue was, if the Court recalls, Mr. Scheetz testified

13  at the hearing that he spoke with another expert, Jorge

14  Gil-Blanco, and Mr. Gil-Blanco told him that the Shasta charter

15  was frozen after they failed to retaliate for a shooting by the

16  Mongols.

17       Based on the report of Mr. Gil-Blanco, it seems like

18  that's incorrect.  It seems like Mr. Gil-Blanco wrote that the

19  Shasta charter was, instead, dissolved after they didn't handle

20  a situation with violent confrontations with the Vagos

21  correctly.

22       So it's still true that the Shasta charter was dissolved

23  after an incident with a rival OMG and national pressure on a

24  local charter, and it's still true that the Mongols shot a

25  member of the former -- a former member of the Shasta charter

about a year afterwards.

It seems like Mr. Scheetz just mixed those two incidents up.

**THE COURT:**  There's a reference in here -- I couldn't quite find the actual minutes -- that prior to the actual frozen out, there was a motion made by the Sonoma chapter to freeze the Shasta chapter.  Is that right?

**MR. KRISHNAMURTHY:**  That's correct.

**THE COURT:**  And that was in a prior meeting.  And I saw the minutes where their actual final decision was made to freeze the Shasta chapter.

Is there a document that shows that there was a motion made by one chapter against another?

**MR. KRISHNAMURTHY:**  Yes, Your Honor.  That was, I think, Exhibit 17 to the declaration.  Oh, sorry.  Exhibit 20 to the declaration.

**THE COURT:**  Exhibit 20?  Okay.  Hold on.  Let me look.  Those are minutes or what?

**MR. KRISHNAMURTHY:**  Those should be the World officers minutes or the West Coast officers minutes.

**THE COURT:**  From that earlier date?

**MR. KRISHNAMURTHY:**  Correct.

**THE COURT:**  Okay.  I'm looking at Exhibit 20 -- no.  This is Exhibit 19.

**MR. KRISHNAMURTHY:**  So I think the binder that we

1   provided the Court has the tabs moved over two from the --

2        THE COURT:  Well, I'm looking at the electronic

3   version now, which is now difficult.  Is it 1084-20 or 21?

4        MR. KRISHNAMURTHY:  It should be 21 --

5        THE COURT:  Probably 21.

6        MR. KRISHNAMURTHY:  -- because the declaration is

7   dash-1.

8        THE COURT:  Okay.  Here.  So I'm looking at 20, 21.

9   Is that the July meeting, or it was before that?

10        MR. KRISHNAMURTHY:  So -- correct.  So that meeting --

11   those minutes lay out a series of -- a couple of different

12   facts.  I think on page 4 it shows that Sonoma County made a

13   motion to expel most of the charter.  On page --

14        THE COURT:  I see.  It refers to "Motions from June."

15        MR. KRISHNAMURTHY:  Correct.

16        THE COURT:  It says (reading):

17         "(Sonoma) To bring the membership of Shasta Coup

18      for their patches."

19      Is that it, or is that something else?

20        MR. KRISHNAMURTHY:  That's correct.

21        THE COURT:  What does that mean?

22        MR. KRISHNAMURTHY:  Bring them up for their patches,

23   as in take away their patches.

24        THE COURT:  Oh, "up."  "Up for their patches."

25      So that's the motion -- that means to freeze them?

1          **MR. KRISHNAMURTHY:**  Correct.  And this --

2          **THE COURT:**  And the point -- and I take it

3    Mr. Scheetz's point is to show that there is some governance

4    that's above, that transcends the chapter.  There is a

5    governing structure from one chapter to make a motion by

6    another chapter.  Is that the point?

7          **MR. KRISHNAMURTHY:**  Correct, Your Honor.

8       I also want to just reiterate that was one of the examples

9    that Mr. Scheetz provided for the fact that charters share

10   similarities.

11      He also talked about the common symbols that he's observed

12   at events across charters.  He's talked about the fact that the

13   World Rules are generally followed.  He's talked about the fact

14   that there are internal communications about incoming and

15   outgoing members.

16      And so this was one example of the common structure

17   between charters.

