1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7    UNITED STATES OF AMERICA,                      Case No.  17-cr-00533-EMC-1

8                          Plaintiff,

9            v.                                      **ORDER GRANTING IN PART AND
                                                     DENYING IN PART DEFENDANTS'
                                                     MOTION TO EXCLUDE**
10   JONATHAN JOSEPH NELSON, et al.

11                         Defendants.               Docket No. 984

12
13
14                      **I.      INTRODUCTION**

15          The United States has charged eleven defendants ("Defendants"), members of the Hells

16   Angels Motorcycle Club ("HAMC"), with violations of 18 U.S.C. § 1962(d) (RICO conspiracy),

17   18 U.S.C. § 1959(a)(1) (VICAR murder), and/or several other offenses.  *See* Docket No. 374

18   ("Superseding Indictment").  Pending before the Court is Defendants' motion to exclude the

19   testimony of the Government's proposed expert, Jeremy Scheetz.  *See* Docket No. 984 ("Joint

20   Mot.").  For the reasons given below, the motion is **GRANTED** in part and **DENIED** in part.

21                      **II.     BACKGROUND**

22          The Government first filed charges against Defendants in late 2017.  *See* Docket No. 1.  It

23   filed a superseding indictment in September 2018.  The superseding indictment alleged, *inter alia*,

24   that several Defendants were involved in the 2014 killing of an individual in Fresno, California, as

25   well as the clandestine disposal of the victim's body.  Superseding Indictment ¶ 22(e).  It also

26   alleges that Defendants, in their capacity as members or former members of the Hells Angels

27   Sonoma County ("HASC") and affiliated HAMC chapters, regularly "engage in criminal activity,

28   including murder, narcotics distribution, assault, robbery, extortion, illegal firearms possession,

United States District Court
Northern District of California

1  and obstruction of justice . . . ." *Id.* ¶¶ 1, 6.  The Government thus charges Defendants with crimes

2  particular to themselves and as participants in HASC's racketeering enterprise.

3  As part of its case-in-chief, the Government seeks to introduce testimony of Intelligence

4  Operations Specialist Scheetz of the Bureau of Alcohol, Tobacco, Firearms and Explosives as an

5  "enterprise" expert.  *See* Docket No. 1084-1 ("Decl.") ¶ 1.  Mr. Scheetz proposes to discuss "Hells

6  Angels symbols, terms, and territory," as well as the group's "history and structure" to the extent

7  they are relevant to his primary focus.  *Id.* ¶ 18.

8  On March 17, 2020, Defendants jointly moved to exclude Mr. Scheetz's testimony.  *See*

9  Joint Mot.  They requested that the Court hold an evidentiary (or *Daubert*) hearing on the

10  admissibility of his testimony, *id.*, and filed a brief in support of their motion, Docket No. 985.

11  The Government filed its response in opposition shortly thereafter.  *See* Docket No. 999 ("First

12  Opp'n").  As instructed by the Court, Mr. Scheetz eventually submitted a 38-page declaration

13  containing his proposed testimony, along with twenty exhibits.  *See* Decl. & Exs. 1-20.  The Court

14  then scheduled a series of three *Daubert* evidentiary hearings, each lasting between three and four

15  hours, which took place on August 18, August 25, and August 28, 2020.  *See* Docket Nos. 1146,

16  1157, 1185.  Mr. Scheetz's declaration served as his direct testimony.  He was subjected to

17  extensive cross-examination by each Defendant who elected to participate in the hearing.

18  Pursuant to the Court's instructions at the end of the final *Daubert* hearing, the

19  Government filed a supplemental response in opposition to Defendants' motion to exclude Mr.

20  Scheetz's testimony on September 4, 2020.  *See* Docket No. 1184 ("Second Opp'n").  Defendants

21  also submitted two narrower sets of objections to Mr. Scheetz's testimony the following week.

22  *See* Docket Nos. 1197 ("Cesena Obj.") and 1199 ("Wendt Obj.").  Finally, on September 16,

23  2020, Defendants submitted a notice of false testimony by Mr. Scheetz, which he allegedly

24  proffered during the *Daubert* hearings.  *See* Docket No. 1205 ("Lyles Obj.").  The Government

25  responded to this filing six days later.  *See* Docket No. 1214 ("Third Opp'n").

26  ### III.       LEGAL STANDARD

27  Federal Rule of Evidence 702 states the requirements for admitting expert testimony.  Rule

28  702 provides that a witness "qualified as an expert by knowledge, skill, experience, training, or

2

education," Fed. R. Evid. 702, may offer opinion testimony if it "rests on a reliable foundation and is relevant to the task at hand,'" *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). In order to testify as an expert, Rule 702 mandates that

> (a) the expert's scientific, technical, or other specialized knowledge *will help the trier of fact to understand the evidence* or to determine a fact in issue;
>
> (b) the testimony is *based on sufficient facts or data*;
>
> (c) the testimony is the *product of reliable principles and methods*; and
>
> (d) the expert has *reliably applied* the relevant principles and methods to the facts of the case.

Fed. R. Evid. 702 (emphasis added).  Rule 703 further identifies the permissible "bases" of an expert's opinion testimony, which must be premised on "facts or data in the case that the expert has been made aware of or personally observed."  Fed. R. Evid. 703.  Additionally, "[i]f experts in the particular field would *reasonably rely on those kinds of facts or data* in forming an opinion on the subject, they *need not be admissible* for the opinion to be admitted."  *Id.* (emphasis added). "But if the facts or data would otherwise be inadmissible," the Rule concludes, "the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect."  *Id.*

The Supreme Court has fleshed out the standards for admissibility under Rules 702 and 703 in a series of cases, including *Daubert*; *General Electric Co. v. Joiner*, 522 U.S. 136 (1997); and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).  Synthesizing the holdings of these decisions, the Ninth Circuit has explained that a trial court, in deciding whether to admit expert testimony, acts as "a gatekeeper, not a fact finder."  *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006).  The court articulates the test of relevance and reliability in the following manner:

> *"Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry.  And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline."*  [*Primiano v. Cook,* 598 F.3d 558, 565 (9th Cir. 2010)] (citation and internal quotation marks omitted).  "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof,

United States District Court
Northern District of California

> not exclusion." *Id.* at 564 (citation omitted).  The judge is "supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable."  [*Alaska Rent–A–Car, Inc. v. Avis Budget Grp., Inc.,* 738 F.3d 960, 969 (9th Cir. 2013)].  Simply put, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury."  *Id.* at 969–70.
>
> The test of reliability is flexible.  *Estate of Barabin v. AstenJohnson, Inc.,* 740 F.3d 457, 463 (9th Cir. 2014) (en banc).[1]  The court must assess the expert's reasoning or methodology, using as appropriate criteria such [factors] as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance.  *Id.; see also Primiano,* 598 F.3d at 564.  But these factors are "meant to be helpful, not definitive, and *the trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on the particular circumstances of the particular case."  Primiano,* 598 F.3d at 564 (citations and quotation marks omitted); *see also Barabin,* 740 F.3d at 463.  The test "is not the correctness of the expert's conclusions but the soundness of his methodology," and when an expert meets the threshold established by Rule 702, the expert may testify and the fact finder decides how much weight to give that testimony.  *Primiano,* 598 F.3d at 564–65.  Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge.  A district court should not make credibility determinations that are reserved for the jury.

*City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) (emphasis added).  While the Ninth Circuit has recently reminded district courts of their gatekeeping function in the *Daubert* inquiry, warning against a reflexive "'that goes to weight, not admissibility' default" position, *United States v. Valencia-Lopez*, 971 F.3d 891, 898 (9th Cir. 2020), it remains the case that the "gate [should] not be closed to [a] relevant opinion offered with sufficient foundation by one qualified to give it," *Primiano*, 598 F.3d at 568.

The proponent of expert testimony "has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence."  Fed. R. Evid. 702 advisory committee's note—2000 amendment (citing *Bourjaily v. United States*, 483 U.S. 171 (1987)).

Related to the limits on admitting expert testimony under evidentiary rules are constraints imposed by the Constitution.  The Confrontation Clause of the Sixth Amendment provides that in

---

[1] The Ninth Circuit recently overruled *Estate of Barabin* on other grounds in *United States v. Bacon*, 979 F.3d 766, 770 (9th Cir. 2020) (en banc).

criminal cases the accused has the right "to be confronted with the witnesses against him."  U.S. Const. amend. VI.  "[T]he Clause's ultimately goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee," requiring only "that reliability be assessed in a particular manner: by testing in the crucible of cross-examination."  *Crawford v. Washington*, 541 U.S. 36, 61 (2004).

In *Crawford*, the landmark case that established the modern approach to the confrontation right, the Supreme Court held that the Confrontation Clause applies to all "testimonial" statements.  *See id.* at 50-51.  The Court has since explained that "statements are testimonial when they result from questioning, 'the primary purpose of [which was] to establish or prove past events potentially relevant to later criminal prosecution,' *Davis v. Washington*, [547 U.S. 813, 822 (2006)], and when written statements are 'functionally identical to live, in-court testimony,' 'made for the purpose of establishing or proving some fact' at trial, *Melendez-Diaz v. Massachusetts*, [557 U.S. 305, 310–11 (2009)] (internal quotation marks omitted)."  *Lucero v. Holland*, 902 F.3d 979, 989 (9th Cir. 2018).  The *Crawford* Court thus concluded that "[t]estimonial statements of witnesses absent from trial [may be] admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine."  541 U.S. at 59.  But *Crawford* left *non*-testimonial hearsay outside the protection of the Confrontation Clause, subject only to "traditional limitations upon hearsay evidence."  *Davis*, 547 U.S. at 821.  And it did "not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted"—*i.e.*, for non-hearsay purposes—as the Confrontation Clause is primarily "concerned with testimonial hearsay."  *Crawford*, 541 U.S. at 59 n.9 (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985), 53.[2]

The following analysis proceeds within the overlapping frameworks provided by Rule 702 (as elaborated in *Daubert* and its progeny) and, to a lesser extent, the Confrontation Clause (as applied in the *Crawford* line of cases).

---

[2] Federal Rules of Evidence 801-807 govern the admissibility of hearsay.  Hearsay is an out-of-court statement offered "to prove the truth of the matter asserted."  Fed. R. Evid. 801(c)(2). Hearsay is generally inadmissible, Fed. R. Evid. 802, subject to the myriad exceptions enumerated in Rules 803 and 804.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

#### IV.     DISCUSSION

The parties have now filed several briefs on the admissibility of Scheetz's testimony, both before and after his three *Daubert* hearings (which cumulatively ran to almost ten hours).  The Government and Defendants each advance arguments in their post-hearing briefs similar to those they first raised several months earlier.  Because the post-hearing briefs tend to be more precise than their pre-hearing counterparts, addressing specific opinions in Mr. Scheetz's declaration, the Court focuses primarily on these below.

