**Pages 1 - 49**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| VS. | ) | **NO. CR 17-00533 EMC** |
| | ) | |
| JONATHAN JOSEPH NELSON, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

San Francisco, California
Friday, August 14, 2020

**TRANSCRIPT OF ZOOM WEBINAR PROCEEDINGS**

**APPEARANCES** (via Zoom):

For Plaintiff:
                         DAVID L. ANDERSON
                         United States Attorney
                         450 Golden Gate Avenue
                         San Francisco, California  94102
         BY:  **KEVIN J. BARRY**
                **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant Jonathan Nelson:
                         RICHARD G. NOVAK, A PROFESSIONAL LAW
                         CORPORATION
                         65 North Raymond Avenue - Suite 320
                         Pasadena, California  91103
         BY:  **RICHARD G. NOVAK, ATTORNEY AT LAW**

                         819 Eddy Street
                         San Francisco, California  94610
         BY:  **JAI M. GOHEL, ATTORNEY AT LAW**

Also Present:        Jalei Kinder, Anthony Granados
                         United States Pretrial Officers


Reported By:  Marla F. Knox, RPR, CRR, RMR
              United States Official Court Reporter

<u>**Friday - August 14, 2020**</u>                              <u>**2:38 p.m.**</u>

P R O C E E D I N G S

---000---

**THE CLERK:**  Court is now in session.  The Honorable
Edward M. Chen is presiding.

Calling criminal action 17-533, United States of America
versus Jonathan Nelson.

Counsel, please state your appearances for the record
beginning with the Government.

**MR. BARRY:**  Good afternoon, Your Honor, Kevin Barry
for the United States.

**THE COURT:**  All right.  Thank you, Mr. Barry.

**MR. GOHEL:**  Good afternoon, Your Honor, this is Jai
Gohel.  I'm appearing by Zoom along with my co-counsel Richard
Novak, who is also appearing by Zoom.  And I see that my
client, Jonathan Nelson, is present via Zoom at Santa Rita
using the Zoom technology; and he will waive his personal
appearance with respect to this hearing because of the COVID
pandemic conditions.

**THE COURT:**  All right.  Thank you, Mr. Gohel and
Mr. Novak.  Good afternoon, Mr. Nelson.  And Ms. Kinder?

**MS. KINDER:**  Good afternoon, Your Honor, Jalei Kinder
for Pretrial Services.

**THE COURT:**  Great.  And so just to reiterate
Mr. Gohel's point, we are holding this hearing because to hold

1    this in a timely fashion live would jeopardize health and

2    safety of the public and the interest of the justice requires

3    us to proceed presently given the nature of the proceedings.

4    So we are going to proceed knowing that Mr. Nelson has waived

5    his appearance but is appearing by video.

6         So I have gone through all of the briefings and materials

7    here.  Let me ask a couple questions.

8         What more can Defense Counsel tell me about Mr. Nelson's

9    performance while incarcerated?  I understand that he has

10   earned one certificate that was attached, but anything more

11   that you can tell me?

12        **MR. GOHEL:**  Your Honor, I can -- that is the only

13   certificate I obtained.  What I can tell the Court -- there is

14   a couple things, and I will make these representations as an

15   officer of the court -- that while at Santa Rita -- and the

16   Court may know this -- there was a lot more programming

17   available.

18        So he did everything from some sort of, you know,

19   parenting classes to, you know, the certificate class that I

20   provided, the 7 steps, the -- everything that was available,

21   drugs, everything, even if he didn't have an issue with that.

22        The problem is that that programming ended.  And one other

23   thing I should add is that Mr. Nelson was not only has -- he is

24   a high school graduate, but he was actively seeking the

25   ability -- and there was a facility at the time to potentially

do correspondence courses with respect to college credits.  I

think it was called Adams University through North County Jail,

the Glenn Dyer facility.  And we were in the process of getting

the paperwork together to get those materials in and were

basically cut short.

I can only represent to the Court in the, I think, at

least year or close to a year that he was in custody there,

that he was constantly going through programming; had gone

through classes, et cetera.

Unfortunately, the only certificate that I have is the one

that I provided to the Court, but I can represent that he has

literally took any classes that were available.

**THE COURT:**  Mr. Barry, do you have any contrary

information about Mr. Nelson's performance while incarcerated?

**MR. BARRY:**  I do not, Your Honor.

**MR. NOVAK:**  Your Honor, if I can add -- and I don't

know specifically the Court was asking -- it is our

understanding that Mr. Nelson has not had any violations of

jail rules of any type.  And also I'm making that

representation as an officer of the court.

The Government hasn't brought any violations to our

attention.  He has never been placed in segregation.  He --

other than when his unit has been on quarantine.  And just to

be frank, Mr. Nelson has told us -- and, of course, if the

Court wants verification, we can ask the sheriff for this --

1    that he hasn't had a single violation while in custody.  And I

2    see Mr. Nelson nodding his head.

3         **MR. GOHEL:**  And, Your Honor, if I can add -- I'm

4    sorry.  I didn't mean to jump in.  My understanding is that

5    there have been problems at Santa Rita, especially pre-COVID,

6    but there have been problems in Mr. Nelson's unit of violence

7    not involving Mr. Nelson.  But there have been opportunities,

8    let's put it, for him to either get in trouble -- but he has

9    been able to stay out of the way, and I think has been pretty

10   exemplary.  So I know for a fact that there have been problems

11   in the jail unrelated to him that he did not in any way get

12   involved in.

13        **THE COURT:**  All right.  Let me ask:  You mention in

14   your papers, Mr. Nelson's relationship with his son, his son's

15   involvement in the painting business -- which I'm not sure if

16   it is still operating or what -- but tell me more about his

17   relationship with his son; whether there is still a painting

18   business; whether that is something that is ongoing and more

19   about the son's -- I know the son is involved previously -- he

20   is a member of the Hells Angels, but I want to know more about

21   who he is and what he has been doing.

22        **MR. GOHEL:**  I can tell you what I know.  I have met

23   him personally, but I can tell you first, that Nelson Brothers

24   Painting, that was an ongoing business for years prior to this.

25   They have a license.  Mr. Nelson was involved with the

1    painter's union.  It was an ongoing business both before his

2    original arrest and then once he was released.  He kept the

3    business going.

4         He had a partner for a period of time, an unrelated

5    non-family partner.  That partner -- during the time Mr. Nelson

6    was re-incarcerated after the superceding indictment.  That

7    partner is no longer involved.  Mr. Nelson had always been

8    training his son, Jonathan, Junior, to take over the business

9    or assist in the business.  Jonathan Junior has taken a full

10   role of basically running the business since then.

11        They have multiple -- I mean, dozens of contracts for

12   painting that are ready to go.  They did, I think, 60 homes in

13   the Coffey Park area in Santa Rosa after the fire; and have

14   many contracts and a very -- well, a potentially good business.

15        I mean, I'm not suggesting that Mr. Nelson is going to be

16   flush with money, per se, but I do -- I know that he will --

17   and that's what I put in my pleadings.  The business is

18   ongoing.  The license is active.  Mr. Nelson's son is running

19   the business and could use the help from Mr. Nelson to continue

20   that business.

21        With respect to Jonathan Junior, the only thing I can tell

22   the Court -- the Court is aware and we have been very upfront,

23   that he is a member as was Mr. Nelson's father -- but he is a

24   high school graduate.  He was a football player.  I think he

25   even had some college scholarship potential offers.  He is

1  employed.  I do not believe he has any criminal record

2  whatsoever.

3      So -- and he is the single most important person by any

4  stretch of the imagination in Mr. Nelson's life.  And

5  Mr. Nelson has essentially raised Jonathan Junior, I believe,

6  since the 7th grade when he got legal custody of him.

