UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

USA,

           Plaintiff,

    v.

JONATHAN JOSEPH NELSON, et al.,

           Defendants.

Case No.  17-cr-00533-EMC   (SK)

**REDACTED REPORT AND RECOMMENDATION REGARDING ORDER TO SHOW CAUSE AND MOTION FOR CRIMINAL CONTEMPT**

Regarding Docket Nos. 1208; 1763, 1883, 1884

      The Undersigned issues the following report and recommendation regarding an order to show cause (Dkt. 1391) to George Boisseau ("Boisseau") to respond to a concern that he violated the terms of the Protective Order in this matter.  This Order supersedes the previous Order (Dkt. 1869) on this issue. This Order also disposes of Boisseau's motion to clarify and for stay.  (Dkts. 1882, 1884.)

      The United States asserts that Boisseau, who is counsel for Defendant Raymond Foakes ("Foakes"), violated a protective order in this case that was put in place to protect sensitive information, including the identities of confidential informants in this case.  (Dkt. 517, known as the "AEO Protective Order").  The United States alleges that the violation resulted in the disclosure by Monique Isom ("Isom"), Boisseau's employee, of the name of a confidential informant, to third parties.  (Dkt. 1208.)  In order to understand the allegations, a long explanation of the people involved, their shifting alliances, and the procedural history, is required.

/ / /

United States District Court
Northern District of California

## Factual Background

The events of this matter stem back to 2016 and contain a large cast of characters. In order to understand the convoluted history and the shifting alliances between and among various witnesses, a chronological summary of facts preceding the evidentiary hearing and during the evidentiary hearing is necessary.

**A.** ███████████████████████

███████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

███

**B. Indictment in Federal Court**

The United States first charged 11 defendants in this case in a sealed Indictment on October 10, 2017. (Dkt. 1.) Foakes was one of the defendants in that indictment. (*Id.*) The allegations of the indictment were that the defendants were members of the Hells Angels Motorcycle Club, Sonoma chapter, and that they were engaged in a racketeering enterprise to commit crimes. (*Id.*) Specifically, the indictment listed crimes including murder, "maiming," assault, robbery, extortion, intimidation of witnesses, bank fraud, and money laundering. (*Id.*) ██

████████████████████████████████████████████

██████████ Boisseau was not Foakes' original lawyer but was appointed by the District Court to represent Foakes in November 2017. (Transcript ("Tr.") 1059-1060.)

United States District Court
Northern District of California

### C.  First Protective Order and Unsealing of Indictment

On March 23, 2018, the first protective order was entered in this case.[1]  (Dkt. 232.)  That protective order (the "Initial Protective Order") provides protection for "Protected Materials" and requires, among other things, that all individuals other than defendants and defense counsel, "prior to receiving access to" Protected Materials must sign a copy of the Order acknowledging that they reviewed the order, understood it, agree to access the Protected Materials only for the purpose of preparing a defense, and understood that failure to abide by the Order might result in sanctions. (*Id.*)

A superseding indictment was filed and unsealed on September 11, 2018.  (Dkt. 374.)

### D.  Chelsea Rose's Employment with George Boisseau

In the fall of 2018, Chelsea Rose renewed her acquaintance with Boisseau.  (Tr. 396.) Boisseau had briefly represented Rose when she was charged and convicted of a federal felony approximately 20 years earlier.  (Tr. 396, 1082.)  Rose and Boisseau began speaking again in 2018 because Rose wanted to expunge her conviction.  (Tr. 396, 1082-1083.)  Although Boisseau could not help Rose do so, they discussed founding a non-profit organization highlighting the injustice of the system of criminal justice.  (Tr. 397.)  Rose's financial situation at that time was dire.  (Tr. 432.)

#### 1.  Initial Introduction of Monique Isom to Boisseau

In November 2018, Rose, Boisseau, and Rose's friend Monique Isom met for drinks on Rose's birthday.  (Tr. 441.)  Isom and Rose had been friends from childhood, with a lapse of their friendship between 2002 and 2016.  (Tr. 409.)  Isom had also been convicted of a federal felony, along with Rose, after Isom pled guilty, in either 1998 or 1999, and Boisseau was familiar with Isom's criminal history.  (Tr. 66, 86-87, 271.)

Both Rose and Isom were in conflict over child custody and division of assets with their former partners.  (Def. Ex. 49, 69, 106, 109. 432.)  At the meeting in November 2018, Isom told Boisseau "what a pain in the side" her former partner Earl Kennedy was.  (Tr. 441.)

---

[1]  During the evidentiary hearing, there were references to this as the March 2018 protective order.

### 2. Chelsea Rose's Work Experience and Education

Rose had no experience working in a law firm and no education to prepare her for a job as a legal assistant. (Tr. 398, 402.) She had attended junior college for approximately two and a half years. (Tr. 398.) She had worked for many years running a trucking company with her former partner. (Tr. 432.)

### 3. Rose's Work for Boisseau

Boisseau asked Rose to work with him on criminal matters, and he sent Rose some documents via email to review in November and December 2018. (Tr. 399, 1063.) Rose began "work in [Boisseau's] office" in November and December of 2018. (Tr. 68.)

Rose's first day "on payroll" with Boisseau was January 1, 2019. (Tr. 68, 1063.) Rose worked as a legal assistant or paralegal for Boisseau, and, as part of her job, Rose reviewed discovery in this matter. (Tr. 403.) From January 1, 2019 to the spring of 2019, Rose and Boisseau were the only people working in Boisseau's office. (Tr. 458.) Boisseau's office contained one room for Boisseau and another room for his paralegal. (Tr. 458.) Boisseau's office had an internal lock that was separate from the lock to enter the building. (Tr. 459.) Boisseau's office was located in a building with other lawyers who shared a receptionist. (Tr. 458.) Rose's work with Boisseau was flexible, as she was paid full-time, but she had permission to work from home and attend events for her children on a regular basis. (Tr. 401.)

Rose never signed the Initial Protective Order (Dkt. 232.) (Tr. 405, 1071.)

### 4. Rose's "Personal Relationship" with Boisseau

Boisseau testified that he and Rose had a "personal relationship" from the fall of 2019 to April of 2019.[2] (Tr. 1083.) Although Rose testified that there was no romantic relationship with Boisseau, there is evidence that Rose reciprocated some of his feelings or at least pretended to do so. (Tr. 399; Def. Exs. 76, 78, 79, 89, 90. 115, 116, 117, 118, 125.) Boisseau gave Rose gifts of jewelry and also paid for some of her expenses, in addition to her salary, and paid tuition for

---

[2] It appears that Boisseau meant to say that he had a personal relationship with her from fall of 2019 to April of 2020, since Boisseau also testified that he had not seen Rose between the year 2000 and August or September of 2019. (Tr. 1082.)

United States District Court
Northern District of California

aesthetician/cosmetology school at a later time (discussed in more detail below). (Tr. 1084, 1086.)

**E.  Attorneys' Eyes Only Protective Order**

In addition to the Initial Protective Order (Dkt. 232), because of the existence of confidential informants in this case, the Court entered another protective order – the AEO Protective Order - for "Attorneys' Eyes Only" materials on January 10, 2019. (Dkt. 517.) The AEO Protective Order specifically provides that the United States can designate certain materials as "AEO," and only certain individuals – not defendants - can review those materials or have access to that information. (*Id.*) The AEO Protective Order also states that the approved individuals cannot discuss the "content/substance of those materials" with the "defendants or anyone else not approved to review the materials." (*Id.*)  The AEO Protective Order also provides: "Examination of ATTORNEYS-EYES-ONLY MATERIALS" shall be done in a secure environment which will not expose the materials to other individuals listed above." (*Id.*)  The AEO Protective Order also provides that, before gaining access to the AEO materials, individuals other than defense counsel "shall sign a copy" of the AEO Protective Order acknowledging that they had reviewed the AEO Protective Order, understand its contents, and agree to access the AEO materials only for the purpose of preparing a defense, and that they understand that failure to abide by the terms may lead to sanctions. (*Id.*)  The AEO Protective Order requires defense counsel to keep the signed copies and that the signed copies "shall be made available upon request under seal to the Court." (*Id.*)

It is undisputed that Rose never signed the AEO Order, but Boisseau testified that she did not have access the AEO materials. (Tr. 77.) Rose testified that she had access to the AEO materials. (Tr. 422.) Boisseau did not train Rose on the procedures for adhering to AEO material, but one time early in 2019, he placed a file on her desk and told her that the material was "attorneys eyes' only" from this case. (Tr. 405.) There was no follow-up discussion to that statement and no training or explanation of the term. (Tr. 406-407.) Rose assumed that anything she learned in Boisseau's office was confidential and treated all information as confidential. (Tr. 406.)

