UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>RAYMOND MICHAEL FOAKES, et al.,<br>Defendants. | Case No. 17-cr-00533-EMC-2<br><br>**ORDER DENYING CHRISTOPHER RANIERI'S MOTION TO STRIKE THE TESTIMONY OF JOSEPH HARDISTY**<br><br>Docket No. 3419 |

## I.   INTRODUCTION

Christopher Ranieri moves to strike the testimony of Joseph Hardisty based on his invocation of the Fifth Amendment in response to cross-examination about the Filthy Few patch. *See* Docket No. 3419 ("Mot."). Mr. Ranieri argues that the Filthy Few patch is a central focus of the Government's case, and Mr. Hardisty's refusal to answer questions about how he earned his denied Mr. Ranieri his right to cross-examination. He brings this motion after the Government rested its case-in-chief, weeks after the conclusion of Mr. Hardisty's testimony, on the eve of the Court's instruction of the jury and closing arguments. It is untimely and for that reason alone warrants denial. Nonetheless, the Court also addresses the merits and finds the motion meritless.

## II.   LEGAL STANDARD

"The Sixth Amendment protects the right of a defendant in a criminal case to confront and cross-examine his or her accusers." *United States v. Morales*, No. 216CR00265GMNNJK, 2019 WL 6310713, at *3 (D. Nev. Nov. 24, 2019) (citing *United States v. Williams*, 626 F.2d 697, 701 (9th Cir. 1980)). "Where a witness asserts a valid privilege against self-incrimination on cross-examination, all or part of that witness's testimony must be stricken if invocation of the privilege

blocks inquiry into matters which are 'direct' and are not merely 'collateral.'" *United States v. Seifert*, 648 F.2d 557, 561 (9th Cir. 1980) (citing *Williams*, 626 F.2d at 701). "'If the subject upon which the witness refuses to testify relates to matters elicited by the government on direct examination and the defendant's counsel is prejudicially impaired in [his or her] ability to assail the truthfulness of the direct testimony, the court should strike at least the relevant portion of the testimony.'" *Morales*, 2019 WL 6310713, at *3 (quoting *United States v. Singer*, 785 F.2d 228, 242 (8th Cir. 1986)). However, "striking a witness's entire testimony is an extreme sanction, not to be lightly imposed." *United States v. Negrete-Gonzales*, 966 F.2d 1277, 1280 (9th Cir. 1992) (citing *United States v. Lord*, 711 F.2d 887, 892 (9th Cir. 1983)). As Judge Navarro explains:

> Matters are "direct" when invocation of the privilege deprives the defendant of his right to test the truth of direct testimony or when answers to the questions would have undermined the Government's case. *Seifert*, 648 F.2d at 562; *see also United States v. Gullett*, 713 F.2d 1203, 1208–09 (6th Cir. 1983) ("If assertion of the privilege precludes inquiry into matters which involve elements or specific events of the crimes charged, there may be substantial danger of prejudice in not allowing the defendants to test the truth of the witness' direct testimony."). "Collateral" means that the evidence does not speak directly to the matters put at issue by the indictment. *Williams v. Borg*, 139 F.3d 737, 742 (9th Cir. 1998). Furthermore, questions going to the credibility of a witness deal with collateral matters. *United States v. Delgado*, 869 F.2d 1498 (9th Cir. 1989) (citing *United States v. Brutzman*, 731 F.2d 1449, 1452 (9th Cir. 1984)).

*Morales*, 2019 WL 6310713, at *3; *see also United States v. Duran*, 884 F. Supp. 573, 577 (D.D.C. 1995) (stating that an attacks on credibility and cumulative testimony are collateral) (citing *Seifert*, 648 F.2d at 561).

Still, "[t]he distinction between matters which are 'collateral' and those which are 'direct' is not precise or easy." *Seifert*, 648 F.2d at 561. As such, "[a] trial court has wide discretion to determine whether a witness's testimony must be stricken because cross-examination was restricted.'" *Id.* at 561–62 (quoting *United States v. Star*, 470 F.2d 1214, 1217–18 (9th Cir. 1972)).

