1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

JONATHAN JOSEPH NELSON, et al.

Defendants.

Case No. 17-cr-00533-EMC-1

**ORDER DENYING DEFENDANTS' MOTIONS FOR JUDGMENT OF ACQUITTAL**

Docket Nos. 2872, 3031, 3032

## I.        INTRODUCTION

On June 22, 2022, a jury convicted Defendants Jonathan Nelson, Russel Ott, and Brian Wendt of conspiracy in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d) (Count One); conspiracy to commit murder in violation of the Violent Crimes in Aid of Racketeering Activity ("VICAR"), 18 U.S.C. § 1959(a)(5); and murder in violation of VICAR, 18 U.S.C. § 1959(a)(1). *See* Docket No. 2886 ("Jury Verdict"). In addition, Jonathan Nelson was convicted of assault with a dangerous weapon in aid of racketeering in violation of 18 U.S.C. § 1959(a)(3) (Count Six), and use of a firearm during a crime of violence in violation of 18 U.S.C. § 941(c) (Count Seven). *Id.*[1]

Now pending are Defendants' motions for acquittal pursuant to Federal Rule of Criminal Procedure 29. *See* Docket No. 2872 (Wendt Motion), Docket No. 2873 (Wendt Memorandum in Support) (collectively "Wendt Mot."); Docket No. 3031 ("Nelson Mot."); Docket No. 3032 ("Ott Mot."). For the following reasons, the Court **DENIES** Defendants' Rule 29 motions.

---

[1] This trial originally involved 11 defendants. *See* Superseding Indictment. The Court opted to try the case in groups due in part to difficulties caused by the COVID-19 pandemic. *See* Docket No. 1110. Group One consisted of Mr. Ott, Mr. Wendt, and Mr. Nelson. *Id.* Group Two consists of Raymond Foakes, Christopher Ranieri, and Brian Burke.

## II.      FACTUAL BACKGROUND

A.      The Hells Angels Motorcycle Club and Hells Angels Sonoma County

The following is a summary of the evidence as it stood at the end of the Government's case-in-chief:

The Hells Angels Motorcycle Club ("Hells Angels" or "HAMC") is what the Government refers to as an Outlaw Motorcycle Gang ("OMG"). *See* Trial Tr. 3856. The Hells Angels operate on a global scale. *Id.* Within the Hells Angels umbrella, there are various charters designated by location. *Id.* at 3855. Hells Angels charters in the United States are organized into West Coast and East Coast regions. *Id.* at 3864. Each charter acts semi-autonomously with its own set of rules; however, charters are still required to adhere to Hells Angels "world rules." *Id.* at 3867. With some variation, the world rules govern how an individual can become a member of a particular Hells Angels charter. *Id.* at 3859–60. Individuals begin as "hang-arounds" and are then required to "prospect" over a twelve-month period before they can become "full-patch" members. *Id.* at 3859, 3927–33. The term "full-patch" refers to the three-piece patch on members' vests, or "cut." *Id.* at 3878; *see, e.g., id.* at 4041. The patch consists of a "top rocker," which states the name "Hells Angels"; the center patch has the Death Head logo, a skull with its mouth stitched shut; and below the Death Head is the "bottom rocker," which denotes the state the member is from. *Id.* at 3878, 3919. Only full-patch members are permitted to wear something that displays the Hells Angels name or the Death Head. *Id.* at 3878. Members can also earn tags that they wear on the front of their vests. Among these is the "Filthy Few" tag, which the Government argued members earn by committing a violent act in furtherance of the club. *Id.* at 3923.

Charters have a standardized leadership structure. *Id.* at 3857–58. Typically, charter leadership consists of a president, vice president, secretary, treasurer, and a sergeant-at-arms. *Id.* Relevant here, the president is the leader of the charter, and the sergeant-at-arms is the enforcer of the charter, tasked with using violence, if necessary, to maintain respect for the charter and discipline charter members who fail to follow charter and world rules. *Id.* at 1996, 2275.

Charters hold mandatory weekly meetings referred to as "church." *Id.* at 3876. At church, members discuss and vote on significant charter issues. *Id.* at 3877. Most charter decisions are

2

subject to a "one man, one vote" rule. *Id.* at 3858. While prospects are prohibited from participating in church, they are expected to provide security when church is held, specifically watching out for rival OMGs and law enforcement. *Id.* 4195–96.

Hells Angels Sonoma County ("HASC") is a charter that operates in Sonoma County. *Id.* at 5057. As the next section demonstrates, HASC has exhibited two purposes relevant to this trial. First, HASC seeks to promote their reputation through violence. *See id.* at 3868, 3923, 4054, 5024–28. This purpose involves, *inter alia*, violence toward rival OMGs, *e.g.*, *id.* at 3868; violence toward non-members who "disrespect" Hells Angels members, *e.g.*, *id.* at 5024–28; and violence toward members who are kicked out of the club in bad standing. *E.g.*, *id.* at 3934, 4285. Second, HASC seeks to evade law enforcement scrutiny. *See id.* at 3919, 3924–26, 4054, 4229. This purpose involves, *inter alia*, assaults on law enforcement officers, as well as violently enforced "no snitching" rules. *E.g.*, *id.* at 3535, 3919, 3924–26, 5021. The stitched shut mouth of the Death Head logo is said to reflect the no snitching rules. *Id.* 3919.

Defendant Russel Ott is one of HASC's founders. *Id.* at 4220. He was president of HASC for fifteen years and remains an influential member of HASC. *Id.*; *see id.* at 5289–91, 5413–16. Mr. Ott is referred to as "Chief," was "one of the most active Hells Angels ever," and would often spend time at the HASC clubhouse, living there at times. *Id.* at 2023–24, 2725, 4220. Defendant Jonathan Nelson is the most recent president of HASC. *Id.* at 4195–96. Mr. Nelson was highly respected in his role as president. *Id.* Testimony demonstrated that Mr. Nelson often used violence in response to perceived transgressions against himself and HASC. *See*, *e.g.*, *id.* at 4248, 4263–64, 4282. Defendant Brian Wendt was the president of Hells Angels Fresno and the Hells Angels Sergeant-at-Arms for the West Coast region. *Id.* at 3083, 4236. Testimony demonstrated that Mr. Wendt often engaged in violent conduct in carrying out his role as West Coast Sergeant-at-Arms. *Id.* at 2737, 4243–44.

In addition, HASC members were particularly close with members of the Fresno and Boston Hells Angels charters. *Id.* at 4235. Mr. Wendt was often present at the HASC clubhouse, Mr. Nelson and Mr. Wendt had a close personal relationship, and HASC and the Fresno charter often went on "runs" (*i.e.*, joint motorcycle rides) together. *Id.* at 1994, 4235–36. Mr. Nelson also

1   displayed significant respect for and had a close friendship with Christopher Ranieri, the president

2   of the Boston Hells Angel charter.  *Id.* at 4238.  For example, celebrations were held for Mr.

3   Ranieri when he visited the HASC and Fresno clubhouses, and Mr. Ranieri spent time with Mr.

4   Nelson and Mr. Wendt on multiple occasions while staying at HASC member Russel Lyles'

5   residence.  *Id.* at 4239, 2029–34.  The Government also presented numerous photos of Mr. Ranieri

6   with HASC and Fresno members.  *See*, *e.g.*, Gov't Ex. 1413 at 1272, 1274.  Another photo

7   depicted Mr. Ott, Mr. Nelson, and Mr. Wendt holding up a framed photo of Mr. Ranieri.  Gov't

8   Ex. 184.  Mr. Ranieri even had a Sonoma County Death's Head tattooed on his forearm.  Gov't

9   Ex. 785.

10      The victim in this case, Joel Silva, was also an HASC member.  *Id.* at 2161, 2245.  Mr.

11  Silva had a reputation for being a bully and reportedly created problems at the HASC, Fresno, and

12  New Hampshire clubhouses.  *Id.* at 2729–33.  Mr. Ott, Mr. Nelson, and Mr. Wendt were convicted

13  for his murder.  *See* Jury Verdict.

14  B.    Overt Acts, Predicate Acts, and Uncharged Conduct

15      1.    Assaults

16      The Government presented evidence of HASC's involvement in three assaults.[2]  Javad

17  Trew testified that he was assaulted by Mr. Nelson and HASC member Jeremy Greer.  Trial Tr.

18  1435.  Mr. Trew explained that he considered joining HASC after meeting Mr. Greer at a tattoo

19  convention in 2015.  *Id.* at 1411–18.  Mr. Greer then began to ask favors of Mr. Trew.  In one

20  instance, Mr. Greer called Mr. Trew late at night asking to borrow Mr. Trew's utility trailer.  *Id.* at

21  1421.  When Mr. Trew declined, Mr. Greer became "very aggressive on the phone about it." *Id.*

22  Next, Mr. Greer asked to borrow Mr. Trew's vehicle.  *Id.* at 1422.  Mr. Trew again declined, and

23  Mr. Greer again became aggressive.  *Id.*  Eventually, in approximately 2016, Mr. Trew told

24  Mariano Malvino, a member of the HASC support club Ghost Warriors, that he was

25  _____

26  [2] While assaults do not qualify as racketeering acts, *see* 18 U.S.C. § 1961(1), they can be
    considered as enterprise evidence and serve, in part, as a basis for the inference that a defendant
27  joined the enterprise agreeing members would engage in a pattern racketeering.  *Cf. See United
    States v. Jaimez*, 45 F.4th 1118, 1122 (9th Cir. 2022) (utilizing of assaults as evidence of an
28  enterprise), *cert. denied*, 143 S. Ct. 1038 (2023); *United States v. Fernandez*, 388 F.3d 1199 (9th
    Cir. 2004) (utilizing evidence of assaults to prove a defendant's participation in an enterprise).

4

uncomfortable with Mr. Greer's aggressive responses. *Id.* at 1423. As a member of an HASC support club, Mr. Malvino was expected to inform HASC of any disrespect toward HASC members. *Id.* at 1333, 1458. Accordingly, Mr. Malvino informed Mr. Greer that Mr. Trew was "talking bad about [HASC]." *Id.* at 1333.

Mr. Malvino subsequently told Mr. Trew to go to the HASC clubhouse. *Id.* at 1426. When Mr. Trew arrived, Mr. Greer and Mr. Nelson were waiting for him with a clear plastic sheet spread across the floor. *Id.* at 1434. Mr. Greer began yelling at Mr. Trew for talking about him to Mr. Malvino. *Id.* at 1435. Mr. Nelson then struck Mr. Trew in the back of his head with a baseball bat. *Id.* at 1437. Others at the clubhouse joined in and beat Mr. Trew for approximately two minutes. *Id.* Mr. Trew stated that he thought he "was going to die," *id.* at 1438, and that by the time the assault ended, he was "pouring blood everywhere[.]" *Id.* at 1437. Mr. Malvino then walked Mr. Trew to the bathroom and instructed Mr. Trew to clean himself off with a bottle of bleach. *Id.* at 1439. After leaving the bathroom Mr. Nelson asked Mr. Trew "What the fuck happened tonight?" *Id.* at 1440. Mr. Trew responded, "Nothing happened tonight," as he was under the impression that he would be killed if he told anyone about the assault. *Id.* On his way home after the assault, he discovered that his phone was factory reset and all his data was cleared. *Id.* at 1441.

Mr. Malvino himself was assaulted by Mr. Nelson and HASC member Russel Lyles for interacting with David Clark, a non-member in bad standing with the Hells Angels. *Id.* at 1340–1346. Mr. Lyles had previously informed HASC and Ghost Warrior members that they could not associate with David Clark. *Id.* at 1339. Despite Mr. Lyles' instruction, Mr. Malvino continued to do so, and was arrested after committing a robbery with David Clark. *Id.* at 1339–40. While released on bail, Mr. Malvino told the Ghost Warriors about his and David Clark's arrest. *Id.* at 1340. The Ghost Warriors told Mr. Malvino he was required to inform Mr. Lyles about the incident, and Mr. Malvino did so. *Id.* at 1340–41.

On August 3, 2017, Mr. Malvino informed Mr. Lyles and was immediately summoned to the HASC clubhouse. *Id.* at 1341; Gov't Ex. 176. When Mr. Malvino arrived, Mr. Lyles and Mr. Nelson attacked him. Trial Tr. 1346. Mr. Lyles and Mr. Nelson repeatedly punched Mr. Malvino

in the face.  *Id.*  Mr. Nelson then struck Mr. Malvino in the back of the head with what Mr. Malvino described as the teeth side of a framing hammer.  *Id.* at 1346–47.  When the assault ended, Mr. Malvino was on the ground and saw a pool of blood.  *Id.* at 1348.  Members of the Ghost Warriors then went to Mr. Malvino's house and took all his Ghost Warrior paraphernalia.  *Id.* at 1350.

Lastly, former member Troy Conte was assaulted and kicked out of HASC for sleeping with the girlfriend of HASC member, and former president, Raymond Foakes.  *Id.* at 5006, 5085, 5089.  In November 2016, after Mr. Foakes discovered the affair, Mr. Nelson texted Mr. Conte that all HASC members needed to come to the clubhouse for a meeting.  *Id.* at 5087–88.  Twenty minutes after Mr. Conte arrived, Mr. Foakes walked in and struck Mr. Conte in the face.  *Id.* at 5089.  Mr. Conte attempted to leave, but Mr. Lyles and Mr. Foakes dragged him back inside and proceeded to beat him.  *Id.* at 5090.  Eventually, the assault was paused so the members could vote on Mr. Conte's membership.  *Id.* at 5091.  All voted to revoke Mr. Conte's membership, including Mr. Nelson and Mr. Ott.  *Id.* at 5092.  Mr. Conte was then intermittently beaten with a bull whip, a pistol, and a baseball bat for a period of four-and-a-half hours.  *Id.* at 5093–94.  Mr. Conte was also held down so Mr. Foakes could run a tattoo gun across his face.  *Id.* at 5095.  Mr. Conte testified that the worst part was when Mr. Nelson pistol whipped him in the face.  *Id.* at 5094.  Every HASC member—save Mr. Ott who left after the vote—was present for, or participated in, the post-vote assault.  *Id.* at 5098.

