ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

KEVIN J. BARRY (CABN 229748)
AJAY KRISHNAMURTHY (CABN 305533)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6840
    FAX: (415) 436-7234
    Email; kevin.barry@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 17-CR-0533 EMC |
| Plaintiff, | **UNITED STATES' SENTENCING MEMORANDUM** |
| v. | Hearing Date:  June 13, 2024 |
| JONATHAN NELSON, et al., | Hearing Time:  9:15 am |
| Defendants. | Hon. Edward M. Chen |

## INTRODUCTION

Defendant Jonathan Nelson stands before the Court to be sentenced following his conviction at trial for charges of Racketeering Conspiracy (Count One); Conspiracy to Commit Murder in Aid of Racketeering (Count Two); Murder in Aid of Racketeering (Count Three); Assault with a Dangerous Weapon in Aid of Racketeering (Count 6); and Use of a Firearm During a Crime of Violence (Count Seven).

Count Three, the VICAR murder conviction, carries a mandatory term of life imprisonment, and Count Seven, the use of a firearm during a crime of violence, carries a mandatory term of seven years consecutive to any term of imprisonment.  The issue before the Court at sentencing, therefore, is what

1  terms to impose for RICO conspiracy, Count One, conspiracy to commit VICAR murder, Count Two,

2  and VICAR assault, Count Six.

3        Nelson led HASC in committing shocking acts of violence against those who were perceived to

4  have disrespected the enterprise or its members.  Because of the nature of the crimes, and consistent

5  with the recommendation of United States Probation, the Court should sentence Defendant Nelson to the

6  statutory maximum terms for each of those counts of conviction: life for Count One; 120 months for

7  Count Two; and 240 months for Count Six.

8                                    **DEFENDANT'S OFFENSE CONDUCT**

9        The Hells Angels are a transnational outlaw motorcycle gang, and the Hells Angels Sonoma

10 County chapter (HASC) is a subset of that organization whose members primarily operate in Sonoma

11 County and the surrounding area.  As the evidence at trial established, HASC engaged in a host of

12 criminal activities, and its members engaged in a conspiracy to conduct its affairs as a criminal

13 enterprise.  The objectives of the conspiracy included to preserve and protect the power, territory,

14 reputation, and profits of HASC through the use of intimidation, violence, threats of violence, and

15 assaults; promoting and enhancing HASC and the activities of its members and associates; and keeping

16 victims, potential victims, and community members in fear of HASC and its members and associates

17 through violence and threats of violence.

18       As president of HASC during the time at issue in this case, Nelson was responsible for HASC's

19 criminal conduct.  He was aware of what HASC did; he set the tone for the criminal enterprise; and, as

20 detailed below, he directly participated in numerous acts of violence.

21                                    **SENTENCING GUIDELINES CALCULATION**

22       The government generally agrees with the calculation of the Sentencing Guidelines for

23 Defendant's offense conduct in the Presentence Report, with some slight alterations.  The government's

24 calculation is as follows:

25       GROUP ONE: Racketeering Conspiracy (Count 1); Conspiracy to Commit Murder in Aid of

26 Racketeering (Count 2); Murder in Aid of Racketeering (Count 3); Assault with a Dangerous Weapon in

27 Aid of Racketeering (Count 6)

28

1.  Racketeering Act 1: Conspiracy to murder rivals
    a.  Base offense level:                                33
        (USSG § 2A1.5)
    b.  Adjustment for Role in the Offense                +4
        (USSG § 3B1.1(a) –
        Leader / Organizer)                               **37**
    c.  Total offense level:

2.  Racketeering Act 2: VICAR Murder of Joel Silva and Conspiracy to Murder Silva
    a.  Base offense level:                                43
        (USSG §§ 2E1.3(a)(2) and 2A1.1(a))
    b.  Adjustment for Role in the Offense                +4
        (USSG § 3B1.1(a) –
        Leader / Organizer)
    c.  Total offense level:                              **47**

