CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

KEVIN J. BARRY (CABN 229748)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-6840
FAX: (415) 436-7234
Email: kevin.barry@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JONATHAN NELSON, et al.,<br><br>Defendants. | Case No. 17-CR-0533 EMC<br><br>**UNITED STATES' SUPPLEMENTAL OPPOSITION TO DEFENDANTS' MOTIONS FOR A NEW TRIAL UNDER RULE 33**<br><br>No Hearing Date Set<br><br>Hon. Edward M. Chen |

## TABLE OF CONTENTS

INTRODUCTION ..... 1
STATEMENT OF FACTS ..... 1
A. The Trial Evidence ..... 1
B. S.C.'s Account of the Silva Homicide ..... 2
C. S.C.'s Testimony at the Evidentiary Hearing ..... 2
LEGAL STANDARD ..... 3
ARGUMENT ..... 4
I. S.C.'s Information Is Not Newly Discovered Evidence ..... 4
II. S.C.'s Testimony About Huff Remains Inadmissible Hearsay ..... 5
A. Robbie Huff's Claim that He Killed Silva Does Not Qualify as a Statement Against Penal Interest ..... 5
III. The Newly Discovered Evidence Would Not Likely Result In Acquittal on the VICAR Murder and Conspiracy to Commit VICAR Murder Counts ..... 11
IV. The Defendants Would Still Be Convicted of RICO Conspiracy With S.C.'s Testimony ..... 16
V. There Is No *Brady* Violation ..... 17
CONCLUSION ..... 20

# TABLE OF AUTHORITIES

## CASES

*Gable v. Williams*, 49 F.4th 1315 (9th Cir. 2022) .......... 10

*Johnson v. United States*, 139 F.4th 830 (9th Cir. 2025) .......... 16

*LaGrand v. Stewart*, 133 F.3d 1253 (9th Cir. 1998) .......... 11

*Parker v. Cnty. of Riverside*, 78 F.4th 1109 (9th Cir. 2023) .......... 17, 18

*Pinkerton v. United States*, 328 U.S. 640 (1946) .......... 16

*Strickler v. Greene*, 527 U.S. 263 (1999) .......... 17, 18

*United States v. Alahmedalabdaloklah*, 94 F.4th 782 (9th Cir. 2024) .......... 17

*United States v. Barama*, No. 19-CR-00463-RS, 2023 WL 2530994 (N.D. Cal. Mar. 14, 2023) .......... 3

*United States v. Del Toro-Barboza*, 673 F.3d 1136 (9th Cir. 2012) .......... 3

*United States v. Halali*, No. 14-CR-00627-SI-1, 2017 WL 3232566 (N.D. Cal. July 28, 2017) .......... 3

*United States v. Hill*, 737 F.3d 683 (10th Cir. 2013) .......... 5

*United States v. Hoyos*, 573 F.2d 1111 (9th Cir. 1978) .......... 6, 8

*United States v. Jenkins*, 10-CR-00882-JSW, 2011 WL 5079508 (N.D. Cal., Oct. 25, 2011) .......... 4

*United States v. Kenny*, 645 F.2d 1323 (9th Cir. 1981) .......... 4

*United States v. Kulczyk*, 931 F.2d 542 (9th Cir. 1991) .......... 4, 11

*United States v. Lara-Hernandez*, 588 F.2d 272 (9th Cir. 1978) .......... 4

*United States v. Lindsey*, 702 F.3d 1092 (8th Cir. 2013) .......... 8

*United States v. Linwood*, 142 F.3d 418 (7th Cir. 1998) .......... 3

*United States v. Lofton*, 333 F.3d 874 (8th Cir. 2003) .......... 5

*United States v. Martinez*, 763 F.2d 1297 (11th Cir. 1985) .......... 3

*United States v. McCourty*, 562 F.3d 458 (2d Cir. 2009) .......... 4

*United States v. Miller*, 529 F.2d 1125 (9th Cir. 1976) .......... 17

*United States v. Monaco*, 735 F.2d 1173 (9th Cir. 1984) .......... 6

*United States v. Nazemian*, 948 F.2d 522 (9th Cir. 1991) .......... 8

*United States v. Poland*, 659 F.2d 884 (9th Cir. 1981) .......... 9, 10

*United States v. Rasmussen*, 790 F.2d 55 (8th Cir. 1986) .......... 10

*United States v. Riley*, 657 F.2d 1377 (8th Cir. 1981) .......... 8, 11

*United States v. Satterfield*, 572 F.2d 687 (9th Cir. 1978) .......... 6, 10

*United States v. Stromberg*, 179 F. Supp. 278 (S.D.N.Y. 1959) .......... 5

*United States v. Wenger*, Case No. 23-CR-00269-JSW, 2025 WL 28458 (N.D. Cal. Jan. 3, 2025) .......... 18

## INTRODUCTION

The jury in the Group One trial returned its verdicts of guilty on all counts against Defendants Wendt, Nelson, and Ott in June 2022. The jury in the Group Two trial returned guilty verdicts on all counts against Defendants Ranieri and Foakes in May 2023. The Court has given the Defendants every opportunity possible to challenge those verdicts in the years since they were entered, but all have fallen flat. The defense's efforts to obtain a new trial based on the "newly discovered evidence" provided by witness S.C. is similarly without merit. The Court should deny the Defendants latest motion under Rule 33 and preserve the finality of the juries' judgments.

## STATEMENT OF FACTS

### A. <u>The Trial Evidence</u>

The Court is quite familiar with the facts of this case, having presided over two months-long trials and having reviewed hundreds of pages of post-trial motions. The government will not rehash all of those facts here. Instead, the government will focus only on the facts related to a new potential witness's information about the killing of Joel Silva and whether it constitutes "newly discovered evidence" sufficient to support a motion under Rule 33.

