ROBERT WAGGENER (SBN 118450)
214 Duboce Ave.
San Francisco, CA 94103
Telephone: (415) 431-4500
rwlaw@mindspring.com

LEAH SPERO (SBN 232472)
912 Cole Street, No. 301
San Francisco, CA 94117
Telephone: (415) 343-5563
leah@sperolegal.com
**Attorneys for RUSSELL OTT**

JOHN T. PHILIPSBORN (SBN 83944)
507 Polk Street, Suite 350
San Francisco, CA 94102
Telephone: (415) 771-3801
jphilipsbo@aol.com

K. ALEXANDRA MCCLURE (SBN 189679)
217 Leidesdorff Street
San Francisco, CA 94111
Telephone: (415) 814-3397
alex@alexmcclurelaw.com
**Attorneys for BRIAN WENDT**

RICHARD G. NOVAK (SBN 149303)
P.O. Box 5549
Berkeley, CA 94705
Telephone: (626) 578-1175
richard@rgnlaw.com

VICKI BUCHANAN (SBN 153318)
19201 Sonoma Hwy, No. 243
Sonoma, CA 95476
Telephone: (707) 343-1907
vickimaroltbuchananpc@gmail.com
**Attorneys for JONATHAN NELSON**

ALBERT J. BORO, JR. (SBN 126657)
345 Franklin Street
San Francisco, CA 94102
Telephone: (415) 621-2400
ajboro@boro-law.com
**Attorney for RAYMOND FOAKES**

JOHN WALSH (MA Bar 555649)
63 Atlantic Avenue, 3rd Floor
Boston, MA 02110
Telephone: (617) 851-2429
johngwalshlaw@gmail.com
**Attorney for CHRISTOPHER RANIERI**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JONATHAN NELSON, et al.,<br><br>Defendants. | CR No. 17-CR-00533-EMC<br><br>**DEFENDANTS' JOINT FILING OF THEIR INDIVIDUAL REPLY MEMORANDA REGARDING EVIDENTIARY HEARING WITH CHS AND AGENTS** |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii
INTRODUCTION ........ 1
ARGUMENT ........ 1
- RUSSELL OTT ........ 1
- BRIAN WENDT ........ 3
- JONATHAN NELSON ........ 5
- CHRISTOPHER RANIERI ........ 6
- RAYMOND FOAKES ........ 8

CONCLUSION ........ 10

# TABLE OF AUTHORITIES

## Cases

*Brady v. Maryland*, 373 U.S. 83 (1963) .......... 6, 7, 8
*Casias v. United States,* 337 F.2d 354 (10th Cir. 1964) .......... 4
*Essex Chem. Corp. v. Hartford Accident & Indem. Co.*, 993 F. Supp. 241 (D.N.J. 1998) .......... 1
*Giglio v. United States*, 405 U.S. 150 (1972) .......... 6, 8
*Gray v. State*, 796 A.2d 697 (Md. App. 2002) .......... 2
*Napue v. Illinois,* 360 U.S. 264 (1949) .......... 6, 8
*Padilla v. Terhune*, 309 F.3d 614 (9th Cir. 2002) .......... 2
*Pinkerton v. United States,* 328 U.S. 640 (1946) .......... 3, 6
*Solorio v. Muniz*, 896 F.3d 914 (9th Cir. 2018) .......... 1
*Sun Sav. & Loan Ass'n v. Dierdorff*, 825 F.2d 187 (9th Cir. 1988) .......... 10
*United States v. Alston*, 974 F.2d 1206 (9th Cir. 1992) .......... 10
*United States v. Banks,* 514 F.3d 959 (9th Cir. 2008) .......... 4
*United States v. Davis,* 960 F.2d 820 (9th Cir. 1992) .......... 4
*United States v. Lindsey*, 702 F.3d 1092 (9th Cir. 2013) .......... 2
*United States v. Long*, 301 F.3d 1095 (9th Cir. 2002) .......... 3
*United States v. Mangum*, 539 F. Supp. 3d 515 (E.D.N.C. 2020) .......... 2
*United States v. Mouzone*, 687 F.3d 207 (4th Cir. 2012) .......... 9
*United States v. Piazza*, 647 F.3d 559 (5th Cir. 2011) .......... 1
*United States v. Riley*, 657 F.2d 1377 (8th Cir. 1981) .......... 2
*United States v. Satterfield*, 572 F.2d 687 (9th Cir. 1978) .......... 2
*United States v. Stepney*, 246 F. Supp. 2d 1069 (N.D. Cal. 2003) .......... 1, 8

