CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

KEVIN J. BARRY (CABN 229748)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-6840
FAX: (415) 436-7234
Email: kevin.barry@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JONATHAN NELSON, et al.,<br><br>Defendants. | Case No. 17-CR-0533 EMC<br><br>**UNITED STATES' SECOND SUPPLEMENTAL OPPOSITION TO DEFENDANTS' MOTIONS FOR A NEW TRIAL UNDER RULE 33**<br><br>No Hearing Date Set<br><br>Hon. Edward M. Chen |

## INTRODUCTION

The government submits this second supplemental opposition to the Defendants' motions for a new trial under Rule 33 to address two issues with the Defendants' supplemental briefing in support of those motions. The Defendants' most recent submission suffers two principal defects: it ignores the standard for new trial based on "newly discovered evidence; and it fails to establish a claim for relief under *Brady*.

## LEGAL STANDARD

Rule 33 motions are generally disfavored and should be granted only in exceptional cases. *United States v. Del Toro-Barboza*, 673 F.3d 1136, 1153 (9th Cir. 2012). Defendants who seek to overturn jury verdicts bear a heavy burden in that they must establish a violation of due process so significant that there is a real concern that an innocent person has been convicted. *United States v. Barama*, No. 19-CR-00463-RS, 2023 WL 2530994, at *2 (N.D. Cal. Mar. 14, 2023). When defendants move for a new trial based on newly discovered evidence, their burden is especially high. To prevail, they must meet a five-part test, with the last part of the test being that the evidence must indicate that a new trial would probably result in acquittal. *United States v. Kulczyk*, 931 F.2d 542, 548 (9th Cir. 1991).

For a defendant to establish a *Brady* claim, the prosecution must have been in possession of evidence favorable to the defense; the government must have suppressed that evidence; and the defendant must have been prejudiced by that suppression. *Strickler v. Greene*, 527 U.S. 263, 282-83 (1999). With respect to the latter consideration, the analysis turns to "whether the lateness of the disclosure so prejudiced appellant's preparation or presentation of his defense that he was prevented from receiving his constitutionally guaranteed fair trial." *United States v. Miller*, 529 F.2d 1125, 1128 (9th Cir. 1976). Under this test, if "the defendant is presented with a substantial opportunity to use the belatedly disclosed evidence, there is no prejudice." *United States v. Alahmedalabdaloklah*, 94 F.4th 782, 828 (9th Cir. 2024). Alternately, if there is no proceeding that could be affected by the withheld information, there is no *Brady* violation. *Parker v. Cnty. of Riverside*, 78 F.4th 1109, 1113-14 (9th Cir. 2023)

## ARGUMENT

**<u>The Newly Discovered Evidence Would Not Likely Result In Acquittal</u>**

In a motion for a new trial based on newly discovered evidence, "the evidence must indicate that a new trial would probably result in acquittal." *Kulczyk*, 931 F.2d at 548. In its most recent briefing, the government discussed how the Defendants cannot meet their burden to satisfy this requirement. First, the jury would be unlikely to credit S.C.'s account because she is an unreliable narrator and has difficulty remembering details. Second, even within the evidentiary hearing, S.C.'s account was contradictory. For instance, she first testified that Huff claimed he killed Silva within the Hefferman family Tahoe, but she later changed her story and testified that Huff said that he killed Silva in Silva's own truck. As the government discussed previously, it is impossible to comprehend how a person could be confused about whether someone was murdered inside that person's vehicle. Third, S.C. also denied telling FBI agents information that they specifically detailed in reports and in their notes. Fourth, S.C. would be impeached through the factual inaccuracy of her account of the Silva homicide. Fifth, the weight of the evidence was so overwhelming that the addition of S.C.'s account of Huff's confession would have no effect on the outcome, let alone would likely result in an acquittal. If the Court were to grant a new trial, the government would put on the evidence that led to rapid verdicts in the first two trials. The defense would then call S.C., who would testify that Robbie Huff claimed that he is the one who killed Silva, and that he made this claim while threatening Hefferman and S.C. at gunpoint. The defense would offer no corroborating evidence or support.