18          **THE COURT:**  All right.  But what about -- so he's not

19   going to render an opinion about -- or is he? -- about why the

20   Shasta chapter was frozen?

21          **MR. KRISHNAMURTHY:**  No, Your Honor.  That was

22   something that he offered for the purpose of showing the basis

23   for his opinion that there are similarities between charters.

24      I think at this point, especially since he was wrong the

25   first time, we don't intend to have him opine on it again.

1          **THE COURT:**  And when you say "similarities" -- I take

2     this point to show that there is a governance issue in that

3     sometimes one chapter can make motions relative to another

4     chapter.  When you say "similarities," how does it show

5     similarities?

6          **MR. KRISHNAMURTHY:**  Your Honor, I think -- so this

7     discussion arose in the context of charter autonomy.  One of

8     the arguments from the defense in the first brief was that

9     because of the existence of charter autonomy, Mr. Scheetz

10    couldn't opine as to the Sonoma charter because most of his

11    investigation was focused on other charters and nationally.

12         And so his point in bringing this up is just that charters

13    do function similarly and have shared governance and shared

14    symbols and shared terms.

15         **MR. SABELLI:**  Your Honor, may I speak to that?

16         **THE COURT:**  Well, let me make sure I understand.

17         So the fact that they have some shared commonalities, some

18    shared governance, some similarities is then what allows him to

19    make sort of inferences about the Sonoma charter based on his

20    knowledge about national, other chapters, et cetera, et cetera?

21    That's the idea?

22         **MR. KRISHNAMURTHY:**  That's correct.  Yes, Your Honor.

23         **THE COURT:**  Because he admitted not knowing much about

24    the Sonoma chapter per se.  Right?

25         **MR. KRISHNAMURTHY:**  That's correct.

1          **THE COURT:**  All right.  Go ahead.

2          **MR. SABELLI:**  Thank you, Your Honor.

3      I'm surprised by that last comment.  I did not understand

4  the Government to be offering Mr. Scheetz to give any opinion

5  about Sonoma.  And so if that's the case, that's a whole

6  'nother discussion.

7      With all due respect to Mr. Krishnamurthy, if you look at

8  paragraph 88 of the declaration, this Shasta episode is not

9  offered to establish an opinion or support an opinion about

10  similarity.  It's supposedly to show that charters are bound by

11  decisions made at the higher level of the HAMC organization.

12  So it's offered not for similarities, but to show that

13  decisions are made at higher levels.  That's the reason it's

14  being shown, not the reason that Mr. Krishnamurthy identified.

15      The Court should be extremely concerned about this.  It

16  was not my intension to go deeper than I did during the first

17  cross-examination on it, though there was a lot more to do with

18  it, much of which we were going to save for trial.  But what

19  happened here is extremely disturbing.

20      First of all, as Mr. Clough has pointed out very

21  meticulously, Mr. Scheetz was just plain wrong.

22      First of all, Gil-Blanco is not in the declaration.

23  Apparently, he's relying on Gil-Blanco.  Gil-Blanco says he's

24  relying on his source, who he doesn't identify and who he says

25  must be kept confidential.  "A source."  As Mr. Clough laid out

1    and I tried to touch upon during part of my cross-examination,

2    Gil-Blanco wasn't in the declaration.

3        And then Scheetz started talking about all sorts of other

4    people who Gil-Blanco did not rely upon, according to

5    Gil-Blanco's report which the Government appended to its recent

6    filing.

7        We've got two problems there.  One, what Mr. Clough

8    identified as Scheetz being incorrect, Mr. Clough is exactly

9    right.  Scheetz never said what Mr. -- Gil-Blanco never said

10   what Scheetz attributed to him.

11       What's even more disturbing, what's even more disturbing

12   is, when I questioned and the Court questioned, the Court

13   drilled down on this, the Court asked Mr. Scheetz:  Is it

14   surprising to you that the real reason isn't in the minutes?

15   And Mr. Scheetz said:  Oh, no, it's not surprising.  They have

16   a motive, essentially, to hide their illegal business.