The Government emphasizes that *Daubert* imposes only a "gatekeeping role" on the Court, one that sets a low bar for finding relevance and reliability in expert testimony.  Second Opp'n at 1.  "At this stage," the Government argues, "this Court's job is to keep out 'nonsense opinions.'" First Opp'n at 1 (quoting *City of Pomona*, 750 F.3d at 1044).  It contends that Mr. Scheetz's testimony is "amply supported by historical facts, personal observations, experience in the field, and [his] review of internal Hells Angels documents," and so easily clears this hurdle.  *Id.*

Defendants counter that various parts of Mr. Scheetz's testimony are inadmissible under Federal Rules of Evidence 402, 403, 404, 702, 707(b), Federal Rule of Criminal Procedure 16, *Daubert*, and this District's precedents.  *See* Wendt Obj. at 4, 10, 15.  Defendants also argue that several of Mr. Scheetz's opinions violate the Confrontation Clause as construed by the Supreme Court in its *Crawford* caselaw.  *See* Cesena Obj. at 1.  Defendants' arguments may thus be grouped, broadly, into two categories: (1) those focusing on reliability and relevance issues under Rule 702 and *Daubert* and (2) those focusing on the Confrontation Clause and related hearsay issues.  The Court addresses these arguments in turn.

A.     Rule 16 Objections

As an initial matter, Defendants argue that the Government failed to give adequate notice of the bases of Mr. Scheetz's testimony, as required by Federal Rule of Criminal Procedure 16. *See* Wendt Opp'n at 4.  More specifically, Defendants contend that the Government failed its Rule 16 requirements and the earlier instructions of this Court by "reserv[ing] or omit[ting] disclosure of a *substantial portion* of the bases for Mr. Scheetz's opinions and of the corroboration for the so-called bases that he provided."  Wendt Obj. at 7 (emphasis in original).  But Defendants'

1    arguments on this score often pertain more to *Daubert* concerns and witness credibility

2    determinations than the notice requirements of Rule 16.  As such, many of these are dealt with

3    below within the analytical framework of Federal Rule of Evidence 702.

4           Moreover, as explained in *United States v. Cerna*—a case on which Defendants rely

5    heavily in arguing that the Government has not carried its burden under Rule 16—the

6    requirements imposed by Rule 16 are not overly demanding.  "Rule 16(a)(1)(G), does not require

7    recitation of the chapter and verse of the experts' opinions, bases and reasons.  No rule, statute, or

8    decision necessitates such comprehensive disclosure."  No. 08-cr-0730-WHA, 2010 WL 2347406,

9    at *2 (N.D. Cal. June 8, 2010).  Instead,

> Rule 16(a)(1)(G) requires that the government provide a summary of
> the opinions of its experts to be used during its case-in-chief.  The
> rule requires that "[t]he summary . . . must describe the witness's
> opinions, the bases and reasons for those opinions, and the witness's
> qualifications."  The Advisory Committee Note to the 1993
> Amendment stated that the bases and reasons must be sufficient to
> allow counsel to frame a *Daubert* motion (or other motion *in
> limine*), to prepare for cross-examination, and to allow a possible
> counter-expert to meet the purport of the case-in-chief testimony.

15   *Id.* at *1.  Unlike the abbreviated, one-paragraph summaries of factual bases that the government

16   disclosed in that case, some of which the court found wanting, the 38-page declaration submitted

17   by Mr. Scheetz here is more than adequate to satisfy Rule 16 requirements.  *See* Second Opp'n at

18   14-15.  Although the Court ordered the Government to provide a complete description of Mr.

19   Scheetz's opinions and the bases therefore, *see* Wendt Obj. at 6-7, that disclosure is subject to a

20   standard of reasonableness, viewed particularly in light of the extensive opportunity Defendants

21   had to cross-examine Mr. Scheetz over numerous days.

22          As an example of their objections, Defendants contend that Mr. "Scheetz explained for the

23   first time on cross examination that some of his information re [sic] the Filthy Few and Purple

24   Heart patches came from 'debriefings' with three cooperators."  *Id.* at 7; *see also id.* at 13.  It is

25   true that Mr. Scheetz did not reveal the identities of these sources in his Declaration, an omission

26   that could conceivably violate Rule 16.  But, as the Government notes, Mr. Scheetz has always

27   maintained that his understanding of the meaning of, *e.g.*, HAMC's Filthy Few patch is based on

28   the totality of his "personal observations," "conversations with former Hells Angels members,"

United States District Court
Northern District of California

7

1    "conversations with other law enforcement officers," a "review of books about the Hells Angels,"

2    and "knowledge about the backgrounds of '15-20' Hells Angels members who wear the flash."

3    Second Opp'n at 8-9 (citing to, *e.g.*, Decl. ¶¶ 66-68).   As this example indicates, the factual bases

4    that Mr. Scheetz disclosed are generally more than adequate to "allow[ing] [Defendants] to frame

5    a *Daubert* motion (or other motion *in limine*), to prepare for cross-examination, and to allow a

6    possible counter-expert to meet the purport of the case-in-chief testimony," which is all that this

7    District requires under Rule 16(a)(1)(G).   *See Cerna*, 2010 WL 2347406, at *1.   Where this is not

8    the case, Mr. Scheetz's lack of an adequate factual basis for an opinion has been addressed below

9    in the Court's *Daubert* analysis.

10   B.    Rule 702 Objections

11        Defendants do not seriously contest the general relevance of Mr. Scheetz's testimony.

12   Instead, their main argument is that Mr. Scheetz's opinions are not "based on sufficient facts or

13   data" under Federal Rule of Evidence 702.   Defendants also claim that Mr. Scheetz's so-called

14   compare-and-contrast methodology is unreliable for Rule 702 purposes, marked by "a profound

15   confirmation bias" and a lack of analytical integrity.   Wendt Obj. at 11.   They point, in particular,

16   to exchanges during the *Daubert* hearings to suggest that Mr. Scheetz has not adequately applied

17   his "training and experience" to, nor "reached an independent judgment" about, numerous facts of

18   the case.   *Id.* at 18 (internal quotations omitted).   Finally, Defendants argue that the Government

19   seeks to use Mr. Scheetz's testimony in ways that offend fundamental principles of due process

20   and that this District has allegedly rejected in similar cases.   *See id.* at 21-22.

21        The Government responds by citing a number of appellate decisions where courts have

22   upheld the reliability of law-enforcement expert testimony on the basis of the officers' training and

23   experience.   *See* Second Opp'n at 1, 2-3.   More specifically, it identifies several cases where

24   courts permitted an expert to testify to gangs' use of specialized symbols, terminology, and

25   activities, as Mr. Scheetz seeks to do here.   *See id.* at 1-2.   The Government also argues that Mr.

26   Scheetz's explanation of his methodology, "compar[ing] and contrast[ing]" new intelligence to

27   information he has previously learned, is sufficiently reliable for *Daubert* purposes.   *Id.* at 4.   And

28   it contends that Mr. Scheetz's testimony was based on a sufficient factual foundation, as required

United States District Court
Northern District of California

8

United States District Court
Northern District of California

1  by Rule 702.  *See id.* at 7-11.

2              1.      Legal Standards

3       As the Government indicates, numerous courts have applied *Daubert* in determining the

4  reliability of gang-expert testimony.  In the oft-cited case of *United States v. Hankey*, the court

5  upheld a district judge's admission of testimony by "a police gang expert regarding

6  the . . . repercussions for testifying against an affiliated gang member."  203 F.3d 1160, 1164 (9th

7  Cir. 2000).  At trial, the defendant argued that he was not the individual identified by nickname in

8  conversations with a police informant, and his co-defendant and another individual testified to the

9  same.  *See id.* at 1164-65.  "In rebuttal, the government sought to discredit the exculpatory

10  testimony . . . by offering the expert testimony" of a witness who opined that all three men "were

11  members of affiliated street gangs, and that these gangs enforce a code of silence among their

12  members that any affiliated gang member would be subject to violent retribution if one gang

13  member testified against another."  *Id.* at 1166.  In analyzing the reliability of this testimony, the

14  court stressed *Kumho Tire*'s teaching "that judges are entitled to broad discretion when

15  discharging their gatekeeping function."  *Id.* at 1168.  It further explained that "[t]he *Daubert*

16  factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of

17  testimony, whose reliability depends heavily on the knowledge and experience of the expert,

18  rather than the methodology or theory behind it."  *Id.* at 1169.  Applying these principles, the court

19  held the expert's testimony both relevant and reliable because

20              the witness had devoted years working with gangs, [and] knew their
               "colors," signs, and activities.  He heard the admissions of the
21             specific gang members involved.  He had communicated and
               worked undercover with thousands of other gang members. . . .
22

               Certainly the officer relied on "street intelligence" for his opinions
23             about gang membership and tenets.  How else can one obtain this
               encyclopedic knowledge of identifiable gangs?  Gangs such as
24             involved here do not have by-laws, organizational minutes, or any
               other normal means of identification . . . . [The expert] was
25             repeatedly asked the basis for his opinions and fully articulated the
               basis, demonstrating that the information upon which he relied is of
26             the type normally obtained in his day-to-day police activity.

27  *Id.* at 1169-70; *see also United States v. Alatorre*, 222 F.3d 1098, 1104 (9th Cir. 2000) (affirming

28  reliability of testimony on basis of expert's "twelve years of experience as a special agent,

                                        9

specialized training in the methods by which narcotics are used and sold, and extensive knowledge of marijuana smuggling as a result of his work as a case agent and in other capacities"); *United States v. Padilla*, 387 F.3d 1087, 1094 (9th Cir. 2004) (affirming reliability of gang expert based on detective's "extensive experience with Los Angeles street gangs").