7          **THE COURT:**  And is Nelson Brothers Painting, is that

8  the name of the company?

9          **MR. GOHEL:**  That's correct, Your Honor.

10          **THE COURT:**  And it is still ongoing?  Still happening?

11          **MR. GOHEL:**  That is my understanding, yes.  And it is

12  my understanding that they have jobs that are available; in

13  other words, jobs that are to be worked on.

14          **MR. NOVAK:**  And if I may supplement that just a bit,

15  Your Honor, I know that the Court read Dr. Selvog's

16  declaration.  Some of the people Dr. Selvog interviewed about

17  Mr. Nelson's character are people in the painting business up

18  in Sonoma County, people who have hired Mr. Nelson -- I think

19  that was addressed in the declaration -- as well as people who

20  have provided his business with supplies and people who have

21  benefited from, what we would call, their pro bono services and

22  materials.  And that is an ongoing concern that is basically

23  being held down, if I may, by his son.

24          **THE COURT:**  And the son has no criminal record?

25          **MR. GOHEL:**  That is my understanding, Your Honor.  I

1   don't have access to a rap sheet; but my understanding is that

2   when Pretrial initially checked this out, he was not found to

3   have had any criminal record.  And that's -- historically

4   that's my understanding.

5        **THE COURT:**  And you have represented in your papers

6   that Mr. Nelson's brother and sister, who were the original

7   sureties, are still there and his brother is willing to still

8   post his home?

9        **MR. GOHEL:**  Yes, Your Honor.  I can represent to the

10  Court that I spoke to both personally.  I mean, it was by

11  phone.  I know their voices.  I have met them several times.

12  Both of them are apprised of the new -- the difference in the

13  penalty; in essence, the mandatory life as opposed to a

14  guideline life sentence possibility.  And they both vigorously

15  affirm that they are willing to continue -- for Stephen Nelson

16  to continue to be both a custodian and a surety with respect to

17  his posted property, which is -- as the Court knows -- his

18  family home with three small children and his wife.

19       And Tracy, his sister, is -- who was for a while when

20  Mr. Granados -- I see him there -- was supervising that there

21  was -- she was the custodian.  She is still willing to stay on

22  as a surety even if he is not living with her.

23       **THE COURT:**  And you -- it looks like from the pretrial

24  update, at least as of a year ago there were other sureties who

25  are willing to step forward?

1          **MR. GOHEL:**  Yes, Your Honor.  There is -- there is --

2    basically two from -- I guess you can call them locally exes in

3    Mr. Nelson's life that I have submitted, Ms. Savia (phonetic)

4    and Ms. Samo (phonetic).  And they may be on this Zoom call.

5    I'm not sure.  As are probably several other people in support

6    of Mr. Nelson.  They did inform me that they were willing to be

7    additional sureties should the Court need additional sureties.

8          **THE COURT:**  So what is your response to the one

9    changed circumstance from prior to the superseding amended

10   complaint -- Mr. Nelson was out for 9 months and appears to

11   have performed well -- is the VICAR count for mandatory life.

12        The Government argues very forcibly that that creates a

13   large incentive to flee or otherwise to avoid that charge.  Now

14   that mandatory life is attached and it's not death, what is

15   your answer to that?

16         **MR. GOHEL:**  Your Honor, you know, I have to apologize

17   because when we were before -- you know, this is our second

18   go-around, I know.  It has been a while.  But when I had done

19   my guideline calculations, my RICO calculations were a little

20   bit rusty, I think.

21        But I have now been convinced -- with the aid of my

22   co-counsel, I'm convinced that Mr. Nelson -- I mean, it is a

23   guideline life sentence if the murder -- and it is important

24   that the Court note that the original indictment had a

25   conspiracy charge.  It is the same underlying set of facts.

 1    But now we have a RICO -- substantive RICO VICAR murder.

 2          But in the Count One RICO conspiracy, it was alleged that

 3    Mr. Nelson had aided and abetted -- in others words, with full

 4    participation, as the Government alleges -- in the actual

 5    murder of Joel Silva.

 6          And with that, in combination with the RICO statute

 7    guidelines, if you look -- and it is in our papers -- I see no

 8    other way to read it other than that was a mandatory -- not

 9    mandatory -- excuse me -- that was a guideline life sentence.

10          And I know the Court back at that hearing, back in

11    February of 2019, had said that there are -- you know,

12    potential things that could take the sentence down from what I

13    thought -- at the time thought was in the 30-plus year range

14    that -- but certainly we are talking about really very little

15    distinction in terms of the potential exposure.

16          And what is important for the Court to note is that, yes,

17    the Government in its wisdom chose to allege or indict on a

18    substantive VICAR murder as opposed to just a conspiracy for

19    murder in addition to a RICO with an overt act of a murder.

20          But these are the same underlying facts.  These are the

21    same underlying conduct; the same exact conduct that was

22    presented to Judge Laporte when she -- and the same arguments

23    that the Government makes here.  Yes, they are a little bit

24    more, I would call them, detailed; but the same basic theories

25    of why Mr. Nelson was a danger because of his role in the

1   organization; the danger of the organization and his alleged

2   misdeeds.  It was exactly what was presented to Judge Laporte.

3       So I would submit to the Court that in reality, there is

4   really is no difference; certainly that cannot be accommodated.

5   I will just remind the Court that most of the danger that is

6   associated or that is predicted or sought to be prevented by

7   the Government with respect to keeping Mr. Nelson in custody

8   are things that are related to his association with the Hells

9   Angels Motorcycle Club.  This is all what their allegations

10  are.  I'm not saying that they are true.

11      There are conditions that the Court can fashion, which he

12  abided by.  We are not just talking about in a hopeful way.  He

13  abided by these conditions staying away from the Hells

14  Angels -- other than his son, who is the only person in his

15  life that he absolutely -- I'm requesting that he be able to

16  have contact with.

17      But he has never had any violations for any kind of, you

18  know, contacting any members.  No violations for anything.  And

19  conditions can be fashioned that will prevent him and will

20  continue to prevent him from associating with the Hells Angels

21  or anyone related to the Hells Angels that are the subject of

22  the Government's concerns.

23      So I just think that we are well past -- he has already

24  demonstrated he can do it, and there is -- the floor is now

25  life.  But in reality, Your Honor -- and I think he was very

1    close to life, if not life, under the guidelines.  Certainly

2    life under the guidelines and probably close to life prior to

3    this indictment.  So I don't think anything has really changed

4    other than the Government has given a more fulsome explanation

5    of what the case is.

6         And but I would submit to the Court is what we have

7    submitted with Mr. Selvog's declaration, which is not rebutted

8    in any way by the Government, is as a byproduct of the

9    mitigation work that he did -- he is extremely qualified -- the

10   Court now has an extremely individualized assessment of

11   Mr. Nelson, which is part of the 3142 factors that the Court

12   didn't have back in February of 2019.  Very specifically, the

13   characteristics of him as a human being, not the reputation

14   because he is with the Hells Angels or because of his supposed

15   role, but the individual consideration that the Bail Reform Act

16   requires the Court to look at that are people who know him well

17   who say that his -- and the opinion of Dr. Selvog based on

18   those interviews -- that this is not a person who is likely to

19   flee.  This is not a person who is likely to violate his

20   conditions with respect to danger.  Any conditions of release.

21        And, again, it is not in a vacuum.  We have nine months of

22   perfect, perfect -- and I would call it exemplary -- and I

23   think Pretrial Service office can confirm this -- of

24   increasingly improving or liberalized conditions throughout

25   those nine months with the same kind of heavy-duty charges,

1    with the same kind of concerns of witness intimidation and

2    these things that the Government, I think, has a legitimate

3    interest in.  Nothing happened.