/ / /

United States District Court
Northern District of California

5

**F.  Production of AEO Materials in February 2019**

In February 2019, the United States produced some materials, stamped as "attorneys' eyes only" under the AEO Protective Order.  (Tr. 1070.)  That information did not identify the confidential informant in any way. (Tr. 1071.)

Boisseau testified that Isom did not have access to those materials.  (Tr. 62-63.)

**G.  Rose's and Boisseau's Meeting with Foakes**

In February 2019, Rose and Boisseau met with Foakes in "lockup" in the federal building located at 450 Golden Gate Avenue, San Francisco, California.  (Tr. 1081.) ███████████

████████████████████████████████████    ████████████████████

████████████████████████████████████████████████████

Boisseau denied that the conversation took place.[4]  (Tr. 1081.)

**H.  Rose's Protective Order against Kennedy**

In April 2019, Rose obtained a restraining order against Kennedy (Isom's former partner) because Kennedy had slashed Rose' tires.  (Tr. 441-442.)  The parties had stipulated to the terms, and Kennedy agreed not to contact Rose. (Def. Ex. 53.)  That order expired by its terms on April 2, 2021.  (*Id*.)  Boisseau was Rose's attorney for that matter.  (Tr. 442.)

**I.  Isom's Employment with Boisseau**

Isom began working for Boisseau on May 1, 2019, her official first day on payroll.[5]  (Tr. 16.)  She worked as a legal assistant to Boisseau, and part of her job was to review materials produced by the United States.  (Tr. 85.)  Before her employment with Boisseau, Isom had spent many years running a roofing and sheet metal company and had no experience as a legal assistant or paralegal.  (Tr. 88.)

---

[3] As a reminder, Kennedy was Isom's former partner, not Rose's former partner.
[4] The Undersigned makes no finding on the issue ████████████████████ ████████████████ because this statement is not the subject of the OSC.  The reason the statement is relevant is that it created a potential motive for Kennedy to lie to the FBI, as discussed in more detail below.
[5] Boisseau submitted a declaration in the dispute over child custody between Rose and her former partner in which he claimed that he had hired Isom in March 2019. (Def. Ex. 4.)  Isom apparently did some informal work in setting up computers for Boisseau before May 2019.  (Tr. 63.)

Rose did not provide training to Isom and did not see Boisseau's providing training to Isom. (Tr. 410.) Boisseau testified that Isom did not have access to any "protected information" in this case before she signed a protective order. (Tr. 64.)

Between May and July 2019, there were only three people working in the office: Boisseau, Rose and Isom. (Tr. 73.) Isom did not sign the Initial Protective Order (Dkt. 232) in this matter. (Tr. 62.) Rose and Isom, during the time that they worked together, traded off days so that each could spend time with her own children. (Tr. 413.)

### 1. Documents Stamped with Isom's Initials or Signature

There are two documents dated May 19, 2019. Isom's signature is on the draft AEO Protective Order (that was not signed by the Court or any lawyer). (Gov. Ex. 4.) Isom's signature is also on the signed, actual AEO Protective Order that the Court signed. (Gov. Ex. 4A.) Boisseau did not see Isom sign the AEO Protective Order. (Tr. 16-17.) The circumstances of the discovery of the second signed document dated May 19, 2019 (Gov. Ex. 4A) are discussed in more detail below.

### 2. Storage of AEO Materials

Isom testified that the AEO materials were kept in a locked file cabinet to which Isom, Boisseau and Rose had access. (Tr. 102; Def. Ex. 92.) Initially, Isom testified that here was only one key to the cabinet of AEO materials (Tr. 276), but later she testified that there were two keys, one of which Boisseau kept and one of which Rose initially held and later transferred to Isom. (Tr. 992.) Isom agreed that, when Rose has one of the two keys to the locked cabinet, she had access to the AEO materials. (Tr. 992.) Rose testified that there was never a file cabinet with a lock for storing AEO materials and that she never saw a key just for locked AEO materials. (Tr. 460-461.)

### J. Rose's Involvement with Boisseau's Office in Summer of 2019 to November 2019

Rose's involvement with Boisseau's office in the summer of 2019 to November 2019 defies categorization. It is not clear if she was an employee, consultant, or non-employee. After Isom began working with Boisseau, Rose decreased her hours over time and eventually stopped going physically to Boisseau's office. (Tr. 413, 983.) Her last day on "payroll" was July 1, 2019.

United States District Court
Northern District of California

(Tr. 1087.)  Rose described her role between July 1, 2019 and November 1, 2019 as a "consultant."  (Tr. 413.)  After her work in the office ended, Rose began aesthetician or cosmetology school, and Boisseau provided her with funds for tuition and some money for expenses.  (Tr. 432, 1085-1086.)  Boisseau testified that the funds were a loan.  (Tr. 1085-1086; Def. Ex. 4.)  Rose characterized the funds as a gift.  (Tr. 432.)

In Boisseau's declaration that he submitted in the dispute between Rose and her former partner, he stated that Rose left his office "voluntarily" on July 15, 2019, that she was put back on payroll temporarily at $1,000 on September 1, 2019 so that she could get health insurance. (Def. Ex. 4.)  He stated that he terminated that employment relationship, effective November 1, 2019. (*Id*.)

After Rose's last day "on salary" of July 15, 2019, only Boisseau and Isom worked in the office.  (Tr. 73.)

**K.  Production of AEO Materials on August 30, 2019**

On August 30, 2019, the United States produced materials that were labeled as "Attorneys' Eyes Only."  (Govt. Ex. 2.)  The materials included reports of the FBI's contacts with a "CHS" or "cooperator."  (*Id*.)  The term "CHS" refers to a "confidential human source."[6]  The United States sent the materials to the discovery coordinator in this matter, and the discovery coordinator then sent the materials on a disk to defense counsel that could not be copied and that could not be downloaded.  (Tr. 56.)  No one could identify the specific date that Boisseau received the AEO materials that the United States produced on August 30, 2019.  (Tr. 55.)  Isom testified that she received the AEO materials in "late August, 2019."  (Tr. 100.)  On her second day of testimony after a gap of a few weeks, Isom testified that she received the materials "approximately the end of September."  (Tr. 991.)  Boisseau testified that his time records (not produced in this matter) show that the first date he reviewed the AEO materials was September 16, 2019 and that he believes that he was the first person to review them.  (Tr. 1072.)  Isom reviewed the AEO materials in this case. (Tr. 100, 1074-1075.)

---

[6] For purposes of this order, the term "confidential informant" is used.

The AEO documents included materials in the form of summaries of interviews which identified the confidential informant ████████████ in this case. (Gov. Ex. 5.) The AEO documents did not list the confidential informant's name but included sufficient detail that a defendant in this case could easily identify the person and note the fact that the person was cooperating with federal agents in this case ████████████████████████████████████████
████████████████████████████████

Isom testified that the AEO materials produced on August 30, 2019 were the first AEO materials she saw in this case. (Tr. 991.) Isom testified that, before she received the AEO materials in September 2019, Isom had guessed the identity of the confidential informant based on "speculation." (Tr. 118.) During the time that Isom worked with Boisseau, she reviewed ████
████████████████████████████████████. (Tr. 986.) Isom testified that Boisseau told her at the time that ████████████████████████████████. (Tr. 989.) Boisseau also testified that he discussed this report and his belief that ████████████████████
████████████████ with Rose and Isom, separately. (Tr. 1062.) After Isom reviewed the AEO materials, she realized that she had correctly guessed the identity of the CHS. (Tr. 118.)

### L. Isom's Disclosure of Confidential Informant's Identity to Other People

#### 1. Isom's Disclosure of Confidential Informant's Identity to Carrie Zanoline

In September 2019, Isom met Carrie Zanoline and Sarah Bernhard (aka Kenworthy) at Steelhead Beach. (Tr. 523.) Isom told Zanoline of the identity of the confidential informant ████████████ (Tr. 524-525, 542.) Bernhard remembered meeting Zanoline at Steelhead Beach in mid-September 2019. (Tr. 154, 156.) She also met someone named "Monique" who was a friend of Zanoline, and the physical description of the person she met matches Isom. (Tr. 154.) Bernhard could not hear Monique and Zanoline talking but knew that they were talking about a legal proceeding. (Tr. 154.) In contrast, Isom testified that she never met Bernhard. (Tr. 998.) Isom denied telling Zanoline of the identity of the confidential informant. (Tr. 114.)