### III.     ANALYSIS

Here, there is no reason to strike any portion of Mr. Hardisty's testimony because his testimony about the Filthy Few patch—which gave rise to his assertion of the Fifth Amendment at

2

1    issue in this motion—was collateral.  First, Mr. Hardisty was asked on direct by the Government
2    about how he earned his Soldier patch, *see* Trial Tr. at 3871–72; he was not asked how he earned
3    his Filthy Few patch.  S*ee id.* at 3846–72.  Instead, as described below, it was raised on *cross* by
4    the Defense to impeach him with prior criminal conduct.  Thus, Mr. Hardisty's refusal to respond
5    to Mr. Ranieri's inquiry about how he earned his Filthy Few patch was collateral and did not
6    "deprive[] the defendant of his right to test the truth of direct testimony."  *Seifert*, 648 F.2d at 562.

7    As argued at the sidebar, the question about how Mr. Hardisty earned his Filthy Few patch
8    was intended to impeach his credibility with extraneous criminal conduct, not "matters which
9    involve elements or specific events of the crimes charged[.]"  *Gullett*, 713 F.2d at 1208–09.  The
10   following was stated during the sidebar:

> If he committed a crime, it's relevant to his *credibility*.  I
> respectfully mean—because I don't know; but if he's not willing to
> admit what he did, then it's probably a serious crime.  *It's relevant
> to his credibility*.
> . . . .
>
> What if it's—you know, what if the truth is he committed a murder?
> We're entitled to cross-examine him on that.  *That's completely
> relevant to his credibility*.

16   *See* Trial Tr. 3915 (emphasis added).  Such questions are not proper under FRE 404(b); nor would
17   the questions be proper under FRE 609 because Mr. Hardisty's conduct did not result in a
18   conviction.  That said, in light of Mr. Hardisty's invocation of the Fifth upon being asked what he
19   did to earn the patch, the Court nevertheless gave an instruction that the jury could infer "that Mr.
20   Hardisty committed a crime."  *See* Trial Tr. 3916.  For that reason, Mr. Ranieri's additional
21   assertion that the Court's inferential instruction was prejudicial fails.  The instruction was given
22   for the benefit of Defendants, none of whom launched an objection prior to its provision.

23   Moreover, after further attempts to invoke the Fifth Amendment, Mr. Hardisty ultimately
24   admitted to extraneous criminal conduct, including conspiracy to kill rivals, effectively waiving
25   his invocation of the Fifth Amendment.  *See id.* at 3941–43; 3961–62.  Thus, the information
26   about his criminal conduct Defendants sought to elicit from Mr. Hardisty eventually came out.  In
27   any event, the law is clear that "questions going to the credibility of a witness deal with collateral
28   matters."  *Morales*, 2019 WL 6310713, at *3 (citing *Delgado*, 869 F.2d 1498).

3

According to Mr. Ranieri, the "government alleges that the degree of violence required to be awarded the [Filthy Few] patch includes murder," and the "government has endeavored to establish that the Filthy Few patch has [ ] been awarded for the killing of Joel Silva[.]" Mot. at 8. Thus, Mr. Ranieri argues that how Mr. Hardisty earned his Filthy Few patch is directly relevant to whether Mr. Hardisty was awarded the patch for his involvement in the conspiracy to murder Joel Silva, and, even more pointedly, "whether Joseph Hardisty killed Joel Silva!" *Id.* at 8–9.

This assertion is entirely baseless. First, it must be observed that the relevance of the Filthy Few patch in this trial has been focused on what the patch signifies generally, not the specific act Mr. Hardisty committed to earn it. In that regard, neither the Government nor Defendants asked Mr. Hardisty what he believes the Filthy Few patch means.