As a result of the assault, Mr. Conte had to spend multiple days in the hospital.  Gov't Exs. 11, 12.  Medical records described Mr. Conte as "a risk for sudden clinical deterioration and life-threatening injuries."  Gov't Ex. 12.  He suffered facial fractures, including to the orbital walls of his left eye, had to have plastic surgery to remove the tattoos on his forehead, and still has vision problems to this day.  Trial Tr. 5103.

### 2.   Extortion and Robbery

The Government presented evidence demonstrating that HASC engaged in the RICO predicate acts of extortion and robbery.  *See*, *e.g.*, *id.* at 3934, 4571–74, 4867, 5031–32.  The night Mr. Conte was assaulted, HASC members went to his house and took all of his Hells Angels

United States District Court
Northern District of California

1    paraphernalia.  *Id.* at 4867.  One member attempted to steal the Contes' car, but it failed to start.

2    *Id.*  Michelle Conte, Mr. Conte's wife, was home at the time.  *Id.* at 4868–69.  Ms. Conte testified

3    that she allowed the members to take the items because she was fearful of what they would do if

4    she tried to stop them.  *Id.*

5         Mr. Conte similarly testified that when prospects get kicked out of the club, members

6    would vote on whether to allow the prospect to keep their motorcycle.  *Id.* at 5031–32.  He

7    explained that if a prospect refused to give up their motorcycle, they would get beaten up.  *Id.* at

8    5033.  Further, at least some members viewed taking prospects' motorcycles as a way to make

9    money.  *Id.* at 5033–34.

10        As one example, former HASC prospect Steve Verhagen was extorted by HASC members

11   after he was told to "step back as being a prospect."  *Id.* at 4285.  The night he was told to "step

12   back," Mr. Verhagen was required to turn over his motorcycle to HASC.  *Id.* at 4286.  Mr.

13   Verhagen believed that if he had failed to give his motorcycle to HASC willingly, he would have

14   been "beaten and it would be taken."  *Id.* at 4287.  In addition to his motorcycle, Mr. Greer and

15   another HASC member went to Mr. Verhagen's home and took all of his Hells Angels related

16   possessions, as well as his personal laptop and digital camera.  *Id.* at 4286.

17        The Government also presented evidence of two robberies committed in furtherance of

18   HASC.  Nicholas Gruber and Nicholas Spencer operated a marijuana grow out of Mr. Gruber's

19   house in Sonoma County.  *Id.* at 4567.  During his partnership with Mr. Gruber, Mr. Spencer lived

20   at Mr. Gruber's house.  *Id.*  On January 15, 2015, HASC members Damien Cesena and Jeremy

21   Greer showed up at Mr. Gruber's house demanding marijuana they believed Mr. Spencer had

22   stolen from an individual named Casey Jones.  *Id.* at 4570–73.  When Mr. Spencer declined to

23   give them the marijuana, Mr. Greer and Mr. Cesena forced themselves in through the gate, and

24   Mr. Cesena struck Mr. Spencer with a pistol.  *Id.* at 4571–74.  After he was struck, Mr. Spencer

25   fled through the back door.  *Id.*  Later that night, Mr. Spencer returned home and found that Mr.

26   Cesena and Mr. Greer had taken several marijuana plants and "a duffle bag with some pounds of

27   weed."  *Id.* at 4573.  A couple of days later, while only Mr. Gruber's mother was home, Mr.

28   Cesena returned to the house wearing his Hells Angels patch and told Mr. Gruber's mother that he

                                                 7

1   wanted to speak with her son.  *Id.* at 5787–88.  According to testimony, the reason Mr. Cesena

2   returned was to notice his affiliation with the Hells Angels.  *Id.* at 5071.

3          Notably, both the robbery and Mr. Cesena's return were captured by Mr. Gruber's

4   surveillance system.  *Id.* at 5787.  Mr. Gruber showed the surveillance footage to his martial arts

5   instructor, who happened to be HASC member Herb Cody.  *Id.* at 5790.  Upon viewing the

6   footage, Herb Cody asked to purchase the surveillance hard drive from Mr. Gruber.  *Id.*  Mr. Cody

7   ended up buying the hard drive for $10,000.  At the next church, when the other HASC members

8   learned of the robbery, Mr. Greer and Mr. Cesena were made to split the proceeds because Mr.

9   Cesena wore his Hells Angels patch when he returned to the grow house.  *Id.* at 5071.

10          HASC was also implicated in the robbery of Eban Hale.  *Id.* at 4076–77.  In the spring of

11   2016, Mr. Hale won an auction for an abandoned storage unit and, much to his surprise,

12   discovered around 200 pounds of packaged marijuana inside.  *Id.* at 4060–4061.  Eventually, word

13   of Mr. Hale's find spread, and individuals began harassing Mr. Hale, demanding he give them

14   some of the marijuana.  *Id.* at 4066.  A friend of Mr. Hale recommended that he speak with HASC

15   member Troy Conte for protection.  *Id.* at 4067.  Mr. Hale took the advice—he set up a meeting

16   with Mr. Conte at which he gave Mr. Conte 30 pounds of marijuana in exchange for his

17   protection.  *Id.* at 4069–70.  After the meeting, the harassment immediately ceased.  *Id.* at 4069–

18   70.

19          However, in November 2016, Mr. Conte was removed from HASC, *id.* at 5091, and a few

20   weeks later, in December 2016, HASC member Jeremy Greer showed up at Mr. Hale's home.  *Id.*

21   at 4075.  When Mr. Hale saw Mr. Greer, he was already inside the house holding a gun.  *Id.* at

22   4075–76.  Mr. Greer told Mr. Hale that the marijuana was his and demanded its return.  *Id.* at

23   4076.  When Mr. Hale explained to Mr. Greer that he had already sold the marijuana for $100,000,

24   Mr. Greer cocked his gun and demanded the $100,000.  *Id.*  After Mr. Hale told Mr. Greer he

25   didn't have the money, Mr. Greer stated "Do you know who I represent?"  *Id.* at 4078.  Mr. Hale

26   understood Mr. Greer to be referencing the Hells Angels.  *Id.* at 4080.  Mr. Hale then gave Mr.

27   Greer everything he had on hand: $4,000 worth of marijuana and $1,000 in cash.  *Id.* at 4081.

28          A few days later, while driving his daughter to school, Mr. Hale noticed Mr. Greer was

United States District Court
Northern District of California

8

following him in a van. *Id.* at 4082–83.  Mr. Hale was able to drop his daughter off at school, *id.* at 4085, but Mr. Greer continued to follow Mr. Hale for another 30 to 40 minutes.  *Id.* at 4086–87.  Eventually, Mr. Hale called the police.  *Id.*  The police arrested Mr. Greer and searched his van.  *Id.* at 4146–48.  Inside, the police found, among other things, guns, a knife, masks, zip-ties, a ballistic vest, and Hells Angels paraphernalia.  *Id.* at 4146–48.  After Mr. Greer was arrested, police officers saw another HASC member circling the block.  *Id.* at 4162–63.

### 3.    Witness Intimidation

The night Troy Conte was removed from HASC, Raymond Foakes sexually assaulted Mr. Conte's wife, Michelle Conte, and subjected her to witness intimidation.  Trial Tr. 4869–71.  During the four-hour assault on Mr. Conte, Mr. Foakes called Ms. Conte and told her to come to the HASC clubhouse.  *Id.*  Once she arrived, Mr. Foakes drove Ms. Conte to a secluded location and told her that if she did what he said, "Troy won't get hurt."  *Id.* at 4071.  Mr. Foakes then forced Ms. Conte to perform fellatio on him.  *Id.*  After sexually assaulting her, Mr. Foakes told Ms. Conte that someone would come after her if she told anyone about the incident.  *Id.*  Ms. Conte then returned home.  *Id.* at 4874.  However, just before Mr. Conte returned from the HASC clubhouse, Mr. Foakes went to the Contes' house and attempted to assault Ms. Conte again while she was in her bed.  *Id.*  HASC member Josh Johnson, who was bringing Mr. Conte home after the assault at the clubhouse, arrived before Mr. Foakes could do so and convinced Mr. Foakes to leave.  *Id.* at 4874–75.  Ms. Conte then took her husband to the hospital.  *Id.* at 4877.  The next day, Ms. Conte informed her husband that Mr. Foakes sexually assaulted her.  *Id.*  Even though the Contes typically avoided dealing with law enforcement, Mr. Conte told Ms. Conte that she should report the incident to the police.  *Id.* at 4878–80.  Ms. Conte did so, and Mr. Foakes was arrested.  *Id.*

Around one year later, Ms. Conte encountered HASC member Brian Burke on a freeway.  *Id.* 4481–82.  Upon seeing Ms. Conte, Mr. Burke shaped his hand in the figure of a gun, pointed it at Ms. Conte, and then pointed it to his head.  *Id.* at 4883.  Ms. Conte testified that she took this as a threat against her life for reporting the sexual assault to law enforcement.  *Id.* at 4884.

United States District Court
Northern District of California

9

4.      Murder of Rivals

The Government provided evidence that HASC contemplated violence which could result in the killing of rival OMGs.  Rival OMGs—such as the Mongols, Vagos, and Wanted—were considered enemies, and Hells Angels members were expected to attack enemies on sight.  *Id.* at 2706–2710.  Government Witness Joseph Hardisty testified that the Hells Angels recruited him for "big game and small game hunting," *i.e.*, to hunt and kill Mongols ("big game") and Vagos ("small game").  *Id.* at 3090–91.  He further testified about an incident in which he was riding with HASC members, including Mr. Silva and Mr. Ott, and observed someone he assessed to be a rival OMG member.  *Id.* at 2715–16.  Mr. Hardisty stated that upon seeing the rival OMG member, he took out his gun and fired several shots in the rider's direction.  *Id.*  After the shooting, HASC members congratulated Mr. Hardisty and told him he was "a real Hells Angels."  *Id.* at 2717.

In another instance, after a member of the Mongols murdered the president of the San Francisco Hells Angels, *id.* at 5049–50, HASC members were told to look out for Mongols and attack them on sight.  *Id.*  Members who failed to do so lost status in HAMC.  *Id.* at 5052.  For example, a full-patch HASC member who failed to report seeing a Mongol license plate in HAMC territory was relegated to a prospect.  *Id.*

Mr. Verhagen testified that he participated in two "runs" to Arizona in which HASC and related charters contemplated killing rivals.  *Id.* at 4250.  Mr. Verhagen explained that after a Phoenix Hells Angels member was killed by a Mongol, HASC travelled to Arizona in force for the funeral.  *Id.* at 4246.  The members chose to take a route through Mongol territory rather than the most direct route "to let them know that we wouldn't be intimidated."  *Id.* at 4247–48.  Before leaving, Mr. Nelson gave a speech in which he explained that they could be ambushed by other motorcycle clubs.  *Id.* at 4248–49.  Mr. Verhagen testified that the speech "made me feel prepared for war . . . I was getting ready to ride into battle."  *Id.* at 4248.  In fact, Mr. Verhagen "felt on several occasions that dying as a Hells Angel prospect would be worth it based on the emotions that are instilled in you to become a good Hells Angel."  *Id.* at 4249.  While on another run to Arizona, Mr. Verhagen saw Fresno charter members pass an AR style rifle, a shotgun, and some pistols through the window of Mr. Wendt's hotel room.  *Id.* at 4241–42.

United States District Court
Northern District of California

United States District Court
Northern District of California

5.     Drug Trafficking and Fraud

Around 2008, Russel Lyles operated a marijuana grow house in Willets, California.  *See* Gov't Ex. 91.  Raymond Foakes' then girlfriend, Meghan Jaynes, testified that Mr. Foakes ordered her to move to the location of the grow house and work for Mr. Lyles without pay.  Trial Tr. 1782.  Ms. Jaynes explained that Hells Angels members would often visit the grow house, including a member of the Boston Hells Angel charter.  *Id.* at 1783.  Eventually, the grow house was raided, and Mr. Lyles was arrested.  *Id.* at 1783–84.  Law enforcement discovered Hells Angels paraphernalia and a number of firearms in the grow house.  *Id.* at 1793, 1795–97.  As a result of his arrest, Mr. Lyles was convicted of possession of marijuana with the intent to distribute, as well as maintaining a premises for the manufacture/use of controlled substances.  Gov't Ex. 91.

Ms. Jaynes also testified that in 2012 Mr. Foakes pled guilty to conspiracy to commit bank and wire fraud, wire fraud, and money laundering connected to a mortgage fraud scheme.  Gov't Ex. 75; Trial Tr. 1779, 1866.  HASC members Chuck Thompson, Josh Johnson, and HASC associate Desiree McLean, were implicated in the mortgage fraud scheme as well.  Trial Tr. 1866.

C.     Murder of Joel Silva

Among the RICO acts, and the basis for each Defendant's VICAR murder conviction, is the conspiracy to murder and murder of former HASC member Joel Silva.