3   Racketeering Act 3: VICAR Assault of Troy Conte
    a.  Base offense level:                                14
        (USSG §§ 2E1.3(a)(2) and 2A2.2(a) –
        Aggravated assault)
    b.  Specific Offense Characteristics:                 +2
        (USSG § 2A2.2(b)(1) –
        More than minimal planning)
    c.  Specific Offense Characteristics:                 +6
        (USSG § 2A2.2(b)(3)(C) –
        Permanent injuries)
    d.  Adjustment for Role in the Offense                +4
        (USSG § 3B1.1(a) –
        Leader / Organizer)
    e.  Total offense level:                              **26**

4.  Racketeering Act 4: Witness Intimidation of Michelle Conte
    a.  Base offense level:                                14
        (USSG § 2J1.2(a))
    b.  Specific Offense Characteristics:                 +8
        (USSG § 2J1.2(b)(1)(B) –
        Causing / threatening to cause injury)
    c.  Adjustment for Role in the Offense                +4
        (USSG § 3B1.1(a) –
        Leader / Organizer)
    d.  Total offense level:                              **26**

5.  Racketeering Act 5: August 2015 Extortion of Steve Verhagen
    a.  Base offense level:                                18
        (USSG § 2B3.2(a))
    b.  Specific Offense Characteristics:                 +2
        (USSG § 2B3.2(b)(1) –

| | | | |
|---|---|---|---|
| | | Express / implied threat) | |
| | c. | Adjustment for Role in the Offense | +4 |
| | | (USSG § 3B1.1(a) – | |
| | | Leader / Organizer) | |
| | d. | Total offense level: | **24** |

6. <u>Racketeering Act 6: January 15, 2015 Nicholas Spencer / Nicholas Gruber Robbery</u>

| | | | |
|---|---|---|---|
| | a. | Base offense level: | 20 |
| | | (USSG § 2B3.1(a)) | |
| | b. | Specific Offense Characteristics: | +6 |
| | | (USSG § 2B3.1(b)(2)(B) – | |
| | | Firearm otherwise used) | |
| | c. | Specific Offense Characteristics: | +2 |
| | | (USSG § 2B3.1(b)(3)(A) – | |
| | | Bodily injury) | |
| | d. | Specific Offense Characteristics: | +1 |
| | | (USSG § 2B3.1(b)(7)(C) – | |
| | | Controlled substance taken) | |
| | e. | Adjustment for Role in the Offense | +4 |
| | | (USSG § 3B1.1(a) – | |
| | | Leader / Organizer) | |
| | f. | Total offense level: | **33** |

7. <u>Racketeering Act 7: December 16, 2016 Eban Hale Robbery</u>

| | | | |
|---|---|---|---|
| | a. | Base offense level: | 20 |
| | | (USSG § 2B3.1(a)) | |
| | b. | Specific Offense Characteristics: | +5 |
| | | (USSG § 2B3.1(b)(2)(C) – | |
| | | Firearm brandished) | |
| | c. | Specific Offense Characteristics: | +1 |
| | | (USSG § 2B3.1(b)(7)(C) – | |
| | | Controlled substance taken) | |
| | d. | Adjustment for Role in the Offense: | +4 |
| | | (USSG § 3B1.1(a) – | |
| | | Leader / Organizer) | |
| | e. | Total offense level: | **30** |