The evidence in the two trials established that Brian Wendt murdered Joel Silva by shooting him in the back of the head in the Fresno Hells Angels clubhouse. Fresno Hells Angel Merl Hefferman arranged to have Silva's body incinerated at a local crematory by threatening the manager of that facility, Levi Phipps, if he did not cooperate. The spark that led to Silva's killing was a threat by Silva to kill a Boston Hells Angel named Sweeney during the Laconia Bike Week in June 2014. That threat led Boston president Christopher Ranieri, who was close with Sweeney, and Fresno president and West Coast Hells Angels Sergeant-at-Arms Brian Wendt to decide that Silva "had to go." Wendt and Ranieri obtained the agreement of Silva's Sonoma County Hells Angels charter president, Jonathan Nelson, to have Silva killed. For his part, Nelson had his own reasons for wanting Silva dead, because Silva was questioning Nelson's leadership and causing other problems within the club.

The government proved beyond a reasonable doubt that these events happened, and two juries agreed by returning quick verdicts.

**B. S.C.'s Account of the Silva Homicide**

In November 2023, S.C., Defendant Merl Heffeman's ex-wife, began providing information about the Hells Angels to Fresno FBI Special Agent Gina Hofmann. In September 2024, S.C. told SA Hofmann a version of the Silva killing that differed significantly from the facts presented in the two trials. According to S.C., Brian Wendt did not kill Silva. Instead, it was Fresno Hells Angel Robbie Huff. In S.C.'s account, Huff did so because he, Silva, and Richmond Hells Angels member Joseph Hardisty had ripped off the New York charter of $30,000 during a marijuana deal. Silva's murder was supposedly an effort to address the problems that the New York incident created among several Hells Angels charters.

S.C. told the agent that Silva was murdered in his truck, and that after the killing, Levi Phipps called the Hefferman's residence in the middle of the night asking whether he could proceed with Silva's cremation. S.C. also claimed that Hefferman had no idea what Levi Phipps was talking about, and that later that morning, she was present at a meeting between Wendt, Hefferman, and her son and Hefferman's stepson J.J. at the Black Bear Diner, where the group discussed Phipps's phone call. According to S.C., the Silva killing was not planned, and it was not ordered by either the Sonoma County Hells Angels or Defendant Ranieri. S.C. told the agent that after the meeting, Wendt and Hefferman reached out to Levi Phipps and told him to finish the cremation. She also said that Wendt then contacted the Sonoma County charter to inform them of the murder and that Nelson was upset when he received the news.

**C. S.C.'s Testimony at the Evidentiary Hearing**

On September 25, 2026, the Court held an evidentiary hearing at which S.C. testified. During that hearing, S.C. told the Court that on two occasions Robbie Huff claimed that he killed Silva. Both incidents were in the context of a threat—the first was when Huff threatened Hefferman; and the second was when Huff threatened S.C. herself. "He threatened me because I guess he thought I wasn't scared of him, which I really wasn't." ECF 4175 at 87-88 (Transcript of September 25, 2026 hearing). In the hearing, S.C. repeatedly indicated that her memory is poor, and she had difficulty recounting details of the events she was discussing on the stand. Apart from the two statements that Huff made to S.C. and Hefferman while threatening them, S.C. admitted that she gathered her information "through just being

around" the Fresno Hells Angels, and that much of it was "from hearsay from around the club." *Id.* at 47-48, 64.

With respect to the threats that Huff made, S.C. confirmed that Hells Angels can falsely claim credit for committing acts of violence, particularly with respect to killing someone.

S.C. also provided information that calls her credibility into question. She contradicted herself several times during the hearing, including whether Huff killed Silva in the Hefferman family's Chevy Tahoe or in Silva's own truck, and she denied having told the FBI agent details that are memorialized in the agent's notes and in her report of the interview. In terms of her relationship with the Defendants in this case, S.C. stated that she remains on good terms with Defendant Hefferman, her ex-husband; she was familiar with Defendant Ott; and she interacted with Defendant Ranieri several times. Finally, S.C. admitted that she attended much of the trial, both in person and by listening to the proceedings remotely.

The evidentiary hearing clarified that the only possible evidence that S.C. could offer in a new trial would be that Huff said he was the person who killed Joel Silva, and that Huff made this statement in an effort to threaten and frighten her.

**LEGAL STANDARD**

A district court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). However, Rule 33 motions are generally disfavored and should be granted only in exceptional cases. *United States v. Del Toro-Barboza*, 673 F.3d 1136, 1153 (9th Cir. 2012); *see also United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998) (overturning a jury's verdict and ordering a new trial is an extraordinary remedy that should be granted only in the most extreme cases); *United States v. Martinez*, 763 F.2d 1297, 1312-13 (11th Cir. 1985) (A district court may not "set aside the verdict simply because it feels some other result would be more reasonable."). Defendants who seek to overturn jury verdicts bear a heavy burden. *United States v. Barama*, No. 19-CR-00463-RS, 2023 WL 2530994, at *2 (N.D. Cal. Mar. 14, 2023) (The defendant "bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is a real concern that an innocent person may have been convicted."); *United States v. Halali*, No. 14-CR-00627-SI-1, 2017 WL 3232566, *2 (N.D. Cal. July 28, 2017) *quoting United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (same); *United States v. Jenkins*,

10-CR-00882-JSW, 2011 WL 5079508, *2 (N.D. Cal., Oct. 25, 2011) (in assessing a motion for new trial, the court's focus should be on whether failing to grant a new trial would result in "manifest injustice").