## Rules

Fed. R. Crim. P. 33 .......... 6, 8
Fed. R. Evid. 614 .......... 6
Fed. R. Evid. 804(b)(3) .......... 2, 3

## INTRODUCTION

Per the Court's order, the defendants submit this joint filing of their individual replies to the government's opposition brief. The defendants join in each other's arguments to the extent those arguments support their own requests for a new trial.

## ARGUMENT

**RUSSELL OTT.** The government's case against Mr. Ott for participating in the alleged plan to murder Silva has always been tenuous at best. The newly discovered evidence leaves no theory on which a reasonable jury could find Mr. Ott guilty beyond a reasonable doubt. The government's opposition to a new trial significantly understates the nature of the new evidence, its admissibility, and its materiality, and it relies on inapposite and outdated authorities. A new trial is required.

**Newly discovered evidence.** The government only addresses Huff's admission that he shot Silva, ECF 4182 at 3, but Huff also admitted burning Silva's truck and being on the hook for a $30k shortfall with Hardisty and Silva after a drug-deal-gone-bad, ECF 4181 at 5–6. The government does not suggest that Mr. Ott had any knowledge of these admissions. ECF 4182 at 4–5.

**No lack of diligence.** The government argues that "other Defendants" (presumably Mr. Ott) "could have discovered" the new evidence sooner "with minimal diligence." ECF 4182 at 5. But without "some indication ... that the alleged exculpatory evidence existed"—and the government points to no such indication here—Mr. Ott "could not have been dilatory in failing to investigate further." *Solorio v. Muniz*, 896 F.3d 914, 920 (9th Cir. 2018). Even if Hefferman knew of Huff's admissions to the CHS, there is no basis to impute the knowledge to Mr. Ott or assume he could have learned it. *United States v. Stepney*, 246 F. Supp. 2d 1069, 1076 (N.D. Cal. 2003); *Essex Chem. Corp. v. Hartford*, 993 F. Supp. 241, 251 (D.N.J. 1998). Mr. Ott, a Sonoma HA member, was not close with Fresno members Hefferman or Huff, or the CHS. The 2014 call records show that there was only one contact between Mr. Ott and Hefferman (in December) and none between Mr. Ott and the CHS or Mr. Ott and Huff. *See* ECF 4109 at Ex. G. Due diligence did not require Mr. Ott to pursue the CHS, whom he did not know to be a witness. *United States v. Piazza*, 647 F.3d 559, 566–69 (5th Cir. 2011).

**Trustworthy and admissible.** Huff's admissions to the CHS that he shot Silva and burned Silva's truck after the drug-deal-gone-bad with Hardisty and Silva are trustworthy and admissible.

ECF 4181 at 5–11. These inculpatory statements were against Huff's penal interest even though he did not anticipate the CHS would report them. ECF 4181 at 7–8 (explaining the rule). The government's reliance on *United States v. Satterfield*, 572 F.2d 687, 691 (9th Cir. 1978), is misplaced. There, the court construed the against-interest requirement *broadly*, and it was the fact that the declarant was convicted and unlikely to win his appeal that made his statement directly exculpating a co-conspirator less trustworthy. Here, Huff had not been charged or convicted and was not directly exculpating others, making his admissions *more* trustworthy. *See* ECF 4181 at 7–8.