The government would then impeach S.C. with: (1) her denials that she made statements to Special Agent Gina Hofmann that are recorded in the agent's notes and report; (2) her poor memory and inability to recollect critical details; (3) her contradictory testimony at the evidentiary hearing; (4) her factual inaccuracy about issues that should be within her knowledge, such as Levi Phipps's relationship with the Hefferman family and the lack of any phone call from Phipps to the Hefferman household the night after Silva disappeared; (5) her close relationship with the Defendants; and (6) the fact that she came forward with her account only after attending and listening to the trial.

This would be followed by a rebuttal case with evidence of the other disappearances and cremations by Hefferman and Levi Phipps. In closing argument, the government would highlight the

lack of factual support for S.C.'s assertions and would demonstrate how the trial evidence contradicts her account. It would also argue that even if S.C. accurately recounted what Huff said when he threatened her, it does not follow that Huff was telling the truth, for the reasons discussed in previous briefing.

Finally, even if a new jury were to fully accept S.C.'s testimony that Huff killed Silva, based on the trial evidence, the Defendants would still be liable for conspiracy to commit VICAR murder and VICAR murder, including through *Pinkerton* liability.

The Defendants' only path to address their failure to meet the requirements of Rule 33 is to misstate those requirements. The Defendants argue that to obtain a new trial, it is sufficient for them to present newly discovered evidence that the jury could weigh against the government's case.

> A new jury would decide whether it believes Huff's corroborated admissions to the murder and the coverup, or instead credits Hardisty's self-serving, ever changing, and recanted-then-reasserted story that the defendants planned and carried out the murder. Huff's admissions make more sense than Hardisty's version of the events and are supported by significant pieces of evidence . . . . Thus, a reasonable jury is likely to credit them.

Def. Suppl. Brief re: Evidentiary Hearing at 1.

> The jury could easily credit the CHS's testimony.

*Id.* at 10.

This is not the standard. To merit the extraordinary relief in which the Court would set aside the careful determination of a trial jury and grant a new trial based on "newly discovered evidence," the Defendants must convince the Court that their convictions represented a "manifest injustice," *United States v. Jenkins*, 10-CR-00882-JSW, 2011 WL 5079508, *2 (N.D. Cal., Oct. 25, 2011), and further, that this injustice would be cured through a new trial in which they would be likely to be acquitted. *Kulczyk*, 931 F.2d at 548. The Defendants assert that S.C.'s testimony would contradict the testimony of Joseph Hardisty, but the Court has already found that Hardisty's account of the Silva homicide was "substantially corroborated" by the wealth of other evidence the government presented at the trials. *See, e.g.*, ECF 3705 at 20 (Order Denying Group One Defendants' Rule 33 Motions); *id.* at 8-10 (summarizing that evidence).

S.C.'s testimony, if it were introduced at a new trial, would not change the outcome from two swift verdicts of guilty on all counts to the complete reversal of a likely acquittal.

**<u>There Is No *Brady* Violation</u>**

In her sworn testimony, Special Agent Hofmann explained that when S.C. first claimed that "Robbie killed Joe Silva" in November 2023, this information meant nothing to her. ECF 4175 at 131-32; 158. She also testified that she repeatedly made efforts to follow up on this claim, but S.C. continually resisted those efforts, claiming that she did not want to talk about it. *Id.* at 131-33; 154. For this reason, and because of the torrent of other information S.C. provided in that initial interview, SA Hofmann did not include this statement from S.C. in her report of the November 2023 interview. *Id.* at 133. Instead, in September 2024, once S.C. was willing to discuss her version of the Silva killing, SA Hofmann elicited as much of that account as she was able, and SA Hofmann memorialized that information in a September 25, 2024 report. Further, SA Hofmann researched whether this was connected to other investigations; she learned who the case agent was; and she informed the case agent about S.C.'s account.

These facts set September 2024 as the earliest date that S.C.'s information was within the knowledge of the government. The defense refuses to accept this reality, and instead insists that SA Hofmann must be lying. They assert that SA Hofmann must have known who Huff, Silva, Hardisty, and the Defendants were long before November 2023, speculating that this case "was likely the main topic of conversation for the Eastern District FBI, where she was agent." Def. Suppl. Mtn at 16-17. They go further: "Based on the evidence, it appears that [SA Hofmann] may have participated in suppressing this information." *Id.* at 17.