17       But if you look at Scheetz's work on this, his report,

18   which is in the record as the Government's 1214-2 -- and I'm

19   looking now at page-- this would be page 15 -- 17, rather, of

20   66.  This is 1214-2, 17 of 66, paragraph 6.6.  What Scheetz

21   actually says is --

22            THE COURT:  What page?

23           MR. SABELLI:  It's 17 of 66 according to the ECF

24   numbers.

25            THE COURT:  Okay.

1          **MR. SABELLI:**  So if you look at -- does the Court see

2     paragraph 6.6?

3          **THE COURT:**  Yes.

4          **MR. SABELLI:**  So recall, this is part of the

5     discussion of the Shasta deal.

6          The Court says:  Is it surprising to you that this is not

7     in the minutes?

8          Mr. Scheetz says:  Oh, no.  Oh, no.  They wouldn't put

9     that in there because that's a problem, insinuating that they

10    were hiding some illegal business.

11         But Mr. Gil-Blanco not only doesn't say that, he says the

12    opposite midway through the paragraph (reading):

13              "If questions concerning criminal activities

14         arise, the utmost secrecy [sic] to prevent detection

15         is used.  They will use hand signals . . . ,"

16         et cetera, et cetera, et cetera.

17              "Sometimes [sic], however, they will discuss

18         openly at their meetings.  (As an example, refer to

19         paragraph 6.4.2.2.1. - The Sonoma charter discusses

20         how they are upset with Shasta and want the members

21         kicked out as they did not 'handle the situation

22         properly' . . . ."

23         So Scheetz says he's relying on Gil-Blanco for the reason

24    in the Mongol shooting.  He's wrong about that.

25         And then he answers the Court's question and says:  Oh,

yeah, it's not in there.  It's not surprising it's not in there

because they wouldn't have said it.  And Gil-Blanco says

exactly the opposite.

So this is not a reliable methodology.  Put apart the fact

that it's just plain a hundred percent wrong on every account,

it's not a reliable methodology.  It's not a reliable

methodology to pass on what somebody else said.  It's not a

reliable methodology to do it by misremembering what they said

and not taking notes on it.  And it's not a reliable

methodology to shoot from the hip when the Court presses

questions at the hearing.

The Court cannot take chances in a life without parole

case with this kind of expert.  I mean, he is not showing the

level of responsibility here that is necessary.

And this is only because we happened to drill down on this

example.  Who knows how many other examples.  Very hard to

figure this stuff out.  Fortunately, we were able to figure out

this piece of it.  And we did read the Gil-Blanco report ahead

of time, and we were ready for it, but we saved a piece of it

for trial.  Now it's out in the open.

But these are two examples of Scheetz not only passing

through Gil-Blanco hearsay, but doing it in a completely

unreliable way.

**THE COURT:**  Mr. Krishnamurthy, do you want to respond?

**MR. KRISHNAMURTHY:**  Yes, Your Honor.  I think there's

1   a couple of responses.

2       I mean, the first is, the Ninth Circuit has made it very

3   clear that this is the sort of stuff -- weaknesses in the

4   factual basis of an expert's opinion -- that is best addressed

5   for cross-examination.

6       It appears the defense is well on their way to identifying

7   weaknesses in Mr. Scheetz's opinion.  That doesn't mean that

8   his methodology is wrong.  Here, he had the wrong -- like, he

9   just made a factual mistake; and if he were to repeat that,

10  that would be ripe for cross-examination.

11      The other point -- and I don't want to spend a ton of time

12  on this, but I'm not entirely sure that Mr. Sabelli's point is

13  well-taken because the minutes themselves don't discuss, at

14  least as to Mr. Scheetz's point about not putting criminal

15  activity in the minutes, because the minutes themselves, as

16  the Court can see from Exhibit 20, don't lay out that this

17  was -- like, that this vote and the dissolution happened

18  because of criminal acts involving the Vagos.  They just refer

19  to "a situation."  That's coded language.  That still shows an

20  intent to conceal.

21          **THE COURT:**  All right.  Anything further about the

22  Shasta situation?

23          **MR. KRISHNAMURTHY:**  Not from the United States.