Ninth Circuit law thus provides that testimony by law-enforcement experts is generally reliable under *Daubert* where the witness demonstrates that his opinion is based on substantial "knowledge and experience," *Hankey*, 203 F.3d at 1169, and/or "specialized training" in the conduct of criminal enterprises, *Alatorre*, 222 F.3d at 1104.[3]

Nevertheless, the Ninth Circuit has at times ruled that a witness's "general qualifications" as an expert do not suffice to satisfy *Daubert*, since under Rule 702 a witness's opinions must also be "supported by reliable methods" that are reliably applied to the facts at hand. *United States v. Hermanek*, 289 F.3d 1076, 1083 (9th Cir. 2002). In *Hermanek*, the prosecution introduced testimony of an FBI agent who interpreted coded language—some of which he had never heard prior to trial—in wiretapped phone calls allegedly relating to cocaine transactions. *See id.* The Ninth Circuit agreed with defendants that "the government failed to establish a reliable basis for [the expert's] interpretations of words and phrases he encountered for the first time." *Id.* at 1093. Whereas in *Hankey* "the expert explained in detail the nature of his personal knowledge and *explained the connection between that knowledge and the particular conclusion* that the witnesses

---

[3] The Ninth Circuit's treatment of law-enforcement experts' reliability is consonant with that of other courts of appeals. In *United States v. Smith*, for instance, the Fourth Circuit addressed a *Daubert*-based challenge from defendants who argued that a gang expert's testimony was "not the product of a reliable methodology for interpreting coded jargon." 919 F.3d 825, 835 (4th Cir. 2019). The court first explained that the witness was qualified "as an expert in drug and gang terminology" because he "was a twelve-year veteran of the FBI with substantial experience in drug and gang investigations (conducting controlled buys, interviewing drug dealers and gang members, using gang members as confidential sources, listening to thousands of recorded conversations, and so forth)." *Id.* Having found the witness qualified to testify as an expert, the court next held that he "employed a sound methodology" and that he "reliably applied it to the facts in forming his expert opinions." *Id.* at 836. And the court's example of the expert's reliable application of his methodology was that he decoded a phrase used by defendants in accordance with "his experience with other investigations as well as the context of this investigation." *Id.*; *see also United States v. Parkhurst*, 865 F.3d 509, 516-17 (7th Cir. 2017) (stating that "[t]raining and experience are proper foundations for expert testimony," that such testimony is admissible "without requiring 'scientific methodologies' or 'peer review,'" and that law-enforcement experts may point to "factors such as the officer's years of experience and number of investigations").

United States District Court
Northern District of California

United States District Court
Northern District of California

were gang members," *id.* at 1094 (emphasis added), in *Hermanek* the witness's "vague statements on voir dire that he interpreted such words based on his knowledge of the defendants" was insufficient under Rule 702, *id.* at 1096.[4]  More recently, in *Valencia-Lopez*, the Ninth Circuit ruled that a district court failed to discharge its *Daubert* responsibilities in allowing an expert to testify, over the defendant's duress claim, "that there was '[a]lmost nil, almost no[ ]' likelihood drug cartels would . . . coerce him, at gunpoint, to carry illegal drugs across the border."  971 F.3d at 898-99 (brackets in original).  While the agent "had sufficient experience and knowledge to testify as an expert," *id.* at 898, he "never explained the methodology, if any, that he relied on to arrive at the near-zero probability of drug trafficking organizations using coerced couriers," *id.* at 900.  "Rather, like the expert in *Hermanek*," the witness "failed to link his general expertise with his 'almost nil' conclusion, and by never explaining *how* his expertise lent itself to that conclusion," the court could not "sort out what 'reliable principles and methods underl[ay] the particular conclusions offered.'"  *Id.* (quoting *Hermanek*, 289 F.3d at 1094) (emphasis in original).

The Ninth Circuit therefore underscores that while an expert's experiential knowledge and training may qualify him to testify as an expert, the district court must also ensure that his testimony is "based on sufficient facts or data," that he employs "reliable principles and methods" generally, and that the methodology is "reliably applied . . . to the facts of the case."  Fed. R. Evid. 702.

Some courts have been particularly cautious about permitting gang experts to opine expansively as part of the prosecution's case-in-chief.  In *Cerna*, the government sought to introduce testimony from twenty-four experts in a RICO/VICAR prosecution of MS-13 members; the defendants objected on the grounds of Federal Rule of Criminal Procedure 16(a)(1)(G), governing disclosure requirements, rather than *Daubert* proper.  *See* 2010 WL 2347406 at *1.  The court nevertheless analyzed the issue through an evidentiary framework:

> The substantive concern is this: Should police officers be allowed to testify as "experts" to supply opinions in place of hard facts to prove

---

[4] These shortcomings gave the appearance that the expert "at times . . . interpreted cryptic language as referring to cocaine simply because he believed appellants to be cocaine traffickers"—an example of "circular, subjective reasoning."  *Id.*

elements of an offense? . . .

No one should be convicted and sent to prison based on an opinion of a police officer that an element of an offense was committed when that element is amenable to ordinary fact proof. . . . One of the key elements of a RICO conspiracy is the structure, organization, and management of the affairs of a racketeering enterprise, all as they relate to conducting the affairs of an enterprise through a pattern of racketeering activity. . . . Juries would ordinarily rely on fact witnesses, such as cooperating witnesses and undercover officers, to supply the facts.  They do not need police opinions to do this.  Under Rule 702, expert testimony is reserved for opinions that will assist the trier of fact. . . .

Here, the main thrust of the proffer will not assist the trier of fact. The way MS-13 operated and its structure should be proven with facts, not opinions, at least on quintessential fact questions.  The racketeering organization alleged to exist in this case is the MS-13 gang itself.  *The gang's existence, organization and history should, therefore, be proven through undercover officers, cooperating witness, admissions by defendants, co-conspirator statements, physical evidence, documents, videos and photographs, wiretaps, and recordings. . . .*

*Id.* at *5 (emphasis in original).  The court noted that *Hankey* and two similar Ninth Circuit cases had "allowed the introduction of law enforcement expert opinion regarding the existence, structure, and history of gangs."  *Id.* at *6.  It distinguished those cases, however, because the testimony "was allowed only as rebuttal testimony and for the limited purpose of impeaching a defense witness."  *Id.*  "No RICO conviction has been sustained in the Ninth Circuit," the court went on, "wherein the RICO elements were proven by opinion evidence from a gang expert admitted in the case-in-chief."  *Id.*  However, it is unclear whether the Ninth Circuit rested its decisions on the fact that the expert evidence was introduced in rebuttal, and there is no obvious reason why that distinction should matter in a *Daubert* motion.

Other courts in this district have appeared to endorse the reasoning of *Cerna* in similar circumstances.  *See United States v. Flores*, No. 12-cr-00119-SI, 2014 WL 12686740, at *1 (N.D. Cal. June 16, 2014) (admitting expert testimony on gang colors and symbols, tattoos and graffiti, and specific terminology but not testimony "that would more properly be elicited from percipient witnesses," such as the contention "that certain gangs operate in South San Francisco," "that they committed acts of violence to enhance the gang's standing," "that rival gangs fight and engage in retaliatory killings, and that they dislike 'snitches'"); *United States v. Williams*, No. 13-cr-00764-

WHO, 2016 WL 899145, at *5 (N.D. Cal. Mar. 9, 2016) (allowing expert testimony on a gang's "common slang," "gang territory," and "gang symbols," but excluding opinions related to "gang alliances and rivalries," "general characteristics of gangs, including common values and behaviors," and gangs' "use of rap music").  In *Williams*, the court noted that judges in this district "have been . . . skeptical about the admissibility" of "broad-ranging gang expert testimony," citing *Flores* and *Cerna* in support.  *Id.* at *5.  "The government," the court asserted, "needs to prove the existence of a criminal enterprise and the violent crimes committed on its behalf on the basis of evidence from lay witnesses, not through the opinions of a police officer who has spent most of his career, among other things, investigating people in the group against whom [a] case is brought."  *Id.*  The court also noted that the expert should not be allowed to testify on topics that are "central factual issues" in the case at hand; the expert's "pronouncements on elements of the charged offense [would] serve as shortcuts to proving guilt."  *See id.* at *8-9.

Other courts in the Ninth Circuit, though, "have allowed gang expert evidence in the case-in-chief in a RICO/VICAR prosecution."  *Cerna*, 2010 WL 2347406 at *7; *see, e.g., United States v. McIntosh*, 2008 WL 4754763, at *2-4 (C.D. Cal. Mar. 14, 2008) (admitting some, and disallowing other, aspects of proposed gang experts' testimony).

As discussed below, the issue of whether law-enforcement experts may "supply opinions in place of hard facts," *Cerna*, 2010 WL 2347406 at *5, is best analyzed through the lens of the Sixth Amendment right of confrontation.  It is therefore addressed in Section IV.C of the order, *infra*.

2.    Scheetz's Scientific, Technical, or Other Specialized Knowledge

As a threshold matter, the Court finds that Mr. Scheetz is "qualified as an expert by knowledge, skill, experience, training, or education" to offer opinions about HAMC and other "outlaw motorcycle gangs" ("OMGs").  Fed. R. Evid. 702.  As the Government points out, Mr. Scheetz:

- Has been involved (in some capacity) in about 250 investigations into the Hells Angels.  [Docket No. 1184-1 ("Tr.") at 38.]

- Has debriefed about 100 people associated with the Hells

Angels, including about 10-15 former members of the Hells Angels, 10-15 prospects, and 5 hangarounds.[5]  Tr. 66, 255–256.

- Has analyzed evidence seized from Hells Angels investigations all over the world.  This evidence includes photographs, meeting minutes, rulebooks, and rosters. [Docket No.] 1084-1, ¶ 5 (Evidentiary Hearing Exhibit 2).

- Speaks with other law enforcement officers who investigate Outlaw Motorcycle Gangs (OMGs) on a "daily basis."  ECF No. 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 5.  These law enforcement officers, in turn, have "personally interview[ed]" witnesses and "run[] sources" across the globe, including current and former Hells Angels members. Tr. 45, 72.

- Has listened to "jail calls and wire intercepts, reviewed post-arrest statements, . . . and reviewed documents seized from members of OMGs."  [Docket No.] 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 14.

*See* Second Opp'n at 2.  "This extensive experience compares favorably to other law enforcement experts whose testimony courts have found reliable" in cases such as *Hankey*, *Alatorre*, and the Fourth Circuit's recent decision in *United States v. Smith*.  *Id.*; *see also Smith*, 919 F.3d 825, 835-36 (4th Cir. 2019) (described, *supra*, at note 3).  Defendants, moreover, do not seriously question Mr. Scheetz's qualifications to serve as an expert.  Mr. Scheetz's knowledge, experience, and training therefore qualify him to testify as an expert under Rule 702.

### 3. Relevance of Scheetz's Testimony

The Government also establishes the general relevance of Mr. Scheetz's opinions under Rule 702(a).  Mr. Sheetz's proffered testimony covers the topics of gang symbols, terms, and territory.  *See* Decl.  "[T]hese topics are the traditional areas in which a gang expert can testify," Second Obj. at 11 (internal quotation omitted), as such testimony may be expected to "help the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702(a).  *See Cerna*, No. 08-cr-0730-WHA, 2010 WL 11627594, at *6 (N.D. Cal. Dec. 17, 2010) (stating that an expert's "interpretation of code words, colors, tattoos, gang-territory mapping, and symbols generally will assist the jury in understanding fact evidence"); *Williams*, 2016 WL 899145, at *5

---

[5] For explanations of these terms, see Decl. ¶¶ 103-10.