4        And we have his previous case that he had more than ten

5    years ago -- that I was personally involved in and I did a

6    declaration to the Court -- that he abided perfectly.  Also a

7    case that allegedly had some Hells Angels' involvement.  And

8    there was never any allegations of any kind of witness

9    intimidation or any danger.  He kept his job.  Came to court

10   and ended up with a result that ended up essentially absolving

11   him of almost all serious criminal conduct in that case.

12       So I think this -- the Court has more at this time to look

13   at that when the Court addressed this issue back in February of

14   2019.  And now we don't have death on the table.  And I think

15   that is significant, and I think that that is -- I respectfully

16   would suggest that the Court should release him.  There are

17   conditions that can allay the Government's concerns.  And

18   Mr. Nelson has proven that he can abide by those and he will

19   again.

20               **THE COURT:**  All right.  Mr. Barry, I understand that

21   the thrust of your argument is that the State is indifferent

22   because of the VICAR mandatory life sentence.  So that

23   obviously is -- it is a significant factor.  It appears that

24   all the other factors weigh in favor of releasing Mr. Nelson at

25   least if you look at the filings, the mitigation report, his

1    performance in jail, his performance while he was out, his

2    continued family support, willingness of his brother to really

3    put up his life savings and the fact that that his son --

4    although he is a member of the Hells Angels -- is engaged in an

5    act of ongoing business.  And, plus, you have other folks who

6    have submitted letters as they have before.

7         So what -- why shouldn't -- if conditions were fashioned

8    in such a way let's say, for instance, similar to the original

9    conditions which is starting off with the most restrictive

10   conditions possible, why -- what is -- why not?

11        **MR. BARRY:**  Well, Your Honor, first, we are not at a

12   position where we are considering the merits.

13        To direct the Court -- the Court directed a very specific

14   question to Mr. Gohel.  What is it about the fact that

15   Mr. Nelson is facing a mandatory life in prison term, how does

16   that change his incentive to flee?  And he didn't answer the

17   question.  All he said was that before the guidelines could

18   have been life.

19        Well, as the Court knows, the guidelines are a starting

20   point.  And the Court could sentence -- arguably, the Court

21   could sentence Mr. Nelson to probation.  The Court observed

22   that with the guidelines range sentence, there are still --

23   even with a lengthy term, even with a guidelines range sentence

24   based on the initial calculation, there was time to get out.

25   There was time to still have a life.

1       Mandatory life is mandatory.  It is not just the -- it is
2   a conceptual floor.  It is the ultimate deprivation of liberty.
3   And to say because death isn't on the table the same issues
4   that animated the Court to find a risk of flight -- and I'm
5   only talking about risk of flight right now.  The same issues
6   that caused Judge Laporte to find that he posed an unmitigable
7   risk of flight -- not just because of the penalties but because
8   of the charges and because of who he was, what his role was in
9   the enterprise and all the other factors in 3142, which none of
10  which are changed by any of the issues that Mr. Gohel raised in
11  his brief or right now -- but nothing has changed.
12      But the issue is the Court found that he poses a risk of
13  flight.  And the death penalty removal --
14          **THE COURT:**  It is a little -- when you say "nothing
15  has changed," there is a difference between -- as heavy as
16  mandatory life is, there is a difference obviously between
17  death and life.  So I wouldn't say nothing --
18          **MR. BARRY:**  But conceptually the idea is:  Well, if I
19  face the death penalty, then the Defendant would more likely --
20  would take off.  If he is facing mandatory life, then he won't.
21  I mean, that is conceptually -- it doesn't make sense.
22      If he was facing -- he was facing -- for the actual murder
23  charge, he was facing a statutory maximum of 10 years.  And not
24  only the penalty for the murder of Joe Silva is at play but
25  most significantly it is the charge.

1      The grand jury found that there is probable cause to

2  believe that Mr. Nelson directly participated in a murder.

3  That is radically different from where we were at the beginning

4  of the case when he was released.  And the Court found that

5  that posed a risk of flight.  Again, I'm tabling the issue of

6  danger for the moment.  And so in order for the Court to

7  consider the merits --

8      **THE COURT:**  I thought the original indictment included

9  a conspiracy to commit murder as part of the RICO charge.  It

10  wasn't a VICAR charge, but there was -- it was more than a

11  10-year penalty he was facing.

12      **MR. NOVAK:**  It was maximum life.

13      **MR. BARRY:**  The RICO conspiracy charge, Your Honor,

14  has an allegation that murder was one of the aims of the

15  conspiracy.  And that's because the Hells Angels are engaged in

16  that kind of conduct.

17      **THE COURT:**  Right.  So there was a potential for life.

18  And I understand you are saying there is also a potential that

19  the Court -- meaning me or the sentencing judge, whoever that

20  might be -- could vary down or find a different range -- but

21  there was a potential for a life -- you know, a life sentence.

22      **MR. BARRY:**  Yes, Your Honor.  But potential for life

23  versus absolute, no equivocation, mandatory life is radically

24  different.  It is a completely different posture.

25      **THE COURT:**  Okay.

1      **MR. BARRY:**  The Government's position is as a matter

2    of procedure, we are not in a position to second-guess,

3    Your Honor's decision and Judge Laporte's decision.  We are not

4    there because it isn't sufficiently different.  And that is

5    just on the risk of flight.

6      **THE COURT:**  All right.  Let me put that aside.  I will

7    tell you right now I find that the gateway question is one

8    which allows me to re-visit.  I think there is a major

9    difference between facing death and facing mandatory life.  I

10   understand your argument that mandatory life may present such a

11   huge incentive that the result is the same.  But I am not

12   precluded from re-visiting and I am re-visiting.  So I would

13   like you to address the merits now.

14     **MR. BARRY:**  Your Honor, I just want to make the record

15   on, the Defense offers absolutely nothing to suggest that the

16   second prong on which the Defendant (sic) ordered the Defendant

17   detained, danger to the community, is changed in any way by the

18   removal of the death penalty.

19     At most -- they could have made an argument.  They did

20   not -- but they could have made an argument that risk of flight

21   is different because the Defendant, who is facing the death

22   penalty, may be more likely to flee than someone who is facing

23   mandatory life.  Again, I disagree with that; but they could

24   have made that argument.

25     They do not address at all the fact that they also have to

1   establish that the removal of the death penalty has a material

2   change on the danger of the community that the Defendant posed.

3   And they don't do that because there is no way to change that

4   danger.

5       The enterprise is still in existence.  The relationship of

6   the Defendant as the leader of that enterprise still maintains.

7   His participation in extremely violent conduct -- his direct

8   participation in extremely violent conduct is still there.

9   None of that has changed.

10      So I would just submit that on the danger to the community

11  prong, the removal of the death penalty has no impact on that

12  prong.  And we cannot re-visit the merits of the detention

13  issue because of that change.

14      **THE COURT:**  Well, let's say we do re-visit the merits.

15  I would like to hear your view on the merits given the state of

16  the evidence as we sit here today.

17      **MR. BARRY:**  So with respect to the first prong, the

18  nature and circumstances of the offense, again, the key thing

19  that prompted Judge Laporte and Your Honor to order the

20  Defendant detained in February of 2019 wasn't the maximum

21  penalty.  It wasn't the penalties that the Defendant faced.  It

22  was the charge.

23      I mean, the Court observed that, you know, murder does not

24  in and of itself indicate that the Defendant should be

25  detained.  It is not the sole issue.  And that is correct.  But

1    it weighs heavily in favor of detention.

2         In general murder defendants do not get released because

3    of the risk of flight they have, because of the charges that

4    are at issue; but more importantly because of the danger.  That

5    hasn't changed at all.