#### 2. Isom's Disclosure of Confidential Informant's Identity to Rose

Rose testified that, either on the day that Isom received the materials or shortly after that, Isom went to Rose's house and told her everything she had seen in the AEO materials. (Tr. 418.)

Rose testified that Isom told her that the AEO materials confirmed the identity of the confidential informant and specifically provided the name of the confidential informant to Rose. (Tr. 419. 427-428.) Up until that time, Isom had speculated about the identity of the confidential informant, and when she told Rose who the confidential informant was, Isom seemed "proud that she was right." (Tr. 685.) At that time, Rose considered herself as part of the defense team and did not think it was inappropriate for Isom to share that information with her. (Tr. 417.) Rose testified that she did not share the name of the confidential informant with anyone other than Isom, Boisseau, and Officer Jonathan Crespan of the Santa Rosa Police Department (described in more detail below). (Tr. 419-420.)

Isom denied telling Rose the identity of the confidential informant. (Tr. 126.)

### 3. Zanoline's Discussion with Rose

A "couple of" days after Zanoline saw Isom at Steelhead Beach, Zanoline told Rose that Isom had revealed the identity of the confidential informant. (Tr. 423-426, 554.) Zanoline questioned whether it was appropriate for Isom to reveal the identity of the confidential informant. (Tr. 554.)

### 4. Isom's Disclosure of Confidential Informant's Identity to Joe Vassallo

About a month after the disclosure at Steelhead Beach, Isom also went to the house of Zanoline's partner, Joe Vassallo, and talked about the confidential informant by name in front of Zanoline and Vassallo.[7] (Tr. 527-528, Tr. 774-775, Def. Ex. 22 at pages 12, 16.) Isom testified that she went to Vassallo's house during that time but did not disclose the name of the confidential informant. (Tr. 1000.)

///

---

[7] Vassallo's testimony at the evidentiary hearing was vague, but his statement to the FBI clearly corroborated Zanoline's version of events. Vassallo initially testified at the evidentiary hearing that he was just walking by and heard some things, but he does not remember what he heard and refused to be refreshed with the transcript of his interview with the FBI. (Tr. 768, 771.) However, Vassallo said about the transcript: "If it's there, I said it. Yeah." (Tr. 771.) Later, he gave a clearer statement about hearing Isom's disclosure after questioning by the Undersigned. (Tr. 774-775.)

**M.  End of Rose's Relationship with Boisseau**

In the fall of 2019, after Rose stopped working in Boisseau's office on a regular basis, their relationship deteriorated.  Boisseau testified that he learned that Rose had misled him about her financial situation – specifically that she had hidden the fact that she had financial support from another person. (Tr. 1087-1088.) Rose claimed that her relationship with Boisseau was dysfunctional because Boisseau wanted a romantic relationship that she did not want. (Tr. 413-414.) Boisseau sent Rose a letter dated November 6, 2019, indicating that her employment with Boisseau was terminated, effective November 1, 2019. (Tr. 1090; Def. Ex. 4.) That letter also asked Rose to return the office key. (Def. Ex. 4.) Boisseau thus cut off any financial pay or assistance to Rose after November 1, 2019.

Although Rose stopped working in the summer of 2019 in Boisseau's office, Isom is not sure if Rose gave up her key. (Tr. 102.) Rose testified that she mailed her key to Boisseau's office to him after November 2019 and that she never made a copy of the key. (Tr. 459-461.) There was a delay in mailing the key because she had given her key to a potential employment lawyer after November 2019. (Tr. 461.)

**1.  Boisseau's Report to Santa Rosa Police Department**

On November 29, 2019, Boisseau then reported to the Santa Rosa Police Department ("SRPD") that Rose had used his credit card without his authorization. (Def. Ex. 27; Tr. 308-309.) Boisseau spoke with Crespan of the SRPD and filed a formal police report. (Tr. 308-309.)

Shortly after that conversation with Boisseau, Crespan then called Rose. (Def. Ex. 27; Tr. 308-309.) Crespan wrote a police report in which he noted that Rose stated that, among other things, she and Isom had been given access to AEO material (which she called "eyes only" material), and that those materials identified a confidential informant. (Def. Ex. 27; Tr. 312-316.) The report also indicated that Rose said that Isom had revealed the identity of the confidential informant in this case to her and that a friend had told her (Rose) that Isom had revealed the identity of the confidential informant to that friend. (Def. Ex. 27.) ████████████████
███████████████████████████████████████████████████████
███

### 2.  Isom's Text Messages to Zanoline

On November 17, 2019 Isom sent the following messages:

> And just so you know, Chelsea also threw you under the bus to my uncle.
>
> Now you are the snitch and not me apparently.

(Def. Ex. 14; Gov. Ex. 9B.)

On November 26, 2019, Isom sent a text message to Zanoline stating:

> Carrie just tried to call you as I am extremely concerned for your safety as well as mine. A message was sent to my uncle by Chelsea, that claims that you and I are 'going around town' discussing sensitive info about local motorcycle riders. I don't have to tell you the potential danger in that as I'm sure you already know. I do not know who else this has been said to, but my uncle is extremely worried due to Chelsea's extreme behavior. I understand she is mad about her finances and George, but why go to this extent?

(*Id.*)

### 3.  Rose's Seeking Advice to Sue Boisseau

Around the same time of the interview by SRPD, Rose sought advice from lawyers about suing Boisseau for terminating her employment.  (Tr. 461.)  Rose spoke first with one lawyer, who declined to represent her, and then with Jonathan Graves and Kasey Corbit.  (Tr. 461.)  Rose also sent Graves and Corbit many emails containing documents from Boisseau's office.  (Tr. 176-177.) Graves became concerned about Rose's claims that Boisseau had taken some illegal action, and one claim was an allegation that the identity of a confidential informant had been leaked.  (Tr. 204.)

### 4.  Lawyers' Call to FBI

On January 8, 2020, Graves, with Rose's permission, contacted the FBI and spoke to an agent. (Def. Ex. 32; Tr. 202, 221, 230.)

### N.  Rose's Animus towards Isom and Boisseau

Rose partially blames Isom for Boisseau's decision to terminate their working relationship.

United States District Court
Northern District of California

1  (Tr. 443.)  Rose also believes that Boisseau and Isom have conspired with her former partner to

2  help her former partner gain custody of her children.  (Tr. 444.)  Rose considers Boisseau to be an

3  "adversary."  (Tr. 444.)  As noted above, Boisseau submitted a declaration dated August 27, 2020,

4  for the dispute over child custody between Rose and her former partner in which he painted Rose

5  in a very unflattering light.  (Def. Ex. 4.)

6  **O.  Notification to U.S. Attorney of Northern District of California**

7  In late 2019, the N.D. USAO received a report of a potential breach of the protective order

8  by Boisseau.  The Department of Justice's Office of the Deputy Attorney General directed the

9  N.D. USAO to recuse itself from any investigation of the issue, and it assigned the matter to the

10 E.D. USAO.  (Dkt. 1208.)

11 **P.  FBI Investigation**

12 FBI agents interviewed Rose, Bernhard, Zanoline, Vassallo, Graves, and Corbit between

13 January 2020 and June 2020 and recorded the interview, which were later transcribed.  (Def. Exs

14 2, 12, 22, 31, 33.)

15 **Q.  Report to the Court**

16 On September 18, 2020, the United States submitted a sealed document informing the

17 Court of a series of alleged violations of the AEO Protective Order.  (Dkt. 1208.)  The United

18 States requested that the Court issue an Order to Show Cause why the AEO Protective Order had

19 not been violated ("OSC Motion").  (*Id.*)

20 Defendants moved for an evidentiary hearing on the OSC Motion.  (Dkts. 1229, 1230,

21 1231, 1232, 1233, 1234, 1236, 1237, 1238, 1239.)  The District Court referred the OSC Motion

22 and related motions for an evidentiary hearing to the Undersigned for review.  (Dkt. 1235.)