Mr. Scheetz's previous testimony that the Soldier tag is Boston's version of the Filthy Few patch did not transform the content of Mr. Hardisty's direct examination. Mr. Hardisty testified how he earned his Soldier patch: he stated that Mr. Ranieri gave him the patch for beating a member of the Wanted motorcycle club with a barstool. *See id.* at 3817. While the Government's expert on outlaw motorcycle gang testified that the Soldier patch is the Boston charter's version of the Filthy Few patch, that did not provide a substantial nexus to Mr. Hardisty's testimony about his Soldier patch. When raised for the first time in cross, Mr. Hardisty never testified who gave him his Filthy Few patch—there is no suggestion it was given by Mr. Ranieri or someone from the Boston/Salem charter. *See* Trial Tr. 3913. It seems highly improbable that the Filthy Few patch was given to him by Mr. Ranieri as it is difficult to see why Mr. Ranieri would additionally award Mr. Hardisty a Filthy Few patch for another course of conduct. As such, any suggestion now raised for the first time at the end of trial that Mr. Hardisty may have earned his Filthy Few patch by committing the Silva murder is a matter of baseless speculation. When read in context, the purpose of Mr. Ranieri's cross-examination about how Mr. Hardisty earned his Filthy Few patch was clearly directed to impeachment and had nothing to do with the murder of Joel Silva.

Indeed, it is entirely illogical for Mr. Ranieri to now argue that Mr. Hardisty invoked the Fifth to avoid testifying that he earned his Filthy Few patch for his role in the conspiracy to murder Joel Silva. Mr. Hardisty was forthright throughout his testimony in confessing he was a

4

1  co-conspirator in Joel Silva's murder, and there was no reason to invoke the Fifth in order to
2  insulate conduct to which he already admitted. Indeed, as evidence of Mr. Hardisty's willingness
3  to admit to serious criminal conduct, the second time Mr. Hardisty involved the Fifth, it was in
4  response to questioning about other conspiracies to commit murder:

> Q. You've testified you've only been involved in one conspiracy to murder; isn't that correct?
> A. Mm-hmm.
> Q. And that one conspiracy to murder is the conspiracy we've discussed about the murder of Joel Silva?
> A. I was involved in other conspiracies to commit murder of other members of other charters—of other clubs.
> Q. Oh, so you've been involved in more than one conspiracy to murder?
> A. Yes.
> Q. Okay. So tell me, what was the next conspiracy to murder you were involved in?
> A. No.
> Q. I'm sorry?
> THE WITNESS: I'm taking the Fifth, Your Honor.
> THE COURT: All right. So he's invoking the Fifth in terms of the details of those conspiracies?
> THE WITNESS: Excuse me?
> THE COURT: You're invoking the Fifth with respect to saying any more about the details of those other conspiracies?
> THE WITNESS: Yes.
> THE COURT: All right. So he's admitted being part of a conspiracy—other murder conspiracies, but is taking the Fifth with respect to the details.

Trial Tr. 3934–35. Though he attempted to invoke the Fifth with respect to details, Mr. Hardisty still admitted to being involved in other conspiracies to commit murder. In fact, Mr. Hardisty ultimately did testify to details about other alleged conspiracies to commit murder. He explained that he was recruited to the Hells Angels for "big game hunting and small game hunting. Big game hunting is for Mongols. Small game hunting is for Vagos." *Id.* at 3961. Mr. Hardisty elaborated that he and another member from the Richmond charter conspired to kill a member of the Vagos, even taking the step of surveilling the target, though no murder occurred. *Id.* at 3935–39. Defendants were not prejudiced by Mr. Hardisty's attempt to invoke the Fifth.

///

///

///

5

## IV. CONCLUSION

In the end, Mr. Hardisty's invocation of the Fifth Amendment was inconsequential. There has been no showing that his answer to the question about how he earned the Filthy Few patch would have had any substantive relevance to his testimony about the commission of Joel Silva's murder. Instead, the question to which Mr. Hardisty invoked the Fifth Amendment was directed to his credibility and was thus collateral to the relevant issues in dispute. The motion to strike is denied.

This order disposes of Docket No. 3419.

**IT IS SO ORDERED**.

Dated: May 10, 2023

_____
EDWARD M. CHEN
United States District Judge