In June 2014, Mr. Silva attended the annual Laconia Motorcycle Week in New Hampshire with Fresno charter members Robbie Huff, Mr. Wendt, Tio Bueno, and former Richmond charter member Joseph Hardisty.  *Id.* at 2730–31.  While there, Mr. Silva and Mr. Hardisty spent time at the Laconia charter clubhouse.  *Id.*  Mr. Hardisty testified that he and Mr. Silva were using meth, "tearing the clubhouse apart, terrorizing the prospects," and "picking on all the East Coast members."  *Id.* at 2731–32.  Mr. Hardisty explained that Mr. Silva engaged in this type of behavior often, and it was creating strife between Mr. Silva and other Hells Angels.  *Id.* at 2730.  At one point, a dispute arose between Mr. Silva and Boston charter member "Sweeney."  *Id.* at 2733.  Sweeney was the "right-hand man" to the Boston charter president, Christopher Ranieri, *see id.*; as noted, Mr. Ranieri was a close friend of Mr. Wendt and Mr. Nelson.  *Id.* at 2759, 2800–11.  According to Mr. Hardisty, Sweeney was upset that Mr. Silva was moving marijuana across

11

the country, and Mr. Silva was upset that Sweeney had taken a Hells Angels chain from him and given it to Mr. Hardisty. *Id.* at 2733–34.  As a result, Mr. Silva threatened to kill Sweeney, and asked Mr. Hardisty and Robbie Huff to help him do so. *Id.* at 2734.  Mr. Hardisty explained that Mr. Silva's threat was a significant problem because "you can't kill other Hells Angels." *Id.* at 2735.  Word of Mr. Silva's threat eventually reached Mr. Wendt, who became furious with Mr. Silva. *Id.*  Mr. Wendt then gave Mr. Hardisty an ultimatum, "you're in with us or you stay here with [Mr. Silva]." *Id.*  Mr. Hardisty chose to go with Mr. Wendt because "[Mr. Silva] had made a big mistake," and "it wasn't the safe choice to stay with [Mr. Silva]." *Id.* at 2735–36.

Mr. Hardisty testified that he and Mr. Wendt then went to Mr. Ranieri's house in Lynn, Massachusetts, where Mr. Wendt and Mr. Ranieri privately discussed Mr. Silva's threat. *Id.* at 2736.  When Mr. Wendt returned from the discussion with Mr. Ranieri, he told Mr. Hardisty that Mr. Silva "had to go," *i.e.*, Mr. Silva "had to be killed." *Id.*  Mr. Hardisty and Mr. Wendt then flew back to California. *Id.* at 2737.  The next day, Mr. Wendt, Mr. Huff, Mr. Hardisty, and HASC president Mr. Nelson met at Mr. Hardisty's residence in Antioch. *Id.* at 2738–40.  Those present discussed Mr. Silva and concluded he "had to disappear." *Id.*  Mr. Hardisty explained that they reached this decision because Mr. Silva was "causing too much problems . . . beating too many friends up.  The threat to Sweeney's life . . . he was causing too much drama within different charters." *Id.*  In addition to the evidence of problems Mr. Silva was causing with other charters, the Government presented evidence that Mr. Nelson perceived Mr. Silva was challenging his status as HASC president.  Issues between the two began to arise in February 2013, when Mr. Silva struck Mr. Nelson in the forehead. *See id.* 2073–74.  Mr. Verhagen testified that Mr. Nelson was generally sensitive about his status as president, *id.* at 4217,  and Mr. Conte similarly noted Mr. Nelson's sensitivity. *Id.* at 5073.  For instance, Mr. Conte explained that in the Summer of 2014, Mr. Nelson came to his work and stated that "he had problems with [Mr. Silva] . . . That he didn't like the way [Mr. Silva] was badmouthing him; that [Mr. Silva] went back East and *said some stuff about him about being president*." *Id.* at 5073 (emphasis added).  Mr. Nelson then told Mr. Conte, in reference to Mr. Silva, "I'll have that guy killed." *Id.* at 5074.

As a result of the meeting in Antioch, Mr. Nelson was given the responsibility of arranging

United States District Court
Northern District of California

12

Mr. Silva's murder; a few weeks later, at a meeting in Berkeley, Mr. Nelson gave Mr. Hardisty the

responsibility of carrying out Mr. Silva's murder. *Id.* at 2740–41. Mr. Nelson further explained to

Mr. Hardisty that the murder would have to take place in Fresno because the Fresno charter had

access to a crematorium. *Id.* at 2742. At first, Mr. Hardisty agreed—he moved to Sonoma so he

could ease Mr. Silva's fears about spending time with Hells Angels. *Id.* at 2741–42. According to

Mr. Hardisty, this was necessary because Mr. Silva was scared after the Laconia incident and was

avoiding places where he believed he could be killed by Hells Angels. *Id.* at 2742. Other

witnesses similarly testified that Mr. Silva was fearful. A friend testified that before his

disappearance, Mr. Silva told him "if the club says I'm running from them, don't believe it[,]" *id.*

at 2249, and Mr. Silva's stepfather testified that the day before his disappearance, Mr. Silva told

him "if the club says I ran, I didn't run." *Id.* at 5681–82.

Eventually, Mr. Hardisty repudiated his role in the plan to kill Mr. Silva. *Id.* at 2743.

However, the overall plan continued without him; Mr. Hardisty testified that he learned some of

the details during a discussion with Mr. Huff and Mr. Wendt. *Id.* at 2745. Mr. Wendt told Mr.

Hardisty they were going to tell Mr. Silva to come to the Fresno club house "for a fight and to

grab a couple pounds of weed[.]" *Id.* The fight was meant to give Mr. Silva the impression that

Mr. Wendt wanted to "squash the beef" stemming from the Laconia incident in a manner typical

of the Hells Angels. *Id.* The weed "was just added incentive" because Mr. Silva was dealing. *Id.*

at 2746. As noted, the plan also required dispelling Mr. Silva's fear of being killed by HAMC.

Thus, the conspirators recruited a member Mr. Silva trusted to lure Mr. Silva to the Fresno

clubhouse. *Id.* That responsibility fell to Mr. Ott. *Id.*

During this time, Mr. Hardisty remained in frequent contact with Mr. Silva until he

received a text "letting [him] know that there was no point in calling [Silva] anymore." *Id.* at

2748. A few weeks later, Mr. Hardisty went to the Fresno clubhouse to meet with Mr. Wendt. *Id.*

at 2749. When Mr. Hardisty arrived, Mr. Wendt gave him a ring Mr. Silva received from the

Richmond charter. *Id.* Mr. Hardisty explained that "when someone gets killed in the club, all the

property from another charter goes back to that charter[.]" *Id.* Because Mr. Silva received the

ring from the Richmond charter and Mr. Hardisty was a member of the Richmond charter, Mr.

13

1   Hardisty inferred that the ring was being given back to him because Mr. Silva had been killed.  *Id.*

2   at 2750.

3         Mr. Wendt then confessed to the details of how he killed Mr. Silva: after Mr. Silva arrived

4   at the Fresno clubhouse, Mr. Wendt told him to grab marijuana from a cubby under a stage.  *Id.*

5   When Mr. Silva bent down to grab the marijuana, Mr. Wendt shot Mr. Silva in the back of the

6   head.  *Id.*  Mr. Wendt explained how he tried to cover-up the murder.  Mr. Wendt told Mr.

7   Hardisty that Mr. Silva's truck was "off in a field or desert somewhere and the body was never

8   going to be found."  *Id.*  at 2751.  According to Mr. Hardisty's testimony, Mr. Silva's body would

9   likely never be found because he believed it had been taken to a nearby crematory with an

10  incinerator large enough to fit a person.  *Id.*  Before Mr. Silva disappeared, Mr. Huff had pointed

11  the crematory out to Mr. Hardisty and stated "this is where we're gonna bring him[.]"  *Id.* at 2752.

12        Other evidence and testimony corroborated Mr. Hardisty's testimony.  Consistent with Mr.

13  Hardisty's testimony about what occurred during Laconia Motorcycle Week, cell-site data showed

14  that from 12:00 a.m. to 3:00 a.m. on June 16, 2014, Mr. Wendt's, Mr. Bueno's, Mr. Huff's, and

15  Mr. Silva's phone where in Laconia, New Hampshire.  *Id.* at 3185.  By 3:00 p.m. on June 16,

16  2014, Mr. Silva had separated from Mr. Wendt and Mr. Huff: cell-site data placed Mr. Silva's

17  phone at the Manchester-Boston Regional Airport, whereas Mr. Wendt's and Mr. Huff's phones

18  registered in Lynn, Massachusetts, near the residence of Mr. Ranieri.  *Id.* at 3187–88; Gov't Ex.

19  127 at 73–74.  By 6:00 p.m. that evening, Mr. Wendt's, Mr. Huff's, and Mr. Bueno's phones

20  registered at the Boston Logan International Airport.  *See* Gov't Ex. 127 at 75.  The next day, June

21  17, 2014, cell-site data placed Mr. Wendt's, Mr. Huff's, and Mr. Nelson's phones in the proximity

22  of Antioch, California, near the residence of Mr. Hardisty.  Trial Tr. 3188; Gov't Ex. 127 at 76.

23        Approximately one month later, on July 14, 2014—only one day before Mr. Silva's

24  disappearance—cell-site data showed that Mr. Wendt's phone was again in the vicinity of Mr.

25  Ranieri's residence in Lynn, Massachusetts from 8:00 a.m. to 4:00 p.m., ET.  Trial Tr. 3189.  In

26  that time, Mr. Wendt and Mr. Ranieri were in regular contact with Mr. Nelson.  *Id.*; *see also* Gov't

27  Ex. 127 at 12–14.  From 5:00 p.m. to 5:55 p.m., cell-site records show Mr. Wendt was at Boston

28  Logan International Airport, where contacts between him, Mr. Nelson, and Mr. Ranieri continued.

1    *See* Gov't Ex. 127 at 14.  From there, cell-site activity for Mr. Wendt's phone is consistent with

2    travel from Boston Logan International Airport to Los Angeles International Airport, with Mr.

3    Wendt's phone connecting to towers near Los Angeles International Airport at approximately

4    10:00 p.m., PT.  Trial Tr. 3190.

5              Then, on the morning of July 15, 2014, the day of Mr. Silva's disappearance, cell-records

6    show Mr. Wendt was in regular contact with Mr. Silva, Mr. Nelson, and Mr. Ranieri.  *Id.* at 3180–

7    82.  The same morning, Mr. Ott's phone made outgoing calls to Mr. Silva's phone at 10:23 a.m.

8    and 11:06 a.m..  *Id.* at 3173, 3181.  Around an hour after the 11:06 a.m. call, Mr. Ott's phone and

9    Mr. Silva's phone travelled in tandem from Santa Rosa to the vicinity of the Fresno clubhouse and

10   remained there until the following day.  *Id.* at 3208–3210.  Cell-site data showed that after arriving

11   in the vicinity of the Fresno clubhouse, Mr. Silva's phone made a series of outgoing contacts to

12   Mr. Wendt's phone, the last of which was an outgoing call made at 4:36 p.m.  Gov't Ex. 127 at 30.

13   Despite numerous incoming contacts, no outgoing calls or texts were made from Mr. Silva's

14   phone thereafter.  *Id.* at 3176–77; Gov't Ex. 127 at 35–36.  Unlike Mr. Silva's phone, however,

15   Mr. Ott's phone continued to make outgoing calls to Mr. Nelson and other HASC members

16   throughout that night until the early morning of the next day.  Gov't Ex. 127 at 31, 38.  Later,

17   when Mr. Silva's mother was trying to find her son, Mr. Ott told her that he and Mr. Silva had

18   been drinking at a house in Fresno when Mr. Silva took a call and never came back.  *See* Trial Tr.

19   5701–02.  Nevertheless, after Mr. Silva allegedly left the house in Fresno, Mr. Ott did not attempt

20   to contact Mr. Silva even though he was Mr. Ott's ride back to Sonoma.  Gov't Ex. 127 at 39.

21   Instead, Mr. Ott spent the night in Fresno attempting to contact Mr. Nelson for a ride home.  Trial

22   Tr. 3209–11.  The next day, after Mr. Ott got in touch with Mr. Nelson, cell-site data showed Mr.

23   Nelson's phone was in the vicinity of Sacramento.  *Id.* at 3210.  Hours later, cell site activity

24   indicated Mr. Nelson was with Mr. Ott moving from the Hayward-Oakland area towards Santa

25   Rosa.  *Id.* at 3212–13.

26             Cell data also corroborates Mr. Hardisty's testimony about the cover-up.  Records showed

27   that on the morning of July 16, 2014—the day after Mr. Silva's disappearance—Fresno charter

28   member Merl Hefferman contacted Levi Phipps, the manager of the California Crematory

United States District Court
Northern District of California

15

1    associated with the Yost & Webb funeral home in Fresno.  Trial Tr. 3198; *see also id.* at 3453–54.

2    Mr. Phipps testified that Merl Hefferman told him "You better be there." *Id.* at 3526.  After

3    receiving the text, two men arrived at the crematory, flashed a gun at Mr. Phipps, and moved from

4    their vehicle what Mr. Phipps believed to be a body and placed it in the crematory incinerator.  *Id.*

5    at 3530–32.  Incinerator temperature records indicate one extra body was in fact burned that day.

6    *Id.* at 3550.  Merl Hefferman later contacted Mr. Phipps and told him to keep quiet.  *Id.* at 3535.