8. <u>Racketeering Act 8: Drug Trafficking</u>

| | | | |
|---|---|---|---|
| | a. | Base offense level: | 12 |
| | | (USSG §§2D1.1(a)(5), (c)(14) – | |
| | | Between 5 and 10 kilograms) | |
| | b. | Specific Offense Characteristics: | +2 |
| | | (USSG § 2D1.1(b)(1) – | |
| | | Firearm possessed) | |
| | c. | Adjustment for Role in the Offense: | +3 |
| | | (USSG § 3B1.1(b) – | |
| | | Manager / Supervisor) | |

|  |  | d. | Total offense level: | **17** |
|---|---|---|---|---|
| 9. | Racketeering Act 9: Fraud and Money Laundering | | | |
|  |  | a. | Base offense level:<br>(USSG § 2S1.1 –<br>Co-defendant admission of loss) | 23 |
|  |  | b. | Adjustment for Role in the Offense:<br>(USSG § 3B1.1(b) –<br>Manager / Supervisor) | +3 |
|  |  | c. | Total offense level: | **26** |
| 10. | Grouping Calculation | | | |
|  |  | a. | Offense level 47 is the only Group that is calculated | **47** |
| **11.** | **Total Offense Level:** | | | **43** |

(Cannot exceed 43)

The Presentence Report correctly calculated that Defendant has a single criminal history point, establishing his CHC level as I.   At an adjusted offense level of 43 and a CHC I, the Guidelines range is life.

## SECTION 3553(A) FACTORS

The factors listed under 18 U.S.C. § 3553(a) direct the Court to impose a sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing.  *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).  The key factors in this case are the nature and circumstances of the offense, 3553(a)(1); the need to reflect the seriousness of the crime, to promote respect for the law, and to provide just punishment for the offense, 3553(a)(2)(A); and the need for deterrence, 3553(a)(2)(B). These factors require a Guidelines sentence of life for Counts One and Three; concurrent terms of 120 months for Count Two and 240 months for Count Six; and a consecutive term of 84 months for Count Seven.

## **The Nature of HASC**

As both trials in this case demonstrated, HASC has been a scourge on the community.  The Hells Angels are a group that enforces its rules and its territory through violence, and it venerates and celebrates those who commit violence on its behalf, such as through the "Filthy Few" patch.  The Court heard and saw a number of examples of this by HASC and its members and associates.  HASC has contempt for the law and the police, as seen in its historical documents; its interactions with law

1    enforcement officers; its membership rules; and its acts of witness intimidation and obstruction of

2    justice.  Indeed, the concept of "no snitching" is literally central to its ethos, as this edict is represented

3    by the stitched-shut mouth on the death head patch that is in the middle of every Hells Angels cut.

4          The evidence in this case firmly established that violence was the lifeblood of the enterprise.

5    Everyone associated with HASC knew that violent clashes with rivals were an ever-present possibility, a

6    reality brought home most powerfully by the murder of San Francisco Hells Angels president and

7    HASC associate Mark Guardado in 2008.  This was seen in by the enterprise's reaction to this event, by

8    the presence of firearms carried by HASC members, by guns in the HASC clubhouse, and by the

9    fortification of the HASC clubhouse over time.  As former HASC officer Troy Conte bluntly stated in

10   the Group Two trial, a member who was not willing to kill for the patch would be kicked out of the

11   enterprise.

12         Violence was not reserved only for rivals, however.  Hells Angels who violated enterprise rules

13   were subject to brutal reprisals, as shown by the planned attack on Sacramento member Joey Fats, by the

14   savage beating of Troy Conte, and, of course, by the murder of Joel Silva.  Members of HASC puppet

15   clubs were beaten for violation of HASC rules, and members of the public were attacked for even the

16   most trivial displays of perceived disrespect.  This was demonstrated by the existence and use of "crime

17   scene cleanup kits," the discovery of knives within the clubhouse that had been "washed with bleach,"

18   and the many instances of assault.

19         A member of the public could be struck unconscious for knocking a Hells Angels vest off a

20   barstool.  Chatting up a member's old lady or girlfriend at a bar or a concert was provocation enough for

21   an attack.  In fact, Troy Conte recounted knocking out a member of the public as a favor to the victim,

22   because after this person disrespected Raymond Foakes, Conte believed the person would be beaten

23   even more severely if he had not intervened.  Bumping into a Hells Angel at a bar and refusing to back

24   down led to a group attack, where the victim was stomped on the ground and his head kicked like a

25   soccer ball.  Failing to yield to Hells Angels on the freeway resulted in being run off the road, and

26   passing a Hells Angels pack resulted in a beating in front of families with children.