When defendants move for a new trial based on newly discovered evidence, their burden is especially high. To prevail, they must meet a five-part test:

> (1) the evidence must be newly discovered;
> (2) the failure to discover the evidence sooner must not be the result of a lack of diligence on the defendant's part;
> (3) the evidence must be material to the issues at trial;
> (4) the evidence must be neither cumulative nor merely impeaching; and
> (5) the evidence must indicate that a new trial would probably result in acquittal.

*United States v. Kulczyk*, 931 F.2d 542, 548 (9th Cir. 1991). All five of these requirements must be satisfied, *United States v. Kenny*, 645 F.2d 1323, 1343 (9th Cir. 1981), but the Defendants here fail to meet them.

## ARGUMENT

### I. S.C.'s Information Is Not Newly Discovered Evidence

The defense did not use the evidentiary hearing to explore many of the statements S.C. made to SA Hofmann during the September 2024 interview. That included the meeting at the Black Bear Diner between Wendt, Hefferman, and J.J. after Huff's unplanned and unsanctioned murder of Silva; Wendt's informing Sonoma County and Nelson about the murder; and Nelson's emotional reaction to the news. Thus, her account of that meeting in SA Hofmann's report still precludes the ability of Wendt and Nelson to move for a new trial under Rule 33. S.C.'s claim that Robbie Huff killed Silva is not "newly discovered evidence" because Wendt was present at a 2014 meeting where Huff's actions were discussed, and Nelson learned this information soon afterward. "We . . . are not at liberty to disregard the explicit directive of Rule 33 and exempt from the 7-day limitation claims of ineffective assistance of counsel based upon facts known to the accused at the time of trial." *United States v. Lara-Hernandez*, 588 F.2d 272, 275 (9th Cir. 1978).

In *United States v. Lofton*, 333 F.3d 874 (8th Cir. 2003), the Eighth Circuit confronted a similar situation. After trial, a co-defendant testified at a Rule 33 hearing that the defendant did not know about

the presence of drugs in the car in which the two were arrested. The court held that this was not newly discovered evidence.

> Before trial, Lofton knew the relevant fact at issue—whether Espinosa had advised Lofton during the course of their travels that Espinosa was carrying illegal drugs in the vehicle. Knowing that fact, Lofton could have called codefendant Espinosa as a defense witness at trial.

*Id.* at 876.

According to S.C., Wendt and Nelson had personal knowledge of Huff's actions, and as the government discussed in its earlier papers, the other Defendants could have discovered such significant information—if it were accurate—with minimal diligence.

## II. S.C.'s Testimony About Huff Remains Inadmissible Hearsay

### A. Robbie Huff's Claim that He Killed Silva Does Not Qualify as a Statement Against Penal Interest

It is axiomatic that to support relief under Rule 33, "newly discovered evidence" must be admissible in a new trial. *See, e.g.*, *United States v. Hill*, 737 F.3d 683, 687 (10th Cir. 2013) ("Implicit in a claim of newly discovered evidence is that there is new *evidence*—that is, material that is admissible at trial.") (citation omitted) (emphasis original); *United States v. Stromberg*, 179 F. Supp. 278, 279-80 (S.D.N.Y. 1959) ("Furthermore, the polygraph test report could not possibly produce a different result at a new trial, for clearly it would not be admissible."). Here, everything that S.C. offered to S.A. Hofmann in her interview, and everything she offered to the Court during the evidentiary hearing constitutes hearsay—information that she heard from other people—and hearsay is inadmissible. Fed. R. Evid. 802.

In their Rule 33 motions, the Defendants assert that a confession by Robbie Huff that he killed Silva would be admissible in a new trial under Federal Rule of Evidence 804(b)(3) because the statement is against the speaker's penal interest. A statement must meet two requirements under that hearsay exception:

> The test for admissibility is two-pronged: (1) whether the statement so far tended to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless he believed it to be true, and (2) whether the corroborating circumstances clearly indicate the trustworthiness of the statement.

*United States v. Hoyos*, 573 F.2d 1111, 1115 (9th Cir. 1978). Huff's alleged statement to S.C. fails both prongs of this test.

**1) Huff Would Not Be Subject to Criminal Liability**

Huff's statement did not "so far tend" to subject him to criminal liability because a reasonable person in Huff's situation—a full-patch Hells Angels member talking to the wife of another full-patch member—could be confident that it would never be reported to law enforcement. For a hearsay statement to be admissible under Rule 804(b)(3), "the declarant's statements must, in a real and tangible way, subject him to criminal liability." *Id*. Based on the strength of the Hells' Angels "no-snitching" rule, a person in Huff's situation would be confident that a statement about his involvement in Silva's murder would never be reported, and therefore, it would not subject him to criminal liability. *See United States v. Satterfield*, 572 F.2d 687 (9th Cir. 1978) (low likelihood of statement resulting in criminal liability reduced its trustworthiness). Indeed, S.C. did not offer Huff's confession to the FBI until nearly 10 years after Huff disappeared.

**2) A Person In Huff's Position Could Falsely Claim to Have Killed Silva**

Further, based on the context, Huff's claim of credit for the Silva killing is not one "that a reasonable person in the declarant's position would not have made unless it were true." *United States v. Monaco*, 735 F.2d 1173, 1176 (9th Cir. 1984). Here, the declarant's was a full-patch Hells Angel, and as the trial evidence showed, Hells Angels can falsely claim credit for acts of violence. Hells Angels members gain status if others believe they committed violence on behalf of the enterprise. RT 2790 (Joseph Hardisty); RT 3924-25 (Jeremy Sheetz); RT 4251-52 (Steven Verhagen); RT 5159 (Troy Conte). That belief is sometimes false, and former members testified about the distinction between displaying a Filthy Few patch because the member earned it through violence and simply wearing one. RT 2790 (Hardisty) ("Filthy Few is – different charters say different things about it, but it should mean – it should mean, like, assaults to murder."); RT 5159 (Troy Conte) ("Filthy Few patch at one time meant somebody fought, earned their patch, they would stand up for their rights or whatever – . . . – at this time, but you see members wearing them that just wear them."). S.C. herself admitted that this form of "stolen valor" exists among Hells Angels.