Further, the fact that Huff admitted to killing Silva as part of a threat "does not detract from" its reliability. *Gray v. State*, 796 A.2d 697, 707 (Md. App. 2002); *United States v. Mangum*, 539 F. Supp. 3d 515, 536 (E.D.N.C. 2020). The government's authorities note only general or inapposite motives to lie; they do not suggest that threats are a motive to lie or are untrustworthy. *United States v. Lindsey*, 702 F.3d 1092, 1102 (9th Cir. 2013); *United States v. Riley*, 657 F.2d 1377, 1384 (8th Cir. 1981). The CHS rebuffed the idea that Huff lied, EH 80–81, 84, and the government's musings about puffery among some HAs, ECF 4182 at 6–7, give no basis to keep Huff's statements from a jury.

As made clear by the 2010 Advisory Committee Notes to FRE 804(b)(3) and *Padilla v. Terhune*, 309 F.3d 614, 620 (9th Cir. 2002), the CHS's credibility is a question for the jury. The government's out-of-circuit authorities to the contrary predate the advisory notes and are not good law on this point. ECF 4182 at 10. The jury could easily credit the CHS, who gave credible testimony at the hearing and was repeatedly deemed credible by SA Hofmann. EH 102–04, 106, 110,114. Any inaccuracies or inconsistencies in her recounting of events are for the jury to weigh, especially against Hardisty's statements, which are riddled with inconsistencies. *See* ECF 4109 at 9–12.

**Likely to result in acquittal.** According to the government at Trial 1, Mr. Ott's only supposed role in the murder was to accompany Silva to Fresno with the knowledge that Mr. Wendt allegedly planned to kill Silva after they arrived. TT1 1202–04, 2746, 2763–64. Aside from Hardisty's testimony that Mr. Ott was in on this plan, there was nothing conclusively tying Mr. Ott to the murder. ECF 4109 at 7–8, 23–25 (detailing evidence). At most, the other evidence demonstrated that Mr. Ott traveled with Silva to Fresno and, at some point after, learned that Silva had been murdered—not that he knowingly participated. *Id.*

The new evidence changes the nature of the murder plan entirely. There is nothing linking Mr. Ott to Huff's plan to murder Silva, and thus no basis for VICAR charges. Nor is there a basis for *Pinkerton* liability, ECF 4182 at 16, because Mr. Ott was not part of Huff's plan to kill Silva, and the government has not indicated any other conspiracy Mr. Ott joined that would have made Silva's murder both reasonably foreseeable to him and in furtherance of the conspiracy. *See United States v. Long*, 301 F.3d 1095, 1103 (9th Cir. 2002) (describing elements for liability under *Pinkerton v. United States*, 328 U.S. 640 (1946)). The RICO conspiracy based on the Hells Angels Sonoma County (HASC) alleged in the Superseding Indictment does not encompass Huff killing Silva. ECF 374. Mr. Ott's RICO conviction was premised on his own alleged role in Silva's murder, TT1 6774, and cannot stand under the new evidence. *See* ECF 4131 at 13.

**BRIAN WENDT.** In opposing the defendants' motions, the government relies in large part on hearsay that the CHS disavowed during her testimony on September 25, 2026. The government ignores SA Hofmann's testimony that the CHS stated "several times in our interviews…" that "'[t]he Government had it wrong…'", EH 140, and that during the interviews SA Hofmann was trying to clarify information about events she was unfamiliar with. This underscores the importance of the CHS's testimony before this Court, which clarified what she actually said. EH 130–45. The government injects argument about references in reports to an alleged Black Bear Diner meeting. That alleged meeting played no part in the CHS's testimony about where she had spoken with Huff. There was no trial or phone record evidence related to any such meeting. At no time during her testimony did the CHS say that Brian Wendt was present when Huff told her about the Silva killing. The CHS testified that Huff admitted twice to killing Silva; he also admitted his theft of money related to a drug deal gone bad. EH 58–62. The defense has fully briefed the admissibility of Huff's statements under FRE 804(b)(3). *See* ECF 4181.