What the defense refuses to explain, however, is why SA Hofmann would conspire to hide information from the defense, from the NDCA case agent, and from the NDCA trial team in November 2023, only to reveal it in a detailed report in September 2024. Neither do they offer any explanation for why she would perjure herself about these topics in September 2026 when she testified about her interactions with S.C.

Thus, the Defendants fail in their efforts to assert that the information was known to the government and suppressed from November 2023 to September 2024.

The Defendants' *Brady* claim fails for the independent reason that the Defendants cannot explain what difference the purported failure to disclose S.C.'s November 2023 statement about the Silva homicide would have made in this case. Fundamental to a *Brady* claim is an assertion of prejudice; that is, the defendant was harmed by the suppression of exculpatory evidence. *Strickler*, 527 U.S. at 283. The only claim of prejudice the Defendants can offer is a claim that S.C.'s information would have had an effect on the new trial motions they were pursuing in light of Josephy Hardisty's text messages where he threatened to recant his testimony. It is impossible to see how this follows.

First, S.C.'s discussion of Huff's supposed confession to SA Hoffman took place on the same day as the November 27, 2023 evidentiary hearing with Joseph Hardisty. Even if the defense were to take the most expansive view possible of the imputation of government knowledge, there can be no support for the concept that information communicated to an agent in another district is *immediately* known to prosecutors conducting an evidentiary hearing in another district at the exact same time. Further, even if immediately known and disclosed, the information from S.C. that would be available to the Defendants was nothing more than an unsupported statement that "Robbie killed Joe Silva." If the Defendants sought to impeach Hardisty with it—"Are you aware that someone claims that Robbie Huff confessed to killing Joel Silva?"—there is nothing to suggest that Hardisty's response would differ in any way from the response he gave to the other challenges on cross examination in November 2023: "I told the truth when I was under oath." ECF 3641 at 119-20 (Transcript of November 27, 2023 hearing). As the Defendants acknowledge, the Court found Hardisty's account of what he meant in the texts at issue in the November 2023 evidentiary hearing to be credible. Def. Suppl. Mtn at 23 (citing ECF 3710 at 68).

Likewise, S.C.'s context- and corroboration-free statement, "Robbie killed Joe Silva" would not have persuaded the Court to rule differently on the Defendants' earlier Rule 33 motions. And the Court's rejection of their earlier Rule 33 motions did not preclude them from bringing the present motions in the wake of the government's disclosure of the September 2024 report. Rather, because of that disclosure, the Defendants have been able to develop the most fulsome record they could about S.C. assertion that Robbie Huff supposedly confessed to killing Joel Silva.

The disclosure of the September 2024 report and the litigation that followed it allowed the Defendants to: (1) learn the identity of S.C. on an Attorney's Eyes Only basis; (2) make efforts to contact S.C. directly to see if she were willing to meet with them and discuss what she had told SA Hofmann; (3) conduct their own investigation of S.C.'s claims; (4) disclose S.C.'s identity to their clients to aid in that investigation; (5) secure the testimony of S.C. at an evidentiary hearing where they questioned her under oath about Robbie Huff, what he had told her, and what S.C. had told SA Hofmann.

As the government has argued earlier, none of the Defendants' efforts has produced anything sufficient to meet the stringent requirements of a new trial. But in terms of the *Brady* analysis, the key point is that disclosure of S.C.'s information in November 2023 would have made no difference to any proceedings in this case. If the Court, based on the full record the defense developed through the government's disclosure of the September 2024 report, now finds a new trial is not warranted, there is no possibility the Court would have granted a Rule 33 motion based on any information disclosed in November 2023 or beyond. This is fatal to their *Brady* claim.

**CONCLUSION**

For all the reasons set forth above and in all the prior briefing, the Court should deny the Defendant's motions for a new trial and should let the juries' verdicts stand.

DATED: November 12, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

/s/ *Kevin J. Barry*
KEVIN J. BARRY
Assistant United States Attorney