24          **THE COURT:**  All right.  I'm going to take the matter

25  under submission.

But I'm going to tell you, my view is there obviously are
some issues with respect to Mr. Scheetz, such as
including -- what's it? -- the Fresno rules, bylaws in his
declaration, which on the stand he said he'd never seen before
and then, later on, kind of suggests, "Well, I might have seen
it but . . ."  And then this mistake here, his attempt to fold
in, without any clear methodology, make an assumption about
territorial violence based on a collection of articles.

There's plenty of room for cross-examination here.  But
the question here is the gateway question, threshold question
of *Daubert*.  And it seems to me I end up where I started, and
that is, where he has based his opinion on multiple sources and
at least facially appears to have engaged in some independent
analysis, even if it's -- even if it's not as thorough as one
might hope, that's likely to pass *Daubert*.

To the extent he relies on a single source or a very
narrow source and does not appear to have engaged in any real
analysis, vetting, synthesis, or anything else, that becomes
more problematic from a *Daubert* viewpoint.

But as I stated at the outset, the *Daubert* threshold is
low.  It's not the same as cross-examination.  And generally,
the Court doesn't get into credibility.  Credibility is not
generally an issue that the Court resolves at a *Daubert*
hearing.  There are some places where it might come into play,
but this is not trial.

1          So chances are, I'm going to allow much, if not most, of

2     what he says.  I think he's strongest in the areas of symbols

3     and terms.  But the stuff about territory, I'm going to have to

4     take a second and third look at.  That raises some serious

5     questions.  So I'm going to take the matter under submission,

6     and I will rule on it.

7               **MR. PHILIPSBORN:**  Your Honor, would you allow two

8     quick comments?

9               **THE COURT:**  Yes.

10              **MR. PHILIPSBORN:**  Okay.  This is Philipsborn for

11    Wendt.

12         I would remind the Court one thing that I know it has in

13    mind, but I think if we were silent on this point, we would

14    look as though we may not have raised it.

15         I'll just reiterate the commentary from the 2000

16    modification of Rule 702.

17         (Reading):

18               "The trial judge in all cases of proffered

19          expert testimony must find that it is properly

20          grounded, well-reasoned, and not speculative before

21          it can be admitted."

22         And so to the extent that -- I think what the Court has

23    done and what the Court has informed us of is it has fashioned

24    its own interpretation of what that means.  For example, the

25    sort of *Washington Post*, like, if you've got two or more

sources, we'll run it; but if it isn't sourced properly, maybe

not.

        And I think we would urge the Court to, as it concludes

its analysis, to just review the distinction between the ruling

of the Ninth Circuit in *Hankey*, H-a-n-k-e-y, and *Hermanek*,

H-e-r-m-a-n-e-k, where in *Hankey*, part of the reason that the

inferences were allowed to be drawn by the expert was because

of the extensive specific experience that the expert had, both

with the situation and with the individuals involved, and the

analysis that he could provide that was specific to the reason

for a certain behavior, like the proffering of a threat; as

compared with *Hermanek*, where the notion was that

notwithstanding the kind of background that the Government

claims that Scheetz has, the Court found there was too large an

analytical gap.

        And so I think we would simply be concerned that the Court

keep that in mind and that even where there are allegedly

multiple sources, the ultimate opinion he's stating could be

speculative.

        And it sounds as though the Court has our 403 objections

in mind as well.  So we appreciate that.

        **THE COURT:**  All right.  Let me give the Government a

brief chance to respond if you want to say something about the

*Hermanek* and *Hankey*.

        **MR. KRISHNAMURTHY:**  Yes, Your Honor.

1        I actually think that *Hankey* is a very useful case as well

2   because it sort of lays out the analytical framework for this.

3        And what *Hankey* says is, essentially, what the Court

4   should have in mind for this type of expert, this type of

5   non-scientific expert, is whether or not the expert has the

6   types of experiences that would allow him to form a reliable

7   basis for his opinions.