(permitting gang expert testimony on slang, territory, and symbols).  Mr. Scheetz's opinions on these topics are generally relevant under *Daubert*.

        4.    <u>Scheetz's Principles and Methods</u>

As the foregoing discussion suggests, the Rule 702 threshold requirement that an expert be qualified often does not meaningfully differ, in the case of law-enforcement experts, from the reliability provision of subsection (c).  In both instances, the witness's experience, knowledge, and training are the overriding focus of the courts' attention.[6]  Here, the Government argues that Mr. Scheetz's "extensive experience" provides "a reliable foundation for the testimony [he] proposes to offer," Second Opp'n at 2-3, and lists the bases for his familiarity with HAMC symbols, terminology, and territory, *id.* at 3.  In addition to the features of Mr. Scheetz's training and experience described above in Section IV.2, the Government emphasizes that Mr. Scheetz "knows what the [HAMC] symbols are because he's personally observed them, and knows what they mean because he's talked to former [HAMC] members about them."  *Id.* at 3 (citing Decl. ¶¶ 45, 66, 70, 73; Tr. at 28-29, 43).  Additionally, the Government asserts that Mr. Scheetz is "familiar with [HAMC] terms and territory because he has researched the organization's history and has seen or heard those terms used in internal [HAMC] documents, countless conversations with other law enforcement officers . . . , debriefings with [HAMC] members and associates, and jail calls between [HAMC] members."  *Id.* (citing Docket No. 1084-4 at EXPERT0000232; Docket No. 1084-5; Tr. at 102, 201).

Defendants contest the integrity of Mr. Scheetz's self-described "compare and contrast" methodology, arguing that it operates merely as "a mantra" and fails to "verify sources, contrast sources, or question assumptions in a reliable manner."  Wendt Obj. at 2.  The Government responds that Mr. Scheetz's compare-and-contrast approach involves a synthesis of information from various sources and an application of independent, critical judgment to that information.  It describes his methods in the following manner:

---

[6] For example, in *Hankey* and similar cases, courts often cite a witness's experience, training, and professional knowledge as probative of the reliability of his methods and their application, even though the two inquiries are analytically distinct, as the *Hermanek* court insists.  *See supra.*

United States District Court
Northern District of California

In both his declaration and during cross-examination, Scheetz repeatedly explained that he evaluates new information against what he knows "from other investigations" into the Hells Angels, what he has "observ[ed]" at Hells Angels events," and what he knows "from [his] conversations with witnesses and confidential informants." [Docket No.] 1084-1 (Evidentiary Hearing Exhibit 2), ¶ 15. The "first thing" Scheetz does when he learns new intelligence is examine "who is giving [him] that information": "is it a law enforcement entity" or a "civilian." Tr. 328. *Then he "look[s] at the validity" of the intelligence by "compar[ing] and contrast[ing]" it with information that he's "either seen" or can research.* Tr. 16, 328. To research, Scheetz may "search through all [his] historical data"; "reach out to ATF special agents who have conducted infiltrations"; "reach[] out to other law enforcement entities"—many of whom have "personally interviewed" current and former Hells Angels; and "look at social media," "books," "newspaper articles," police "reports[,] and officer safety bulletins." Tr. 16, 45.

Second Opp'n at 3-4 (emphasis added). The Government also emphasizes that Mr. Scheetz does not take all information he encounters at face value: Mr. "Scheetz is sometimes unable to 'formulate a conclusion' about whether what he's learned is accurate," and when he "learns 'through other channels' that information is inaccurate, he gives less weight to a particular source" and reevaluates "the validity of the conclusions that he draws." *Id.* at 4.

The Court finds that Mr. Scheetz's principles and methods are reliable within the meaning of Rule 702. As *Hankey* and related decisions repeatedly emphasize, law-enforcement expertise "depends heavily on the knowledge and experience" of the officer, rather than on the kinds of factors that *Daubert* enumerated for scientific testimony (*e.g.*, peer review, testability, etc.). *See* 203 F.3d at 1170. In the instant case, the Government maintains that Mr. Scheetz considers the source of new information he receives about HAMC and other OMGs; that he assesses the validity of new information by setting it against the totality of his accumulated knowledge about these groups; and that he further tests the veracity of new information by consulting with fellow experts in the field, as well as public and private media sources. Mr. Scheetz has demonstrated "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *See Kumho Tire*, 526 U.S. at 152; *see also United States v. Paracha*, 2006 WL 12768, at *20 (S.D.N.Y. Jan. 3, 2006) (finding a terrorism expert's methodology reliable where it consisted of "gathering multiple sources of information, including original and secondary sources, cross-checking and juxtaposing new information against existing information and evaluating new

information to determine whether his conclusions remain consonant with the most reliable sources").

While Defendants argue that Mr. Scheetz's repeated invocations of "comparing and contrasting" amount to empty sloganeering, that he fails to credit all information neutrally, that he suffers from "a profound confirmation bias," and that he is susceptible to "group think," *see* Wendt Obj. at 11, these are matters that go to the weight of his testimony. They are therefore "reserved for the jury" and not subject to exclusion under *Daubert*. *See City of Pomona*, 750 F.3d at 1044.

Defendants also protest that much of Mr. Scheetz's purported expertise derives from in-person conferences and other conversations with law-enforcement officials and informants whose contents have not been memorialized in writing.[7] Defendants assert, for instance, that "the Government did not provide the reports, written by others, referred to by Mr. Scheetz," nor did he have any "notes or summaries of his contacts with other law enforcement experts." Wendt Obj. at 8; *see also* Lyles Obj. at 2 (discussing "the significance of Scheetz's practice of not taking notes, memorializing, or otherwise documenting information he receives from other purported OMG experts"). But this lack of documentary evidence for Mr. Scheetz's testimony again concerns Mr. Scheetz's credibility as a witness, not the fundamental reliability of his principles and methods. The Court cannot conclude as a matter of law that failing to keep a written of factual knowledge acquired by the expert is so inherently untrustworthy as to render any opinion based thereon inadmissible under *Daubert*. Mr. Scheetz's failure to reduce many of his personal interactions with other intelligence officers to written form renders his testimony vulnerable to charges of, *e.g.*, inaccuracy or fabrication—charges that Defendants are of course free to develop at trial. But his reliance on conferences and personal conversation as part of his methodology is precisely the kind of "[s]haky but admissible evidence" that "is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *City of Pomona*, 750 F.3d at 1044

---

[7] *See* Decl. ¶ 12: "I routinely attend and conduct training at national and international conferences and symposiums about OMGs. . . . Often, former members of an OMG are present, and I have the opportunity to informally debrief them. Through these conferences and symposiums, I also speak to OMG experts from across the globe."

United States District Court
Northern District of California

1    (quoting *Primiano*, 598 F.3d at 564).

2          In sum, the Court is satisfied that "the information upon which [Mr. Scheetz] relie[s] is of

3    the type normally obtained in [an agent's] day-to-day police activity," *Hankey*, 203 F.3d at 1170,

4    and that it therefore constitutes a reliable methodology for *Daubert* purposes.  The Government

5    plausibly argues "that other professionals develop their knowledge about the Hells Angels the

6    same way that [Mr. Scheetz] does: they review evidence, read documents, speak with other law

7    enforcement officers, and draw inferences based on personal observations."  Second Opp'n at 6.

8    This showing is sufficient to clear the low bar that *Daubert* sets for admitting expert testimony.

9          5.    <u>Reliability of Scheetz's Application and Sufficiency of Factual Bases</u>

10          Having established Mr. Scheetz's qualifications as an expert, the general relevance of his

11   opinions, and the reliability of his methodology under Rule 702, the Court turns to Defendants'

12   objections to Mr. Scheetz's testimony on the grounds that he applied his principles in an unreliable

13   fashion and/or lacked an adequate factual basis for his conclusions.

14          In general, the Court finds that Mr. Scheetz's methods have been reliably applied to the

15   facts at hand and that his opinions are supported by an adequate factual basis.  In its principal post-

16   hearing brief, the Government provides a detailed summary of the "specific information on which

17   Scheetz based his opinions" of the Hells Angels' symbols, terminology, and territory.  *See id.* at 7-

18   11.  Regarding symbols, for example, "the basis for Scheetz's testimony about the appearance of

19   the four-piece back-patch is his personal observations of hundreds of events at which members of

20   the Hells Angels have been present and his review of thousands of photographs of Hells Angels

21   members wearing their colors," as well as "his review of the Hells Angels World Rules, which set

22   forth requirements for the back patch."  *Id.* at 8 (citing evidentiary hearing exhibits) (internal

23   quotation marks omitted).  Similarly, regarding terms, Mr. Scheetz's testimony about the Nomads,

24   another alleged OMG with ties to the Hells Angels, "is based on his knowledge about the

25   establishment of Nomads charters," "use of the phrase in internal Hells Angels documents such as

26   the [Big House] List . . . and West Coast Officers' Meeting minutes," "and descriptions of

27   Nomads charters in press accounts."  *Id.* at 10 (citing evidentiary hearing exhibits).  As Mr.

28   Scheetz's opinions on these topics and others like them are generally supported by multiple

1    sources of information and plausibly result from the reliable application of his compare-and-

2    contrast methodology, they are admissible under Rule 702.  *Cf. Hermanek*, 289 F.3d at 1093-94

3    (explaining that expert provided "no basis for assessing the reliability of [his] interpretation" of

4    certain gang terminology).

5           Defendants, however, plausibly argue that a number of Mr. Scheetz's specific statements

6    should be excluded under *Daubert* because they either result from unreliably applied methods

7    and/or lack an adequate factual foundation.  Notably, these statements tend to concern purported

8    episodes of violence between HAMC and rival OMGs.  The Court divides its discussion between

9    the main categories of Mr. Scheetz's declaration.

10                a.    HAMC Symbols

11          First, Defendants argue that certain publications about HAMC that Mr. Scheetz cites in his

12   discussion of symbols do not constitute a sufficient factual basis for *Daubert* purposes.  The

13   dispute focuses on a document titled *The Definitive History of the Hells Angels*.  *See* Docket No

14   1084-3.  As Defendants mention, cross-examination during the *Daubert* hearings revealed that Mr.

15   Scheetz, though relying on the work for "the history of the Hells Angels Death Head," Decl. ¶ 34,

16   did not know "who had authored the document and had never actually verified its authorship,"

17   Wendt Obj. at 9 (citing Tr. at 47-50).  Defendants are presumably correct that a witness's reliance

18   on a text whose authorship he is unfamiliar with may in some circumstances fail *Daubert*.  But

19   Mr. Scheetz's declaration also cites to additional sources beyond the *Definitive History* when

20   discussing the origins and certain implications of the Death Head logo (*e.g.*, the significance of the

21   stitched-shut mouth).  *See* Decl. at, *e.g.*, ¶¶ 35, 36, 43.  Further, as explained above, Mr. Scheetz's

22   use of such sources as "books" and "newspaper articles" as part of his broader intelligence-

23   gathering practice satisfies the methodological-reliability requirement of Rule 702.  Questions

24   about the publications' journalistic shortcomings, authorial biases, or a witness's confusion about

25   the origins of a specific text go to credibility rather than threshold reliability under *Daubert*.