6         At most the only change would be the nature of the offense

7    is somewhat different because Defendant now faces a maximum

8    penalty of life -- of mandatory life instead of death.

9         So the nature and circumstances of the offense haven't

10   changed at all.  The Hells Angels are a violent transnational

11   organization.

12        If the Defendant is convicted and he is facing mandatory

13   life, there is absolutely no -- there is no downside to him to

14   flee.  There is nothing more that the Court can do to him if he

15   chooses to flee and gets caught.  He can't get any more time.

16        So the risk -- the incentive to flee, either because he is

17   facing the charge or trial isn't going well or he has been

18   convicted is still there.  There is nothing that -- there is no

19   deterrent to flight.

20        The -- you know, I sort of went into the issues at length.

21   The Court made findings based on those.  But let me just

22   address some of the other things about the characteristics of

23   the Defendant.

24        First of all, you know, the mitigation expert's report is

25   not new.  It is not a new and material issue on the

1    Defendant's -- the Defendant's character, the type of person he

2    is that they are putting forward to the Court isn't a new

3    circumstance.

4         But the key takeaway from that report -- at least in the

5    Government's view -- is that Mr. Nelson will do what he has

6    promised to do.  And the Defense paints that as -- as that he

7    will abide by the conditions of release.

8         The Defendant is a man of his word.  He is going to do

9    what he promises to do.  But the Court has to consider where

10   Mr. Nelson's loyalties lie.  Mr. Nelson is a lifelong Hells

11   Angel.  His entire family is in the Hells Angels.

12        If the Hells Angels direct him to intimidate witnesses, to

13   commit crimes, to keep the enterprise afloat through illicit

14   activity, he will do so.  He has promised to do so.  He is

15   loyal to that.  He has -- he bears their badges on his skin.

16   The key thing in his life is the Hells Angels.

17        You know, I think the Court mentioned, you know, his son

18   is running the business and that's a key factor in his life

19   and, you know, but-for the Hells Angels issue.

20        Well, I submit that the Hells Angels aspect is the most

21   important thing with respect to Mr. Nelson's son.

22        **THE COURT:**  Now, wouldn't that be true of every

23   pledged member of the Hells Angels?  I mean, you can say the

24   same thing about every Hells Angel; their number one allegiance

25   and loyalty is to the Hells Angels above all else.

1       So it seems like under that theory, no one would ever be

2   released if they were a member of the Hells Angels.

3       **MR. BARRY:**  Well, if they are facing VICAR murder

4   charges, yeah, that's correct, Your Honor.  They shouldn't be

5   released.

6       But Mr. Nelson isn't just a member.  I mean, the Court

7   observed multiple times during the last hearing that Mr. Nelson

8   isn't just a member of the Hells Angels.  He is the president.

9       As the Government argued -- and I believe the Court

10  accepted -- the violent crimes of the Hells Angels are

11  Mr. Nelson's crimes.  And, more importantly, Mr. Nelson wasn't

12  just a Hells Angel who by virtue of his membership is

13  responsible for the racketeering acts because he conspired with

14  other members that people would do that.  But Mr. Nelson is

15  alleged to have directly participated in extremely violent acts

16  in assaults, in maimings and the murder of Joel Silva.

17      So it's not just that he is a Hells Angel, but he is the

18  president of the Hells Angels.  So the acts of violence and

19  criminal activity that the enterprise has engaged in and will

20  continue to engage in, he has a direct responsibility for that.

21      Moreover, in terms of the danger of witness intimidation

22  and witness retaliation, it's not just Mr. Nelson's -- the

23  witnesses against him that the Court has to be concerned about.

24      By virtue of Mr. Nelson's role as the president, he is

25  also responsible for making sure that witnesses don't testify

1   against his co-Defendants because they are members of the

2   enterprise of which he is a leader.

3          And let me say that the -- that the -- that the threats to

4   witnesses and the fear that witnesses have is real.  It is not

5   an academic question.

6          In terms of the weight of the evidence, you know, the

7   Court now has the declaration of Jeremy Sheetz where it is --

8   it will be in evidence -- that the Hells Angels do commit acts

9   of reprisal against witnesses.  And I have sat across the table

10  from witnesses in this case who are literally terrified of the

11  prospect of coming forward and giving information against the

12  Hells Angels; let alone testifying at trial.

13         And one of the reasons -- one of the reasons they are able

14  to come forward is because Mr. Nelson is in custody.  Not only

15  are they -- their fears are somewhat assuaged by the reality

16  that he is in custody.  He can't get out to either orchestrate

17  things against them or do things to them personally; but that

18  he is in custody.  And they are what somewhat mollified by

19  that, but they are still trembling when I'm talking to them.

20  They have panic attacks at the idea of testifying.  So it is a

21  real thing, witness intimidation, in this case.

22         So I would argue in terms of the second factor that the

23  weight of the evidence is more in favor of detention now than

24  it was in 2019.  You know, the Defendant has a much better idea

25  of what the case is against him.

1      He knows what overt acts the Government is going to prove

2   up at trial.  He knows that he is named in more acts than are

3   in the indictment.  He knows what the Government's expert will

4   say at trial against him.  He knows sort of the -- more of the

5   scope of the case.  He knows the dozens and dozens and dozens

6   of weapons that will be at issue.  He knows the thousands of

7   rounds of ammunition.  He knows that is the question of the

8   enterprise is going to be established against him.

9      So the strength of the evidence is much stronger -- the

10  weight of the evidence is much stronger now than it was in

11  2019.

12     So the next factor is the nature and circumstances of

13  the -- the history and characteristics of the Defendant.

14     Now, it's good that Mr. Nelson is making use of his time

15  while he is in custody.  But performance -- you know, good

16  performance, no violations in custody or no violations on

17  pretrial release is the baseline.  That is the minimum that is

18  expected.

19     And the fact is that life in custody is much different

20  than life on release.  So if he is out and about in the

21  community not being -- you know, he is not being monitored

22  24/7.  He can have conversations with other people.  He can

23  direct other Hells Angels to do things.  Not just personally.

24     It is not just his own witness intimidation and

25  retaliation that the Government is concerned about.  It is not

1  just whatever criminal acts he will participate in, but it is

2  what will he direct as the president.  What will he have other

3  people do.  How will he impact the community as the president

4  of the Hells Angels, not just a generic member.

5          **MR. GOHEL:**  Your Honor -- sorry --

6          **MR. BARRY:**  And then the nature of the danger to the

7  community posed by Defendant's release is exactly the same as

8  it was when the Court found that he posed a danger to community

9  that could not be mitigated.

10      Again, the Defendant is charged with the most serious

11  crimes under the law.  He is charged with murder, VICAR

12  assault, maiming.  He participated personally in a number of

13  violent attacks on individuals.  And he is a member and the

14  leader of a -- of an organization, a racketeering enterprise,

15  that has violence at its core.

16      You know the Sonoma Hells Angels motto is:  You do us

17  right, we'll do you better.  You do us wrong, we'll do you

18  worse.

19      And the mitigation expert told the Court that Mr. Nelson

20  is a man of his word.  And you can be sure that if he is

21  released, he will do what he can to make sure that witnesses

22  who testify against him will face a grave risk; that they will

23  be intimidated; that they will be acted against.  And no

24  conditions can mitigate that, as the Court has already found,

25  and nothing has changed with respect to danger.

1      **THE COURT:**  What -- but those arguments were made the

2   first time around -- when he was released the first time

3   around, facing not mandatory but potential life, facing

4   murder -- essentially murder charges, murder for RICO.  And he

5   was present.  And all the arguments that you have made other

6   than now that there is mandatory life, there is a super

7   incentive to either do harm to witnesses or to flee; but all

8   the arguments about his leadership, his pledged loyalty, the

9   risk of intimidation to witnesses and threats, all of that

10   existed before.