23 Boisseau, through his client Foakes, moved for discovery related to the OSC Motion.  (Dkt. 1240.)

24 The Undersigned held a status conference on October 13, 2020.  (Dkt. 1248.)

25 **R.  Isom's Contacts with Kennedy**

26 Rose sent the FBI agents a "screenshot" of text messages that Isom sent to Kennedy in

27 October 2020.  (Def. Ex. 40.)  One message stated: "Tell the fbi [sic[ thanks for leaking all the

28 info to Chelsea that's on the 302's."  (*Id.*)  Another said: "You two threatening people and

bragging about FBI CASES [sic] impulsively is the greatest thing ever." (*Id.*)

### S.  Further Proceedings in this Case

At the status conference on October 13, 2020, the Undersigned ordered Boisseau to provide signed copies of the AEO Protective Order within one week. (Dkt. 1248.) Boisseau did not provide a copy of the actual AEO Order signed by Isom within one week. Instead, he provided a draft of the AEO Order signed by Isom and dated May 19, 2019. (Govt. Ex. 4.) Boisseau did not provide any other signed protective orders. The Undersigned further ordered the N.D. USAO to contact the E.D. USAO to determine whether an E.D. USAO attorney could represent the E.D. USAO in proceedings related to the OSC Motion.

The Undersigned held another status conference on October 16, 2020. (Dkt. 1253.) The Undersigned ordered the parties to determine from the E.D. USAO whether additional materials exist that had not been shared with Boisseau by the N.D. USAO. (*Id.*) The Undersigned further proposed an evidentiary procedure in two stages: (1) an evidentiary hearing; (2) briefing on the effects on Defendants' rights. (*Id.*) The Undersigned ordered both Defendants and the United States to submit their responses to the proposed procedure. (*Id.*)

### T.  FBI's Interview with Kennedy

Kennedy spoke with the FBI agents on September 25, 2020. (Def. Ex. 11.) That interview was recorded and transcribed. (Def. Ex. 11.) At that interview, he said that he had a child custody dispute with Isom, and that, "within the past year," Isom had told him about details of the Hells Angels case, including that █████████████ (Def. Ex. 11 at pages 49-48.) He said that he had told another █████████, about six months ago: "this is what she [Isom] is telling people," but Kennedy denied telling ████ the identity of the confidential informant. (Def. Ex. 11 at page 44, 48.)

### U.  Isom's Text Messages to Zanoline

In September 2020, Isom sent Zanoline a text message with a picture of a parasite. (Tr. 535.) And a few months before the evidentiary hearing in this matter, Isom sent another text message to Zanoline to send Isom all Zanoline's legal bills or expenses. (Tr. 536.)

///

United States District Court
Northern District of California

### V. Isom's Suspicions of Hacking

In October 2020, Isom became suspicious that someone had hacked into her email or that someone had broken into Boisseau's office. (Tr. 1003.) At that time, Boisseau hired a forensic analyst to review the printer to see what had been printed from the office printer. (Tr. 1003, 1095.) The forensic analyst determined that some documents, including a list of passwords and some AEO materials, had been printed on April 11, April 25, and June 20, 2020 – either after hours or on a weekend. (Tr. 1052-1058, 1096-1099.) Boisseau speculated at the evidentiary hearing that Rose was the culprit. (Tr. 1099.) Boisseau said that Rose had taken a long time to return the key to the office after he fired her, that she would have known where the key to the locked cabinet for AEO materials was kept because of her work in the office, and that the passwords for the password-protected AEO disks were on Isom's work computer in the office. (Tr. 1097-1100.) Rose denied going to Boisseau's office on the three dates in April and June 2020. (Tr. 462.)

### W. Further Proceedings

On November 20, 2020, the Undersigned held a hearing to establish procedures for the evidentiary hearing on the OSC Motion and related discovery. (Dkt. 1335.) The Undersigned ordered that: the confidential source must remain confidential and Defendants must not name sources or materials in documents; the scope of the evidentiary hearing would be limited to whether Boisseau violated the AEO Protective Order; Foakes could attend the hearing; the other Defendants ("non-Foakes Defendants") could not attend, but their attorneys could attend on an AEO basis with redacted transcripts to be provided to their clients if necessary; non-Foakes' Defendants could access discovery given to Boisseau on an AEO basis; non-Foakes' Defendants could access unredacted 302's with witnesses' identities but not the identities of confidential sources revealed; due process was implicated in the hearing but likely not the Sixth Amendment. (*Id.*) The Undersigned further instructed the parties that there would be a process for referring to confidential informants at the hearing. (*Id.*) The Undersigned directed N.D. USAO to subpoena the witnesses, including all witnesses interviewed by E.D. USAO, Boisseau, and Isom, to testify at the evidentiary hearing. (*Id.*) The Undersigned addressed allegations of misbehavior during the

1   pendency of the proceeding by Isom in a private hearing with Boisseau and Isom only. (*Id.*)

2        On December 4, 2020, the Undersigned held a further status conference and procedural

3   hearing related to the evidentiary hearing on the OSC Motion. (Dkt. 1353.) Pursuant to

4   allegations of unauthorized communications, the Undersigned advised Isom to have no contact

5   with Rose without a lawyer present. (*Id.*) The N.D. USAO proposed four topics for the

6   evidentiary hearing, as well as the topic of Isom's alleged misbehavior, and sought to access

7   Isom's phone. (*Id.*) The Undersigned ordered the parties to meet and confer within one week on

8   the issue of phone access. (*Id.*) The Undersigned denied the N.D. USAO's request to phase the

9   E.D. USAO out of the case. (*Id.*) The Undersigned appointed counsel for Rose for the purpose of

10   the evidentiary hearing and stated that Rose would be advised of her Fifth Amendment right

11   during the hearing. (*Id.*) The Undersigned ordered the parties to meet and confer on whether they

12   would stipulate to the fact that Boisseau had accused Rose of theft in a separate proceeding. (*Id.*)

13   The Undersigned made several rulings regarding discovery, including establishing a procedure for

14   attorney-client privilege review of audio transcripts and establishing a procedure for informing

15   Defendants about the case without revealing confidential information. (*Id.*)

16        On December 28, 2020, Kennedy contacted the FBI agents to tell them that he no longer

17   trusted Rose. (Def. Ex. 11.) Kennedy claimed that Rose had used him and that he no longer had

18   contact with her. (*Id.*) Kennedy also claimed that Isom had contacted him repeatedly, even

19   though he had tried to block her. (*Id.*)

20   **X. Issuance of OSC and Further Proceedings**

21        On January 5, 2021, the Undersigned issued an Order to Show Cause "to respond to a

22   concern that he violated the terms of the Protective Order in this matter." (Dkt. 1391.)

23        On January 22, 2021, the Undersigned held a further status conference and procedural

24   hearing related to the evidentiary hearing on the OSC Motion. (Dkt. 1433.) The Undersigned

25   discussed procedures for the evidentiary hearing, which would be held via Zoom due to COVID-

26   19, with the parties, including procedures for questioning witnesses, for objecting via Zoom, and

27   providing witnesses' transcripts. (*Id.*) Based on objection by Defendants that the witnesses'

28   transcripts and testimony would unavoidably contain information covered by the Joint Defense

Agreement in the case, the Undersigned ruled that N.D. USAO could not be present at the hearing, and E.D. USAO would be responsible for questioning the witnesses, but the Undersigned would issue a redacted transcript after the hearing for the N.D. USAO. (*Id.*)

On February 4, 2021, the Undersigned held a further status conference and procedural hearing related to the evidentiary hearing on the OSC Motion. (Dkt.1472.) The Undersigned proposed procedures for a mixed live and Zoom proceeding for the evidentiary hearing. (*Id.*) The Undersigned ruled that the following topics were within the scope of the hearing: disclosure of AEO materials and disclosure of Joint Defense Agreement materials based on testimony from witnesses. (*Id.*) What N.D. USAO and E.D. USAO shared with each other was not within the scope. (*Id.*)

On February 19, 2021, the Undersigned held a further status conference to select dates for the evidentiary hearing to occur. (Dkt. 1509.)