7    Cell-site data further showed that Mr. Huff was in the vicinity of Dos Palos on July 16, 2014, *id.* at

8    3195–97, where Mr. Silva's truck was found on fire later that day.  *Id.* at 1922–23.  The fire

9    captain who found Mr. Silva's truck testified that he believed the fire was most likely the result of

10   arson.  *Id.*

11        As mentioned above, after Mr. Silva had been missing for a while, his family began to ask

12   HASC members about his whereabouts.  In one instance, Mr. Silva's wife came to Mr. Ott's

13   apartment looking for Mr. Silva.  *Id.* at 4266.  Mr. Verhagen testified that when Mr. Silva's wife

14   left, Mr. Ott stated "little does she know he's not coming back." *Id.*  None of the Hells Angels

15   approached Mr. Silva's family to offer assistance in locating him, *see id.* at 5701–04, and

16   approximately four days after his disappearance, Mr. Silva was voted out of HASC.  *Id.* at 5075.

17        After an extended investigation, law enforcement discovered that HASC obtained

18   possession of noteworthy items that had belonged to Mr. Silva.  Mr. Verhagen testified that HASC

19   members cleared out Mr. Silva's old tattoo shop, taking, *inter alia*, his personalized hardhat and an

20   antique door.  *Id.* at 4269–71.  Law enforcement also found Mr. Silva's dog tags during a search

21   of Mr. Lyles' residence.  *Id.* at 2067–68, 2518–19.  Shortly thereafter, investigators discovered

22   that HASC member Damien Cesena was in possession of a motorcycle with multiple parts that

23   appeared "consistent with parts that were on Mr. Silva's motorcycle before he went missing." *Id.*

24   at 2528; *see also id.* at 5074–75.

25                    **III.    LEGAL STANDARD**

26        Under Federal Rule of Criminal Procedure 29, a defendant may file a motion for a

27   judgment of acquittal after a jury verdict.  Fed. R. Crim. P. 29.  A Rule 29 motion challenges the

28   sufficiency of evidence.  *See United States v. Johnson*, 874 F.3d 1078, 1080 (9th Cir. 2017).  In

United States District Court
Northern District of California

16

United States District Court
Northern District of California

1    reviewing the sufficiency of the evidence, a district court must consider whether, "after viewing

2    the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have

3    found the essential elements of the crime beyond a reasonable doubt.'"  *United States v. Nevils*,

4    598 F.3d 1158, 1163–64 (9th Cir. 2010) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979))

5    (emphasis in *Jackson*).  It is not the district court's function to "second-guess the jury's credibility

6    assessments; rather, under *Jackson*, the assessment of the credibility of witnesses is generally

7    beyond the scope of review." *Id.* at 1170.  Indeed, "[i]t is well established that the uncorroborated

8    testimony of a single witness may be sufficient to sustain a conviction." *United States v. Katakis*,

9    800 F.3d 1017, 1028 (9th Cir. 2015); *United States v. Williams*, No. 3:13-CR-00764-WHO-1,

10   2018 WL 2724337, at *7 (N.D. Cal. June 6, 2018).

## IV. ANALYSIS

### A. RICO Conspiracy

To support a conviction for violation of 18 U.S.C. §1962(d), the Government must show

that a defendant knowingly agreed "to participate, directly or indirectly, in the conduct of the

[enterprise's] affairs through a pattern of racketeering."  *United States v. Jaimez*, 45 F.4th 1118,

1129 (9th Cir. 2022), *cert. denied,* 143 S. Ct. 1038 (2023) (quoting *United States v. Fernandez*,

388 F.3d 1199, 1226 n.18 (9th Cir. 2004)).  A "pattern of racketeering activity" is defined as "at

least two acts of racketeering activity."  18 U.S.C. § 1961(5).  It "is not necessary to prove that a

defendant committed a substantive RICO violation under § 1962(d); instead 'proof of an

agreement the objective of which is a substantive violation of RICO (such as conducting the

affairs of an enterprise through a pattern of racketeering) is sufficient to establish a violation of

section 1962(d).'"  *United States v. Ortiz*, No. CR 12-00119 SI, 2013 WL 6842541, at *2 (N.D.

Cal. Dec. 27, 2013) (quoting *United States v. Tille*, 729 F.2d 615, 619 (9th Cir. 1984)); *see also*

*United States v. Martinez*, No. CR 13-00794 WHA, 2014 WL 998183, at *2 (N.D. Cal. Mar. 12,

2014) ("The mere agreement itself…is what Section 1962(d) forbids.").

Moreover, the Government need only prove a defendant agreed with the *types* of

racketeering acts that the members agreed to commit, and not the specific acts.  *See United States*

*v. Cornell*, 780 F.3d 616, 625 (4th Cir. 2015) ("[E]very circuit . . . has concluded that for a RICO

conspiracy charge the jury need only be unanimous as to the *types* of racketeering acts that the defendants agreed to commit.") (emphasis added) (citing *United States v. Applins*, 637 F.3d 59, 82 (2d Cir. 2011)); *Sahakian v. United States*, No. EDCR 02-00938-VAP, 2013 WL 12291874, at *4 (C.D. Cal. Aug. 23, 2013). *But cf. United States v. Cervantes*, 170 F. Supp. 3d 1226, 1233 (N.D. Cal. 2016) (noting the Ninth Circuit "might require that RICO conspiracy charges set out racketeering activity with a particular degree of specificity"). It suffices that a defendant was "'aware of the essential nature and scope of the enterprise and intended to participate in it.'" *Fernandez*, 388 F.3d at 1230 (quoting *Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000)); *accord United States v. Zichettello*, 208 F.3d 72, 100 (2d Cir. 2000) ("To be convicted as a conspirator, one must be shown to have possessed knowledge of only the general contours of the conspiracy.").

1.      Russel Ott

Mr. Ott argues he should be acquitted of his RICO conspiracy conviction because there was insufficient evidence to show his knowledge or participation in criminal acts of HASC. Ott Mot. at 24. The Government first argues that the evidence was sufficient to show that Mr. Ott had general knowledge of HASC's criminal activities and it "need not prove that [he] committed any overt act for [him] to be convicted of RICO conspiracy." *See* Docket No. 3049 at 15 ("Opp'n"). Second, the Government argues there was sufficient evidence for a rational juror to find Mr. Ott participated in overt acts for HASC, including the murder of Mr. Silva, and that the murder of Mr. Silva alone is sufficient for a rational juror to convict Mr. Ott of RICO conspiracy. *Id.* at 16–18.

a.      Evidence of Agreement Based on General Knowledge and Participation in HASC's Criminal Acts

With respect to general knowledge of HASC's criminal acts, Mr. Ott primarily argues that there was no evidence that he was involved in the assaults of Mariano Malvino, Javad Trew, or Troy Conte. Ott Mot. at 25–26. The Government responds that a rational juror could find Mr. Ott had general knowledge of HASC's criminal acts based on Mr. Ott's long-time membership and extensive knowledge of HASC. *See* Opp'n at 16–18.

At the outset, so long as there is sufficient evidence to show Mr. Ott knew of the "essential

United States District Court
Northern District of California

nature and scope" of the HASC enterprise agreed to participate in HASC, it is immaterial that Mr. Ott was not involved in any specific act because section 1962(d) has no such requirement. *See Fernandez*, 388 F.3d at 1230; *see also Ortiz*, 2013 WL 6842541, at *2 (It "is not necessary to prove that a defendant committed a substantive RICO violation under § 1962(d)."). In that regard, the evidence was sufficient for a rational juror to infer that Mr. Ott agreed to participate, directly or indirectly, in the conduct of HASC's affairs through a pattern of racketeering based on his general knowledge of HASC's criminal acts and his status as a founding member and former president of HASC. *Jaimez*, 45 F.4th at 1129. As a founding member of the HASC, Mr. Ott had been with the chapter for approximately forty-five years, fifteen of which he served as president. *Id.* at 5289–91; 5413–16. Testimony demonstrated that Mr. Ott continued to be a highly respected member of HASC after his presidency. *Id.* at 2724–25, 4220. Mr. Ott was still referred to as "Chief" because "he would always be in control," and HASC members often went to Mr. Ott for advice because they valued his reasoning. *Id.* at 4220, 5008. Mr. Verhagen testified that Mr. Ott once told him "at one time, nobody lived or died in Sonoma County without my permission." *Id.* at 4221, 4461. Moreover, Mr. Ott lived at the HASC clubhouse for a period of time—where club business was discussed, and racketeering activities were conducted—and a rational juror could reasonably infer that he was aware of HASC's racketeering activities and contemplated that other members would commit racketeering acts based on his continual presence there. Thus, viewing the evidence in the light most favorable to the Government, a rational juror could have reasonably inferred that Mr. Ott "agreed to participate in the conduct of [HASC's] affairs through a pattern of racketeering" based on his status and position in HASC. *Jaimez*, 45 F.4th at 1129.

As to Mr. Ott's argument that he was not "at the center of the events involving Troy Conte" or the other assaults, it is simply inapposite. Ott Mot. at 26. Assaults are not racketeering acts, *see* 18 U.S.C. § 1961(1), and therefore evidence of Mr. Ott's participation in the assault has no direct relevance to his conviction of RICO conspiracy. Rather, the importance of this evidence is its tendency to show the "essential nature and scope of [HASC]," *Fernandez*, 388 F.3d at 1230 (internal citation omitted), specifically, the circumstances surrounding the assaults, the type of impermissible conduct the victims engaged in, and the conduct, such as extortion, that attended the

United States District Court
Northern District of California

1   assaults.  A rational juror, viewing such evidence in the context of Mr. Ott's entrenched role in

2   HASC, could reasonably infer Mr. Ott was "aware of the essential nature and scope of the

3   enterprise and intended to participate in it."  *Fernandez*, 388 F.3d at 1230 (internal citation

4   omitted).

5          In any event, Mr. Ott's argument that he was only present when Mr. Conte was voted out

6   but left before the actual assault fails to account for the fact RICO conspiracy forbids the "mere

7   agreement itself," *Martinez*, 2014 WL 998183, at *2, and has "no requirement of some overt act or

8   specific act."  *Salinas v. United States*, 522 U.S. 52, 63 (1997).  The evidence showed that Mr. Ott

9   was present for the portion of Mr. Conte's beating that took place before the vote, and present

10  when HASC voted Mr. Conte out.  Trial Tr. 5092.  The evidence further showed that HASC

11  members knew that being voted out is often accompanied by a beating.  *Id.* at 3934, 4286, 4868.

12  Even Ms. Conte, a non-member, was aware of this practice.  *Id.* at 4868.  Thus, a rational juror

13  could have reasonably inferred that the vote of Mr. Ott—a former HASC president who was still

14  substantially involved in the chapter—reflected Mr. Ott's knowledge and an agreement with Mr.

15  Conte's assault.  *See United States v. Sanchez*, 623 F. App'x 35 (2d Cir. 2015) (concluding that

16  because the defendant knew members who were kicked out of the gang were often assaulted, "the

17  jury could infer that when defendant agreed that [the victim] be kicked out of the gang, he

18  intended that it be effected, as occurred frequently, by an assault").[3]  There was also substantial

19  evidence that when someone is kicked out in bad standing, as was Mr. Conte, their Hells Angels

20  paraphernalia, and possibly their motorcycle, may be taken under threat of force.  *See* Trial Tr.

21  4286–87, 4867–69.  As alleged by the Government, this practice formed the basis for the predicate

22  act of extortion.  *See id.* at 5031–34.  Thus, just as a rational juror could have reasonably inferred

23  from Mr. Ott's position and status in HASC that he agreed with the assault of Mr. Conte based on

24  his vote, a rational juror could have reasonably inferred that Mr. Ott agreed with the extortion of

25

26  ───────────────
    [3] Mr. Conte's testimony that the assault "wouldn't have went as far as it did" if Mr. Ott had stayed
27  after the vote does not make Mr. Ott less culpable.  That Mr. Ott may have limited the extent of
    the assault does not change the fact that a rational juror could have found that Mr. Ott knew his
28  decision would be effectuated by an assault and that he was aware that Mr. Conte had already been
    beaten.

                                              20

Mr. Conte based on his vote.

But even discounting Mr. Ott's unique status and extended tenure in HASC, the Government presented substantial evidence that all HASC members, as well as prospects, shared broad knowledge of each other's criminal cases and potential criminal liability. Troy Conte testified that members followed the progress of members' criminal cases as a general practice. Trial Tr. 5041. In fact, Mr. Verhagen was required to give HASC a copy of his rap sheet upon becoming a prospect, and an HAMC member once confronted him because he thought there were discrepancies in his "rap sheet or [] PACER report." *Id.* at 4199–202. The Government also offered evidence that incarcerated HAMC members were given "BHC," or "Big House Crew" designation, and "HASC members and associates were expected to provide assistance to [those] members while they were in prison." Opp'n at 18 (citing Trial Tr. 3874). Mr. Ott's claim that there is no evidence of his awareness of HASC's criminal actions or the specific charged acts is therefore unavailing. *See* Docket No. 3057 at 7 ("Ott Reply"). A rational juror could still infer that Mr. Ott was generally aware of HASC criminal acts based on HASC members' general knowledge of each other's criminal cases and conduct, and that Mr. Ott agreed with the acts based on his continued and dedicated involvement with the enterprise.

There is more. The Government explained that HASC "discussed members' criminal cases and law enforcement action at . . . 'church.'" Opp'n at 17 (citing Trial Tr. 5041–49). While there was no direct evidence tying Mr. Ott to specific church meetings, considering Mr. Ott's status and tenure in HASC, the fact that Mr. Ott lived at the HASC clubhouse for a period of time, and the fact that church was mandatory, a rational juror could reasonably infer that Mr. Ott participated in some meetings and would be among those members most aware of HASC priorities. It is evident from testimony that members discussed specific types of racketeering acts at church, such a willingness to murder rivals and robbery. *See Cornell*, 780 F.3d at 625. Church discussions included a "battle" speech prior to travelling "in force to Arizona following the murder of a Hells Angel member . . . by a Mongol," after which members felt they would sacrifice themselves for the club. *Id.* (citing Trial Tr. 4247–50). Additionally, the Government noted that the "robbery of Nicholas Spencer and Nicholas Gruber" was discussed at church, and that HASC

voted to make "Cesena split the proceeds of the robbery with the charter as a whole" because "Cesena used his HASC patch in connection with it." Opp'n at 17 (citing Trial Tr. 5070–71). From this evidence, a rational juror could infer that Mr. Ott was present at these meetings and others like it, and that he agreed that other members would continue to engage in the type of racketeering conduct discussed (*i.e.*, conspiracy to murder and robbery). *See Jaimez*, 45 F.4th at 1129. At the very least, a rational inference could be drawn that Mr. Ott, if not present, was aware of what went on at these meetings.