27         The pervasive nature of HASC violence is what made its efforts at extortion and witness

28   intimidation so successful.  HASC members could act with impunity because they knew that their

threats to victims and other witnesses to keep quiet about what happened to them would be effective. And they were. But for the sexual assault of M.C., Troy Conte would likely have simply accepted his savage beating and simply gone on with his life as a "bad out"—assuming Foakes didn't take further action against him once he was a civilian. Similarly, none of the following victims—Javad Trew, Mariano Malvino, Eban Hale, Nicholas Spencer, Nicholas Gruber, or M.J.—reported the HASC assaults and robberies when they happened.

HASC could successfully extort motorcycles from former prospects and members—bikes worth tens of thousands of dollars—because those HASC members and associates knew exactly what would happen to them if they resisted. As just once example, the violent reputation of HASC is what enabled members to view the payment of $30,000 worth of marijuana for protection as a "gift," instead of extortion.

**The Need for General Deterrence**

The Court needs to impose lengthy sentences for the Group One defendants, like Nelson, for RICO conspiracy and the related crimes not only to incapacitate and deter these individuals, but for general deterrence as well.

General deterrence matters in criminal cases. For instance, a 30-year sentence for a person who assaulted the family member of a government leader serves as a deterrent to people who would use violence for political ends. As the Court saw in this case, the arrest and charging of HASC members, including prominent leaders like Nelson and co-defendants Russell Ott and Raymond Foakes, created a virtuous circle. The Court heard from crime victims who were so terrified of retribution that they didn't seek medical treatment for serious injuries Nelson inflicted. In the Group Two trial, the Court heard from a person who had been beaten for speaking with Raymond Foakes' former girlfriend. Because the Hells Angels were involved, he refused to identify his attacker—HASC member Jeremy Greer, who was arrested near the scene—and for months afterward, he inspected his vehicle, looking for bombs. However, after this case was charged, witnesses became more willing, or at least less resistant, to talk about what HASC had done to them. Seeing that action was being taken against HASC encouraged people to come forward. The charges lessened the sense of impunity, and other members of the public were willing to share what HASC had done to them as well.

A sentence that reflects the violent and dangerous nature of HASC will send a similar message to the community.  Criminal enterprises like HASC are a serious threat to the public, and the Court should treat them as such by deterring others from associating with it or supporting its criminal work.

**Defendant Nelson's Conduct**

The Court's assessment of Nelson's culpability must begin with the Silva murder.  As the evidence demonstrated, although he was not the person who pulled the trigger, Nelson played a critical role in the killing.  That murder was directly tied to Nelson's leadership of HASC, in several ways.  First, as HASC president, Nelson's agreement to the killing was necessary.  Without his approval, Silva could not have been killed.  Second, Nelson took steps to ensure its success.  Initially, he recruited Joseph Hardisty to eliminate Silva, and he directed Hardisty to move closer to Silva to put him at ease.  When Hardisty rescinded his agreement to join the plot, Nelson pivoted and made arrangements for Silva to be lured to the Fresno clubhouse, where he could be killed and his body removed without a trace.  When the deed was done, he personally drove for hours in the middle of the night to pick up Ott from Fresno and return with him to Sonoma County.  Finally, Nelson's motive in agreeing to and planning the murder was tied in part to Silva's challenge to his leadership.  Troy Conte recounted Nelson's anger at Silva's bad-mouthing of him and his leadership, and Conte repeated Nelson's statement that he would have Silva killed as a result.

This was consistent with Nelson's reaction to Steve Verhagen when he suspected that Verhagen was undermining his leadership by talking to Foakes about Nelson.  Nelson pulled a gun on Verhagen, put it in his face, and told him that he would be the last person Verhagen would ever see alive if Verhagen "fucked over" any of his brothers.  Verhagen absolutely believed Nelson at the time, and he still does.