> Q. Have you heard talk about people wearing like a patch, like the Filthy Few patch, when they haven't earned it?
> A. That's a guaranteed fact that it's true.
> Q. Tell me about that if you would.
> A. I mean, if you had bodies for every time there was a patch – somebody wore a patch, then you would have a big body somewhere.
> Q. So sometimes people take credit for a body or a killing?
> A. Just because you have a couple Filthy Few patches doesn't mean you actually killed somebody. It just means you did something.

ECF 4175 at 79-80. S.C. testified that although she thinks it would be "stupid" for a person to take credit for a killing when they didn't commit that murder, and she's not personally aware of any such instances, she is still "sure" that this happens. *Id.* at 80.

Further, even apart from the Hells Angels context, the Court must consider that Huff's intent was to frighten S.C.

> Q. And when he then told you that, you know, he had killed Mr. Silva, did he just – did that just erupt and come out of him?
> A. Yeah. He pretty much was using it to try to threaten us – try to threaten me, yeah. It didn't matter to me. I don't care.

ECF 4175 at 74.

> Q. And I think you said that he said that Robbie Huff said that he killed Silva as a threat; is that right?
> A. Yeah, he threatened me. He tried – he was trying to scare me. He was trying to scare me.

*Id.* at 79. In fact, S.C. testified that Huff brought out the claim that he killed Silva after other efforts at intimidation proved insufficient.

> Q. Okay. But this was all in the context of "I killed Silva. This can happen" –
> A. No. He threatened me because I guess he thought I wasn't scared of him, which I really wasn't.
> Q. So – but this was all in the context of a violent confrontation –
> A. Yes.
> Q. – and he said, "I killed Silva" –
> A. Yeah.
> Q. – with the implication being that this will happen to you too?
> A. Yes.

*Id.* at 88.

The fact that Huff made his purported confession to killing Silva in the form of a threat disqualifies the statement under Rule 804(b)(3), because the intended effect could be achieved regardless of whether the statement were true. Huff wanted S.C. to be intimidated, so he had a "motive . . . to misrepresent the matter." *United States v. Lindsey*, 702 F.3d 1092, 1102 (8th Cir. 2013) (citing *United States v. Halk*, 634 F.3d 482, 488 (8th Cir. 2011)). The question for the Court in assessing a statement under the Rule is whether it was made in circumstances which "cast doubt on reliability" and whether there is a reason to think the declarant would be untruthful about the statement. *See United States v. Nazemian*, 948 F.2d 522, 530 (9th Cir. 1991). For instance, in *United States v. Riley*, 657 F.2d 1377 (8th Cir. 1981), the court found that the declarant may have been motivated by her fear of the defendant and her desire to leave him. *Id.* at 1384. For this reason, even though she made a statement "ostensibly against interest," the statement was not admissible because of the surrounding circumstances. *Id.* at 1385. The same is true here.

**3) Huff's Purported Confession Fails to Meet the Rule 804(b)(3) Factors**

For a statement to carry the necessary trustworthiness to be admitted under the exception to hearsay in Rule 804(b)(3), courts consider the following factors: "(a) the time of the declaration and the party to whom it was made; (b) the existence of corroborating evidence; (c) the extent to which the declaration is really against the declarant's penal interest; and (d) the availability of the declarant as a witness." *Hoyos*, 573 F.2d at 1115 (citation omitted). None of these factors supports admission of the S.C.'s testimony about Huff's confession, with the exception that Huff is dead.

With respect to the timing of Huff's statement that he killed Silva, S.C. could provide no details when it was made, only that it was "way after" Silva disappeared.

> Q. Okay. And I think you said when he came back or brought the Tahoe [*just after Silva disappeared*], that's when you had this conversation about –
> A. No. The conversation about that was way after that. It was quite a bit, like, later on. Like, quite a bit later on.
> Q. When you say "quite a bit later," what do you mean?
> A. I couldn't even begin to tell you. It was quite a bit later.

ECF 4175 at 51-52. This diminishes the trustworthiness of Huff's statement. "There is no clear

indication of the 'trustworthiness' of Sylvia's statement based on 'corroborating circumstances.' It is not made spontaneously on her part; to the contrary, it was made over a year and a half after the crime." *United States v. Poland*, 659 F.2d 884, 895 (9th Cir. 1981).

Likewise, the fact that the confession was made to someone whom Huff was trying to threaten makes it less reliable: "her statement was not made to a family member, close friend, or someone to whom admission of a crime might be natural." *Id.*

Both in her interview with the FBI and during the evidentiary hearing, S.C. offered no corroborating evidence to support Huff's supposed confession. There are no accounts from other family members who were present at the time. There is no surveillance footage of the incidents where Huff came to S.C.'s house and threatened Hefferman and then S.C. There are no phone records, text messages, emails, or letters showing communication among the parties before or after the threats. There are no police reports detailing Huff's brandishing of a weapon. There are no Hells Angels records disciplining Huff for threatening to kill a fellow member and members of his family.