Plenty of evidence corroborates the CHS's testimony that Huff admitted to killing Silva. At trial, phone records showed Huff traveling in the areas where Silva's truck was found and elsewhere in Fresno. TT1 3194–98; T1 GX 127 at 45, 48–49. According to FBI Agent Sparano, whoever used Huff's cellphone after July 15 was also using a SIM card from Silva's phone on occasion. TT1 3202–08; T1 GX 127 at 53–54, 60, 66, 68. In its rebuttal argument at trial, the government responded to the

theory of Huff/Hardisty involvement by claiming that the evidence at trial did not support the theory. TT1 7265. But clearly, the CHS's evidence provided in court on September 25, 2026, supports it.

The Hardisty version was not corroborated and can now be disputed. No phone records for Hardisty were ever produced. There was no direct location evidence about where he was. There was no corroboration for Hardisty's testimony that Mr. Wendt confessed to him. The government's argument at trial was that Hardisty's testimony about the conspiracy was otherwise corroborated by phone records. During the Group One trial, jurors heard evidence that Hardisty told his former girlfriend Margaret Chin that he had killed Joel Silva. TT1 6412–13. The testimony was limited to the matter of Hardisty's credibility. TT1 6424. Ms. Chin's testimony that Hardisty had confessed to her makes more sense in view of the CHS's testimony that Hardisty was hanging out with Huff and Silva in Fresno in the summer of 2014, EH 76, and that Huff had talked about the three of them stealing money related to a drug deal and that Huff admitted killing Silva. EH 61–62.

The CHS's evidence is newly discovered. At a new trial, jurors could use her testimony and the phone records to conclude that Huff killed Silva. And that he did so to clear himself from the accusation that he had stolen from fellow Hells Angels and crossed his own Chapter. Count 1 (the RICO conspiracy) specifies that Brian Wendt killed Joel Silva and that was the factual theory pursued by the government at trial. ECF 374 at 10. If Huff was the actual killer, he would not have been conspiring to kill, or engaged in killing, by reason of, or in furtherance of membership in the enterprise. As discussed in *United States v. Banks,* 514 F.3d 959, 969–70 (9th Cir. 2008), Huff killing Silva was not "committed 'as an integral aspect'" of the charged HASC enterprise and was not something that would have been expected from a member of the charged enterprise. It was done for Huff's individual purpose. As described by the CHS, it did not enhance Mr. Wendt's position in the enterprise. The CHS's testimony undermines the centerpiece of the case against Mr. Wendt.

"No one can doubt that a confession by another party to the crime for which petitioner has been tried and convicted, if discovered after conviction, would be grounds for a new trial." *Casias v. United States,* 337 F.2d 354, 356 (10th Cir. 1964). As explained in *United States v. Davis,* 960 F.2d 820, 825–26 (9th Cir. 1992), where newly discovered evidence contradicts the only evidence of an essential element of the government's case presented by one witness whose account is undermined by the new

evidence, the granting of a new trial is in the interests of justice. The Court should grant Brian Wendt a new trial.

**JONATHAN NELSON.** At the outset of the evidentiary hearing, this Court specifically advised the parties that the Federal Rules of Evidence would govern. EH 9. The government's post-hearing arguments that, *as to Mr. Nelson*, the evidence presented by the CHS is not "newly discovered," rely on untested, unsourced, and inadmissible hearsay. The government had every opportunity to pursue admissible evidence on this topic at the evidentiary hearing but for purely strategic reasons decided not to do so.

The government concedes that it was "after the meeting" that Mr. Nelson was informed of Silva's death and that he was "upset when he received the news." ECF 4182 at 2. The government had no less than three witnesses who could have been asked about the specifics of this notification. It chose not to do so because the CHS has no personal knowledge of exactly what was said to Mr. Nelson nor his actual response. While, as this Court knows, the defense had no contact with the CHS until about an hour before she appeared in court, SA Hofmann had numerous opportunities in her own meetings with the CHS to get detailed information concerning her knowledge about this topic. Moreover, the government had every opportunity to examine SA Hofmann concerning the CHS's statements to her about this post-meeting call to Mr. Nelson. Again, it chose not to do so.