8        And here, the answer is clearly yes, based on

9   Mr. Scheetz's over a decade involved in OMG investigations.

10        **THE COURT:**  Well, the critical question is -- and I

11   know in your brief, you sort of aggregate all of his experience

12   and you aggregate everything:  the number of people he's

13   debriefed, number of experts he's talked to, number of things

14   he's read, number of --

15        But I have to look at it sort of opinion area or opinion

16   by opinion, and that's why I see that, it seems to me, he's on

17   a stronger basis for some of these things, including symbols

18   and terms.

19        I think the area that appears to me to be one that begins

20   to look more speculative, less grounded, less based on a broad

21   enough base to make it reliable that I think there's a closer

22   question there.

23        But I understand the case law and the Ninth Circuit case

24   law, and I will take that into consideration.  Thank you.

25        All right.  So I think we need to do our second hearing.

 1   This may mean a change in case management schedule.  We'll

 2   probably have to schedule -- depending on what happens now with

 3   respect to this matter that we have to address, that may

 4   impact, obviously, the motion with respect to the Laughlin

 5   incident.  It may impact on second wave, third wave with

 6   respect to *Daubert* motions.  But I can't tell you what that's

 7   going to be yet.

 8       My goal still is to keep with our trial date, and I want

 9   to do everything we can to keep on track, but we'll have to

10   see.

11       So I may have to reset some dates, and we'll schedule a

12   further status conference once we resolve the issue at hand.

13       **MR. BUSTAMANTE:**  Your Honor, could I -- I wanted to

14   add something else before the Court moves on to that next

15   section, and I wanted to add a comment with regards to the

16   issue that Mr. Sabelli brought up and Mr. Barry made a comment

17   on.

18       And I just wanted to direct the Court's attention to a

19   portion of the under seal filing by the Government that

20   emphasizes that the investigation of the violation of the AEO

21   was turned over by the DOJ in Washington to the Eastern

22   District of California in Sacramento and that Mr. Barry's

23   office is not aware of all of the information provided by the

24   individuals that were interviewed and audio-taped because

25   Mr. Barry's office has not been provided the entire audio

recording.  According to page 5 in the footnotes, they've not

been provided it.

So I think what Mr. Sabelli's concern is, we've got

another AUSA office that's investigating a co-counsel's

handling of AEO material and they're sort of -- I don't want to

say they're running blind, but they may not be sensitive to the

type of questions that they're asking or the nature and type of

answers that are being given by these people that had access to

not only the AEO material, but also possibly joint defense

strategy, information, investigation.

And so it's this concern that's sort of floating around in

the air by an agency and group of AUSAs that are not

particularly honed in on the intricacies of what's been

happening in this case for the past, you know, three --

whatever it's been -- two or three years.

THE COURT:  Well, I believe, Mr. Bustamante, that was

the very point of referring this out to a different district,

so there'd be an ethical wall.  It's like having a taint team

look at it.  They don't know anything about this case.

And if what you're asking is that there be a court order

that they seal everything they have and not share that with

Mr. Barry's office, we could probably do something like that.

But I thought that was the whole idea, is not to have Mr. Barry

access this.  It's like a giant -- or another taint team coming

in and looking at it.  That's exactly, I think, why they did

1   it.

2        **MR. BUSTAMANTE:**  And I'm not suggesting that that

3   methodology was incorrect.  I agree that is the way for it to

4   be done.

5        I think the concern that Mr. Sabelli had is, we don't know

6   because of that appropriate process the nature of the

7   information and whether or not any defense team information has

8   been breached or not, and so we're sort of running blind.

9        I don't know what the answer to that is, and I know that

10  co-counsel and I will collectively have a discussion about that

11  possibility, and I know that Mr. Boisseau will also be

12  sensitive to that.  But I think that is a concern.

13       I'm not suggesting that the taint team is not the

14  appropriate process; but by virtue of the fact that they don't

15  have the information that we have, there's the possibility for

16  them to breach certain pieces of information that they may just

17  be receiving by virtue of a wide-open interview of these people

18  that were part of a defense team.  That's all I'm suggesting.

19       **THE COURT:**  Well, all right.  When you meet and

20  confer, keep in mind that that was, I believe, the purpose of

21  having the Eastern District team and not the Northern District

22  team look at it.  And if you think that there ought to be some

23  kind of a judicial order to make sure that that's sealed and

24  segregated and walled off, tell me about it and I'll look at

25  it.