26          Much the same analysis applies to the book written by Yves Lavigne, titled *Hell's Angels:*

27   *Three Can Keep a Secret if Two Are Dead*, that Mr. Scheetz occasionally cites.  Defendants stress

28   that during the *Daubert* hearings Mr. Scheetz acknowledged that "he had no idea how Lavigne

United States District Court
Northern District of California

1  came up with the information in his book" and, more importantly, "agreed that the quotation

2  which he chose to cite," in paragraph 68 of his Declaration, "might be entirely invented and

3  attributed to a fictional character."  Wendt Obj. at 9 (citing Tr. at 59-62, 179-80).  It is true that

4  Mr. Scheetz's reliance on anecdotes whose veracity he cannot vouch for "as an analogy" to other

5  incidents that he presumably *can* attest to raises non-trivial questions of admissibility.  *See id.*

6  (quoting Tr. at 61-62).  As the Court noted with respect to the *Definitive History* document,

7  however, Mr. Scheetz's reliance on published books about HAMC is not inherently suspect, and

8  factual inaccuracies or speculative inventions within those books should be revealed through

9  "cross-examination" and "contrary evidence" at trial rather than outright exclusion.  *See City of*

10  *Pomona*, 750 F.3d at 1044 (quoting *Primiano*, 598 F.3d at 564).  And as with *The Definitive*

11  *History*, his opinion on this matter is not reliant solely on this publication but rests on a broader

12  body of information.

13         Defendants are correct, however, in arguing that Mr. Scheetz's opinion that "the Death

14  Head represents violence," Decl. ¶ 40, is problematic.  *See* Wendt Obj. at 16.  Mr. Scheetz first

15  offers this opinion in paragraph 40 of his declaration, which also asserts that "[a]nyone or

16  anything that opposes or disrespects a member or the colors is subject to the wrath of the HAMC,

17  including being subject to violence."  Decl. ¶ 40.  No source is cited in support of this broad

18  contention, nor is any foundation laid for it in the surrounding discussion of the Death Head's

19  centrality to the HAMC mythos.  *See id.* ¶¶ 39-49.  Mr. Scheetz elaborates on his belief that "the

20  Death Head represents violence" in paragraphs 50-55.  *See id.* ¶ 50.  There, he recites incidents

21  from the "long history of violence" that he attributes to HAMC, focusing in particular on "a series

22  of violent confrontations with the Mongols Motorcycle Club" starting in the 1970s.  *See id.* ¶¶ 50,

23  52.  After Mr. Scheetz quotes a passage from another book that ostensibly illustrates "the violent

24  character of the Hells Angels," *id.* ¶ 50, the next four paragraphs simply describe "violence

25  between the Hells Angels and adversarial motorcycle groups," *id.* ¶ 54, such as that which

26  occurred at Laughlin, Nevada, in 2002, *see id.* ¶¶ 52-53.[8]  In none of these paragraphs is the Death

27

28  _____

[8] In paragraph 55, meanwhile, Mr. Scheetz opines that "Hells Angels know that violence is part of their organization" because they "frequently take care of prospects and members who have been

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Head so much as mentioned, much less specifically tied to these violent encounters in a way that

2    would substantiate Mr. Scheetz's claim that the logo "represents violence."  Instead, Mr. Scheetz

3    simply juxtaposes his conclusory opinion about the Death Head's meaning with incidents

4    suggesting that HAMC, as a whole, is a violent organization.  Because this evidence is insufficient

5    factual support for the proposition that the Death Head specifically symbolizes violence, Mr.

6    Scheetz cannot testify to the violent incidents in paragraphs 50-54.  He also cannot assert the

7    substantive opinions in paragraphs 40 and 50, as he offers no reliable methodology for his

8    conclusions.

9           Similarly, Mr. Scheetz's conclusion that the HAMC "bottom rocker," part of the four-piece

10   back patch on members' vests, "refers to a claim of territory" raises Rule 702 questions insofar as

11   Mr. Scheetz uses this opinion to then recount additional "violent confrontations . . . with other

12   adversarial OMGs."  *See id.* ¶ 58.  In this part of his declaration, Mr. Scheetz again discusses "the

13   Hells Angels['] long-running feud with the Mongols," which he argues grew increasingly violent

14   in the 1970s "due to the Mongols' use of the California bottom rocker" and HAMC's

15   simultaneous assertion of "the sole right to display the California bottom rocker."  *Id.* ¶¶ 59-61.

16   While the factual basis for parts of this narrative is unclear, the declaration suggests (and the

17   Government represented at the post-*Daubert* hearing) that it is supported by accounts of two

18   former OMG members, who suggested in public statements that the rivalry between the groups

19   "worsened because of the Mongols' use of the California bottom rocker."  *See id.* ¶ 61; Docket

20   No. 1225 at 19-20.  Because Mr. Scheetz's testimony here involves synthesizing information from

21   multiple sources and exercising independent judgment in finding the former members' statements

22   credible, it is has an adequate factual basis and is therefore admissible under *Daubert*.  But Mr.

23   Scheetz's description, in paragraph 60, of a 1977 killing of two Mongols by HAMC members in

24   San Diego is inadmissible because Mr. Scheetz does not show that this incident is attributable, in

25   any specific way, to the groups' competing claims to territory (rather than to their broader rivalry).

26

27   _____

28   incarcerated" for acts of violence.  Decl. ¶ 55.  Because this conclusion is supported by internal
     HAMC documents listing "every Hells Angels member who has been incarcerated," *id.*, it is
     admissible under Rule 702.

1    *See* Decl. ¶ 60.  Without establishing such a connection, Mr. Scheetz strays beyond the

2    significance of HAMC symbols—the locus of his purported expertise—and instead merely

3    catalogues episodes of apparently indiscriminate violence between the OMGs.  Such testimony

4    about specific instances of violence cannot be cited to support his opinion on the bottom rocker

5    absent any demonstrable nexus.[9]

6                b.    HAMC Terms

7         Defendants also challenge Mr. Scheetz's account of "the Hells Angels['] history of violent

8    conflicts with adversarial OMGs," *id.* ¶ 89, found in Mr. Scheetz's discussion of HAMC charters,

9    as "[t]he basic organizational unit of the HAMC . . . , which is operated out of a city or county,"

10   *id.* ¶ 76.  While stating that individual charters enjoy significant autonomy in their day-to-day

11   activities, *id.* ¶ 81, Mr. Scheetz also contends that "individual charters believe themselves to be

12   part of a single organization," *id.* ¶ 89.  The basis for this opinion is the fact that "[m]embers of

13   charters carry out violent acts against adversaries that span time and geography, and those violent

14   acts sometimes have no apparent triggering event other than the existence of a historical rivalry"

15   between HAMC and rival groups.  *Id.*  More specifically, Mr. Scheetz points to a 2006 encounter

16   between members of HAMC and another OMG, the Outlaws, where the participants were from

17   different parts of the country; Mr. Scheetz's only explanation for the incident is therefore "the

18   historical feud" among the umbrella organizations, rather than individual charters.  *Id.*  This

19   opinion, which is partly based on Mr. Scheetz's "debriefing [of] former or current Hells Angels

20   members," *id.*, is adequately supported by relevant facts and involves a plausible exercise of

21   critical judgment.  It is therefore admissible under *Daubert*.

22        But Mr. Scheetz's specific conclusion, in paragraph 90, "that Hells Angels charters are

23   strategically established to fend off expansion by an adversary or demonstrate control over an

24   area" is not supported by a sufficient factual basis.  *See id.* ¶ 90.  The two book quotations that Mr.

25   Scheetz cites to substantiate this claim merely state (1) that HAMC charters were added so as "to

26

27   ---

     [9] Mr. Scheetz remains free to opine that "HAMC members use their colors to intend to intimidate
     other OMGs and the public," Decl. ¶ 63, as that conclusion is supported by Mr. Scheetz's personal
28   observations of an incident involving HAMC members and Mongols, as well as his understanding
     "of the long history of violence between" the two groups, *id.*

                                          22

United States District Court
Northern District of California

1    contribute to [the group's] image and business concerns" (*e.g.*, by "distributing drugs in an

2    *untapped* area") and (2) that the charters were intended "to function under the same rules" as one

3    another. *Id.* (emphasis added). Neither of these quotations sustains Mr. Scheetz's opinion in

4    paragraph 90; the former, if anything, undermines it. And the evidence offered in the next two

5    paragraphs simply describes additional instances of violence between HAMC and rival OMGs,

6    which fail to offer any specific foundation for Mr. Scheetz's claim that charters are typically

7    "established to limit the reach of [HAMC] adversaries." *See id.* ¶¶ 91-92. No demonstrable nexus

8    is shown. This particular opinion thus fails to pass muster under *Daubert*, as it lacks a factual

9    basis and reliable methodology.

10          Defendants are also correct in arguing that Mr. Scheetz's references to the document

11   known as the "Fresno Rules" is inadmissible under *Daubert*. This document was included as

12   Exhibit 13 to Mr. Scheetz's declaration and is referenced at numerous points in his testimony. *See*

13   Docket No. 1084-14; Decl. ¶¶ 82, 100, 109, 112, 115. When the document was mentioned during

14   the *Daubert* hearings, however, Mr. Scheetz admitted that he was entirely unfamiliar with it and

15   could not explain how it had been included with his declaration. *See* Wendt Obj. at 18 (citing Tr.

16   at 84-85).[10] Defendants have therefore shown that testimony based specifically on the Fresno

17   Rules must be excluded, as Mr. Scheetz acknowledged that his opinions do not actually derive

18   from the document. The Court notes, however, that none of the paragraphs in which the Fresno

19   Rules are referenced in connection with Mr. Scheetz's opinions rely *exclusively* on that document

20   in reaching their conclusions. As those opinions are not otherwise inadmissible, Mr. Scheetz

21   remains free to offer them but may not rely on the Fresno Rules as support.