11      You probably disagreed with the original decision to

12   release Mr. Nelson; but, you know, if it weren't for the

13   superseding indictment and if there weren't any violations, you

14   know, he would still be on release.  The difference is the

15   superseding indictment and, frankly, primarily it was death,

16   capital charge.  We are in a middle zone because it does add

17   something significant, mandatory life.  But 80 percent,

18   90 percent of your arguments were -- had the same force they

19   did even before the VICAR addition.

20      **MR. BARRY:**  Well, Your Honor, but-for the superseding

21   indictment is -- not to be flip -- but it is akin to saying:

22   Well, other than that, Mrs. Lincoln, how did you like the play?

23      **THE COURT:**  Well, it was a serious charge before.

24   It's not like he was charged with, you know, something minor.

25   It was a murder charge all along.

1      **MR. BARRY:**  Absolutely -- there wasn't, Your Honor.

2   There was an allegation that the Hells Angels engaged in

3   murder.  The superseding indictment changed that radically not

4   only in terms of punishment but to say that Mr. Nelson

5   committed a murder.  And that was the game-changing issue for

6   both Judge Laporte and for Your Honor.  It was the charge, not

7   the penalty.  In fact, even the penalty is still mandatory

8   life.  And that is radically --

9      **THE COURT:**  Wasn't there -- I mean, was it not known

10  prior to the superseding that it was going to be asserted at

11  trial and Mr. Nelson was one of the planners of the Joe Silva

12  murder?  I mean, that was -- I assume that was known by

13  everyone from day one.  And it was -- you know, maybe the

14  formalities of not charging VICAR weren't there.  It is not

15  like some new evidence, new surprise, overt act or charge.

16  That was known from day one; right.

17     **MR. BARRY:**  But it is completely different,

18  Your Honor, when it is actually charged.  I mean, the nature

19  and circumstances of the offense are the first factor under

20  3142.

21     And it is a game-changing issue when someone is alleged to

22  say that that murder is part of the deal.  And, yes, we know --

23  we are going to argue that Mr. Nelson participated in the

24  murder of Mr. Silva; but when he is charged with it -- and the

25  allegation is that he did this and a grand jury has found

1  probable cause to assert that he did -- that is radically

2  different than him not being charged with it, and everybody

3  knows that he was a part of it.  That is radically different.

4      And, again, that's what led the Court to find that he

5  posed an unmitigable danger.

6      **MR. GOHEL:**  Your Honor, may I -- point of

7  clarification here?

8          **THE COURT:**  Yeah.

9      **MR. GOHEL:**  Your Honor, this -- I mean, Mr. Barry

10 unfortunately initially said to the Court that the allegation

11 was that the Hells Angels were involved in murder when his own

12 indictment signed under his own name -- the original indictment

13 that Judge Laporte saw and read and advised Mr. Nelson of in

14 paragraph 22 of the original indictment, document number 1 in

15 this case, 22(e) reads:  On or about July 15th, Brian Wendt

16 aided and abetted by Jonathan Nelson and Russell Ott killed

17 Victim One at the Fresno Hells Angels clubhouse, et cetera.

18     There is no doubt -- to answer the Court's question -- and

19 I'm surprised that Mr. Barry has initially told you that it was

20 just an allegation that the Hells Angels were involved in

21 murder and now had to admit that, in fact, it was originally

22 charged.  The reason that that is important is because that is

23 what made the original charges a guideline life case.

24     It was known to everyone.  And the case was not just

25 really serious.  It was extremely, extremely serious, a

1  guideline life sentence from the outset.

2      I would like to make two other quick points, Your Honor,

3  in rebuttal.  One is that, in fact, all of these arguments that

4  Mr. -- and the Court hit the nail on the head.  All these

5  arguments were made to Judge Laporte in not as florid a manner

6  as Mr. Barry is making it.  It was done by one of his

7  colleagues.  But I pointed out in our brief all the places:

8  Transnational organization, involved in murder, a life possible

9  sentence, all of these things were brought up to Judge Laporte.

10  And she released him under conditions and he performed well.

11      The last thing I really have to push back on here, Your

12  Honor, is Mr. Barry has now -- I think improperly -- suggested

13  that my client -- that there are witnesses that have been

14  intimidated by my client.  He is not naming those witnesses.

15  These are witnesses that are unnamed; that I have no idea who

16  they are.  This allegation is absolutely 100 percent brand new

17  to me.

18      And Mr. Barry has witnesses that he is saying that he has

19  talked to who say they are afraid of Jonathan Nelson getting

20  out.  And he has not disclosed to us who these witnesses are.

21  I would request that either Mr. Barry withdraw that argument or

22  I would request that we have a hearing on this to determine who

23  these --

24          **THE COURT:**  I'm not sure he said exactly that.  He

25  said there are witnesses who are very fearful.

1          Did you say, Mr. Barry, that there are witnesses who

2   specifically are fearful about Mr. Nelson's release; Mr. Nelson

3   in particular, not just a general retaliation being ordered but

4   the consequences of his release.

5          **MR. BARRY:**  There are not witnesses who are

6   specifically afraid of Mr. Nelson's release.  There are

7   witnesses who are glad that Defendants are in custody.  There

8   are witnesses who have come forward because the Government has

9   taken action against the Hells Angels, but there are -- there

10  are witnesses who are specifically afraid of Mr. Foakes'

11  release.

12         But I think it is in general that people are afraid of any

13  of the Hells Angels getting out.  And I'm trying to think if

14  someone has mentioned Mr. Nelson as "I'm afraid that he is in

15  custody" or "I'm glad that he is in custody."

16         **THE COURT:**  All right.  Thank you for that

17  clarification.

18         **MR. GOHEL:**  Your Honor, if that's the case, I think

19  that we have a right to have those witnesses presented.  He can

20  not use them as a sword in a bail hearing on a case where my

21  client is facing potential life.

22         **THE COURT:**  Well, he is not --

23         **MR. GOHEL:**  Mandatory life in prison.

24         **THE COURT:**  Mr. Barry did not say that there was a

25  specific fear of -- a specific threat from this particular

1    Defendant.  He said it is a general fear of intimidation

2    generally by witnesses and others.  And, you know, I understand

3    that.  But I don't see that as -- it is not any specific level

4    like where you have perpetrator, and the victim is afraid that

5    the perpetrator is going to get out of prison or get out of

6    jail and not be in custody and do something.  We don't have

7    that level of specificity here.  And I'm not hearing it.

8         **MR. GOHEL:**  Understood, Your Honor.  But I would ask

9    that those arguments be withdrawn or that the Court not

10   consider them.

11        The second thing is we -- unlike rank speculation and

12   reputation for violence and all the things that are attributed

13   and laid at Mr. Nelson's feet -- we have presented specific

14   information about the man.

15        Yes, did we present those exact details of Dr. Selvog's

16   declaration at the original bail hearing in front of Judge

17   Laporte when she did -- you know, after he was remanded?  No,

18   we did not have Dr. Selvog at the time.  This is a byproduct of

19   the mitigation process.  He is an extremely experienced

20   mitigation specialist.  Highly licensed.  Quoted by the Supreme

21   Court.  And the Government has not rebutted any single thing

22   that is said in that declaration.

23        And so we have proffered to the Court in this -- while

24   they may not be new facts about his character -- we have

25   elucidated for the Court specifics about Mr. Nelson's

1   character; individualized things about this man in the screen

2   there that the Court can now consider that it didn't have

3   initially.  And those strongly suggest that he will comply by

4   the orders which include not associating with Hells Angels, not

5   intimidating people, not doing anything other than abiding by

6   the conditions that the Court will set.