**Y.  Further Disputes between Isom and Kennedy**

On March 5, 2021, Isom obtained a restraining order against Kennedy. (Def. Ex. 106.) that was set to expire on March 5, 2023. (*Id.*)

**Z.  Evidentiary Hearing**

After delays related to COVID-19, the evidentiary hearing on the OSC motion occurred on the following dates: March 12, 2021 (Dkt. 1565), March 19, 2021 (Dkt. 1577), April 9, 2021 (Dkt. 1623), April 16, 2021 (Dkt. 1655), April 23, 2021 (Dkt. 1685), April 30, 2021 (Dkt. 1710), and May 28, 2021 (Dkt. 1812).[8]

There was testimony from the following witnesses, in order of appearance and reappearance: George Boisseau (Dkt. 1565), Monique Isom (Dkts. 1565), Sara Bernhard (Dkt. 1577), Kasey Corbit (Dkt. 1577), Benjamin Graves (Dkt. 1577), Kasey Corbit (Dkt. 1577), Monique Isom (Dkt. 1577), Officer Jonathan Crespan (Dkt. 1623), Chelsea Rose (Dkt. 1623),

---

[8] The transcripts of these proceedings cannot be posted on the docket, as the evidentiary hearing was conducted under seal. Accordingly, the Undersigned refers to the minute entries corresponding to the evidentiary hearing dates. The Undersigned ordered at the hearing on April 9, 2021, that Defense counsel of record and the E.D. USAO may obtain copies of the hearing transcripts without a court order.

United States District Court
Northern District of California

Carrie Zanoline (Dkt. 1655), Chelsea Rose (Dkt. 1655), Kasey Corbit (Dkt. 1685), Benjamin

Graves (Dkt. 1685), Joe Vassallo (Dkt. 1685), Earl Kennedy (Dkt. 1685), Officer Jonathan

Crespan (Dkt. 1710), Monique Isom (Dkt. 1710), Samuel Plainfield (Dkt. 1710), George Boisseau

(Dkt. 1710). Because of scheduling issues, both Boisseau and Isom testified on separate days with

weeks between the first and second days of testimony.

### 1. Warning about Naming Confidential Informant

On the first day of the hearing, with Boisseau present, the Undersigned noted: "No one is

allowed to give the name of any confidential human source. And when the witnesses testify, I will

notify them in advance that they are not to name the potential confidential human source. And I

will advise them. If someone does, by chance, mention the name of a confidential human source, I

will say I do not confirm or deny that that is the person who is the confidential human source."

(Tr. 8.) Also while Boisseau was present, the Undersigned gave individual witnesses the same

warning. (Tr. 156.) There were several instances during the evidentiary hearing when the United

States raised concerns about even witnesses' discussing even identifying characteristics of the

confidential informant, and the Undersigned continued to warn witnesses not to even use

identifying characteristics. (Tr. 279-281, 353-355.) When necessary, the Undersigned excluded

Foakes from the courtroom so that witnesses could name the confidential informant. (Tr. 494,

502, 520, 538-539, 542, 6777, 680-681, 775-784, 810-811, 962, 984.) While Foakes was

excluded from the courtroom, Kennedy testified that the confidential informant █████████

████████ (Tr. 844.)

### 2. Isom's Production of Signed AEO Protective Order

On the first day of the evidentiary hearing, Isom presented her signed copy of the actual

AEO Order. (Govt. Ex. 4A.) She testified that, the night before the evidentiary hearing began,

she "accidentally" found the document in some computer files. (Tr. 262.) Isom was the one who

found both the signed draft order (Gov. Ex. 4) and the signed AEO Protective Order (Gov. Ex.

4B). (Tr. 20.) The testimony by Boisseau about this was not helpful. (Tr. 15.) He was not

present when Isom allegedly signed the actual AEO Order. (Tr. 15.) In other words, according to

Isom and Boisseau, Isom signed both the draft version of the AEO Order and the actual AEO

Order on the same day, May 19, 2019. However, one version has only Isom's initials, and the other has her full name. (Govt. Exs. 4, 4A.) Boisseau agreed that "someone" sent the AEO Order to Isom via email, but Boisseau first testified did not review emails to look for the email in which he potentially sent her the AEO Order and later testified that he did not have the email. (Tr. 25-26, 1124.) Isom testified that she signed the document, scanned it, saved it and emailed it to herself. (Tr. 93.) Isom was not able to find any of those emails, even though she looked for them. (Tr. 262.) Isom's explanation for signing both the draft and the actual AEO Protective Order was that she was not sure which one to sign, so she signed them both at Boisseau's request because he was not sure which one to sign. (Tr. 96.) Boisseau did not testify about that conversation.

### 3. Isom's Continued Work for Boisseau

After the OSC was issued, Isom continued to work for Boisseau and was employed by Boisseau as of the dates she testified at the hearing on this matter. (Tr. 84.) There was no evidence of any further training for Isom or any remedial measures taken in Boisseau's office other than changing the key to the office.

### 4. Text Messages Between Zanoline and Rose

After the evidentiary hearing began, the Undersigned ordered the production of text messages between Rose and Zanoline. Rose produced hers. The Undersigned reviewed and redacted those messages to reveal only relevant information and released the redacted messages to the parties. None of the parties admitted those text messages into evidence. Zanoline failed to produce her version of the text exchanges with Rose as ordered, and the Undersigned issued a separate OSC against Zanoline.

### 5. Disappearance of Kennedy's and Isom's Son

Between the first date of this multi-day evidentiary hearing and the last day, Isom and Kennedy communicated, despite the order of protection in state court that barred contact between them. (Tr. 1008.) Kennedy told Isom that he blamed Rose for the disappearance of their son (Kennedy's and Isom's son). (Tr. 1009.) In April 2021, after the evidentiary hearing began and a few days before Zanoline testified, Isom also sent text messages to Zanoline about Isom's son. (Tr. 535.) Zanoline was confused about the messages. (Tr. 535.)

### 6. Kennedy's Testimony at Evidentiary Hearing

At the evidentiary hearing, Kennedy first claimed that he did not recall telling the FBI agents that Isom had said that ███████████████ but later then admitted that she had made that statement to him. (*Compare* Tr. 813-814, *with* 827, 829.) However, Kennedy claimed that Isom learned that information from Rose. (Tr. 827, 829.) Kennedy explained that his statements to the FBI were true but that he had been "fed" information by Rose, whom he no longer trusted. (Tr. 809-810, 814.) Rose had told him that she could help him get custody of his daughter from Isom, but later Kennedy started to believe that Rose was lying and cut off contact with Rose. (Tr. 890-900.) Kennedy blamed Rose for the disappearance of his and Isom's son, under the theory that their son was angry about the accusations against his mother. (Tr. 1034.) Kennedy denied having a romantic relationship with Rose. (Tr. 900.)

Kennedy confirmed some aspects of his statements to the FBI agents: that Isom had taken some documents to his house and asked people to help highlight the name of Foakes in the documents and that, although he spoke with ██████ about Isom's comments about the Hells Angels, he did *not* tell ██████ the name of the confidential informant. (Tr. 824.) When asked about his communications with Isom about his testimony at the evidentiary hearing, Kennedy refused to answer and invoked his privilege not to incriminate himself under the Fifth Amendment right, to many questions. (Tr. 808, 857-62.) Kennedy admitted that he had previously accused Isom of witness tampering in their child custody case. (Tr. 909.)

### 7. Boisseau's Testimony

Boisseau testified on the first and last day of the evidentiary hearing. (Tr. 12-28, 31-57, 60-79, 1059-1140.) As noted above, the Undersigned allowed Foakes to remain in the courtroom during much of the evidentiary hearing but either cautioned each witness not to name the confidential witness or removed Foakes from the courtroom when witnesses necessarily had to discuss the name of the confidential informant. On the first day of the hearing, Boisseau stated that Rose had told him that the confidential informant ████████████████████. (Tr. 43.) There was no objection from the United States. On the last day of the hearing, Boisseau was asked about a conversation he had with Rose in October 2018 about the identity of the confidential

United States District Court
Northern District of California

United States District Court
Northern District of California

1    informant. (Tr. 1064.)  Boisseau then, while Foakes was present in the courtroom, said:



7    (Tr. 1064.)

8         The text message from Rose that Boisseau submitted for this evidentiary hearing and to

9    which he referred stated:

17   (Def. Ex. 81.)

18        The United States moved for criminal contempt against Boisseau, and the Undersigned

19   took the matter under submission and allowed the parties to meet and confer regarding a briefing

20   schedule.  (Tr. 1065, 1144.)  The United States and Boisseau then submitted briefs regarding their

21   respective positions.

22        Closing arguments of counsel were made on May 28, 2021.  (Dkt. 1812.)

23                          **Legal Standards for Contempt**

24        Courts possess inherent power to punish disobedience to judicial orders through the

25   mechanism of contempt.  *Michaelson v. United States ex rel. Chicago, St. P., M., & O.R. Co.*, 266

26   U.S. 42, 65-66 (1924).  The contempt power is regarded as essential to judicial function and

27   extends to disobedience that occurs both in and out of court proceedings.  *Young v. U.S. ex rel.*

28   *Vuitton et Fils S.A.*, 481 U.S. 787, 797 (1987).  Contempt sanctions may be civil or criminal.