Mr. Hardisty's testimony provided even stronger evidence that Mr. Ott agreed that one other member would engage in the predicate act of murdering rivals. Mr. Hardisty testified about an incident in which he was riding with HASC members, including Mr. Ott, and observed someone he assessed to be a rival OMG member. Trial Tr. 2715–16. Upon seeing the rival OMG member, Mr. Hardisty stated that he took out his gun and fired several shots in the rider's direction. *Id.* After the shooting, HASC members congratulated Mr. Hardisty and told him he was "a real Hells Angels." *Id.* at 2717. The testimony suggests not only that the HASC members on this ride were aware of a willingness to murder rivals, but that these members, including Mr. Ott, *see id.* at 2715–16, voiced their support for associates that advanced such conduct. In that regard, a rational juror could have determined a willingness to murder rivals was open-ended and included the contemplation of future acts to murder rivals. *United States v. Freeman*, 6 F.3d 586, 595–96 (9th Cir. 1993) (concluding that continuous predicate acts related to a single scheme may constitute a pattern of racketeering). It is of no moment that there is no specific evidence that a member or associate of HASC actually murdered a rival because, "unlike the general conspiracy provision applicable to federal crimes[,]" "there is no requirement of some overt act or specific act" under 18 U.S.C. § 1962(d)." *Ortiz*, 2013 WL 6842541, at *2 (quoting *Salinas*, 522 U.S. at 63). All that is required for violation of 18 U.S.C. § 1962(d) must allege, is that the defendant knowingly joined a conspiracy the objective of which was to operate that enterprise through an identified pattern of racketeering activity. *Id.*

The murder of Joel Silva presented more specific evidence of Mr. Ott's agreement to murder rivals of the enterprise. Although not a murder of a rival in the conventional sense, the

22

murder of Mr. Silva falls within the parameters of the indictment.  The indictment alleges:

> Beginning on a date unknown to the Grand Jury but since at least the mid-1990s . . . Jonathan Joseph Nelson . . .  Brian Wendt, [and] Russel Taylor Ott . . . together with others known and unknown . . . unlawfully, knowingly, and intentionally conspired to commit murder in violation of California Penal Code Sections 187, 188, 189, and 182, to wit, the defendants agreed together and with each other to kill, with malice aforethought, actual and suspected members of rival gangs, individuals suspected of cooperating with law enforcement, and *individuals who defied the will of HASC*.

*See* Docket No. 374 ("Superseding Indictment") ¶ 23.  There was evidence that Mr. Silva defied the will of HASC and that HASC murdered him for his defiance.  *See*, *e.g.*, Trial Tr. 2738–40.  As the Ninth Circuit has explained, murdering a fellow enterprise member "because he was politicking against other members, threatening to kill other members, claimed to have made an individual a member without following the proper procedure, and for generally causing dissension within the organization" is consistent with acting in furtherance of an enterprise.  *Fernandez*, 388 F.3d at  1222 (quoting *United States v. Shryock,* 342 F.3d 948, 985 (9th Cir. 2003)).

In sum, the Government produced sufficient evidence for a rational juror to find that Mr. Ott "knowingly agree[d] to facilitate a scheme which includes the operation or management of [the HASC] enterprise."  *Id.* at 1230.

### b.    The Murder of Joel Silva

Next, the Government argues that Mr. Ott's convictions for conspiracy to commit the VICAR murder of Mr. Silva, the VICAR murder itself, and the racketeering acts that arose from the murder (*e.g.,* arson, obstruction of justice, and witness intimidation) constitute sufficient evidence to support Mr. Ott's RICO conspiracy conviction.  *See* Opp'n at 16.  Mr. Ott raises a multitude of arguments in opposition.  *See* Ott Mot. at 27–33.

First, Mr. Ott argues that on the day of Mr. Silva's murder there were too few calls between Mr. Ott and Mr. Silva, and Mr. Ott and the other conspirators, for a rational juror to believe Mr. Ott was involved in the conspiracy.  *Id.* at 27–28.  Mr. Ott notes that on July 14 and 15, 2014, there were multiple cell contacts between Mr. Wendt and Mr. Nelson, Mr. Silva and Mr. Nelson, and Mr. Silva and Mr. Wendt, but there were no contacts between Mr. Ott and Mr. Wendt. *Id.* at 27 (citing Gov't Ex. 127).  Mr. Ott also notes that he had no contact with Robbie Huff, Merl

23

1   Hefferman, or Levi Phipps, during this time. *Id.*

2       Mr. Ott's argument is unavailing.  The jury was not required to find that Mr. Ott made the

3   same number of contacts with all the same actors as did his coconspirators.  Mr. Ott was alleged to

4   have participated in the murder by luring Mr. Silva to the Fresno clubhouse so he could be killed,

5   and the evidence shows that Mr. Ott travelled to the Fresno clubhouse with Mr. Silva and left

6   without him.  Trial Tr. 2746, 3210; Gov't Ex. 127 at 39.  Indeed, the inference that Mr. Ott *knew*

7   Mr. Silva had been murdered is supported by the fact that Mr. Ott travelled with Mr. Silva to

8   Fresno, yet when Mr. Silva seemed to have disappeared, Mr. Ott made no calls to find Mr. Silva

9   and ensure he had a ride back to Sonoma.  *See* Gov't Ex. 127 at 31, 38–39.  As Mr. Ott eventually

10  told Mr. Silva's mother, Mr. Silva took a phone call and never came back.  Trial Tr. 5701–02.

11  Rather than trying to find Mr. Silva for a ride back, Mr. Ott instead spent the night contacting Mr.

12  Nelson, and the next morning, Mr. Nelson drove to Fresno and gave Mr. Ott a ride back to

13  Sonoma without Mr. Silva.  *See* Gov't Ex. 127 at 31, 38–39; Trial Tr. 5701–02.  That was the

14  Government's theory of Mr. Ott's involvement, and the Government presented sufficient evidence

15  for a rational juror to convict on that theory.

16      For the same reason, it does not matter that Mr. Silva was the one who initiated contact

17  with Mr. Ott on the day of Mr. Silva's disappearance or that Mr. Silva was the one who drove

18  when he and Mr. Ott went to Fresno.  Ott Mot. at 32.  Such evidence is not inconsistent with the

19  Government's theory of Mr. Ott's role in Mr. Silva's murder—all that matters is that the jury

20  could reasonably have found that Mr. Ott knowingly lured Mr. Silva to his death.

21      Second, Mr. Ott argues that there was no evidence that Mr. Silva trusted Mr. Ott, and

22  therefore a central premise of the Government's theory of the case is incorrect.  *Id.*  However, the

23  Government elicited testimony sufficient for a rational juror to find that Mr. Silva trusted Mr. Ott:

24  Mr. Hardisty testified that Mr. Silva and Mr. Ott "were very close," *id.* at 2764; an HASC

25  member's former girlfriend described Mr. Silva and Mr. Ott as close, *id.* at 2024; and there was

26  also evidence that Mr. Ott was generally trusted by HASC members.  *Id.* at 4220, 5008.  Such

27  evidence is sufficient for a rational juror to fairly infer that Mr. Silva trusted Mr. Ott.  *See Nevils*,

28  598 F.3d at 1170.

United States District Court
Northern District of California

24

United States District Court
Northern District of California

Third, Mr. Ott argues that Mr. Verhagen's testimony that Mr. Ott once stated "little does she know he's not coming back" after Mr. Silva's wife came looking for him is insufficient to support Mr. Ott's conviction. According to Mr. Ott, the "credibility of [Mr. Verhagen's] account of what [Mr. Ott] said was undermined" by Mr. Verhagen's former handlers who testified they did not recall Mr. Verhagen reporting this statement. Ott Mot. at 31. However, it is not the role of the Court, in this context, to assess witness credibility, *Nevils*, 598 F.3d at 1170, and viewing the evidence in the light most favorable to the Government, a rational juror could have found Mr. Verhagen's testimony credible despite the lack of corroboration. *Katakis*, 800 F.3d at 1028. Mr. Ott also argues that the statement "little does she know he's not coming back" is not necessarily an admission of responsibility for Mr. Silva's death. Ott Reply at 4. However, viewing the evidence in the light most favorable to the Government, as the Court must do in the Rule 29 context, a rational juror could reasonably interpret the statement as an admission of knowledge that Mr. Silva was murdered. *See Nevils*, 598 F.3d at 1163–64. Regardless, Mr. Ott's statement does not stand alone. A rational juror viewing this statement in conjunction with Mr. Hardisty's testimony that Mr. Ott was tasked with luring Mr. Silva to the Fresno clubhouse, as well as the cell-site data that corroborated Mr. Hardisty's testimony, could fairly infer that Mr. Ott meant Mr. Silva would not be coming back because he had been killed. Indeed, it is arguable that the jury could have convicted even without this statement.

Fourth, Mr. Ott takes issue with the fact that Mr. Hardisty "was the only witness who specifically said that Ott was part of the plan to kill [Mr. Silva]." Ott Mot. at 31. That Mr. Hardisty was the only witness who tied Mr. Ott to the plan to kill Mr. Silva is immaterial. "It is well established that the uncorroborated testimony of a single witness may be sufficient to sustain a conviction." *Katakis*, 800 F.3d at 1028. Similarly, Mr. Ott argues that he should be acquitted because he was not present during the planning of Mr. Silva's murder at Mr. Hardisty's home in Antioch, and because he was unaware of Mr. Silva's transgressions that motivated the murder. Ott Mot. 31–32. But the fact that Mr. Ott was not present at Antioch does not demonstrate that the jury's conviction was based on "mere speculation, rather than reasonable inference." *Nevils*, 598 F.3d at 1167. A rational juror could reasonably infer based on Mr. Hardisty's testimony and Mr.

1   Ott's actions on June 14 and 15, 2014—driving with Mr. Silva to the Fresno clubhouse and then

2   leaving with Mr. Nelson—that Mr. Ott eventually joined the plan to murder Mr. Silva even if he

3   was not originally part of it.  *See Salinas*, 522 U.S. at 65 ("One can be a conspirator by agreeing to

4   facilitate only some of the acts leading to the substantive offense.").

5          Finally, Mr. Ott argues he should be acquitted of his RICO conspiracy conviction because

6   his phone calls to Mr. Silva after Mr. Silva disappeared are exonerating.  *Id.* at 28; Ott Reply at 4.

7   According to Mr. Ott, he would not have made those calls if he participated in the murder.  Ott

8   Reply at 4.

9          But, Mr. Ott's attempted contacts with Mr. Silva after July 15, 2014, are not necessarily

10  exonerating.  Through the testimony of FBI Special Agent Stanger ("SA Stanger"), the

11  Government demonstrated that each of Mr. Ott's attempted contacts with Mr. Silva were made

12  after Mr. Silva's SIM card was removed from his cellular device and inserted into Robbie Huff's

13  device.  *See, e.g.*, Trial Tr. 3214–16, 3419.  SA Stanger first explained the difference between

14  international mobile equipment identity ("IMEI") and international mobile subscriber identity

15  ("IMSI"): IMEI is "a specific number tied to the actual phone device," whereas IMSI is tied to

16  "subscriber information associated with [] a SIM card," such as an individual's phone number.

17  Trial Tr. 3145–46.  Next, SA Stanger testified that by 7:53 p.m. on July 16, 2014, the IMSI

18  associated with Mr. Silva's SIM card was placed into a device with the same IMEI reported in Mr.

19  Huff's records, *see id.* at 3202–03, and each of the calls at issue were made after the switch.  *See

20  id.* at 3214–16, 3419.  As such, after the SIM card was switched, each time Mr. Ott attempted to

21  contact Mr. Silva's phone number, that contact was received on Mr. Huff's device.  Therefore, a

22  rational juror could reasonably assume that the attempted contacts at issue were not exonerating

23  because Mr. Ott was trying to contact Mr. Huff instead of Mr. Silva.  Moreover, as noted above,

24  Mr. Ott made no attempt to contact Mr. Silva in the critical hours before returning from Fresno the

25  next morning with Mr. Nelson.  *See* Gov't Ex. 127 at 31, 38–39

26          Mr. Ott's only counter to this argument is that he had no way of knowing that Mr. Silva's

27  SIM card had been placed in Mr. Huff's cell phone.  *See* Ott Mot. at 29 (citing Trial Tr. 3424).

28  However, a rational juror could have determined that someone, such as Mr. Nelson or Mr. Wendt,

United States District Court
Northern District of California

26

1    informed Mr. Ott of the SIM card switch.  Indeed, cell records and cell-site data demonstrated that

2    Mr. Ott and Mr. Nelson were in contact on July 16, 2014, and that Mr. Nelson drove Mr. Ott back

3    from Fresno.  *See* Trial Tr. 3209–11; Gov't Ex. 127 at 31, 38–39.  Accordingly, a rational juror

4    could have convicted Mr. Ott despite his attempted contacts with Mr. Silva after July 15, 2014.