The Court should also consider the timing of the Silva killing.  At any time between the June 2014 events of Laconia and the July 15, 2014 murder, Nelson could have stopped it.  All he needed to do was say "no."  Without his support, there would be no killing.  This is particularly significant because there was another HASC-sanctioned means of addressing Silva's rule violations: Nelson could have arranged to have Silva beaten out of the enterprise.  As shown by the hours-long torture of Troy Conte, this process could have involved significant punishment, and while Silva might leave the clubhouse

grievously injured, he would still be alive. His family would have been spared not only his loss, but also the trauma of not knowing what happened to him and the false hope that he might come home.

Nelson's threatening—and imposing—death when faced with leadership challenges is consistent with other instances of meeting perceived disrespect with shocking violence. The first example the jury heard was when Javad Trew criticized HASC member Jeremy Greer in a conversation Trew had with HASC associate Mariano Malvino. After Malvino, a member of the HASC puppet club the Ghost Riders, reported this to HASC, they directed him to tell Trew to come to the HASC clubhouse. Once Trew arrived, he was beaten by several HASC members, including Nelson. For his part, Nelson hit Trew in the head with a baseball bat.

The next instance was an assault on Mariano Malvino. Malvino was ordered to the clubhouse after he violated an order not to associate with someone whom HASC considered a "bad out." After Malvino arrived, he, too was beaten by several members, including Nelson. His attack only ended when Nelson took a framing hammer and hit Malvino in the back of the head with the claw.

The last example the jury heard was the prolonged assault of Troy Conte. That assault involved multiple rounds of beating and hours of torture with a tattoo gun. It finally ended when Foakes egged on Nelson, telling him that Conte had disrespected *Nelson* for violating HASC rules by having sex with the mother of Foakes' children. Goaded by Foakes, Nelson took his pistol and smashed in Conte's face, breaking bones in his skull and causing lasting injuries.

Each of these assaults could easily have resulted in fatal injuries.

In addition to the level of violence, a startling aspect to each attack, particularly those of Trew and Malvino, was their casual nature. These were not well-planned raids on a rival, or retaliation for some serious harm. Instead, Nelson learned of some perceived disrespect; he quickly arranged for the victim to come to the clubhouse and be beaten; and he struck them in the head with a weapon. If the attack proved fatal, that would not be an issue. They took place at the clubhouse, so the scene could be cleaned up and the bodies disposed of. The casual nature of these attacks suggests that they were far from rare.

Nelson was the leader of a violent, dangerous criminal enterprise. He arranged for the murder of one of his own brothers-in-arms; he brutally beat several members of the public; and he oversaw those

17-CR-0533 EMC, *United States v. Jonathan Nelson*
9

1  acts of witness intimidation, extortion, and robberies that the Court and the juries spent so much time

2  hearing about in trial.  The agreement to murder rivals and the murder of Joel Silva represent some of

3  the most serious crimes the Court must address, and this conduct merits the most serious sentence it can

4  impose.

5  **CONCLUSION**

6        For the foregoing reasons, and for all the reasons set forth in the two trials in this case, the

7  government respectfully submits that the Court should sentence Defendant Jonathan Nelson to a term of

8  life for Counts One and three; concurrent terms of 120 months for Count Two and 240 months for Count

9  Six; and a consecutive term of 84 months for Count Seven.

10

11  DATED:  June 6, 2024                                    Respectfully submitted,

12                                                                         ISMAIL J. RAMSEY
                                                                           United States Attorney
13

14                                                                         __/s/ *Kevin J. Barry*_____
                                                                           KEVIN J. BARRY
15                                                                         AJAY KRISHNAMURTHY
                                                                           Assistant United States Attorneys
16

17

18

19

20

21

22

23

24

25

26

27

28