When S.C. testified, the defense had the opportunity to inquire about whether any corroborating evidence to support Huff's confession exists. They declined to do so. Likewise, the defense elicited none of the details that would make S.C.'s story more believable, such as: What exactly did Huff say about killing Silva? What else did Huff say? Who was present each time Huff said he killed Silva? What time of day was it? Where was Huff when he made these statements? Where were the listeners? What did anyone say to Huff? What was Huff doing? What was he wearing? How long were these interactions? How did they begin? How did they end? Did S.C. talk to anyone about Huff's statements? Whom did she talk to, and when? What was said?

Similarly, the Defendants made no effort to elicit testimony that would explain some of the confusing aspects of S.C.'s account. For instance, if Huff accused Hefferman of stealing money from the Fresno Hells Angels, why was *Huff* so angry with Hefferman that he would threaten Hefferman and his family at gunpoint? Moreover, the defense made no effort to have S.C. establish the foundation of her credibility, such as providing an explanation why she reached out to law enforcement in the first place. As Special Agent Hofmann's testimony indicated, money was not a motivating factor because S.C. did not know that information she provided might result in payment. "We didn't have any payment

conversations until I gave her her first payment, which she was not aware that I was bringing money to that meeting." ECF 4175 at 110. This lack of explanation represents a significant gap in assessing S.C.'s credibility.

In considering hearsay statements under Rule 804(b)(3), the Court can weigh not only the reliability of the out-of-court declarant, but whether the sponsoring witness is trustworthy. "The trustworthiness of a statement against the declarant's penal interest is determined by analysis of two elements: 'the probable veracity of the in-court witness, and the reliability of the out-of-court declarant.'" *United States v. Rasmussen*, 790 F.2d 55, 56 (8th Cir. 1986) (citing *United States v. Alvarez*, 584 F.2d 694, 701 (5th Cir. 1978)); *see also Gable v. Williams*, 49 F.4th 1315, 1330 (9th Cir. 2022) (approving admission of a confession under Rule 804(b)(3) where, among other factors, it was made to "to nearly unimpeachable witnesses and his family").

In terms of corroboration, the most that Defendants can offer is that the trial record showed that Huff played a role in the cleanup after Silva was killed and his body was cremated, and specifically, that Huff played a role in burning Silva's truck. But these details were aired during the two trials, and therefore they provide no corroboration. "Moreover, the details she here related on which appellants naturally rely as corroborative . . . could easily have been learned by her from the news media, especially after the August 1978 hearings." *Poland*, 659 F.2d at 895. S.C. admitted that she "was around for the trial" and followed "most of it," both in person and through remote broadcast. ECF 4175 at 78-79.

Further, that Huff killing Silva could be viewed as *somewhat* corroborated by the trial evidence—Huff disposed of Silva's truck and participated in other aspects of the cleanup—is insufficient. Rule 804(b)(3) requires much more than just some corroboration. "Under Rule 804(b)(3), the corroborating circumstances must do more than tend to indicate the trustworthiness of the statement; they must clearly indicate it." *Satterfield*, 572 F.2d at 694. Courts have precluded admission of statements under the Rule even where there is partial corroboration.

> Ms. Robinson's statement does not meet the third criterion of the admissibility test because corroborating circumstances do not clearly indicate the trustworthiness of the statement. And we so hold even though the statement may be true and was corroborated to some extent by other evidence in the record.

*Riley*, 657 F.2d at 1385 (footnote omitted).

With respect to corroboration, courts must also assess whether the statement is contradicted by other evidence. "Further, as noted by the Arizona Supreme Court, direct evidence contradicted Karl's statement that Walter was not involved in the stabbing of Ken Hartsock." *LaGrand v. Stewart*, 133 F.3d 1253, 1268 (9th Cir. 1998) (review of state court evidentiary ruling through reference to Rule 804(b)(3)). Here, the entire trial record supports the juries' findings that Wendt, Nelson, and Ott murdered Silva—not Huff—and that they conspired with Ranieri to do so. That includes witness testimony, call detail reports, cell phone location data, crematory records, and other evidence, all of which directly contradicts S.C.'s account.

## III. <u>The Newly Discovered Evidence Would Not Likely Result In Acquittal on the VICAR Murder and Conspiracy to Commit VICAR Murder Counts</u>

The last requirement that a defendant must meet in moving for a new trial based on newly discovered evidence is that "the evidence must indicate that a new trial would probably result in acquittal." *Kulczyk*, 931 F.2d at 548. Here, the Defendants cannot meet their burden to satisfy this requirement for several reasons.

First, the jury would be unlikely to credit S.C.'s account because she is an unreliable narrator and has difficulty remembering details. When asked specifically when Huff threated her and her husband with a firearm, she replied, "I couldn't even begin to tell you. . . . I can't remember. It's been a while. I mean, I really can't. . . It's hard to remember details." ECF 4175 at 52. S.C. claimed that she didn't remember what she told Special Agent Hofmann in their discussions. *Id.* at 63 ("I don't remember what I told her. I don't remember."). S.C. vacillated on key points, such as how she learned key pieces of information.

> Q. Well, let me ask you this: In your conversations with Agent Hofmann, do you remember telling her that Robbie Huff had told you that he had burned Joel Silva's truck?
> A. You know what? I think – I'm going back to . . . He might have. I don't – it wasn't the day that he talked to me – that he told me that Merl was next. No, it wasn't the same day.
> Q. So it may have been a different occasion where he told you about burning Joel Silva's truck?
> A. I honestly don't know if he did or not, but I know someone did tell me.
> Q. Okay. But you don't remember who the someone was?

A. It could have been Merl.
Q. Okay. I'll ask you a specific question. In relation to your questions – or your discussions with Agent Hofmann and maybe other agents, do you remember specifically telling them that it was – that Robbie Huff told you that he had burned Doughboy's truck?
A. I don't remember doing it, but I very well could have. I don't remember him telling me that.
Q. Okay.
A. I know he told me – you know what? Yeah, he might have.