In light of the government's strategic decision to avoid this critical issue, it cannot now shift to Mr. Nelson the consequences of the lack of admissible evidence to *defeat* his new trial motion. There is no admissible evidence, even at this stage, upon which this Court can conclude that: 1) Mr. Nelson was told that it was Huff who killed Silva, 2) that Mr. Nelson was informed of the specific reasons why Silva was killed, or 3) that Mr. Nelson was aware that the CHS could offer admissible evidence at a trial that Huff repeatedly admitted to her in her home that he killed Silva, that he personally burned Silva's truck, and that he had admitted to her at a Fresno Hells Angels gathering that there was a serious problem because he, Silva, and Hardisty had misappropriated funds from their own narcotics trafficking activities.

The only *information* on this topic is an unsourced, inadmissible statement that Mr. Nelson was "upset when he received the news." ECF 4181 at 2, ll. 18–19. The government didn't ask the CHS

who told her this because it knows that it would not be admissible at trial and would actually demonstrate that Mr. Nelson did not sanction, approve of, or participate in the killing of Silva.

Nor was the government limited to these witnesses on this issue. The government has, as it has demonstrated in this case, vast power to compel testimony. If it had sought to compel testimony from some other person that would reveal more about what Mr. Nelson was and was not told and his reaction, it certainly could have done so. The lack of admissible evidence on this issue, even at this stage, must be construed against the government, as it asks this Court to impermissibly speculate and to rely for a ruling on that speculation.[1]

As a back-up argument, the government argues that even if at a new trial the CHS testified that Huff admitted to killing Silva because of what are clearly non-enterprise motives (i.e., the dishonest drug transaction of Hardisty, Silva, and Huff), Mr. Nelson would still be convicted of conspiracy to murder under a *Pinkerton* theory. ECF 4182 at 16. However, there is no evidence that Mr. Nelson agreed to engage in the Hardisty/Silva/Huff conspiracy to distribute narcotics that led to two of these co-conspirators agreeing to kill the third. The government also argues that it can obtain another conviction of Mr. Nelson for conspiracy to commit VICAR murder by taking some of the CHS's testimony as true, namely, that Huff is the person who killed Silva; by rejecting the exculpatory motive (as to Mr. Nelson) for that killing; and by substituting in its place the enterprise-related motive concocted by Hardisty—a motive for which there is no corroboration. ECF 4182 at 15. It certainly may attempt to do so at a new trial of Mr. Nelson on the conspiracy charges, but that is a question for a jury to decide. The government conveniently ignores the now well-established credibility issues that attend any testimony by Hardisty.

**CHRISTOPHER RANIERI.** Nothing in the government's opposition changes the fact that the newly discovered evidence is trustworthy, admissible, exculpatory, and impeaches Hardisty. Nothing in it changes the fact that the government violated Mr. Ranieri's *Brady* and *Napue/Giglio* rights. A new trial is warranted under the Rule 33, *Brady,* and *Napue/Giglio* standards.

[1] Of course, if this purported notification of Mr. Nelson were germane to this Court's resolution of the disputed issues, it was also well within its authority under FRE 614 to conduct its own examination of the witnesses on this topic.

**The evidence is newly discovered.** Huff's confession is newly discovered despite the government's assertion that Mr. Ranieri "… could have discovered such significant information … with minimal diligence." ECF 4182 at 5, ll. 7–9. Its claim is unsupported by evidence or legal authority. There is no evidence he or his defense team knew the CHS provided any information about this case to the government; or knew any of these facts before the government's post-trial disclosures; or failed to investigate or exercise due diligence regarding these facts before or after those disclosures. He could not have presented this evidence at trial. It is newly discovered to him.