 1          **MR. BUSTAMANTE:**  Appreciate that, Your Honor.

 2          **THE COURT:**  All right?

 3          **MR. WALSH:**  Your Honor --

 4          **THE COURT:**  Let's say -- yeah.

 5          **MR. WALSH:**  Excuse me, Your Honor.  John Walsh on

 6  behalf of Christopher Ranieri.

 7      I would like to seek some guidance from the Court as to

 8  what I can discuss with respect -- or the scope of what I can

 9  disclose to my client with respect to the Government's filing.

10          **THE COURT:**  All right.  Well, that's a good question.

11      Does the Government have any comment on that?

12          **MR. BARRY:**  Yes, Your Honor.  This is Kevin Barry

13  again.

14      We think that the reason that the materials were filed

15  under seal, as the defense has seen, is that the witnesses who

16  were interviewed expressed great concern about their names,

17  their identities being associated with this whole incident.  So

18  that's why it was under seal.

19      But I think the fact of a potential breach and who was the

20  possible source of that breach, I think, can be -- I don't see

21  an issue with the defense team discussing that with their

22  clients.

23          **THE COURT:**  So how would you define what can be shared

24  and what should not be shared?

25          **MR. BARRY:**  Yeah.  I think they can indicate that

1    there was a -- that there appears to have been -- that

2    the Court is exploring whether or not there was a breach of the

3    attorneys' eyes only protective order by one of the other

4    defense attorneys in the case and that the Court will be having

5    a hearing to explore that issue, you know, whenever you set

6    that hearing.

7              **THE COURT:**  And should they not disclose which defense

8    attorney?

9              **MR. BARRY:**  It's -- I don't -- we don't have a stake

10   in that fight, Your Honor.  If they want to, that's fine with

11   the Government.

12             **THE COURT:**  Do you have any view, Mr. Boisseau, on

13   that?

14             **MR. BOISSEAU:**  Your Honor, that issue I'm going to

15   discuss at the sealed hearing.

16       On the other hand, I have -- the -- what -- I do not want

17   my paralegal's name mentioned unless we discuss this further.

18   And so -- because, as I will discuss at the hearing, there's a

19   lot of risk to the parties -- and I'm not talking about the

20   witnesses; I'm talking about my paralegal and my family --

21   regarding these proceedings.  And so -- and it's not coming

22   from any of the defendants.

23       And I will discuss this further at the sealed hearing and

24   the reason why, because there are police reports filed that

25   indicate contact between the claimed witnesses and my office.

1      So --

2           **THE COURT:**  Right.

3           **MR. BOISSEAU:**  -- I don't -- I don't know right now.

4      Obviously, it's going to be -- there's no allegation that

5      my client did anything, that he did anything wrong.  The

6      allegations are myself and my current paralegal.  So --

7           **MR. WALSH:**  Your Honor, if I may interject.  Again,

8      John Walsh on behalf of Mr. Ranieri.

9           I believe, at this point, my function with respect to

10     Mr. Ranieri can be served without discussing the individuals

11     implicated in the Government's filing.

12          **THE COURT:**  All right.

13          **MR. WALSH:**  And also, from my respect, briefly,

14     Your Honor, I agree with Mr. Wendt and my understanding of

15     Mr. Hefferman's position as well.  I have significant concerns

16     about the potential risks that my clients incurred with respect

17     to the Government's allegations.

18          And my understanding is you want a defense position on

19     that monitoring or perhaps participation within the next couple

20     of days.  Is that accurate?

21          **THE COURT:**  Well, there was -- yes.  I think

22     Mr. Sabelli volunteered that you all are going to meet and then

23     have some position in the next couple of days, next

24     several days as to what you think your interests are and what

25     your procedural recommendations are, and so I will consider

1  that.

2      And meanwhile, I think what should be disclosed is the

3  fact that the Court is having a hearing into whether or not the

4  protective order was violated and that it does emanate from

5  counsel for one of the defendants.  I don't think you have to

6  say anything more than that at this point.  We'll have more to

7  come.  And so let's just keep it at that.