22                    c.    HAMC Territory

23          The most significant challenge Defendants raise to the factual basis for Mr. Scheetz's

24   opinions is the lengthy catalogue of "violent incidents between the Hells Angels" and rival OMGs,

25   *see* Decl. ¶ 120, in the final section of his declaration. In paragraphs 120-21, Mr. Scheetz briefly

26

27   _____
     [10] Defendants seek to leverage this error as proof that Mr. "Scheetz is taking his cues from the
     Government" and that it "undermines [his] claims of independent judgment" throughout the
28   entirety of his testimony. *Id.* These arguments go to Mr. Scheetz's credibility rather than the
     reliability of his methods generally or their application to other facts in this case.

refers, in bullet-point form, to more than sixty encounters between HAMC and the Mongols or Vagos groups. A typical entry states: "On May 10, 2014, Paul Gibson, HAMC Oahu, Hawaii, stabbed David Coombes, formerly of Vagos, 12 times near James Kealoha Beach Park, Hawaii." *Id.* ¶ 121(d). All of these references are meant to support the conclusion, previously articulated in Mr. Scheetz's discussion of the bottom rocker, that "this violence arose from a dispute over territory." *See id.* ¶ 120. But, as before, nowhere in this extensive list does Mr. Scheetz establish that the violent incidents he recounts are attributable specifically to a *conflict over territory*, as opposed to a personal conflict or general gang rivalry. In alluding to the Oahu stabbing, for example, Mr. Scheetz does not provide any evidence showing that the incident was motivated by a *territorial* dispute rather than a more general conflict between the groups or even a purely personal quarrel. The same is true for the other episodes that Mr. Scheetz recalls. While he indicates that they are documented in various newspaper articles that he appends to his declaration as Exhibits 17 and 18, Mr. Scheetz does not offer any justification for selecting these particular incidents to support his opinion or even explain how he knows them to be anything more than indiscriminate acts of violence.

Revealingly, Mr. Scheetz was questioned at the *Daubert* hearings about this catalogue of violence between the Hells Angels and rival OMGs. When asked by defense counsel "if there was an opinion on territory being expressed" in this section of his declaration, Mr. Scheetz responded, "I don't believe so, no. These are just listing of violent acts that have transpired between [HAMC] and an adversarial OMG." Wendt Obj. at 16 (quoting Tr. at 197). Mr. Scheetz therefore expressly acknowledged that these incidents do not constitute a sufficient factual basis for his opinion that widespread violence between HAMC and rival groups has arisen specifically "from a dispute over territory." *See* Decl. ¶ 120. As that conclusion is ostensibly what these incidents are being mentioned to substantiate—and what Mr. Scheetz is qualified as an expert to opine on—the Court finds them inadmissible under *Daubert* for lack of a factual basis and reliable methodology.

Finally, Defendants are also correct that Mr. Scheetz's testimony as to these sixty-plus incidents is independently excludable under Federal Rule of Evidence 403. That rule permits a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger

24

of . . . unfair prejudice, confusing the issues, misleading the jury, u*ndue delay, wasting time, or needlessly presenting cumulative evidence*." Fed. R. Evid. 403 (emphasis added). Defendants point out that they would be obliged at trial to challenge the veracity of each violent incident recounted by Mr. Scheetz, potentially creating "for each one a little mini-trial" and generating "an incredible amount of rebuttal evidence." Docket No. 1225 at 31. The Government suggests that Defendants could refute Mr. Scheetz's testimony by calling their own expert witness, but it is not clear that due process principles would permit the Court to mandate such an expedient. Because the prospect of such a drawn-out evidentiary dispute at trial would be intolerable, Rule 403 supplies an adequate basis for disallowing Mr. Scheetz's testimony on the violent incidents his declaration recounts in paragraphs 120-122.

C.    Confrontation Clause and Hearsay Objections

In the Wendt objection, Defendants argue that Mr. Scheetz's testimony is inadmissible under the Confrontation Clause because it frequently functions as a "[p]ass [t]hrough" for testimonial hearsay in the form of his various sources' conclusions. Wendt Obj. at 19. In a supplemental brief, Defendant Cesena offers three specific examples of purported Confrontation Clause violations: Mr. Scheetz's opinions concerning (1) the meaning of the Filthy Few and Dequaillo patches, (2) the termination of HAMC's Shasta Charter, and (3) the violent character of HASC.

The Government does not directly address confrontation issues in its post-hearing briefs but did so in its pre-hearing opposition to Defendants' motion to exclude. *See* First Opp'n at 13-16. The Government there contends that Scheetz's testimony is not "simply a conduit for hearsay" and so does not implicate Defendants' Sixth Amendment rights. *Id.* at 13.

1.    Legal Background

Since *Crawford*, the Supreme Court has decided several cases testing the limits of the Confrontation Clause. In 2012, it addressed the interaction between the confrontation right and expert testimony, specifically the question of whether *Crawford* and its progeny "bar an expert from expressing an opinion on facts . . . that have been made known to the expert but about which the expert is not competent to testify." *Williams v. Illinois*, 567 U.S. 50, 56 (2012) (Alito, J.)

1   (plurality opinion).[11]  There, the prosecution in a rape trial had "called an expert who testified that

2   a DNA profile produced by an outside laboratory . . . matched a profile produced by the state

3   police lab"; the expert "referred to the DNA profile . . . as having been produced from semen

4   found on the victim's vaginal swabs" even though the only basis for this conclusion was the

5   profile itself (which was not admitted into evidence).  *Id.* at 56-57.  The case thus focused on the

6   potential incongruity between the Confrontation Clause and the longstanding principle, codified in

7   Rule 703, that "an expert may voice an opinion based on facts" that "the expert lacks first-hand

8   knowledge of."  *Id.* at 67; *see also* Fed. R. Evid. 703 (permitting expert testimony based on

9   evidence that is itself inadmissible).

10        *Williams* produced a fractured decision in which the Court held that the expert's statements

11   did not violate the Confrontation Clause because they were not testimonial, but in which five

12   Justices also agreed that the DNA profile on which the expert relied amounted to hearsay.  A four-

13   Justice "plurality" concluded that the profile was not hearsay because the statement in question—

14   that the DNA profile was in fact generated from the victim's vaginal-swab sample—was not

15   offered to prove the truth of the matter asserted.  Rather, it was a "mere premise" that was "simply

16   assumed . . . to be true" by the expert, 567 U.S. at 72, and was further substantiated with

17   additional evidence, *see id.* at 76.  This use of "basis evidence," the plurality argued, is consistent

18   with Rule 703, which expresses the view "that the disclosure of basis evidence can help the

19   factfinder understand the expert's thought process and determine what weight to give to the

20   expert's opinion."  *Id.* at 78.  The plurality also held, "[a]s a second, independent basis for [its]

21   decision," *id.* at 58, that the profile was not testimonial because it did not have "the primary

---

[11] The previous year, the Court narrowly resolved a similar issue in *Bullcoming v. New Mexico*, 564 U.S. 647 (2011).  There, it held that the prosecution could not use a "surrogate" expert to vouch for a forensic report, also admitted into evidence, that certified the defendant's blood-alcohol concentration.  *Williams*, 567 U.S. at 66 (Alito, J.) (plurality opinion).  The Court ruled that only the testimony of the expert who had "performed or observed the actual analysis," and not that of another expert who "was only familiar with the general testing procedures of the laboratory," could satisfy the Confrontation Clause.  *Id.*  Because the forensic report was held to be testimonial hearsay, the defendant had the right under the Sixth Amendment "to be confronted with the [expert] who made the certification."  *Id.* (quoting *Bullcoming*, 564 U.S. at 657).

purpose of accusing a targeted individual of engaging in criminal conduct,"[12] *id.* at 82, and it was not formalized in the manner of "extrajudicial statements, such as affidavits, depositions, prior testimony, or confessions, that the Confrontation Clause was originally understood to reach," *id* at 58.  Justice Thomas concurred in the judgment because he also believed that the DNA profile was non-testimonial, in accordance with his unique understanding of that term.[13]

Five Justices, however, concluded that the expert's statements were hearsay because they were introduced to prove the truth of the matter asserted.  Justice Thomas concluded that "[t]here is no meaningful distinction between disclosing an out-of-court statement so that the factfinder may evaluate the expert's opinion and disclosing that statement for its truth."  *Id.* at 106.  Justice Kagan, writing for four dissenters, agreed that the profile amounted to hearsay and offered an explanation similar to that of Justice Thomas: "when a witness, expert or otherwise, repeats an out-of-court statement as the basis for a conclusion," she argued, "the statement's utility is then dependent on its truth."  *See id.* at 126.  Justice Kagan thus observed that "five Justices agree, in two opinions reciting the same reasons," that the expert's statements about the DNA report were hearsay, "and the State could not rely on her status as an expert to circumvent the Confrontation Clause's requirements."  *Id.*  The dissenters also held that the profile represented a testimonial statement because it was "meant to serve as evidence in a potential criminal trial," *id.* at 138, thus bringing it within the ambit of the Confrontation Clause as testimonial hearsay, *see id.* at 133-34.

The *Williams* dissent concluded by noting that, because no single rationale "command[ed] the support of a majority," the doctrinal effect of *Williams* "is—to be frank—who knows what."

---

[12] Five Justices pointed out that the plurality's definition of "testimonial" here differs somewhat from, and is arguably more restrictive than that adopted by the Court in other recent Confrontation Clause decisions.  *See* 567 U.S. at 133-38 (Kagan, J., dissenting) ("We have previously asked whether a statement was made for the primary purpose of establishing 'past events potentially relevant to later criminal prosecution'—in other words, for purpose of providing evidence."); *see also id.* at 114-17 (Thomas, J., concurring in judgment) ("The original formulation of that test asked whether the primary purpose of an extrajudicial statement was 'to establish or prove past events potentially relevant to later criminal prosecution'"; "The new primary purpose test asks whether an out-of-court statement has 'the primary purpose of accusing a targeted individual of engaging in criminal conduct.'").

[13] *See id.* at 110-11 (concluding, as in earlier opinions, "that the Confrontation Clause regulates only the use of statements bearing 'indicia of solemnity.'").

*Id.* at 141.  Yet in the wake of *Williams*, several circuit courts have developed a broadly consistent framework for analyzing the admissibility of gang expert testimony vis-à-vis the Confrontation Clause and hearsay doctrine.  In doing so, they have focused on a remark in *Williams* where the plurality urges trial courts to "screen out experts who would act as mere conduits for hearsay by strictly enforcing the requirement that experts display some genuine 'scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue.'"  *Id.* at 80 (quoting Fed. R. Evid. 702(a)).  Thus, in *United States v. Vera*, the Ninth Circuit noted the tension between the Confrontation Clause and various Federal Rules of Evidence but explained:

> Under [Rule 703], there is generally no *Crawford* problem when an expert "appli[es] his training and experience to the sources before him and reach[es] an independent judgment."  [*United States v. Gomez,* 725 F.3d 1121, 1129 (9th Cir. 2013)] (quoting *United States v. Johnson,* 587 F.3d 625, 635 (4th Cir. 2009)).  *But an expert exceeds the bounds of permissible expert testimony and violates a defendant's Confrontation Clause rights when he "is used as little more than a conduit or transmitter for testimonial hearsay*, rather than as a true expert whose considered opinion sheds light on some specialized factual situation."  *Id.* (quoting *Johnson,* 587 F.3d at 635).  Accordingly, the key question for determining whether an expert has complied with *Crawford* is the same as for evaluating expert opinion generally: whether the expert has developed his opinion by "applying his extensive experience and a reliable methodology."  *United States v. Dukagjini,* 326 F.3d 45, 54 (2d Cir. 2003).