7        And, remember, this is a situation where he has his

8   brother's family home at risk that he is not going to do

9   anything to put in jeopardy.

10       I just think that the Government is just throwing out

11  their closing argument to the Court rather than specifics about

12  this individual that the Court should consider.

13           **THE COURT:**  Let me ask.  We have the privilege of

14  having Mr. Granados and Ms. Kinder from Pretrial here.  Do you

15  have any thoughts about whether conditions can be imposed that

16  would sufficiently secure against the risk of the danger to the

17  community and in particular witness intimidation and flight?

18           **MS. KINDER:**  Thank you, Your Honor.  So we believe at

19  this point in time that we do have conditions that may mitigate

20  flight adequately.

21       However, with regard to danger, whether the Defendant

22  remains on the electronic monitoring, either by GPS or RF, we

23  cannot ensure that he won't be a danger to the community.

24  Regardless if we can find out where he is at any given time, we

25  don't know what he is doing during that time.

1        **THE COURT:**  And what kind of monitoring -- you have

2   location monitoring obviously; right?

3        **MS. KINDER:**  That's correct, Your Honor.

4        **THE COURT:**  But you don't have -- other electronic --

5   other monitoring capabilities?

6        **MS. KINDER:**  I'm not certain, Your Honor.  Can you

7   clarify exactly what type of monitoring --

8        **THE COURT:**  Obviously, you don't have wiretap

9   authority?

10       **MS. KINDER:**  No, Your Honor.

11       **MR. NOVAK:**  Your Honor, may I comment on some of the

12  conditions that Pretrial Services recommended to Judge Laporte

13  when Judge Laporte did release Mr. Nelson?  Because I think

14  they actually address exactly what the Court is asking about

15  and what Mr. Barry was arguing is absent.

16      Pretrial Services recommended that --

17       **THE COURT:**  The original -- not the lessening of

18  conditions, the original conditions that were imposed.

19       **MR. NOVAK:**  Yes, Your Honor.  So I'm actually looking

20  at the Pretrial Services report dated September 1st of 2017,

21  which recommended a million dollar bond and 13 specific

22  conditions.

23      And three or four of them relate to this issue of witness

24  intimidation, which I understand the Court is concerned

25  about -- and it may or may not matter what I think -- but I

1  think it's a hollow argument given the importance to Mr. Nelson

2  of being on bond.

3        First -- and I will just start at the bottom -- the

4  Pretrial Services recommendation included that Mr. Nelson not

5  use or have access to any computers or use e-mail.  It could

6  have also included a condition that computers used by people,

7  for example, on his behalf so that he could conduct

8  employment -- I guess, under the scenario maybe his son would

9  do all the communications with clients -- could be searched.

10        So we -- and that's very common at least my experience in

11  other districts.  Search conditions on computers -- even if you

12  are not personally allowed to use one -- and I am confident

13  that the people involved in Mr. Nelson's painting business

14  would authorize those kinds of conditions.  He was only

15  authorized under the Pretrial Services recommendation number 12

16  to have one cell phone and to provide phone records, which I

17  think goes to some distance; but it could also permit the

18  search of his phone.

19        There is GPS monitoring.  And there was what I think

20  Your Honor would call a home detention order at first which

21  said that he could only leave his residence for court, legal

22  and medical purposes.  I would think that we might want to

23  modify that for purposes of employment.  But obviously that is

24  up to the Court.

25        So if he can't leave his home without Pretrial Services

1   knowing exactly where he is going, and he only has one

2   telephone, and he is not allowed to have contact with

3   co-Defendants or other members of the club other than his son;

4   and if he is not allowed to use a computer or even e-mail,

5   these are a broad set of conditions that Pretrial Services --

6   and if Mr. Barry wants to task the FBI on this -- they could

7   follow Mr. Nelson around day and night to see if he is

8   complying with those conditions.

9        THE COURT:  Where -- where has he proposed to stay?

10  He was to reside with his sister.

11       MR. GOHEL:  Yes, Your Honor.  We would request -- I

12  mean, the one modification that we would ask the Court, if the

13  Court would consider release under the original conditions, is

14  that he stay in Santa Rosa with his son at the Healdsburg

15  address.  That is still where his son lives, and that is a

16  location where he can go to work because all of the work that

17  he has is in Sonoma County.  And I think it will be the easiest

18  for him to -- so that is the one condition I would ask that the

19  Court consider.

20       THE COURT:  Well, that -- the disadvantage of that is

21  that with his sister, she served as a third-party custodian

22  with reporting duties to ensure, for instance, that he doesn't

23  have another phone; he doesn't have access to computer, et

24  cetera, et cetera.

25       And so if you are proposing -- I understand why you are

1   proposing it, but that suggests there is no custodian.  And

2   that could be problematic.

3        **MR. BARRY:**  Your Honor, this is Kevin Barry again.

4   All of those conditions that were just discussed are completely

5   toothless because Mr. Nelson's son is a Hells Angel.  The

6   notion that well, he can't associate with Hells Angels except

7   his son.

8        His son can get a smart phone from a store that is not

9   linked to Mr. Nelson and bring it over to his sister's house

10  any time he wants.

11       I mean, the idea that -- that Mr. Nelson is going to

12  supplant his loyalty to the Hells Angels to follow the Court's

13  orders and not have his son carry out his orders or direct

14  other people to do things for him, you know, everything that

15  the Court has in evidence about the Hells Angels mitigates

16  against that.

17       And the -- you know, it's -- those conditions are

18  completely unenforceable because of, you know, his son who is a

19  Hells Angel.  And to say that they can't talk about the case or

20  they can't talk about the Hells Angels, again, there is no way

21  to monitor that.  There is no way to ensure that that takes

22  place.

23       Even a non-association condition with any Hells Angels,

24  you know, is still subject to workarounds.  But especially

25  here, you know, when his son, who is a member of the Hells

1    Angel family, can have free access to Mr. Nelson with whatever

2    devices, whatever e-mail, whatever forms of communication --

3    and they don't even need a phone.  All Mr. Nelson has to say

4    is, you know, just speak to his son and get the word out.

5          **THE COURT:**  Well, if you want to do that now -- I

6    understand that they are monitoring the jail and all that --

7    but we know that the -- we know that people run all sorts of

8    stuff out of the jail and people -- I mean, if one wanted to

9    direct a son or an associate or somebody else -- you really are

10   that determined to do it -- unfortunately, I -- I'm afraid that

11   our jails are not 100 percent secure in that regard anyway.

12        So, you know, yes, there is a difference being out.  And I

13   understand.

14         **MR. NOVAK:**  But this is a case, Your Honor -- I think

15   as the Court is pointing out -- where Mr. Nelson's

16   communications other than those of Counsel have been monitored

17   for a significant period of time.  And at least it is my

18   experience, that in a RICO case where there are allegations of

19   violence, the Government regularly asks the jail to provide

20   whatever non-privileged communications are available.  And we

21   frequently see that in discovery.

22        And I would point out that there is nothing in this case

23   that suggests that Mr. Nelson has ever made a phone call or

24   sent an e-mail or asked somebody to do anything that would bear

25   on witness testimony or this case.

1    **THE COURT:**  Well, that sort of cuts both ways.

2    Mr. Barry can come back and say well, that's because he is

3    being monitored.  Once we let him out, he is no longer

4    monitored and subject to every non-privileged call being

5    listened into, you know, a lot of mischief could happen.

6        **MR. GOHEL:**  I am sure that if Mr. Nelson

7    hypothetically asked somebody to give somebody a message, one

8    of Mr. Barry's witnesses -- we would hear about that in the

9    flash of an eye.  Because what Mr. Barry is saying is that

10   there is this level of vigilance out there.