"[W]hether a contempt is civil or criminal turns on the 'character and purpose' of the sanction involved." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994). Civil contempt sanctions are remedial and generally seek to compel compliance with a court order or provide compensation to a complainant for actual losses associated with the order's violation. *Id.* In contrast, criminal contempt sanctions are "punitive, to vindicate the authority of the court." *Id.* at 828.

Civil contempt "consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply. *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). Courts do not consider the intent of parties in finding civil contempt, and contempt need not be willful. *In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361, 1365 (9th Cir. 1987). "'Substantial compliance' with the court order is a defense to civil contempt, and is not vitiated by 'a few technical violations' where every reasonable effort has been made to comply." *Dual-Deck*, 10 F.3d at 695 (quoting *Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 891 (9th Cir. 1982). The party alleging civil contempt must show that the alleged contemnor violated the court order by clear and convincing evidence. *Id.* (citing *Vertex*, 689 F.2d at 899).

Exceptional circumstances or a good faith attempt at compliance are not defenses to a finding of civil contempt. *Crystal Palace*, 817 F.2d at 1365. However, the party moving for contempt sanctions must show that the nonmoving party violated the order beyond substantial compliance and that the violation was not based on a good faith and reasonable interpretation of the order. *Wolfard Glassblowing Co. v. Vanbragt*, 118 F.3d 1320, 1322 (9th Cir. 1997). Further, "[t]o hold an individual in civil contempt for violation of a court order, that order must be clear in its commands." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 289 F.R.D. 548, 552-53 (N.D. Cal. 2013), *dismissed* (May 23, 2014) (citing *Balla v. Idaho St. Bd. Of Corr.*, 869 F.2d 461, 465 (9th Cir. 1989)). "A party may also be held liable for knowingly aiding and abetting another to violate a court order. *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 945 (9th Cir. 2014). A finding of civil contempt is reviewed for abuse of discretion. *Dual-Deck*, 10 F.3d at 695.

In contrast, "[c]riminal contempt is a crime in the ordinary sense." *Bloom v. Illinois*, 391 U.S. 194, 201 (1968). "[C]riminal contempt sanctions are entitled to full criminal process." *Bagwell*, 512 U.S. at 833. The character and purpose of criminal contempt is punitive and "is imposed retrospectively for a 'completed act of disobedience'" that cannot be purged by an affirmative act in compliance with a remedial order of the court. *Id.* at 828-29 (citing *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 443 (1911)).

Criminal contempt is set forth in 18 U.S.C. § 401, which provides that a court has the "power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority" as

> (1) Misbehavior by any person in its presence or so near thereto as to obstruct the administration of justice;
>
> (2) Misbehavior of any of its officers in their official transactions;
>
> (3) Disobedience or resistance to its lawful writ, process, order, rule, decree or command.

*Id.*

Contempt exists under subsection (1) where the "contumacious behavior occurred in or near the presence of the court, it actually disrupted or materially obstructed the administration of justice, and it was willful." *United States v. Galin*, 222 F.3d 1123, 1127 (9th Cir. 2000.) Disobedience of a court's order is "contumacious behavior" for purposes of this subsection. *In re Gustafson*, 650 F.2d 1017, 1020 (9th Cir. 1981). The seriousness of the behavior bears on whether the behavior constitutes the obstruction of justice. *Id.*

Contempt exists under subsection (3) where the following exist: (1) a clear and definite order of the court, (2) that the party alleged of contempt knew, (3) and willful disobedience of the order. *United States v. Thoreen*, 653 F.2d 1332, 1339 (9th Cir. 1981). Thus, criminal contempt requires a finding of willfulness.

Upon a finding of civil contempt, the court may impose penalties that are either compensatory or coercive. *In re Dyer*, 322 F.3d 1178, 1192 (9th Cir. 2003); *see also Ahearn ex rel. N.L.R.B. v. Int'l Longshore & Warehouse Union, Locs. 21 &4*, 721 F.3d 1122, 1128 (9th Cir. 2013) ("civil contempt proceedings serve two purposes: (1) coercing compliance with a court

United States District Court
Northern District of California

order; and (2) compensating the prevailing party.") (citations omitted).  "Civil contempt sanctions"

are "penalties designed to compel future compliance with a court order, are considered to be

coercive and avoidable through obedience, and thus may be imposed in an ordinary civil

proceeding upon notice and an opportunity to be heard." *Bagwell*, 512 U.S. at 827.  "Neither a

jury trial nor proof beyond a reasonable doubt is required." *Id.*  The Supreme Court has

recognized that where "contempts involving out-of-court disobedience to complex injunctions" are

at issue, the line between civil and criminal contempt is blurred, and heightened procedural

protections – including a jury trial and an elevated standard of proof – are required. *Id.* at 833-34.

In this context, a civil sanctions remedy will be oriented toward compliance and compensation,

"considerations central to the contempt power" that do not take on a punitive character. *See*

*Ahearn*, 721 F.3d at 1129-30 (discussing *Bagwell*, 512 U.S. at 831).

      The court has broad authority "to grant the relief that is necessary to effect compliance

with its decree." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193 (1949).  "The measure of

the court's power in civil contempt proceedings is determined by the requirements of full remedial

relief." *Id.*  To that end, the court may order "the doing of a variety of acts" or "the payment of

money." *Id.* at 193-94.

### Discussion

### A. Recommendation of No Finding of Criminal Contempt

      The United States argues that Boisseau committed criminal contempt by providing a

biographical detail about the confidential informant while his client was in the courtroom, in

violation of the Undersigned's many orders not to disclose information about the confidential

informant.  The Undersigned finds that Boisseau's conduct in providing biographical information

was a violation of the Undersigned's orders but that his conduct was negligent and not willful.

Thus, his actions do not rise to the level of criminal contempt, which require a finding of

willfulness.[9]

---

[9] The Undersigned may have authority to determine the motion for criminal contempt based on
actions "in the magistrate judge's presence so as to obstruct the administration of justice, 28
U.S.C. § 636(e)(2), as well as criminal contempt and civil contempt authority in misdemeanor

United States District Court
Northern District of California

1    Several factors support the finding of negligence, as opposed to willfulness. On the first

2    day that Boisseau testified, he mentioned, with no objection from the United States, that Rose had

3    stated that the confidential informant ███████████████████. (Tr. 43.) Given that

4    lack of objection, Boisseau could reasonably believe that he could mention a further detail, that the

5    confidential informant ███████████. Additionally, Boisseau testified about a conversation

6    he had with Rose before she began working with him, so his testimony did not indicate that Rose

7    was correct in her statement about the identity of the confidential informant. It is arguably

8    understandable that Boisseau did not think that his conversation with Rose about her belief of the

9    identity of the confidential informant was a violation of the orders.

10    Finally, the undersigned does not find Boisseau to have acted willfully because he was

11    nervous, rambling, and confused through much of his testimony at the evidentiary hearing and

12    during this specific portion of testimony. Thus, the Undersigned does not find that Boisseau acted

13    willfully.

14    **B. Recommendation of Finding of Civil Contempt**

15    The Undersigned finds clear and convincing evidence that Boisseau violated the AEO

16    Protective Order[10] in the following ways:

17    (1) He allowed Rose access to AEO Materials even though she did not sign the AEO

18        Protective Order;

19    (2) He allowed Isom access to AEO Materials even though she did not sign the AEO

20        Protective Order; and

---

22    cases and cases where the magistrate judge presides with the consent of the parties." *Johnson v.*

23    *North Tahoe Station,* 2015 U.S. Dist. LEXIS 70684 (E.D. Cal. June 1, 2015), citing 28 U.S.C. §§ 636(e)(3), (4) and *Irwin v. Mascott,* 370 F.3d 924, 932 (9th Cir. 2004). However, in an abundance

24    of caution the Undersigned recommends this decision to the District Court.

25    [10] Although neither Rose nor Isom signed the Initial Protective Order, there was no evidence presented at the evidentiary hearing that the United States produced Protected Materials

26    – as opposed to the narrower category of AEO materials. The only discussion about the United States' production was about the February 2019 and August 30, 2019 production of AEO

27    materials. If no Protected Materials were produced, there was no need for Isom and Rose to sign the Initial Protective Order. Thus, the Undersigned does not find that Boisseau violated the Initial

28    Protective Order, based on the information presented at the evidentiary hearing.

1    (3) He violated the AEO Protective Order's order that examination of AEO materials

2        "shall be done in a secure environment which will not expose the materials to other

3        individuals" not authorized to have access to AEO materials.