5         In the end, Mr. Ott's participation in Mr. Silva's murder taken by itself is sufficient to

6    support his conviction for RICO conspiracy in view of the numerous predicate acts that arose from

7    it.  *See Freeman*, 6 F.3d at 595–96; *United States v. Kirk*, 844 F.2d 660, 664 (9th Cir. 1988)

8    ("[P]redicate acts may constitute a pattern of activity under RICO even though only a single

9    scheme is involved.").  At the very least, Mr. Ott's conviction can stand based on his agreement

10   with the predicate acts of conspiracy to commit the murder and the murder of Mr. Silva.  *See*

11   *United States v. Rodriguez*, 971 F.3d 1005, 1014 (9th Cir. 2020) (citing *United States v. Licavoli*,

12   725 F.2d 1040 (6th Cir. 1984) (conspiracy to commit murder and murder can establish a pattern of

13   racketeering)).  But even beyond those acts, Mr. Silva's murder also included the predicate acts of

14   arson and obstruction of justice, and a rational juror could have inferred Mr. Ott's agreement with

15   HASC's pattern of racketeering on those grounds as well.  For the foregoing reasons, the Court

16   **DENIES** Mr. Ott's Rule 29 motion challenging his RICO conspiracy conviction (Count One).

17        2.    Brian Wendt

18        The Government presented sufficient evidence for a rational juror to find that Mr. Wendt

19   "knowingly agree[d] to facilitate a scheme which includes the operation or management of a

20   RICO enterprise." *Fernandez*, 388 F.3d at 1230.  Most significantly, Mr. Wendt "actively

21   facilitated the HASC's racketeering activity by murdering [Mr. Silva] and conspiring to do so."

22   Opp'n at 20 (citing *United States v. Delgado*, 972 F.3d 63, 80 (2d Cir. 2020) ("In light of this and

23   other evidence showing Anastasio's efforts to facilitate the Gang's racketeering activity, we have

24   no doubt that a reasonable jury could convict him of RICO conspiracy.")).  *Cf. United States v.*

25   *Scott*, 642 F.3d 791 (9th Cir. 2011) (affirming RICO conviction based on predicate racketeering

26   acts of conspiracy to commit murder).

27        First, the Government presented evidence that Mr. Wendt was an associate of all West

28   Coast charters, including HASC, through his role as West Coast Sergeant-at-Arms.  In that role,

United States District Court
Northern District of California

Mr. Wendt was expected to use violence to maintain respect for West Coast charters (which include the HASC) and to discipline West Coast charter members who failed to follow HAMC rules. Trial Tr. 1996, 2275. Mr. Hardisty testified that Mr. Wendt decided to murder Mr. Silva after Mr. Silva's unbecoming behavior in Laconia that culminated in the impermissible threat against a Boston Hells Angel's life. *Id.* at 2731–40. Mr. Hardisty also testified that the decision to murder Mr. Silva was made because "[Mr. Silva] was causing too much drama within different charters"; "he was fucking up how everything was working"; and HASC members were afraid to bring their friends around the clubhouse. Trial Tr. 2739–40. Responding to such behavior was part of Mr. Wendt's responsibility as West Coast Sergeant-at-Arms. Therefore, a rational juror could infer Mr. Wendt's facilitation of HASC's racketeering acts based on his agreement to join with HASC to murder Mr. Silva in fulfilling his role as West Coast Sergeant-at-Arms and assuaging the conflict Mr. Silva was causing with other HAMC charters.

Second, the Government presented substantial evidence of Mr. Wendt's general position "as a long time HASC associate[.]" Opp'n at 21. The Government demonstrated that Mr. Wendt was often present at the HASC clubhouse, Mr. Nelson and Mr. Wendt had a close personal relationship, and HASC and the Fresno charter often went on motorcycle runs together. Trial Tr. 1994, 4235–36. A rational juror could infer Mr. Wendt was "aware of the essential nature and scope of [HASC] and intended to participate in it,'" *Fernandez*, 388 F.3d at 1230, based solely on the extensive evidence of his close relationship with HASC. But in addition, the jury heard evidence of conduct that although uncharged, demonstrated Mr. Wendt's facilitation and awareness of the nature and scope of the HASC enterprise. *See United States v. Rizk*, 660 F.3d 1125, 1131 (9th Cir. 2011) ("The rule is well established that the government in a conspiracy case may submit proof on the full scope of the conspiracy; it is not limited in its proof to the overt acts alleged in the indictment."). For instance, during a joint HASC and Fresno charter run to Arizona, Mr. Verhagen observed Mr. Wendt and other Fresno charter members pass an AR style rifle and a shotgun through the window of Mr. Wendt's hotel room. *Id.* at 4241–42. A rational juror could infer that Mr. Wendt brought the firearms in preparation for encounters with rival OMGs, something HASC members have done as well, and therefore that Mr. Wendt agreed that the

activities of the enterprise would encompass the murder of rivals.  A rational juror could also have determined the willingness to murder rivals was open-ended, *i.e.*, included the contemplation of future murder.  *See Freeman*, 6 F.3d at 595–96; *Kirk*, 844 F.2d at 664 (9th Cir. 1988) ("[P]redicate acts may constitute a pattern of activity under RICO even though only a single scheme is involved.").  Thus, a rational juror could have reasonably inferred Mr. Wendt agreed HASC would engage in a pattern of racketeering based on the evidence of a willingness to murder to rivals.

Moreover, while on another joint ride to Arizona, Mr. Verhagen observed Mr. Wendt assault a non-HAMC motorcyclist for passing the HASC and Fresno Hells Angels "pack"; Mr. Verhagen explained that HAMC views passing the "pack" as a sign of disrespect.  *Id.* at 4243.  Though this assault does not constitute a predicate act by itself, *see* 18 U.S.C. § 1961(1), it is additional evidence that Mr. Wendt was ready and willing to facilitate the HASC enterprise, and could allow a rational juror to further infer that Mr. Wendt was "aware of the essential nature and scope of the [HASC] enterprise and intended to participate in it."  *Fernandez*, 388 F.3d at 1230.

More significantly, a rational juror could find that Mr. Wendt's participation in a conspiracy to commit murder and the actual murder of Mr. Silva, as planned with HASC members, demonstrates knowledge and facilitation of HASC racketeering acts.  *See, e.g., United States v. Houston*, 648 F.3d 806, 810–12 (9th Cir. 2011) (affirming RICO convictions based on predicate racketeering acts of conspiracy to commit murder and murder).  As with Mr. Ott, Mr. Wendt's conviction can stand based solely on his agreement with the predicate acts of conspiracy to commit the murder of Mr. Silva and the murder of Mr. Silva, *see Rodriguez*, 971 F.3d at 1014 (citing *Licavoli*, 725 F.2d 1040 (conspiracy to commit murder and murder can establish a pattern of racketeering)), as well as the predicate acts of arson and obstruction of justice that accompanied the murder.  *See Freeman*, 6 F.3d at 595–96; *Kirk*, 844 F.2d at 664.

For the foregoing reasons, the Court **DENIES** Mr. Wendt's Rule 29 motion challenging his RICO conspiracy conviction (Count One).

### 3.      Jonathan Nelson

The Government presented sufficient evidence for a rational juror to find that Mr. Nelson "knowingly agree[d] to facilitate a scheme which includes the operation or management of a

RICO enterprise." *Fernandez*, 388 F.3d at 1230.  Mr. Nelson argues that: (1) the Government inappropriately equated membership in HASC "to membership in a RICO conspiracy," (2) there was insufficient evidence of a conspiracy to murder members of rival OMGs, and (3) Mr. Hardisty and Mr. Verhagen are not credible witnesses.  *See* Docket No. 3058 at 1 ("Nelson Reply").  Mr. Nelson's claims lack merit.

The Government did not simply equate membership in HASC to membership in a RICO conspiracy.  Instead, the Government presented sufficient evidence for a rational juror to find that Mr. Nelson knowingly agreed "to participate, directly or indirectly, in the conduct of the [enterprise's] affairs through a pattern of racketeering." *Jaimez*, 45 F.4th at 1129.  Mr. Nelson was the HASC president for at least six years.  *See* Trial Tr. at 2026.  He had a reputation for using violence as a way of maintaining order and respect of the HASC.  *See*, *e.g.*, *id.* at 4248, 4263–64, 4282.  Indeed, the evidence showed that Mr. Nelson was a central participant in the assaults of Javad Trew, Mariano Malvino, and Troy Conte.  Trial Tr. 1435–40, 1341–50, 5090–98.  While the assaults cannot constitute predicate racketeering acts in themselves, they could allow a rational juror to infer that Mr. Nelson was "aware of the essential nature and scope of the [HASC] enterprise and intended to participate in it." *Fernandez*, 388 F.3d at 1230.  Moreover, after the assault of Mr. Trew concluded, Mr. Nelson impliedly threatened Mr. Trew so he would not go to law enforcement—witness intimidation can constitute a predicate act of racketeering.  And with respect to Mr. Malvino and Mr. Conte, they were both extorted by HASC members on the nights of their assaults.  *See* Trial Tr. 1350, 4867.  A rational juror could infer that Mr. Nelson agreed with the extortion based on his role as president and participation in the assaults.

A rational juror could also infer Mr. Nelson agreed with the extortion of Mr. Verhagen's motorcycle, as well as the robbery of Nicholas Gruber.  It is entirely reasonable to believe that Mr. Nelson, the one who told Mr. Verhagen to "step back as being a prospect," *id.* at 4285, either personally told Mr. Verhagen to give up his motorcycle, or ordered other HASC members to collect it, or at the very least were aware of the action.  Similarly, it is reasonable to believe that Mr. Nelson, through his leadership role, had a role in demanding Mr. Cesena and Mr. Greer split the proceeds from the robbery of Mr. Gruber.  Indeed, it is difficult to imagine that Mr. Nelson—

30

the highly respected president of HASC—did not know and encourage these acts, particularly in view of his leadership position.

The Government also presented evidence that Mr. Nelson agreed to participate in, and encouraged, violent rivalries with other OMGs, *i.e.*, a willingness to murder rivals. For instance, after the murder of a Hells Angel by a rival OMG member, Mr. Verhagen testified that Mr. Nelson gave a speech that made him feel prepared for war and ready to die for HASC. Trial Tr. 4246–50. Mr. Nelson's speech is strong evidence that he agreed and contemplated that at least one member might engage in murder. And, as with Mr. Ott and Mr. Wendt, the continuous nature of a willingness to murder rivals by itself could have led a rational juror to infer a pattern of racketeering with which Mr. Nelson agreed. *Freeman*, 6 F.3d at 595–96.

Above all, the evidence showed that Mr. Nelson was a central participant in the murder of Mr. Silva. *Id.* at 2739–40; Gov't Ex. 127 at 39. Mr. Nelson's conviction can stand based on his agreement with the predicate acts of conspiracy to commit the murder of Mr. Silva, the murder of Mr. Silva, and the acts of arson and obstruction of justice that accompanied the murder. *See Rodriguez*, 971 F.3d at 1014 (citing *Licavoli*, 725 F.2d 1040 (conspiracy to commit murder and murder can establish a pattern of racketeering)); *see also Freeman*, 6 F.3d at 595–96; *Kirk*, 844 F.2d at 664.

Lastly, with respect to Mr. Hardisty's and Mr. Verhagen's credibility, the Court "cannot second-guess the jury's [] assessments; rather, 'under *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of review.'" *Nevils*, 598 F.3d at 1170 (quoting *Schlup v. Delo*, 513 U.S. 298, 330 (1995)).

For the foregoing reasons, the Court **DENIES** Mr. Nelson's Rule 29 motion challenging his RICO conspiracy conviction (Count One).

B.    <u>VICAR Murder</u>

To support a VICAR conviction, the government must show: "(1) that the criminal organization exists; (2) that the organization is a racketeering enterprise; (3) that the defendants committed [or attempted or conspired to commit] a violent crime; and (4) that they acted for the purpose of promoting their position in [or gaining entrance to] the racketeering enterprise."

United States District Court
Northern District of California

*Rodriguez*, 971 F.3d at 1009 (quoting *United States v. Bracy*, 67 F.3d 1421, 1429 (9th Cir. 1995)). "[A]lthough the law does not require that the defendant's gang-related purpose be his primary or sole purpose . . . it must be one of the defendant's general purposes or dominant purposes[.]" *United States v. Banks*, 514 F.3d 959, 969 (9th Cir. 2008); *United States v. Hackett*, 762 F.3d 493, 500 (6th Cir. 2014) ("VICAR's 'purpose' element is met if the jury could find that an 'animating purpose' of the defendant's action was to maintain or increase his position in the racketeering enterprise."). Importantly, the Government need not prove that the defendant was considered an official member of the criminal enterprise. *Rodriguez*, 971 F.3d at 1011; *see also United States v. Manning*, No. CR 19-00313 WHA, 2022 WL 4241658 (N.D. Cal. Sept. 14, 2022) ("Even accepting defendant Manning's argument that Sean Harrison was not a 'made member' of Mac Block, it was reasonable to conclude that he was associated with the Mac Block gang."). "The VICAR statute speaks of maintaining or increasing one's 'position' within the enterprise—a broad term that encompasses the ringleader of an [enterprise] as well as [] less formalized roles[.]" *Id.* (citing *United States v. Brady*, 26 F.3d 282, 289–90 (2d Cir. 1994) ("[A]ssociates are considered to be members of the enterprise, even though they are not 'made members' of the [enterprise].")).

    1.   Russel Ott

Mr. Ott argues he should be acquitted of his VICAR murder conviction because there was insufficient evidence to show that the "death of Joel Silva served to maintain or increase [his] position in [HASC]." Ott Mot. at 35. Mr. Ott's argument fails for the following reasons.