*Id.* at 53-54.

Even within the evidentiary hearing, S.C.'s account was contradictory. For instance, she first testified that Huff killed Silva within the Hefferman family Tahoe.

Q. Just so we're clear, Robbie Huff specifically told you that he had shot Joel Silva within your truck?
A. Yes.

*Id.* at 55. This was consistent with her assertion that after Huff borrowed the vehicle, he returned it cleaner than when it was lent to him. *Id.* at 56. Later, however, S.C. changed course, testifying that Huff said that he shot Silva in *Silva's* truck.

A. You know, I think he shot him in his truck. I don't think he shot him in mine.
Q. In Mr. Silva's truck?
A. Yeah, I do believe that was said. I don't think it was mine, but he had my – he had my Tahoe during that time period.
Q. Okay. But –
A. Yes.
Q. – your understanding is the shooting actually occurred in Mr. Silva's truck?
A. Yes.

*Id.* at 77. It is hard to fathom how the owner of a vehicle could be confused whether or not someone had been murdered inside it after they lent it to someone else.

S.C. also denied telling Special Agent Hofmann information that the agent specifically detailed in her report and in her notes, such as the claim that Silva, Hardisty, and Huff were beaten as a result of the New York marijuana deal.

Q. Do you remember any beatings or physical punishment as a result of –
A. No.
Q. – the loss of $30,000 –

> A. No.
> Q. – or the theft of $30,000?
> A. No.
> Q. You do not remember telling Agent Hofmann –
> A. No, I never told her that. I never told her that.
> Q. Okay. You don't remember telling Agent Hofmann that there was a meeting called at church where Jojo Hardisty, Robbie Huff, and Joel Silva were beaten or punished for their involvement in the theft?
> A. No, no, no. I never said that because that's not true.

*Id.* at 64-65. In her report of the September 2024 interview with S.C., Special Agent Hofmann presented S.C.'s account of that very beating, and she listed the specific injuries that S.C. discussed.

> As a result of the missing money and product, Hardisty, Huff, and Silva received a beating at the Fresno Charter HAMC clubhouse during church. Hardisty had upper body and back injuries, and he was thrown through a wall. Huff sustained injuries from a hammer, and Silva had a busted lip.

July 30, 2026 Declaration of Albert Boro In Support of New Trial Motion ("Boro Decl."), Ex A at 021, ¶ 9 (September 25, 2024 Report); *id.* at 028 (SA Hofmann's notes memorializing S.C.'s statements); *id.* at 042 (SA Benjamin White's notes: "2 weeks between Salem-Fresno church. Then Richmond church w/in that month. All had beatings."). If S.C. were a witness in a new trial, it would be difficult to imagine more concrete impeachment—S.C. flatly denies saying something and then two FBI agents testify that they contemporaneously recorded that statement in their notes and in an official report.

Second, S.C. would be impeached through the factual inaccuracy of her account of the Silva homicide. Those inaccuracies are detailed in the government's July 13, 2026 opposition to the Defendants' motions for a new trial under Rule 33. Briefly summarized, the trial evidence demonstrates that S.C. is wrong about:

- The details of Silva's marijuana trafficking to the East Coast
- The role of the New York charter in Silva's killing
- The idea that Hells Angels charters discipline another charter's members
- The relationship between Levi Phipps and Merl Hefferman and his family
- The lack of any connection between Levi Phipps and Hells Angels members other than Hefferman

- Communications between Hefferman and Levi Phipps in the days leading up to and immediately after Silva's disappearance
- The mechanics of the cremation of Silva's body; specifically, the manner in which it was brought to the crematory and the lack of any "pause" in that cremation
- The lack of any payment by Hefferman to Levi Phipps for use of the crematory
- Brian Wendt's actions from the June 2014 Laconia Bike Week through Silva's disappearance on July 15, 2014
- Jonathan Nelson's actions from the June 2014 Laconia Bike Week through Silva's disappearance on July 15, 2014

Third, the weight of the evidence was so overwhelming that the addition of S.C.'s account of Huff's confession would have no effect on the outcome, let alone would likely result in an acquittal. If the Court were to grant a new trial, the government would put on the same evidence that led to the quick verdicts in the first two trials. The defense would then call S.C., who would be allowed to testify only that Robbie Huff claimed that he is the one who killed Silva, and that he made this claim while threatening Hefferman and S.C. at gunpoint. The defense would be able to offer no corroborating evidence or support.

The government would then impeach S.C. with: (1) her denials that she made statements to SA Hofmann that are recorded in the agent's notes and report; (2) her poor memory and inability to recollect critical details; (3) her contradictory testimony at the evidentiary hearing; (4) her factual inaccuracy about issues that should be within her knowledge, such as Levi Phipps's relationship with the Hefferman family and the lack of any phone call from Phipps to the Hefferman household the night after Silva disappeared; (5) her close relationship with the Defendants; and (6) the fact that she came forward with her account only after attending and listening to the trial.

This would be followed by a rebuttal case with evidence of the other disappearances and cremations by Hefferman and Levi Phipps. This evidence would be relevant to establish that the disposal of Silva's body was not a Robbie Huff improvisation, as Huff later suffered the same exact fate. It would also be admissible to impeach S.C. with respect to her account of the treatment of the ashes of

the various victims[1] and to the nature of Levi Phipps's relationship with Hefferman and his family.

In closing argument, the government would highlight the lack of factual support for S.C.'s assertions and how the trial evidence contradicts her account. It would also argue that even if S.C. accurately recounted what Huff said when he threatened her, it does not follow that Huff was telling the truth, for the reasons discussed above.