**The government violated its *Brady* obligations.** The government maintains it did not violate its constitutional self-executing duty to disclose *Brady* material because it did not suppress this material as it disclosed it to the defense eight days after the NDCA prosecutor received "that report," i.e., SA Hofmann's September 24, 2024 report. ECF 4182 at 17. Its claim is misleading. Its reframing of its "possession" of this material as being no earlier than September 24, 2024, *id*. at 17–19, does not comport with the facts established at the evidentiary hearing. The government completely disregards the fact that it "possessed" the evidence that Huff killed Silva on November 27, 2023, when SA Hofmann interviewed the CHS as her notes of that interview, but not her contemporaneous report, reflect. The government only once mentions, nominally, that interview in its opposition. ECF 4182 at 2, ll. 2–3. This reframing is misleading. Its suppression of this material deprived the Court and the defense of the opportunity to present this evidence and use it to examine Hardisty, which could have left the Court with a materially different impression of his testimony at the then pending proceeding: the evidentiary hearing on Hardisty's post-trial texts to FBI Agent Lane exculpating Mr. Ranieri.

**Likely to result in acquittal.** The Court found the evidence that Mr. Ranieri knew of and agreed members of the HASC would engage in a pattern of racketeering activity, including at least two predicate acts, was "... thin—until, … his participation in the murder of Silva…. there is little evidence of his knowledge of any specific racketeering acts until the murder of Silva." ECF 3673 at 25. The Court found that Hardisty was the only witness for key evidence against Mr. Ranieri. ECF 3717 at 26. There is no VICAR or racketeering conspiracy without his testimony. Thus, the inferential value of any circumstantial evidence that may tend to implicate Mr. Ranieri hinges on his veracity. The Court found his testimony inconsistent and he had admitted having lied to FBI agents investigating

Silva's murder. ECF 3717 at 27. He also lied under oath at Mr. Ranieri's trial, as established by the government's CAST expert, and later lied under oath at the post-trial evidentiary hearing when he claimed he never lied under oath. ECF 2325 at 12–13.

The new evidence directly contradicts and impeaches Hardisty's testimony; exculpates Mr. Ranieri; inculpates Huff and Hardisty; provides their motive for killing Silva; and reveals Hardisty's motive to fabricate. It is consistent with his spontaneous confession to Ms. Chin; and his post-trial text to SA Lane that Mr. Ranieri was "not involved" in Silva's murder. Mr. Ranieri's VICAR and racketeering convictions are based on his allegedly having conspired to murder Silva. The new evidence compels that he be granted a new trial under Rule 33's would "probably produce an acquittal" standard; *Brady*'s "reasonable probability the result of the proceeding would be different," standard; and under the *Napue/Giglio* "reasonable likelihood the false testimony could have affected the judgment of the jury" standard.

**RAYMOND FOAKES.** The newly discovered evidence of Huff's confessions to the Silva murder exposes the falsity of the government's main trial theme in Trial 2 and requires a new trial.

**Newly discovered evidence.** The government cannot argue Mr. Foakes could have discovered the CHS's testimony. Mr. Foakes was in prison when Silva was murdered. The government has not shown he had any knowledge of Huff's or the CHS's activities. Even if another defendant knew about the evidence, that knowledge would not be imputed to Mr. Foakes, even under a joint defense agreement. *Stepney*, 246 F. Supp. 2d at 1076.

**Probably result in acquittal.** The government claims the CHS's testimony on Huff's confessions at most "call into question the specific detail from Hardisty's testimony" that Mr. Wendt confessed to shooting Silva. ECF 4182 at 16. But if Hardisty lied to the jury about that confession by Mr. Wendt, TT2 3862, a reasonable jury would also disbelieve Hardisty that Mr. Wendt exited a private discussion with Mr. Ranieri at his home and confessed to Hardisty the plan was to kill Silva. TT2 3854–55. Also, it is Hardisty's word alone that Mr. Nelson twice discussed with him the plan to murder Silva. TT2 3856–58. If the jury finds the CHS's testimony credible—just as SA Hofmann did, EH 114—and it concludes Hardisty lied to two separate juries, it would disbelieve his entire account

of incriminating statements by Mr. Wendt, Mr. Nelson, and Mr. Ranieri. A jury would find Huff's confessions corroborated and would reject Hardisty's testimony. *See, e.g.*, ECF 4181 at 11–12.