8        **MR. WALSH:**  All right.  Thank you very much, Judge.

9        **THE COURT:**  All right.  So let's set a further status

10  conference.  Anticipating that we're going to, hopefully, try

11  to look at this issue we're talking about over the next 30 days

12  or so, we should maybe set something out 60 days from now or

13  45 days from now.

14        **THE CLERK:**  Your Honor, we have --

15        **THE COURT:**  Let's try seven weeks from now.  That's

16  49 days.  What's that?

17        **THE CLERK:**  That would be November 11th, but that's

18  Veterans Day.

19        **THE COURT:**  Oh.  All right.

20        **THE CLERK:**  And you're not available the next week.

21        **THE COURT:**  I'm not available the week after that?

22        **THE CLERK:**  On the Wednesday.

23        **THE COURT:**  Can we specially set it?

24        **THE CLERK:**  Yes.  It looks like the Monday,

25  November 16th, might be a good day, in the afternoon.

1          **THE COURT:**  Okay.  At what?  2:30?

2          **THE CLERK:**  1:30 or 2:00.

3          **THE COURT:**  1:30?

4          **THE CLERK:**  2 o'clock.

5          **THE COURT:**  2 o'clock?  Okay.  2 o'clock on the 16th.

6      All right.  Any objection to excluding time between now

7  and the 16th?

8                          (No response.)

9          **THE COURT:**  All right.  Hearing none, I will exclude

10  time between now and November 16th on the grounds that time is

11  needed for effective preparation of defense.  Plus, given that

12  this case has been deemed complex, I find that the ends of

13  justice outweighs the public's and the defendants' interest in

14  a speedy trial.

15      There's also an exclusion due to the pending motion for

16  order to show cause.  That's the third ground for excluding

17  time.

18      Mr. Barry, if you could submit an exclusion order, for the

19  record, I'd appreciate it.

20      And then Angie will send out a meeting notice with respect

21  to the sealed hearing we're about to have.

22      And so I will adjourn this meeting.  Okay?

23          **MR. PHILIPSBORN:**  Your Honor --

24          **THE CLERK:**  Your Honor --

25          **MR. PHILIPSBORN:**  -- this is Philipsborn.

1        Quick question.

2             **THE COURT:**  Yes.

3             **MR. PHILIPSBORN:**  Are you going to issue an order so

4      that we know, for example, whether you contemplate asking the

5      parties to meet and confer about the setting of -- or, rather,

6      the extension of any briefing dates that have been agreed on or

7      changes in your hearing schedules?  Because the way you've set

8      the next hearing, we're actually, I think, past the first of

9      the CAST hearings.

10             **THE COURT:**  Yeah.  I think, realistically, I'm going

11      to have to vacate those dates that have obviously -- I'm going

12      to have to look at it.  I'll get out an order --

13             **MR. PHILIPSBORN:**  That would be great.

14             **THE COURT:**  -- that will clarify which dates are being

15      vacated; and then, hopefully, we can set some new dates shortly

16      thereafter.

17        But it's a fair point.

18        Angie, make sure we address this.  We want to vacate dates

19      that are not realistic at this point.  For anything sort of set

20      for hearing over the next two months, it's obviously not going

21      to fly.  It may have to go out further than that.

22        So we'll get out an order vacating certain dates.

23             **MR. PHILIPSBORN:**  Thank you, Your Honor.

24             **THE COURT:**  All right?

25        All right.  If there's nothing else, we're going to go on

1   to the sealed hearing.

2           **THE CLERK:**  Court is in recess.

3           (Proceedings adjourned at 2:55 p.m.)

4                   ---o0o---

5

6           **CERTIFICATE OF REPORTER**

7           I certify that the foregoing is a correct transcript

8   from the record of proceedings in the above-entitled matter.

9

10  DATE:  Sunday, September 27, 2020

11

12

13  _____

14   Ana M. Dub, CSR No. 7445, RDR, CRR, CCRR, CRG, CCG
           Official Reporter, U.S. District Court

15

16

17

18

19

20

21

22

23

24

25