770 F.3d 1232, 1237-38 (9th Cir. 2014) (emphasis added).

The *Vera* court then discussed the Second Circuit's decision in *United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008), to illustrate "how case agent expert testimony can violate a defendant's Confrontation Clause rights."  770 F.3d at 1238.  In *Mejia*, an expert "identified custodial interrogations of MS-13 members as at least a partial basis for his testimony" that the gang was a racketeering enterprise, and "did not have to conduct a 'synthesis of various source materials' or apply any of 'his extensive experience [or] a reliable methodology'" to form his opinion.  *Id.* (quoting *Mejia*, 545 F.3d at 197).  Instead, the expert's "testimony 'was based directly on statements made by an MS-13 member in custody (during the course of th[at] very investigation),'" which were communicated "directly to the jury in the guise of an expert opinion."  *Id.* (quoting

*Mejia*, 545 F.3d at 198-99).  In contrast, while the expert in *Vera* relied in part on "contacts with [gang] members" and reviews of "wiretapped telephone calls" in opining about a California gang's control over certain territory, "nothing in [his] testimony suggest[ed] that he was *directly repeating* what someone else told him about the [gang] during this or any other investigation." *Id.* at 1239 (emphasis added).  In particular, the expert testified, *inter alia*, "that [an apartment complex] fell within the territory of the Minnie Street Lopers gang and that the gang maintained control over narcotics sales within [the complex] and the surrounding areas by requiring any non-member drug dealers in the area to pay a tax." *Id.* at 1238.  Because the expert "knew from reviewing intercepted telephone calls that [a defendant] did not pay taxes to anyone else in the neighborhood, [the expert] concluded that [the defendant] was one of the leaders of the narcotics trade in [the complex]." *Id.* (internal quotation omitted).  Against the defendants' *Crawford* challenge, the court held that the expert did not violate the Confrontation Clause because he was not "directly repeating what someone else told him about the Minnie Street Lopers during this or any other investigation," his conclusions "distilled and synthesized what he had learned through his experience," and he "did not impart" information gleaned from the wiretapped calls "for its own sake, but to explain the basis for his expert opinion." *Id.* at 1239.  Moreover, whatever information derived from the contacts and phone calls that the expert conveyed was not introduced to prove the truth of the matter asserted "but to explain the basis for his expert opinion" on a related matter.  *Id.*  The *Vera* court thus held that the expert did not violate the Confrontation Clause, rejecting defendants' argument that his opinions amounted to "repackaged testimonial hearsay."  *Id.*; *see also United States v. Garcia*, 793 F.3d 1194, 1213-15 (10th Cir. 2015) (framing the *Crawford*-Rule 703 inquiry in similar terms).[14]

---

[14] The Tenth Circuit has explained: "If an expert *simply parrots another individual's out-of-court statement*, rather than conveying an independent judgment that only incidentally discloses the statement to assist the jury in evaluating the expert's opinion, then the expert is, in effect, disclosing that out-of-court statement for its substantive truth; the expert thereby becomes little more than a backdoor conduit for an otherwise inadmissible statement."  793 F.3d at 1213 (quoting *United States v. Pablo*, 696 F.3d 1280, 1288 (10th Cir. 2012)) (emphasis added).  Applying these principles, the court held that several contested statements offered by a gang expert violated the defendant's confrontation right.  For example, the expert opined that certain individuals made attractive targets for gang members based on "investigative interviews" that the government conceded were testimonial in nature.  *Id.* at 1214.  The court held that this testimony

In sum, an expert violates the Confrontation Clause when he acts as "a conduit or transmitter for testimonial hearsay," *Vera*, 770 F.3d at 1237, by "directly repeating what someone else told him," *id.* at 1239, or otherwise "parrot[ing]" a testimonial out-of-court statement, *Garcia*, 793 F.3d at 1213.[15]  But where an expert "reach[es] an independent judgment," *Vera*, 770 F.3d at 1237, *e.g.*, by performing a "synthesis of various source materials," *Mejia*, 545 F.3d at 197, or in a way that "only incidentally discloses the [inadmissible] statement to assist the jury in evaluating the expert's opinion," *Garcia*, 793 F.3d at 1213, then he does not run afoul of a defendant's confrontation right.  *Cf. Cerna*, 2010 WL 2347406 at *5-6 (quoting *Mejia* for the proposition that experts may not "simply disgorge" opinions on "the facts needed to satisfy the elements of the charged offense" in place of testimony from percipient witnesses).

### 2.    Defendants' Objections

The Government's pre-hearing brief summarizes the "conduit" theory of the confrontation right vis-à-vis Rule 703, and argues that Defendants have "not identified any opinions that simply transmit testimonial hearsay."  First Opp'n at 15.  Defendants propose that Mr. Scheetz's opinions concerning (1) the Filthy Few and Dequaillo tags, (2) the circumstances of the Shasta Charter's disbandment, and (3) the Sonoma County charter's reputation for violence are all simply "repackaged testimonial hearsay."  *See* Cesena Obj. at 1; *Vera*, 770 F.3d at 1239.

First, regarding the Filthy Few and Dequaillo patches, Defendants place strong emphasis

---

violated the Confrontation Clause because the expert "simply relayed what [certain] gang members told him."  *Id.*  Similarly, the expert asserted that two individuals were high-status members within a gang and explained that his knowledge was acquired "[t]hrough debriefing other gang members" who had become cooperating witnesses in that investigation.  *Id.* at 1215. The court held that the testimony was "quintessential parroting" and so barred by the Sixth Amendment.  *Id.*; *see also United States v. Rios*, 830 F.3d 403, 417-18 (6th Cir. 2016) (noting the "tension" between Rule 703 and *Crawford*, but explaining that, with gang experts, "it is the process of amalgamating the potentially testimonial statements to inform an expert opinion that separates an admissible opinion from an inadmissible transmission of testimonial statements"); *United States v. Garcia*, 752 F.3d 382, 393-95 (4th Cir. 2014) (stating that an expert may not "merely channel[ ] information and statements by non-testifying participants in [a] conspiracy into the trial record" and holding inadmissible statements where an expert "simply substituted information gleaned from," *e.g.*, "post-indictment debriefings of participants in the conspiracy").

[15] Such statements, it bears repeating, must be "testimonial," as the Court has defined that term in *Crawford* and its progeny, for the Confrontation Clause to apply in the first place.  On the definitions the Court has offered on this term, see note 12 above.

United States District Court
Northern District of California

1    on the fact that Mr. Scheetz claimed to have "interviewed three ATF cooperating witnesses and

2    spoke[n] to two more witnesses" (the former event apparently occurring between the first and

3    second *Daubert* hearings) to support his understanding of the patches' significance.  Cesena Obj.

4    at 6.  According to Defendants, the *Daubert* hearings confirmed that these discussions provided

5    the only basis for Mr. Scheetz's understanding of the tags' meanings, as Mr. "Scheetz provided no

6    evidence in support of [his] conclusions in his declaration."  *Id.* at 1 (citing Tr. at 136-38, 145-46).

7    In their account, Mr. Scheetz's testimony thus amounts to "the relay of inadmissible hearsay

8    information (from cooperating witnesses) to the jury."  *Id.* at 6.

9            But in arguing that Mr. Scheetz "provided no evidence of these conclusions in his

10   declaration," *id.* at 1, Defendants cite to only two paragraphs of his declaration.  In fact, as the

11   Court indicated above, Mr. Scheetz devotes at least eight paragraphs to the meaning of these

12   patches, paragraphs that are premised on a number of evidentiary sources.  *See* Decl. ¶¶ 65-72; *see*

13   *also* Second Opp'n at 8-9 (explaining that Mr. Scheetz's knowledge of the Filthy Few patch is

14   based on, *inter alia*, "personal observations," "conversations with other law enforcement officers,"

15   and a "review of books about the Hells Angels").  Mr. Scheetz's testimony about the significance

16   of these tags thus involves a "synthesis of various source materials," *Mejia*, 545 F.3d at 197, and

17   does not merely "repeat[ ] what someone else told him," *Vera*, 770 F.3d at 1239.  As a result, his

18   opinions do not run afoul of the Confrontation Clause or the prohibition on hearsay evidence.

19           Second, regarding the Shasta County charter's termination, Mr. Scheetz opines in his

20   Declaration that individual HAMC "charters are bound by decisions made at the higher levels of

21   the HAMC organization."  Decl. ¶ 88.  He bases this conclusion on the minutes of a June 2007

22   HAMC West Coast Officers' Meeting, which state that the Shasta County charter was "frozen"

23   pursuant to a motion submitted by the Sonoma County and Frisco charters.  *Id.*  During the

24   *Daubert* hearings, Mr. Scheetz went on to allege "that the Sonoma charter voted to freeze the

25   Shasta charter because the Shasta charter did not retaliate when [the Mongols] shot one of Shasta's

26   members."  Cesena Obj. at 2; Tr. at 154-59, 320-23.  The minutes, however, offer a rationale for

27   the disbandment of the Shasta charter inconsistent with that offered by Mr. Scheetz in the

28   hearings.  *See* Docket No 1084-21 at 2 (stating, in the minutes, that Shasta was frozen due to the

United States District Court
Northern District of California

charter membership's "low numbers"). Mr. Scheetz was pressed on this discrepancy on cross-examination and explained that "the sole source of information" for his allegation concerning Shasta's failure to retaliate "was Jorge Gil-Blanco, a former motorcycle club expert," Cesena Obj. at 2, who himself "learned the information from the member of another motorcycle club," *id.* (citing Tr. at 323).