11       So I think the conditions that Pretrial Services

12   originally recommended were not about flight.  They actually

13   were about a danger to specific witnesses.  And Mr. Nelson was

14   out of custody for nine months, and there was never a report of

15   him trying to get a message to a witness, was there?

16       **MR. GOHEL:**  And I was going to add that, Your Honor,

17   we have proof of both him in and out, nine months, facing

18   charges where there were victims that were pretty obvious who

19   they were to Mr. Nelson.  And there was no incidents whether in

20   or out.

21       And I would also -- with respect to where he stays should

22   the Court consider releasing him, if the Court is not

23   considering releasing him to the residence in Healdsburg where

24   his son lives --

25       **MR. NOVAK:**  Santa Rosa.

1        **MR. GOHEL:**  Santa Rosa.  I'm sorry.  His brother is

2    probably a more viable alternative in the sense that it is

3    still in the area where all the painting work is.  It is in

4    Healdsburg, and it is the actual -- he can be a surety and a

5    custodian.  I think that would be a little bit more workable.

6        I think the South Bay is not as workable.  We will work

7    with whatever the Court orders should he be released.  But I

8    think the address -- the residing with his brother would be a

9    second best alternative.

10       **MR. NOVAK:**  Your Honor, I would just like to say one

11   more thing -- and I apologize if the Court feels like we are

12   double-teaming -- but I think this argument about a conspiracy

13   to murder is different from a VICAR count is what I think

14   people call an inside the beltway argument.

15       I mean, the idea that a Defendant would be convicted at

16   trial of a RICO homicide; and then the Court would exercise its

17   discretion under 3553, I mean, that's a -- to impose a sentence

18   below the guideline where the Government is going to argue that

19   Mr. Nelson played a leadership role and he is alleged, you

20   know, it's just -- I really think that that is not something

21   that figures into a Defendant's calculation.

22       Oh, you know, under the first indictment, you know, I can

23   count on a judicial officer giving me a short enough sentence

24   that my calculation about, you know, sacrificing my family's

25   multi-generational home was different than after a VICAR

1    charge.  I just think it's what lawyers and -- probably not

2    judges but what lawyers think about and not what people in

3    Mr. Nelson's situation think about.

4         **THE COURT:**  Let me ask Pretrial about the conditions

5    and what Mr. Novak pointed out to about not having access to

6    computers.  And I assume that there is a search condition that

7    would allow you to search to see whether, in fact, that that is

8    being complied with; that his offer that computers used -- for

9    instance, if there is others in the household -- might be

10   subject to search, that the cell phone, the phone limitation

11   and the access to records of that cell phone and potential

12   search, do any of those -- what is your view of how effective

13   that can be?

14        **MR. GRANADOS:**  Your Honor, this is Anthony Granados

15   from United States Pretrial.  We are particularly limited at

16   this time due to the COVID-19 pandemic with regard to doing

17   in-home visits; particularly something as extensive as a

18   search.

19        Our normal course of supervision, we would see all

20   individuals who are monitoring at least every 30 days in the

21   home.  We would typically conduct thorough in-home visits.

22        In the current pandemic for the safety of our officers and

23   for the safety of the Defendants and the community at large,

24   much of our community contact is done via virtual platform.

25        So it is unrealistic at this point to believe that we

1    would be able to conduct any physical inspections of the

2    residence or anything of that nature.

3          **THE COURT:**  Can you think of any other way with

4    consenting to conditions that you could monitor computer use,

5    cell phone use?

6          **MR. GRANADOS:**  Generally speaking, what we would like

7    to do at this point -- particularly with the pandemic -- is to

8    involve somebody who would be willing to be a good third-party

9    custodian.

10          So if Mr. Nelson had somewhere where he could reside,

11    where there was somebody that we felt was reliable -- probably

12    somebody unrelated to the Hells Angels Motorcycle Club -- that

13    would be willing to ensure that he does not have any other

14    electronics or access to electronics; that any other computers

15    in the home would be password protected, that would probably be

16    our best bet at this juncture.

17          **THE COURT:**  And from the past experience, would his

18    sister fit that bill?

19          **MR. GRANADOS:**  During my two months of supervising

20    Mr. Nelson, while he was residing with his sister, she was very

21    responsive and cooperative.  I believe that she -- I haven't

22    had any dealings with her for a couple of years.  But at least

23    during that time, she would probably fit that bill, yes.

24          **MR. BARRY:**  Sorry, Your Honor.  I just think it is

25    unrealistic to expect that the sister will monitor what

1   Mr. Nelson's son brings into the home.  She is not going to

2   monitor what they are talking about.  She is not going to

3   search him for non-searchable or non-reported cell phones.  And

4   especially, you know, is she going to do that if finding that

5   out results in the loss of her home.

6        So it is an unworkable situation.  I mean, he effectively

7   would be released and unsupervised.

8            **MR. GOHEL:**  Your Honor, first of all, it is not her

9   home.  It is her -- his brother's home.  And I would suggest --

10  again, sister is fine.  Whatever the Court decides -- the

11  brother, he has no criminal record.

12       Mr. Nelson -- I would propose if the Court were not to

13  allow him to live with his son -- he could live with his

14  brother, who is a custodian, whose home is the home that is

15  being -- I would take the other argument.  He is going to make

16  sure Mr. Nelson is not doing anything because the home that he

17  and his three children live in, young children, would be

18  subject to potential forfeiture should there be a violation.

19       So I think that that would be probably the most

20  appropriate person and, again, would allow Mr. Nelson at least

21  to go from Healdsburg to work in Sonoma County.

22           **MR. NOVAK:**  And he is not a member and he never has

23  been.

24           **THE COURT:**  If there is a release, it would not start

25  off with being able to go out and work initially.  And the

```
 1   contact with his son, we would have to visit with that.

 2        I understand how important that is, but that -- given the

 3   affiliation, that there would have to be some restriction on

 4   that.

 5             MR. GOHEL:  Understood.

 6             THE COURT:  What is -- here is what I'm going to do.

 7   I would like Pretrial to look at these conditions.  Think about

 8   what can be done.  I understand Mr. Barry's arguments, and I

 9   share his concerns.

10        On the other hand, nothing is 100 percent.  Even being in

11   jail isn't 100 percent.  People operate all sorts of operations

12   even in penitentiaries.  The whole idea is that -- we are told

13   time and time again with respect to various street gangs --

14   Surenos and Nortenos -- that shots are being called by the big

15   guys inside still.

16        So the idea that somehow there is a -- to be realistic

17   that if somebody wanted to do something, unfortunately, it

18   appears -- and the Government has argued this in many, many,

19   many gang cases -- that stuff, it is very difficult to control.

20   It is more control for the reasons Mr. Novak stated, but it is

21   not perfect.  So nothing is perfect.

22        And I have to weigh the risks here.  And part of that risk

23   assessment is that -- I mean, Mr. Nelson is facing very serious

24   charges, potential life -- and I presume he knew that --

25   performed well during his nine months -- and the fact that
```

1    he -- you know, he has been compliant during his incarceration

2    of last year, I think is a plus.

3        On the negative side, he is facing a VICAR charge, a

4    murder charge, which means mandatory life.  So whatever

5    incentive there was is enhanced to a certain extent with

6    respect to whether there is witness intimidation or flight.

7        But I want to explore the idea of imposing enough

8    restrictions -- and it is unfortunate we are in this COVID

9    restriction because that does take away some tools that

10   Pretrial would normally have -- but, perhaps, with a

11   third-party custodian that pretrial vets, is comfortable with,

12   with the conditions and knowing that whoever is in charge with

13   respect to supervising Mr. Nelson -- if he is released -- if

14   there is not performance, then that risks, you know, either

15   their homes or their sibling's home or families and to ensure

16   that there is enough at stake here.