4    (Dkt. 517.)

5        **1.    Rose's Access to AEO Materials**

6        It is undisputed that Rose did not sign the Initial Protective Order or the AEO Protective

7    Order. Rose testified that she had access to the files in this case without any discussion about

8    what she could and could not see. Rose is credible in stating that she saw AEO materials. She

9    described a specific conversation in which Boisseau placed a file on her desk and told her what

10   "attorneys' eyes only" meant. She also said that there was never a discussion about preventing her

11   from seeing any of the files in this case. Boisseau denied providing Rose with any AEO materials.

12   (*Compare* Tr. 422 *with* Tr. 1071.)  The Court finds Rose credible on this point because at the time

13   of the first tranche of AEO materials in February 2019, Rose and Boisseau were the only people

14   working in his office. Given that she was the sole employee in Boisseau's office for several

15   months and that she was required to review discovery, her testimony is logically consistent with

16   the circumstances.

17       Rose has credibility problems as well, especially in describing her relationship with

18   Boisseau, and she clearly hates both Isom and Boisseau and wants to harm them. Her motivation

19   to harm them stemmed not only from her hatred of them but also her attempt to deflect attention

20   from Boisseau's accusation that she stole from him, her attempt to bolster her case for sexual

21   harassment or wrongful termination of employment against him, and her verified concern that

22   Boisseau was allied with Rose's former partner in her separate dispute over child custody.

23   Although Rose has many problems with credibility, her testimony on this issue of ability to review

24   AEO was clear and logical. The undersigned finds that Rose did review AEO materials in this

25   case. Boisseau did not ensure that Rose, who had access to the AEO materials, signed the AEO

26   Protective Order.

27       In addition, even if Rose were lying and Boisseau never gave her AEO materials,

28   Boisseau's own testimony shows that Rose had *access to* the AEO materials even if he did not

26

specifically ask her to review them or hand them to her.  Isom agreed that Rose had access to the AEO Materials because the key to the locked cabinet was in the office, and Rose knew the location of the key.  Boisseau's own testimony about Rose's alleged break-in after her employment ended shows that she had access to the AEO Materials.  As noted above, Boisseau claims that, in April 2020, long after Rose's employment with him ended, she broke into the office, using a copy of her old key, and accessed AEO Materials.  Boisseau claimed that Rose was able to make a copy of her key to his office, find the key to the locked cabinet, and then find the password on one of the two computers in the office, to access AEO Materials.  If Rose were able to access the AEO Materials after her employment ended, she obviously was able to do so while she was employed.  The undersigned finds that Rose had access to AEO materials in this case.

The AEO Protective Order states that a person must sign the order before gaining "access to" the AEO materials.  The AEO Protective Order does not state that a person must sign the order before reviewing the AEO materials, and the use of the term "access to" has meaning in this context.  The term "access to" is broader than reviewing, as courts are understandably concerned with obtaining a signature acknowledging understanding of the AEO Protective Order from people who are able to review AEO materials even if they do not actually review them – before they even have access.

### 2.  Isom's Access to AEO Materials

Boisseau violated the AEO Protective Order by allowing Isom access to AEO materials before she signed the AEO Protective Order.  Boisseau did not ensure that Isom, who actually reviewed the AEO materials, signed the AEO Protective Order.  Although Isom provided a copy of the signed AEO Protective Order on the first day of evidentiary hearing, the Undersigned does not find Isom credible and finds that Isom fabricated the signed copy of the actual AEO Protective Order (Gov. Ex. 4A), to help her employer, Boisseau, avoid sanctions.

As described in detail above, Isom was not able to explain how she found the signed copy of the AEO Protective Order.  She was not able to re-create her steps in finding the copy.  Even though Isom testified that she sent the signed AEO Protective Order to herself via email, she was not able to find it.  Boisseau also testified that he probably sent Isom the AEO Protective Order via

email for her to sign, but he did not even look for that email. Boisseau actually hired a forensic expert who testified in this case about unauthorized access to his computer systems (Tr. 1052-1058), but Boisseau did not present any forensic expert regarding the critical emails in which he allegedly sent Isom the AEO Protective Order to sign and in which Isom sent the signed version to herself.

Isom also claimed that she signed both the draft AEO Protective Order and the actual AEO Protective Order on the same day, May 19, 2019, because Boisseau asked her to sign both because he was not sure which one was valid. (Tr. 95-96.) That explanation makes no sense, as Boisseau, an experienced criminal lawyer, understands that a draft order is not the same as a signed order in this case. Notably, Boisseau provided no testimony that he told Isom to sign both versions. (Tr. 12-28, 31-57, 60-79, 1059-1140.)

Other factors undermine Isom's credibility on this issue. She remains employed by Boisseau and has every incentive to help him avoid a finding of contempt. Her behavior after the allegation against her in this matter also diminishes her credibility greatly. Specifically, Isom interfered with witnesses in this proceeding. Her messages to Zanoline, a key witness in this case, in 2020, after Isom learned that Zanoline was claiming that Isom disclosed the identity of the confidential informant, either appear to be threats or bribes (an implicit offer to pay Zanoline's legal expenses). Those messages show Isom's desperation in her attempt to dissuade a witness from testifying in this matter against her.

Boisseau argues that Isom signed the *draft* AEO Protective Order on May 19, 2019, which was identical to the AEO Protective Order, and thus that he substantially complied with the AEO Protective Order. In essence, he argues that there was no harm caused by Isom's failure to sign the actual AEO Protective Order because she signed the draft AEO Protective Order. The many problems with Isom's credibility lead the Undersigned to believe that she also fabricated the signed version of the draft AEO Protective Order (Gov. Ex. 4). Because neither Isom nor Rose signed the Initial Protective Order, it is not believable that Isom would then sign the AEO Protective Order.

But even if Isom had signed the draft AEO Protective Order, there is harm caused by her

28

failure to sign the AEO Protective Order: because Isom did not sign the AEO Protective Order, the Undersigned did not issue an order to show cause why Isom should not be held in contempt but instead issued the order to show cause only against Boisseau. Had the Undersigned believed, when issuing the actual order to show cause, that Isom had signed the AEO Protective Order, the Undersigned would have considered both criminal and civil contempt against Isom. But because the Undersigned mistakenly believed, based on Boisseau's and Isom's failure to provide a signed AEO Protective Order when ordered to do so, that Isom had never signed the AEO Protective Order, the Undersigned did not issue the order to show cause against Isom.

Boisseau also violated the AEO Protective Order because he did not ensure that examination of AEO materials occurred in a "secure environment" that would not expose the materials to other individuals who were not allowed access to AEO materials: Isom and Rose. In general, Boisseau was lax in the way he treated AEO materials. Boisseau hired two employees who had no experience in the legal world other than their own experiences as convicted felons, to handle sensitive discovery in this case. Rose testified that he provided no real training other than an explanation of what "attorneys' eyes only" meant. Even the testimony about the keys is disturbing. Boisseau and Isom went to great lengths to accuse Rose of breaking into Boisseau's office in April 2020 and implied that Rose had kept and made a copy of the office's keys, which she was able to use because presumably Boisseau had not changed his locks after Rose's employment ended. That Boisseau, who kept sensitive information in his office, did not make any effort to regain the keys to his office from someone he believed to be a thief or did not make any attempt to change the locks to prevent an alleged thief from accessing his office after a delay in obtaining the key, shows that he did not maintain the AEO materials in a secure environment.

The consequences of Boisseau's failure to take the AEO Protective Order seriously are severe. The Court finds that Isom disclosed the identity of the confidential informant to Zanoline at Steelhead Beach in September 2019. Zanoline was credible and consistent in her testimony, and she is the only witness with no stake in the outcome of this evidentiary hearing. Another witness with no stake in the outcome of this evidentiary hearing – Bernhard – bolsters Zanoline's testimony about meeting Isom at Steelhead Beach. Although Bernhard did not hear the

conversation, she described meeting a person who matched the description of Isom, with Isom's first name.

Rose also confirmed that, after the AEO materials were disclosed to Isom, Isom then told Rose the identity of the confidential informant, as disclosed by those AEO materials. Her testimony on this subject was again realistic, as she explained that Isom was happy that she had correctly guessed the identity.