First, VICAR liability only requires that a defendant had a substantial purpose of *maintaining* one's position in an enterprise. *See* 18 U.S.C. § 1959; *see also Banks*, 514 F.3d at 972 ("[A] properly instructed jury could reasonably have inferred that one of Banks's general purposes was to *maintain* his position . . ."). The Government was not required to show that Mr. Ott's status with HASC would *increase* from his involvement in Mr. Silva's murder.

Second, the Government provided sufficient evidence for a rational juror to find that a substantial purpose of Mr. Ott's involvement in Mr. Silva's murder was to maintain respect within HASC. The Government elicited testimony that maintaining respect among HASC members was important to Mr. Ott. For example, Mr. Verhagen testified that Mr. Ott was referred to as "Chief"

32

because "he would always be in control," and that Mr. Ott once stated, "at one time, no one lived or died in Sonoma County without my permission."  Trial Tr. 2023–24; *id.* at 4220–21.  Based on these statements, a rational juror could find that Mr. Ott cared about maintaining his status and respect in HASC.  His failure to go along with the plans of the presidents of HASC and the Fresno chapter and Sergeant-at-Arms of the West Coast to disappear a problematic member causing dissention among HAMC chapters could be viewed as a threat to diminish his reputation and status among the HASC.

To that end, the Government presented substantial evidence that siding with Hells Angels who are in bad standing, or non-members in bad standing, could negatively impact one's status within HASC.  As one witness testified, an HASC member lost status because he failed to attack a rival OMG member.  Trial Tr. 5052.  Also, Mariano Malvino was brutally assaulted and kicked out of an HASC support club for associating with an individual in bad standing with HASC.  *Id.* at 1340–1346.  Mr. Silva similarly was in bad standing with HASC.  As Mr. Hardisty testified, he left Mr. Silva after the incident in Laconia because he did not want to side with a "bad Hells Angel."  *Id.* at 2737.  Thus, a rational juror could find that Mr. Ott participated in the murder of Mr. Silva to avoid the negative implications of siding with a "bad Hells Angel," instead of the leadership of the three current presidents—Mr. Nelson, Mr. Wendt, and Mr. Ranieri.  *See Banks*, 514 F.3d at 969–70 (affirming a VICAR conviction even though "the jury could reasonably infer no more than that [the defendant] acted out of concern for his status in the eyes of his 'little homies' within the gang, or his reputation among other gang members generally").  Moreover, there was substantial evidence that respect in the HASC was held for those willing to take violent action to enforce the rules and interests of the Hells Angels.

In brief, viewing the evidence in the light most favorable to the Government, there was sufficient evidence for a rational juror to find that Mr. Ott participated in the murder of Mr. Silva "because he knew it was expected of him by reason of his membership in [HASC] or that he committed it in furtherance of that membership."  *Id.* at 965.

For the foregoing reasons, the Court **DENIES** Mr. Ott's Rule 29 motion challenging his VICAR murder convictions (Counts Two and Three).

33

1    2.    Brian Wendt

2    Mr. Wendt's various arguments boil down to the claim that the charged enterprise was

3 HASC and he was not a member or associate of HASC for VICAR purposes because killing Mr.

4 Silva would not "affect or improve his status in HASC."  Wendt Mot. at 9–10; *see also* Docket

5 No. 3081 ("Wendt Reply").

6    At the outset, the Ninth Circuit has made clear that formal membership in an enterprise is

7 not necessary to sustain a VICAR conviction. *Rodriguez*, 971 F.3d at 1011; *see also Fernandez*,

8 388 F.3d at 1231.  In *Rodriguez*, a secretary of the Mexican Mafia challenged her VICAR

9 conviction on the grounds that she was not a formal member of the enterprise. *Id.*  However,

10 because the enterprise charged in the indictment encompassed the organization's "leadership,

11 membership, *and associates*," the Ninth Circuit concluded that official membership was not a

12 prerequisite to a VICAR conviction. *Id.* (emphasis added).  *Rodriguez* then found that the

13 government presented sufficient evidence "to establish that [the defendant] served as [a Mexican

14 Mafia] secretary and facilitated acts of violence as part of that role." *Id.*  Specifically, the

15 government proved that although the defendant was not a formal member of the Mexican Mafia,

16 through her role as secretary, she disseminated "instructions to murder or otherwise inflict

17 violence upon those who threatened [her boss] or the people loyal to him." *Id.*

18    The Superseding Indictment in this case alleged that the enterprise included HASC's

19 "leadership, members, *and associates*."  Superseding Indictment ¶ 11 (emphasis added).  Thus, the

20 Government argues that while Mr. Wendt was not a formal HASC member, he could qualify as an

21 HASC "associate" for the purpose of VICAR "by virtue of his close association with [HASC] and

22 his agreement to facilitate their affairs, including through the Silva murder."  Opp'n at 21.

23    The Government is correct, and there was evidence at trial to support the allegations in the

24 Indictment.  First, the Government presented sufficient evidence for a rational juror to find that

25 Mr. Wendt had status with HASC due to his role as West Coast Sergeant-at-Arms, and murdering

26 Mr. Silva would help Mr. Wendt maintain that status.  As West Coast Sergeant-at-Arms, Mr.

27 Wendt was expected to use violence to maintain respect for West Coast charters and to discipline

28 West Coast charter members who failed to follow rules.  Trial Tr. 1996, 2275.  A rational juror

United States District Court
Northern District of California

34

could infer that Mr. Wendt's status with West Coast charters, including HASC, depended on his ability to effectively do so.  As explained, Mr. Hardisty testified that the decision to murder Mr. Silva arose after Mr. Silva's unbecoming behavior in Laconia that culminated in the impermissible threat against a Boston Hells Angel's life.  *Id.* at 2731–40.  Accordingly, the Government persuasively argued that Mr. Wendt's purpose for murdering Mr. Silva was undertaken in furtherance of enforcing HAMC rules in his role as West Coast Sergeant-at-Arms.  Opp'n at 23.  It follows that a rational juror could have inferred that Mr. Wendt would have lost status with HASC if he failed to appropriately address Mr. Silva's contravention of HAMC rules, and therefore that Mr. Wendt murdered Mr. Silva with the purpose of maintaining his status with HASC.  *See Banks*, 514 F.3d at 965.

VICAR liability has been upheld based on "regional enforcer" roles similar to that of Mr. Wendt's.  *See United States v. DeSilv*a, 505 F.3d 711, 715 (7th Cir. 2007) ("There was sufficient evidence to meet [the VICAR] standard here.  DeSilva was the Regional Enforcer for the Latin Kings, and it was his duty to ensure internal and external security.  The trial testimony included examples of actions taken by Regional Enforcers against Latin Kings members who failed to fulfill their obligations in the Latin Kings, and against rival gang members who engaged in hostile or 'disrespectful' actions toward the Latin Kings.").  *Cf. Fernandez*, 388 F.3d at 1231 ("As an Eme associate who was ordered to handle the southeast Los Angeles gangs, and to assault someone who had 'burned' Eme members . . . Gavaldon shared the liability of other individuals within the enterprise, even if he was not a leader within the group.").

It does not matter whether enforcement is directed at rival gang members or factions within the enterprise with which the defendant associated.  "Conspiring to kill rival factions within the enterprise is perfectly consistent with an attempt to maintain or increase one's position in the group, especially when the intended victims were not leaders in the group."  *See Fernandez*, 388 F.3d at 1233.  Indeed, *Fernandez* explained that murdering a fellow enterprise member "because he was politicking against other members, threatening to kill other members, claimed to have made an individual a member without following the proper procedure, and for generally causing dissension within the organization" was consistent with acting in furtherance of an enterprise.  *Cf.*

35

United States District Court
Northern District of California

1    *id.* at 1222 (quoting *Shryock,* 342 F.3d at 985).  So too could a rational juror find that Mr. Wendt

2    conspired with HASC members Mr. Nelson and Mr. Ott to murder HASC member Mr. Silva

3    because Mr. Silva was "generally causing dissension within [HASC]."  *See id.*  The Government

4    presented evidence that Mr. Silva was murdered because "he was causing too much drama within

5    different charters," "he was fucking up how everything was working," and HASC members were

6    afraid to bring their friends around the clubhouse.  Trial Tr. 2739–40.  Therefore, a rational juror

7    could infer that Mr. Wendt chose to participate in the murder of Mr. Silva because Mr. Silva

8    behaved in a manner unbecoming of a Hells Angel and as an HASC member, and thus the murder

9    facilitated discipline within HASC.

10           Mr. Wendt counters that murdering another Hells Angel is forbidden, and therefore no

11   rational juror could believe that "the West Coast Sergeant-at-Arms could unilaterally decide to

12   discipline, much less kill, a member for conduct that occurred on the East Coast."  Wendt Reply at

13   9; *see also* Wendt Reply at 7–8.  The Court is not persuaded.  For one thing, the decision to

14   murder Mr. Silva was not "unilateral."  There is evidence that Mr. Wendt coordinated with Mr.

15   Ranieri and Mr. Nelson, the presidents of the Boston Hells Angels charter and HASC,

16   respectively, before finalizing the plan to murder Mr. Silva.  Trial Tr. 2740–41.  Moreover, a

17   rational juror could have credited Mr. Hardisty's testimony that "at the time [HASC] was going to

18   kill [Mr. Silva], I don't think they even considered him a Hells Angels," and "[i]f you did

19   something bad enough to be kicked out of the Hells Angels, then you did something bad enough to

20   get killed."  *Id.* at 3087; *id.* at 2743.  In that regard, Mr. Silva himself believed that he could be

21   killed by HASC despite his formal status as a member at the time.  *Id.* at 2248–49.  Moreover, just

22   because a club rule prohibits certain conduct does not mean the defendant complied with that rule.

23   *See United States v. Vernace*, 811 F.3d 609, 618 (2d Cir. 2016) ("The Gambino crime family

24   could have, by its internal rules, discouraged drug dealing, and still, as a factual matter, been

25   engaged in it as part of its racketeering activities."); *United States v. Pimentel*, 346 F.3d 285, 301

26   (2d Cir. 2003) (concluding a rational jury could find a racketeering enterprise engaged in drug

27   trafficking despite the enterprise's official policy prohibiting its members from using and selling

28   narcotics).

1    Second, as noted above, the Government demonstrated that HASC and the Fresno chapter,

2    of which Mr. Wendt was president, were particularly close. *Id.* at 4235. As the Government

3    argues, "[b]ecause of the close connection between the Fresno Hells Angels and HASC, and

4    between Mr. Wendt and HASC in particular, the jury could infer that even without [Mr. Wendt's]

5    role as West Coast Sergeant-at-Arms, [Mr. Wendt] enjoyed status within HASC." Opp'n at 29. A

6    rational juror could have further determined that if Mr. Wendt failed to murder Mr. Silva in

7    response to Mr. Silva's troublemaking behavior, it would have negatively impacted his status

8    within HASC.

9    Similarly, Mr. Wendt's personal relationship with Mr. Nelson by itself is sufficient for a

10    rational juror to find a VICAR purpose, as an action that maintains or increases "one's status in

11    the eyes of certain individuals, especially if they are in leadership roles within the group," is a

12    sufficient VICAR purpose. *Fernandez*, 388 F.3d at 1232–33. Here, testimony demonstrated that

13    Mr. Nelson and Mr. Wendt had a close personal relationship, and a rational juror could therefore

14    infer that Mr. Wendt had status with the leader of HASC. Trial Tr. 4236. By extension, a rational

15    juror could determine that carrying out a violent act to stabilize HASC would improve or maintain

16    Mr. Wendt's status with Mr. Nelson and others in HASC. Furthermore, Mr. Hardisty testified that

17    after Laconia, Mr. Nelson agreed with Mr. Wendt that Mr. Silva had to be killed. *Id.* at 2740–41.

18    Once that decision was made, a rational juror could have inferred an added expectation was

19    created between Mr. Nelson and Mr. Wendt, and a failure to fulfill this expectation would result in

20    a loss of status as between and for both individuals. *See Banks*, 514 F.3d at 965 (affirming

21    VICAR purpose where defendant "committed his violent crime because he knew it was expected

22    of him by reason of his membership in the enterprise . . ."); *see also Brady*, 26 F.3d at 289–90

23    ("[A]ssociates are considered to be members of the enterprise, even though they are not 'made

24    members' of the [enterprise].")  Accordingly, a rational juror could find that Mr. Wendt's

25    personal relationship with Mr. Nelson, as well as with HASC more generally, was sufficient to

26    establish a VICAR purpose.

27    Mr. Wendt responds that he did not have a VICAR purpose because Mr. Silva's murder

28    was motivated by Mr. Wendt's personal issues with Mr. Silva (*i.e.*, Mr. Wendt's disagreement

United States District Court
Northern District of California

United States District Court
Northern District of California

1    with Mr. Silva's threat on Sweeney's life), and therefore murdering Mr. Silva could not serve to

2    maintain or increase Mr. Wendt's position in the enterprise.  Wendt Mot. at 9–10; Wendt Reply at

3    9.  However, *Banks* makes clear that the Government need only prove that Mr. Wendt's

4    *substantial* purpose was to maintain or increase his status in HASC, not that Mr. Wendt's *only*

5    purpose was to maintain or increase his status in HASC.  *Banks*, 514 F.3d at 966–67.  Here, the

6    Government presented sufficient evidence for the jury to infer that Mr. Wendt's decision to

7    murder Mr. Silva was motivated in substantial part for at least three non-personal reasons related

8    to his association with the HASC enterprise: (1) Mr. Wendt's role as West Coast Sergeant-at-

9    Arms, Trial Tr. 1996, 2275; (2) Mr. Wendt's general association with HASC, *id.* at 1994, 4235–

10   36; and (3) Mr. Wendt's close personal association with Mr. Nelson.  *Id.* at 4236.  In any event,

11   Mr. Wendt fails to provide any persuasive evidence of a personal purpose for Mr. Silva's murder

12   that a jury could have credited as Mr. Wendt's primary motivation.