Finally, if a new jury were to fully accept S.C.'s testimony that Huff killed Silva, the Defendants would still be liable for conspiracy to commit VICAR murder and VICAR murder.[2] Her testimony would have no effect on the government's evidence regarding the conspiracy to kill Silva. If the jury believed that Huff killed Silva, they could conclude that Hardisty was wrong about who pulled the trigger, possibly because Wendt falsely claimed credit for it. However, the jury would still be free to accept the remainder of Hardisty's testimony about the decision to kill Silva, the planning to carry it out, and the roles each of the Defendants played. Indeed, S.C.'s testimony in a new trial would offer no challenge to any of that evidence. The only difference would be that Huff instead of Wendt killed Silva in the Fresno clubhouse after Silva and Ott arrived. That would support the jury's verdict for conspiracy to commit Silva's murder.

Further, even if jurors accepted S.C.'s account of who shot Silva and found that Hardisty testified falsely on that point, they could still accept the other aspects of Hardisty's testimony. "[I]f you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest." Ninth Cir. Model Criminal Jury Instruction 1.7. The jury could consider the substantial corroboration of Hardisty's testimony that the Defendants and others conspired to kill Silva, including Huff. *See* ECF 3705 at 20 (March 11, 2023 Order Denying Group One Rule 33 Motions). That would include Huff's communications with others prior to Silva's disappearance and his connection to the arson of Silva's truck. *See, e.g.*, GX 127 (CAST and call records).

If the jury determined that there was a conspiracy to murder Silva, that Huff and the Defendants

---

[1] This topic is addressed in more detail in the government's July 13, 2026 opposition to the Defendants' Rule 33 motions.

[2] Foakes was not charged with these crimes.

were members of that conspiracy, and that Huff murdered Silva as part of that agreement, the Defendants would be liable for Silva's murder through *Pinkerton*. Under *Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946), a defendant is vicariously liable for reasonably foreseeable substantive crimes committed by a co-conspirator in furtherance of the conspiracy. In the Group One trial, the Court denied the government's request for a *Pinkerton* instruction. A principal basis for that ruling was that the theory of the government's case and all the evidence at trial was that Wendt did the killing. *See, e.g.*, RT 6552. However, if the defense admits testimony from S.C. about a supposed confession by Huff, then a *Pinkerton* instruction would be necessary in a new trial, and the jury would be likely to convict on that basis because *Pinkerton* remains a valid theory of criminal liability. *See Johnson v. United States*, 139 F.4th 830, 839 (9th Cir. 2025) (Hobbs Act robbery based on a *Pinkerton* liability is still a valid crime-of-violence predicate for § 924(c)).

## IV. <u>The Defendants Would Still Be Convicted of RICO Conspiracy With S.C.'s Testimony</u>

The evidentiary hearing established that the only potentially admissible evidence that S.C. could offer in a new trial would be her bald assertion that Robbie Huff threatened her and her husband by saying that he killed Joel Silva, with the implication that they could be next. ECF 4175 at 88. This testimony would have zero impact on the evidence related to the RICO Conspiracy conviction. If accepted by the jury, the most it could accomplish would be to call into question the specific detail from Hardisty's testimony that Wendt confessed that he—Wendt—is the person who shot Silva. This would not force a wholesale rejection of Hardisty's testimony by a new jury, for several reasons. First, the jury could consider that Hardisty truthfully testified about Wendt's confession, but Wendt falsely claimed credit for the killing. Alternately, the jury could reject Hardisty's account of who carried out the killing but accept Hardisty's other testimony about the planning for the homicide and about the nature of the Sonoma County Hells Angels enterprise. Third, as the government outlined in its July 13, 2026 Rule 33 opposition brief, with the exception of Defendant Ranieri, the Court found that the RICO Conspiracy convictions stand entirely without reference to the murder of Silva. With respect to Ranieri, S.C.'s proposed testimony does not eliminate evidence of the murder or Ranieri's role in conspiring to kill Silva. Rather, it would simply change one aspect of the homicide—who fired the fatal shot—while

leaving all the other evidence untouched.

Thus, there is no basis for any Defendant to argue that S.C.'s testimony about Huff's purported confession would likely lead to an acquittal for the RICO Conspiracy count.

## V. There Is No *Brady* Violation

The government disclosed the facts contained in the report of the critical interview with S.C. in February 2025, eight days after the NDCA prosecutor received that report. Because the information was not suppressed, the Defendants must rely on the delay between when SA Hofmann learned of potentially helpful information and its disclosure. In those circumstances, the analysis turns to "whether the lateness of the disclosure so prejudiced appellant's preparation or presentation of his defense that he was prevented from receiving his constitutionally guaranteed fair trial." *United States v. Miller*, 529 F.2d 1125, 1128 (9th Cir. 1976). Under this test, if "the defendant is presented with a substantial opportunity to use the belatedly disclosed evidence, there is no prejudice." *United States v. Alahmedalabdaloklah*, 94 F.4th 782, 828 (9th Cir. 2024). The defense used the information from S.C. in their efforts to seek new trials, so they have not suffered any prejudice. This is fatal to their *Brady* claim. *See Strickler v. Greene*, 527 U.S. 263, 282-83 (1999) (for a "true *Brady* claim . . . prejudice must have ensued").

The first time SA Hofmann heard anything of substance from S.C. about the Silva homicide and Huff's confession was September 2024, and she wrote a detailed report of S.C.'s account of that event. In that report, SA Hofmann made a connection to this investigation in NDCA for the first time. She also informed the case agent for the investigation about the interview. Thus, the earliest possible date the government could be imputed to possess S.C.'s information is September 2024.