Huff's confessions establish the Silva murder was not part of the alleged HASC RICO conspiracy. This undermines Mr. Foakes's convictions for RICO conspiracy and VICAR assault, both of which are tied to the HASC racketeering enterprise. The government argued to the jury the Silva murder constituted five racketeering acts. TT2 6691 (murder, conspiracy to murder, arson, obstruction of justice, and witness intimidation). Although the jury acquitted Mr. Foakes of the special sentencing factor for premeditated murder, the jury instructions permitted it to use the Silva evidence for the five racketeering acts because murder as a racketeering act does not require premeditation. ECF 4116 at 12. The government invited the jury to do so, arguing that Mr. Foakes's telephone conversation with Stacie Silva after the Silva murder showed his agreement to participate in the HASC RICO conspiracy that included murder as a racketeering act. TT2 6616–17, 6676–79, 6699–701, 7009–10; *see* ECF 4133 at 9–10.

Without the five 2014 Silva racketeering acts, there is no "pattern of racketeering" or "threat of continued criminal activity" for a jury to find Mr. Foakes guilty. TT2 Jury Instr., ECF 3444, Nos. 46 & 49. Mr. Foakes's leadership role in HASC is not enough because the Hells Angels is a legally constituted organization. *See United States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012) ("the RICO conspiracy statute does not 'criminalize mere association with an enterprise'"). The Court pointed to Mr. Foakes's leadership role to infer his agreement that HASC would be conducted through a pattern of racketeering, but it acknowledged he went to prison in 2008, and the Order and the trial transcript do not identify any occasion where Mr. Foakes was kept informed of racketeering activity while incarcerated. *See* ECF 3673 at 15–17.

This leaves for pattern and continuity only the alleged 2008 Willits grow and the 2016 witness intimidation of Michelle Conte. The testimony on the 2008 Willits grow was that a friend of M.J.'s and Mr. Foakes, who was not a Hells Angels, came to move her to Russell Lyles's house in Willits in about 2008, where she had her own room, helped as needed (including watering marijuana plants), had use of a car to drive to her job, which was 45 minutes away, and possessed firearms. TT2 1161–63, 1177. There was no evidence at trial that the Willits grow house was an HASC enterprise activity,

and not Lyles's personal side endeavor. The next event was eight years later when Mr. Foakes was released from prison. He is accused of assaulting Troy Conte because he had an affair with Mr. Foakes's common law wife while he was in prison (not a racketeering act) and witness intimidation against Michelle Conte (a racketeering act). With the Silva racketeering acts discredited, the jury would probably acquit Mr. Foakes because his lengthy incarceration creates a reasonable doubt that "the acts of racketeering had a relationship to each other which posed a threat of continued criminal activity." ECF 3444, No. 49; *see Sun Sav. & Loan Ass'n v. Dierdorff*, 825 F.2d 187, 192 (9th Cir. 1988) (recognizing that "the pattern requirement should be interpreted to prevent the application of RICO to the perpetrators of 'isolated' or 'sporadic' criminal acts"). The government knew these two sporadic acts were not sufficient to convince a jury on pattern and continuity, and argued in Trial 2 that Mr. Foakes's alleged inaction following his conversation with Stacie Silva proved his agreement with an HASC RICO conspiracy that included murder as a racketeering act. With the five Silva racketeering acts discredited in a new trial by the Huff confessions, the jury would probably acquit Mr. Foakes.

## CONCLUSION

Thus, the new evidence indicates "'that a serious miscarriage of justice'" occurred and compels a new trial for each of the defendants. *United States v. Alston*, 974 F.2d 1206, 1211 (9th Cir. 1992) (citation omitted).

Dated: November 12, 2026

By: *s/ Richard G. Novak*
Richard G. Novak
On Behalf of All Defendants