Setting aside the Confrontation Clause issue presented by Mr. Scheetz's statements about the specific reason for the Shasta County charter's disbandment, *i.e.*, its members' failure to retaliate against the Mongols, the Court finds that they are excludable under Rule 702 as lacking an adequate factual basis. Questioning by both Defendants and the Court at the *Daubert* hearings established that Mr. Scheetz's opinion, admittedly based on reporting from Mr. Gil-Blanco, is not supported by the meeting minutes themselves. *See, e.g.*, Tr. at 157-58. Moreover, Defendants submitted a notice of false testimony after the hearings arguing that Mr. Scheetz's statements concerning the freezing of the Shasta charter were "demonstrably false—and, indeed impossible," as the Mongols' shooting of the Shasta HAMC member to which Mr. Scheetz referred did not occur until November 2008 (long after the June 2007 West Coast Officers' Meeting at which the Shasta charter was shut down).[16] Lyles Obj. at 11. In response, the Government acknowledged that Mr. "Scheetz was mistaken in his recollection regarding the [Shasta member's] shooting being a specific reason for Shasta's dissolution," but explained that "other disputes between the Hells Angels" and a different OMG, the Vagos, underlay the Shasta charter's disbandment, as Mr. Gil-Blanco contended in his report. Third Obj. at 3; *see also* Docket No. 1214-2 (appending Gil-Blanco's report as Exhibit 1). Since the Government concedes that Mr. Scheetz's testimony about the particular reason for the Shasta charter's termination was based on a "mistake of fact," Third Obj. at 4, the Court has little difficulty concluding that this opinion is not "based on sufficient facts or data," Fed. R. Evid. 702, and so must be excluded under *Daubert*.[17]

---

[16] Defendants support this assertion by pointing to "readily available newspaper articles" from late 2008 and early 2009, which they provide as attachments to their brief. *See* Lyles Obj. at 2; *id.* at Attachment B.

[17] For the reasons previously given, the Court rejects Defendants' "joint request to exclude Mr. Scheetz from testifying" altogether as a result of this mistake, especially given Defendants' failure

In its opposition to the Lyles brief, however, the Government argues that Mr. "Scheetz's error does not cast doubt on his conclusion" that Shasta was shut down because of a failure to retaliate against a rival OMG, "regardless of which violent incident led to Shasta's dissolution." Third Opp'n at 5. Insofar as the Government wishes to introduce Mr. Scheetz's opinion "that the Shasta charter was frozen by the Hells Angels' West Coast officers after the charter failed to respond appropriately to violence by rivals," *id.* at 5, the Court finds that the Government is not barred by the Confrontation Clause from doing so.

Assuming, *arguendo*, that Mr. Scheetz's exclusive reliance on Mr. Gil-Blanco for this opinion amounts to "parroting" of hearsay,[18] the report is nevertheless not a testimonial statement under *Crawford* and its progeny. The Government has not made clear the exact nature of Gil-Blanco's report,[19] which "summarize[s] the history, the background and characteristics that make up the Hells Angels" and concludes "that the Hells Angels are a world wide criminal organization," Docket No. 1214-2 at 5. But the document appears originally to have been prepared for the Crown Solicitor's Office of New South Wales, Australia; Mr. Gil-Blanco was seemingly serving as an expert witness in court proceedings there in or before 2014. *See id.*

_____

to demonstrate that "Scheetz knowingly lied about the reasons for the freezing of the Shasta charter." Lyles Obj. at 12; *see also* Third Obj. at 6 (citing cases for the proposition that "honestly mistaken witness recollections generally do not" establish false testimony). The Court also disagrees, however, with the Government's contention that Mr. Scheetz's error in this instance "goes to weight and credibility, rather than admissibility," *id.* at 4, given its concession that there is *no* factual basis for this particular opinion. In any event, the Government represented at the post-*Daubert* hearing that it will not elicit from Scheetz "an opinion about . . . why the Shasta chapter was frozen." Docket No. 1225 at 39.

[18] Mr. Scheetz admitted throughout the *Daubert* hearings that his belief about the genuine reason for the Shasta charter's disbandment was predicated solely on the account that Gil-Blanco provided to him, either in the written report or personal conversation. *See, e.g.*, Tr. at 320 (indicating that Scheetz had personally spoken with Gil-Blanco about the Shasta County charter's dissolution and related matters); Tr. at 386 (affirming that Gil-Blanco was Mr. Scheetz's "only source of th[e] information" about the Shasta charter's disbandment). The Government re-confirmed this fact in its opposition to the Lyles brief. *See* Third Opp'n at 3 (explaining Mr. Scheetz's erroneous testimony as a misremembrance of "the expert report of Gil Blanco"). The Government notes that Mr. Scheetz testified that he also "reached out to ATF law enforcement officers" about HAMC's rivalry with other OMGs, but these other officers "didn't go into detail about the [Shasta] charter being frozen." Third Opp'n at 3 (quoting Tr. at 324-25).

[19] The Government simply refers to the document as an "expert report," Third Opp'n at 3, and "'Statement of Opinion' regarding the Hells Angels," Docket No. 1214-1 at 1.

33

United States District Court
Northern District of California

1    (stating that Gil-Blanco had "been asked to prepare this report by the NSW Crown Solicitor's

2    Office on behalf of the NSW Commissioner of Police," and that he had read "the Expert Witness

3    Code of Conduct" in the court's rules of civil procedure).  The report was then evidently

4    distributed among fellow OMG intelligence officers in the ATF (and perhaps other law-

5    enforcement agencies), as Mr. Scheetz's testimony indicates.

6           While the report's provenance is therefore somewhat ambiguous, the document is not

7    "testimonial" as the Supreme Court defined the term in *Williams*, where the Court explained that

8    out-of-court statements are testimonial when, *inter alia*, they have "the primary purpose of

9    accusing a targeted individual of engaging in criminal conduct."  567 U.S. at 82.  In contrast, Mr.

10   Gil-Blanco's report was not prepared in anticipation, or as part, of the instant case, nor (with one

11   passing exception) does it mention any of the eleven Defendants here.[20]  It also contains no quotes

12   from any percipient witnesses here.  Moreover, Mr. Scheetz's familiarity with the report seems to

13   derive from its circulation within the OMG intelligence community over the course of several

14   years, rather than from its use in a given prosecution.  In contrast, the out-of-court statements that

15   the Supreme Court and courts of appeals have identified as testimonial under *Crawford* generally

16   pertain to the particular case in which the statements are introduced.  *See, e.g.*, *Crawford*, 541 U.S.

17   at 38 (custodial statement made after *Miranda* warnings that shifted blame from declarant to

18   accused); *Melendez-Diaz*, 557 U.S. at 308 (certified lab report having purpose of showing that

19   substance connected to defendant contained cocaine); *United States v. Garcia*, 752 F.3d 382, 393-

20   94 (4th Cir. 2014) (statements made during post-indictment debriefings of non-testifying

21   participants in a conspiracy).[21]

22          Mr. Scheetz's opinion "that the Shasta charter was frozen by the Hells Angels' West Coast

23

24   [20] The report includes a photograph of Defendant Foakes, briefly describing his involvement in

25   "the Laughlin River shootout (between Hells Angels and Mongols) in April 2002).  Docket No.
     1214-2 at 31.

26   [21] In *Williams*, moreover, the dissenters objected to the introduction of a forensic report very
     similar to those in *Melendez-Diaz* and *Bullcoming*, showing "a DNA profile produced by an

27   analyst at [a] laboratory . . . made to establish some fact in a [particular] criminal proceeding," and
     "detail[ing] the results of forensic testing on evidence gathered by the police."  567 U.S. at 123

28   (Kagan, J., dissenting).  This type of case-specific forensic document is very different from the
     capsule history of an organization offered by Gil-Blanco's report.

1    officers after the charter failed to respond appropriately to violence by rivals," Third Opp'n at 5, is

2    therefore not barred by the Confrontation Clause.

3        The Court also notes that Mr. Scheetz remains free to opine that local HAMC "charters are

4    bound by decisions made at the higher levels of the HAMC organization," Decl. ¶ 88, and to rely

5    on the West Coast Officers Meeting minutes as a factual basis for the opinion, as that document

6    plausibly suggests that HAMC's West Coast Officers determine whether some individual HAMC

7    charters may continue to operate.

8        Lastly, Defendants argue that Mr. Scheetz's testimony during the *Daubert* hearings that

9    HASC "is considered a violent charter," Tr. at 330, violates Defendants' confrontation rights.

10   Cesena Obj. at 2, 9.  At the hearings, Mr. Scheetz claimed, in a colloquy with the Court, that his

11   conclusion was based on a combination of "analytical reports" and "arrest reports," in addition to

12   conversations with "ATF special agents who are assigned in California."  Tr. at 330.  Defendants

13   claim that the statement about the HASC charter's reputation for violence merely "parrot[s]

14   statements made by [the] ATF agents."  Cesena Obj. at 9.

15       But Mr. Scheetz's opinion does not simply amount to "directly repeating what someone

16   else told him," as it has been mediated by his own "independent judgment" as an expert.  *See*

17   *Vera*, 770 F.3d at 1237 (internal quotations omitted).  His conclusion about HASC's propensity

18   for violence is based, at least in part, on arrest reports he has reviewed, which suggests that he has

19   conducted a "synthesis of various source materials," *Mejia*, 545 F.3d at 197, and has drawn a

20   "considered opinion" from them.  *Vera*, 770 F.3d at 1237.  Moreover, under the Ninth Circuit's

21   analysis in *Vera*, Mr. Scheetz's disclosure of facts taken from arrest reports does not constitute

22   excludable hearsay since he is "not impart[ing]" information gleaned from the reports "for its own

23   sake, but to explain the basis for his expert opinion."  *See id.* at 1239.  As a result, Mr. Scheetz

24   would only "incidentally disclose[ ] the [inadmissible] statement to assist the jury in evaluating

25   [his] opinion," much as he did during the *Daubert* hearings.  *See Garcia*, 793 F.3d at 1213.

26   Defendants have therefore not established that Mr. Scheetz was acting as a mere conduit of, or

27   pass-through for, testimonial hearsay with respect to Mr. Scheetz's statement about HASC's

28   reputation as a violent charter.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

## V.    **CONCLUSION**

For the reasons given above, the Court **DENIES** Defendants' motion to exclude the entirety of Mr. Scheetz's proposed expert testimony as irrelevant and/or unreliable under Rule 702. The Court **GRANTS** the motion with respect to the following opinions and statements:

- Decl. ¶ 40 (opining that "the Death Head represents violence");
- Decl. ¶¶ 50-54 (opining that "the Death Head represents violence" and describing violent incidents as factual support);
- Decl. ¶ 60 (describing specific incident to show that "[v]iolence between the HAMC and the Mongols has continued");
- Decl. ¶¶ 90-92 (opining that "Hells Angels charters are strategically established to fend off expansion by an adversary");
- Decl. ¶¶ 82, 100, 109, 112, and 115 (citing Fresno Rules in support of various propositions; opinions otherwise admissible where supported by factual basis);
- Decl. ¶¶ 120-22 (describing specific incidents to show that "violence arose from a dispute over territory").
- Tr. at 154-59, 320-23 (opining on the specific reason for the Shasta Charter's dissolution).

This order disposes of Docket No. 984.

**IT IS SO ORDERED**.

Dated: January 8, 2021

_____
EDWARD M. CHEN
United States District Judge