17       But I want Pretrial -- because they have not been involved

18   until just really today -- in looking at serious conditions

19   that there are -- if there is going to be a possibility of

20   release, what those conditions will be.

21       So what I would like to do is have Pretrial do some

22   further investigation and vet whether it is the sister or the

23   brother that -- they seem to be the two candidates at this

24   point unless you can come up with something else or think of

25   somebody else -- has to be not affiliated with the Hells

1   Angels.  There has got to be enough distance.  They have to be

2   responsible, responsive and have something in the gain --

3   something at stake here to ensure that they are going to carry

4   out the restrictions if Mr. Nelson is going to be released.

5        So that's what I'm going to do is ask for a supplemental

6   report from Pretrial.  And I understand you are very busy.  And

7   I don't want to impose on you.  This is a very important

8   matter.  I am going to ask you to do that.  And then call for a

9   further continuation of this hearing for -- I don't know if you

10  need three weeks or how much time you need given your workload.

11        **MR. GRANADOS:**  Your Honor, we can have something by

12  next week.

13        **THE COURT:**  All right.

14        **MR. BARRY:**  Your Honor --

15        **THE COURT:**  Yeah.

16        **MR. BARRY:**  This is Kevin Barry.  If we could defer it

17  for three weeks, I think as a practical matter, that might be

18  beneficial.  Because if there is a release order and if there

19  is an appeal, we don't want to interfere with the expert

20  process.  Because if the notice of appeal divests the Court of

21  jurisdiction, I want Mr. Nelson to be able to participate in

22  the expert issue without -- without having the detention issue

23  sort of mess with that.

24        So if the Court could defer it for three weeks -- and

25  also, you know, we will know -- we should have a decision

1    whether a release order will be appealed within that time as

2    well.  So as a practical matter, I just wonder if the Court

3    would stick with the original three-week --

4         **THE COURT:**  I didn't get your last point.  You would

5    know, what, if the release order is going to be appealed?

6         **MR. BARRY:**  Exactly.  I can assess whether the office

7    would appeal a release order.

8         **THE COURT:**  I see.  You can make an internal decision

9    what you are going to do.

10        **MR. BARRY:**  Yes.

11        **THE COURT:**  I see.

12        **MR. NOVAK:**  Your Honor, I don't believe -- I may be

13   wrong, but I don't believe the Government's appeal of a release

14   order divests the Court of jurisdiction such that it could not

15   conduct an evidentiary hearing.

16        **MR. BARRY:**  Your Honor, I'm not an appellate lawyer.

17   I'm just trying to troubleshoot a potential problem.

18        **THE COURT:**  Well, let's do this:  Part of it depends

19   on the scheduling of Santa Rita as well.  If we do it two weeks

20   from now, the problem is if it is a Friday, we have got our

21   potential hearing; perhaps, the third leg of our Daubert

22   hearing in that afternoon already.  So that kind of blows that

23   afternoon.

24        **THE CLERK:**  Your Honor, we do have an available slot

25   from Santa Rita on September 4th at 2:00 p.m.

```
 1            THE COURT:  All right.  Well, I think we are going to

 2   have to do that because two weeks from now, when we might have

 3   this, we have the other hearing.

 4        And -- well, on the other hand, Mr. Nelson will be here

 5   actually.  He will be live.  We have that hearing.

 6            MR. NOVAK:  On the 28th.

 7            THE COURT:  On the 1st.  That's the third date.

 8            MR. NOVAK:  Oh, I see.  Yes.

 9            THE COURT:  That's our third date.  And if not, we

10   could have him brought -- well, if not --

11            MR. GOHEL:  Your Honor, we would assent to Zoom even

12   if he is in the jail.

13            THE COURT:  Yeah, we would have to see whether we

14   could get time from the jail.

15            MR. GOHEL:  No, but I think he will be -- I think the

16   way it works -- actually, I don't know.  But for the Daubert,

17   are the Defendants, in custody, going to be at the Federal

18   building even though they are not in the courtroom, per se?

19            THE COURT:  Yeah.

20            MR. GOHEL:  So I think we could work something out

21   where -- and, you know, I can talk to Mr. Novak and perhaps we

22   could -- I don't want to necessarily waive his appearance.  I

23   think there is a way we could fashion it so that he could be

24   apprised of what the Court's decision is on the 1st.

25        I mean, we would like to do this -- one other request is I
```

don't want to jam Pretrial; but if they could finish it next
week, I think the sooner we get it -- and if they need a little
bit more time -- but the sooner we get it, the earlier we can
all -- both the Government and us -- assess how we proceed with
respect to whether the Government wants to do an appeal and for
us what our -- you know, get our ducks in a row for the Court's
final decision.

THE COURT:  Well, I think it is complicated because we
have got other hearings.  And they may be here; but, you know,
I think we should just set this specially.

THE CLERK:  Your Honor, we only have a three-hour
limit in the courtroom.

THE COURT:  Yeah, that's the other problem.  So I'm
going to set it for the 4th.  I understand that, you know,
that's some delay beyond what you want.  But we have got to get
this right, and I want the information.  And I don't want to
jam Pretrial.  I want to make sure that I get the full
information before I make a final decision.

And, unfortunately, because we have other hearings, I
can't squeeze it in in two weeks, which would be the ideal
time.  So we will do it on the 4th.

THE CLERK:  We may also have another potential date
that is being given to me.

THE COURT:  Oh, what is that?

THE CLERK:  Diana is letting me know.  September 4th

 1   time would be at 2:00 p.m.

 2          **THE COURT:**  Okay.

 3          **THE CLERK:**  There is also August 26th at

 4   2:30 available.  That coincides with our critical calendar.

 5          **MR. GOHEL:**  Your Honor, we would -- sorry.  We would

 6   prefer that.  I think that's enough time for Pretrial.  I don't

 7   want to speak for them.

 8          **THE COURT:**  Well, the problem is I have got -- I have

 9   got several matters.  I have got eight matters -- seven matters

10   on that day.

11          **THE CLERK:**  And there is also another prison video

12   conference on that day.

13          **THE COURT:**  Yeah, so that would be a problem.  We are

14   going to have to do it on the 4th.  I mean, that's the best we

15   can do.

16          **MR. GOHEL:**  Your Honor, would the Court mind just --

17   ad hoc right now -- ordering me present?  I have another matter

18   in state court, a serious preliminary hearing.  But if you

19   order me present, I know I will be available for this.

20          **THE COURT:**  You are ordered present.  We will note

21   that for the record.  2:00 o'clock on the 4th.

22          **MR. GOHEL:**  Thank you, Your Honor.

23          **THE COURT:**  And I would like, you know, Pretrial to

24   have a full opportunity to look at all the matters that I have

25   asked and to re-interview all the sureties and make sure they

```
 1  are on board too.  I want to make sure of that.

 2          MR. GOHEL:  And I will -- if they -- if Pretrial

 3  doesn't have the contact information, I will make sure they

 4  have that information.

 5          MS. KINDER:  That would be great.  Thank you.

 6          THE COURT:  All right.  Thank you.  So we will adjourn

 7  this proceeding and reconvene on the 4th.

 8          MR. NOVAK:  Thank you for your time.

 9          MR. GOHEL:  Thank you, Your Honor.

10          MR. BARRY:  Thank you, Your Honor.

11          MS. KINDER:  Thank you, Your Honor.

12              (Proceedings adjourned at 3:49 p.m.)

13                      ---oOo---

14

15

16

17

18

19

20

21

22

23

24

25
```

## CERTIFICATE OF REPORTER

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:    Saturday, August 22, 2020




_____

Marla F. Knox, RPR, CRR
U.S. Court Reporter