In addition, Isom later disclosed the identity of the confidential informant to Kennedy and Vassallo. Although Kennedy and Vassallo claimed not to remember the incidents at the evidentiary hearing, they were clear in their recorded conversations with the FBI before the evidentiary hearing, and neither denied the statements they made to the FBI. The transcripts of their interviews, labeled as defense exhibits proffered by Boisseau, were admitted into evidence without any objection. (Tr. 148, 302.)

Isom attacks Rose's credibility and hints that Rose manipulated others into lying. As noted above, there are significant problems with Rose's credibility. However, it is not believable that Rose could persuade Zanoline to lie under penalty of perjury about what she heard from Isom at Steelhead Beach, that she could persuade Bernhard to lie under penalty of perjury about meeting Zanoline and a woman who fits Isom's description at Steelhead Beach, and that Rose could also persuade Vassallo and Kennedy to lie to the FBI. Boisseau's theory is that Rose persuaded four people to lie either to the FBI or both to the FBI and under penalty of perjury in the evidentiary hearing. That degree of conspiracy, absent the existence of a pre-existing criminal enterprise, strains the imagination. That farfetched theory is simply not believable.

Boisseau argues that many defendants and defense counsel knew that the confidential informant was cooperating with the FBI in this matter ███████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ███████████████████████████████████████████████████. However, guessing and knowing are different. █████████████████████████████████████ ████████████████████████████████████████████████████████████

1 ████████████  ████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ████████████████████████.

Isom's testimony confirmed that guessing and knowing are different. She first testified, in response to direct questioning from the Undersigned, that she had merely speculated but did not know for sure until after reviewing AEO materials who the confidential informant was, but when she later testified – weeks later – she said that she had known all along. (*Compare* Tr. 118 *with* Tr. 987-988.) The first version of her story – the she had guessed but that her guess was confirmed by the AEO materials – is the most believable and consistent with the testimony of Rose who said that Isom was proud that the AEO materials confirmed her guess.

Boisseau also argues that Rose was the source of the leak. Rose did testify that, despite Boisseau's failure to demand that she sign a protective order in this case, she treated information she learned in his office as confidential. (Tr. 406.) That statement rings true because no other witness in either interviews with the FBI pointed to Rose as the source of the identity of the confidential informant,[11] and because none of the documents indicate that she revealed the identity, either. The Court finds that Rose was not the source of the leak of the identity of the confidential informant. If she discussed the name with Zanoline or anyone else, that discussion occurred after Isom had revealed the identity and after Zanoline told Rose about that leak.

Ironically, even if Boisseau's theory that Rose was the source of the leak is accurate, the only way she could have confirmed of the identity of the confidential informant is through Boisseau's office – either by seeing AEO materials – or from Isom. In other words, if Rose were the source of the leak, the leak again goes back to Boisseau's office and his failure to make sure that Rose signed the AEO Protective Order and understood its meaning and restrictions.

### 3. Boisseau's Failure to Maintain AEO Materials in a Secure Environment

Boisseau also violated the AEO Protective Order by failing to ensure that examination

---

[11] At the evidentiary hearing, Kennedy claimed that Rose had "fed" him information bit did not specifically state that Rose had told him the identity of the confidential informant. (Tr. 819-820.)

United States District Court
Northern District of California

1   would occur in a secure environment.  As described in detail above, he maintained the AEO

2   materials in a way that Rose, who never signed the AEO Protective Order, could easily access the

3   AEO Materials.  He hired two employees who had no legal experience and no training to work in

4   a law office.[12]  Furthermore, Boisseau took no measures to safeguard the AEO materials after the

5   United States alleged wrongdoing in this matter.  Most important, when the Court requested all

6   copies of the signed protective orders in this case, and Boisseau initially learned that Isom had

7   signed only a draft version of the AEO Protective Order, he made no attempt either to isolate Isom

8   from AEO materials or require her to sign the actual AEO Protective Order.  He learned on

9   October 20, 2020 (one week after the date the Court requested copies and the deadline for

10  producing protective orders) that Isom had signed only a draft.  Yet, between October 20, 2020

11  and  March 11, 2021 (the day before the first date of evidentiary hearing when Isom presented the

12  false signed AEO Protective Order), Boisseau did nothing to make sure that Isom signed the actual

13  AEO Protective Order.

14      **C.  Appropriate Sanction**

15      In considering the appropriate sanction for Boisseau's violation of the AEO Protective

16  Order in this case, the Undersigned considers the consequences of Boisseau's failure to safeguard

17  AEO materials and any hope that Boisseau can in the future prevent future breaches of any

18  protective order in this case.  The Undersigned has no confidence that the future will be better.  It

19  is undisputed that Rose never signed the Initial Protective Order or the AEO Protective Order.  It

20  is undisputed that Isom never signed the Initial Protective Order, and therefore she should have no

21  access to Protected Materials.  Boisseau's admitted failure to ensure that his employees signed at

22  least three protective orders in this case shows how grossly negligent his practices were, even if

23  there is no finding regarding the failure of Rose and Isom to sign the Initial Protective Order.

24  Because Boisseau maintained slipshod practices in his office and hired two employees with no

25  _____

26      [12] That Boisseau hired Isom and Rose even though he knew that they had federal felony
    convictions from over 20 years ago is not a critical factor in his failure to ensure compliance with
27  the AEO Protective Order, because there was no evidence of further criminal activity by either of
    them since those convictions.  However, by Boisseau's own admission, he knew that Rose was "in
28  with" other chapters of Hells Angels, based on her text message before he hired her, and
    nonetheless hired a person with self-professed affiliation with a gang.

United States District Court
Northern District of California

1    training for or experience in the legal profession, his employee then revealed information gleaned

2    from AEO materials in this case. Isom remained working for Boisseau as his sole employee even

3    after the United States alleged wrongdoing and even after Boisseau learned that she had signed

4    only a draft version of the AEO Protective Order. Boisseau's only action in determining whether

5    Isom was telling the truth when she denied disclosing AEO materials was to question her and

6    review witnesses' statements, and he chose to believe her over a mountain of evidence that

7    showed that she was lying. (Tr. 48-49.) Boisseau also hired a forensic expert to try to pin the

8    blame on Rose, but he took no steps to find the emails in which he allegedly sent Isom the actual

9    AEO Protective Order or in which Isom allegedly sent herself the signed AEO Protective Order.

10   Boisseau, without any critical analysis, chose to accept Isom's denials and allowed her further

11   access to AEO materials in this case. Boisseau's actions, both before the United States raised this

12   issue and afterward, show that he does not and will not maintain an office that can keep materials

13   confidential.

14           Finally, Boisseau's behavior during this evidentiary hearing was disturbing. His blurting

15   out the fact that the confidential informant ▮▮▮▮▮▮▮▮▮▮▮▮ does not rise to the level

16   of criminal contempt, but his action is relevant in determining whether Boisseau can be trusted to

17   safeguard confidential information. That Boisseau could not keep that information confidential

18   while his client was in the courtroom, despite the Undersigned's many admonitions about

19   confidentiality of the informant's identity, is a factor the Undersigned considers in determining

20   that Boisseau should not have further access to AEO materials.

21           The Undersigned also considers that Isom revealed information that she learned from the

22   AEO materials and that she cannot be trusted to maintain the confidentiality of that sensitive

23   information. Moreover, her disturbing behavior in contacting a key witness, Zanoline, with either

24   a veiled threat or implicit bribe, further undermines her trustworthiness. Her contacts with

25   Kennedy, against whom she had a restraining order, during the time that she had a restraining

26   order, also shows that she does not respect orders of a court.

27           For these reasons, the undersigned RECOMMENDS that the District Court issue an order

28   that Boisseau and any staff working for him, including Monique Isom, may not have access to any

materials deemed "Protected Materials" under the Initial Protective Order (Dkt. 232) and may not have any access to "Attorneys' Eyes Only" in this matter pursuant to the Attorneys' Eyes Only Protective Order (Dkt. 517). The Undersigned FURTHER RECOMMENDS that the District Court issue an order requiring Boisseau to return any materials designated as Protected Materials and Attorneys' Eyes Only and produced by the United States to the United States by a date certain to be determined by the District Court.

The Undersigned further RECOMMENDS that the District Court deny the motion by the United States for criminal contempt, based on Boisseau's actions during the evidentiary hearing.

The E.D. USAO is ORDERED to provide a copy of this Report and Recommendation to all lawyers in this matter via electronic mail.

**IT IS SO ORDERED**.

Dated: July 6, 2021

SALLIE KIM
United States Magistrate Judge