13           Moreover, any personal motive is overshadowed by the fact that Mr. Wendt recruited

14   HASC members, as well as Fresno members (*e.g.*, to dispose of Mr. Silva's body and truck), to

15   carry out the murder.  *See United States v. Kamahele*, 748 F.3d 984 (10th Cir. 2014) (concluding,

16   despite the defendant's assertion that a home shooting was inspired by personal motives, a rational

17   juror could find a VICAR purpose because the defendant enlisted two of his fellow gang members

18   to assist in the shooting).

19           Therefore, viewing the evidence in the light most favorable to the Government, a rational

20   juror could have found that Mr. Wendt's substantial purpose for murdering Mr. Silva was to

21   maintain or increase his status with HASC.  *See Banks*, 514 F.3d at 966–67 (citing *Pimentel*, 346

22   F.3d at 295–96).[4]  The Court **DENIES** Mr. Wendt's Rule 29 motion challenging his VICAR

23   _____

24   [4] Mr. Wendt also relies on *United States v. Bruno*, 383 F.3d 65 (2d Cir. 2004), *as amended* (Oct. 6,
     2016).  In *Bruno*, the Second Circuit vacated the defendant's VICAR conviction because evidence
25   that the defendant merely socialized with the charged enterprise was insufficient to show that the
     defendant was an associate for VICAR purposes.  *Id.* at 84 ("Polito was merely an associate of the
26   Genovese Family whose principal ties to that organization were in his capacity as a gambling and
     loansharking customer.").  Here, however, the Government presented evidence well beyond mere
27   socialization.  The evidence showed that Mr. Wendt was an associate of the HASC RICO
     conspiracy, that Mr. Wendt had status with HASC, that he worked together with HASC leaders
28   and members to conspire and effect Mr. Silva's murder, and that murdering Mr. Silva was
     undertaken for the purpose of maintaining or increasing his status with the HASC.  Trial Tr. 2738–

United States District Court
Northern District of California

1    murder convictions (Counts Two and Three).

2         3.    Jonathan Nelson

3         Like Mr. Wendt, Mr. Nelson argues he must be acquitted of his VICAR murder conviction

4    because there was "insufficient evidence to establish that [Mr. Nelson] conspired to commit

5    murder for the purpose of maintaining or increasing his position in the HASC."  Nelson Mot. at 2

6    (emphasis removed).  According to Mr. Nelson, the testimony of Mr. Hardisty and Troy Conte

7    demonstrated that killing another Hells Angels member was not "sanctioned or commendable,"

8    and therefore killing Mr. Silva could not maintain or increase his position in HASC.  *Id.* at 2–3.

9    Specifically, Mr. Nelson quotes Mr. Hardisty's testimony that ". . . you're not allowed to kill

10   another Hells Angel," Trial Tr. 2735, and Mr. Conte's testimony that he was shocked when Mr.

11   Nelson stated "I'll have that guy killed[,]" in reference to Mr. Silva.  *Id.* at 5074.  Mr. Nelson also

12   attacks the veracity of Mr. Hardisty's testimony that "once everyone gets together and makes a

13   decision, then he's no longer considered a Hells Angels . . . So at the time they were going to kill

14   [Mr. Silva], I don't think they even considered him a Hells Angels."  Mr. Nelson asserts this

15   testimony is unreliable because Mr. Hardisty "was a failed and short-lived member, remarkably

16   and unceremoniously kicked out after less than a year . . ."  Nelson Reply at 2 (citing Trial Tr.

17   3087).

18        The Government first responds that murders resulting from internal conflict within an

19   enterprise can still be committed for a VICAR purpose.  As discussed above, a murder resulting

20   from internal conflict of an enterprise may be consistent with a VICAR purpose.  *Fernandez*, 388

21   F.3d at 1233 ("Conspiring to kill rival factions within the enterprise is perfectly consistent with an

22   attempt to maintain or increase one's position in the group, especially when the intended victims

23   were not leaders in the group."); *see also Brady*, 26 F.3d 282 (same).

24        Second, Mr. Nelson's argument that no rational juror could have found a VICAR purpose

25   considering the Hells Angels prohibition against killing other Hells Angels also fails.  An internal

26   rule can be broken, and Mr. Nelson has not cited any case law suggesting conduct under the

27   _____

28   40, 3210.

VICAR statute must conform to internal rules of the enterprise.  *See Vernace*, 811 F.3d at 618.  In any event, the Government persuasively argues that testimony of former HASC members in which they expressed a belief that they could be killed by HASC contradicts Mr. Nelson's claim.  Opp'n at 39–40.  Testimony showed that Mr. Silva believed he could be killed by HASC despite his status as a member, Trial Tr. 2248–49, and Mr. Hardisty testified that he left HAMC because he believed Mr. Wendt was planning to kill him.  *Id.* at 2269–70.  And, despite Mr. Nelson's argument to the contrary, a rational juror could have credited Mr. Hardisty's testimony that "at the time [HASC] was going to kill [Mr. Silva], I don't think they even considered him a Hells Angels," and "[i]f you did something bad enough to be kicked out of the Hells Angels, then you did something bad enough to get killed."  *Id.* at 3087; *id.* at 2743.  Mr. Hardisty's statement is sufficient by itself.  *See Katakis*, 800 F.3d at 1028.  Thus, viewing the evidence in the light most favorable to the Government, a rational juror could have found VICAR liability despite the Hells Angels rule prohibiting the killing of other Hells Angels.

Third, the Government argues Mr. Nelson had a VICAR purpose in maintaining respect in his role as HASC president.  Opp'n at 40–42.  As discussed above, there is no requirement that Mr. Nelson's VICAR purpose was to *increase* his position in HASC; rather, the statute only requires that Mr. Nelson's VICAR purpose was to *maintain* his position in HASC.  *See* 18 U.S.C. § 1959; *see also United States v. Smith*, 413 F.3d 1253, 1278 (10th Cir. 2005) ("A conviction under § 1959(a) will stand even when the underlying crime was sanctioned by a high-ranking leader of the RICO enterprise, if the high-ranking leader was expected to act and any failure to do so would have undermined his position in the enterprise."); *United States v. Dhinsa*, 243 F.3d 635, 671 (2d Cir. 2001) (same).  And here, it is not unreasonable for a rational juror to believe that murdering Mr. Silva would have helped Mr. Nelson maintain his position as president of HASC.  Testimony illuminated a rift growing between Mr. Silva and HASC beginning as early as February 2013, when Mr. Silva struck Mr. Nelson in the forehead.  *See* Trial Tr. 2073–74.  The Government then presented further evidence establishing that Mr. Nelson was "sensitive to what he perceived to be challenges to his leadership."  Opp'n at 41.  Mr. Verhagen's testimony suggested that Mr. Nelson was particularly sensitive about his status in relation to Mr. Foakes, who had "the highest

respect out of everybody[.]"  *Id.* at 4217.  Mr. Verhagen explained that he once circulated a letter written by Mr. Foakes to HASC members, in which Mr. Foakes expressed dissatisfaction with how certain HASC matters were handled.  According to Mr. Verhagen, Mr. Nelson responded by threatening him with a gun because Mr. Nelson thought Mr. Verhagen "was going behind [Mr. Nelson's] back talking to [Mr. Foakes] about [Mr. Nelson's] performance."  *Id.* at 4282.  Further, Mr. Conte testified that in the Summer of 2014, Mr. Nelson came to his work and explained that "he had problems with [Mr. Silva].  That he didn't like the way [Mr. Silva] was badmouthing him; that [Mr. Silva] went back East and *said some stuff about him about being president*."  Trial Tr. 5073 (emphasis added).  Mr. Nelson then told Mr. Conte, in reference to Mr. Silva, "I'll have that guy killed."  *Id.* at 5074.  Thus, a rational juror could have inferred that Mr. Nelson sought to murder Mr. Silva because Mr. Nelson was concerned about his role and reputation in connection therewith, and Mr. Silva challenged his leadership.

Additionally, a rational juror could have found that Mr. Nelson had a VICAR purpose similar to that of Mr. Wendt.  As with Mr. Wendt in his role as West Coast Sergeant-at-Arms, the jury could have inferred that Mr. Nelson felt compelled to handle Mr. Silva's erratic behavior in his role as HASC president.  *See Banks*, 514 F.3d at 965 (affirming VICAR purpose where defendant "committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise . . .").  Likewise, Mr. Nelson's relationship with Mr. Wendt is sufficient for a rational juror to find a VICAR purpose, as an action that maintains or increases "one's status in the eyes of certain individuals, especially if they are in leadership roles within the group," is a sufficient VICAR purpose.  *Fernandez*, 388 F.3d at 1232–33.  Here, Mr. Wendt had some authority over all West Coast HAMC charters, including HASC, and a close personal relationship with Mr. Nelson.  Thus, once Mr. Wendt brought the Mr. Silva matter to Mr. Nelson, Mr. Nelson may have felt that failing to join and carry out the scheme would have impacted his status in the eyes of Mr. Wendt, an associate of the HASC enterprise.

Finally, Mr. Nelson's claim that Mr. Hardisty's testimony was unreliable or inconsistent is immaterial.  The Court "cannot second-guess the jury's credibility assessments; rather, 'under *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of review.'"

1   *Nevils*, 598 F.3d at 1170 (quoting *Schlup*, 513 U.S. at 330).

2        For the foregoing reasons, the Court **DENIES** Mr. Nelson's Rule 29 motion challenging

3   his VICAR murder convictions (Counts Two and Three).

4   C.    <u>Counts Six and Seven</u>

5        Mr. Nelson also challenges his convictions arising out of the use of a firearm in the assault

6   of Troy Conte, *i.e.*, assault with a dangerous weapon in aid of racketeering in violation of 18

7   U.S.C. § 1959(a)(3) (Count Six), and use of a firearm during a crime of violence in violation of 18

8   U.S.C. § 941(c) (Count Seven).  Mr. Nelson claims that "the [Government] presented no reliable

9   evidence that the object that [Mr. Conte] testified [Mr. Nelson] assaulted him with was, in fact, a

10  'firearm' as defined by the jury instructions."  Nelson Reply at 4.  Mr. Nelson asserts that the

11  evidence was insufficient because the "only evidence about that object was [Mr. Conte's]

12  testimony," the firearm allegedly used was never recovered, and the Government's expert, Dr.

13  Eric Kenley, "acknowledged that many non-firearm objects could cause the injuries" shown in Mr.

14  Conte's medical records.  *Id.*; Nelson Reply at 4.  According to Mr. Nelson, the "far more credible

15  scenario, and the only one that a reasonable jury could conclude is true, is that [Mr. Conte]

16  continues to bear deep resentment toward [Mr. Nelson]," and that Mr. Conte "blames [Mr. Nelson]

17  for [Mr. Foakes'] alleged *personal* acts of retribution against [Mr. Conte] for his predatory sexual

18  escapades with [Mr. Foakes'] domestic partner[.]"  Nelson Reply at 4–5 (emphasis in original).

19       Mr. Nelson's claim lacks merit.  The jury instructions for Counts Six and Seven defined

20  "firearm" as "any weapon which will or is designed to or may readily be converted to expel a

21  projectile by the action of an explosive or the frame or receiver of any such weapon."  *See* Docket

22  No 2832 at 54, 55 ("Jury Instructions").  Mr. Conte testified that Mr. Nelson struck him in the face

23  with a revolver—a revolver fits the definition of firearm provided in the Jury Instruction.  Trial Tr.

24  5093–100.  Specifically, Mr. Conte stated he saw Mr. Nelson swing the firearm across his body

25  and felt it strike his eye.  *Id.* at 5099.  And, when Defense asked Mr. Conte how he knew Mr.

26  Nelson struck him with a firearm, Mr. Conte stated, "I know he did."  *Id.* at 5183.  Mr. Conte also

27  testified that he heard Mr. Foakes ask Mr. Nelson for the firearm with which to shoot Mr. Conte.

28  *Id.* at 5098.  Though Mr. Nelson did not give Mr. Foakes the firearm, the fact that Mr. Foakes

United States District Court
Northern District of California

United States District Court
Northern District of California

asked Mr. Nelson in the first place suggests Mr. Foakes believed that Mr. Nelson possessed a firearm. *See* Opp'n at 43. Because "[i]t is well established that the uncorroborated testimony of a single witness may be sufficient to sustain a conviction[,]" Mr. Conte's testimony is enough to sustain Mr. Nelson's convictions for Counts Six and Seven. *See Katakis*, 800 F.3d at 1028.

Furthermore, although Dr. Kenley could not definitively confirm Mr. Conte's injuries were caused by a firearm, Dr. Kenley testified that Conte's injuries were entirely consistent with being struck with a gun. *See* Trial Tr. at 4657, 4644. He testified that it was likely that a hard object, and not a human fist, caused the damage to Mr. Conte's skull and nasal area. *Id.* at 4681–82

For the foregoing reasons, the Court **DENIES** Mr. Nelson's Rule 29 motion challenging his convictions on Counts Six and Seven.

## V.        CONCLUSION

The Court **DENIES** Group One Defendants' Rule 29 motions as to all counts.

This order disposes of Docket Nos. 2872, 3031, and 3032.

**IT IS SO ORDERED**.

Dated: June 13, 2023

_____
EDWARD M. CHEN
United States District Judge