There were no proceedings in this case between September 2024 and February 2025. In *Parker v. Cnty. of Riverside*, 78 F.4th 1109 (9th Cir. 2023), the court held that if there is no proceeding that could be affected by the withheld information, there is no *Brady* violation. *Id.* at 1113-14; *see also United States v. Wenger*, Case No. 23-CR-00269-JSW, 2025 WL 28458, at *7 (N.D. Cal. Jan. 3, 2025) (quoting *Parker*, 78 F.4th at 1113). The Court denied the Group One Rule 33 motions on March 3, 2024, and it denied the Group Two motions the next month, on April 16, 2024. ECF 3705; ECF 3716. The Court conducted sentencing hearings for the Group One Defendants on June 13, 2024, ECF 3752-54, and it imposed judgment for each defendant before SA Hofmann's report was finalized on

September 25, 2024. *See* ECF 3780; ECF 3782; ECF 3795; Boro Decl., Ex. A, at 020. The Group One jury issued its verdict on June 22, 2022. ECF 2886. In September 2024, the Group One Defendants still had nine months in which to file motions for a new trial based on newly discovered evidence. *See* Fed. R. Crim. Proc. 33(b)(1) (three-year deadline). For the Group Two Defendants, their deadline under Rule 33 was May 17, 2026. *See* ECF 3493 (May 17, 2023 Verdict). The Group Two Defendants were not set for sentencing until March 6, ECF 3618 (Ranieri), and March 27, 2025, ECF 3819 (Foakes). Therefore, the passage of time between September 2024 and February 2025 had no effect on their sentencing. The lack of any proceedings to be affected by a delay in disclosure is another reason the Defendants' *Brady* claim fails. *Parker*, 78 F.4th at 1113.

In addition, for a "true *Brady* claim," the suppressed evidence must be favorable to the accused. *Strickler*, 527 U.S. at 282-83. This is linked to the prejudice requirement, because even information arguably favorable to the accused cannot support a *Brady* violation if it could have no impact on any proceeding. *See, e.g.*, *Parker*, 78 F.4th at 1113. With respect to S.C.'s information about Huff's role in the Silva murder, even if it were known to the government, wholly suppressed, and only discovered through independent defense investigation, it would not constitute a violation of *Brady* because it would not likely produce an acquittal in a new trial.

However, S.C.'s information was disclosed by the government. During the September 25, 2026 evidentiary hearing, in addition to S.C., the defense called Special Agent Hofmann as witness. SA Hofmann testified that after her September 9, 2024 interview with S.C., she made a connection to the NDCA investigation involving the Defendants. She said that "not long" after the interview, she informed the NDCA case agent, Special Agent Kassandra Lane, that S.C. provided potentially exculpatory information. ECF 4175 at 140. She finalized her report of the S.C. interview on September 25, 2024, and she made it available within the FBI network. *Id.* at 146. SA Hofmann testified that SA Lane asked her about the report "a couple of weeks" later. *Id.* at 142-43.

At the conclusion of the evidentiary hearing, counsel for Defendant Nelson argued that the Court should keep the hearing open so that the defense could call SA Lane. The basis for this demand was the assertion that the Defendants learned for the first time that the NDCA case agent was aware of S.C.'s information in the time frame presented by SA Hofmann, and that this information was material to

litigation involving Joseph Hardisty's text messages.

> We learned things that we didn't know, and my colleagues remind me that we learned for the first time today that in September and October of 2024 Special Agent Hofmann advised the case agent on this case of the witness' statements concerning Mr. Huff's confession.
>
> * * * *
>
> [W]e have a case agent in this case who at the same moment, if I may, when I say "moment," the same period of time, where her communications with Mr. Hardisty are being – are the subject of an evidentiary hearing because of the things that Mr. Hardisty told her.

ECF 4175 at 178.

This claim is false on two fronts. First, the government informed the defense in March 2025 that it first heard about potentially exculpatory information from a confidential informant at some point after September 2024. The specific disclosure is below:

> The NDCA trial team first became [aware] that an out-of-district CI made statements regarding the Silva homicide sometime after the September 2024 proffer. I do not recall when that was, but it was likely before November 2024, as I was out of the office for much of November 2024 through January 2025 addressing family and personal matters. The information about the CI's reporting was only general, with no specifics. We learned that statements were made about the homicide, and that they differed from the facts presented at trial.

September 25, 2026 Evidentiary Hearing Ex. W at 2 (March 20, 2025 letter of Kevin Barry to defense counsel). This is completely consistent with SA Hofmann's testimony—she informed SA Lane about S.C.'s interview in general terms not long after it happened; she finalized her report in late September 2024; and SA Lane inquired about that report "a couple of weeks" later. That is, prior to November 2024. As discussed above, government counsel obtained a copy of the actual report in February 2025 and disclosed it eight days later.

Second, counsel's assertion that the disclosure to SA Lane took place at the same time as an evidentiary hearing regarding SA Lane's communications with Hardisty is also false. That evidentiary hearing took place in November *2023*, not November 2024. *See, e.g.*, ECF 3641 (Transcript of November 27, 2023 evidentiary hearing).

In sum, there was no *Brady* violation with respect to S.C.'s information about the Silva

homicide.

## CONCLUSION

New information from S.C. would not be admitted in a new trial, and even if introduced, it would not likely lead to an acquittal. The government disclosed the information that the Defendants have used to make their motions under Rule 33, and there has been no violation of *Brady*. The Court should deny the Defendant's motions and let the juries' verdicts stand.

DATED: October 29, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

/s/ *Kevin J. Barry*
KEVIN J. BARRY
Assistant United States Attorney